**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN HOARE Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> ODDITY TECH LTD., ORAN HOLTZMAN, LINDSAY DRUCKER MANN, SHIRAN HOLTZMAN-EREL, MICHAEL FARELLO, LILACH PAYORSKI, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, ALLEN & COMPANY, BOFA SECURITIES INC., BARCLAYS CAPITAL INC., TRUIST SECURITIES, INC., JMP SECURITIES LLC, and KEYBANC CAPITAL MARKETS INC. <br><br> Defendants. | Case No. 1:24-CV-06571-MMG <br><br> CLASS ACTION |

**<u>MEMORANDUM OF LAW IN SUPPORT OF</u>**
**<u>DEFENDANTS' JOINT MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................1

BACKGROUND .....................................................................................................4

    A.    Oddity Acquired Il Makiage, a Legacy Retail Chain...................................4

    B.    Oddity's IPO. ..............................................................................................5

    C.    NINGI Attacks Oddity. ...............................................................................7

LEGAL STANDARDS ............................................................................................8

ARGUMENT ..........................................................................................................9

I.    PLAINTIFFS FAIL TO PLEAD A SECTION 11 CLAIM....................................9

    A.    Plaintiffs Fail To Allege a Material Misrepresentation in the Registration
        Statement.....................................................................................................9

        i.    No Misstatement About Oddity's Israeli Stores............................11

        ii.    No Misstatements About Technology or Marketing ......................12

        iii.    No Misstatement Regarding Lawsuits ...........................................16

    B.    Plaintiffs Fail To Plead Scienter..................................................................17

    C.    Plaintiffs Lack Standing and Suffered No Cognizable Loss.......................18

II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 15 OF THE
      SECURITIES ACT. ...............................................................................................19

III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) OF THE
       EXCHANGE ACT AND RULE 10B-5.................................................................20

    A.    Plaintiffs Fail To Allege Misleading Statements or Omissions. ................20

        i.    No Misstatements in Oddity's Registration Statement. .................20

        ii.    No Misstatements in Oddity's Earnings Releases and Form 20-F.21

    B.    Plaintiffs Fail to Allege a Strong Inference of Scienter. ...........................22

        i.    Plaintiffs Fail to Plead Motive and Opportunity. ..........................23

        ii.    Plaintiffs Fail to Plead Conscious Misbehavior or Recklessness. .24

    C.    Plaintiffs Fail to Allege Loss Causation.....................................................25

    D.    Plaintiffs Fail to Plausibly Allege Scheme Liability. ................................27

IV.    PLAINTIFFS FAIL TO PLEAD A SECTION 20(a) CLAIM. .............................27

CONCLUSION......................................................................................................29

**TABLE OF AUTHORITIES**

**Cases**

*Akerman v. Oryx Commc'ns., Inc.*, 810 F.2d 336 (2d Cir. 1987) ...................................................19

*Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351 (S.D.N.Y. 2010) .......................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .........................................................................................8

*ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ..........................8, 20, 22, 27

*Basic Inc. v. Levinson,* 485 U.S. 224 (1988)................................................................................12

*Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010)................................................................................................................................18

*Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32 (2d Cir. 2012) ..............................................................................................................................10

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013)..............................................................................................26

*Chan v. New Oriental Educ. & Tech. Grp. Inc.*, 2019 WL 2865452 (D.N.J. July 3, 2019)..........10

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379 (S.D.N.Y. 2020)....................................................................................................23

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206 (E.D.N.Y. 2019)................................................................................................................23

*Coronel v. Quanta Capital Holdings Ltd.*, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009)...............17

*Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ......................25

*Defeo v. IonQ, Inc.*, 2025 WL 1035292 (4th Cir. Apr. 8, 2025).................................................26

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187 (2d Cir. 2009)..............................................................................................................23

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169 (S.D.N.Y. 2000) ..............................................................................................................................17

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821 (S.D.N.Y. 2019)....................................................................................................16

*Helo v. Sema4 Holdings Corp.*, 2024 WL 3593677 (D. Conn. July 31, 2024) ............................17

*IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015)...................................................12

*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...............................................28

*In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008), *aff'd sub nom. Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010).....................................................25

*In re AOL Time Warner Sec. & ERISA Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004) ............18, 19

*In re Bristol–Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004)............................24

*In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009) .............................17

*In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ..................28

*In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352 (E.D.N.Y. 2013)............................................13, 27

*In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283 (S.D.N.Y. 2021).............................................9

*In re IPO Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ...........................................................18

*In re IPO Sec. Litig.*, 383 F. Supp. 2d 566 (S.D.N.Y. 2005) .............................................................8

*In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358 (E.D.N.Y. 2003).......................................22

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167 (2d Cir. 2011) ...............................19

*In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194 (S.D.N.Y. 1999)................................................28

*In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006)........................9

*In re Marsh & McLennan Cos. Sec. Litig.*, 536 F. Supp. 2d 313, 322 (S.D.N.Y. 2007)...............17

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...............................................................................................................12, 19

*In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000) ......................................14

*In re Omnicom Grp. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010).......................................................25

*In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019)................................12

*In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584 (S.D.N.Y. 2011)..........................................................................................................18

*In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23 (E.D.N.Y. 2021).......................................................17

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob.*, Ltd., 620 F.3d 137 (2d Cir. 2010)................................14

iii

*Lau v. Opera Ltd.*, 527 F. Supp. 3d 537 (S.D.N.Y. 2021) ...............................................................5

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)........................................................25

*Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144 (S.D.N.Y. 2015) .....................................24

*Liu v. Intercept Pharms., Inc.*, 2020 U.S. Dist. LEXIS 53252 (S.D.N.Y. Mar. 26, 2020) ..............................................................................................................................................28

*Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208 (E.D.N.Y. 2013) ...............................13

*Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774 (S.D.N.Y. 2020) ..................................10, 15, 26

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999) ......................................1

*Park Yield LLC v. Brown*, 2019 WL 6684127 (S.D.N.Y. Dec. 6, 2019).........................................11

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .................................................................. passim

*SEC v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022)...........................................................................27

*SEC v. First Jersey Sec.*, 101 F.3d 1450 (2d Cir. 1996) .................................................................28

*SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011) .....................................................................27

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007) ................................................4, 23

*Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323 (S.D.N.Y. 2011) ..............................................25

*Villare v. Abiomed, Inc.*, 2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) .......................................24

*Winter v. Stronghold Digital Mining, Inc.*, 686 F.Supp.3d 295 (S.D.N.Y. 2023) .........................14

*Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499 (S.D.N.Y. 2016)...............................20

*Zheng v. Pingtan Marine Enter.*, 379 F. Supp. 3d 164 (E.D.N.Y. 2019) ......................................29

**Statutes & Rules**

15 U.S.C. § 77k(a) ......................................................................................................................9, 13

15 U.S.C. § 77k(e) ...........................................................................................................................18

15 U.S.C. § 78u-4(b)(1)(B).................................................................................................................8

15 U.S.C. § 78u-4(b)(2)(A)...............................................................................................................23

PSLRA ...................................................................................................................................8, 22, 24

F.R.C.P. 8(a) ....................................................................................................................................10

F.R.C.P. 9(b) .............................................................................................................................8, 9, 10, 17

F.R.C.P. 12(b)(6) ..............................................................................................................................8

Defendants ODDITY Tech Ltd. ("Oddity"), Lindsay Drucker Mann and Michael Farello ("Individual Defendants"), and Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Allen & Company LLC, BofA Securities, Inc., Barclays Capital Inc., Truist Securities, Inc., JMP Securities LLC, and KeyBanc Capital Markets Inc. (collectively, "Underwriter Defendants" and, together with Oddity and Individual Defendants, the "Defendants")[1] respectfully submit this memorandum of law in support of their joint motion to dismiss the Amended Complaint ("Complaint" or "AC").

## **PRELIMINARY STATEMENT**

Plaintiffs parrot a self-interested short-seller, NINGI, in an attempt to manufacture a claim under the federal securities laws. Echoing baseless claims in a NINGI-issued report (the "Report"), Plaintiffs claim that the Company concealed its long-lasting operation of Israeli retail stores and misrepresented its use of technology. But Oddity's retail stores were always in plain view, and the Complaint is devoid of facts showing that any of the Company's statements touting its technology were misleading. Moreover, the Complaint should be dismissed for the independent reasons that (i) Plaintiffs have not adequately pleaded scienter, (ii) there can be no loss causation; no Plaintiff sold Oddity stock for less than the IPO price following the NINGI Report and, moreover, that Report—the sole alleged corrective disclosure—was admittedly based on public information, and (iii) Plaintiffs have not adequately alleged control person liability.

*    *    *

---

[1] Plaintiffs have not served Oran Holtzman, Shiran Holtzman-Erel or Lilach Payorski, so they are not parties to this action. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).

***Plaintiffs Plead No Actionable Misstatement or Omission***

Plaintiffs fail to allege that Oddity's disclosures were false or misleading. Specifically, Plaintiffs implausibly claim that Oddity concealed, in public filings, its continued operation of Israeli retail stores. But those stores were never a secret—indeed, they are the namesake of Oddity's flagship brand, Il Makiage, were open and available for all to see, were listed on Oddity websites, and offer the same products sold on Oddity's online platform. Oddity appropriately noted in its Registration Statement that its business was "almost entirely online"—reflecting the minor role of that legacy physical retail business in Oddity's current operations and financials, while acknowledging its continued existence.

Plaintiffs contend that Oddity misstated other aspects of its operations, such as its use of AI and the centrality of its technology. Oddity's statements about technology targeted by the Plaintiffs are inactionable corporate puffery. Even if they were actionable, the conclusory allegations from unidentified former employees who assert that Oddity is not a "tech company" fail because they contain nothing beyond generalized and vague statements, none of the individuals was a member of Oddity's "tech team", and none has any basis to dispute Oddity's disclosures (nor does so with any degree of specificity). Moreover, Plaintiffs' allegations that Oddity's "Registration Statement also does not disclose that Oddity uses social media marketing" and that it faces certain lawsuits (AC ¶¶ 121, 128) are belied by explicit disclosures of both topics in the Registration Statement. (Ex. 1 at 126, 132-33); (*Infra* Parts I.A and III.A.)

***Plaintiffs Fail to Plead Scienter***

Plaintiffs do not allege the requisite strong inference of scienter—*i.e.*, an intent to defraud. This requirement applies to each of Plaintiffs' claims—even the Securities Act claims—because they all sound in fraud. Yet Plaintiffs do not even attempt to allege scienter for their

Securities Act claims.  (*Infra* Part I.B.)  Plaintiffs' Exchange Act allegations rest on the unremarkable premise that Oddity and its CEO sold shares in the IPO, but the mere existence of an IPO (and routine executive stock sales) is insufficient to establish scienter. (*Infra* Part III.B.)

***Plaintiffs' Claims Independently Fail For Lack of Standing and Loss Causation***

The Complaint fails because the NINGI Report did not cause any cognizable losses to Plaintiffs.  Specifically, Plaintiffs' Securities Act claims fail because neither Plaintiff sold Oddity stock for less than the Offering Price *after the NINGI Report*.  Indeed, the Report allegedly caused the stock price to drop to $36—above the $35 IPO price—and it remained above $35 from the publication of the Report through the end of the Section 11 class period (July 19, 2024). Plaintiffs thus lack standing to bring Section 11 claims.  (*Infra* Part I.C.)

Moreover, to suffer *any* loss, Plaintiffs must identify some *new*, material information, the publication of which could plausibly have caused a stock decline.  But the only "new" information Plaintiffs identify was the issuance of the Report, which by its own admission reveals no "new" facts.  Although NINGI made the sensational *claim* that it was revealing previously undisclosed information, its Report *concedes* that the statements in the Report were "obtained from public sources" and moreover were *not* "statement[s] of fact".  (Ex. 3 at 1.) NINGI disclosed that it "will realize significant gains in the event that the prices of [Oddity's] securities decline"; that the Report reflects its own personal "opinions"; that its "opinions may prove to be substantially inaccurate"; and that it makes "no representation, express or implied, as to [their] accuracy".  (*Id.* at 1, 3.)  Courts repeatedly have instructed that allegations of short-sellers must be disregarded or at least severely discounted given the short-seller's interest in depressing the stock price.  That is especially apt as Oddity promptly denied NINGI's allegations, neither NINGI nor Plaintiffs disputed Oddity's response to the Report and, within

3

three weeks from publication, Oddity's stock price had more than fully rebounded.  (*Infra* Part III.C.)

### Plaintiffs' Control Person Claims Fail

Finally, Plaintiffs' control person claims fail because Plaintiffs cannot plead an underlying violation and, moreover, do not adequately plead that Individual Defendants engaged in the requisite control.  (*Infra* Parts II and IV.)

**BACKGROUND**[2]

### A.    Oddity Acquired Il Makiage, a Legacy Retail Chain.

The Il Makiage brand began in 1996 in Israel as a "cosmetics retail chain".  (AC ¶ 38.) "By 2013, Il Makiage's fortunes had faded", and it entered bankruptcy.  (AC ¶ 39.)  Oran Holtzman purchased the business out of bankruptcy, believing it offered a "potential for growth". (AC ¶¶ 39, 49.)  Mr. Holtzman rebuilt it, and over the next several years, "managed to make its Israel stores and beauty schools profitable".  (AC ¶ 40.)

Oddity's operation of Il Makiage stores in Israel has never been secret.  The investment firm L.Catterton publicly announced, in connection with its investment in Oddity in 2017, that "[i]n addition to its boutiques, the company [Il Makiage] operates a network of makeup artist academies".  (AC ¶ 51.)  L.Catterton's investments are mentioned throughout the Registration Statement. (Ex. 1 at 164-65.)  Plaintiffs also reproduce a photograph of Mr. Holtzman in an Israeli store—taken from a 2018 Oddity company profile—and several photographs of branded brick-and-mortar stores in Israel taken this year.  (AC ¶¶ 41, 46-48; Ex. 7.)  Il Makiage's Israel

---

[2] For purposes of this Motion to Dismiss, Oddity accepts the pleaded facts, as it must at this stage.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  For the avoidance of doubt, Oddity disputes many of the facts and will prove their falsity should the case proceed (which it ought not to).

website has a "stores" tab and even displays its stores on a map.  (Ex. 6.)[3]  It was public

knowledge that Il Makiage's brick-and-mortar business in Israel remains active.

As Oddity's online business expanded, the Israeli brick-and-mortar business became—

and remains—an immaterial part of Oddity's business.  The lion's share of Oddity's revenue—

approximately 75%—is generated through the United States. (Ex. 1 at 87.)[4]  Oddity's ex-U.S.

operations (from Israel, Canada, the UK, Europe and Australia), *in aggregate*, account for the

remainder.  (*Id*.)  Shortly after NINGI's report, Oddity explained that the Israel stores accounted

for less than 5% of its net revenue and EBITDA.[5]  (Ex. 4 at 1.)  Neither NINGI nor Plaintiffs

disputed this.

**B.    Oddity's IPO.**

On July 19, 2023—the start of the putative class period—Oddity conducted its IPO at a

$35.00/share offering price.  (AC ¶ 1, 97.)  In its Registration Statement, Oddity explained that it

is a "consumer tech platform that is built to transform the global beauty and wellness market"

and has been working to "transform[] the shopping experience" to "bring visitors to our website,

turn them into users by asking questions and learning about them, and then leverage the data we

have across the platform to convert them into paying customers".  (AC ¶ 118.)  Oddity "invest[s]

---

[3] The Complaint refers to the number of retail stores in Israel.  (AC ¶ 42.)  Plaintiffs' Complaint extensively refers to the NINGI Report and appears to rely on the NINGI Report for this specific information, which in turn sources it from the Il Makiage website, Google Maps and "news reports".  (Ex. 3 at 6.)  The Court may take judicial notice of such information.  *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 550 (S.D.N.Y. 2021).

[4] The Court may consider documents referenced in the Complaint, including the Form F-1 Registration Statement.  *Lau*, 527 F. Supp. 3d at 550.

[5] The Court may take judicial notice of information that was in Plaintiffs' possession when they filed the Complaint.  *Lau*, 527 F. Supp. 3d at 550.  Indeed, Plaintiffs' original Complaint referred to and quoted from Oddity's response, and never asserted that this statement was false or misleading.  (Dkt. 1 ¶ 58.)

heavily in data science, machine learning, and computer vision." (*Id.*) While Oddity's "competitive strengths" are its data-centric online platform (AC ¶ 162), Oddity also disclosed that it was not wholly digital, describing its operations as "almost entirely online" (AC ¶ 118). Oddity likewise reported lease agreements, noting that some were for stores. (Ex. 1 at F-21.)

Oddity also detailed various aspects of its business:

**Technology.** The Registration Statement disclosed that when a consumer visits an Oddity-brand website, it begins by "asking questions" about the consumer. (*Id.* at 1.) These answers, in conjunction with Oddity's "1 billion unique data points on [] users' beauty preferences", are then "used across multiple vectors, including product recommendations, remarketing and retargeting, new product and brand development, and machine learning". (*Id.* at 4, 110.)

In 2023, Oddity acquired Revela, its molecular discovery technology, rebranded "ODDITY LABS", and an R&D arm focused on using biotech and bio-chemistry technology along with a machine-learning tool developed by Revela in product development. (*Id.* at 7.)

**Marketing and Sales Strategy.** The Registration Statement disclosed that Oddity's "success is impacted not only by [its] ability to use data to convert users to customers, but also by [its] ability to retain [] customers and drive repeat purchases." (*Id.* at 86.) In addition to "driv[ing] high levels of [] engagement" with its consumer-facing online brands, Oddity also "invest[s] strategically in performance marketing, such as paid search and product listing advertisements" and "paid social media advertisements". (*Id.*) Oddity warned that "if consumers perceive us as being irresponsible or untruthful in our marketing" or if there are "[n]egative posts or comments about us", that "could damage our brand and reputation". (*Id.* at 45.)

**Legal Proceedings.**  The Registration Statement also disclosed that Oddity is susceptible to litigation and is "*currently involved in*, and may in the future be involved in, legal proceedings, claims, and government investigations".  (AC ¶ 128 (emphasis added).)  It further explained that " [it] believe[s] that the final outcomes of any pending matters will not, either individually or in the aggregate, have a material adverse effect on [its] business, financial condition and results of operations."  (*Id.*)  Indeed, the proceedings referred to were—with some exceptions—small claims proceedings related to "spam texts or spam mail".  (AC ¶ 66; Ex. 4 at 1.)  Oddity also disclosed that it is subject to laws for "automatically renewing subscription services", which could result in "substantial legal fees and costs and reputational harm".  (Ex. 1 at 45.)

## C.    NINGI Attacks Oddity.

On May 21, 2024, NINGI Research—a short-seller seeking to profit on the *decline* of Oddity's stock—published a report claiming that Oddity "misled investors about every critical aspect of its business".  (Ex. 3 at 3.)  The Report reveals that NINGI is "short [on] ODDITY" and "will realize significant gains in the event that the prices of [Oddity's] securities decline".  (*Id.* at 1, 3.)  NINGI disclaimed any "representation, express or implied, as to the accuracy" "of "any . . . information" in the Report.  (*Id.* at 1.)  NINGI emphasized that the "report is . . . an opinion, not a statement of fact".  (*Id.*)  NINGI disclosed that its Report is based on information "obtained from public sources" and interviews supposedly conducted with unnamed former employees.  (*Id.* at 1, 3.)

The gravamen is that it is NINGI's *opinion* that Oddity "conceal[ed] a large brick-and-mortar business and sales generated by dishonest tactics."  (*Id.* at 3.)  The Report also claims that "ODDITY's product-matching technology is akin to 'a normal questionnaire'"; "ODDITY's

7

digital growth is its non-cancelable subscriptions"; the "Better Business Bureau (BBB) and social media are flooded with complaints"; and Oddity failed to disclose lawsuits "alleging unpaid bills and violations of consumer protection laws". (*Id.* at 4-5.) The Report repeatedly qualifies these allegations, conceding that they are based on NINGI's "*opinion* [that] the claim that ODDITY is using AI is just a lie", and that it is just its *"opinion* [that] ODDITY is not a cutting-edge tech company". (*Id*. at 9, 26 (emphases added).)

After publication of the Report, Oddity's share price fell (to $36.67 on May 23), but remained over the $35 offering price. (AC ¶ 10.) Even that drop was short-lived—within three weeks of the Report and Oddity's response (Ex. 4), the price rebounded to higher than pre-Report levels, trading at $44.31 by June 7. (Ex. 5.)[6]

## LEGAL STANDARDS

To withstand a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court must accept well-pleaded facts, mere "labels and conclusions" or "[t]hreadbare recitals of the elements of a cause of action" are disregarded. *Id*.

Plaintiffs' Exchange Act claims are governed by the heightened pleading standards of the PSLRA. Plaintiffs must specify "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading". 15 U.S.C. § 78u-4(b)(1)(B). Plaintiffs also must satisfy the "exacting pleading requirements" of Rule 9(b), requiring that "the circumstances constituting fraud . . . shall be stated with particularity". *See ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

---

[6] The Court "may take judicial notice of well-publicized stock prices". *In re IPO Sec. Litig.*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005).

Because Plaintiffs' Securities Act claims are based on the same allegations as their Exchange Act claims, they "sound in fraud" and are also subject to Rule 9(b). *Rombach v. Chang*, 355 F.3d 164, 171-72 (2d Cir. 2004); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 299 n.17 (S.D.N.Y. 2021). Indeed, the allegations to support Plaintiffs' Securities Act claims are deployed verbatim to support their Exchange Act securities fraud claims.[7] (AC ¶ 153.) "Allowing plaintiffs to allege fraud [for the majority of the Complaint] and then withdraw those claims for [a subset of their claims] in order to state a Section 11 claim eviscerates Rule 9(b)'s mandate to 'safeguard a defendant's reputation from improvident charges of wrongdoing.'" *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 492 (S.D.N.Y. 2006) (internal citation omitted). Regardless of the pleading standard, however, dismissal is appropriate.

**ARGUMENT**

I.      **PLAINTIFFS FAIL TO PLEAD A SECTION 11 CLAIM.[8]**

      A.      **Plaintiffs Fail To Allege a Material Misrepresentation in the Registration Statement.**

Under Section 11 of the Securities Act, a plaintiff must allege that a registration statement either (1) contained an untrue statement of material fact, (2) omitted to state a material fact required to be stated therein, or (3) omitted to state a material fact necessary to make the statements therein not misleading. 15 U.S.C. § 77k(a). Plaintiffs fail to do so.

---

[7] Plaintiffs' Section 11 claim "incorporate[s] by reference and reallege[s] each and every allegation contained above". (AC ¶ 131.) That includes further insinuations of fraud, *e.g.* comments from a Facebook group called "Il Makiage is a Fraud", a Reddit comment that they were "called by their bank's fraud department", and a complaint alleging "unauthorized fraudulent charges". (AC ¶ 87.)

[8] The Section 11 claim is brought against "all Defendants". (AC ¶ 132.)

9

*First*, Plaintiffs fail to identify the specific alleged misstatements, and instead quote full paragraphs (or pages) from the Registration Statement.   "[L]eaving the District Court to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false" falls "far short" of Rule 9(b)'s requirements.  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012); *see Rombach*, 355 F.3d at 171 (applying particularity requirement to Section 11 claim sounding in fraud).[9]

*Second*, Plaintiffs' allegations are parroted from the Report issued by NINGI, a short-seller with "an obvious motive to exaggerate the infirmities of the securities in which they speculate".  *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).  NINGI's allegations must be approached with "caution and care".  *Id*.  Moreover, "the *complaint* must rise or fall on allegations about defendant['s] conduct and not on wide-eyed citation to the gratuitous commentary of outsiders."  *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, 2019 WL 2865452, at *7 (D.N.J. July 3, 2019).

Indeed, the bulk of Plaintiffs' allegations are based on blind reliance on the Report, in which NINGI disclaims that it "makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information" contained therein.  (Ex. 3 at 1); *see Long Miao*, 442 F. Supp. 3d at 804 (dismissing complaint that relied on an uncorroborated short-seller report).  Plaintiffs' reliance on NINGI's biased "*opinion*" synthesized from information "obtained from public sources" and unnamed "former employees" of unspecified position (Ex. 3

---

[9] Plaintiffs' failure to identify specific alleged misstatements also violates Rule 8(a)'s mandate that they plead "a short and plain statement showing that the pleader is entitled to relief".  Defendants are entitled to know which statements Plaintiffs contend are false or misleading.

10

at 1, 3) is insufficient.  And Plaintiffs' alleged confidential witnesses add nothing for the reasons discussed below.

Third, Plaintiffs fail to plead facts to show the Registration Statement contained a material misrepresentation or omission.

### i.    No Misstatement About Oddity's Israeli Stores

Plaintiffs allege that the Registration Statement misled investors into believing that Oddity does not operate *any* retail stores.  (AC ¶¶ 25, 45, 90, 94-95, 125-26.)  Yet as Plaintiffs themselves acknowledge, Oddity's purchase of the Israel Il Makiage stores out of bankruptcy was publicly known. (AC ¶¶ 38-42, 51.)  In fact, the Registration Statements disclosed its lease agreements for stores (*see* Ex. 1 at F-21) and that its operations were "*almost* entirely online". (Ex. 1 at 114 (emphasis added).)  All of that was true.  Investors were informed that Oddity was largely—but not entirely—digital, and that a small portion of the Company was retail stores.

Moreover, these stores were never concealed—they were open and available for all to see. *See Park Yield LLC v. Brown*, 2019 WL 6684127 at *8 (S.D.N.Y. Dec. 6, 2019) (defendants had no duty to disclose information that plaintiff "could have easily learned about . . . through, for example, a quick internet search").  The Report even explains that "a quick search on Google Maps brings up dozens of retail stores".  (Ex. 3 at 6.)  Each location is listed on Il Makiage Israel's website itself.  (Ex. 6.)  The Complaint further refers to an image of Mr. Holtzman posing in front of a store, published in a 2018 Company profile on Ynet.  (AC ¶ 41; Ex. 7.)  All of these sources were available at the time of Oddity's IPO, and "Section 11 . . . do[es] not require the disclosure of publicly available information." *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003).

Further, Plaintiffs do not (because they cannot) identify any duty to disclose the number of Israeli stores or employees.  Nor do Plaintiffs allege how such information would be material to investors, as it must be to render an omission actionable.  *See Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988).  To the contrary, "a misstatement related to less than 5% of a financial statement carries the preliminary assumption of immateriality".  *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015).  Plaintiffs do not allege that any omission relating to the Israeli stores affects more than 5% of its financials.  Indeed, Plaintiffs never challenged as false or misleading Oddity's disclosure (in response to NINGI) that Israeli stores accounted for *less than 5%* of its net revenue and EBITDA, despite referencing Oddity's response in their original Complaint. (Ex. 4 at 1; Complaint ¶ 58.)

Finally, while Plaintiffs allege that the (unquantified) "costs" of maintaining retail locations would be relevant to investors (AC ¶ 45), they do not allege that those costs were omitted from Oddity's financials.  Plaintiffs concede that these stores are "profitable"— generating revenues *exceeding* their costs. (AC ¶ 40.)  And Plaintiffs ignore that the cost of leases (including store leases) were specifically disclosed (*see* Ex. 1 at F-21).  Plaintiffs do not (and cannot) advance any cogent theory that any alleged omission of a very small, publicly known and profitable part of Oddity's business would have been material.  *See In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *6 (S.D.N.Y. Sept. 27, 2019).

### ii.   No Misstatements About Technology or Marketing

#### (1)   Technology

Plaintiffs broadly contend that Oddity "overstate[s] its AI technology".  (AC ¶ 114.)  Yet Plaintiffs do not—and have no basis to—challenge Oddity's detailed explanations of its

technology, including its "tech team" comprising "40% of [its] headcount" or the "1 billion unique data points" that it uses for real-time product recommendations.  (Ex. 1 at 85, 115.)

*First*, many of the challenged statements are inactionable puffery, which, as the Second Circuit has explained, "do[es] not give rise to securities violations." *Rombach*, 355 F.3d at 174. For example, Oddity's statement that it is "seeking to reinvent every aspect of a massive industry," and statements about its "significant potential to grow [its] existing brands and to disrupt additional product categories" (AC ¶ 118), are the types of expressions that courts repeatedly have held are "too general to cause reliance by a reasonable investor".  *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013); *Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 220 (E.D.N.Y. 2013) ("[Defendant's] statement that [company] 'can continue to provide superior products, superior customer service, and compete aggressively, and continue to grow' is quintessential inactionable puffery.")

*Second,* Plaintiffs complain that they "have still not seen release" of Oddity's applications of its "hyperspectral imaging systems".  (AC ¶¶ 59-60.)  In doing so, Plaintiffs quote a purported statement not contained in the Registration Statement, which discusses how Oddity "will leverage" the technology.  (AC ¶ 60.)  Plaintiffs provide no source, and Section 11 is limited to misstatements in a registration statement.  15 U.S.C. § 77k(a).  More importantly, the fact that Plaintiffs have *yet* to see release of certain technology in a consumer-facing application does not mean a prior forward-looking statement was false.  In the Registration Statement, Oddity disclosed that it acquired Voyage81, which developed hyperspectral imaging technology; and that Oddity "believe[s] this imaging technology" will allow it to expand its "product capabilities".  (Ex. 1 at 118.)  Oddity did not make any representation as to *when* such technology would be released, and in what manner it would be used, and thus Plaintiffs cannot

13

demonstrate that the statement was false or misleading merely by alleging that consumers have not yet seen release. *See Winter v. Stronghold Digital Mining, Inc.*, 686 F. Supp. 3d 295, 307 (S.D.N.Y. 2023) (considering the "'truth of a statement made in the registration statement' as 'judged by the facts as they existed when the registration statement became effective'").

Moreover, these statements are classic "forward-looking statement[s] accompanied by sufficient cautionary language", which also are "not actionable". *See Iowa Pub. Emps.' Ret. Sys. v. MF Glob.*, Ltd., 620 F.3d 137, 141 (2d Cir. 2010). The Registration Statement disclosed that Oddity may "fail[] to successfully complete the integration of any acquired business or to achieve the long-term plan for such business", including Voyage81 and its hyperspectral imaging technology. (Ex. 1 at 71.) Plaintiffs allege no facts suggesting Oddity's statement about the future promise of this technology was not a genuinely-held belief of its future applications. *See In re N. Telecom Ltd. Sec. Litig*., 116 F. Supp. 2d 446, 467 (S.D.N.Y. 2000).

*Third,* Plaintiffs repeat allegations from the Report that the "PowerMatch/SpoiledBrain technology was not, as advertised, based on a proprietary algorithm". (AC ¶ 62.) Plaintiffs' only support for this allegation is a 2020 interview—three years *prior* to the Registration Statement— in which Shiran Holtzman, Oddity's Chief Product Officer, described SpoiledBrain's product-matching algorithm as "simple questions with four possible answers" and supposedly "did not mention AI". (AC¶ 63.) The fact that Ms. Holtzman did not mention AI *in a 2020* interview says nothing about the PowerMatch/Spoiled Brain technology *in 2023*. Plaintiffs do nothing to bridge this gap. Moreover, there was nothing concealed about SpoiledBrain's user questions. In its Registration Statement, Oddity disclosed that it asks questions of its online visitors, and used the answers to "buil[d] a platform of over 40 million users" with "over 1 billion unique data points". (Ex. 1 at 110.) Oddity uses "real-time predictions drawn from [its] pool of user data".

14

(*Id.* at 118.)  The "simple questions" were disclosed.  (*Id.* at 110.)  Furthermore, the allegations centering on the user interface (the "simple questions") have no bearing on the Company's statements about AI-use, which refer to back-end systems used to process the data. As is the case with most AI-powered services, users interact through conventional interfaces while the complex AI-powered components are inaccessible to the user.

*Fourth*, Plaintiffs attempt to utilize confidential witnesses ("CWs") to bolster their claims that Oddity "is not a technology company".  (*See* AC ¶¶ 54-58.)  None are alleged to have been on Oddity's technology team— its "largest" team "compris[ing] over 40% of [its] headcount". (Ex. 1 at 2.)  The generalized statements attributed to the CWs should thus be discredited as "descriptions [that] do not suggest that they had been in [a] position to know the facts attributed to them."  *Long Miao*, 442 F. Supp. 3d at 799.

### (2)    Marketing and Advertising

Plaintiffs allege that Oddity understated the extent it relies on conventional marketing and advertising and failed to "disclose that Oddity uses social media marketing and promotion practices to generate sales". (AC ¶¶ 120-21.)

Plaintiffs ignore the explicit disclosures of Oddity's marketing strategies.  Oddity disclosed that it "invest[s] strategically in performance marketing, such as paid search and product listing advertisements" and "paid social media advertisements".  (Ex. 1 at 86.)  Oddity warned that its "business depends on [its] ability to maintain a strong base of engaged customers and content creators, including through the use of social media" and "a variety of marketing

15

channels". (*Id.* at 10, 126.) [10] Oddity's use of social media is mentioned *25 times*; marketing is mentioned *98 times* in the Registration Statement.

Plaintiffs also wrongly assert that "Oddity did not disclose the risks of the 'try-before-you-buy's program design'". (AC ¶ 124.) The Registration Statement disclosed that through the "'Try Before You Buy' program", customers "pay[] only for the products they keep after the trial period", and Oddity does "not resell returned products". (Ex. 1 at 32.) Oddity warned investors: "Product returns could harm our business." (*Id.*) Having disclosed precisely the risks Plaintiffs complain of, there is no actionable statement regarding Oddity's sales and marketing practices. *See Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 838 (S.D.N.Y. 2019).

### iii.    No Misstatement Regarding Lawsuits

Plaintiffs claim that Oddity "failed to include material facts revealing the true scope and severity of Oddity's and/or subsidiaries' legal issues and related lawsuits". (AC ¶¶ 128-30.) Plaintiffs restate—almost verbatim—the Report's references to small claims lawsuits in Israel and vaguely referenced class action suits. (*Compare* AC ¶¶ 64-79 *with* Ex. 3 at 35-39.)

But Oddity's Registration Statement *did* disclose that Oddity is "currently involved in, and may in the future be involved in, legal proceedings" and that it "believe[s] that the final outcomes of any pending matters will not, either individually or in the aggregate, have a material adverse effect on our business". (Ex. 1 at 132-33.) It also disclosed that it accrues loss contingencies on its balance sheet for litigation "when a loss is probable". (*Id.* at F-20.)

---

[10] Oddity also warned that "if consumers perceive us as being irresponsible or untruthful in our marketing and advertising" or if there are "negative posts or comments " that "could damage our brand and reputation". (Ex. 1 at 45.)

Plaintiffs do not plausibly allege that any of the legal proceedings had a material effect on Oddity's business, or that these disclosures were otherwise misleading. And Oddity is not required to disclose immaterial legal proceedings. *See In re Marsh & McLennan Cos. Sec. Litig.*, 536 F. Supp. 2d 313, 322 (S.D.N.Y. 2007); *see also In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 36 (E.D.N.Y. 2021) (it "is the absolute effect on the company. . . that determines materiality").

## B.    Plaintiffs Fail To Plead Scienter.

Because "Rule 9(b) requires that all averments of fraud be stated with particularity . . . that long has meant the plaintiff must allege with particularity the circumstances constituting the fraud *and scienter*." *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 174 (S.D.N.Y. 2000) (emphasis in original). Accordingly, where a Section 11 claim sounds in fraud, a plaintiff must "convey through factual allegations that the defendants made materially false statements, and that they did so with *scienter*." *Coronel v. Quanta Capital Holdings Ltd.*, 2009 WL 174656, at *15–16 (S.D.N.Y. Jan. 26, 2009).

Plaintiffs make no scienter allegations for their Section 11 claims, and they should be dismissed also on this basis. Even assuming Plaintiffs' scienter allegations in support of their Section 10(b) claim applied to their Section 11 claim, those would fail for the reasons discussed *infra* Section III.B. And the Complaint contains no scienter allegations whatsoever against the Individual Defendants or Underwriter Defendants. "In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *Helo v. Sema4 Holdings Corp.*, 2024 WL 3593677, at *10 (D. Conn. July 31, 2024) (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009)).

## C.    Plaintiffs Lack Standing and Suffered No Cognizable Loss.

Section 11 claims should be dismissed where "the absence of loss causation is apparent on the face of the complaint". *Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at \*11 (S.D.N.Y. Jan. 14, 2010); *see also In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011).  Moreover, when Plaintiffs fail to allege cognizable losses, their claims must be dismissed for lack of jurisdiction.  *See In re AOL Time Warner Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 245-46 (S.D.N.Y. 2004).

"[B]ased on the plain language of Section 11 and its legislative history, a plaintiff who sells a security above its offering price has no cognizable damages under Section 11".  *In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 351 (S.D.N.Y. 2003); *see* 15 U.S.C. § 77k(e).  Plaintiffs concede this principle.  (AC ¶ 139 ("Purchasers of Oddity common stock who sold shares prior to July 19, 2024 at a price below $35.00 are entitled to recover damages").)  But Plaintiffs allege that the Report revealed the truth about Oddity, causing the stock price to close after its publication at $37.97 on May 21 (and $36.67 on May 23)—*above the Offering Price.*  (AC ¶ 110.)  Indeed, following the Report, Oddity's stock price always remained above $35.00 through July 19.  (Ex. 5.)

It is thus unsurprising that neither Plaintiff sold Oddity stock below $35.00 following the Report; consequently, neither suffered cognizable injury.  (Dkt. 15-2, 17-1.)  Lead Plaintiff Alex Gordon did not sell Oddity stock at any time, and suffered no loss. 15 U.S.C. § 77k(e).[11]  Plaintiff Brian Hoare alleges sales of Oddity stock at $34.53 and $34.52, but those were completed on

---

[11] The IPO was not greater than the value of any Oddity stock held as of the Complaint, an alternative measure of damages.  15 U.S.C. § 77k(e).  Oddity traded above $40.00 on July 19, 2024.  (Ex. 5.)

May 3, 2024—*before* the Report (Dkt. 15-2). Losses resulting from sales made before the alleged truth was "revealed" could not have been caused by a Section 11 violation as a matter of law. *Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 371-72 (S.D.N.Y. 2010); *In re Merrill Lynch & Co.*, 272 F. Supp. 2d at 253–55; *see also Akerman v. Oryx Commc'ns., Inc.*, 810 F.2d 336, 342 (2d Cir. 1987). Because neither Plaintiff suffered any cognizable injury, they lack standing to bring a Section 11 claim and their claims should be dismissed for lack of jurisdiction. *See In re AOL*, 381 F. Supp. 2d at 245-46.

Moreover, as an independent basis for dismissal, the face of the Complaint shows that the Report did not cause Plaintiffs' alleged losses, for the reasons discussed *infra* Part III.C.

## II. PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 15 OF THE SECURITIES ACT.[12]

To state a claim under Section 15 of the Securities Act, a plaintiff must allege (i) a "primary violation" of Section 11 and (ii) control by the defendant of the primary violator. *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011).

*First*, because Plaintiffs have failed adequately to allege a primary violation of Section 11 of the Securities Act, for the reasons described above (Part I, *supra*), Plaintiffs' claims under Section 15 also fail. *See Rombach*, 355 F.3d at 177-78.

*Second*, even if they had adequately stated a Section 11 claim, Plaintiffs have not alleged the requisite control. Plaintiffs merely allege that "[t]he Individual Defendants were controlling persons of Oddity by virtue of their positions as directors or senior officers". (AC ¶ 148.) That conclusory allegation is insufficient to plead control. *See Youngers v. Virtus Inv. Partners Inc.*,

---

[12] The Section 15 claims are brought against all "Individual Defendants"—for purposes of this motion, Ms. Drucker Mann and Mr. Farello. (AC ¶¶ 147-48.)

195 F. Supp. 3d 499, 524-25 (S.D.N.Y. 2016). There are no allegations showing that either Ms. Drucker Mann or Mr. Farello exercised managerial control.

### III. PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5.[13]

To state a Section 10(b) Exchange Act claim, a plaintiff must allege that each defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury [called 'loss causation']". *ATSI*, 493 F.3d at 105. Plaintiffs' Section 10(b) claim should be dismissed because Plaintiffs have not adequately alleged any misstatements, pled with particularity facts giving rise to scienter, or adequately alleged that their losses were caused by any actionable misstatement or omission.

### A. Plaintiffs Fail To Allege Misleading Statements or Omissions.

#### i. No Misstatements in Oddity's Registration Statement.

In asserting their Exchange Act claims, "Plaintiffs incorporate by reference and reallege each and every allegation contained above", *i.e.*, their claims as to the Registration Statement. (*see* AC ¶ 153.) Because the Registration Statement does not contain any false or misleading statements for the reasons described above, Plaintiffs' 10(b) claims similarly fail as to those statements. (*See* Part I.A, *supra.*)

---

[13] The Section 10(b) claim is brought against Oddity and Mr. Holtzman. (AC ¶ 191.) As Mr. Holtzman has not been served, the motion to dismiss the Section 10(b) claim is brought by Oddity.

### ii.    No Misstatements in Oddity's Earnings Releases and Form 20-F.

The alleged misstatements in the Form 20-F and earnings releases are nearly identical to those in the Registration Statement (*see, e.g.*, AC ¶¶ 157-164.), and thus Plaintiffs' 10(b) claims fail for the same reasons (*see* Part I.A, *supra*.)

### (1)    No Misstatements Regarding AI.

Plaintiffs claim that Oddity's earnings releases and Form 20-F, like its Registration Statement, "overstated Oddity's AI technology and capabilities, and/or the extent to which this technology drove its sales". (AC ¶ 160.)

Plaintiffs challenge statements from Oddity's earnings releases in which Mr. Holtzman characterized Oddity's earnings and performance as positive. (AC ¶¶ 157-59.) Plaintiffs do *not* allege that Oddity had not achieved those earnings, but instead distort the statements to imply that "Oddity's sales and growth were primarily the result of its use of AI". (AC ¶ 160.) Not so. Instead, each statement describes Oddity's efforts to "***transform*** the global beauty and wellness market through technology", to leverage technology to "***build***[] powerful engines" and "***grow*** fast", and Oddity's "large investments" in technology. (AC ¶¶ 157-59.) Nothing about those statements attributes sales primarily to AI. Moreover, these statements are plainly forward-looking and inactionable as corporate puffery, and Plaintiffs thus fail to set forth any creditable challenge to them. *See Rombach*, 355 F.3d at 174.

Plaintiffs' similar criticism regarding Oddity's Form 20-F also fails. The 20-F never asserts that sales are "primarily" driven by AI or other technology, and Oddity never disclaims the use of "marketing, advertising and subscription sales". (*See* AC ¶ 163). To the contrary, as with the Registration Statement, the 20-F explains that Oddity "acquire[s] new users through a variety of marketing channels including social media, search engine optimization and brand-

21

oriented marketing campaigns". (Ex. 2 at 72-74.) The 20-F also discloses Oddity's promotional practices. (*Id.* at 17.)

### (2)   No Misstatements About Oddity's Israeli Stores.

Plaintiffs aver that Oddity failed to disclose its brick-and-mortar operations in Israel. Plaintiffs again provide no explanation, let alone with the requisite particularity, how this alleged omission renders any cited statement materially misleading. (*See* Part I.A.i, *supra.*) The challenged statements never claim that Oddity's business is entirely digital—the Form 20-F explains that Oddity is "almost entirely online", making clear Oddity retains certain non-digital operations. (Ex. 2 at 61.*)* Where, as here, "allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for failing to disclose this information." *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003). Moreover, there is no allegation why information relating to a very small, profitable part of Oddity's business would be material. (*See* Part I.A.i, *supra*.)

### (3)   No Misstatements Regarding Oddity's Legal Proceedings.

Plaintiffs' challenge to Oddity's legal disclosures in its Form 20-F fails for the same reasons as those in the Registration Statement: Oddity affirmatively disclosed its involvement in ongoing litigation and accompanying risks (Ex. 2 at 124), and its practice of accruing for loss contingencies when a loss is probable and can be reasonably estimated (*Id*. at F-25). Plaintiffs do not allege any obligation to disclose specific lawsuits.

### B.   Plaintiffs Fail to Allege a Strong Inference of Scienter.

Plaintiffs' 10(b) claim should also be dismissed for the independent reason that Plaintiffs fail to plead facts giving rise to a strong inference of scienter. Under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference" of scienter as to each defendant,

22

15 U.S.C. § 78u-4(b)(2)(A).[14]  "[A] court must consider plausible, nonculpable explanations for the defendant's conduct" and a complaint survives "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  This heightened scienter requirement that Defendants intended "to deceive, manipulate, or defraud" is met only with particularized facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.  Neither is adequately alleged.

### i.      Plaintiffs Fail to Plead Motive and Opportunity.

Plaintiffs contend that Oddity and Mr. Holtzman[15] had motive because they sold shares pursuant to Oddity's IPO.  (AC ¶ 185.)  But such generic motives—which are common to any parent company or officer—are insufficient.  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir. 2009).  Indeed, the sale of shares to the public is *the very purpose of an IPO*.  Plaintiffs' theory that IPO sales—on their own—support a "strong inference" of scienter has been routinely rejected by courts in this district.  *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 420 (S.D.N.Y. 2020) ("[T]he fact that the Individual Defendants sold only in public offerings cuts against an inference of scienter, because it suggests a motive that is 'generally possessed by most

---

[14] The Complaint alleges that Mr. Holtzman's scienter should be imputed to Oddity. Although Mr. Holtzman has not been served, this Motion addresses these allegations solely for the purposes of evaluating Oddity's scienter.

[15] Plaintiffs also raise *L.*Catterton's sale of its Oddity shares in connection with the IPO.  As *L,*Catterton is not a defendant, its sales have no bearing on Oddity's scienter.  (*See* AC ¶¶ 16-35; *see City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 227 (E.D.N.Y. 2019).)

corporate directors and officers.'").  Moreover, "[w]hile 'unusual' executive stock trading under some circumstances may give rise to an inference of fraudulent intent, executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent."  *In re Bristol–Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

### ii.    Plaintiffs Fail to Plead Conscious Misbehavior or Recklessness.

With no plausible motive alleged, Plaintiffs must allege "a defendant's conscious misbehavior or recklessness" and those allegations' strength "'must be correspondingly greater'".  *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *22 (S.D.N.Y. Sept. 21, 2021). Plaintiffs must allege conduct that is at least "highly unreasonable", and an "extreme departure from the standards of ordinary care".  *Id.*  None of Plaintiffs' allegations come close.

Plaintiffs' contention that Mr. Holtzman somehow "intentionally omitted information regarding these retail operations" because he was "photographed inside one" is illogical.  (AC ¶ 188.)  That Mr. Holtzman chose to pose for a Company profile in front of a store demonstrates that he had no intent to conceal their existence—and in fact tried to publicize it—thus negating any inference of scienter.  And Plaintiffs' allegation that Mr. Holtzman "had access to" information about "conventional marketing, advertising and subscriptions", (AC ¶ 187), is too vague and conclusory because it is indisputable that Oddity's public filings disclosed all of these—and Plaintiffs plead no facts showing Mr. Holtzman "had access to" information suggesting those disclosures were somehow insufficient.  *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015).

Finally, Plaintiffs' attempt to invoke the core operations doctrine fails.  (AC ¶ 187.) "[T]hat an allegedly fraudulent statement concerned 'core operations,' standing alone, is insufficient to support strong circumstantial evidence of scienter."  *Tyler v. Liz Claiborne, Inc.*,

24

814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011).  And "there is considerable doubt whether the core operations doctrine survived enactment of the PSLRA, and many courts have held that it is no longer valid."  *Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at \*7 (S.D.N.Y. Dec. 29, 2016).

Because no alleged facts give rise to a strong inference of scienter (or even to a weak one), Plaintiffs' Section 10(b) claims should be dismissed.[16]

### C.    Plaintiffs Fail to Allege Loss Causation.

Plaintiffs' Section 10(b) claim separately fails because they do not adequately allege that their losses were caused by any actionable misstatement or omission.  Loss causation requires Plaintiffs in a Section 10(b) claim to plead a "corrective disclosure", *i.e.* announcement or series of announcements that "reveal to the market the falsity" of a prior statement.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005).  Critically, a corrective disclosure must show more than a "negative characterization of already-public information".  *In re Omnicom Grp. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010).  But, although the Report—the only alleged corrective disclosure—uses hyperbole about "previously undisclosed" matters, NINGI concedes that the information therein was "obtained from public sources" and "is expressed as an opinion, not a statement of fact".  (Ex. 3 at 1-5.)  And the allegations attributed to unnamed former employees similarly added no new information to the market.  Indeed, none of the underlying facts discussed in the Report are "new"—the fact that Oddity had leases for stores was disclosed, as was the fact that its business was not entirely online; the retail business in

---

[16] Plaintiffs do not rely on CWs to allege scienter.  Nor could they.  None is alleged to have "had any contact with the Individual Defendants or would have knowledge of what they knew".  *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at \*8 (S.D.N.Y. Sept. 26, 2008), *aff'd sub nom. Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010).

Israel was never concealed and was publicly touted to anyone who cared to examine Oddity's business in that country (for example, through the Israel website); and Oddity's involvement in legal proceedings was disclosed.  With respect to Oddity's AI capabilities, NINGI concedes that it is just its "*opinion* [that] the claim that ODDITY is using AI is just a lie" and that it is just its "*opinion* [that] ODDITY is not a cutting-edge tech company".  (*Id.* at 9, 26 (emphases added).)  "Reports express[ing] negative opinions . . . based on information that was already publicly available . . .  are not 'corrective' for the purpose of pleading loss causation."  *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013).[17]

The fact that a stock price drop followed a short-seller's report does nothing to make the allegations any more plausible because depressing a company's stock price (however briefly) is the short-seller's *raison d'etre*.  *See, e.g.*, *Long Miao*, 442 F. Supp. 3d at 800.  That is precisely the case here.  NINGI had a vested interest in mischaracterizing publicly available information about Oddity because it would "realize significant gains in the event that the prices of [Oddity's] securities decline".  (Ex. 3 at 1.)

Oddity's stock price recovery further confirms the lack of any plausible link between Plaintiffs' alleged losses, and the so-called *new* information—which in reality was neither *new* nor unknown— repackaged and misrepresented by NINGI.  Although a temporary stock price

---

[17] NINGI's "interviews" with unnamed employees also are inadequate.  *Long Miao*, 442 F. Supp. 3d at 801 ("[T]he case law reflects a particular need for close scrutiny where a short-seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources, without corroboration."); *see also Defeo v. IonQ, Inc.*, 2025 WL 1035292, at *6 (4th Cir. Apr. 8, 2025) ("[S]elf-interested [r]eport[s] [that] rel[y] on anonymous sources for [their] nonpublic information and disclaim[] [their] accuracy" do not meet the "'high bar that plaintiffs must meet in relying on self-interested and anonymous short-sellers' when attempting to plead loss causation").

drop followed the Report, after Oddity addressed NINGI's misleading claims (Ex. 4), the stock price rose within weeks to pre-Report levels.  (Ex. 5.)  Clearly, Oddity did not shut down its retail stores, miraculously develop new technology or defeat all pending litigation in those few weeks.  The only plausible inference is that the market temporarily reacted to NINGI's mischaracterization, but promptly reverted to valuing Oddity based on its fundamentals, not a short-seller's hyperbole.  (Ex. 5.)  That is why "loss causation is not adequately pled simply by allegations of a drop in stock price following an announcement of bad news if the news did not disclose the fraud".  *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 384.

> ### D.      Plaintiffs Fail to Plausibly Allege Scheme Liability.

Plaintiffs also assert that Oddity "engaged in a plan, scheme, conspiracy and course of conduct . . . to defraud".  (AC ¶ 192.)  "[C]ourts have routinely rejected [] attempt[s] to bypass the elements necessary to impose 'misstatement' liability . . . by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'"  *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011).  In other words, "misstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections" of Rule 10b-5; rather, there must be "something extra that makes a violation a scheme".  *SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) (citation omitted).  Plaintiffs' "scheme" allegations are identical to Plaintiffs' deficiently alleged misstatements and do not identify "something extra".  They should be dismissed.

## IV.      PLAINTIFFS FAIL TO PLEAD A SECTION 20(a) CLAIM.[18]

To state a claim under Section 20(a), a plaintiff "must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant

---

[18] The Section 20(a) claims are brought against the "Individual Defendants"—for purposes of this motion, Ms. Drucker Mann and Mr. Farello.  (AC ¶ 208.)

was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108.  Plaintiffs' 20(a) claims fail for several reasons.

*First*, as explained above, Plaintiffs fail to show a primary violation.  (Part III, *supra*.) *See Liu v. Intercept Pharms., Inc.*, 2020 U.S. Dist. LEXIS 53252, at *52 (S.D.N.Y. Mar. 26, 2020).  *Second*, Plaintiffs fail to allege that the Individual Defendants are control persons. Control over a primary violator "may be established by showing that [the Individual Defendants] possessed 'the power to direct or cause the direction of the management and policies of [Oddity], whether through the ownership of voting securities, by contract, or otherwise.'"  *SEC v. First Jersey Sec.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996).  Plaintiffs, however, provide no such allegation.  Plaintiffs allege control based on "their positions of control and authority as senior officers".  *Id.*  But "[o]fficer or director status alone does *not* constitute control for the purposes of § 20(a) liability"—actual control is "essential to control person liability."  *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999) (emphasis added).  Plaintiffs fail to plead that the Individual Defendants possessed the power to control.

*Third*, Plaintiffs' 20(a) claim fails because Plaintiffs do not plead facts to show that the Individual Defendants were "in some meaningful sense, [c]ulpable participant[s] in the controlled [entity's] fraud".  *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 493 (S.D.N.Y. 2005).  Where a complaint contains no detailed allegations regarding the state of mind of the "control person", a Section 20(a) claim should be dismissed.  *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *6-7 (S.D.N.Y. Feb. 20, 2002).  The Complaint does not provide any such allegations.  Instead, Plaintiffs merely allege that Ms. Drucker Mann "has served as

28

Oddity's CFO" and that Mr. Farello "has served as a Director of Oddity". (AC ¶¶ 20, 22.) That is woefully insufficient.[19]

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice.

---

[19] Plaintiffs allege that Ms. Drucker Mann "signed certifications pursuant to the Sarbanes-Oxley Act", but that too is insufficient. (AC ¶ 172.) "[C]ourts in this circuit regularly hold that the signing of a SOX certification, without more, is insufficient to plead scienter." *Zheng v. Pingtan Marine Enter.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019).

Dated:  April 21, 2025

Respectfully Submitted,

*s/ Yonatan Even*
Yonatan Even
Lauren M. Rosenberg
**CRAVATH, SWAINE & MOORE LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone:  (212) 474-1000
yeven@cravath.com
lrosenberg@cravath.com

*Attorneys for Defendants Oddity Tech Ltd., Lindsay Drucker Mann and Michael Farello*

*s/ Susan L. Saltzstein*
Susan L. Saltzstein
Robert A. Fumerton
Sabeen S. Sarwar
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
susan.saltzstein@skadden.com
robert.fumerton@skadden.com
sabeen.sarwar@skadden.com

*Attorneys for Underwriter Defendants*

30

## CERTIFICATE OF WORD COUNT COMPLIANCE

Pursuant to local Civil Rule 7.1(c), I certify under penalty of perjury that the foregoing Joint Memorandum of Law in Support of Defendants' Joint Motion to Dismiss contains 8,626 words, excluding items exempted by local Civil Rule 7.1(c). In making this certification I have relied upon the word count of Microsoft Word, the word-processing system used to prepare the memorandum.

Dated: April 21, 2025

Respectfully Submitted,

*/s/ Yonatan Even*
Yonatan Even
Lauren M. Rosenberg
**CRAVATH, SWAINE & MOORE LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
yeven@cravath.com
lrosenberg@cravath.com

*Attorneys for Defendant Oddity Tech Ltd. Lindsay Drucker Mann and Michael Farello*


/s/ *Susan L Saltzstein*
Susan L. Saltzstein
Robert A. Fumerton
Sabeen S. Sarwar
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
susan.saltzstein@skadden.com
robert.fumerton@skadden.com
sabeen.sarwar@skadden.com

*Attorneys for Underwriter Defendants*