# EXHIBIT 1
# PART 2

In connection with the offering, certain of the underwriters or securities dealers may distribute prospectuses by electronic means, such as email.

**Directed Share Program**

At our request, the underwriters have reserved up to    % of the Class A ordinary shares offered by this prospectus for sale at the initial public offering price per share through a directed share program to certain of our employees, directors, partners, and friends and family members of certain of our employees, directors, and partners. The number of Class A ordinary shares available for sale to the general public will be reduced by the number of reserved shares purchased by these individuals in the directed share program. Any reserved shares not purchased by these individuals will be offered by the underwriters to the general public on the same basis as the other Class A ordinary shares offered by this prospectus. Any shares sold under the directed share program will not be subject to the terms of any lock-up agreement, except in the case of shares purchased by any of our officers or directors. We will agree to indemnify the underwriters against certain liabilities and expenses, including liabilities under the Securities Act of 1933, in connection with sales of the shares reserved for the directed share program. The directed share program will be arranged through Goldman Sachs & Co. LLC.

**Selling Restrictions**

*European Economic Area*

In relation to each Member State of the European Economic Area, each a "Member State," no ordinary shares have been offered or will be offered pursuant to this offering to the public in that Member State prior to the publication of a prospectus in relation to the ordinary shares which has been approved by the competent authority in that Member State or, where appropriate, approved in another Member State and notified to the competent authority in that Member State, all in accordance with the Prospectus Regulation, except that offers of ordinary shares may be made to the public in that Member State at any time under the following exemptions under the Prospectus Regulation:

(a)  to any legal entity which is a qualified investor as defined under the Prospectus Regulation;

(b)  to fewer than 150 natural or legal persons (other than qualified investors as defined under the Prospectus Regulation), subject to obtaining the prior consent of the underwriters for any such offer; or

(c)  in any other circumstances falling within Article 1(4) of the Prospectus Regulation,

*provided* that no such offer of ordinary shares shall require the Issuer or any underwriter to publish a prospectus pursuant to Article 3 of the Prospectus Regulation or supplement a prospectus pursuant to Article 23 of the Prospectus Regulation.

For the purposes of this provision, the expression an "offer to the public" in relation to any ordinary shares in any Member State means the communication in any form and by any means of sufficient information on the terms of the offer and any ordinary shares to be offered so as to enable an investor to decide to purchase or subscribe for any ordinary shares, and the expression "Prospectus Regulation" means Regulation (EU) 2017/1129.

*United Kingdom*

In relation to the UK, no ordinary shares have been offered or will be offered pursuant to this offering to the public in the UK prior to the publication of a prospectus in relation to the ordinary shares that either (i) has been approved by the Financial Conduct Authority, or (ii) is to be treated as if it had been approved by the Financial Conduct Authority in accordance with the transitional provision in Regulation 74 of the Prospectus (Amendment etc.) (EU Exit) Regulations 2019, except that offers of ordinary shares may be made to the public in the UK at any time under the following exemptions under the UK Prospectus Regulation:

192

    (a)   to any legal entity which is a qualified investor as defined in Article 2 of the UK Prospectus Regulation;

    (b)   to fewer than 150 natural or legal persons (other than qualified investors as defined in Article 2 of the UK Prospectus Regulation), subject to obtaining the prior consent of the Representatives for any such offer; or

    (c)   in any other circumstances falling within section 86 of the Financial Services and Markets Act 2000, as amended, or the FSMA,

*provided* that no such offer of units shall require the issuer or any underwriter to publish a prospectus pursuant to section 85 of the FSMA or supplement a prospectus pursuant to Article 23 of the UK Prospectus Regulation.

For the purposes of this provision, the expression an "offer to the public" in relation to any units in the UK means the communication in any form and by any means of sufficient information on the terms of the offer and any units to be offered so as to enable an investor to decide to purchase or subscribe for any units, and the expression "UK Prospectus Regulation" means Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018.

### Canada

The securities may be sold in Canada only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and are permitted clients, as defined in National Instrument 31-103 Registration Requirements, Exemptions, and Ongoing Registrant Obligations. Any resale of the securities must be made in accordance with an exemption form, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment hereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory of these rights or consult with a legal advisor.

Pursuant to section 3A.3 of National Instrument 33-105 Underwriting Conflicts (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

### Hong Kong

The ordinary shares may not be offered or sold in Hong Kong by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap. 32 of the Laws of Hong Kong), or the Companies (Winding Up and Miscellaneous Provisions) Ordinance, or which do not constitute an invitation to the public within the meaning of the Securities and Futures Ordinance (Cap. 571 of the Laws of Hong Kong), or the Securities and Futures Ordinance, or (ii) to "professional investors" as defined in the Securities and Futures Ordinance and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies (Winding Up and Miscellaneous Provisions) Ordinance, and no advertisement, invitation or document relating to the ordinary shares may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to ordinary shares which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" in Hong Kong as defined in the Securities and Futures Ordinance and any rules made thereunder.

*Singapore*

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the ordinary shares may not be circulated or distributed, nor may the ordinary shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor (as defined under Section 4A of the Securities and Futures Act, Chapter 289 of Singapore, or the SFA) under Section 274 of the SFA, (ii) to a relevant person (as defined in Section 275(2) of the SFA) pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA, in each case subject to conditions set forth in the SFA.

Where the ordinary shares are subscribed or purchased under Section 275 of the SFA by a relevant person which is a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor, the securities (as defined in Section 239(1) of the SFA) of that corporation shall not be transferable for 6 months after that corporation has acquired the ordinary shares under Section 275 of the SFA except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person (as defined in Section 275(2) of the SFA), (2) where such transfer arises from an offer in that corporation's securities pursuant to Section 275(1A) of the SFA, (3) where no consideration is or will be given for the transfer, (4) where the transfer is by operation of law, (5) as specified in Section 276(7) of the SFA, or (6) as specified in Regulation 32 of the Securities and Futures (Offers of Investments) (Shares and Debentures) Regulations 2005 of Singapore, or Regulation 32.

Where the ordinary shares are subscribed or purchased under Section 275 of the SFA by a relevant person which is a trust (where the trustee is not an accredited investor (as defined in Section 4A of the SFA)) whose sole purpose is to hold investments and each beneficiary of the trust is an accredited investor, the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferable for 6 months after that trust has acquired the ordinary shares under Section 275 of the SFA except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person (as defined in Section 275(2) of the SFA), (2) where such transfer arises from an offer that is made on terms that such rights or interest are acquired at a consideration of not less than S$200,000 (or its equivalent in a foreign currency) for each transaction (whether such amount is to be paid for in cash or by exchange of securities or other assets), (3) where no consideration is or will be given for the transfer, (4) where the transfer is by operation of law, (5) as specified in Section 276(7) of the SFA, or (6) as specified in Regulation 32.

Solely for the purposes of our obligations pursuant to Section 309B of the SFA, we have determined, and hereby notify all relevant persons (as defined in the Securities and Futures (Capital Markets Products) Regulations 2018, or the CMP Regulations) that the ordinary shares are "prescribed capital markets products" (as defined in the CMP Regulations) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

*Japan*

The securities have not been and will not be registered under the Financial Instruments and Exchange Act of Japan (Act No. 25 of 1948, as amended), or the FIEA. The securities may not be offered or sold, directly or indirectly, in Japan or to or for the benefit of any resident of Japan (including any person resident in Japan or any corporation or other entity organized under the laws of Japan) or to others for reoffering or resale, directly or indirectly, in Japan or to or for the benefit of any resident of Japan, except pursuant to an exemption from the registration requirements of the FIEA and otherwise in compliance with any relevant laws and regulations of Japan.

*Switzerland*

The ordinary shares may not be publicly offered in Switzerland and will not be listed on the SIX Swiss Exchange, or SIX or on any other stock exchange or regulated trading facility in Switzerland. This document has been prepared without regard to the disclosure standards for issuance prospectuses under art. 652a or art. 1156 of the Swiss Code of Obligations or the disclosure standards for listing prospectuses under art. 27 ff. of the SIX Listing Rules or the listing rules of any other stock exchange or regulated trading facility in Switzerland. Neither this document nor any other offering or marketing material relating to the ordinary shares or the offering may be publicly distributed or otherwise made publicly available in Switzerland.

Neither this document nor any other offering or marketing material relating to the offering, the Company, the ordinary shares have been or will be filed with or approved by any Swiss regulatory authority. In particular, this document will not be filed with, and the offer of ordinary shares will not be supervised by, the Swiss Financial Market Supervisory Authority FINMA (FINMA), and the offer of ordinary shares has not been and will not be authorized under the Swiss Federal Act on Collective Investment Schemes, or CISA. The investor protection afforded to acquirers of interests in collective investment schemes under the CISA does not extend to acquirers of ordinary shares.

*Dubai International Financial Centre*

This prospectus relates to an Exempt Offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority, or the DFSA. This prospectus is intended for distribution only to persons of a type specified in the Offered Securities Rules of the DFSA. It must not be delivered to, or relied on by, any other person. The DFSA has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The DFSA has not approved this prospectus nor taken steps to verify the information set forth herein and has no responsibility for the prospectus. The ordinary shares to which this prospectus relates may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the ordinary shares offered should conduct their own due diligence on the ordinary shares. If you do not understand the contents of this prospectus you should consult an authorized financial advisor.

*Israel*

This document does not constitute a prospectus under the Israeli Securities Law, 5728-1968, or the Securities Law, and has not been filed with or approved by the Israel Securities Authority. In Israel, this prospectus is being distributed only to, and is directed only at, and any offer of the ordinary shares is directed only at, (1) a limited number of persons in accordance with the Israeli Securities Law and, (2) investors listed in the first addendum, or the Addendum, to the Israeli Securities Law, consisting primarily of joint investment in trust funds, provident funds, insurance companies, banks, portfolio managers, investment advisors, members of the Tel Aviv Stock Exchange, underwriters, venture capital funds, entities with equity in excess of NIS 50 million, and "qualified individuals," each as defined in the Addendum (as it may be amended from time to time), collectively referred to as qualified investors (in each case, purchasing for their own account or, where permitted under the Addendum, for the accounts of their clients who are investors listed in the Addendum). Qualified investors are required to submit written confirmation that they fall within the scope of the Addendum, are aware of its meaning and agree to it.

**EXPENSES OF THE OFFERING**

We estimate that our expenses in connection with this offering, other than underwriting discounts and commissions, will be as follows:

| Expenses | Amount |
|---|---|
| SEC registration fee | $ 11,020 |
| FINRA filing fee | 15,500 |
| Stock exchange listing fee | 295,000 |
| Transfer agent's fee | * |
| Printing and engraving expenses | * |
| Legal fees and expenses | * |
| Accounting fees and expenses | * |
| Miscellaneous costs | * |
| Total | $      * |

\*    To be filed by amendment.

All amounts in the table are estimates except the SEC registration fee, the stock exchange listing fee and the FINRA filing fee. We will pay all of the expenses of this offering.

196

**LEGAL MATTERS**

The validity of our Class A ordinary shares and certain other matters of Israeli law will be passed upon for us by Herzog Fox & Neeman, Tel Aviv, Israel. Certain matters of U.S. federal law will be passed upon for us by Latham & Watkins LLP, New York, New York. Certain matters of Israeli law will be passed upon for the underwriters by Goldfarb Gross Seligman & Co., Tel Aviv, Israel. Certain matters of U.S. federal law will be passed upon for the underwriters by Davis Polk & Wardwell LLP, New York, New York.

197

TABLE OF CONTENTS

Case 1:24-cv-06571-MMG     Document 62-1     Filed 04/22/25     Page 7 of 248

The validity of our Class A ordinary shares and certain other matters of Israeli law will be passed upon for us by Herzog Fox & Neeman, Tel Aviv, Israel. Certain matters of U.S. federal law will be passed upon for us by Latham & Watkins LLP, New York, New York. Certain matters of Israeli law will be passed upon for the underwriters by Goldfarb Gross Seligman & Co., Tel Aviv, Israel. Certain matters of U.S. federal law will be passed upon for the underwriters by Davis Polk & Wardwell LLP, New York, New York.

**EXPERTS**

The consolidated financial statements of Oddity Tech Ltd. at December 31, 2022 and 2021, and for each of the two years in the period ended December 31, 2022, appearing in this Prospectus and Registration Statement have been audited by Kost, Forer, Gabbay and Kasierer, a member of Ernst & Young Global, independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

**ENFORCEABILITY OF CIVIL LIABILITIES**

We are incorporated under the laws of the State of Israel. Service of process upon us and upon our directors and officers and the Israeli experts named in this prospectus, substantially all of whom reside outside the United States, may be difficult to obtain within the United States. Furthermore, because substantially all of our assets and substantially all of our directors and officers are located outside the United States, any judgment obtained in the United States against us or any of our directors and officers may not be collectible within the United States.

We have irrevocably appointed ODDITY Tech US Inc. as our agent to receive service of process in any action against us in any U.S. federal or state court arising out of this offering or any purchase or sale of securities in connection with this offering. The address of our agent is 110 Greene Street, New York, New York 10012.

We have been informed by our legal counsel in Israel, Herzog Fox & Neeman, that it may be difficult to initiate an action with respect to U.S. securities laws claims in original actions instituted in Israel. Israeli courts may refuse to hear a claim based on an alleged violation of U.S. securities laws reasoning that Israel is not the most appropriate forum to hear such a claim. In addition, even if an Israeli court agrees to hear a claim, it may determine that Israeli law and not U.S. law is applicable to the claim. If U.S. law is found to be applicable, the content of applicable U.S. law must be proved as a fact by expert witnesses which can be a time-consuming and costly process. Certain matters of procedure may also be governed by Israeli law.

Subject to certain time limitations and legal procedures, Israeli courts may enforce a U.S. judgment in a civil matter which, subject to certain exceptions, is non-appealable, including judgments based upon the civil liability provisions of the Securities Act and the Exchange Act, and including a monetary or compensatory judgment in a non-civil matter, provided that, among other things:

- the judgment was rendered after due process by a court which was, according to the laws of the state of the court, competent to render the judgment;

- the obligation imposed by the judgment is enforceable according to the law of the state in which the relief was granted and according to the rules relating to the enforceability of judgments in Israel;

- the substance of the judgment is not contrary to public policy of Israel; and

- the judgment is executory in the state in which it was given.

Even if these conditions are met, an Israeli court may not declare a foreign civil judgment enforceable if:

- the judgment was given in a state whose laws do not provide for the enforcement of judgments of Israeli courts (subject to exceptional cases);

- the enforcement of the judgment is likely to prejudice the sovereignty or security of the State of Israel;

- the judgment was obtained by fraud;

- the opportunity given to the defendant to bring its arguments and evidence before the court was not reasonable in the opinion of the Israeli court;

- the judgment was rendered by a court not competent to render it according to the laws of private international law as they apply in Israel;

- the judgment is contradictory to another judgment that was given in the same matter between the same parties and that is still valid; or

- at the time the action was brought in the foreign court, a lawsuit in the same matter and between the same parties was pending before a court or tribunal in Israel.

If a foreign judgment is enforced by an Israeli court, it generally will be payable in Israeli currency, which can then be converted into non-Israeli currency and transferred out of Israel. The usual practice

199

in an action before an Israeli court to recover an amount in a non-Israeli currency is for the Israeli court to issue a judgment for the equivalent amount in Israeli currency at the rate of exchange in force on the date of the judgment, but the judgment debtor may make payment in foreign currency. Pending collection, the amount of the judgment of an Israeli court stated in Israeli currency ordinarily will be linked to the Israeli consumer price index plus interest at the annual statutory rate set by Israeli regulations prevailing at the time. Judgment creditors must bear the risk of unfavorable exchange rates. The trend in recent years has increasingly been for Israeli courts to enforce a foreign judgment in the foreign currency specified in the judgment, in which case there are also applicable rules regarding the payment of interest.

200

**WHERE YOU CAN FIND ADDITIONAL INFORMATION**

We have filed with the SEC a registration statement (including amendments and exhibits to the registration statement) on Form F-1 under the Securities Act with respect to the Class A ordinary shares offered hereby. This prospectus, which is part of the registration statement, does not contain all of the information set forth in the registration statement and the exhibits and schedules thereto. The rules and regulations of the SEC allow us to omit certain information from this prospectus that is included in the registration statement and the exhibits and schedules to the registration statement. For further information, we refer you to the registration statement and the exhibits and schedules filed as part of the registration statement.

Statements contained in this prospectus as to the contents of any contract, agreement, or other document are not necessarily complete descriptions of all terms of these documents. If a document has been filed as an exhibit to the registration statement, we refer you to the copy of the document that has been filed for a complete description of its terms. Each statement in this prospectus relating to a document filed as an exhibit is qualified in all respects by the filed exhibit. You should read this prospectus and the documents that we have filed as exhibits to the registration statement of which this prospectus is a part completely.

Upon the closing of this offering, we will become subject to the informational requirements of the Exchange Act applicable to foreign private issuers. Accordingly, we will be required to file reports and other information with the SEC, including annual reports on Form 20-F and reports on Form 6-K. The SEC maintains an internet website that contains reports and other information about issuers, like us, that file electronically with the SEC. The address of that website is www.sec.gov. We also maintain a website at https://oddity.com, at which, following the completion of this offering, you may access these materials free of charge as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. Information contained on, or that can be accessed through, our website does not constitute part of this prospectus, and the inclusion of our website address in this prospectus is an inactive textual reference only.

As a foreign private issuer, we are exempt under the Exchange Act from, among other things, the rules prescribing the furnishing and content of proxy statements, and our officers, directors, and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act with respect to their purchase and sale of our Class A ordinary shares. In addition, we will not be required under the Exchange Act to file periodic reports and financial statements with the SEC as frequently or as promptly as U.S. companies whose securities are registered under the Exchange Act.

We will send our transfer agent a copy of all notices of shareholders' meetings and other reports, communications, and information that are made generally available to shareholders. The transfer agent has agreed to mail to all shareholders a notice containing the information (or a summary of the information) contained in any notice of a meeting of our shareholders received by the transfer agent and will make available to all shareholders such notices and all such other reports and communications received by the transfer agent.

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**CONSOLIDATED FINANCIAL STATEMENTS**

**INDEX**

**AS OF DECEMBER 31, 2022**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID: 1281) | F-2 |
| Consolidated Balance Sheets | F-3 – F-4 |
| Consolidated Statements of Income | F-5 |
| Statements of Redeemable A Shares and Changes in Shareholders' Equity | F-6 |
| Consolidated Statements of Cash Flows | F-7 |
| Notes to Consolidated Financial Statements | F-8 – F-31 |

**AS OF MARCH 31, 2023 (UNAUDITED)**

|  | Page |
|---|---|
| Consolidated Balance Sheets | F-33 – F-34 |
| Consolidated Statements of Income | F-35 |
| Statements of Redeemable A Shares and Changes in Shareholders' Equity | F-36 |
| Consolidated Statements of Cash Flows | F-37 |
| Notes to Consolidated Financial Statements | F-38 – F-46 |



**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

**To the Shareholders and Board of Directors of**

**ODDITY TECH LTD.**

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Oddity Tech Ltd. and its subsidiaries (the "Company") as of December 31, 2022 and 2021, the related consolidated statements of income, statements of redeemable A shares and changes in shareholders' equity and cash flows for each of the two years in the period ended December 31, 2022, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2022, in conformity with U.S. generally accepted accounting principles.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ KOST FORER GABBAY & KASIERER
A Member of Ernst & Young Global

We have served as the Company's auditor since 2019.
Tel-Aviv, Israel
May 1, 2023

F-2

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**
**U.S. dollar in thousands**

| | December 31, | | | |
|---|---|---|---|---|
| | **2022** | | **2021** | |
| ASSETS | | | | |
| CURRENT ASSETS: | | | | |
| Cash and cash equivalents | $ | 40,955 | $ | 28,827 |
| Short-term deposits | | 18,000 | | — |
| Trade receivables | | 7,576 | | 5,141 |
| Inventory | | 70,230 | | 51,457 |
| Prepaid expenses and other current assets | | 9,172 | | 7,273 |
| Total current assets | | 145,933 | | 92,698 |
| LONG-TERM ASSETS: | | | | |
| Property, plant and equipment, net | | 9,468 | | 9,656 |
| Deferred tax asset, net | | 2,334 | | 1,003 |
| Intangible assets, net | | 26,800 | | 21,663 |
| Goodwill | | 16,237 | | 16,237 |
| Operating lease right-of-use assets | | 13,278 | | — |
| Other assets | | 2,358 | | 1,713 |
| Total long-term assets | | 70,475 | | 50,272 |
| Total assets | $ | 216,408 | $ | 142,970 |

The accompanying notes are an integral part of the consolidated financial statements.

F-3

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**
**U.S. dollar in thousands (except share and per share data)**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| LIABILITIES AND SHAREHOLDERS' EQUITY | | |
| CURRENT LIABILITIES: | | |
| Trade payables | $ 44,807 | $ 37,019 |
| Other accounts payable and accrued expenses | 37,792 | 14,119 |
| Short-term debt and current maturities of long-term debt | 3,917 | 4,430 |
| Current maturities of operating lease liabilities | 3,890 | — |
| Total current liabilities | 90,406 | 55,568 |
| LONG-TERM LIABILITIES: | | |
| Operating lease liabilities, non-current | 8,076 | — |
| Digital securities liability | 648 | |
| Other long-term liabilities | 6,298 | 6,478 |
| Total liabilities | 105,428 | 62,046 |
| COMMITMENTS AND CONTINGENCIES (Note 9) | | |
| Redeemable A shares of NIS 0.001 par value each – Authorized: 2,000,000 shares at December 31, 2022 and 2021; Issued and outstanding: 63,904 shares at December 31, 2022 and 2021[**] | 12,275 | 12,275 |
| SHAREHOLDERS' EQUITY:[**] | | |
| Class A ordinary shares of NIS 0.001 par value each – Authorized: 10,000,000 shares at December 31, 2022 and 2021; Issued and outstanding: 2,493,153 and 1,697,311 shares at December 31, 2022 and 2021, respectively | —[*] | —[*] |
| Class B ordinary shares of NIS 0.001 par value each – Authorized: 2,000,000 shares at December 31, 2022 and 2021; Issued and outstanding: 910,792 and 1,697,311 shares at December 31, 2022 and 2021, respectively | —[*] | —[*] |
| Additional paid-in capital | 53,723 | 45,395 |
| Cumulative translation adjustments | 1,738 | 1,738 |
| Retained earnings | 43,244 | 21,516 |
| Total shareholders' equity | 98,705 | 68,649 |
| Total liabilities and shareholders' equity | $ 216,408 | $ 142,970 |

(*)    Represents an amount lower than $1.

(**)    Adjusted for the issuance of Class B ordinary shares and additional Redeemable A shares (see Note 11).

The accompanying notes are an integral part of the consolidated financial statements.

F-4

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF INCOME**
**U.S. dollar in thousands (except share and per share data)**

| | Year Ended December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Net revenue | $ 324,520 | $ 222,555 |
| Cost of revenue | 106,470 | 69,374 |
| Gross profit | 218,050 | 153,181 |
| Selling, general and administrative | 190,385 | 133,669 |
| Operating income | 27,665 | 19,512 |
| Financial expenses (income), net | (1,247) | 877 |
| Income before taxes on income | 28,912 | 18,635 |
| Taxes on income | 7,184 | 4,715 |
| Net income | $ 21,728 | $ 13,920 |
| Basic earnings per share of Class A and Class B ordinary share and Redeemable A share | $ 6.27 | $ 4.07 |
| Diluted earnings per share of Class A and Class B ordinary share and Redeemable A share | $ 5.94 | $ 4.01 |

The accompanying notes are an integral part of the consolidated financial statements.

F-5

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**STATEMENTS OF REDEEMABLE A SHARES AND CHANGES IN SHAREHOLDERS' EQUITY**
**U.S. dollars in thousands (except share and per share data)**

| | Redeemable A shares(**) | | Class A ordinary shares(**) | | Class B ordinary shares(**) | | Additional paid-in capital | Retained earnings | Cumulative translation adjustments | Total shareholders' equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| Balance as of January 1, 2021 | — | $ — | 1,697,200 | $ —(*) | 1,697,200 | $ —(*) | $ 43,015 | $ 7,596 | $ 1,738 | $ 52,349 |
| Issuance of Redeemable A shares | 63,904 | 12,275 | — | — | — | — | — | — | — | — |
| Share based compensation | — | — | — | — | — | — | 2,380 | — | — | 2,380 |
| Vesting of RSUs | — | — | 111 | —(*) | 111 | —(*) | — | — | — | — |
| Net income | — | — | — | — | — | —(*) | — | 13,920 | — | 13,920 |
| Balance as of December 31, 2021 | 63,904 | 12,275 | 1,697,311 | —(*) | 1,697,311 | —(*) | 45,395 | 21,516 | 1,738 | 68,649 |
| Share conversion | — | | 790,239 | —(*) | (790,239) | —(*) | — | — | — | |
| Share based compensation | — | — | — | — | — | — | 8,253 | — | — | 8,253 |
| Exercise of options and vesting of RSUs | — | — | 5,603 | —(*) | 3,720 | —(*) | 75 | — | — | 75 |
| Net income | — | — | — | — | — | — | — | 21,728 | — | 21,728 |
| Balance as of December 31, 2022 | 63,904 | $ 12,275 | 2,493,153 | —(*) | 910,792 | —(*) | $ 53,723 | $ 43,244 | $ 1,738 | $ 98,705 |

(*)   Represents an amount lower than $1.

(**)  Adjusted for the issuance of Class B and additional Redeemable A shares (see Note 11).

The accompanying notes are an integral part of the consolidated financial statements.

F-6

| | Redeemable A shares(**) | | Class A ordinary shares(**) | | Class B ordinary shares(**) | | Additional paid-in capital | Retained earnings | Cumulative translation adjustments | Total shareholders' equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| Issuance of Redeemable A shares | 63,904 | 12,275 | — | — | — | — | — | — | — | — |
| Share based compensation | — | — | — | — | — | — | 2,380 | — | — | 2,380 |
| Vesting of RSUs | — | — | 111 | —(*) | 111 | —(*) | — | — | — | — |
| Net income | — | — | — | — | — | —(*) | — | 13,920 | — | 13,920 |

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**U.S. dollars in thousands**

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Cash flows from operating activities: | | |
| Net income | $ 21,728 | $ 13,920 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 4,408 | 4,006 |
| Share-based compensation | 6,697 | 2,107 |
| Deferred income taxes | (1,515) | (903) |
| Increase in trade receivable | (2,435) | (588) |
| Increase in prepaid expenses and other receivables | (1,802) | (1,306) |
| Increase in inventory | (18,773) | (35,732) |
| Increase in trade payables | 7,788 | 21,087 |
| Increase in other accounts payable and accrued expenses | 23,651 | 7,103 |
| Change in operating lease right-of-use assets | 5,009 | — |
| Change in operating lease liability | (6,321) | — |
| Other | 597 | 530 |
| Net cash provided by operating activities | 39,032 | 10,224 |
| Cash flows from investing activities: | | |
| Purchase of property, plant and equipment | (2,347) | (2,371) |
| Capitalization of software development costs | (5,051) | (3,354) |
| Purchase of other intangible assets | (382) | (1,020) |
| Loan to shareholder | — | (3,000) |
| Repayment of loan to shareholder | — | 3,000 |
| Investment in short term deposits | (18,000) | — |
| Acquisition of a business, net of cash acquired | — | (11,787) |
| Other | — | (250) |
| Net cash used in investing activities | (25,780) | (18,782) |
| Cash flows from financing activities: | | |
| Repayment of loans and borrowings | (362) | (318) |
| Deferred issuance costs | (607) | — |
| Proceeds from issuance of digital securities | 648 | — |
| Proceeds from exercise of options | 75 | — |
| Net cash used in financing activities | (246) | (318) |
| Effect of exchange rate fluctuations on cash and cash equivalents | (781) | (359) |
| Net increase (decrease) in cash, cash equivalents and restricted cash | 12,225 | (9,235) |
| Cash, cash equivalents and restricted cash at the beginning of the year | 30,889 | 40,124 |
| Cash, cash equivalents and restricted cash at the end of the year | $ 43,114 | $ 30,889 |
| Components of cash, cash equivalents, and restricted cash: | | |
| Cash and cash equivalents | $ 40,955 | $ 28,827 |
| Restricted cash included within prepaid expenses and other current assets | 2,159 | 2,062 |
| Total cash, cash equivalents and restricted cash | $ 43,114 | $ 30,889 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for interest | $ (210) | $ (168) |
| Cash paid during the year for income tax | $ (1,945) | $ (696) |
| Supplemental disclosures of non-cash investing and financing activities: | | |
| Issuance of Redeemable A shares in connection with an acquisition of a business (see Note 3) | $ — | $ 12,275 |
| Non-cash compensation capitalized as part of capitalization of software development costs | $ 1,577 | $ 397 |
| Lease liabilities arising from obtaining right-of-use assets | $ 1,079 | $ — |

The accompanying notes are an integral part of the consolidated financial statements.

F-7

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 1: — GENERAL**

Oddity Tech Ltd., an Israeli corporation, together with its subsidiaries (the "Company") is a consumer-tech company which builds and scales digital-first brands designed to disrupt the offline-dominated beauty and wellness industries. The Company leverages data science, machine learning and computer vision capabilities to identify consumer needs and develop solutions in the form of beauty, wellness and tech products.

**NOTE 2: — SIGNIFICANT ACCOUNTING POLICIES**

The consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States ("U.S. GAAP").

a.    Basis of presentation and principles of consolidation:

These consolidated financial statements have been prepared in accordance with U.S. GAAP as set forth in the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC"). The consolidated financial statements include accounts of the Company's wholly owned subsidiaries in which the Company controls. All intercompany account balances and transactions are eliminated upon consolidation.

b.    Use of estimates:

The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates, judgments and assumptions. The Company's management believes that the estimates, judgments and assumptions used are reasonable based upon information available at the time they were made.

These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities as of the date of the financial statements, and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

c.    Financial statements in U.S. dollars:

The functional currency for the Company and its subsidiaries is determined based on the primary economic environment in which the companies operate that is U.S. dollar (the "functional currency").

Accordingly, transactions denominated in currencies other than the functional currency are re-measured to the functional currency in accordance with ASC No. 830, "Foreign Currency Matters". All transaction gains and losses from the re-measured monetary balance sheet items are reflected in the statements of income as financial income or expenses, as appropriate.

d.    Cash equivalents:

Cash equivalents are short-term unrestricted highly liquid investments that are readily convertible into cash, with original maturities of three months or less at the date of deposit.

e.    Restricted cash:

Restricted cash consists of deposits used as security for credit facility, credit cards and lease agreements. As of December 31, 2022 and 2021, restricted cash amounted to $2,159 and $2,062, respectively, and is included within prepaid expenses and other current assets.

F-8

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 2: — SIGNIFICANT ACCOUNTING POLICIES (Continued)**

f.   Short-term bank deposits:

Short term bank deposits are deposits with an original maturity of more than three months but less than one year from the date of acquisition. Accrued interest in deposits is classified as other current assets. As of December 31, 2022, the Company's bank deposits were denominated in U.S. dollars and bore interest at weighted-average interest rates of 5.1%.

g.   Digital securities

The Company accounts for securities issued as either equity-classified or liability-classified instruments based on an assessment of the digital securities specific terms and applicable authoritative guidance. The assessment considers whether the digital securities are freestanding financial instruments, meeting the definition of a liability under ASC 480, "Distinguishing Liabilities from Equity" or meeting all the requirements for equity classification, including whether the digital securities are indexed to the Company's stock and whether the digital securities holders could potentially require "net cash settlement" in a circumstance outside of the Company's control, among other conditions for equity classification under ASC 815-40. This assessment, which requires the use of professional judgment, is conducted at the time of issuance and as of each subsequent reporting period end. Digital securities that meet all the criteria for equity classification, are required to be recorded as a component of additional paid-in capital. Digital securities that do not meet all the criteria for equity classification, are required to be recorded as liabilities at their initial fair value on the date of issuance and remeasured to fair value at each balance sheet date thereafter.

As of December 31, 2022, all the outstanding digital securities (see Note 16) were classified as liabilities. The liability-classified digital securities are recorded under other long-term liabilities on the consolidated balance sheet. Changes in the estimated fair value of the digital securities are recognized in "Financial expenses (income), net" in the consolidated statements of income. Digital securities are classified within Level 3 as the valuation inputs are based on unobservable inputs. Changes in fair value were immaterial during 2022.

h.   Inventory:

Inventory costs include costs incurred to bring inventory to its current condition, including materials, manufacturing costs, inbound freight, duties and other costs. The Company values its inventory at cost, using an average costing method. Net realizable value is estimated based upon assumptions made about future demand, market conditions and the age of the inventory. If the Company determines that the estimated net realizable value of its inventory is less than the carrying value of such inventory, a charge to cost of revenue is recorded to reflect the lower of cost or net realizable value. If actual market conditions are less favorable than those projected by the Company, further adjustments may be required that would increase the cost of revenue in the period in which such a determination was made.

i.   Property, plant and equipment:

Property, plant and equipment are stated at cost, net of accumulated depreciation. When assets are retired or otherwise disposed of, the cost and accumulated depreciation are removed from the accounts and any resulting gain or loss is reflected in the consolidated statements of income in the period realized. Maintenance and repairs are expensed as incurred.

F-9

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 2: — SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Property, plant and equipment items are depreciated on a straight-line basis over the estimated useful lives of the assets, as follows:

| | Years |
|---|---|
| Computers and electronic equipment | 3 |
| Office furniture and equipment | 7 – 15 |
| Molds and others | 7 |
| Leasehold improvements | Shorter of lease term or estimated useful life |

j.   Impairment of long-lived assets and intangible assets subject to amortization, including right-of-use ("ROU") lease asset:

Long-lived assets held and used by the Company are reviewed for impairment in accordance with ASC 360, "Property, Plant and Equipment" whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment is measured as the amount of which the carrying amount of the assets exceeds the fair value of the assets. During the years ended December 31, 2022 and 2021, no impairment was identified.

k.   Business combination:

The Company applies the provisions of ASC 805, "Business Combination" and allocates the fair value of purchase consideration to the tangible assets acquired, liabilities assumed and intangible assets acquired based on their estimated fair values. The excess of the fair value of purchase consideration over the fair values of these identifiable assets and liabilities is recorded as goodwill.

When determining the fair values of assets acquired and liabilities assumed, management makes significant estimates and assumptions, especially with respect to intangible assets. Significant estimates in valuing certain intangible assets include but are not limited to future expected cash flows from acquired technology from a market participant perspective, useful lives and discount rates. Management's estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates. Acquisition-related expenses are recognized separately from the business combination and are expensed as incurred (see also Note 3).

l.   Goodwill:

Goodwill reflects the excess of the consideration transferred, including the fair value of any contingent consideration, over the assigned fair values of the identifiable net assets acquired at the acquisition date. Goodwill is not amortized, and is tested for impairment at least on an annual basis. The Company operates as one reporting unit. The Company tests goodwill for impairment annually in the fourth quarter and whenever events or changes in circumstances indicate the carrying amount of goodwill may not be recoverable. When testing goodwill for impairment, the Company may first perform a qualitative assessment. If the Company determines it is not more likely than not that the reporting unit's fair value is less than its carrying amount, then no further analysis is necessary. If the Company determines that it is more likely than not that the reporting unit's fair is less than its carrying amount, then the quantitative impairment test will be performed. The Company may elect to bypass the qualitative assessment and proceed directly to performing a quantitative analysis. Under the quantitative

F-10

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 2: — SIGNIFICANT ACCOUNTING POLICIES (Continued)**

impairment test, if the carrying amount of the Company's reporting unit exceeds its fair value, the Company will recognize an impairment loss in an amount equal to that excess but limited to the total amount of goodwill.

During the years ended December 31, 2022 and 2021, no impairment of goodwill has been identified.

m.   Internal use software costs:

The Company capitalizes certain costs associated with the development of its website and its proprietary technology after the preliminary project stage is complete and until the software is ready for its intended use. Costs incurred during the preliminary project stage or costs incurred for data conversion activities, training, maintenance, and general and administrative or overhead costs are expensed as incurred. Capitalization begins when the preliminary project stage is complete, management authorizes and commits to the funding of the software project with the required authority, it is probable the project will be completed, the software will be used to perform the functions intended and certain functional and quality standards have been met.

Qualified costs incurred during the operating stage of the Company's software applications relating to upgrades and enhancements are capitalized to the extent it is probable that they will result in added functionality, while costs that cannot be separated between maintenance and minor upgrades and enhancements to websites and internal use software are expensed as incurred. Capitalized website and software development costs are amortized on a straight-line basis over their estimated useful life beginning with the time when it is ready for intended use. Amortization expenses are included under selling, general and administrative expenses in the consolidated statements of income. Management evaluates the useful lives of these assets on an annual basis and tests for impairment whenever events or changes in circumstances occur that could impact the recoverability of these assets.

During the years ended December 31, 2022 and 2021, the Company capitalized $6,628 and $3,751 of website and software development costs, respectively.

n.   Intangible assets:

Intangible assets are amortized over their estimated useful lives using the straight-line method, at the following annual periods ranges:

|  | Years |
|---|---|
| Internal-used software | 3 – 5 |
| Technology | 3 – 6 |
| Other intangibles | 5 – 10 |

o.   Concentration of credit risk:

The Company is subject to certain risks, including exposure to risks associated with online commerce environment, credit card fraud, as well as the interpretation of state and local laws and regulations in regards to the collection and remittance of sales and use taxes. The Company does not have significant vendor concentrations.

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents, restricted cash, short-term deposits, and trade receivables.

The Company's cash and cash equivalents, restricted cash and short-term bank deposits are invested in major banks in the United States and Israel. The Company is exposed to credit risk in the

F-11

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 2: — SIGNIFICANT ACCOUNTING POLICIES (Continued)**

event of default by the financial institutions to the extent of the amounts recorded on the accompanying consolidated balance sheets exceed federally insured limits. The Company places its cash and cash equivalents, restricted cash and short-term deposits with financial institutions with high-quality credit ratings and has not experienced any losses in such accounts.

The Company's trade receivables are derived mainly from sales to customers in the United States, Canada, UK, Europe, Australia and Israel. The Company's sales are primarily based on credit card transactions and therefore bear minimal credit risk.

The Company performs ongoing credit evaluations of its customers and records allowance for doubtful accounts to the extent that the amount is not collectible. For each of the years ended December 31, 2022 and 2021 there was no individual customer that accounted for 10% or more of the Company's revenue.

p.   Severance pay:

*Israeli parent:*

Severance liability is calculated (pursuant to Israeli severance pay law for all Israeli employees), based on the most recent salary of each employee multiplied by the number of years of employment as of the balance sheet date.

The Company makes monthly deposits with certain insurance companies and pension funds on behalf of each employee. The value of these deposits was recorded as an asset in the Company's balance sheet. The deposited funds made for those employees include profits accumulated up to the balance sheet date. The deposited funds could be withdrawn only upon the fulfillment of the obligation pursuant to Israel's Severance Pay Law or labor agreements. The value of the deposited funds was based on the cash surrendered value of these deposits and include profits.

The Company's liability for severance pay is partially covered by the provisions of Section 14 of the Severance Pay Law ("Section 14"). Under Section 14 employees are entitled to monthly deposits, at a rate of 8.33% of their monthly salary, deposited on their behalf to their insurance funds. Payments in accordance with Section 14 release the Company from any future severance payments in respect of those employees. As a result, the Company does not recognize any liability for severance pay due to these employees and the deposits under Section 14 are not recorded as an asset in the Company's consolidated balance sheets.

During the years ended December 31, 2022 and 2021, severance expenses were $959 and $647, respectively.

q.   Defined benefit plan:

*U.S. subsidiary:*

The U.S. subsidiary has a defined benefit plan (the "Benefit Plan") under the provisions of Section 401(k) of the Internal Revenue Code (the "Code"), which covers eligible U.S. employees as they are defined in the Benefit Plan. Participants may elect to contribute up to a maximum amount as prescribed by the Code. The U.S. subsidiary, at its discretion, makes matching contribution of up to 4% of the participant's compensation. During the years ended December 31, 2022 and 2021, the expenses were immaterial.

F-12

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 2: — SIGNIFICANT ACCOUNTING POLICIES (Continued)**

r.  Fair value of financial instruments:

Fair value is defined as the amount that would be received for selling an asset or paid to transfer a liability in an orderly transaction between market participants and requires that assets and liabilities carried at fair value are classified and disclosed in the following three categories:

Level 1 — Unadjusted quoted prices in active markets for identical assets or liabilities accessible to the reporting entity at measurement date.

Level 2 — Other than quoted prices included in Level 1 inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the asset or liability.

Level 3 — Unobservable inputs for the asset or liability used to measure fair value to the extent that observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at measurement date.

The carrying amounts of cash and cash equivalents, restricted cash, short-term bank deposits, trade receivables, prepaid expenses and other current assets, trade payables and other accounts payables approximate their fair value due to the short-term maturity of such instruments.

s.  Income taxes:

The Company accounts for income taxes in accordance with ASC 740, "Income Taxes" ("ASC 740"). ASC 740 prescribes the use of the liability method whereby deferred tax assets and liabilities are recognized for the future tax consequences attributable to the differences between the financial statements carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. The Company provides a valuation allowance, if necessary, to reduce deferred tax assets to their estimated realizable value, if it is more likely than not that a portion or all of the deferred tax assets will not be realized.

The Company accounts for uncertain tax positions in accordance with ASC 740-10. ASC 740-10 contains a two-step approach to recognizing and measuring uncertain tax positions. The first step is to evaluate the tax position taken or expected to be taken in a tax return by determining if the weight of available evidence indicates that it is more likely than not that, on an evaluation of the technical merits, the tax position will be sustained on audit, including resolution of any related appeals or litigation processes. The second step is to measure the tax benefit as the largest amount that is more than 50% (cumulative probability) likely to be realized upon ultimate settlement.

The Company establishes reserves for uncertain tax positions based on the evaluation of whether or not the Company's uncertain tax position is "more likely than not" to be sustained upon examination. The Company records interest and penalties pertaining to its uncertain tax positions in the financial statements as income tax expense.

t.  Revenue recognition:

The Company recognizes revenue in accordance with ASC No. 606, "Revenue from Contracts with Customers" ("ASC 606"). Under ASC 606, the Company recognizes revenue when its customers obtain control of promised goods or services in an amount that reflects the consideration that the Company expects to receive in exchange for those goods or services. The Company determines revenue recognition through the following steps:

F-13

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 2: — SIGNIFICANT ACCOUNTING POLICIES (Continued)**

1. Identification of the contract, or contracts, with a customer;

2. Identification of the performance obligations in the contract;

3. Determination of the transaction price;

4. Allocation of the transaction price to the performance obligations in the contract; and

5. Recognition of revenue when, or as, the performance obligations are satisfied.

The Company derives its revenue primarily from the sale of beauty and wellness products through its online direct-to-consumer model based on its proprietary technology. Revenue is recognized when the control of the products is transferred to the customer, which is when the products are shipped to the customer. The Company also offers a "Try Before You Buy" program, which allows some of its customers to order certain products and pay for the products after the trial period ends. Under ASC 606 the Company recognizes revenue for orders placed under the program when the trial period lapses.

The Company recognizes revenue in an amount that reflects the consideration to which the Company expects to be entitled in exchange for transferring promised goods or services to a customer. Sales and other taxes the Company collects concurrent with revenue-producing activities are excluded from revenue. Shipping fees charged to customers are reported within revenue.

The Company accounts for shipping and handling costs as fulfillment costs which are classified as part of cost of revenue.

The Company records a reserve for estimated product returns in each reporting period. This reserve is calculated using historical return trends and is recorded within other accounts payable and accrued expenses. Any difference between the actual returns and previous estimates is adjusted in the period in which such returns occur. The sales refund reserve as of December 31, 2022 and 2021, was immaterial.

For the years ended December 31, 2022 and 2021, the Company recognized $1,638 and $1,615 of revenue that was deferred as of December 31, 2021 and 2020, respectively. Deferred revenue as of December 31, 2022 amounted to $4,488 and is expected to be recognized when the performance obligation is satisfied.

u.   Cost of revenue:

Cost of revenue consists principally of the costs to procure the Company's products, including the amounts invoiced by third-party contract manufacturers and suppliers for inventory, as well as inbound and outbound shipping costs, duties and other related costs and inventory write-offs. Cost of revenue also include third-party fulfillment costs, warehousing, depreciation and amortization and packaging costs.

v.   Operating expenses:

*Selling, general and administrative expenses:*

Selling, general and administrative expenses primarily consist of marketing and advertising expenses, employee-related costs including salaries, benefits and share-based compensation, rents, software and product research and development costs, depreciation and amortization expense, professional fees, payment processing fees and other general expenses.

Advertising costs are expensed as incurred and were $92,048 and $63,771 for the years ended December 31, 2022 and 2021, respectively.

F-14

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 2: — SIGNIFICANT ACCOUNTING POLICIES (Continued)**

w.    Accounting for share-based compensation:

The Company accounts for share-based compensation in accordance with ASC No. 718, "Compensation — Stock Compensation" ("ASC 718") that requires companies to estimate the fair value of equity-based payment awards on the date of grant using an option-pricing model. The Company recognizes compensation expenses for the value of its awards granted based on the straight-line attribution method over the requisite service period of each of the awards. The Company recognizes forfeitures of awards as they occur.

The Company selected the Black-Scholes option-pricing model as the fair value method for its options awards. The option-pricing model requires a number of assumptions as noted below:

*Expected dividend yield* — *The expected dividend yield assumption is based on the Company's historical experience and expectation of no future dividend payouts. The Company has historically not paid cash dividends and has no foreseeable plans to pay cash dividends in the future.*

*Expected volatility* — *Since the Company is not traded on any stock exchange, quoted prices of the Company's shares are unavailable. According to ASC 718, due to insufficient or no historical data for the Company, the expected volatility determination was based on comparable companies' share volatility.*

*Risk free interest rate* — *The risk-free interest rate is based on the yield of U.S. Treasury bonds with equivalent terms.*

*Expected term* — *The period that the Company's options are expected to be outstanding was determined based on the simplified method permitted by Staff Accounting Bulletin No. 110 as the average of the vesting period and the contractual term of those options.*

*Fair value of ordinary shares* — *As the Company's ordinary shares are not publicly traded, the Company estimates the fair value of its ordinary shares based on contemporaneous valuations and other factors deemed relevant by management.*

x.    Basic and diluted earnings per share:

The Company computes earnings per share of Class A and Class B ordinary shares and Redeemable A shares using the two-class method. Basic earnings per share is computed using the weighted-average number of shares outstanding during the period. Diluted earnings per share is computed using the weighted-average number of shares and the effect of potentially dilutive securities outstanding during the period. Potentially dilutive securities consist of share-based compensation awards. The dilutive effect of share-based compensation awards is reflected in diluted earnings per share by application of the treasury stock method.

The distribution rights of Class A and Class B ordinary shares and Redeemable A shares are identical. The Redeemable A shares are contingently convertible (see Note 11), the conversion conditions have not been met as of December 31, 2022 and 2021, and the Redeemable A shares carrying amount exceeds the redemption value. As a result, the undistributed earnings are allocated based on the contractual participation rights of the Class A and Class B ordinary shares and Redeemable A shares as if the earnings for the year had been distributed. As the dividend rights are identical, the undistributed earnings are allocated on a proportionate basis.

y.    Operating segments:

Operating segments are defined as components of an entity for which separate financial information is available and that is regularly reviewed by the Chief Operating Decision Maker ("CODM") in deciding

F-15

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 2: — SIGNIFICANT ACCOUNTING POLICIES (Continued)**

how to make operating decisions, allocate resources to an individual segment and in assessing performance. The Company's CODM is its Chief Executive Officer. The Company operates in one operating segment and this segment comprises the only reporting unit.

z.   Leases

On January 1, 2022, the Company adopted Accounting Standards Update ("ASU") No. 2016-02, Leases ("Topic 842") using the modified retrospective transition approach by applying the new standard to all leases existing at the date of initial application. Results and disclosure requirements for reporting periods beginning after January 1, 2022 are presented under Topic 842, while prior period amounts have not been adjusted and continue to be reported in accordance with the historical accounting requirements under Topic 840.

The Company elected the package of practical expedients permitted under the transition guidance, which allowed it to carryforward the historical lease classification, the assessment on whether a contract was or contains a lease, and the initial direct costs for any leases that existed prior to January 1, 2022.

Leases are classified as either finance leases or operating leases. A lease is classified as a finance lease if any one of the following criteria are met: the lease transfers ownership of the asset by the end of the lease term, the lease contains an option to purchase the asset that is reasonably certain to be exercised, the lease term is for a major part of the remaining useful life of the asset, the present value of the lease payments equals or exceeds substantially all of the fair value of the asset, or the underlying asset is of such a specialized nature that it is expected to have no alternative use to the lessor at the end of lease term.

A lease is classified as an operating lease if it does not meet any one of these criteria. Since all the Company's lease contracts do not meet any of the criteria above, the Company concluded that all its lease contracts should be classified as operating leases.

Under Topic 842, the Company determined if an arrangement is a lease at inception. ROU assets and lease liabilities are recognized at commencement date based on the present value of remaining lease payments over the lease term. For this purpose, the Company considered only payments that are fixed and determinable at the time of commencement. As most of the Company's leases do not provide an implicit rate, the Company used its incremental borrowing rate based on the information available at commencement date in determining the present value of lease payments. The ROU asset also includes any lease payments made prior to commencement and is recorded net of any lease incentives received. The lease terms may include options to extend or terminate the lease when it is reasonably certain that the Company will exercise such options. Variable lease costs are expensed as incurred on the consolidated statements of income.

Operating leases are included in operating lease ROU assets, current maturities of operating lease liabilities, and operating lease liabilities, non-current on the consolidated balance sheets.

aa.   Recently issued and recently adopted accounting pronouncements:

As an "emerging growth company", the Jumpstart Our Business Startups Act ("JOBS Act") allows the Company to delay adoption of new or revised accounting pronouncements applicable to public companies until such pronouncements are made applicable to private companies. The Company has elected to use this extended transition period under the JOBS Act and as a result of this election, the financial statements may not be comparable to companies that comply with public company effective dates. The adoption dates discussed below reflect this election.

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 2: — SIGNIFICANT ACCOUNTING POLICIES (Continued)**

On January 1, 2022, the Company adopted Topic 842, which supersedes the lease accounting guidance under Topic 840, and generally requires lessees to recognize operating and financing lease liabilities and corresponding ROU assets on the balance sheet and to provide enhanced disclosures surrounding the amount, timing and uncertainty of cash flows arising from leasing arrangements. The Company adopted the new guidance using the modified retrospective transition approach by applying the new standard to all leases existing on the date of initial application and not restating comparative periods. The most significant impact was the recognition of total ROU assets and corresponding liabilities of $17,208 on the consolidated balance sheets. The ROU assets include adjustments for prepayments and accrued lease payments. The adoption did not impact the beginning balance of retained earnings, or prior year consolidated statements of income and statements of cash flows.

In June 2016, the FASB issued ASU No. 2016-13, Financial Instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments ("ASU 2016-13"), which replaces the existing incurred loss impairment model with an expected credit loss model and requires a financial asset measured at amortized cost to be presented at the net amount expected to be collected. The guidance will be effective for the Company beginning January 1, 2023. ASU 2016-13 is not expected to have a material impact on the Company's consolidated financial statements.

In October 2021, the FASB issued ASU 2021-08, Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers (ASU 2021-08). ASU 2021-08 requires an acquirer in a business combination to recognize and measure contract assets and contract liabilities acquired in a business combination in accordance with ASC 606, Revenue from Contracts with Customers, as if it had originated the contracts. The standard is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2023. ASU 2021-08 is not expected to have a material impact on the Company's consolidated financial statements.

**NOTE 3: — ACQUISITIONS**

On July 9, 2021, the Company entered into a share purchase agreement with the shareholders of Voyage81 Ltd. ("Voyage81"), a developer of computer vision solutions which recover hyperspectral information from existing cameras, providing a unique and low-cost solution for low-light and material sensing, whereby the Company acquired all of the shares of Voyage81 from such shareholders. The aggregate purchase price amounted to $32,508 and was comprised of cash payment in the amount of $20,233 and the issuance of a new class of shares, Redeemable A shares, out of which 63,904 (adjusted for the issuance of Class B ordinary shares and additional Redeemable A shares, see Note 11) were issued to the sellers for an aggregated fair value of $12,275. The cash consideration was comprised of $16,975 which was paid at the closing date and $3,258 of deferred consideration to be paid over the course of three years.

The results of Voyage81's operations have been included in the consolidated financial statements since July 29, 2021. Pro forma results of operations related to this acquisition have not been prepared because they are not material to the Company's consolidated statements of income.

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 3: — ACQUISITIONS (Continued)**

The purchase price allocation for the acquisition has been determined as follows:

| | |
|---|---:|
| Tangible assets (including receivables, property and equipment and other) | $ 4,822 |
| Deferred tax liability, net | (957) |
| Intangible assets: | |
| Technology | 12,712 |
| Goodwill | 15,931 |
| Total assets | $32,508 |

The acquired technology was valued by using the multi-period excess earnings method under the income approach. This method reflects the present value of the projected cash flows that are expected to be generated by the acquired technology after making adjustments for the cash flow contributions of other assets, which are also known as contributory asset charges.

The weighted-average useful life for the Technology purchased is 6 years.

Goodwill generated from the above business combinations is attributed to synergies between the Company's and the acquired business and is not deductible for income tax purposes. The acquisition-related costs were immaterial.

**NOTE 4: — INVENTORY**

| | December 31, | |
|---|---:|---:|
| | **2022** | **2021** |
| Raw materials and work in progress | $27,307 | $27,717 |
| Finished goods | 42,923 | 23,740 |
| Total | $70,230 | $51,457 |

Write down to reduce inventories to net realizable value as of December 31, 2022 and 2021 amounted to $2,236 and $865, respectively.

**NOTE 5: — PROPERTY, PLANT AND EQUIPMENT**

| | December 31, | |
|---|---:|---:|
| | **2022** | **2021** |
| Cost: | | |
| Computers, software and electronic equipment | $ 2,827 | $ 2,062 |
| Office, furniture and equipment | 1,690 | 1,231 |
| Molds and others | 2,446 | 1,974 |
| Leasehold improvements | 16,161 | 15,510 |
| | 23,124 | 20,777 |
| Less – accumulated depreciation | (13,656) | (11,121) |
| Property, plant and equipment, net | $ 9,468 | $ 9,656 |

Depreciation and amortization expenses for the years ended December 31, 2022 and 2021 amounted to $2,535 and $2,803, respectively.

F-18

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 6: — GOODWILL AND OTHER INTANGIBLE ASSETS, NET**

a.   Goodwill:

| | 2022 | 2021 |
|---|---|---|
| Balance as of January 1, | $16,237 | $   306 |
| Acquisition | — | 15,931 |
| Balance as of December 31, | $16,237 | $16,237 |

b.   Other intangible assets, net:

| | December 31, 2022 | | |
|---|---|---|---|
| | Gross carrying amount | Accumulated amortization | Net carrying amount |
| Internal-used software | $15,711 | $(3,089) | $12,622 |
| Technology | 13,033 | (311) | 12,722 |
| Other intangibles | 2,147 | (691) | 1,456 |
| Total intangible assets | $30,891 | $(4,091) | $26,800 |

| | December 31, 2021 | | |
|---|---|---|---|
| | Gross carrying amount | Accumulated amortization | Net carrying amount |
| Internal-used software | $ 9,083 | $(1,538) | $ 7,545 |
| Technology | 13,033 | (205) | 12,828 |
| Other intangibles | 1,765 | (475) | 1,290 |
| Total intangible assets | $23,881 | $(2,218) | $21,663 |

c.   Amortization expenses for the years ended December 31, 2022 and 2021 amounted to $1,873 and $1,203, respectively.

d.   The estimated future amortization expense of other intangible assets as of December 31, 2022 is as follows:

| | |
|---|---|
| 2023 | $ 5,329 |
| 2024 | 5,601 |
| 2025 | 4,971 |
| 2026 | 4,258 |
| 2027 | 3,499 |
| Thereafter | 3,142 |
| | $26,800 |

F-19

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 7: — OTHER ACCOUNTS PAYABLE AND ACCRUED EXPENSES**

| | December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Employees and related accruals | $19,370 | $ 4,973 |
| Government authorities | 12,904 | 6,645 |
| Other | 5,518 | 2,501 |
| Total | $37,792 | $14,119 |

**NOTE 8: — LOANS**

a.    2016 Credit Line Agreement:

On May 10, 2016, the Company entered into a credit line agreement with a bank (the "2016 Credit Line Agreement"), denominated in New Israeli Shekels ("NIS"), pursuant to which the Company may withdraw an aggregate principal amount of up to NIS 25,000,000 ($7,104 according to the applicable exchange rate as of December 31, 2022). The 2016 Credit Line has a maturity date of one year which is automatically renewed on an annual basis. The principal amount will bear interest at a floating per annum rate equal to prime plus 1.4% and additional annual fee of 0.4% of the unused credit line. During the years ended December 31, 2022 and 2021, the Company did not withdraw or repay any amounts in respect of the 2016 Credit Line Agreement. The outstanding balance of the loan as of December 31, 2022 and 2021 was $3,569 and $4,036, respectively. Interest expense was immaterial for the years ended December 31, 2022 and 2021.

b.    2020 Loan Agreement:

On April 27, 2020, the Company entered into a loan agreement with a bank (the "2020 Loan Agreement"), denominated in NIS, pursuant to which the Company borrowed an aggregate principal amount of NIS 5,000,000 ($1,420 according to the applicable exchange rate as of December 31, 2022). The principal amount will bear interest at a floating per annum rate equal to prime plus 1.5% starting April 27, 2021 (the "Commencement Date"). Following the Commencement Date, the Company shall make 48 monthly installments of principal and interest. The outstanding balance of the loan as of December 31, 2022 and 2021 was $813 and $1,313, respectively.

**NOTE 9: — COMMITMENTS AND CONTINGENCIES**

a.    Guarantees:

Guarantees in the amount of $916 were issued by banks to secure rent payments to landlords.

b.    Liens:

The loans made under the 2016 Credit Line Agreement and the 2020 Loan Agreement are secured by a floating charge on the Company's assets and liens on deposit in the amount of $2,000. This amount is reflected under prepaid expenses and other current assets on the consolidated balance sheets.

c.    Litigation:

From time to time, the Company is party to various legal proceedings, claims and litigation that arise in the normal course of business. In the opinion of management, the ultimate outcome of these matters will not have a material adverse effect on the Company's financial position, results of operations or cash flows. Accruals for loss contingencies are recorded when a loss is probable, and the amount of such loss can be reasonably estimated.

F-20

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 10: — LEASES**

The Company has entered into various non-cancelable operating lease agreements for certain office spaces, stores and motor vehicles. The leases have remaining lease terms of up to 5 years, some of which may include options to extend the leases for up to an additional 5 years. The Company does not assume renewals in its determination of the lease term unless the renewals are considered as reasonably assured.

The components of operating lease cost recorded under operating expenses for the year ended December 31, 2022 were as follows:

| | |
|---|---|
| Operating lease cost | $5,133 |
| Short term lease cost | 364 |
| | $5,472 |

Supplemental balance sheet information related to operating leases is as follows:

| | December 31, 2022 |
|---|---|
| Operating lease ROU assets | $13,278 |
| Operating lease liabilities, current | 3,890 |
| Operating lease liabilities, non-current | 8,076 |
| Weighted-average remaining lease term (in years) | 4.23 |
| Weighted-average discount rate | 1.67% |

Future minimum lease payments under non-cancelable operating lease agreements as of December 31, 2022, were as follows:

| | December 31, 2022 |
|---|---|
| 2023 | $ 4,053 |
| 2024 | 3,107 |
| 2025 | 1,908 |
| 2026 | 1,287 |
| 2027 | 856 |
| Thereafter | 1,235 |
| Total undiscounted lease payments | $12,446 |
| Less: imputed interest | (480) |
| Present value of lease liabilities | $11,966 |

**NOTE 11: — SHAREHOLDERS' EQUITY**

a.   Ordinary shares:

On February 2022, the Company amended its articles of association to include a dual class ordinary share structure pursuant to which the Company will have two classes of ordinary shares outstanding: Class A ordinary shares and Class B ordinary shares. The rights of the holders of Class A ordinary shares and Class B ordinary shares are identical, except with respect to voting rights, conversion rights, and transfer rights. Immediately after the effectiveness of the dual class structure,

F-21

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 11: — SHAREHOLDERS' EQUITY (Continued)**

the Company issued and distributed Class B ordinary shares to the holders of Class A ordinary shares on a one-for-one ratio, such that each holder of Class A ordinary shares received one Class B ordinary share for each Class A ordinary share. In addition, Redeemable A shareholders received additional Redeemable A shares on a one-for-one ratio. Holders of the Class A ordinary shares and Class B ordinary shares will vote together as a single class on all matters submitted to a vote of shareholders except as otherwise provided in the Company's amended and restated articles of association or as required by applicable law.

These consolidated financial statements have been retroactively adjusted to give effect to the dual class share structure for all periods presented.

    1.    Class A ordinary shares:

Confer upon their holders voting rights, rights to receive dividends and certain other rights as described in the Company's articles of association and under the applicable law.

    2.    Class B ordinary shares:

Confer upon their holders identical rights as Class A ordinary shares, except with respect to voting rights, conversion rights, and transfer rights. Each holder of Class B ordinary shares shall be entitled to ten votes for each Class B ordinary share. Each Class B ordinary share is convertible at any time at the option of the holder into one Class A ordinary share. In addition, each Class B ordinary share will convert automatically on a one-for-one basis into a Class A ordinary share upon the sale or transfer of such Class B ordinary share, other than excluded transfers as further described in the Company's amended and restated articles of association.

b.    Redeemable A shares:

Redeemable A shares confer upon their holders rights to receive dividends and certain other rights as described in the Company's articles of association and under the applicable law with no voting rights. The holder of such shares has a redemption right in the case that the Company does not consummate a Deemed Liquidation Event (as defined in the Company's articles of association) prior to the second anniversary of the date of the issuance of the Redeemable A shares for an aggregated redemption value of $12,000.

The deemed liquidation preference provisions of the Redeemable A shares are considered contingent redemption provisions that are not solely within the Company's control. Accordingly, the Redeemable A shares have been presented outside of permanent equity in the temporary equity (mezzanine) section of the consolidated financial statements.

During the years ended December 31, 2022 and 2021, the Company did not adjust the carrying values of the redeemable shares to the deemed liquidation values of such shares since Redeemable A shares carrying amount exceeds the redemption value.

c.    2020 Equity incentive plan:

On April 1, 2020, the Company's board of directors adopted the IL Makiage Cosmetics (2013) Ltd. 2020 Equity Incentive Plan (the "Plan").

The Plan provides for the grant of share options, share awards and restricted shares to the Company's and its affiliates' respective employees, non-employee directors and consultants. The options generally vest over four years and have 5-10 years contractual terms. Any option that is forfeited or canceled before expiration becomes available for future grants under the Plan. Each option, that

F-22

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 11: — SHAREHOLDERS' EQUITY (Continued)**

was granted before the issuance of Class B shares, is exercisable for one Class A share and one Class B share. Each option, that was granted thereafter is exercisable for one Class A ordinary share.

The fair value of options granted during the years ended December 31, 2022 and 2021 is estimated at the date of grant using the following grant date weighted average assumptions:

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | **2022** | **2021** |
| Risk-free interest rate | 1.35% – 4.13% | 0.46% – 1.18% |
| Expected term (in years) | 3.31 – 3.61 | 2.5 – 6.13 |
| Expected volatility | 40% | 40% |
| Expected dividend yield | 0% | 0% |

A summary of Company's stock options that are exercisable for one Class A ordinary share and one Class B ordinary share activity is as follows:

|  | Number of options | Weighted average exercise price | Weighted average remaining contractual terms (in years) | Aggregate intrinsic value |
| --- | --- | --- | --- | --- |
| Outstanding at beginning of year | 178,523 | $285.91 | 6.48 | $79,611 |
| Granted | 1,036 | 433.07 |  |  |
| Exercised | (775) | 97.21 |  |  |
| Forfeited | (5,642) | 162.78 |  |  |
| Outstanding at end of year | 173,142 | 291.65 | 5.39 | 82,580 |
| Exercisable at end of year | 65,156 | $271.62 | 5.64 | $32,382 |

Intrinsic value represents the potential amount receivable by the option holders had all option holders exercised their share options as of such date.

The weighted-average grant date fair value of options granted during the year ended December 31, 2022 and 2021 was $381.69 and $108.22, respectively.

The aggregate intrinsic value of the exercised share options for the year ended December 31, 2022 was $520.

F-23

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 11: — SHAREHOLDERS' EQUITY (Continued)**

A summary of Company's stock options that are exercisable for one Class A ordinary share activity is as follows:

| | Number of options | Weighted average exercise price | Weighted average remaining contractual terms (in years) | Aggregate intrinsic value |
|---|---|---|---|---|
| Outstanding at beginning of year | — | $    — | — | $    — |
| Granted | 13,144 | 202.59 | | |
| Exercised | — | — | | |
| Forfeited | — | — | | |
| Outstanding at end of year | 13,144 | 202.59 | 4.83 | 2,388 |
| Exercisable at end of year | 983 | $296.84 | 4.78 | $    86 |

The weighted-average grant date fair value of options granted during the fiscal year ended December 31, 2022 was $230.27.

As of December 31, 2022, there were $13,408 of total unrecognized compensation cost related to non-vested share-based compensation arrangements granted under the Plan. This expense is expected to be recognized over a period of approximately 4 years.

The following table summarizes the activities for unvested RSUs that settle upon vesting into one Class A ordinary share and one Class B ordinary share for the year ended December 31, 2022:

| | Number of RSUs | Weighted- average grant date fair value |
|---|---|---|
| Outstanding as of January 1, 2022 | 8,266 | $534.98 |
| Granted | 1,162 | 731.85 |
| Vested | (2,945) | 541.40 |
| Forfeited | (308) | 534.98 |
| Outstanding as of December 31, 2022 | 6,175 | $568.97 |

The following table summarizes the activities for unvested RSUs that settle upon vesting into one Class A share for the year ended December 31, 2022:

| | Number of RSUs | Weighted- average grant date fair value |
|---|---|---|
| Outstanding as of January 1, 2022 | — | $    — |
| Granted | 10,016 | 383.58 |
| Vested | (1,883) | 396.73 |
| Forfeited | — | — |
| Outstanding as of December 31, 2022 | 8,133 | $380.54 |

As of December 31, 2022, there were $5,616 of total unrecognized compensation cost related to RSUs granted under the Plan. This expense is expected to be recognized over a period of approximately 4 years.

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 12: — EARNINGS PER SHARE**

The Company computes earnings per share of Class A and Class B ordinary shares and Redeemable A shares using the two-class method. Basic earnings per share is computed using the weighted-average number of shares outstanding during the period. Diluted earnings per share is computed using the weighted-average number of shares and the effect of potentially dilutive securities outstanding during the period. Potentially dilutive securities consist of employee stock options and restricted stock units. The dilutive effect of outstanding employee stock options and restricted stock units is reflected in diluted earnings per share by application of the treasury stock method.

The rights, including the liquidation and dividend rights, of the holders of the Company's Class A and Class B ordinary shares and Redeemable A shares are identical, except with respect to voting. As a result, the undistributed earnings for each year are allocated based on the contractual participation rights of the Class A and Class B ordinary shares and Redeemable A shares as if the earnings for the year had been distributed. As the liquidation and dividend rights are identical, the undistributed earnings are allocated on a proportionate basis.

In the years ended December 31, 2022 and 2021, the earnings per share amounts are the same for Class A and Class B ordinary and Redeemable A shares because the holders of each class are entitled to equal per share dividends or distributions in liquidation in accordance with the Company's articles of association.

The following tables set forth the computation of basic and diluted earnings per share attributable to Class A and Class B ordinary shares and Redeemable A shares:

| | Year Ended December 31, 2022 | | |
| --- | --- | --- | --- |
| | Class A ordinary shares | Class B ordinary shares | Redeemable A shares |
| Basic earnings per share: | | | |
| Numerator: | | | |
| Allocation of undistributed earnings | $ 14,563 | $ 6,764 | $ 401 |
| Denominator: | | | |
| Number of shares used in per share computation | 2,320,999 | 1,077,949 | 63,904 |
| Basic earnings per share | $ 6.27 | $ 6.27 | $ 6.27 |
| Diluted earnings per share: | | | |
| Numerator: | | | |
| Allocation of undistributed earnings for basic computation | $ 14,563 | $ 6,764 | $ 401 |
| Reallocation of undistributed earnings | (198) | 220 | (22) |
| Allocation of undistributed earnings | 14,365 | 6,984 | 379 |
| Denominator: | | | |
| Number of shares used in basic computation | 2,320,999 | 1,077,949 | 63,904 |
| Weighted-average effect of dilutive securities: | | | |
| Employee stock options and RSUs | 98,775 | 98,346 | — |
| Number of shares used in per share computation | 2,419,774 | 1,176,295 | — |
| Diluted earnings per share | $ 5.94 | $ 5.94 | $ 5.94 |

F-25

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 12: — EARNINGS PER SHARE (Continued)**

| | Year Ended December 31, 2021 | | |
| --- | --- | --- | --- |
| | Class A ordinary shares | Class B ordinary shares | Redeemable A shares |
| Basic earnings per share: | | | |
| Numerator: | | | |
| Allocation of undistributed earnings | $ 6,905 | $ 6,905 | $ 110 |
| Denominator: | | | |
| Number of shares used in per share computation | 1,697,206 | 1,697,206 | 27,137 |
| Basic earnings per share | $ 4.07 | $ 4.07 | $ 4.07 |
| Diluted earnings per share: | | | |
| Numerator: | | | |
| Allocation of undistributed earnings for basic computation | $ 6,905 | $ 6,905 | $ 110 |
| Reallocation of undistributed earnings | 1 | 1 | (2) |
| Allocation of undistributed earnings | 6,906 | 6,906 | 108 |
| Denominator: | | | |
| Number of shares used in basic computation | 1,697,206 | 1,697,206 | 27,137 |
| Weighted-average effect of dilutive securities: | | | |
| Employee stock options and RSUs | 25,638 | 25,638 | — |
| Number of shares used in per share computation | 1,722,844 | 1,722,844 | 27,137 |
| Diluted earnings per share | $ 4.01 | $ 4.01 | $ 4.01 |

Employee stock options to purchase 17,327 and 8,786 ordinary shares were excluded from the calculation during 2022 and 2021, respectively, because the effect would be anti-dilutive. The basic and diluted earnings per share were adjusted to reflect the issuance of Class B ordinary shares and additional Redeemable A shares.

**NOTE 13: — GEOGRAPHICAL INFORMATION**

Revenues from sales to customers:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| North America | $258,726 | $170,543 |
| Others | 65,794 | 52,012 |
| Total net revenue | $324,520 | $222,555 |

Total revenue is attributed to geographic areas based on the location of the end customer.

F-26

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 13: — GEOGRAPHICAL INFORMATION (Continued)**

The following table summarizes long-lived assets by geographic area, which consist of property, plant and equipment, net and right-of-use assts:

|  | December 31, | |
|---|---|---|
|  | **2022** | **2021** |
| Israel | $18,665 | $6,882 |
| United States | 4,081 | 2,774 |
| Total long-lived assets | $22,746 | $9,656 |

**NOTE 14: — TAXES ON INCOME**

a.   Tax rates applicable to the Company:

*Israeli parent and Israeli subsidiaries:*

The tax rate applicable to the Israeli companies in 2022 and 2021 is — 23%.

Applicable benefits to the Company:

1.   "Preferred Technology Enterprises" ("PTE") granting a 12% tax rate in central Israel on qualified income deriving from Benefited Intellectual Property, subject to a number of conditions being fulfilled, including a minimal amount or ratio of annual R&D expenditure and R&D employees, as well as having at least 25% of annual income derived from exports to large markets.

2.   A withholding tax rate of 20% for dividends paid from PTE income (with an exemption from such withholding tax applying to dividends paid to an Israeli company). Such rate may be reduced to 4% on dividends paid to a foreign resident company, subject to certain conditions regarding percentage of foreign ownership of the distributing entity.

The Company elected to apply the PTE regime in 2022 for its qualified income and believes it meets the required conditions.

*Income taxes on non-Israeli subsidiaries:*

Non-Israeli subsidiaries are taxed according to the tax laws in their respective countries of residence.

The Company does not provide deferred tax liabilities when it intends to reinvest earnings of foreign subsidiaries indefinitely or if distributed, no tax liability will be imposed. Undistributed earnings of foreign subsidiaries that are not distributed amounted to $10,508   and unrecognized deferred tax liability related to such earning amounted to $2,417 as of December 31, 2022.

b.   Deferred income taxes:

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes.

F-27

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 14: — TAXES ON INCOME (Continued)**

| | December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Deferred tax assets: | | |
| Research and development costs | $ 661 | $ 601 |
| Depreciation and amortization | 519 | 463 |
| Employees and other accruals | 1,457 | 541 |
| Operating lease liabilities | 2,691 | — |
| Stock based compensation | 1,177 | 420 |
| Net operating losses | 908 | 696 |
| Other | 467 | 397 |
| Deferred tax assets | 7,880 | 3,118 |
| Valuation allowance | (1,010) | (686) |
| Net deferred tax assets | 6,870 | 2,432 |
| Deferred tax liabilities: | | |
| Property and equipment | (182) | (235) |
| Operating lease right-of-use assets | (2,980) | — |
| Intangible assets | (1,529) | (1,533) |
| Total deferred tax liabilities | (4,691) | (1,768) |
| Total deferred tax assets, net | $ 2,179 | $ 664 |

c.    A reconciliation of the Company's effective tax rate to the statutory tax rate in Israel is as follows:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Income before taxes on income, as reported in the consolidated statements of income | $28,912 | $18,635 |
| Statutory tax rate in Israel | 23% | 23% |
| Theoretical taxes on income | $ 6,650 | $ 4,286 |
| Foreign currency measurement differences (*) | 662 | (172) |
| Preferred Enterprise tax (**) | (1,996) | (388) |
| Subsidiaries taxed at different tax rate | 418 | 61 |
| Non-deductible expenses | 732 | 414 |
| Uncertain tax positions | 858 | 90 |
| Other | (140) | 424 |
| Actual tax expenses | 7,184 | $ 4,715 |

---

(*)    Results for tax purposes are measured under the "Measurement of results for tax purposes under the Income Tax (Inflationary Adjustments) Law, 1985", in terms of earnings in NIS. As explained in Note 2c, the financial statements are measured in U.S. dollars. The difference between the annual changes in the NIS/dollar exchange rate causes a difference between taxable income and the income before taxes shown in the financial statements. In accordance with ASC 740-10-25-3(F), the Company has not provided deferred income taxes in respect of the difference between the functional currency and the tax bases of assets and liabilities.

| (**) | Basic earnings per share amounts of the benefit resulting from the Technological Preferred or Preferred Enterprise status | $0.58 | $0.11 |
| --- | --- | --- | --- |
| | Diluted earnings per share amounts of the benefit resulting from the Technological Preferred or Preferred Enterprise status | $0.55 | $0.11 |

F-28

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 14: — TAXES ON INCOME (Continued)**

d.   Income before taxes on income is comprised as follows:

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Domestic (Israel) | $22,205 | $18,045 |
| Foreign | 6,707 | 590 |
| Total | $28,912 | $18,635 |

e.   Actual tax expenses are comprised as follow:

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Current: | | |
| Domestic (Israel) | $ 4,528 | $4,463 |
| Foreign | 4,171 | 1,155 |
| Total current income tax expense | $ 8,699 | $5,618 |
| Deferred: | | |
| Domestic | (181) | (276) |
| Foreign | (1,334) | (627) |
| Total deferred income tax expense | (1,515) | (903) |
| Total taxes on income | $ 7,184 | $4,715 |

f.   A reconciliation of the beginning and ending balances of the total amounts of unrecognized tax benefits are as follows:

| | **2022** | **2021** |
| --- | --- | --- |
| Uncertain tax positions, beginning of year | $1,081 | $  287 |
| Decrease related to previous years tax positions | (247) | — |
| Increase related to previous years tax positions | 41 | 10 |
| Increases in tax positions for current year | 907 | 784 |
| Uncertain tax positions, end of year | $1,782 | $1,081 |

The Company currently does not expect uncertain tax positions to change significantly over the next 12 months, except in the case of settlements with tax authorities, the likelihood and timing of which is difficult to estimate. Timing of the resolution of audits is highly uncertain and therefore as of December 31, 2022, the Company cannot estimate the change in unrecognized tax benefits resulting from these audits within the next 12 months.

Substantially all the balance of unrecognized tax benefits, if recognized, would reduce the Company's annual effective tax rate.

The Company adjusts the unrecognized tax benefit liability and income tax expense in the period in which the uncertain tax position is effectively settled, the statute of limitations expires or when new information is available.

F-29

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 14: — TAXES ON INCOME (Continued)**

During the years ended December 31, 2022 and 2021, interest expense related to uncertain tax positions was immaterial. As of December 31, 2022 and 2021, accrued interest liability related to uncertain tax positions was immaterial and is included within income tax accrual on the balance sheets. The Company did not accrue penalties during the years ended December 31, 2022 and 2021.

The Company believes that it has adequately provided for any reasonably foreseeable outcomes related to tax audits and settlement. The final tax outcome of its tax audits could be different from that which is reflected in the Company's income tax provisions and accruals. Such differences could have a material effect on the Company's income tax provision and net income in the period in which such determination is made.

The Company believes it had adequately provided for all of its uncertain tax positions, including those items currently under dispute.

As of December 31, 2022, the Company had open tax years for the periods between 2017 and 2022 in Israel and for the periods between 2019 and 2022 for the U.S. subsidiaries.

**NOTE 15: — RELATED PARTY TRANSACTIONS**

On July 5, 2017, the Company entered into a service agreement with Cosmofill Industries Ltd. ("Cosmofill"), an entity controlled by one of the Company's shareholders which provides the Company with filling and assembling services for some of the Company's cosmetic products.

Services provided to the Company by Cosmofill amounted to $113 and $109 for the years ended December 31, 2022 and 2021, respectively. The outstanding balance in respect of this related party transaction as of December 31, 2022 and 2021 was insignificant.

On October 6, 2020, the Company entered into a loan agreement with the Company's co-founder and Chief Executive Officer for an aggregate principle amount of $3,000, which had an annual interest rate of 0.49%. The loan was provided in January 2021 and was repaid in full in December 2021.

As of December 31, 2021 the Company had a current receivable balance of $625 with its Chief Executive Officer, which was fully repaid during April 2022.

On October 4, 2020, the Company provided its co-founders, the Chief Executive Officer and Chief Product Officer, with an incentive plan (the "Incentive Plan") in connection with certain revenue thresholds over agreed period. Under the Incentive Plan, the Chief Executive Officer and Chief Product Officer are eligible to earn up to $20,000 and $10,000 of incremental incentive bonuses respectively, subject to certain revenue thresholds and other conditions. As of December 31, 2022, the Company recognized an expense of $12,643 under the Incentive Plan.

**NOTE 16: — DIGITAL SECURITIES**

On April 26, 2022, the Company launched an offering of digital securities (the "Digital Securities"). The Digital Securities are represented by a blockchain-based digital token using the Ethereum blockchain. Each Digital Security will automatically convert into Class A ordinary share of the Company immediately prior to the closing of an initial public offering by the Company of its Class A ordinary shares (an "IPO") at a conversion price equal to 80% of the initial price per Class A ordinary share to the public in an IPO, subject to customary adjustments in the event of any stock dividend, stock split, combination or similar recapitalization affecting such shares. Holders of the Digital Securities do not have any voting rights, are not entitled to any dividends or other distributions, and do not have any right to the Company's assets in the event of a liquidation, dissolution or winding-up of the Company. Upon conversion of the

F-30

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 16: — DIGITAL SECURITIES (Continued)**

Digital Securities into Class A ordinary shares, the digital token previously representing such Digital Securities will be decommissioned. The Class A ordinary shares will have the rights and preferences set forth in the Company's articles of association. This offer has been prepared solely for the benefit of "accredited investors" (as such term is defined under Regulation D) and certain parties that are not "U.S. persons". The Company issued an aggregate of 648 digital securities at a purchase price per digital security of $1,000.

The Digital Securities will be redeemable, in whole or in part, at the Company's option at a cash redemption price equal to the original purchase price per Digital Security to be redeemed.

The Company concluded that the digital securities are not indexed to the Company's own stock and should be recorded as a liability measured at fair value with changes in fair value recognized in earnings.

The Digital Securities' change in the fair value during the year ended December 31, 2022 was immaterial.

**NOTE 17: — SUBSEQUENT EVENTS**

The Company evaluated all events or transactions that occurred subsequent to December 31, 2022, through the date of approval of these financial statements, May 1, 2023, and has determined that there are no subsequent events that require disclosure or recognition in the financial statements except for the below:

In April 2023, the Company signed an agreement to acquire 100% of the shares of Revela Inc. ("Revela"), a US biotechnology company. The aggregated purchase price amounted to $70,000 subject to certain price adjustments as described in the agreement. The consideration was comprised of cash and the Company's restricted shares which are subject to certain performance milestones as specified in the agreement. In addition, the transaction includes additional consideration related to compensation for post combination services. Closing of the acquisition is subject to fulfillment of certain conditions as agreed by the parties.

F-31

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**CONSOLIDATED FINANCIAL STATEMENTS**

**AS OF MARCH 31, 2023**

**Unaudited**

**INDEX**

|  | Page |
| --- | --- |
| **Consolidated Balance Sheets** | **F-33 – F-34** |
| **Consolidated Statements of Income** | **F-35** |
| **Statements of Redeemable A Shares and Changes in Shareholders' Equity** | **F-36** |
| **Consolidated Statements of Cash Flows** | **F-37** |
| **Notes to Consolidated Financial Statements** | **F-38 – F-46** |

F-32

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**
**U.S. dollar in thousands**

| | March 31, 2023 | December 31, 2022 |
|---|---|---|
| | (Unaudited) | |
| **ASSETS** | | |
| CURRENT ASSETS: | | |
| Cash and cash equivalents | $ 99,916 | $ 40,955 |
| Short-term deposits | 8,000 | 18,000 |
| Trade receivables | 8,536 | 7,576 |
| Inventory | 69,851 | 70,230 |
| Prepaid expenses and other current assets | 13,435 | 9,172 |
| Total current assets | 199,738 | 145,933 |
| LONG-TERM ASSETS: | | |
| Property, plant and equipment, net | 9,185 | 9,468 |
| Deferred tax assets, net | 2,429 | 2,334 |
| Intangible assets, net | 26,508 | 26,800 |
| Goodwill | 16,237 | 16,237 |
| Operating lease right-of-use assets | 14,835 | 13,278 |
| Other assets | 3,577 | 2,358 |
| Total long-term assets | 72,771 | 70,475 |
| Total assets | $ 272,509 | $ 216,408 |

The accompanying notes are an integral part of the unaudited interim consolidated financial statements.

F-33

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**
**U.S. dollar in thousands (except share and per share data)**

| | March 31, 2023 | December 31, 2022 |
|---|---|---|
| | (Unaudited) | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| CURRENT LIABILITIES: | | |
| Trade payables | $ 73,157 | $ 44,807 |
| Other accounts payable and accrued expenses | 45,294 | 37,792 |
| Short-term debt and current maturities of long-term debt | 1,316 | 3,917 |
| Current maturities of operating lease liabilities | 3,827 | 3,890 |
| Total current liabilities | 123,594 | 90,406 |
| LONG-TERM LIABILITIES: | | |
| Operating lease liabilities, non-current | 9,484 | 8,076 |
| Digital securities liability | 680 | 648 |
| Other long-term liabilities | 6,122 | 6,298 |
| Total liabilities | 139,880 | 105,428 |
| COMMITMENTS AND CONTINGENCIES (Note 5) | | |
| Redeemable A shares of NIS 0.001 par value each – Authorized: 2,000,000 shares at March 31, 2023 (unaudited) and December 31, 2022; Issued and outstanding: 63,904 shares at March 31, 2023 (unaudited) and December 31, 2022 | 12,275 | 12,275 |
| SHAREHOLDERS' EQUITY: | | |
| Class A ordinary shares of NIS 0.001 par value each – Authorized: 10,000,000 shares at March 31, 2023 (unaudited) and December 31, 2022; Issued and outstanding: 2,493,673 and 2,493,153 shares at March 31, 2023 (unaudited) and December 31, 2022, respectively | —(*) | —(*) |
| Class B ordinary shares of NIS 0.001 par value each – Authorized: 2,000,000 shares at March 31, 2023 (unaudited) and December 31, 2022; Issued and outstanding: 910,826 and 910,792 shares at March 31, 2023 (unaudited) and December 31, 2022, respectively | —(*) | —(*) |
| Additional paid-in capital | 55,782 | 53,723 |
| Cumulative translation adjustments | 1,738 | 1,738 |
| Retained earnings | 62,834 | 43,244 |
| Total shareholders' equity | 120,354 | 98,705 |
| Total liabilities and shareholders' equity | $ 272,509 | $ 216,408 |

(*)    Represents an amount lower than $1.

The accompanying notes are an integral part of the unaudited interim consolidated financial statements.

F-34

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF INCOME**
**U.S. dollar in thousands (except share and per share data)**

| | Three months ended March 31, | |
|---|---|---|
| | 2023 | 2022 |
| | (Unaudited) | |
| Net revenue | $ 165,654 | $ 90,414 |
| Cost of revenue | 48,169 | 30,047 |
| Gross profit | 117,485 | 60,367 |
| Selling, general and administrative | 92,764 | 56,732 |
| Operating income | 24,721 | 3,635 |
| Financial expenses (income), net | 157 | (443) |
| Income before taxes on income | 24,564 | 4,078 |
| Taxes on income | 4,974 | 1,067 |
| Net income | $ 19,590 | $ 3,011 |
| Basic earnings per share of Class A and Class B ordinary share and Redeemable A share | $ 5.65 | $ 0.87 |
| Diluted earnings per share of Class A and Class B ordinary share and Redeemable A share | $ 5.34 | $ 0.82 |

The accompanying notes are an integral part of the unaudited interim consolidated financial statements.

F-35

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**STATEMENTS OF REDEEMABLE A SHARES AND CHANGES IN SHAREHOLDERS' EQUITY**
**U.S. dollars in thousands (except share and per share data)**

| | Redeemable A shares | | Class A ordinary shares | | Class B ordinary shares | | Additional paid-in capital | Retained earnings | Cumulative translation adjustments | Total shareholders' equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| Balance as of January 1, 2023 | 63,904 | $ 12,275 | 2,493,153 | $ —(*) | 910,792 | $ —(*) | $ 53,723 | $ 43,244 | $ 1,738 | $ 98,705 |
| Share based compensation | — | — | — | — | — | — | 2,059 | — | — | 2,059 |
| Vesting of RSUs | — | — | 520 | — | 34 | — | — | — | — | — |
| Net income | — | — | — | — | — | — | — | 19,590 | — | 19,590 |
| Balance as of March 31, 2023 (unaudited) | 63,904 | $ 12,275 | 2,493,673 | $ —(*) | 910,826 | $ —(*) | $ 55,782 | $ 62,834 | $ 1,738 | $ 120,354 |

| | Redeemable A shares | | Class A ordinary shares | | Class B ordinary shares | | Additional paid-in capital | Retained earnings | Cumulative translation adjustments | Total shareholders' equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| Balance as of January 1, 2022(**) | 63,904 | $ 12,275 | 1,697,311 | $ —(*) | 1,697,311 | $ —(*) | 45,395 | $ 21,516 | $ 1,738 | $ 68,649 |
| Share conversion | — | — | 790,239 | —(*) | (790,239) | —(*) | — | — | — | — |
| Share based compensation | — | — | — | — | — | — | 1,724 | — | — | 1,724 |
| Vesting of RSUs | — | — | 105 | — | 105 | — | — | — | — | — |
| Net income | — | — | — | — | — | — | — | 3,011 | — | 3,011 |
| Balance as of March 31, 2022 (unaudited) | 63,904 | $ 12,275 | 2,487,655 | $ —(*)- | 907,177 | $ —(*)- | $ 47,119 | $ 24,527 | $ 1,738 | $ 73,384 |

(*)    Represents an amount lower than $1.

(**)   Adjusted for the issuance of Class B ordinary shares and additional Redeemable A shares.

The accompanying notes are an integral part of the unaudited interim consolidated financial statements.

F-36

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**U.S. dollars in thousands**

| | Three months ended March 31, | | | |
|---|---|---|---|---|
| | | 2023 | | 2022 |
| | | (Unaudited) | | |
| Cash flows from operating activities: | | | | |
| Net income | $ | 19,590 | $ | 3,011 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Depreciation and amortization | | 1,900 | | 1,143 |
| Share-based compensation | | 1,811 | | 1,327 |
| Deferred income taxes | | (250) | | (682) |
| Increase in trade receivables | | (960) | | (1,009) |
| Increase in prepaid expenses and other receivables | | (4,239) | | (5,685) |
| Decrease (increase) in inventory | | 379 | | (2,636) |
| Increase in trade payables | | 27,450 | | 17,805 |
| Increase in other accounts payable and accrued expenses | | 7,502 | | 3,271 |
| Change in operating lease right-of-use assets | | 1,154 | | 1,298 |
| Change in operating lease liability | | (1,366) | | (1,577) |
| Other | | 228 | | (191) |
| Net cash provided by operating activities | | 53,199 | | 16,075 |
| Cash flows from investing activities: | | | | |
| Purchase of property, plant and equipment | | (328) | | (781) |
| Capitalization of software development costs | | (749) | | (1,297) |
| Purchase of other intangible assets | | — | | (344) |
| Proceeds from short-term deposits | | 10,000 | | — |
| Other | | (250) | | — |
| Net cash provided by (used in) investing activities | | 8,673 | | (2,422) |
| Cash flows from financing activities: | | | | |
| Repayment of loans and borrowings | | (2,662) | | (96) |
| Deferred issuance costs | | (151) | | — |
| Net cash used in financing activities | | (2,813) | | (96) |
| Effect of exchange rate fluctuations on cash and cash equivalents | | (74) | | 133 |
| Net increase in cash, cash equivalents and restricted cash | | 58,985 | | 13,690 |
| Cash, cash equivalents and restricted cash at the beginning of the period | | 43,114 | | 30,889 |
| Cash, cash equivalents and restricted cash at the end of the period | $ | 102,099 | $ | 44,579 |
| Components of cash, cash equivalents, and restricted cash: | | | | |
| Cash and cash equivalents | $ | 99,916 | $ | 42,422 |
| Restricted cash included within prepaid expenses and other current assets | | 2,183 | | 2,157 |
| Total cash, cash equivalents and restricted cash | $ | 102,099 | $ | 44,579 |
| Supplemental disclosure of cash flow information: | | | | |
| Cash paid during the period for interest | $ | 51 | $ | 49 |
| Cash paid during the period for income tax | $ | 2,399 | $ | — |
| Supplemental disclosures of non-cash investing and financing activities: | | | | |
| Non-cash compensation capitalized as part of capitalization of software development costs | $ | 248 | $ | 422 |
| Issuance expenses on credit | $ | 900 | $ | — |
| Lease liabilities arising from obtaining right-of-use assets | $ | 2,711 | $ | 351 |

The accompanying notes are an integral part of the unaudited interim consolidated financial statements.

F-37

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 1: — GENERAL**

Oddity Tech Ltd., an Israeli corporation, together with its subsidiaries (the "Company") is a consumer-tech company which builds and scales digital-first brands designed to disrupt the offline-dominated beauty and wellness industries. The Company leverages data science, machine learning and computer vision capabilities to identify consumer needs and develop solutions in the form of beauty, wellness and tech products.

**NOTE 2: — SIGNIFICANT ACCOUNTING POLICIES**

a.   Basis of presentation

The unaudited interim consolidated financial statements and accompanying notes have been prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP"). In management's opinion, the unaudited interim consolidated financial statements reflect all adjustments of a normal recurring nature that are necessary for a fair financial statement presentation. The Company's interim period results do not necessarily indicate the results that may be expected for any other interim period or for the full year ending December 31, 2023. The significant accounting policies applied in the annual consolidated financial statements of the Company as of December 31, 2022, have been applied consistently in these unaudited interim consolidated financial statements, unless otherwise stated. These interim consolidated financial statements should be read in conjunction with the consolidated financial statements as of and for the year ended December 31, 2022.

The consolidated balance sheet as of December 31, 2022 included herein was derived from the audited financial statements as of that date, but does not include all disclosures including notes required by U.S. GAAP.

b.   Basis of Consolidation:

Intercompany transactions and balances have been eliminated in the preparation of the interim consolidated financial statements.

c.   Use of estimates:

The preparation of interim consolidated financial statements in conformity with U.S. GAAP requires management to make estimates, judgments, and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, together with amounts disclosed in the related notes to the interim consolidated financial statements. The Company's significant estimates and assumptions used in these financial statements include, but are not limited to, the recognition and disclosure of contingent liabilities, revenue recognition and stock-based compensation awards. The Company bases its estimates on historical factors, current circumstances and the experience and judgment of management. The Company evaluates its assumptions on an ongoing basis. The Company's management believes that the estimates, judgments, and assumptions used are reasonable based on information available at the time they are made. Estimates, by their nature, are based on judgment and available information, therefore, actual results could be materially different from these estimates.

d.   Significant Accounting Policies:

There have been no material changes to the significant accounting policies from the Company's Annual Report for the year ended December 31, 2022, except for the policies noted below which changed as a result of the adoption of Topic 326.

e.   Trade Receivables

Trade receivables are recorded and carried at the original invoiced amount less an allowance for any potential uncollectible amounts. The Company makes estimates of expected credit losses based

F-38

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 2: — SIGNIFICANT ACCOUNTING POLICIES (Continued)**

upon its assessment of various factors, including historical experience, the age of the accounts receivable balances, credit quality of its customers, current economic conditions, reasonable and supportable forecasts of future economic conditions, and other factors that may affect the Company's ability to collect from customers. The estimated credit loss allowance is recorded as general and administrative expenses on the consolidated statements of income. As of March 31, 2023, the allowance for credit losses was immaterial.

f.    Restricted cash:

Restricted cash consists of deposits used as security for credit facility, credit cards and lease agreements. As of March 31, 2023 and December 31, 2022, restricted cash amounted to $2,183 and $2,159, respectively, and is included within prepaid expenses and other current assets.

g.    Recently issued and adopted accounting pronouncements:

In June 2016, the FASB issued ASU 2016-13, Financial Instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments ("ASU 2016-13"). ASU 2016-13 requires the measurement of all expected credit losses for financial assets held at the reporting date based on historical experience, current conditions, and reasonable and supportable forecasts. ASU 2016-13 requires enhanced qualitative and quantitative disclosures to help investors and other financial statement users better understand significant estimates and judgments used in estimating credit losses, as well as the credit quality and underwriting standards of an organization's portfolio. ASU 2016-13 is effective for fiscal years beginning after December 15, 2022, and interim periods within those fiscal years. The Company adopted this standard on January 1, 2023, and the adoption did not have a material impact on these unaudited interim consolidated financial statements.

In October 2021, the FASB issued ASU 2021-08, Business Combinations (Topic 805) ("ASU 2021-08"). ASU 2021-08 requires that an acquiring entity recognize, and measure contract assets and contract liabilities acquired in a business combination in accordance with ASC 606, Revenue from Contracts with Customers ("ASC 606") and that at the acquisition date, the acquirer accounts for related revenue contracts in accordance with ASC 606 as if it had originated the contracts. The Company adopted this standard on January 1, 2023, and the adoption did not have a material impact on these unaudited interim consolidated financial statements.

**NOTE 3: — INVENTORY**

|  | March 31, 2023 | December 31, 2022 |
|---|---|---|
|  | (Unaudited) |  |
| Raw materials and work in progress | $22,813 | $27,307 |
| Finished goods | 47,038 | 42,923 |
| Total | $69,851 | $70,230 |

Write down to reduce inventories to net realizable value as of March 31, 2023 and December 31, 2022 amounted to $2,052 and $2,236, respectively.

**NOTE 4: — LOANS**

a.    2016 Credit Line Agreement:

On May 10, 2016, the Company entered into a credit line agreement with a bank (the "2016 Credit Line Agreement"), denominated in New Israeli Shekels ("NIS"), pursuant to which the Company may

F-39

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 4: — LOANS (Continued)**

withdraw an aggregate principal amount of up to NIS 25,000,000 ($6,916 according to the applicable exchange rate as of March 31, 2023). The 2016 Credit Line has a maturity date of one year which is automatically renewed on an annual basis. The principal amount will bear interest at a floating per annum rate equal to prime plus 1.4% and additional annual fee of 0.4% of the unused credit line. During the three months ended March 31, 2023, the Company repaid $2,574 out of the 2016 Credit Line. During the twelve months ended December 31, 2022, the Company did not withdraw or repay any amounts in respect of the 2016 Credit Line Agreement. The outstanding balance of the loan as of March 31, 2023 and December 31, 2022 was $977 and $3,569, respectively. Interest expenses were immaterial for the three months ended March 31, 2023 and 2022.

b.   2020 Loan Agreement:

On April 27, 2020, the Company entered into a loan agreement with a bank (the "2020 Loan Agreement"), denominated in NIS, pursuant to which the Company borrowed an aggregate principal amount of NIS 5,000,000 ($1,383 according to the applicable exchange rate as of March 31, 2023). The principal amount will bear interest at a floating per annum rate equal to prime plus 1.5% starting April 27, 2021 (the "Commencement Date"). Following the Commencement Date, the Company shall make 48 monthly installments of principal and interest. The outstanding balance of the loan as of March 31, 2023 and December 31, 2022 was $706 and $813, respectively.

**NOTE 5: — COMMITMENTS AND CONTINGENCIES**

a.   Guarantees:

Guarantees in the amount of $878 were issued by banks to secure rent payments to landlords.

b.   Liens:

The loans made under the 2016 Credit Line Agreement and the 2020 Loan Agreement are secured by a floating charge on the Company's assets and liens on deposit in the amount of $2,000. This amount is reflected under prepaid expenses and other current assets on the consolidated balance sheets.

c.   Litigation:

From time to time, the Company is party to various legal proceedings, claims and litigation that arise in the normal course of business. In the opinion of management, the ultimate outcome of these matters will not have a material adverse effect on the Company's financial position, results of operations or cash flows. Accruals for loss contingencies are recorded when a loss is probable, and the amount of such loss can be reasonably estimated.

**NOTE 6: — SHAREHOLDERS' EQUITY**

2020 Equity incentive plan:

On April 1, 2020, the Company's board of directors adopted the IL Makiage Cosmetics (2013) Ltd. 2020 Equity Incentive Plan (the "Plan").

The Plan provides for the grant of share options, share awards and restricted shares to the Company's and its affiliates' respective employees, non-employee directors and consultants. The options generally vest over four years and have 5-10 years contractual terms. Any option that is forfeited or canceled before expiration becomes available for future grants under the Plan. Each option, that

F-40

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 6: — SHAREHOLDERS' EQUITY (Continued)**

was granted before the issuance of Class B shares (February 2022), is exercisable for one Class A share and one Class B share. Each option that was granted thereafter is exercisable for one Class A ordinary share.

There were no grants of stock options during the three-month period ended March 31, 2023.

The fair value of options granted during the three months ended March 31, 2022 is estimated at the date of grant using the following grant date weighted average assumptions:

|  | Three months ended March 31, |
| --- | --- |
|  | 2022 |
|  | (Unaudited) |
| Risk-free interest rate | 1.35% |
| Expected term (in years) | 3.56 |
| Expected volatility | 40% |
| Expected dividend yield | 0% |

A summary of the Company's stock options that are exercisable for one Class A ordinary share and one Class B ordinary share activity for the three months ended March 31, 2023 (unaudited) is as follows:

|  | Number of options | | Weighted average exercise price | Weighted average remaining contractual terms (in years) | Aggregate intrinsic value |
| --- | --- | --- | --- | --- | --- |
| Outstanding as of January 1, 2023 | 173,142 | $ | 291.65 | 5.39 | $82,580 |
| Granted | — | | — | | |
| Exercised | — | | — | | |
| Forfeited | — | | — | | |
| Outstanding as of March 31, 2023 | 173,142 | | 291.65 | 5.14 | $82,580 |
| Exercisable as of March 31, 2023 | 79,599 | $ | 275.47 | 5.30 | $39,253 |

Intrinsic value represents the potential amount receivable by the option holders had all option holders exercised their share options as of such date.

F-41

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 6: — SHAREHOLDERS' EQUITY (Continued)**

A summary of Company's stock options that are exercisable for one Class A ordinary share activity for the three months ended March 31, 2023 (unaudited) is as follows:

| | Number of options | Weighted average exercise price | Weighted average remaining contractual terms (in years) | Aggregate intrinsic value |
|---|---|---|---|---|
| Outstanding as of January 1, 2023 | 13,144 | $202.59 | 4.83 | $2,388 |
| Granted | — | — | | |
| Exercised | — | — | | |
| Forfeited | (741) | 253.36 | | |
| Outstanding as of March 31, 2023 | 12,403 | 199.56 | 4.58 | $2,291 |
| Exercisable as of March 31, 2023 | 1,277 | $277.84 | 4.51 | $ 136 |

As of March 31, 2023, there were $11,885 of total unrecognized compensation costs related to non-vested share-based compensation arrangements granted under the Plan. This expense is expected to be recognized over a period of approximately 4 years.

The following table summarizes the activities for unvested RSUs that settle upon vesting into one Class A ordinary share and one Class B ordinary share during the three months ended March 31, 2023 (unaudited):

| | Number of RSUs |
|---|---|
| Outstanding as of January 1, 2023 | 6,175 |
| Granted | — |
| Vested | (34) |
| Forfeited | — |
| Outstanding as of March 31, 2023 | 6,141 |

The following table summarizes the activities for unvested RSUs that settle upon vesting into one Class A share during the three months ended March 31, 2023 (unaudited):

| | Number of RSUs |
|---|---|
| Outstanding as of January 1, 2023 | 8,133 |
| Granted | — |
| Vested | (486) |
| Forfeited | (114) |
| Outstanding as of March 31, 2023 | 7,533 |

As of March 31, 2023, there were $4,930 of total unrecognized compensation costs related to RSUs granted under the Plan. This expense is expected to be recognized over a period of approximately 4 years.

F-42

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 7: — EARNINGS PER SHARE**

The Company computes earnings per share of Class A and Class B ordinary shares and Redeemable A shares using the two-class method. Basic earnings per share is computed using the weighted-average number of shares outstanding during the period. Diluted earnings per share is computed using the weighted-average number of shares and the effect of potentially dilutive securities outstanding during the period. Potentially dilutive securities consist of employee stock options and restricted stock units. The dilutive effect of outstanding employee stock options and restricted stock units is reflected in diluted earnings per share by application of the treasury stock method.

The rights, including the liquidation and dividend rights, of the holders of the Company's Class A and Class B ordinary shares and Redeemable A shares are identical, except with respect to voting. As a result, the undistributed earnings for each period are allocated based on the contractual participation rights of the Class A and Class B ordinary shares and Redeemable A shares as if the earnings for the period had been distributed. As the liquidation and dividend rights are identical, the undistributed earnings are allocated on a proportionate basis.

During the three months ended March 31, 2023 and 2022, the earnings per share amounts are the same for Class A and Class B ordinary and Redeemable A shares because the holders of each class are entitled to equal per share dividends or distributions in liquidation in accordance with the Company's articles of association.

The following tables set forth the computation of basic and diluted earnings per share attributable to Class A and Class B ordinary shares and Redeemable A shares:

| | Three Months Ended March 31, 2023 | | |
| --- | --- | --- | --- |
| | Class A ordinary shares | Class B ordinary shares | Redeemable A shares |
| | | (Unaudited) | |
| Basic earnings per share: | | | |
| Numerator: | | | |
| Allocation of undistributed earnings | $ 14,084 | $ 5,145 | $ 361 |
| Denominator: | | | |
| Number of shares used in per share computation | 2,493,618 | 910,792 | 63,904 |
| Basic earnings per share | $ 5.65 | $ 5.65 | $ 5.65 |
| Diluted earnings per share: | | | |
| Numerator: | | | |
| Allocation of undistributed earnings for basic computation | $ 14,084 | $ 5,145 | $ 361 |
| Reallocation of undistributed earnings | (227) | 247 | (20) |
| Allocation of undistributed earnings | 13,857 | 5,392 | 341 |
| Denominator: | | | |
| Number of shares used in basic computation | 2,493,618 | 910,792 | 63,904 |
| Weighted-average effect of dilutive securities: | | | |
| Employee stock options and RSUs | 100,478 | 98,473 | — |
| Number of shares used in per share computation | 2,594,096 | 1,009,265 | 63,904 |
| Diluted earnings per share | $ 5.34 | $ 5.34 | $ 5.34 |

F-43

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 7: — EARNINGS PER SHARE (Continued)**

|  | Three Months Ended March 31, 2022 | | |
|---|---|---|---|
|  | Class A ordinary shares | Class B ordinary shares | Redeemable A shares |
|  |  | (Unaudited) |  |
| **Basic earnings per share:** |  |  |  |
| Numerator: |  |  |  |
| Allocation of undistributed earnings | $ 1,563 | $ 1,392 | $ 56 |
| Denominator: |  |  |  |
| Number of shares used in per share computation | 1,794,981 | 1,599,641 | 63,904 |
| Basic earnings per share | $ 0.87 | $ 0.87 | $ 0.87 |
| **Diluted earnings per share:** |  |  |  |
| Numerator: |  |  |  |
| Allocation of undistributed earnings for basic computation | $ 1,563 | $ 1,392 | $ 56 |
| Reallocation of undistributed earnings | (3) | 6 | (3) |
| Allocation of undistributed earnings | 1,560 | 1,398 | 53 |
| Denominator: |  |  |  |
| Number of shares used in basic computation | 1,794,981 | 1,599,641 | 63,904 |
| Weighted-average effect of dilutive securities: |  |  |  |
| Employee stock options and RSUs | 97,074 | 97,074 | — |
| Number of shares used in per share computation | 1,892,055 | 1,696,715 | 63,904 |
| Diluted earnings per share | $ 0.82 | $ 0.82 | $ 0.82 |

Employee stock options to purchase 16,090 and 9,303 ordinary shares were excluded from the calculation during the three months ended March 31, 2023 and 2022, respectively, because the effect would be anti-dilutive. The basic and diluted earnings per share were adjusted to reflect the issuance of Class B ordinary shares and additional Redeemable A shares.

**NOTE 8: — GEOGRAPHICAL INFORMATION**

Revenues from sales to customers:

|  | Three months ended March 31, | |
|---|---|---|
|  | 2023 | 2022 |
|  | (Unaudited) | |
| North America | $140,447 | $72,129 |
| Others | 25,207 | 18,285 |
| Total net revenue | $165,654 | $90,414 |

Total revenue is attributed to geographic areas based on the location of the end customer.

The following table summarizes long-lived assets by geographic area, which consist of property, plant and equipment, net and right-of-use assts:

F-44

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 8: — GEOGRAPHICAL INFORMATION (Continued)**

|  | March 31, 2023 | December 31, 2022 |
|---|---|---|
|  | (Unaudited) |  |
| Israel | $18,888 | $18,665 |
| United States | 5,132 | 4,081 |
| Total long-lived assets | $24,020 | $22,746 |

**NOTE 9: — RELATED PARTY TRANSACTIONS**

On October 4, 2020, the Company provided its co-founders, the Chief Executive Officer and Chief Product Officer, with an incentive plan (the "Incentive Plan") in connection with certain revenue thresholds over agreed period. Under the Incentive Plan, the Chief Executive Officer and Chief Product Officer are eligible to earn up to $20,000 and $10,000 of incremental incentive bonuses respectively, subject to certain revenue thresholds and other conditions. During the three-months period ended March 31, 2023 and 2022, the Company recognized under the Incentive Plan, an expense of $7,785 and $0, respectively.

**NOTE 10: — DIGITAL SECURITIES LIABILITY**

On April 26, 2022, the Company launched an offering of digital securities (the "Digital Securities"). The Digital Securities are represented by a blockchain-based digital token using the Ethereum blockchain. Each Digital Security will automatically convert into Class A ordinary share of the Company immediately prior to the closing of an initial public offering by the Company of its Class A ordinary shares (an "IPO") at a conversion price equal to 80% of the initial price per Class A ordinary share to the public in an IPO, subject to customary adjustments in the event of any stock dividend, stock split, combination or similar recapitalization affecting such shares. Holders of the Digital Securities do not have any voting rights, are not entitled to any dividends or other distributions, and do not have any right to the Company's assets in the event of a liquidation, dissolution or winding-up of the Company. Upon conversion of the Digital Securities into Class A ordinary shares, the digital token previously representing such Digital Securities will be decommissioned. The Class A ordinary shares will have the rights and preferences set forth in the Company's articles of association. This offer has been prepared solely for the benefit of "accredited investors" (as such term is defined under Regulation D) and certain parties that are not "U.S. persons". The Company issued an aggregate of 648 digital securities at a purchase price per digital security of $1,000.

The Digital Securities will be redeemable, in whole or in part, at the Company's option at a cash redemption price equal to the original purchase price per Digital Security to be redeemed.

The Company concluded that the digital securities are not indexed to the Company's own stock and should be recorded as a liability measured at fair value with changes in fair value recognized in earnings.

The Digital Securities' change in the fair value during the three-month period ended March 31, 2023 was immaterial.

**NOTE 11: — SUBSEQUENT EVENTS**

The Company evaluated all events or transactions that occurred subsequent to March 31, 2023, through the date of approval of these financial statements, June 1, 2023, and has determined that there are no subsequent events that require disclosure or recognition in the financial statements except for the below:

F-45

**ODDITY TECH LTD. AND ITS SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share and per share data)**

**NOTE 11: — SUBSEQUENT EVENTS (Continued)**

On May 12, 2023, the Company completed the acquisition of 100% of the shares of Revela Inc. ("Revela"), a US biotechnology company. The aggregated purchase price amounted to approximately $69,000 and was comprised of: (i) cash in the amount of $32,514 (ii) 45,571 Class A ordinary shares and (iii) 39,768 restricted Class A ordinary shares which are subject to certain performance milestones as specified in the agreement. In addition, the transaction includes additional consideration related to compensation for post combination services. The acquisition of Revela has been accounted for as a business combination using the acquisition method of accounting.

F-46

Shares



Class A Ordinary Shares

# Prospectus

**Goldman Sachs & Co. LLC**

**Morgan Stanley**

**Allen & Company LLC**

**BofA Securities**          **Barclays**          **Truist Securities**

**JMP Securities, A CITIZENS COMPANY**          **KeyBanc Capital Markets**

**Through and including          , 2023 (the 25th day after the date of this prospectus), all dealers that effect transactions in the ordinary shares, whether or not participating in this offering, may be required to deliver a prospectus. This in addition to the dealer's obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.**

**PART II**

**INFORMATION NOT REQUIRED IN PROSPECTUS**

**Item 6.   Indemnification of Directors and Officers.**

Under the Companies Law, a company may not exculpate an office holder from liability for a breach of the duty of loyalty. An Israeli company may exculpate an office holder in advance from liability to the company, in whole or in part, for damages caused to the company as a result of a breach of duty of care but only if a provision authorizing such exculpation is included in its articles of association. Our amended and restated articles of association to be effective upon the closing of this offering include such a provision. An Israeli company may not exculpate a director from liability arising out of a prohibited dividend or distribution to shareholders.

An Israeli company may indemnify an office holder in respect of the following liabilities and expenses incurred for acts performed as an office holder, either in advance of an event or following an event, provided a provision authorizing such indemnification is contained in its articles of association:

- a financial liability imposed on him or her in favor of another person pursuant to a judgment, including a settlement or arbitrator's award approved by a court. However, if an undertaking to indemnify an office holder with respect to such liability is provided in advance, then such an undertaking must be limited to events which, in the opinion of the board of directors, can be foreseen based on the company's activities when the undertaking to indemnify is given, and to an amount or according to criteria determined by the board of directors as reasonable under the circumstances, and such undertaking shall detail the abovementioned events and amount or criteria;

- reasonable litigation expenses, including legal fees, incurred by the office holder (1) as a result of an investigation or proceeding instituted against him or her by an authority authorized to conduct such investigation or proceeding, provided that (i) no indictment was filed against such office holder as a result of such investigation or proceeding; and (ii) no financial liability, such as a criminal penalty, was imposed upon him or her as a substitute for the criminal proceeding as a result of such investigation or proceeding or, if such financial liability was imposed, it was imposed with respect to an offense that does not require proof of criminal intent; and (2) in connection with a monetary sanction;

- reasonable litigation expenses, including legal fees, incurred by the office holder or imposed by a court in proceedings instituted against him or her by the company, on its behalf or by a third party or in connection with criminal proceedings in which the office holder was acquitted or as a result of a conviction for an offense that does not require proof of criminal intent; and

- expenses, including reasonable litigation expenses and legal fees, incurred by an office holder in relation to an administrative proceeding instituted against such office holder, or certain compensation payments made to an injured party imposed on an office holder by an administrative proceeding, pursuant to certain provisions of the Israeli Securities Law.

An Israeli company may insure an office holder against the following liabilities incurred for acts performed as an office holder if and to the extent provided in the company's articles of association:

- a breach of the duty of loyalty to the company, to the extent that the office holder acted in good faith and had a reasonable basis to believe that the act would not prejudice the company;

- a breach of the duty of care to the company or to a third party, to the extent such breach arises out of the negligent conduct of the office holder;

- a financial liability imposed on the office holder in favor of a third party;

- a financial liability imposed on the office holder in favor of a third party harmed by a breach in an administrative proceeding; and

- expenses, including reasonable litigation expenses and legal fees, incurred by the office holder as a result of an administrative proceeding instituted against him or her, pursuant to certain provisions of the Israeli Securities Law.

An Israeli company may not indemnify, exculpate or insure an office holder against any of the following:

- a breach of the duty of loyalty, except to the extent that the office holder acted in good faith and had a reasonable basis to believe that the act would not prejudice the company;

- a breach of the duty of care committed intentionally or recklessly, excluding a breach arising out of the negligent conduct of the office holder;

- an act or omission committed with intent to derive illegal personal benefit; or

- a civil or criminal fine, monetary sanction or forfeit levied against the office holder.

Under the Companies Law, exculpation, indemnification, and insurance of office holders must be approved by the compensation committee and the board of directors (and, with respect to directors and the chief executive officer, by the shareholders). However, under regulations promulgated under the Companies Law, the insurance of office holders shall not require shareholder approval and may be approved by only the compensation committee, if the engagement terms are determined in accordance with the company's compensation policy and that policy was approved by the shareholders by the same special majority required to approve a compensation policy, provided that the insurance policy is on market terms and the insurance policy is not likely to materially impact the company's profitability, assets or obligations.

Our amended and restated articles of association to be effective upon the closing of this offering allow us to exculpate, indemnify and insure our office holders for any liability imposed on them as a consequence of an act (including any omission) which was performed by virtue of being an office holder. Our office holders are currently covered by a directors and officers' liability insurance policy.

We have entered into agreements with certain of our directors and executive officers exculpating them in advance, to the fullest extent permitted by law, from liability to us for damages caused to us as a result of a breach of duty of care, and undertaking to indemnify them to the fullest extent permitted by law. This indemnification is limited to events determined as reasonably anticipated by the board of directors based on our activities, and to an amount determined by the board of directors as reasonable under the circumstances.

Effective as of the date of this offering, the maximum indemnification amount set forth in such agreements is limited to an amount equal to the higher of $25 million and 25% of our total shareholder's equity as reflected in our most recent consolidated financial statements prior to the date on which the indemnity payment is made. The maximum amount set forth in such agreements is in addition to any amount paid (if paid) under insurance and/or by a third party pursuant to an indemnification arrangement.

In the opinion of the SEC, indemnification of directors and office holders for liabilities arising under the Securities Act, however, is against public policy and therefore unenforceable.

There is no pending litigation or proceeding against any of our office holders as to which indemnification is being sought, nor are we aware of any pending or threatened litigation that may result in claims for indemnification by any office holder.

**Item 7.    Recent Sales of Unregistered Securities.**

During the past three years, we issued securities which were not registered under the Securities Act as set forth below. We believe that each of such issuances was exempt from registration under the Securities Act in reliance on Section 4(2) of the Securities Act, Rule 701 and/or Regulation S under the Securities Act.

The following is a summary of transactions during the preceding three fiscal years involving sales of our securities that were not registered under the Securities Act.

In July 2021, we issued an aggregate of 31,952 Redeemable A Shares at a purchase price per share of approximately $375.56. Of these Redeemable A Shares, 6,370 remain in escrow until January 23, 2023 to satisfy certain indemnification obligations.

In February 2022, we issued an aggregate of 1,697,311 Class B ordinary shares and 31,952 Redeemable A shares (of which 6,370 Redeemable A shares were placed in escrow until January 23, 2023 to satisfy certain indemnification obligations) to existing holders of Class A ordinary shares and Redeemable A shares, respectively, on a one-for-one basis in connection with the implementation of a dual class ordinary share structure.

In June 2022, we issued and sold an aggregate of 648 digital securities in a private placement at a purchase price per digital security of $1,000. These digital securities were issued and sold pursuant to Regulation D and Regulation S of the Securities Act.

Since March 31, 2020, we have granted our directors, officers, employees and consultants an aggregate of options to purchase 192,703 Class A ordinary shares, at a weighted-average exercise price of $281.02 per share, and 179,559 Class B ordinary shares, at a weighted-average exercise price of $286.76 per share under our 2020 Equity Incentive Plan.

Since March 31, 2020, we have granted our directors, officers, employees and consultants an aggregate of 16,825 Class A ordinary shares underlying RSUs, and 9,539 Class B ordinary shares underlying RSUs, to which have been or will be settled in ordinary shares under our 2020 Equity Incentive Plan.

In connection with our acquisition of Revela in May 2023, we issued 85,339 Class A ordinary shares as part of the purchase price.

No underwriter or underwriting discount or commission was involved in any of the transactions set forth in Item 7.

**Item 8.  Exhibits and Financial Statement Schedules.**

(a)  The Exhibit Index is hereby incorporated herein by reference.

(b)  Financial Statement Schedules.

All schedules have been omitted because they are not required, are not applicable or the information is otherwise set forth in the Consolidated Financial Statements and related notes thereto.

**Item 9.  Undertakings.**

(a)  The undersigned registrant hereby undertakes to provide to the underwriters at the closing specified in the underwriting agreement certificates in such denominations and registered in such names as required by the underwriters to permit prompt delivery to each purchaser.

(b)  Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers, and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction, the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(c)  The undersigned registrant hereby further undertakes that:

(1)  For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2)  For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

**EXHIBIT INDEX**

| Exhibit No. | Description |
|---|---|
| 1.1* | Form of Underwriting Agreement |
| 3.1 | Amended and Restated Articles of Association of the Registrant, as currently in effect |
| 3.2 | Form of Amended and Restated Articles of Association of the Registrant to be effective upon the closing of this offering |
| 4.1 | Specimen share certificate of the Registrant |
| 4.2 | Registration Rights Agreement |
| 5.1* | Opinion of Herzog Fox & Neeman, counsel to the Registrant, as to the validity of the Class A ordinary shares (including consent) |
| 10.1 | Form of Indemnification Agreement |
| 10.2† | Il Makiage Cosmetics (2013) Ltd. 2020 Equity Incentive Plan |
| 10.3† | U.S. Sub-Plan to the Il Makiage Cosmetics (2013) Ltd. 2020 Equity Incentive Plan |
| 10.4†* | 2023 Incentive Award Plan |
| 10.5† | Form Share Option Agreement |
| 10.6† | Form Restricted Share Unit Agreement |
| 10.7†* | 2023 Employee Share Purchase Plan |
| 10.8† | Non-Employee Director Compensation Policy |
| 10.9† | Compensation Policy for Directors and Officers |
| 10.10 | Holdback Agreement with Niv Price |
| 10.11^# | Voyage81 Stock Purchase Agreement |
| 10.12# | Agreement and Plan of Mergers, by and among ODDITY Labs, LLC, Revela Inc., IM Pro Makeup NY L.P., IM Pro Makeup NY Merger Sub, Inc. and Evan Zhao, as representative, dated April 4, 2023. |
| 21.1 | List of subsidiaries of the Registrant |
| 23.1 | Consent of Kost, Forer, Gabbay & Kasierer, an independent registered public accounting firm |
| 23.2* | Consent of Herzog Fox & Neeman (included in Exhibit 5.1) |
| 24.1 | Power of Attorney (included in signature page to Registration Statement) |
| 99.1 | Consent of Ohad Chereshniya as director nominee |
| 107 | Filing Fee Table |

---

\*  To be filed by amendment.

†  Indicates a compensatory plan or arrangement.

^  Certain portions of this exhibit (indicated by "[***]") have been omitted pursuant to Item 601(b)(10)(iv) of Regulation S-K. The Registrant undertakes to furnish supplemental unredacted copies of the exhibit upon request by the SEC.

#  Schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The Registrant undertakes to furnish supplemental copies of any of the omitted schedules upon request by the SEC.

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form F-1 and has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Tel Aviv, Israel on this 23rd day of June, 2023.

**ODDITY Tech Ltd.**

By:  /s/ Oran Holtzman

Name:  Oran Holtzman
Title:    Chief Executive Officer

KNOW ALL PERSONS BY THESE PRESENTS that each person whose signature appears below hereby constitutes and appoints Oran Holtzman and Lindsay Drucker Mann and each of them, his or her true and lawful attorneys-in-fact and agents, with full power to act separately and full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this registration statement and all additional registration statements pursuant to Rule 462 (b) of the Securities Act of 1933, as amended, and to file the same, with all exhibits thereto, and all other documents in connection therewith, with the Securities and Exchange Commission, granting unto each said attorney-in-fact and agent full power and authority to do and perform each and every act in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or either of them or his or her or their substitute or substitutes may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this registration statement has been signed by the following persons on June 23, 2023 in the capacities indicated:

| Name | Title |
|---|---|
| /s/ Oran Holtzman | Chief Executive Officer, Director |
| Oran Holtzman | (Principal Executive Officer) |
| /s/ Lindsay Drucker Mann | Global Chief Financial Officer |
| Lindsay Drucker Mann | (Principal Financial Officer and Principal Accounting Officer) |
| /s/ Shiran Holtzman-Erel | Director |
| Shiran Holtzman-Erel | |
| /s/ Michael Farello | Director |
| Michael Farello | |
| /s/ Lilach Payorski | Director |
| Lilach Payorski | |

**Signature of Authorized U.S. Representative of Registrant**

Pursuant to the requirements of the Securities Act of 1933, as amended, the undersigned, the duly authorized representative in the United States of ODDITY Tech Ltd. has signed this registration statement on June 23, 2023.

By:   /s/ Lindsay Drucker Mann

Name:  Lindsay Drucker Mann
Title:    Global Chief Financial Officer

Exhibit 3.1

**The Companies Law 5759-1999**

**Private Company Limited by Shares**

**AMENDED AND RESTATED ARTICLES OF ASSOCIATION**

**OF**

**Oddity Tech Ltd.**

**Adopted by the Shareholders on February 23, 2022**

**PART A: DEFINITIONS AND INTERPRETATION**

1.  Definitions

In these Articles of Association, the following terms shall have the meaning appearing opposite them, unless another interpretation is expressly stated herein:

| | |
|---|---|
| "**2019 SPA**" | Share Purchase Agreement, dated June 6, 2019, by and between the Company and L Catterton; |
| "**Affiliate**" | With respect to any Person, a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by or under common Control with the first-mentioned Person; |
| "**Alternate Director**" | As defined in these Articles; |
| "**Articles**" | These amended and restated articles of association as they may be modified or amended from time to time by the Shareholders; |
| "**Board of Directors**" | The Board of Directors of the Company elected or properly appointed in accordance with the provisions of these Articles; any committee of the Board of Directors to the extent that any of the authorities of the Board of Directors are delegated to it; |
| "**Business Day**" | Each day other than: (i) Friday, Saturday and Sunday, or (ii) any other day on which commercial banks in Israel or New York are generally closed for business; |
| "**CEO**" | The person holding this title and any person having the authority of a General Manager whatever his title; |
| "**Closing Date of the SPA**" | June 2, 2017; |
| "**Companies Law**" | The Israeli Companies Law, 5759-1999 and any and all rules and regulations promulgated thereunder, all as amended from time to time; |
| "**Companies Ordinance**" | Those sections of the Companies Ordinance [New Version] 5743 - 1983 that remain in force after the date of the coming into force of the Companies Law as the same shall be amended from time to time thereafter or any other law which shall replace those sections after the date of entry into force of the Companies Law; |
| "**Company**" | Oddity Tech Ltd.; |
| "**Control**" | Means (i) the ability to direct, or cause the direction of, the management and policies of the relevant Person, whether through the ownership of voting securities, by contract or otherwise, and whether directly or indirectly, or (ii) the beneficial ownership (directly or indirectly, including through one or more intermediaries) of 50% or more of the ownership interests in such Person, including the issued and outstanding share capital, voting rights or other ownership interests, or (iii) the right to appoint the majority of the directors (or the equivalent thereof) in such Person; |

| | |
|---|---|
| "**Corporate Representative**" | As defined in these Articles; |
| "**Director**" or "**Directors**" | A member or members of the Board of Directors who are elected or appointed in accordance with the provisions of these Articles, including an Alternate Director and a Corporate Representative serving in such capacity at the relevant time; |
| "**Equity Securities**" | (i) any Shares, other shares or interests, (ii) any ownership interests in a Person other than a company, including membership interests, partnership interests, joint venture interests and beneficial interests, and (iii) any warrants, options, convertible or exchangeable securities, convertible debt, subscription rights (including any preemptive or similar rights), calls or other rights to purchase or acquire any of the foregoing; |
| "**Family Member**" | With respect to any Person, the spouse, registered domestic partner, parent, sibling, descendants (including any adopted descendant) and trusts for the benefit of each of the foregoing of such Person who is a natural person ; |
| "**Fully Diluted Basis**" | With respect to any Person, after taking into account all issued and outstanding shares of such Person of any class (calculated on an as-converted basis), and after giving effect to the conversion or exercise (as the case may be) of all Equity Securities, including any and all undertakings or promises (whether written or oral) to receive the same, into the shares of such Person; |
| "**Governmental Body**" | Any (a) nation, principality, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) Israeli, federal, state, local, municipal, or other government; (c) governmental authority of any nature (including any governmental, administrative or regulatory division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal); or (d) multi-national organization or body; |
| "**General Meeting**" | As defined in the Companies Law; |
| "**IM Investments**" | Il Makiage Investments L.P. a limited partnership organized under the laws of Israel, registered number 550269492, having its principal offices at 8 Hacharash St., Tel Aviv, Israel; |
| "**Involuntary Transfer**" | Means and includes disposition upon death of a Shareholder, whether by will or upon intestacy; disposition pursuant to any judgment, execution, levy, seizure, attachment, or other similar legal process; transfer to any receiver, trustee in bankruptcy, assignee for the benefit of creditors, or other similar party; transfer or disposition in connection with a divorce or settlement decree or agreement; and any other transfer, direct or indirect, of any Interest or any part thereof, or of any legal, equitable or beneficial interests of a Shareholder in any Interest or part thereof, that is not a Voluntary Transfer; |

| | |
|---|---|
| "**IPO**" | An initial underwritten public offering of Shares that raised gross proceeds to the Company of at least US $75 million at a per share price equal to 2.5 x US$ 6,150.58 (as adjusted for any Recapitalization Event occurring following the issuance of the L Catterton SPA Shares); |
| "**In Writing**" or "**Written**" | Including by photocopy, facsimile or electronic mail; |
| "**L Catterton**" | LCGP3 PRO MAKEUP, L.P., a Delaware limited partnership, having its principal offices at 599 West Putnam Avenue, Greenwich, CT 06830, USA; |
| "**L Catterton Entitlement Holdings Threshold**" | A number of Shares equal to 75% of the number of L Catterton SPA Shares (as such number of shares may be adjusted for any Recapitalization Event); |
| "**L Catterton SPA Shares**" | As at February 15, 2022, a total of 552,800 Shares as such number of shares may be adjusted for any Recapitalization Events occurring following that date; |
| "**L Catterton 2019 SPA Shares**" | As at February 15, 2022, a total of 154,300 Shares as such number of shares may be adjusted for any Recapitalization Event occurring following that date; |
| "**Minority Shareholder**" | A Shareholder, holding 5% or less of the Company's issued and outstanding share capital at that time; |
| "**Non-U.S. CapEx**" | Capital expenditures made by the Company, less all U.S. CapEx; |
| "**Non-U.S. EBITDA**" | as defined in the Shareholders Agreement; |
| "**Office**" or "**the Offices of the Company**" | The registered office of the Company at the relevant time; |
| "**Office Holder**" or "**Officer**" | As defined in the Companies Law; |
| "**Oran Shilo**" | OS Investments together with IM Investments; |
| "**Ordinary Shareholder**" | Any holder of Ordinary Shares of the Company, as may be from time to time |
| "**OS Investments**" | Oran Shilo Investments LP, a limited partnership organized under the laws of the State of Israel, registered number 55-025056-7, having its principal offices at 8 Hacharash St., Tel Aviv, Israel; |
| "**Permitted Pledge**" | A pledge, encumbrance or other security interest provided, directly or indirectly, by Oran Shilo (or by its direct or indirect shareholders) to any third party in respect of such number of Shares held by them directly or indirectly, equal to or less than the difference between (i) shares held by L Catterton (and its Permitted Transferees) and Oran Shilo (and its Permitted Transferees) at that time, minus (ii) shares that represent 51% of the Company's issued and outstanding share capital at that time; |

"**Permitted Transferees**"     With respect to a Shareholder:

(I)     in the case of an institutional, private equity, hedge, venture capital or other private investment fund, or any subsidiary of such a person, any partner, limited partner, retired partner, member or retired member of such holder, any affiliated fund, any fund which is Controlled by or under common Control with one or more general partners of such holder, any fund that is managed and governed by the same management company as such holder, any fund that Controls such holder or any fund that is Controlled by, under common Control with, managed or advised by the same management company or registered investment advisor that controls, is under common control with, manages or advises the fund that Controls such holder;

(II)     in the case of a mutual fund, pension fund, other pooled investment vehicle or an institutional client, to another mutual fund, pension fund, other pooled investment vehicle or an institutional client in connection with a merger, fund reorganization or otherwise for regulatory or fund management purposes;

(III)   in the case of a partnership, its limited partners, provided each has received their entitlement in the Transferred Company's shares on a pro-rata basis based on their limited partner's interest; or

(IV)   in the case of a natural person, an entity Controlled (directly or indirectly) by a natural person, or a trust created by a natural person,

(a)     such natural person;

(b)     a legal successor or heir of such natural person, provided that the foregoing shall not be regarded as Permitted Transferees for the purpose of Article 6.1.4.

(c)     a Family Member and, solely in the context of a transfer of assets in connection with a divorce, a former spouse of such natural person (provided that such transfer is not in excess of 50% of the shares held by such a Shareholder and subject to such former spouse signing an irrevocable proxy and power of attorney to such transferring Shareholder with respect to such transferred shares in form and substance reasonably satisfactory to the Board of Directors);

(d)   any custodian, trustee (including a trustee of a voting trust), executor or other fiduciary for the account of such Shareholder or natural person or any one or more Family Members of such natural person or any of such Shareholder's Permitted Transferees or any trust contemplated by clause (e);

(e)     a trust whose sole beneficiary(ies) is the Shareholder and/or its Permitted Transferees;

(f)     if the Shareholder is a trust, any beneficiary(ies) of the trust; and

(g)     a company, corporation, partnership or limited liability company Controlled by such natural person and/or his Family Members directly, or indirectly through one or more Permitted Transferees thereof;

*provided* that with respect to Class B Shares, in the case of clauses (IV)(c) through (g), such natural person maintains the exclusive ability to vote the Class B Shares.

For the avoidance of any doubt, as of the Effective Time, Oran Holtzman is a Permitted Transferee and the ultimate Controlling shareholder of Oran Shilo.

| | |
|---|---|
| "**Person**" or "**person**" | Any natural person, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, proprietorship, trust union, association, court, tribunal, agency, governmental, regulatory organization, arbitrator, board, bureau, instrumentality, governmental authority or other entity, enterprise, authority or business organization, including any Governmental Body; |
| "**Recapitalization Event**" | Any dividend in Shares (i.e., issuance of bonus shares), split-up of shares, redemption of Shares, combination of Shares into a lesser number of Shares, re-capitalization, reclassification, exchange pursuant to a merger or consolidation or similar event (if immediately following such transaction all of the capital stock of the surviving or resulting corporation is held by persons who were Shareholders immediately preceding such transaction); |
| "**Register of Charges**" | The register of charges pursuant to Section 172 of the Companies Ordinance; |
| "**Register of Directors**" | The register of Directors pursuant to Section 224 of the Companies Law; |
| "**Register of Shareholders**" | The register of shareholders of the Company pursuant to Section 127 of the Companies Law, together with any additional shareholders register that the Company may maintain outside Israel; |
| "**Shareholder**" | Any holder of Shares of the Company, as may be from time to time; |
| "**Shares**" | Any shares of any class of the Company; |
| "**Security Interest**" | Means any mortgage, charge, pledge, lien, attachment, assignment, security interest, hypothecation, restriction, option, right to acquire, right of first offer, right of first refusal or right of pre-emption or any other encumbrance or third party right or interest of any kind; or any other agreement or arrangement the effect of which is the creation of security; any other type of arrangement (including a title transfer or retention arrangement) having similar effect; or any agreement or arrangement or obligation to create any of the same; |

| | |
|---|---|
| "**Shareholders Agreement**" | The amended and restated shareholders agreement dated October 25, 2021, among L Catterton, Oran Shilo and the Company; |
| "**Simple Majority**" | A majority of those present and voting at a general meeting or meeting of the Board of Directors. The vote of any person present at a meeting as aforesaid who does not vote or abstains from voting with respect to any matter on the agenda shall not be included in the number of votes cast; |
| "**SPA**" | as defined in the Shareholders Agreement; |
| "**Strategic "Partnership** | as defined in the Shareholders Agreement; |
| "**Surplus Account**" | The profits of the Company as appearing in the books of account of the Company; |
| "**Transaction**" | A contract or an agreement or a unilateral decision to bestow a right or some other benefit; |
| "**Transfer**" | Means any Voluntary Transfer or Involuntary Transfer; |
| "**U.S. Business**" | Means the Company's retail and other businesses operated in the United States or promoted or marketed primarily to the United States market, including all sales made in the United States; |
| "**U.S. CapEx**" | Means capital expenditures made solely with respect to the U.S. Business; |
| "**U.S. EBITDA**" | Means consolidated earnings before interest, taxes, depreciation and amortization of the U.S. Business of the Company's subsidiaries, as set forth in such Subsidiaries' standalone financial statements for the most recently completed fiscal year, as determined in accordance with the same methodology used to calculate the Non-U.S. EBITDA; |
| "**V81 SPA**" | Share Purchase Agreement dated July 9, 2021 in respect of Voyage81 Ltd. |
| "**Voluntary Transfer**" | Any sale, transfer, assignment, gift, pledge or encumbrance, grant of security interest, distribution pursuant to voluntary liquidation, or other voluntary disposition or alienation of any Shares or Equity Securities or any portion thereof or of any legal, equitable and beneficial interest in Shares or Equity Securities or part thereof; |
| "**year**" or "**month**" | According to the Gregorian calendar. |

In addition to the defined terms in this Article 1, each capitalized term listed below has the meaning ascribed to it in the Article referenced opposite such term.

**Defined Terms**

| | |
|---|---|
| Acceptance Notice | Articles 12.2.1, 13.2 |
| Acquirer | Article 12.4.1 |
| Appointment | Article 17.6 |
| Anti Trust Law | Article 26.1 |
| Business Plan | Article 22.13 |
| Chairman | Article 18.1.2 |
| Class A Shares | Article 4 |
| Class B Shares | Article 4 |
| Distress Fund Raising | Article 22.1 |
| Equity Grants | Article 13.1 |
| Financing | Article 13.1 |
| Invested Capital | Article 22.3 |
| L Catterton Director | Article 17 |
| New Securities | Article 13.1 |
| Notice | Articles 12.2.1, 13.1 |
| Offer | Articles 12.2.1, 12.4.1 |
| Offeree | Article 12.2.1 |
| Offered Shares | Articles 12.2.1, 12.3.1 |
| Offeror | Article12.2.1 |
| Ordinary Shares | Article 4 |
| Participation Notice | Article 12.3.2 |
| Proposed Transaction | Articles 12.3.1, 12.4.1 |
| Redeemable A Shares | Article 4 |
| Response Period | Article 12.2.1 |
| Secretary | Article 25 |
| Securities Law | Article 26.1f |
| Selling Shareholder | Article 12.3.1 |
| Senior Securities | Article 22.1 |
| Subsidiary | Article 22 |
| Tag-Along Period | Article 12.3.2 |

2.     Interpretation

2.1     Subject to the provisions of Article 1 above, and unless the context expressly requires some other interpretation, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Companies Law or in the Companies Ordinance, as the case may be.

2.2.     In these Articles, words in the singular shall include the plural (and vice versa); masculine terms shall include the feminine gender (and vice versa), and words indicating individuals shall include corporations.

2.3.     Any Article in these Articles which provides for an arrangement which differs in whole or in part from any provision in the Companies Law or the Companies Ordinance, as the case may be, which can be stipulated against, amended or added to, in whole or with regard to specific matters or within specific limitations, in accordance with any law, shall be considered a stipulation against the provision of the Companies Law or the Companies Ordinance, as the case may be, even if the actual stipulation is not specified in the said Article, and even if it is expressly stated in the Article (in whatever form) that the effectiveness of the Article is subject to the provisions of any law.

2.4.    In the event of a contradiction between any Article and the provisions of any law that may not be stipulated against, amended or added to, the provisions of the said law shall prevail, provided that nothing thereby shall nullify or impair the effectiveness of these Articles or any other Article herein.

2.5.    In interpreting any Article or examining its effectiveness, the interpretation shall be given to that Article which is most likely to achieve its purpose as appearing therefrom or as appearing from the other Articles included within these Articles of Association.

<u>PART B: THE COMPANY, ITS OBJECTS AND ITS CAPITAL</u>

3.    <u>The Company and its Objects</u>

3.1.    The Company is a private company.

3.2.    The objectives of the Company shall be to undertake any lawful activity.

3.3.    The Company is subject to the following limitations:

(a)    the Company may not offer any shares, convertible securities or debentures of the Company to the public;

(b)    the number of Shareholders for the time being in the Company (exclusive of employees of the Company and former employees of the Company who have continued as Shareholders in the Company after the termination of such employment) is limited to fifty (50). Where two or more persons hold one or more shares in the Company jointly, they shall, for the purposes of this Article, be treated as a single Shareholder;

(c)    the transfer of Equity Securities in the Company (and the transfer of any rights in shares held by a number of joint owners) shall be subject to the restrictions contained in these Articles.

3.4.    The Company may contribute reasonable amounts for any suitable purpose or category of purposes even if such contributions do not fall within business considerations of the Company. The Board of Directors may determine the amounts of the contributions, the purpose or category of purposes for which the contribution is to be made and the identity of the recipients of any contribution.

3.5.    The Company may at any time undertake any kind of business activity which is permitted under the terms of these Articles, expressly or by implication, and may refrain from these activities, whether or not the Company has commenced that kind of business activity, all in the absolute discretion of the Board of Directors.

4.    Capital of the Company

The authorized share capital of the Company is NIS 14,000 (Fourteen Thousand New Israeli Shekels) divided into (i) 10,000,000 (Ten Million) Class A Ordinary Shares of nominal value NIS 0.001 each ("**Class A Shares**"); (ii) 2,000,000 (Two Million) Class B Ordinary Shares of nominal value NIS 0.001 each ("**Class B Shares**" and, together with the Class A Shares, the "**Ordinary Shares**"); and (iii) 2,000,000 (Two Million) Redeemable A Shares of nominal value NIS 0.001 each ("**Redeemable A Shares**").

5.    Limited Liability

The liability of each of the Shareholders of the Company for the indebtedness of the Company shall be limited to payment of the nominal value of the shares of that Shareholder.

6.    Rights attaching to the Shares

6.1.    **Rights of Ordinary Shares**

6.1.1. Voting Rights.

(a)    Except as otherwise expressly provided herein or required by applicable law, the holders of Class A Shares and Class B Shares shall vote together as one class on all matters submitted to the vote of the Shareholders.

(b)    Except as otherwise expressly provided herein or required by applicable law, on any matter that is submitted to a vote of the Shareholders, each holder of Class A Shares shall be entitled to one (1) vote for each Class A Share then held by it, and each holder of Class B Shares shall be entitled to ten (10) votes for each Class B Share then held by it.

6.1.2. Identical Rights. Unless these Articles provide otherwise, the Class A Shares and Class B Shares shall carry the same rights and rank equally, share ratably and be identical in all respects, and each Class A Share and Class B Share shall vest in the holder thereof:

(a)    The right to receive an invitation to and to participate in each General Meeting of the Company, annual or special, and the right to one (1) vote (in respect of each Class A Share) or ten (10) votes (in respect of each Class B Share) in respect of each share that the holder holds in every vote at each General Meeting of the Company in which he participates provided that the share is owned by the shareholder on the date specified in the resolution to convene the General Meeting in question;

(b)    The right to receive, together with the Redeemable A Shares, if and to the extent distributed, dividends, bonus shares and any other distribution in each case, in accordance with the number of shares that the shareholder holds on the date upon which it is resolved to distribute the dividend or bonus shares or other distribution (as the case may be) or at such later date as shall be provided in the resolution in question. The Class A Shares, Class B Shares and Redeemable A Shares shall be treated equally, identically and ratably, on a per share basis, with respect to any dividend, bonus shares or distribution, *provided* that any bonus shares issued on a share shall be in the same per share ratio for all classes, but shall be of the same class of the share on which it is being distributed (i.e. Class A Shares will be issued as bonus shares on outstanding Class A Shares, Class B Shares will be issued as bonus shares on outstanding Class B Shares and Redeemable A Shares will be issued as bonus shares on outstanding Redeemable A Shares), unless different treatment is proposed by the Board of Directors and approved in a general meeting of each of the Class A Shares and Class B Shares, each voting separately as a class, and in which a majority of the shares of each such class present and voting in such meeting affirmatively votes in favor of such different treatment;

(c)      The right to participate in the distribution of any surplus assets of the Company upon liquidation (it being clarified that the Class A Shares, Class B Shares and Redeemable A Shares shall be treated equally, identically and ratably, on a per share basis, with respect to the distribution of any surplus assets of the Company upon liquidation).

(d)      If the Company effects a split, reverse split, subdivision or combination of the outstanding Class A Shares, Class B Shares or Redeemable A Shares, the outstanding Shares of each other class will be subject to the same split, reverse split, subdivision or combination in the same proportion and manner, unless different treatment is proposed by the Board of Directors and approved in a general meeting of each of the Class A Shares and Class B Shares, each voting separately as a class, and in which a majority of the shares of each such class present and voting in such meeting affirmatively votes in favor of such different treatment.

(e)      <u>Change of Control Transaction</u>. Class A Shares, Class B Shares and Redeemable A Shares shall be treated equally, identically and ratably on a per share basis with respect to any consideration into which such Shares are converted or any consideration paid or otherwise distributed to Shareholders of the Company in connection with a Change of Control Transaction (as defined below), unless different treatment of the Shares of each such class is proposed by the Board of Directors and approved in a general meeting of each of the Class A Shares and Class B Shares, each voting separately as a class, and in which a majority of the shares of each such class present and voting in such meeting affirmatively votes in favor of such different treatment.

6.1.3.    <u>Voluntary Conversion</u>. Each one (1) Class B Share shall be convertible into one (1) Class A Share at the option of the holder thereof, at any time, upon written notice to the Company.

6.1.4.    <u>Automatic Conversion Upon Transfer</u>. Class B Shares shall automatically convert into an equal number of Class A Shares upon a Transfer of such Class B Shares (including, for the avoidance of doubt, a Transfer to another Shareholder, including a Transfer pursuant to an exercise of Section 12.2 (*Right of First Offer*)) by the holder of such shares as of immediately following the Effective Time (or in the case of any Class B Shares issued following the Effective Time, by the holder of such Class B Shares as of the time of original issuance of such shares) (any such holder, the "**Operative Holder**") or by any of such Operative Holder's Permitted Transferees to a natural person or entity other than (A) the Operative Holder, or (B) a Permitted Transferee of such Operative Holder, *provided, however*, that the following shall not be considered a "Transfer" for the purposes of this Article 6.1.4: (a) the pledge of Class B Shares by a holder of Class B Shares that creates a mere security interest in such shares pursuant to a *bona fide* loan or indebtedness transaction so long as the holder of Class B Shares continues to exercise exclusive voting control over such pledged shares; *provided, however*, that a foreclosure on such Class B Shares or other similar action under or in connection with the pledge shall constitute a "Transfer" for the purpose hereof; and (b) the fact that, at any time the spouse of any holder of Class B Shares possesses or obtains an interest in such holder's Class B Shares arising solely by reason of the application of the community property laws of any jurisdiction, so long as no other event or circumstance shall exist or have occurred that constitutes a "Transfer" of such Class B Shares.

6.1.5.    <u>Conversion of All Outstanding Class B Shares</u>. Each one (1) issued and outstanding Class B Share shall automatically, without any further action, convert into one (1) Class A Share upon the earliest of: (a) the date specified by affirmative vote or written consent of the holders of at least sixty percent (60%) of the outstanding Class B Shares, voting or acting as a separate class; (b) 5:00 pm New York City time on a date fixed by the Board that is not less than sixty (60) days nor more than one hundred and eighty (180) days following the date that Oran Shilo and Oran Holtzman, together with their Permitted Transferees, cease to hold an aggregate of at least thirty-three percent (33%) of the number of Class B Shares held by such holders at the Effective Time (as such number of shares is adjusted for any Recapitalization Event); (c) 5:00 pm New York City time on a date fixed by the Board that is not less than sixty (60) days nor more than one hundred and eighty (180) days following the death of Oran Holtzman; and (d) the seven-year anniversary of the closing date of the Company's IPO.

6.1.6.    <u>Procedures</u>. The Company may, from time to time, establish such policies and procedures relating to the conversion of Class B Shares to Class A Shares and the general administration of this dual class share structure, including the issuance of share certificates (or the establishment of book-entry positions) with respect thereto, as it may deem necessary or advisable, and may request that holders of Class B Shares furnish affidavits or other proof to the Company as it deems necessary to verify the ownership of Class B Shares and to confirm that a conversion to Class A Shares has not occurred.

The Company may provide a written notice and certification request to any holder of Class B Shares that (a) specifies a date that is not less than ninety (90) calendar days after the date of such notice and certification request (the "**Certification Date**") and (b) requests a certification, in a form satisfactory to the Company, verifying such holder's ownership of Class B Shares and confirming that an event requiring a conversion to Class A Shares has not occurred to be delivered by such holder to the Company by the Certification Date. To the extent such holder does not furnish a certification satisfactory to the Company prior to the specified Certification Date, any such Class B Shares held by such holder shall automatically, and without further action by the Company or such holder, be deemed to have converted into Class A Shares as of the Certification Date.

A determination by the Board that a Transfer results in a conversion to Class A Shares shall be conclusive and binding.

6.1.7.    Immediate Effect of Conversion. In the event of a conversion of Class B Shares to Class A Shares pursuant to this Article 6, such conversion(s) shall be deemed to have been made either at the time that the Company receives the written notice required, the time that the Transfer of such shares occurred or upon the applicable dates or events set forth in Articles 6.1.4 through 6.1.6 above (inclusive), as applicable. Upon any conversion of Class B Shares to Class A Shares, all rights of the holder of such Class B Shares shall cease and the person or persons in whose names or names the certificate or certificates (or book-entry position(s)) representing the Class B Shares) are to be issued shall be treated for all purposes as having become the record holder or holders of such number of Class A Shares into which such Class B Shares were convertible. Class B Shares that are converted into Class A Shares as provided in this Article 6 shall not be reissued. Any proxy issued with respect to Class B Shares shall, unless otherwise stated in such proxy, continue to apply with respect to the Class A Shares into which the Class B Shares have been converted.

6.1.8.    Reservation of Shares. The Company shall at all times reserve and keep available out of its authorized but unissued Class A Shares, solely for the purpose of effecting the conversion of the Class B Shares as provided in this Article 6, such number of its Class A Shares as shall from time to time be sufficient to effect the conversion of all outstanding Class B Shares into Class A Shares.

6.1.9.    Definitions. In this Article 6.1, the following terms (whether or not capitalized) shall bear the meanings set forth opposite them, respectively, unless the subject or context requires otherwise:

(a)    "Change of Control Transaction" means (i) the merger, consolidation, business combination, or other similar transaction of the Company with any other entity, other than a merger, consolidation, business combination, or other similar transaction that would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its parent) more than fifty percent (50%) of the total voting power represented by the voting securities of the Company and more than fifty percent (50%) of the total number of outstanding Shares of the Company, in each case as outstanding immediately after such merger, consolidation, business combination, or other similar transaction, and the shareholders of the Company immediately prior to the merger, consolidation, business combination, or other similar transaction own voting securities of the Company, the surviving entity or its parent immediately following the merger, consolidation, business combination, or other similar transaction in substantially the same proportions (vis-à-vis each other) as such shareholders owned the voting securities of the Company immediately prior to the transaction; (ii) a recapitalization, liquidation, dissolution, or other similar transaction involving the Company, other than a recapitalization, liquidation, dissolution, or other similar transaction that would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or being converted into voting securities of the surviving entity or its parent) more than fifty percent (50%) of the total voting power represented by the voting securities of the Company *and* more than fifty percent (50%) of the total number of outstanding Shares of the Company, in each case as outstanding immediately after such recapitalization, liquidation, dissolution or other similar transaction, and the shareholders of the Company immediately prior to the recapitalization, liquidation, dissolution or other similar transaction own voting securities of the Company, the surviving entity or its parent immediately following the recapitalization, liquidation, dissolution or other similar transaction in substantially the same proportions (vis-à-vis each other) as such shareholders owned of the voting securities of the Company immediately prior to the transaction.

(b) "Effective Time" shall mean the date on which the Class B Shares are initially issued to the holders thereof.

6.2. **Redeemable A Shares** – The Redeemable A Shares shall not have any voting rights and the holders thereof will not be entitled to attend or vote at any General Meeting in respect of the Redeemable A Shares, shall not be entitled to receive notice of any General Meeting in respect of such shares and shall not be entitled or required to sign any shareholders' written consent in respect of such shares. Without derogating from the generality of the immediately preceding sentence, in the event the consent of the holders of the Redeemable A Shares is required to effect any of the resolutions of the shareholders in accordance with the Companies Law, the holders of Redeemable A Shares hereby waive any rights to vote as a separate class to the maximum extent permitted by law. In the event that, notwithstanding this Article above, a class vote of the Redeemable A Shares is required and cannot not be waived by law, each Redeemable A Share shall convey to its holder the right to receive notice of, and to participate and vote in, such class vote, and each holder thereof shall be required to vote such shares in the same manner voted or instructed by the majority of the Class A Shares and Class B Shares voting together as one class on an as-converted basis (as provided below). Notwithstanding the above, the holders of Redeemable A Shares shall have all other rights of shareholders under the Companies Law, including without limitation, the right to receive annual audited financial statements.

6.2.1. **Redemption at the Option of a Holder** - If the Company does not consummate a Deemed Liquidation Event (as defined below) prior to the second anniversary of the date of original issuance of the Redeemable A Shares, then for a period of three months following such second anniversary (such three month period, the "**Redemption Period**"), each holder of Redeemable A Shares will have the right to require the Company to redeem such shares at a redemption price per share equal to the value of each Consideration Share (as defined in the V81 SPA, and the value of which is as agreed pursuant to the V81 SPA), as such price may be adjusted for any Recapitalization Event occurring following the issuance of the Redeemable A Shares (including Recapitalization Events that occurred prior to the adoption of these Articles), plus all accumulated, accrued, declared but unpaid dividends thereon. The Company shall provide the holders of the Redeemable A Shares with a notice of the commencement date of the Redemption Period. Each holder of Redeemable A Shares shall be entitled, during the Redemption Period, to provide written notice to the Company (via email) stating its desire to have its Redeemable A Shares (all or a part thereof) so redeemed (in this Article 6.2: the "**Notice**"). The Company shall be required to effect such redemption within 14 days following receipt of the Notice, by making payment, in cash to such holder, in accordance with wire instructions provided in the Notice. For the sake of clarity, until the consummation of such redemption, the Redeemable A Shares shall remain outstanding and shall convey to the holders thereof all rights, preferences and privileges set forth in the Articles, under applicable law and hereunder.

6.2.2.    **Non-transferability**– Without prejudice the provisions of Article 12, until the earlier of the Company's IPO, Direct Listing or consummation of a SPAC Transaction (as defined below), the Redeemable A Shares shall be non-transferable except for a sale: (i) as part of a Deemed Liquidation Event; or (ii) pursuant to Article 12.3. Any Transfer of Redeemable A Shares in violation of this Article 6.2.2 shall be null and void.

6.2.3.    **Conversion** – Upon the earlier of (a) the consummation of the Company's IPO, Direct Listing or consummation of a SPAC Transaction, or (b) any transfer of a Redeemable A Share, subject to Article 6.2.2 above, each such issued and outstanding Redeemable A Share shall, immediately prior to and subject to the consummation of the transfer thereof, be automatically converted into one Class A Share (adjusted for any Recapitalization Event).

For the sole purpose of this Article 6.2, any of the following events shall be considered a "**Deemed Liquidation Event**": *(A)* any merger, reorganization or consolidation of the Company with or into another entity, or the acquisition of the Company by means of any transaction or series of related transactions, *except* any such merger, reorganization, consolidation or other transaction or series of related transactions, in which the issued shares of the Company as of immediately prior to such transaction represent, immediately following such merger, reorganization, consolidation or other transaction or series of related transactions, at least a majority, by voting power, of the issued and outstanding shares of the surviving or acquiring entity ; *(B)* a sale or other disposition of all or substantially all of the shares and/or the assets of the Company, in a single transaction or a series of related transactions, other than to a wholly-owned subsidiary of the Company; *(C)* the consummation of the Company's IPO, Direct Listing or consummation of a SPAC Transaction

For the sole purpose of this Article, (a) "**SPAC Transaction**" means a merger, consolidation, share exchange, share purchase or other business combination between (1) the shareholders of the Company, the Company and/or a wholly-owned subsidiary of the Company and (2) a publicly listed "special purpose acquisition company" (a "**SPAC**") and/or its shareholders (or a subsidiary of the publicly listed company), in connection with which either (x) the Company becomes a publicly listed Company (or a subsidiary of a publicly listed company), or (y) the shareholders of the Company immediately prior to the closing of such merger, consolidation, share exchange, share purchase or other business combination hold or have the right, by virtue of their shareholdings in the Company, to acquire or to be issued, immediately following the closing of such merger, consolidation, share exchange, share purchase or other business combination, the majority shareholding in a publicly listed company that is the surviving entity of such merger, consolidation, share exchange, share purchase or other business combination; (b) "**Direct Listing**" means the Company's initial listing of its Class A Shares on an internationally recognized exchange by means of an effective registration statement.

6.3.     Subject to the provisions of any law, and without prejudice to any special rights granted to the current Shareholders of the Company prior to such date and any rights set forth in Article 22, if any, the Company (acting through the Board of Directors) may issue shares, whether included within the original capital of the Company or as a result of an increase in capital, with rights that are superior or inferior to the outstanding shares, or may issue shares which are preferred or subordinated with regard to distributions, voting rights, the right to repayment of capital or in connection with any other matter, all as the Company shall determine from time to time.

6.4.     If at any time the share capital is divided into different classes of shares, the General Meeting may, unless the terms of issue of that class of shares provide otherwise, amend, convert, expand, add to or otherwise alter the rights, preferences, limitations and provisions relating to those shares (or which do not relate at such time to one of the classes), provided that the holders of the class of shares that have been issued and whose rights will be affected thereby agree thereto at a meeting of the holders of the shares of the said class.

6.5.     The special rights of the holders of any shares or class of shares that have been issued, including shares issued with preferred rights or other special rights, shall not be deemed to have been altered or impaired as a result of the creation or issue of additional shares of equal rank or as a result of the cancellation of authorized share capital of the same class which have not yet been issued, unless it is otherwise specified in the conditions of issue of those shares.

6.6.     The consolidation or division of the share capital of the Company shall not be deemed to amend the rights attaching to the shares which are the subject of such consolidation.

6.7.     The provisions of these Articles with respect to General Meetings shall apply to all meetings of any class of Shareholders, mutatis mutandis.

6.8.     Subject to any special provisions in this regard contained in these Articles, the unissued shares forming part of the authorized share capital of the Company shall at all times be under the control of the Board of Directors, which shall be entitled to issue or otherwise deal with them, in favour of such Persons, for cash or other non-cash consideration, upon such terms and conditions and at such times as the Board of Directors shall deem fit. The Board of Directors shall have full authority to issue a demand for payment in respect of any shares, at such times, for such period and for such consideration as the Board of Directors shall deem fit, and to grant any Person the right to demand that any shares be issued to him at such times, for such period and for such consideration as the Board of Directors shall determine in its absolute discretion.

6.9.     Subject to Article 22, the Company may issue redeemable Equity Securities upon such terms as the Board of Directors of the Company shall determine.

6.10. The Board of Directors may attach to redeemable Equity Securities the attributes of shares, including voting rights and the right to participate in profits.

7. <u>Shareholders</u>

7.1. The Company shall be entitled to treat the registered holder of any share, including a Shareholder holding a share on trust, as the absolute owner, and accordingly shall not be required to recognize any claim on the part of any person on the basis of any equitable right or on any other basis in relation to such share, or in relation to any benefit therein on the part of any other person unless an order to this effect has been given by a court of competent jurisdiction.

7.2. The Board of Directors may, from time to time, set procedures in connection with determining the identity of Shareholders and in connection with the manner in which any right, benefit, asset or amount should be transferred to or distributed among them, including, without limitation, with respect to the distribution of dividends or bonus shares, and with respect to the grant of any right, asset or other benefit to the Shareholders in their capacity as such. Any monies, bonus shares, rights or property of any kind that are transferred to a Shareholder (including to his agent, attorney or to any other person that the Shareholder directs) whose identity has been authenticated in accordance with the procedures as aforesaid shall be deemed settlement in full and release of the indebtedness of the Company towards any person claiming a right to such payment, transfer, distribution or grant of right, as the case may be.

8. <u>Changes in Share Capital</u>

8.1. Subject to <u>Article 22.2</u>, the General Meeting of the Company may, from time to time, increase the authorized share capital of the Company by creating new shares, whether or not all of the shares that have been resolved to be issued have in fact been issued at such time, and whether or not all of the shares which have been issued at such time have been paid in full. The increase in share capital shall be in such amount and divided into shares and shall be made subject to such terms and conditions and with such rights and preferences as shall be specified in the resolution creating the shares and in particular the shares may be issued with preferred or subordinated rights (or without rights) to dividends, voting, repayment of capital or with respect to any other matters.

8.2. Unless the resolution authorizing the increase in share capital provides otherwise, the new shares shall be issued subject to all of the provisions of these Articles which apply to the existing share capital of the Company.

8.3. The General Meeting of the Company may, from time to time, cancel any of its unissued authorised share capital, unless there is any outstanding obligation on the part of the Company, including a conditional obligation, to issue the shares.

8.4. The General Meeting of the Company may, from time to time, combine and/or divide the authorised share capital of the Company into shares without nominal value and/or shares with a greater and/or lower nominal value and/or into different classes of shares than those then existing.

PART C: THE SHARES

9.    Share Certificates

9.1.    Share certificates shall be signed by authorised signatories on the part of the Company, as may be determined by the Board of Directors from time to time, alongside the name of the Company.

9.2.    Each Shareholder whose name appears in the Register of Shareholders shall be entitled to receive one share certificate in respect of the shares registered in his name, or, if the Board of Directors so authorizes (and after payment of the amount which the Board of Directors shall determine from time to time) to a number of share certificates, each one in respect of one or more of these shares. Each share certificate shall indicate the name of the Shareholder, the number of shares in respect of which it has been issued, and additional particulars that shall be determined by the Board of Directors.

9.3.    A certificate in respect of a share registered in the name of two or more persons shall be delivered to such person as all of the registered shareholders of that share shall direct, and in the absence of such direction, to the person whose name appears first on the Register of Shareholders from among the names of the joint owners.

9.4.    If a certificate is lost or damaged, the Board of Directors may issue a new certificate in its place, provided that the original certificate is presented to and destroyed by the Board of Directors, or it is proved to the satisfaction of the Board of Directors that the certificate has been lost or destroyed, and the Board of Director receives security satisfactory to it in respect for any possible damage, in each case against payment if a requirement for such a payment is imposed.

9.5.    Shares shall be deemed to have been paid in full if the full amount of the nominal value and any premium thereon has been paid, in accordance with the terms of issue of the shares.

10.    Calls on Shares

10.1.    The Board of Directors may, from time to time, at its sole discretion, make calls for payment upon shareholders in respect of any sum that has not been paid up in respect of shares held by such shareholders and which, pursuant to the terms of allotment or issuance of such shares, is not payable at a fixed time. Each shareholder shall pay to the Company the amount of every call so made upon him at the time and place designated by the Board of Directors. A call for payment may be made for payment of a number of installments. A call for payment shall be deemed to be made when the decision to issue the call is approved by the Board of Directors.

10.2.    Notice of any call for payment shall be given In Writing to the Shareholder not less than fourteen (14) days prior to the time of payment fixed in such notice, and shall specify the amount due, the time and place of payment, and the person to whom such payment is to be made. Prior to the time for any such payment fixed in a notice of a call given to a Shareholder, the Board of Directors may, by notice in writing to such Shareholder, revoke such call in whole or in part or extend the time fixed for payment.

10.3.   Joint holders of a share shall be jointly and severally liable to pay all calls for payment in respect of such share.

10.4.   If pursuant to the terms of allotment or issuance of a share, or otherwise, an amount is payable at a fixed time or in installments at fixed times, whether on account of such share or by way of premium, such amount shall be payable at such time as if it was payable by virtue of a call for payment made by the Board of Directors and for which due notice was given, and the provisions of these Articles with regard to calls shall be applicable to such amount.

10.5.   If any amount called for payment is not paid prior to or on the due date for payment, the person who, at such time, is the owner of the share for which the call for payment was issued or payment is due shall pay interest on such amount at the rate determined by the Board of Directors from time to time, from the date fixed for payment until actual payment. The Board of Directors may decide to waive all or part of such interest.

10.6.   With the consent of the Board of Directors, any Shareholder may pay to the Company any amount not yet called or payable in respect of his shares. If agreed with the shareholder, the Board of Directors may approve the payment by the Company of interest on all or part of any such amount until the date the amount would have been payable if it had not been paid in advance, at such rate as may be agreed by the Board of Directors and the Shareholder. The Board of Directors may, at any time prior to the due date for payment, cause the Company to repay the money so advanced to such Shareholder.

11.   Forfeiture and Charge

11.1.   If a Shareholder fails to pay an amount payable by virtue of a call or any portion thereof, on or before the day fixed for payment of the same, the Board of Directors may at any time after the day fixed for such payment, so long as such amount or any portion thereof remains unpaid, issue a notice to the said Shareholder requiring him to pay such amounts, together with accumulated interest thereon and any expenses incurred by the Company in connection with the non-payment.

11.2.   The notice shall state the date and place or places on which the call or the said demand must be paid, together with interest and expenses as stated above. The notice shall also specify that, in the event of non-payment on or before the said date at the place specified in the notice, the shares in respect of which the call was made or payments are due may be forfeited.

11.3.   If the requirements of such notice have not been met, then following such time until the payment of the call, or the said amount, the interest and expenses payable in connection with the shares, the Board of Directors may decide to forfeit the shares in respect of which such notice was issued. Such forfeiture shall include any dividends that have been declared with respect to such shares and which have not yet been paid prior to such forfeiture.

11.4.     Any forfeited share shall be considered the property of the Company and the Board of Directors may, in accordance with these Articles and subject to any provisions of law, sell, reissue or transfer such share in any manner as it may see fit.

11.5.     The Board of Directors may, at any time prior to such sale, reissuance or Transfer in another manner of the forfeited share, cancel the forfeiture in such manner and on such conditions as it shall determine in its absolute discretion.

11.6.     Each Shareholder whose shares have been forfeited shall cease to enjoy any rights in connection with the forfeited shares, provided that, notwithstanding the foregoing, it shall be required to immediately pay to the Company the amount of any call or unpaid amounts including interest and expenses payable to the Company in respect of the shares on the date on which the forfeiture was carried out together with interest on such sums from the date of forfeiture until the date of payment of all such amounts (including interest and expenses as stated above) at the rate determined by the Board of Directors, provided only that in the event that the forfeited shares are resold, the amount of the debt of the Shareholder whose shares are forfeited shall be reduced by the net amount (after deduction of tax and expenses of the Company in respect of the sale of the forfeited shares) received by the Company from the resale.

11.7.     The provisions of these Articles regarding forfeiture of shares shall also apply to the non-payment of any specific amount that, according to the terms of allotment or issuance of the relevant share, is payable at a fixed time (whether in respect of the nominal value of the shares and whether in respect of premium) as if such amount was payable following a call issued and notified to the Shareholder in accordance with the law.

11.8.     The Company shall have a first ranking charge over all shares registered in the name of the Shareholders (without regard to any equitable or other claim or in such shares on the part of any other person), other than with respect to shares that are fully paid up, including with respect to any proceeds of sale, for the purposes of paying the debts and obligations of the said shareholder to the Company whether individually or together with another person in respect of the shares issued to him by the Company, whether or not such debts or obligations have matured. The said charge shall also apply to all dividends declared from time to time in respect of such shares.

11.9.     In order to realize the said charge, the Board of Directors shall be entitled to sell the shares subject to the charge in such manner as it shall see fit in its sole discretion; provided that no shares may be sold unless the shareholder or his executor has received written notice specifying that the Company intends to sell the shares and the said shareholder or executor, as appropriate, has not paid all the said amounts or complied with the obligations within a period of ten Business Days from the date of issuance of such notice.

11.10.    The net amounts (after deducting any tax and expenses incurred by the Company in such sale) from the sale as stated above shall serve to pay the said debts and to fulfill the said obligations of the Shareholder including the debts and obligations which have not yet matured, and any surplus shall be paid to the Shareholder or his executor.

11.11.    Upon any sale after forfeiture or upon the realization of the charge in accordance with these Articles, the Board of Directors shall be entitled to appoint any person to sign a share transfer deed with respect to such shares and to cause the purchaser to be registered in the Register of Shareholders as the owner of the shares being sold. The purchaser shall not be required to confirm the validity of the sale proceedings or to confirm the application of the proceeds of such sale and, after the registration of such shareholder in the Register of Shareholders with respect to such shares, the validity of the sale shall not be disputed and the sole remedy of any person who is harmed by the sale shall be to seek damages solely against the Company.

12.    Restrictions on Transfer of Shares

No Shareholder shall make any Transfer of any Equity Securities, except in compliance with this Article 12. Any Transfer of shares or other Equity Securities of the Company in violation of this Article 12 shall be null and void.

12.1.    General Restrictions

Without derogating from the other provisions of this Article12, any Transfer of shares or other Equity Securities of the Company (including to a Permitted Transferee) shall be subject to the following:

12.1.1.    conditioned upon the execution by the transferee of a written undertaking whereby the transferee agrees to adhere to and observe the provisions of these Articles and the Shareholders Agreement, and to assume all of the transferor's obligations and undertakings under these Articles and such the Shareholders Agreement;

12.1.2.    no Shareholder may Transfer Equity Securities to a proposed transferee (including its Controlling Persons and/or any Affiliates thereof) who is indicted in charges of, or has been convicted of, a criminal offense (other than traffic and other minor violations), unless the Board of Directors (including the approval of a L Catterton Director, which will not be unreasonably withheld) finds that such circumstances are not materially detrimental to the business or the reputation of the Company and its Subsidiaries, taken as a whole; and

12.1.3.    Any rights of L Catterton set forth in these Articles and/or in the Shareholders Agreement shall be transferable provided that they are transferred together with the L Catterton SPA Shares and/or the L Catterton 2019 SPA Shares in accordance with the terms of these Articles and the Shareholders Agreement; provided, however, that L Catterton and its Permitted Transferees shall not transfer to a transferee who is not a Permitted Transferee of L Catterton, and no transferee of L Catterton who is not its Permitted Transferee shall be entitled to exercise, any rights under Article 27 (*Protective Covenants*). For the avoidance of doubt, L Catterton's rights under these Articles and under the Shareholders Agreement may be transferred to any of its Permitted Transferees, including the rights under Article 22.

12.1.4.    Without prejudice of the aforesaid, a Minority Shareholder will not Transfer its Equity Securities to any Person without a prior written approval from the Board of Directors, which may be withheld for any reason and without any justification, and any such Transfer will be subject to Article 12.2.

12.2.    <u>Right of First Offer</u>

12.2.1.    If an Ordinary Shareholder intends to Transfer (in this Article, the "**Offeror**") any of its Equity Securities in the Company to a transferor which is not a Permitted Transferee of such Shareholder (in this Article, the "**Offered Shares**"), it shall first offer (in this Article, the "**Offer**") such Offered Shares to the other Ordinary Shareholder(s), excluding the Minority Shareholder(s) (in this Article, the "**Offerees**"), by delivering a notice thereto setting forth the terms and conditions to such proposed Transfer (in this Article, the "**Notice**"), including the price per Offered Share, the number of Offered Shares, the payment terms and other applicable terms, if any. The Offerees may accept the Offer by delivering, within a thirty (30) day period from the date of receipt of the Notice (in this Article, the "**Response Period**"), an acceptance notice agreeing to the Offer and setting forth the maximum number of Offered Shares such Offeree undertakes to purchase under the terms of the Notice (in this Article, the "**Acceptance Notice**"). Such Acceptance Notice shall be deemed unconditional and irrevocable. A failure to accept the Offer in writing within said 30-day period shall be deemed a waiver of such right of first offer in respect of such Offer.

12.2.2.    If the Acceptance Notices, in the aggregate, are in respect of all of, or more than all of, the Offered Shares, then the accepting Offerees shall acquire the Offered Shares, on the terms aforementioned, in proportion to their respective ownership of the outstanding shares of the Company, provided that no accepting Offerees shall be entitled to acquire under the provisions of this Article more than the number of Offered Shares initially accepted by such Offeree, and upon the allocation to it of the full number of Offered Shares so accepted, it shall be disregarded in any subsequent computations and allocations hereunder. Any shares remaining after the computation of such respective entitlements shall be re-allocated among the accepting Offerees (other than those to be disregarded as aforesaid), in the same manner, until one hundred percent (100%) of the Offered Shares have been allocated as aforesaid. The accepting Offerees shall then be obligated to transfer the consideration for their respective share in the Offered Shares, and consummate the purchase of such Offered Shares on the terms and conditions set forth in the Notice, within sixty (60) days after the expiration of the Response Period. The Offeror shall deliver the Offered Shares to the accepting Offerees, free and clear of any Security Interest other than those created by these Articles and the Shareholders Agreement.

12.2.3.    If the Acceptance Notices, in the aggregate, are in respect of less than all of the Offered Shares, or if the Offerees do not respond at all to the Offer within the said 30-day period, then the Offeror may sell and transfer all the Offered Shares to a third party, at the price and on the terms and conditions as specified in the Notice or at a greater price and on terms and conditions not more advantageous to such third party, within one hundred and eighty (180) days after the expiration of the Response Period or after the actual day when all the Offerees gave notice of their refusal to purchase all of the Offered Shares (or their acceptance of less than all of the Offered Shares), whichever is the earlier. If the Offeror does not sell and transfer such Offered Shares to a third party within the aforesaid 180-day period, or it wishes to sell or transfer the Offered Shares on terms and conditions more favorable to a transferee than those stated in the Notice, it shall again offer the Offered Shares first to the Offeree(s), in accordance with the provisions of this <u>Article 12.2</u>.

12.2.4. This Article 12.2 shall also apply to the sale of Equity Securities by a receiver, liquidator, trustee in bankruptcy, administrator of an estate, executor of a will, etc.

12.2.5. This Article 12.2 shall expire upon the consummation of an IPO. This Article 12.2 shall not apply in case of a drag along pursuant to Article 12.4.

12.3.   Tag-Along

12.3.1. If Oran Shilo or any of its Permitted Transferees or, only in the event of a Qualifying Sale (as defined below) by L Catterton, L Catterton or its Permitted Transferees (a "**Selling Shareholder**") wishes to Transfer to any Person, other than to its Permitted Transferees, all or any of its Equity Securities in the Company including to a third party pursuant to Article 12.2.3 above (for the purpose of this Article 12.3 the "**Offered Shares**"), then such Selling Shareholder shall notify, (a) in case that the Selling Shareholder is Oran Shilo or any of its Permitted Transferees, L Catterton and, subject to the Transfer being a Qualifying Sale by Oran Shilo or its Permitted Transferees, also the Shareholders that were initially issued with Redeemable A Shares, and (b) in case of a Qualifying Sale by L Catterton, Shareholders that were initially issued with Redeemable A Shares (each of the offerees referred to in (a) or (b), as applicable, the "**Offered Shareholders**"), of the proposed sale (the "**Proposed Transaction**"), by delivering the Offered Shareholders a written notice, stating therein the identity of the purchaser and the proposed price, terms of payment and other terms of sale of the Offered Shares (in this Article 12.3, the "**Notice**"). For the avoidance of doubt, the Selling Shareholder shall first comply with Article 12.2 *(Right of First Offer)* before complying with this Article 12.3 *(Tag-Along)*. "**Qualifying Sale**" means a sale pursuant to which the Offered Shares comprise more than 10% of the issued and outstanding share capital of the Company at the time of such offer.

12.3.2. Upon receipt of the Notice, Offered Shareholders shall be entitled to notify such Selling Shareholder, by delivering a written notice to such Selling Shareholder (the "**Participation Notice**") within thirty (30) days after receipt of the Notice (the "**Tag-Along Period**"), that it wishes to participate in such Selling Shareholder's sale of the Offered Shares, and to sell to the proposed purchaser up to that number of shares owned by it determined by multiplying the total number of Offered Shares by a fraction the numerator of which is the number of shares owned by the Offered Shareholder and the denominator of which is the total number of Equity Securities (calculated on a Fully-Diluted Basis) owned by all Offered Shareholders and the Selling Shareholder. The sale shall be effected under the same terms and conditions (including the same price per share, warranties, holdbacks, covenants and indemnities) set out in the Notice. A Participation Notice shall be unconditional and irrevocable. A failure by an Offered Shareholder to deliver a Participation Notice to such Selling Shareholder within the Tag-Along Period shall be deemed a waiver by the Offered Shareholder of its tag-along right with respect to such Proposed Transaction.

12.3.3. To the extent an Offered Shareholder exercises its tag-along right pursuant to this Article 12.3, the number of the Offered Shares that such Selling Shareholder may sell pursuant to the Proposed Transaction shall be correspondingly reduced. At the closing of the sale of the Offered Shares to the purchaser, such Selling Shareholder shall transfer its Offered Shares to the purchaser only if the purchaser concurrently therewith purchases, on the same terms and conditions specified in the Notice, all of the shares as to which a Participation Notice has been delivered. An Offered Shareholder shall deliver its portion of the Offered Shares to the purchaser, free and clear of any Security Interest other than those created by these Articles and the Shareholders Agreement.

12.3.4. If an Offered Shareholder does not deliver a Participation Notice within the Tag-Along Period, or otherwise waives its right to tag-along pursuant to the terms hereof, then such Selling Shareholder shall be entitled to Transfer the Offered Shares to the third-party purchaser, *provided*, *however*, that in no event shall such Selling Shareholder Transfer any of the Offered Shares on terms more favorable to such Selling Shareholder than those stated in the Notice, and, *provided, further*, that any of the Offered Shares not Transferred within one hundred and twenty (120) days after the expiration of the Tag-Along Period (which period shall extend by up to additional sixty (60) days if the cause for the delay in the Transfer is a delay in receipt of a regulatory consent required under applicable law, if any) shall be subject again to the provisions of this Article 12.3.

12.3.5. This Article 12.3 shall expire upon the consummation of an IPO. This this Article 12.3 shall not apply in case of a drag along pursuant to Article 12.4.

12.4. Drag Along

Subject to the provisions of Article 22 (*Protective Covenants*) below to the extent applicable, but notwithstanding the provisions of Articles 12.2 and 12.3 above:

12.4.1. In the event that the Board of Directors, or the Shareholders of the Company, as applicable, approve, pursuant to the relevant sections of the Shareholders Agreement, a binding offer (in this Article 12.4, the "**Offer**") received from any Person(s) who is not an Affiliate or Permitted Transferee of a Shareholder (an "**Acquirer**"), to effect a transaction or a series of related transactions resulting in the purchase of all or substantially all of the shares or assets of the Company, whether effected by way of a share sale, asset sale, merger, acquisition or otherwise (in this Article 12.4, the "**Proposed Transaction**"), then all Shareholders shall be compelled: (i) if asked to do so by the Company, the Board of Directors, the Shareholders' meeting or by the Acquirer, to sell all of its shares and other Equity Securities in the Company to the Acquirer, free and clear of any Security Interest other than those created by the Shareholders Agreement and this Articles, and under the same terms stated in the Offer (including the same price per Share, warranties, holdbacks, covenants and indemnities), and (ii) not to oppose such Proposed Transaction and, if applicable, vote all of their shares in favor of such Proposed Transaction.

12.4.2. If compelled to sell, at the closing of the Proposed Transaction, the Shareholders shall (to the extent required by the Company or the Acquirer) deliver certificates evidencing its ownership of the shares (or Equity Securities, as applicable) being sold by them, accompanied by a duly executed written instruments of transfer in form satisfactory to the Acquirer, against delivery of the closing purchase price therefor and take any other actions and sign any other document reasonably necessary to effect such Proposed Transaction.

12.4.3. The Shareholders hereby agree that the provisions of Section 341 of the Companies Law shall not apply to them, to the extent such provisions may be waived. Without derogating from the aforesaid and in addition to it, to the extent that the provisions of Section 341 of the Companies Law cannot be waived, (i) the majority required for a forced sale pursuant to Sections 341(d) of the Companies Law shall be 50% of the voting rights in the Company and for the purpose of Section 8.5 of the Shareholders Agreement (and for that purpose only), it shall be the holdings of L Catterton in the Company at the relevant time it exercises its drag right pursuant to that Section, and (ii) to the extent permitted by law, the notices that should be sent by the Acquirer according to the provisions set forth in Section 341(a) and 341(c) of the Companies Law may be sent by either the Acquirer or the Company and the time frame set forth in the aforementioned provisions for sending each of such notices under Section 341, shall not be limited to the time frame specified therein.

12.4.4. In the event of a conflict between the provisions of (or the exercise of rights pursuant to) this Article 12.4 *(Drag Along)* and the provisions of Article 12.3 *(Tag Along)*, then the provisions of this Article 12.4 shall prevail.

12.5. Transfer to Permitted Transferees; Permitted Pledge

12.5.1. Notwithstanding any provision to the contrary in this Article 12 (other than Article 12.1.4), an Ordinary Shareholder shall have the right to (x) pledge or encumber its shares in connection with a loan made to the Company or any of its Subsidiaries, and (y) Transfer all or part of its shares or other Equity Securities (together with its rights under the Shareholders Agreement and subject to Article 12.1.3 above) to its Permitted Transferees, provided that (a) such Permitted Transferee has agreed In Writing (i) to adhere to and observe the provisions of the Shareholders Agreement as if such Permitted Transferee was the Transferor, and (ii) to Transfer such shares back to the Shareholder which held such shares initially in the event such Permitted Transferee ceases at any time to be a Permitted Transferee of such Shareholder, and (b) such Shareholder shall ipso facto be deemed to have agreed to guarantee performance by such Permitted Transferee of its obligations pursuant to clause (a). Oran Shilo and their Permitted Transferees may pledge or encumber their shares in connection with a Permitted Pledge, provided that as a condition to such pledge, the pledgee (and any person acquiring said pledged shares pursuant to the realization of such pledge) shall agree to adhere to the provisions of Article 12.4 *(Drag Along)* and allow for the transfer of the pledged shares in the circumstances of Section 12.4 when they are free and clear of any Security Interest (it being clarified that in such event, the pledgee may maintain its rights in the proceeds received from the sale of the shares in accordance with its pledge agreement with the pledgor).

13.    Preemptive Rights and Financing

13.1.    Prior to the consummation of an IPO, if the Board of Directors resolves to issue or sell any New Securities (as defined below) or to accept a shareholders' loan from one or more of the Shareholders (including in either case in connection with a Distress Fund Raising, a "**Financing**"), the Company shall, before such issuance of New Securities or such extension of Financing, offer to each Shareholder (in this Article 13 and its sub-articles, the term "**Shareholder**" – shall exclude any Minority Shareholder) the right to purchase a *pro-rata* share of the New Securities or to provide the *pro-rata* share of the Financing in accordance with the provisions of this Article 13. For the avoidance of doubt, the Company shall be obligated to offer the preemptive rights under this Article 13 with respect to any Distress Fund Raising that contemplates the issuance of New Securities or is in the form of a Financing.

A Shareholder's *pro-rata* share, for purposes of this Article 13, is the ratio between: (i) the number of the issued and outstanding shares owned by such Shareholder immediately prior to the issuance of the New Securities or the extension of the Financing; and (ii) the total number of issued and outstanding shares owned by all Shareholders immediately prior to the issuance of the New Securities or the extension of the Financing.

For the purpose of this Article 13, the term "**New Securities**" shall mean shares, whether now or hereafter authorized, and any other Equity Securities; *provided, however,* that New Securities shall not include: (i) shares issued in connection with any share split, share dividend, recapitalization, reclassification, issuance of bonus shares or similar recapitalization event by the Company approved, if required, pursuant to Article 22; (ii) shares or options issued to employees, directors, officers or consultants, other than any of the Shareholders or Oran Holtzman, pursuant to a share option plan or incentive plan approved by the Board of Directors and which provides for aggregate issuances under all such plans of not more than a number of Equity Securities equal to 5% of the total number of shares on a Fully-Diluted Basis (collectively "**Equity Grants**") and provided further that if the Company seeks to issue Equity Grants in excess of the 5% threshold it shall be entitled to do so for as long as any such excess issuance beyond the 5% shall not dilute L Catterton's then outstanding holding in the Company; (iii) shares or other Equity Securities issued to a Person or its shareholders pursuant to the acquisition of such Person by the Company or any of its subsidiaries (including by way of a merger or share swap) or purchase of all or substantially all of the assets of such Person by the Company or its subsidiaries approved, if required, pursuant to Article 22; or (iv) Equity Securities issued to a lending institution in connection with a loan or credit facility approved, if required, pursuant to Article 22.

13.2. In the event the Company proposes to undertake an issuance of New Securities or to raise Financing, it shall give each Shareholder written notice of its intention, describing the type of Equity Securities or Financing, their price, amount and the general terms upon which the Company proposes to issue or raise the same (in this Article 13, the "**Notice**"). Each Shareholder shall have thirty (30) days after the receipt of Notice to agree to purchase all (and not only part) of such Shareholder's *pro rata* share of such New Securities or to provide all (and not only part of) such Shareholder's *pro rata* share of the Financing, for the price and/or upon the terms specified in the Notice, by giving a written notice to the Company (in this Article 13, the "**Acceptance Notice**"). An Acceptance Notice shall be unconditional and irrevocable. Any failure by a Shareholder to send to the Company an Acceptance Notice within such 30-day period shall be deemed as an irrevocable waiver of such Shareholder's right to participate in purchase of the New Securities or the extension of the Financing described in the Notice. In the event of a Financing or issuance of New Securities which is made as part of a Distress Fund Raising (and only in such event), then to the extent that any New Securities or portion of the Financing remains available (because one or more Shareholder did not deliver an Acceptance Notice), such remaining New Securities or portion of the Financing shall be re-allocated among those Shareholders who have provided an Acceptance Notice, pro rata among such Shareholders or in such other proportions as agreed by such Shareholders.

13.3. In the event that the Shareholders fail to exercise in full their preemptive right within the said 30-day period, the Company shall have one hundred and eighty (180) days thereafter to sell or enter into an agreement to sell the un-exercised portion of the New Securities or obtain the portion of the Financing which was not provided by the Shareholders, at a price not more favorable to the third party purchasers or lenders than those specified in the Notice. In the event the Company has not sold or entered into an agreement to sell the New Securities or has not obtained the Financing in accordance with the foregoing terms within the said 180-day period, the Company shall not thereafter issue or sell any New Securities or raise any Financing without first offering such securities or seeking such Financing from the Shareholders, in accordance with the terms of this Article 13.

13.4. The rights set forth in this Article may be assigned, in whole or in part, by a Shareholder to its Permitted Transferees, subject to such Permitted Transferee agreement to adhere and observe the provisions of the Shareholders Agreement as set forth in Article 12.5.

13.5. Section 290(a) of the Companies Law shall not apply to the Company and only the provisions of this Article 13 shall apply.

PART D - GENERAL MEETINGS

14. Convening a General Meeting

14.1. Subject to compliance with the applicable laws, at least seven (7) days' notice of each Shareholders' meeting must be given to each Shareholder holding Ordinary Shares (then entitled to receive an invitation and to participate and vote in General Meetings pursuant to these Articles) specifying the date, time and place of the meeting, and the business to be transacted thereat shall be given In Writing and sent by electronic mail or by overnight courier, except that in the event that the Chairman (as defined below) determines that there is an urgent matter on the agenda, a Written notice of the meeting of the Shareholders may be dispatched to all Shareholders not less than forty-eight (48) hours before the Shareholders' meeting.

14.2.    If all Shareholders agree In Writing to a shorter period of notice, then any meeting called at such shorter period of notice shall be deemed to be properly called.

14.3.    Unless all the Shareholders agree otherwise, no business may be transacted at a Shareholders' meeting other than as set out in the notice of meeting delivered to the Shareholders.

14.4.    The quorum required to commence a General Meeting shall consist of Shareholders holding the majority of the voting rights in the Company (provided that one of whom must be L Catterton), provided that if a quorum is not present at a General Meeting within thirty (30) minutes of the time set for such General Meeting, the meeting shall be adjourned and postponed by seven (7) days. If a quorum is not present at such reconvened meeting of the General Meeting within thirty (30) minutes of the time set for such reconvened meeting, such reconvened meeting shall again be adjourned and postponed to the same time three (3) days thereafter and at such second reconvened meeting the attendance of any Shareholder(s) holding the majority of the voting rights the Company will qualify as a quorum irrespective of whether L Catterton is represented at such second reconvened meeting.

14.5.    Subject to the provisions of Article 22 (*Protective Covenants*) hereof, to the extent applicable, resolutions at General Meetings shall be adopted by a majority of the votes of the Shareholders present at such General Meeting. Each Shareholder shall have one (1) vote for each Class A Share held by such Shareholder and ten (10) votes for each Class B Share held by such Shareholder.

14.6.    Unless otherwise expressly directed by a court of competent jurisdiction the provisions of these Articles shall apply, with such changes as shall be required in the circumstances, to the convening, conduct and proceedings of a General Meeting convened by order of a court of competent jurisdiction and of a General Meeting lawfully convened other than by the Board of Directors, and to any vote at such meeting.

15.    Notices to Shareholders

15.1.    Each Shareholder may waive his right to receive notice or his right to receive a notice at any specified time, and may agree that a General Meeting be convened and decisions taken threat even though he or she has not received notice of the meeting or has not received notice within a specified time, in each case subject to the provisions of any law prohibiting a waiver or agreement of this nature.

15.2.    The Company may give notice to joint holders of any share by notice to the joint holder whose name first appears on the Register of Shareholders with respect to that share.

15.3.    The validity of any resolutions carried at a General Meeting shall not be affected if the Company, by oversight, has not sent a notice of the convening of the meeting to a shareholder entitled to receive written notice of the convening the meeting, or has sent an incomplete or incorrect notice regarding the convening of the meeting or its agenda, or has not served a notice as aforesaid to the shareholder or has delayed in sending or delivering the said notice.

15.4.  Any document or notice delivered by the Company in accordance with the provisions of these Articles shall be deemed to have been properly served notwithstanding the death, bankruptcy or liquidation of that Shareholder (whether or not the Company knew of the circumstances) so long as no other Person has been registered in his place as Shareholder in the Register of Shareholders, and delivery or service as aforesaid shall be deemed sufficient for all purposes with respect to any Person who claims to be entitled to the shares in question.

16.    Voting by Proxy and in Other Manners

16.1.  A resolution In Writing signed by all the Shareholders of the Company then entitled to attend and vote at General Meetings or to which all such Shareholders have given their Written consent shall be deemed to have been unanimously adopted by a General Meeting duly convened and held.

16.2.  A General Meeting may be held via any means of communication - provided that the Shareholders participating therein can hear one another at the same time - or in any other manner permitted by law.

16.3.  A corporation which is a Shareholder in the Company may authorize a representative of such corporation to be its representative at any meeting of the Company. A person authorized as aforesaid shall be entitled to make use, on behalf of the corporation that he represents, of the same powers which the corporation itself could have used if it was an individual Shareholder in the Company.

16.4.  In the case of joint holders of a share, the vote of the principal joint holder shall be accepted by the Company, whether given in person or by proxy, and the vote of the remaining joint holders shall not be accepted. For the purpose of this Article, the principal joint holder shall be deemed to be the shareholder whose name first appears in the Register of Shareholders with respect to the relevant shares.

16.5.  A Shareholder may appoint a proxy to vote in his place and the proxy need not be a Shareholder in the Company. The appointment of a proxy shall be In Writing signed by the person making the appointment or by an attorney authorized for this purpose, and if the person making the appointment is a corporation, by a person or persons authorized to bind the corporation.

16.6.  The document appointing the proxy to vote (the "**Appointment**") and power of attorney (if any) pursuant to which the Appointment has been signed, or a copy thereof certified to the satisfaction of the Board of Directors, shall be deposited in the Office or at the location set for the meeting not less than forty eight (48) hours before the time of the meeting at which the person specified in the Appointment is due to vote, or shall be delivered by hand to the chairman at the commencement of the meeting provided that the chairman of the meeting may waive this requirement for any meeting.

16.7.    A Shareholder holding more than one share may appoint more than one proxy, subject to the following provisions:

(a)    The Appointment shall indicate the class and number of shares in respect of which it is given;

(b)    If the number of the shares of any class specified in the Appointments that have been given by one Shareholder exceeds the number of shares of that class held by him, all of the Appointments given by that Shareholder shall be void;

(c)    If only one proxy is appointed by the Shareholder and the Appointment does not indicate the number and class of shares in respect of which it is given, the Appointment shall be deemed to have been given with respect to all of the shares owned by the Shareholder at the time for determining the entitlement to participate and vote in the meeting (if the Appointment is given for a specific meeting) or in respect of all of the shares held by the Shareholder at the date of depositing the appointment with the Company or on the date of delivery to the chairman of the meeting, as the case may be. In the event that an Appointment is given with respect to a number of shares less than the number of shares held by the Shareholder, the Shareholder shall be deemed to have abstained from voting with respect to the remainder of the shares that he owns and the Appointment shall be valid with respect to the number of shares specified therein.

16.8.    Each Appointment of a proxy, whether for a specific meeting or otherwise, shall, to the extent that the circumstances permit, be substantially in the following form:

"I, _____ (I.D. Number/Company Number _____) of _____, in my capacity as shareholder in _____ Limited, hereby appoint _____, (I.D. Number/Company Number _____) of_____, or in his/her absence, _____, (I.D. Number/Company Number _____) of _____, to vote on my behalf and in my name with respect to _____ Class __ shares held by me at the (annual/special) meeting of the Company that shall be held on the ____ day of _____, and at any adjournment of such meeting.

In witness whereof I have signed hereon this ___ day of _____.

_____
Name and Signature"

16.9.    A vote cast pursuant to an Appointment appointing a proxy shall be valid notwithstanding the death of the person making the Appointment or the cancellation of the power of attorney or the Transfer of the share in respect of which the vote is cast as aforesaid unless notice in writing of the death, cancellation or Transfer as aforesaid has been received in the Office or by the chairman of the meeting, by the time of the vote.

PART E: THE BOARD OF DIRECTORS

17.     The Board of Directors, Appointment and Dismissal of Directors

17.1.     The Board of Directors shall consist of up to five (5) directors, which will be appointed as follows:

17.1.1.     For as long as L Catterton and its Permitted Transferees collectively hold at least the L Catterton Entitlement Holdings Threshold, L Catterton shall have the right to appoint two (2) directors to the Board of Directors; *provided, however*, that in the event that L Catterton and its Permitted Transferees collectively hold below the L Catterton Entitlement Holdings Threshold but collectively more than 30% of the L Catterton SPA Shares, L Catterton shall have the right to appoint one (1) director to the Board of Directors (each appointee of L Catterton shall be referred to as a "**L Catterton Director**" and collectively as the "**L Catterton Directors**"). The L Catterton Directors shall not be a legal or financial adviser of L Catterton or its Affiliates; *provided, however*, that, individuals employed by L Catterton or its Affiliates, including those in a legal or financing role, will not be restricted from serving as L Catterton Directors. The Company shall cause each of its Subsidiaries to maintain the same Board of Directors structure with the same representation of the Shareholders, to the extent permitted by applicable law of the jurisdiction in which such Subsidiary is formed.

17.1.2.     Oran Shilo and their Permitted Transferees, acting jointly, shall have the right to appoint three (3) directors to the Board of Directors, one of whom shall serve as the chairman of the Board of Directors (the "**Chairman**"). For so long as Oran Holtzman controls OS Investments, Oran Shilo shall appoint Oran Holtzman as one of its directors and Holtzman shall serve as Chairman.

17.2.     A Shareholder that is entitled to appoint a Director to the Board of Directors shall be entitled to dismiss or replace such Director. Appointment, dismissal and replacement of a Director shall be effected by furnishing a Written notification to the Company, signed by the Shareholder entitled to effect such appointment, replacement or removal, and shall become effective on the date fixed in the notice or upon receipt of the notice by the Company, whichever is later.

17.3.     All notices of meetings of the Board of Directors shall state the date, time and place of the meeting, and the nature of business proposed to be transacted thereat, and shall be given to all Directors in writing sent by electronic mail or by overnight courier. Notices of meeting of the Board of Directors shall be dispatched to all Directors not less than seven (7) days before the proposed date for such meeting, unless all the Directors agree In Writing to a shorter notice period. Notwithstanding the foregoing, in the event that the Chairman determines that there is an urgent material matter that requires action by the Board of Directors, a notice of the meeting of the Board of Directors may be dispatched to all Directors not less than twenty-four (24) hours before the Board of Directors meeting.

17.4.     If a Director has appointed an Alternate Director (as defined below) for himself, notice shall be provided both to the Director and to the Alternate Director. Notice to a Director which is a corporation shall be delivered to the Corporate Representative.

17.5.    The details of a Director, Alternate Director or Corporate Representative appearing in the Register of Directors which the Company maintains or which have been notified to the Company In Writing together with a request that these details be used for the purposes of delivery of notices, shall be the address and other details of the Director for the purposes of delivery of notices to him.

17.6.    Any member of the Board of Directors may participate and act at any meeting through the use of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. The attendance of any Director at a meeting of the Board of Directors shall constitute a waiver of notice of such meeting. Notwithstanding the nature of the business set forth on the applicable notice, the Directors may transact business at a Board of Directors meeting other than as set out in the applicable notice of meeting delivered to the Directors. The Board of Directors shall meet at least bi-annually and at such other times as determined by the Chairman or pursuant to applicable law and, to the extent possible, the Directors will consult with each other regarding the scheduling of Board of Directors meetings.

17.7.    The quorum required to commence a meeting of the Board of Directors shall be a majority of the members of the Board of Directors then serving (provided that at least one of whom will be an L Catterton Director). If a quorum is not present at a meeting of the Board of Directors within thirty (30) minutes of the time set for such meeting, the meeting shall be adjourned and postponed to the same time three (3) days thereafter. If a quorum is not present at such reconvened meeting of the Board of Directors within thirty (30) minutes of the time set for such reconvened meeting, such reconvened meeting shall again be adjourned and postponed to the same time three (3) days thereafter. At any such second reconvened meeting (and only at such meeting), a majority of the Directors then serving shall constitute quorum, irrespective of whether an L Catterton Director is represented at such second reconvened meeting.

17.8.    Subject to the provisions of Article 22 *(Protective Covenants)* hereof: (a) the Board of Directors may take action upon a majority of the votes of the members of the Board of Directors present at a meeting of the Board of Directors at which quorum as provided in Article 18.7 is present, and (b) each member of the Board of Directors shall have one (1) vote at all meetings of the Board of Directors attended by him or her; provided, however, that (x) Oran Holtzman, for the period he is a Director, shall have such number of additional votes (in addition to his own vote) that equals to the number of the Directors that Oran Shilo is entitled to appoint, but has failed to so appoint at that time (and/or that Oran Shilo has appointed, but who failed to attend the relevant meeting) and (y) to the extent L Catterton is entitled to appoint two Directors pursuant to Section18.1.1, any L Catterton director who is appointed shall be entitled to an additional vote in the event the second L Catterton Director has not been appointed (or that has been appointed, but failed to attend the relevant meeting).

17.9.    The Company shall reimburse the Directors for their respective reasonable out-of-pocket expenses incurred in attending Board of Directors meetings or meetings of Board of Directors committees, promptly upon presentation of receipts. Subject to the foregoing, Directors shall not be entitled to any per-diem or other remuneration in connection with their service on the Board of Directors.

17.10.    Subject to the provisions of any law, a Director who has ceased to serve as Director is eligible to be re-appointed.

17.11.    Subject to the provisions of any law, the office of a Director shall be vacated (including the office of an Alternate Director and a Corporate Representative) automatically in each of the following events:

      (a)    upon his death;

      (b)    if he is declared to be legally incompetent;

      (c)    if he is declared bankrupt, or if the Director is a corporation, if a liquidator, receiver, special manager or trustee (in each case temporary or permanent) is appointed for the corporation or its assets within the context of a creditors scheme of arrangement or an order of stay of proceedings;

      (d)    if he resigns from office by written notice to the Company, the Chairman or the Board of Directors, in which case the office of the Director shall be vacated on the date of service of notice or at such later date specified in the notice;

      (e)    if his term of office has terminated in accordance with the provisions of these Articles;

      (f)    if the Director is convicted in a final judgment of an offence of a nature which disqualifies a person from serving as a company director; or

      (g)    if a court of competent jurisdiction decides to terminate his office in a decision or judgment for which no stay of enforcement granted.

18.    **Alternate Director and Corporate Representative**

18.1.    Subject to any limitations set forth in <u>Article 18.1</u>, a Director may at any time appoint an alternate (the "**A1ternate Director**") who is fit to serve as Director and meets the requirements for such position in accordance with these Articles and the Shareholders Agreement. So long as the appointment of the Alternate Director remains in force, the Alternate Director alone is entitled to participate in any meeting of the Board of Directors and he shall have all of the duties, rights and authorities (other than the authority to appoint an alternate for himself) which the Director who appointed him has, but without thereby limiting the liability under any law of the Director who appointed him.

18.2.    A person who at that time is serving as a Director or an Alternate Director of another Director may be appointed as an Alternate Director. In addition, a Director may be appointed as an Alternate Director for a member of a committee of the Board of Directors, provided that such Director to be appointed as such is not a member of the committee of the Board of Directors.

18.3.    The appointment of an Alternate Director and the cancellation thereof shall be by written notice that the appointing Director shall deliver to the Company. The appointment and cancellation of appointment shall come into effect on the later of the date of delivery of the notice to the Company or the date specified in the notice.

18.4.    A Director who appoints an Alternate Director may at any time cancel the appointment. In addition, the office of Alternate Director shall be vacated whenever the Alternate Director notifies the Company in Writing of his resignation from office as Alternate Director, with effect from the date of his notice or whenever the Director who has appointed the Alternate Director ceases to be a Director of the Company for whatever reason.

18.5.    A corporation which acts as Director or Alternate Director shall appoint an individual who is qualified to be appointed as a Director to act on its behalf on the Board of Directors (the "**Corporate Representative**").

18.6.    The appointment of a Corporate Representative and the cancellation thereof shall be by notice in Writing which the appointing corporation shall deliver to the Company, and shall come into effect on the later of the date of service of notice to the Company or on the date specified in the notice.

18.7.    The appointing corporation shall not be entitled to the rights or authorities of a Director at a time at which the corporation has no validly appointed Corporate Representative.

19.    **Chairman of the Board of Directors**

19.1.    The Chairman will serve as the chairman of the General Meetings of the Company. If the Board of Directors has no Chairman or if he is not present fifteen (15) minutes from the time stated for the commencement of the meeting, the Shareholders present at the meeting may choose someone amongst them to chair the meeting. The office of Chairman shall not, by itself, entitle the holder thereof to vote at any General Meeting nor shall it entitle such holder to a second or casting vote (without derogating, however, from the rights of such Chairman to vote as a Shareholder or proxy of a Shareholder if, in fact, he is also a Shareholder or such proxy).

19.2.    At a meeting of the Board of Directors, only those matters specified in the notice convening the meeting shall be discussed, unless all of the members of the Board of Directors agree to discuss additional matters.

19.3.    The agenda of meetings of the Board of Directors shall be fixed by the Chairman of the Board of Directors and shall include:

(a)    matters determined by the Chairman;

(b)    matters specified by the Person at whose request the meeting has been convened;

(c)    any matter which a Director or the General Manager has requested the Chairman to include on the agenda within a reasonable time prior to the convening of the meeting of the Board of Directors.

19.4.    The Directors may pass resolutions without actually meeting, provided that all the Directors entitled to participate in the discussion and vote on the matter brought for resolution have agreed that no meeting is required for such matter. A resolution in writing signed by all Directors or to which all the Directors have given their written consent, (by letter, facsimile, electronic mail or otherwise) shall be deemed to have been unanimously adopted by the Board of Directors duly convened and held.

19.5.    The Chairman or the person appointed by the Board of Directors or any person authorized by them shall record minutes of the decisions taken with or without the convening of the Board of Directors, including the resolution not to meet. The minutes shall be signed by the Chairman or the person appointed or authorized by the Board of Directors, as the case may be.

19.6.    Any action taken by or in accordance with a decision of the Board of Directors or by or in accordance with a decision of a committee of the Board of Directors or by a Director acting in his capacity as Director shall be valid and effective even if it is subsequently discovered that there was a defect in the appointment of any of the Directors or the election of any of the Directors or if all or one of them was disqualified, in each case as if each of the Directors had been lawfully elected and as if he was fully qualified to act as Director, Alternate Director, Corporate Representative or member of the said committee, as the case may be.

20.    **Authority of the Board of Directors**

20.1.    The Board of Directors shall set the policy guidelines for the Company and shall supervise the performance and activities of the CEO. The Board of Directors shall have the powers and authorities necessary, in the opinion of the Board of Directors, in order to carry out its duties fully and efficiently, all subject to the provisions set forth in these Articles.

20.2.    Subject to Article 22, the Board of Directors may exercise any authority of the Company which has not been delegated by these Articles or by law to the CEO or to the General Meeting, and such authority shall be deemed to have been delegated to the Board of Directors by these Articles.

20.3.    The power of the Board of Directors shall be subject to the provisions of any law, and to any Article or resolution that shall be adopted by the Company in General Meeting, provided that no such Article or resolution shall affect the validity of any action taken prior thereto by the Board of Directors or pursuant to a decision thereof which would have been legally valid but for the adoption of the said Article or resolution.

20.4.    The General Meeting may assume the authority vested in the Board of Directors (including the authorities vested in the Board of Directors in the absence of a General Manager) for a specific matter or for a specific period of time which will not exceed the period of time required under the circumstances of the matter.

21. **Committees of the Board of Directors**

21.1. In the event that the Board of Directors establishes a compensation committee and/or an audit committee or any other committees that serve functions similar to a compensation or audit committee (whether in accordance with the Companies Law or as the Board of Directors may otherwise charter), and L Catterton is entitled to appoint any directors to the Board of Directors pursuant to Article 18.1.1, L Catterton shall be entitled to appoint one (1) member to each such committee.

21.2. A person who is not a Director may not serve as a member of any committee to which the Board of Directors has delegated any of its powers or authorities. A person who is not a Director may serve as a member of a committee established solely to advise the Board of Directors.

21.3. Each committee of the Board of Directors must, in exercising its authority, comply with the directions of the Board of Directors.

21.4. Unless the Board of Directors has determined otherwise, meetings, decisions and activities of the committees of the Board of Directors shall be conducted and convened in accordance with the provisions of these Articles which relate to the convening and conduct of meetings of the Board of Directors, the manner of adopting resolutions and the methods of operation of the Board of Directors, mutatis mutandis.

21.5. Any decision adopted or action taken by any committee of the Board of Directors in accordance with the delegation of the powers of the Board of Directors to such committee shall be equivalent to a decision adopted or action taken by the Board of Directors itself. A decision or recommendation of a committee of the Board of Directors which requires approval of the Board of Directors, will be brought to the attention of the Directors a reasonable period of time prior to the meeting of the Board of Directors.

22. **Protective Covenants**

Notwithstanding anything to the contrary set out herein or in the Shareholders Agreement, for so long as the holdings of L Catterton in the Company meet the L Catterton Entitlement Holdings Threshold, the Board of Directors or the Shareholders shall not adopt any resolution, and the Company shall not take, or permit any direct or indirect subsidiary of the Company (a "**Subsidiary**") to take, any action on the below matters, without either (i) the written consent of L Catterton; or (ii) the consent of at least one (1) L Catterton Director (where such resolution is brought before the Board of Directors), or the consent of L Catterton (where such resolution is brought before the General Meeting):

22.1. Any amendment or restatement of these Articles in a manner that could adversely affect any right attached to the L Catterton SPA Shares and/or the L Catterton 2019 SPA Shares (except as permitted pursuant to Section 11 of the Shareholders Agreement), including a reclassification of any outstanding Equity Securities into Senior Securities (as defined below), except that an authorization, classification or issuance of Equity Securities having rights, preferences or privileges as to dividends and liquidation superior to the L Catterton SPA Shares and/or the L Catterton 2019 SPA Shares (and which also may include any anti-dilution rights) will be permitted if it is made in the context of a Distress Fund Raising, *provided, however*, that in no event, including a Distress Fund Raising, shall the Company be permitted to (i) grant to any Person sale or exit rights (including rights of first offer or refusal, tag-rights and drag rights) that take priority over or otherwise adversely affect the rights granted to L Catterton contained herein (it being clarified that the grant of such rights to others that result in the pro-rata dilution of the rights of all Shareholders who are entitled to such right )other than a reduction of the percentage of Equity Securities that L Catterton may include in connection with a tag-along right as compared to the percentage that Oran Shilo may include in such sale) shall not be considered as taking priority over or otherwise adversely affecting the rights granted to L Catterton contained herein), (ii) grant any Person a tag-along sale right on the sale of, or grant any drag along rights over, the shares owned by L Catterton or its Permitted Transferees, or (iii) diminish or modify the pre-emptive rights under Article 13 or the other special right provided to L Catterton pursuant to the Shareholders Agreement (it being clarified that grant of pre-emptive rights to others that result in the pro-rata dilution of the rights of the all other shareholders' pre-emptive entitlement shall not be considered as diminishing or modifying L Catterton's rights under Article 13).

"**Distress Fund Raising**" means Company fund raising, whether by way of an issuance of Equity Securities, borrowing or otherwise, where the Company's consolidated cash balance is less than US$ 3 million; *provided*, that the amount that may be raised at each Distress Fund Raising shall not exceed the amount required in order to achieve a cash balance of US$10 million following such Distress Fund Raising if the fund raising is being made in the form of non-convertible indebtedness or US$20 million if it is being made in the form of Equity Securities, it being expressly agreed that the Company can engage in a Distress Fund Raising (without the consent of L Catterton or a L Catterton Director, as the case may be) each time the Company has a cash balance of less than US$ 3 million;

"**Senior Securities**" means Equity Securities of the Company that have any right, preference or privilege senior or adverse to the L Catterton SPA Shares and/or the L Catterton 2019 SPA Shares with respect to liquidation preferences or dividend rights, or that provides for the granting of (w) special voting rights (i.e., which does not grant one vote for each share) or board representation not commensurate with the economic ownership percentage represented by such Equity Securities or anti-dilution rights, (x) sale or exit rights (including rights of first offer and refusal, tag-rights and drag rights) that take priority over or otherwise adversely affect the rights granted to L Catterton contained herein (it being clarified that the grant of such rights to others that result in the pro-rata dilution of the rights of all Shareholders who are entitled to such right, other than reduction of the number of Equity Securities that are offered by the Selling Shareholder to all other Shareholders who will be entitled to such right (other than a reduction of the percentage of the Equity Securities that L Catterton may include in connection with a tag-along right as compared to the percentage that Oran Shilo may include in such sale) shall not be considered as taking priority over or otherwise adversely affecting the rights granted to L Catterton contained herein), (y) a tag-along sale right on the sale of, or grant any drag along rights over, the shares owned by L Catterton or its Permitted Transferees, or (z) diminish or modify the pre-emptive rights under <u>Article 13</u> or the other special right provided to L Catterton pursuant to the Shareholders Agreement (it being clarified that grant of pre-emptive rights to others that result in the pro-rata dilution of the rights of the all other shareholders' pre-emptive entitlement shall not be considered as diminishing or modifying L Catterton's rights under <u>Article 13</u>);

22.2.     Any authorization or issuance of Senior Securities, except if made in the context of a Distress Fund Raising (subject to the proviso at the end of Article 22.1 above);

22.3.     Any merger or sale of all or substantially all the Company's assets or a merger or reorganization or consolidation of the Company with or into one or more other entities (whether pursuant to or in connection with a Strategic Partnership or otherwise), or any transaction under Article 12.4 other than: (i) if such actions do not result in a change to the ownership percentage of L Catterton in the surviving company as compared to its holdings in the Company immediately before such change (including a merger with a wholly owned subsidiary of the Company or any similar reorganization); (ii) solely for the purpose of changing the Company's domicile, or (iii) if such actions result in L Catterton receiving consideration per L Catterton SPA Share and L Catterton 2019 SPA Share, as applicable, in value equal to (or higher than) three (3) times the Invested Capital in respect of each such Share then held and sold by L Catterton in such event. "**Invested Capital**", for the purpose of the foregoing, means the weighted average price per L Catterton SPA Share and L Catterton 2019 SPA Share originally paid by L Catterton for each of these Shares under the SPA and the 2019 SPA, being US$ 6,929.71 (as adjusted for any Recapitalization Event occurring following the date of the 2019 SPA);

22.4.     Change the nature of the business of the Company and its subsidiaries, taken as a whole, including entering into the ownership, active management or operation of any line of business other than those engaged in by the Company as of the Closing Date of the SPA or the material reduction of the Company's retail store consumer business, including a material reduction in the number of retail locations. For the avoidance of doubt, none of the businesses or actions, or the type of business or actions, contemplated within the Business Plan (as defined below) shall be regarded as a change to the nature of the Company's business for the purpose of the foregoing;

22.5.     Make any loans or advances to (excluding loans or advances made in the ordinary course of business, e.g., trade payables), guarantees for the benefit of (excluding guarantees in the ordinary course of business, including, landlord and construction guarantees for budgeted store openings, regulatory\municipal related guarantees, etc.) or investments in, any Person, in an aggregate amount in excess of US$ 1,000,000;

22.6.     Acquire or enter into any agreement to acquire the business, activity or securities of another Person having a value of US$ 500,000;

22.7.     Incur any indebtedness in an aggregate amount exceeding US$ 5,000,000, other than trade debt incurred in the ordinary course of business and other than in the context of a Distress Fund Raising;

22.8.     Create, incur, assume or suffer to exist any liens over any of the assets of the Company or any of its subsidiaries, other than in respect of indebtedness which is not subject to a L Catterton, or L Catterton Director, consent pursuant to this Article 22;

22.9.    Enter into any transaction or agreement with any of (i) a Shareholder or an Affiliate of the Company, (ii) any Family Member of a Shareholder or any Affiliate, or (iii) any member of management (other than employment agreements) or any Affiliates or Family Members of Persons identified in clauses (i), (ii) or (iii), or amend or modify any such transaction or agreement, other than any transaction, agreement, amendment or modification which is made on an arms-length basis or which is between the Company and its subsidiary(ies) or between two or more of its subsidiaries; provided, however, notwithstanding the foregoing, that employment agreements (and any amendment or modification thereto) between the Company or any of its subsidiary, on the one hand, and Oran Holtzman, any Family Member of Oran Holtzman or any subsequent CEO of the Company, on the other hand, shall require the consent of a L Catterton Director;

22.10.    Declaration or payment of any dividend (including by way of redemption) in an amount that (a) if U.S. EBITDA for the most recently completed fiscal year less U.S. CapEx during such fiscal year is negative, exceeds 75% of the accumulated Non-U.S. EBITDA less Non-U.S. CapEx for the period commencing from January 1, 2017 through the date of declaration or payment of such dividend (less any dividends previously paid after the Closing Date (as such term is defined in the SPA)), or (b) if U.S. EBITDA for the most recently completed fiscal year less U.S. CapEx during such fiscal year is zero or positive, exceeds 50% of the consolidated Company's (all Company operations (including in Israel and the U.S. Business)) then distributable profits at the end of such fiscal year as reflected in the audited and consolidated financial statements of the Company for such fiscal year; provided that in all events, immediately following the payment of any dividend pursuant to (a) or (b) above, the Company has (i) sufficient working capital for current operations as reasonably determined by the Board of Directors, and (ii) a consolidated Company cash balance of at least US$ 3 million of cash or cash equivalents;

22.11.    Hiring a CEO;

22.12.    Adoption of an annual budget (other than with respect to capital expenditures as set forth in Article 22.13) or plan that:

22.12.1. during the period beginning on Closing Date of the SPA and ending on the fifth anniversary of the Closing Date of the SPA, calls for planned total operating expenses (*i.e.* all planned business expenditures reflected on the P&L budget (management accounts) between direct contribution and EBITDA, as calculated pursuant to the Shareholders Agreement) which materially, in the aggregate and not per expense, exceed (by more than 35%) in that year from what is set out in the five year business plan attached to the Shareholders Agreement ("**Business Plan**") for that year; provided, however, that unused marketing expenses from the Business Plan in a certain year may be carried forward to the following year(s) and accordingly increase such deviation amount in a certain year which does not require consent pursuant to this Article; or

22.12.2. would result in a consolidated Company cash balance (in accordance with the management forecast/budget (management accounts)) of less than US$ 3 million at any point during the fiscal year;

22.13.    Adoption of an annual capital expenditure plan/budget that:

22.13.1. during the period beginning on Closing Date of the SPA and ending on the fifth anniversary of the Closing Date of the SPA, calls for a material annual increase (by more than $ 1.5 million) in the aggregate capital expenditures set forth in the Business Plan for that year; or

22.13.2. would result in a consolidated Company cash balance (in accordance with the management forecast/budget (management accounts)) of less than US$ 3 million at any point during the fiscal year;

22.14.    Any material deviation (more than 25%) from the capital expenditure plan contemplated in the aforementioned annual budget or plan, or any capital expenditure in excess of US $100,000 (whether or not budgeted) that would result in a consolidated Company cash balance of less than US$ 3 million; or

22.15.    Change or replacement of the Company's auditors, unless such replacement auditor is one of the "Big 4" international accounting firms, including their Israeli Affiliates.

<u>PART F: THE CEO AND OFFICERS</u>

23.    **<u>The Chief Executive Officer</u>**

23.1.    The Board of Directors of the Company may appoint one or more CEO for the Company. If a CEO is appointed, he shall have all of the authorities vested in the General Manager under these Articles. If no CEO is appointed, the Company shall be managed by the Board of Directors, and the Board of Directors shall have all of the authorities, rights and duties of the CEO.

23.2.    The CEO is responsible for the day-to-day management of the affairs of the Company within the framework of the policies set down by the Board of Directors and subject to its directions.

23.3.    The CEO shall have full managerial and operational authority to carry out all of the activities which the Company may carry on by law and under these Articles and which have not been vested by law or by these Articles in any other organ of the Company. The CEO shall be subject to the supervision of the Board of Directors.

23.4.    The CEO may, with the prior written approval of the Board of Directors, delegate his authority to another person who is subordinate to him.

23.5.    The Board of Directors may decide to transfer the authority vested in the CEO to the Board of Directors in a specific instance or for a specific period of time.

23.6.    The Board of Directors may direct the CEO how to act in a specific matter. If the CEO does not comply with the direction, the Board of Directors may exercise the authority necessary to carry out the direction in his place.

23.7.    The Board of Directors may exercise the authorities of the CEO if the CEO is incapable of performing them.

23.8.    The General Meeting may assume for itself the authorities vested in the CEO or transfer these authorities to the Board of Directors, for a specific matter or for a specific period of time.

24.    **Secretary**

The Board of Directors may appoint a Company secretary (the "**Secretary**") and determine his or her duties and authorities. The Secretary, if appointed, shall be responsible to the Board of Directors and shall report to it.

25.    **Insurance, Release and Indemnification of Officers**

25.1    The Company may, from time to time and subject to any provision of law, enter into an agreement to insure an Officer against any liability, in whole or in part, that may be imposed upon such Officer as a result of an action carried out in his capacity as an Officer in each of the following cases:

(a)    breach of duty of care towards the Company or towards another Person;

(b)    breach of fiduciary duty towards the Company, provided that the Officer acted in good faith and had reasonable grounds to assume that the action would not harm the interests of the Company;

(c)    a monetary liability imposed on him in favour of a third party.

(d)    a payment which the Officer is obligated to make to an injured party as set forth in Section 52(54)(a)(1)(a) of the Securities Law, and expenses that the Officer incurred in connection with a proceeding under Chapters H'3, H'4, or I'1 of the Israeli Securities Law – 1968 (the "**Securities Law**"), including reasonable legal expenses, which term includes attorney fees, to the extent permissible under the Securities Law; and

(e)    any other circumstances arising under the law with respect to which the Company may, or will be able to, insure an Officer of the Company (including, without limitation, indemnification with respect to the matters referred to under Section 56h(b)(1) of the Securities Law and Section 50P of the Antitrust Law, 5758-1988, as amended, and any regulations promulgated thereunder (the "**Antitrust Law**"), if and to the extent permissible under the Antitrust Law applicable).

25.2 The Company may, from time to time and subject to any provision of law and to the maximum extent permitted under any applicable law, indemnify an Officer in respect of a liability or expense set out below which is imposed on him or incurred by him as a result of an action taken in his capacity as an Officer of the Company:

(a) monetary liability imposed on him in favour of a third party by a judgment, including a settlement or a decision of an arbitrator which is given the force of a judgment by court order including a judgment imposed on such Officer in a compromise or in an arbitration decision approved by a competent court;

(b) reasonable litigation expenses, including legal fees, incurred by the Officer as a result of an investigation or proceeding instituted against such Officer by a competent authority, which investigation or proceeding has ended without the filing of an indictment or in the imposition of financial liability in lieu of a criminal proceeding, or has ended in the imposition of a financial obligation in lieu of a criminal proceeding for an offence that does not require proof of criminal intent or in connection with monetary sanctions (without derogating from Article 26.1 above, the phrases "proceeding that has ended without the filing of an indictment" and "financial obligation in lieu of a criminal proceeding" shall have the meanings ascribed to such phrases in Section 260(a)(1a) of the Companies Law);

(c) reasonable litigation expenses, including legal fees, which the Officer has incurred or is obliged to pay by the court in proceedings commenced against him by the Company or in its name or by any other person, or pursuant to criminal charges of which he is acquitted or criminal charges pursuant to which he is convicted of an offence which does not require proof of criminal intent;

(d) a payment which the Officer is obligated to make to an injured party as set forth in Section 52(54)(a)(1a) of the Securities Law, and expenses that the Officer incurred in connection with a proceeding under Chapters H'3, H'4, or I'1 of the Securities Law, including reasonable legal expenses, which term includes attorneys' fees; and

(e) any other liability or expense incurred or imposed because of an act performed in his/her capacity as an officer of the company, which may be indemnified under the provisions of any law.

25.3 The Company may, from time to time and subject to any provision of law:

(a) undertake in advance to indemnify an Officer of the Company for any of the following:

(i) any liability as set out in Article 26.2(a) above, provided that the undertaking to indemnify is limited to the classes of events which in the opinion of the Board of Directors can be anticipated in light of the Company's activities at the time of giving the indemnification undertaking, and for an amount and/or criteria which the Board of Directors has determined are reasonable in the circumstances and, the events and the amounts or criteria that the Board of Directors deem reasonable in the circumstances at the time of giving of the undertaking are stated in the undertaking; or

(ii)    any liability stated in Article 26.2 (b) or (c) above;

(b)    indemnify an Officer after the occurrence of the event which is the subject of the indemnity.

25.4    Subject to the provisions of the Companies Law and to the extent permitted under law, the Company may release an Officer in advance from liability, in whole or in part, for damage suffered as a result of breach of duty of care of the Officer towards the Company, other than for a breach of care in connection with a Distribution (as defined in the Companies Law).

25.5    The above-mentioned provisions are not intended and shall not in any way limit the Company's ability to enter into any contract of insurance or to grant a release from liability or an indemnity:

(a)    in connection with a person who is not an Officer, including employees, contractors or consultants of the Company who are not Officers;

(b)    in connection with Officers - to the extent that the insurance, release or indemnity is not prohibited by law.

25.6    Any amendment to the Companies Law or other applicable law adversely affecting the right of any Officer to be indemnified, insured or released pursuant to this Article 26 above shall be prospective in effect, and shall not affect the Company's obligation or ability to indemnify or insure an Officer for any act or omission occurring prior to such amendment, unless otherwise provided by applicable law.

26.    **Signature in the Name of the Company**

The signature rights in the name of the Company shall be determined by the Board of Directors of the Company or in any other manner determined by the Board of Directors, generally, for a class of matters or for a specific matter. Any signature in the name of the Company shall be accompanied by the name of the Company. The authorized signatories do not have to be Directors of the Company.

<u>PART G: MINUTES, REGISTERS AND BOOKS OF ACCOUNTS</u>

27.    Minutes

27.1    The Board of Directors shall ensure that records of the following matters are duly maintained in books that shall be prepared for this purpose:

(a)    the names of Directors who are present at any meeting of the Board of Directors and at any meeting of a committee of the Board of Directors (including any decision of the Board of Directors or of its committees which is adopted without actually convening);

(b)     the names of the Shareholders participating in any General Meeting;

(c)     the instructions given by the Board of Directors to the committees of the Board of Directors; and

(d)     the proceedings and resolutions at General Meetings, meetings of the Board of Directors, and meetings of committees of the Board of Directors, including decisions adopted without actually convening.

27.2    Any minute of a meeting of the Board of Directors or of any committee of the Board of Directors or of the General Meeting of the Company which purports to be signed by the Director who chaired the meeting shall be prima facie evidence of the matters stated therein.

27.3    The Company shall maintain the records referred to in this Part G as required by law.

27.4    The minute book of General Meetings shall be open to inspection by the Shareholders of the Company at all reasonable times, and a copy thereof shall be sent to any Shareholder who so requests, subject to the procedures that the Board of Directors may specify from time to time regarding the times at which the minute book is open for inspection (including periods during which the minute book will be closed), regarding the authentification of the identity of the Shareholder and regarding any fee to be paid for inspection or delivery as aforesaid.

28.     Books and Registers of the Company

28.1    The Company shall comply with all of the provisions of the Companies Law in connection with the maintenance of the Register of Directors, the Register of Shareholders, the additional register of shareholders, the register of material shareholders and the Register of Charges.

28.2    Each book, register and registration that the Company must maintain in accordance with the provisions of the Companies Law or these Articles shall be made in regular books or by electronic means, as the General Manager shall determine, provided that the persons entitled to inspect them are able to receive copies of the documents.

28.3    The Company may, bearing in mind the provisions of the Companies Law and any other law, maintain in any other country a register of shareholders, and exercise all of the authorities mentioned in the Companies Law in connection with these registers, subject to the authority of the Minister of Justice to enact rules in connection with the administration of the Register of Shareholders.

28.4    If the Company elects to maintain an additional shareholders' register outside Israel, it must indicate in the Register of Shareholders the number of shares that are registered in the additional share register, and the numbers of those shares if the shares are numbered.

28.5    The Company may close the Register of Shareholders and any other register which the Company maintains or shall maintain (whether by law, by agreement or at the election of the Company) in connection with any Equity Security of the Company, as the case may be, for such period of time as the Board of Directors deems fit, but no longer than for 30 Business Days in any year.

28.6    Subject to any provisions of law, the Company may determine a Record Date for the purposes of entitlement to receive invitations to General Meetings to participate and vote thereat and for the purposes of entitlement to dividends, bonus shares, participation in rights issuances and any other right, provided that this date shall not be more than 21 Business Days before the date set for the General Meeting, or the date in which the shareholders will be entitled to the other rights specified in this Article.

28.7    The Company may destroy any request for entering any change in the Register of Shareholders seven (7) years after the date of the change in the Register of Shareholders and there shall be a prima facie assumption that all requests for changes in the Register of Shareholders were valid and that any action taken by virtue or as a result thereof was lawfully taken.

PART H: AUDIT

29.    Auditor

29.1    At least once in each year, the financial statements of the Company shall be audited by an auditor or auditors who will express their opinion as to the financial statements. The fiscal year of the Company for its financial statements shall be the twelve calendar months ended December 31.

29.2    Subject to Article 22.15, the Company shall appoint at the Annual General Meeting an auditor or auditors to act in this capacity until the following Annual General Meeting, but the General Meeting may appoint an auditor to serve in this capacity for a longer period of time, not extending beyond the end of the third Annual General Meeting after the appointment. If the Company decides not to hold an Annual General Meeting, it may appoint an auditor for three annual audits beyond the date of the appointment.

29.3    Subject to the provisions of the Companies Law, any act of the auditors of the Company shall be valid with regard to any person acting in good faith with the Company notwithstanding any defect in the appointment or qualification of the auditor.

29.4    The fees of the auditor for the audit and for any additional services of the auditor that are not within the scope of the audit shall be determined by the Board of Directors. The Board of Directors shall report to the annual meeting the fees and other terms of engagement of the auditor.

<u>PART I: RESERVES, DISTRIBUTIONS AND BONUS</u>
<u>SHARES</u>

The provisions of <u>Articles 30 to 31</u> below shall be subject to, and without derogating from, the provisions of <u>Article 22</u> hereinabove.

30.    <u>Reserves</u>

30.1    The Board of Directors may at any time allocate such amounts as it sees fit from the Surplus Account to a reserve for the distribution of dividends, the distribution of Bonus Shares, for the acquisition of Equity Securities in the Company or for any other purpose as it sees fit. Likewise, the Board of Directors may direct the management of and the uses to which any reserve or part thereof is put, including of any reserve or part thereof for the business of the Company, without need to maintain such amount separate from the remaining assets of the Company.

30.2    The Board of Directors may transfer from time to time sums which have been set aside as a reserve as aforesaid to the Surplus Account.

30.3    The Board of Directors may from time to time, subject to the provisions of any law and the provisions of these Articles, change the purpose for which any capital reserve has been designated or the manner in which it is managed, to combine or split reserves and to transfer the amount of any capital reserve to the Surplus Account or to any other account in the accounting records of the Company. Notwithstanding the aforesaid, the Board of Directors may not transfer any amount from the share premium account other than to share capital of the Company or for the purposes of a Reduction of Capital.

31.    <u>Distribution of Dividends and Bonus Shares</u>

31.1    Each share, unless otherwise provided in the terms of issue of that share, shall entitle its holder to receive dividends and bonus shares if and when these are distributed, proportionate to the nominal value of shares which are paid up or deemed to be paid up, without taking into account any premium paid in respect thereof.

31.2    Subject to Article 22, a decision regarding a Distribution (as defined in the Companies Law) or the issuance of bonus shares shall be taken by the Board of Directors.

Subject to any provisions of law, the Company may determine a Record Date for the purposes of entitlement to receive any Distribution or bonus shares.

31.3    Unless the Board of Directors decides otherwise, the Company shall not pay interest on dividends including dividends which are paid after the date set for payment for whatever reason. The Board of Directors may decide from time to time in its absolute discretion, with regard to the payment of a specific dividend or class of dividends, to pay linkage differentials in respect of dividends paid after the date set for payment, based on a consumer price index or a rate of exchange of any foreign currency.

31.4    A dividend may be paid, in whole or in part, by way of distribution of assets of any kind. A distribution of assets as aforesaid shall be made by transfer, assignment, transfer of title, grant of a contractual or proprietary right or in any other manner as the Board of Directors shall direct.

31.5    If the Board of Directors decides to distribute a dividend, in whole or in part, by way of an allotment of shares in the Company to those entitled to receive the dividend at a price lower than the nominal value of those shares, the Company shall convert to share capital a portion of its Profits in respect of which the dividend was issued equal in amount to the difference between the nominal value of the said shares and the price paid therefor.

31.6    The Board of Directors may decide from time to time that all or part of the balance in the Surplus Account, the balance in the share premium account, the balance of any capital reserve that stands in credit or any other reserve included within the equity of the Company shall form part of the share capital of the Company and shall be considered to be payment in full for bonus shares of such class and number as the Board of Directors shall determine (in such amount, being not less than the nominal value of the shares, as the Board of Directors shall direct). The said bonus shares shall be allotted without payment, to the Shareholders of the Company who would have been entitled to receive the amount converted to share capital for the purpose of distribution of the bonus shares if that amount had been distributed by way of a cash dividend and in the same proportion.

31.7    The Board of Directors may, from time to time, transfer to the holders of Equity Securities issued by the Company that are convertible into shares of the Company, dividends, bonus shares or rights that are distributed by the Company as if the said Equity Securities had been converted into shares prior to the said distribution, in each case subject to the terms of issue of the said Equity Securities, the other provisions of these Articles and the obligations lawfully undertaken by the Company with respect thereto.

31.8    Subject to the provisions of Article 6.1.2, the Board of Directors may make any arrangements and take any actions necessary for the efficient and speedy implementation of the provisions of Article 32.7, to determine the rights which the holders of convertible Equity Securities shall receive and the manner in which they shall receive these rights and to carry out any adjustment necessary to the rights of the holders of the said Equity Securities as a result of any distribution of dividends, bonus shares or rights more than once, and to exercise any authority granted to the Board of Directors in connection with the distribution of dividends, bonus shares or rights to the shareholders in the Company, mutatis mutandis - all in the absolute discretion of the Board of Directors.

31.9    In order to implement any decision regarding the distribution of a dividend or bonus shares or in connection with the acquisition of Equity Securities of the Company, the Board of Directors may, subject to the provisions of Article 6.1.2:

(a)    resolve any difficulty that arises in connection with the aforesaid distribution as it sees fit, and take any steps that it deems appropriate in order to overcome such difficulty;

(b)   issue certificates for fractions of shares or to decide that shares in the Company which entitle the holder thereof to fractions of shares in an amount lower than the level fixed by the Board of Directors shall not entitle the holder to participate in that distribution, or to sell the fractions of shares and to pay the net proceeds of sale (after deduction of the expenses of sale and any tax that shall be payable in respect of the sale) to the persons entitled thereto;

(c)   sign or appoint Person to sign on behalf of the shareholders on any contract or other document required for the purpose of implementing a distribution, and in particular the Board of Directors shall be entitled to sign or appoint another person who shall be entitled to enter into and sign a written document as required by the Companies Law, and this contract shall bind the Company and the shareholders;

(d)   effect any arrangement which is, in the opinion of the Board of Directors, necessary in order to enable or facilitate the distribution.

31.10   Subject to the provisions of Article 6.1.2, the Board of Directors may determine from time to time the manner of payment of the dividends or the distribution of bonus shares and the arrangements therefore for each class of Shareholders. Without prejudice to the generality of the aforesaid, the Board of Directors may pay all dividends or monies due in respect of shares by sending cheques in the mail, and if the benefit is, in whole or in part, an asset or a right, by sending by mail any document confirming or creating the said right to the address of the shareholder as appearing in the Register of Shareholders. Any cheque or document sent as aforesaid shall be dispatched at the risk of the Shareholder.

31.11   The Board of Directors may delay any dividend, benefit, rights or amounts payable in connection with any shares which are subject to the Company's lien or charge and to use the proceeds of realisation thereof to pay the debts in respect of which the Company has a lien or charge.

31.12   Subject to the provisions of Article 6.1.2, the Board of Directors may decide that bonus shares shall be of the same class of shares as those shares which entitle the holders thereof to participate in the distribution of bonus shares, or that all bonus shares shall be of a single class which shall be distributed to all persons entitled thereto without taking into account the class of shares which they hold, or that bonus shares be a combination of classes of shares.

31.13   The transferee of any shares shall not be entitled to any dividend or any other Distribution or entitlement to bonus shares which has been declared in respect of those shares after the date of transfer but before registration of the transfer in the Register of Shareholders, and in the event of a transfer of shares which is subject to the approval of the Board of Directors, before the date of said approval.

31.14   If the payment of the dividend is not demanded within seven (7) years from the date of the decision to distribute that dividend, the person entitled thereto shall be deemed to have waived the dividend and ownership thereof shall return to the Company.

31.15 The Board of Directors may deduct from any dividend, distribution or other monies which are to be paid to a shareholder (including to a person who is one of the joint holders of a share) any amounts due from such a person to the Company (either by that person alone or jointly with another person) in respect of any call on shares or any other indebtedness which the Shareholder owes to the Company in his capacity as Shareholder.

31.16 If there are a number of persons registered as joint holders of a share, each one may give a valid receipt to the Company for any dividend or bonus shares which is paid or transferred in respect of that share or in respect of any consideration which the Company shall pay for acquiring that share and for any other monies or benefit given in respect of that share or as a result thereof.

PART J: LIQUIDATION AND REORGANISATION

32.    Liquidation

32.1 Subject to the provisions of Section 319(1) of the Companies Ordinance, the General Meeting may adopt a resolution for the winding up of the Company, provided that the resolution is passed by the majority required by law, and in the absence of any legal requirement for a specific majority, by the majority required in accordance with these Articles.

32.2 If the Company is wound up and the assets available for distribution among the Shareholders are not sufficient for payment in full of the paid up share capital of the Company, the assets shall be distributed, as far as possible, so that the Shareholders will bear the losses proportionately to the share capital paid or that should have been paid by the commencement of the winding up and the number of shares held by the Shareholders.

32.3 If the Company is wound up and the assets available for distribution among the shareholders are more than sufficient for payment in full of the paid up share capital at the time of commencement of the winding up, the surplus shall be distributed among the Shareholders proportionately to the share capital paid or that should have been paid by the commencement of the winding up, and the number of shares held by the Shareholders. This Article shall not affect the rights of holders of any shares issued with special rights (for the purposes of the distribution of the assets of the Company at the time of a liquidation, any payments that have been made as share premium shall not be taken into account).

32.4 If the Company is wound up, by way of voluntary liquidation or otherwise, the liquidators may, if the approval of the General Meeting is given with the majority required by law, and in the absence of any legal requirement for a specific majority, by the majority required by these Articles, distribute any portion of the assets of the Company among the shareholders in specie, and the liquidators may, subject to receiving approval as aforesaid, deposit any part of the assets of the Company with trustees upon trust for the benefit of the Shareholders. A General Meeting that approves any distribution as aforesaid may also approve a distribution in a manner other than in accordance with the legal rights of the Shareholders and may grant special rights to any class of shareholders, provided that if a resolution is adopted authorizing any distribution other than in accordance with the legal rights of the Shareholders, a Shareholder who has been harmed thereby shall have the right to object in the same manner as if the resolution had been adopted by the majority required in Section 334 of the Companies Ordinance.

33.    Reorganization

In the event of the sale of the assets of the Company, the Directors (or the liquidators in the event of the liquidation, if they have been so authorized by a resolution passed by the General Meeting with the majority required by law) may receive fully paid or partly paid shares, debentures or any other Security Interests of another company, Israeli or foreign, whether existing or being established for the purpose of acquiring all or part of the assets of the Company. The Board of Directors or the liquidators may distribute in specie such shares or debentures or Security Interests or any other property of the Company among the shareholders without realizing the same or may deposit them on trust on behalf of the Shareholders. A decision of the General Meeting as aforesaid may also direct the distribution of cash, shares or other Security Interests, rights or property in a manner other than in accordance with the legal rights of the Shareholders (or participants in the Company) and may determine the value of any asset of the Company at such price and in such manner as the General Meeting shall direct. All of the Shareholders (or participants) shall accept the valuation or distribution approved as aforesaid and shall waive their existing rights other than in the event that the Company is about to enter into liquidation or is in the process of being wound up, and the legal rights (if any) under the Companies Ordinance or the Companies Law, as the case may be, cannot be varied or cancelled by the provisions of this Article.

PART K: NOTICES

34.    Presumption of Delivery of Notices

34.1    Unless expressly stated otherwise in these Articles, notices to be served under these Articles or in connection therewith shall be In Writing and signed by the person serving the notice.

34.2    A notice that is hand-delivered by the Company to an addressee at the address registered with the Company shall be deemed to have been received at the time of delivery to the addressee or at the time of deposit in the post box of the addressee.

34.3    A notice sent by facsimile, by electronic mail, via an internet site or other similar electronic means shall be deemed to have been received at the time of transmission unless the notice is transmitted on a day which is not a Business Day in which case it shall be deemed to have been received on the next following Business Day.

34.4    Confirmation of an Officer of the Company regarding the date and manner of delivery of a notice on behalf of the Company in accordance with or relating to these Articles shall be prima facie evidence of the facts stated therein.

THE COMPANIES LAW, 1999
A LIMITED LIABILITY COMPANY

----------------

**AMENDED AND RESTATED
ARTICLES OF ASSOCIATION
OF
Oddity Tech Ltd.**

As Adopted on _____, 2023

**PRELIMINARY**

1. **DEFINITIONS; INTERPRETATION**.

(a)  In these Articles, the following terms (whether or not capitalized) shall bear the meanings set forth opposite them, respectively, unless the subject or context requires otherwise.

| | |
|---|---|
| "Articles" | shall mean these Amended and Restated Articles of Association, as amended from time to time. |
| "Board of Directors" | shall mean the Board of Directors of the Company. |
| "Chairperson" | shall mean the Chairperson of the Board of Directors, or the Chairperson of the General Meeting, as the context implies; |
| "Company" | shall mean Oddity Tech Ltd. |
| "Companies Law" | shall mean the Israeli Companies Law, 5759-1999 and the regulations promulgated thereunder. The Companies Law shall include reference to the Companies Ordinance (New Version), 5743-1983, of the State of Israel, to the extent in effect according to the provisions thereof. |
| "Director(s)" | shall mean the member(s) of the Board of Directors holding office at a given time. |
| "Economic Competition Law" | shall mean the Israeli Economic Competition Law, 5758-1988, and the regulations promulgated thereunder. |
| "External Director(s)" | shall have the meaning provided for such term in the Companies Law. |
| "General Meeting" | shall mean an Annual General Meeting or Special General Meeting of the Shareholders (each as defined in Article 24 of these Articles) as the case may be. |
| "NIS" | shall mean New Israeli Shekels. |
| "Office" | shall mean the registered office of the Company at any given time. |
| "Office Holder" or "Officer" | shall have the meaning provided for such term in the Companies Law. |
| "Securities Law" | shall mean the Israeli Securities Law 5728-1968 and the regulations promulgated thereunder. |
| "Shareholder(s)" | shall mean the shareholder(s) of the Company, at any given time. |

(b)   Unless the context shall otherwise require: words in the singular shall also include the plural, and vice versa; any pronoun shall include the corresponding masculine, feminine and neuter forms; the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; the words "herein", "hereof" and "hereunder" and words of similar import refer to these Articles in their entirety and not to any part hereof; all references herein to Articles or clauses shall be deemed references to Articles or clauses of these Articles; any references to any agreement or other instrument or law, statute or regulation are to it as amended, supplemented or restated, from time to time (and, in the case of any law, to any successor provisions or re-enactment or modification thereof being in force at the time); any reference to "law" shall include any law ('*din*') as defined in the Interpretation Law, 5741-1981 and any applicable supranational, national, federal, state, local, or foreign statute or law and shall be deemed also to refer to all rules and regulations promulgated thereunder; any reference to a "day" or a number of "days" (without any explicit reference otherwise, such as to business days) shall be interpreted as a reference to a calendar day or number of calendar days; any reference to a business day shall mean each calendar day other than any calendar day on which commercial banks in New York, New York or Tel-Aviv, Israel are authorized or required by applicable law to close; reference to a month or year means according to the Gregorian calendar; any reference to a "Person" shall mean any natural person, partnership, corporation, limited liability company, association, estate, any political, governmental, regulatory or similar agency or body, or other legal entity; and reference to "written" or "in writing" shall include written, printed, photocopied, typed, any electronic communication (including email, facsimile, signed electronically (in Adobe PDF, DocuSign or any other format)) or produced by any visible substitute for writing, or partly one and partly another, and signed shall be construed accordingly.

(c)   The captions in these Articles are for convenience only and shall not be deemed a part hereof or affect the construction or interpretation of any provision hereof.

(d)   The specific provisions of these Articles shall supersede the provisions of the Companies Law to the extent permitted thereunder.

Limited liability

2.   The Company is a limited liability company and each Shareholder's liability for the Company's debt is therefore limited (in addition to any liabilities under any contract) to the payment of the full amount (par value (if any) and premium) such Shareholder was required to pay the Company for such Shareholder's Shares (as defined below), and which amount has not yet been paid by such Shareholder.

Company's objectives

3.   **Objectives**.

The Company's objectives are to carry on any business, and do any act, which is not prohibited by law.

4.   DONATIONS.

The Company may donate a reasonable amount of money (in cash or in kind, including the Company's securities) to worthy purposes, as the Board of Directors may determine in its discretion, even if such donations are not made on the basis or within the scope of business considerations of the Company.

SHARE CAPITAL

5.   AUTHORIZED SHARE CAPITAL.

The authorized share capital of the Company is NIS 240,000 (*two hundred and forty thousand*) divided into (i) 200,000,000 Class A Ordinary Shares of nominal value NIS 0.001 each (the "Class A Shares") and (ii) 40,000,000 Class B Ordinary Shares of nominal value NIS 0.001 each (the "Class B Shares" and, collectively with the Class A Shares, the "Shares").

6.   RIGHTS OF CLASS A SHARES AND CLASS B SHARES

(a)   Voting Rights:

   (i)   Except as otherwise expressly provided herein or required by applicable law, the holders of Class A Shares and Class B Shares shall vote together as one class on all matters submitted to the vote of the Shareholders.

   (ii)   Except as required by applicable law, on any matter that is submitted to a vote of the Shareholders, each holder of Class A Shares shall be entitled to one (1) vote for each Class A Share then held by it, and each holder of Class B Shares shall be entitled to ten (10) votes for each Class B Share then held by it.

(b)   Identical Rights. Except as otherwise expressly provided in these Articles (including in Article 6(a)(ii) above), the Class A Shares and Class B Shares shall carry the same rights and privileges and rank equally, share ratably and be identical in all respects, including, without limitation, each Class A Share and Class B Share shall vest in the holder thereof:

   (i)   The right to receive an invitation to and to participate in each General Meeting of the Company, whether Annual General Meeting or Special General Meeting, and the right to one (1) vote (in respect of each Class A Share) or ten (10) votes (in respect of each Class B Share) in respect of each share that the holder holds in every vote at each General Meeting of the Company in which he participates, provided that the share is owned by the shareholder on the date specified in the resolution to convene the General Meeting in question;

   (ii)   The right to receive, if and to the extent distributed, dividends, bonus shares and any other distribution in each case, in accordance with the number of shares that the shareholder holds on the date upon which it is resolved to distribute the dividend or bonus shares or other distribution (as the case may be) or at such later date as shall be provided in the resolution in question. The Class A Shares and the Class B Shares shall be treated equally, identically and ratably, on a per share basis, with respect to any dividend, bonus shares or distribution, *provided* that any bonus shares issued on a share shall be in the same per share ratio for all classes, but shall be of the same class of the share on which it is being distributed (i.e. Class A Shares (or rights to acquire such shares, as the case may be) will be issued as bonus shares on outstanding Class A Shares and Class B Shares (or rights to acquire such shares, as the case may be) will be issued as bonus shares on outstanding Class B Shares), unless different treatment is proposed by the Board of Directors and approved in a general meeting of each of the Class A Shares and Class B Shares, each voting separately as a class, and in which a majority of the shares of each such class present and voting in such meeting affirmatively votes in favor of such different treatment.

   (iii)   The right to participate in the distribution of any surplus assets of the Company upon liquidation (it being clarified that the Class A Shares and Class B Shares shall be treated equally, identically and ratably, on a per share basis, with respect to the distribution of any surplus assets of the Company upon liquidation).

(iv) If the Company effects a split, reverse split, subdivision or combination of the outstanding Class A Shares or Class B Shares, the outstanding Shares of each other class will be subject to the same split, reverse split, subdivision or combination in the same proportion and manner, unless different treatment is proposed by the Board of Directors and approved in a general meeting of each of the Class A Shares and Class B Shares, each voting separately as a class, and in which a majority of the shares of each such class present and voting in such meeting affirmatively votes in favor of such different treatment.

(v) Change of Control Transaction. Class A Shares and Class B Shares shall be treated equally, identically and ratably on a per share basis with respect to any consideration into which such Shares are converted or any consideration paid or otherwise distributed to Shareholders of the Company in connection with a Change of Control Transaction (as defined below), unless different treatment of the Shares of each such class is approved in a general meeting of each of the Class A Shares and Class B Shares, each voting separately as a class, and in which a majority of the shares of each such class present and voting in such meeting affirmatively vote in favor of such different treatment.

(c) Voluntary Conversion. Each one (1) Class B Share shall be convertible into one (1) Class A Share at the option of the holder thereof, at any time, upon written notice to the Company or the Company's transfer agent.

(d) Automatic Conversion Upon Transfer. Class B Shares shall automatically convert into an equal number of Class A Shares upon a Transfer (as defined below) of such Class B Shares, *provided, however,* that no such conversion shall occur upon the Transfer by a Shareholder to its, his or her Permitted Transferee (as defined below).

(e) Conversion of All Outstanding Class B Shares. Each one (1) issued and outstanding Class B Share shall automatically, without any further action, convert into one (1) Class A Share upon the earliest of: (a) the date specified by affirmative vote or written consent of the holders of at least sixty percent (60%) of the outstanding Class B Shares, voting or acting as a separate class; (b) 5:00 pm New York City time on a date fixed by the Board that is not less than sixty (60) days nor more than one hundred and eighty (180) days following the date that Oran Shilo and Oran Holtzman, together with their Permitted Transferees, cease to hold an aggregate of at least thirty-three percent (33%) of the number of Class B Shares held by such holders at the Effective Time; and (c) 5:00 pm New York City time on a date fixed by the Board that is not less than sixty (60) days nor more than one hundred and eighty (180) days following the death of Oran Holtzman; and (d) the seven-year anniversary of the closing date of the Company's underwritten initial public offering of its Class A Shares pursuant to an effective registration statement under the Securities Act of 1933, as amended.

(f) Procedures. The Company may, from time to time, establish such policies and procedures relating to the conversion of Class B Shares to Class A Shares and the general administration of this dual class share structure, including the issuance of share certificates (or the establishment of book-entry positions) with respect thereto, as it may deem necessary or advisable, and may request that holders of Class B Shares furnish affidavits or other proof to the Company as it deems necessary to verify the ownership of Class B Shares and to confirm that a conversion to Class A Shares has not occurred.

The Company may provide a written notice and certification request to any holder of Class B Shares that (a) specifies a date that is not less than ninety (90) calendar days after the date of such notice and certification request (the "Certification Date") and (b) requests a certification, in a form satisfactory to the Company, verifying such holder's ownership of Class B Shares and confirming that an event requiring a conversion to Class A Shares has not occurred to be delivered by such holder to the Company by the Certification Date. To the extent such holder does not furnish a certification satisfactory to the Company prior to the specified Certification Date, any such Class B Shares held by such holder shall automatically, and without further action by the Company or such holder, be deemed to have converted into Class A Shares as of the Certification Date.

A determination by the Board that a Transfer results in a conversion to Class A Shares shall be conclusive and binding.

(g)  Immediate Effect of Conversion. In the event of a conversion of Class B Shares to Class A Shares pursuant to this Article 6, such conversion(s) shall be deemed to have been made either at the time that the Company receives the written notice required pursuant to Article 6(c), the time that the applicable Transfer of such shares occurred or upon the applicable dates or events set forth in Articles 6(d) through 6(f) above (inclusive), as applicable. Upon any conversion of Class B Shares to Class A Shares, all rights of the holder of such Class B Shares shall cease and the person or persons in whose names or names the certificate or certificates (or book-entry position(s) representing the Class B Shares) are to be issued shall be treated for all purposes as having become the record holder or holders of such number of Class A Shares into which such Class B Shares were convertible. Class B Shares that are converted into Class A Shares as provided in this Article 6 shall not be reissued. Any proxy issued with respect to Class B Shares shall, unless otherwise stated in such proxy, continue to apply with respect to the Class A Shares into which the Class B Shares have been converted.

(h)  Reservation of Shares for Conversion. The Company shall at all times reserve and keep available out of its authorized but unissued Class A Shares, solely for the purpose of effecting the conversion of the Class B Shares as provided in this Article 6, such number of its Class A Shares as shall from time to time be sufficient to effect the conversion of all outstanding Class B Shares into Class A Shares.

(i)  Amendments. Notwithstanding anything to the contrary herein, this Article 6 may only be amended or replaced by a resolution adopted at a General Meeting by a majority of at least sixty percent (60%) of the total voting power of the Company's shareholders.

(j)  Definitions. In this Article 6, the following terms (whether or not capitalized) shall bear the meanings set forth opposite them, respectively, unless the subject or context requires otherwise:

(i)  "Change of Control Transaction" means (i) the merger, consolidation, business combination, or other similar transaction of the Company with any other entity, other than a merger, consolidation, business combination, or other similar transaction that would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its parent) more than fifty percent (50%) of the total voting power represented by the voting securities of the Company and more than fifty percent (50%) of the total number of outstanding Shares of the Company, in each case as outstanding immediately after such merger, consolidation, business combination, or other similar transaction, and the shareholders of the Company immediately prior to the merger, consolidation, business combination, or other similar transaction own voting securities of the Company, the surviving entity or its parent immediately following the merger, consolidation, business combination, or other similar transaction in substantially the same proportions (vis-à-vis each other) as such shareholders owned the voting securities of the Company immediately prior to the transaction; (ii) a recapitalization, liquidation, dissolution, or other similar transaction involving the Company, other than a recapitalization, liquidation, dissolution, or other similar transaction that would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or being converted into voting securities of the surviving entity or its parent) more than fifty percent (50%) of the total voting power represented by the voting securities of the Company *and* more than fifty percent (50%) of the total number of outstanding Shares of the Company, in each case as outstanding immediately after such recapitalization, liquidation, dissolution or other similar transaction, and the shareholders of the Company immediately prior to the recapitalization, liquidation, dissolution or other similar transaction own voting securities of the Company, the surviving entity or its parent immediately following the recapitalization, liquidation, dissolution or other similar transaction in substantially the same proportions (vis-à-vis each other) as such shareholders owned the voting securities of the Company immediately prior to the transaction.

(ii) "Control" means (i) the ability to direct, or cause the direction of, the management and policies of the relevant Person, whether through the ownership of voting securities, by contract or otherwise, and whether directly or indirectly, or (ii) the beneficial ownership (directly or indirectly, including through one or more intermediaries) of 50% or more of the ownership interests in such Person, including the issued and outstanding share capital, voting rights or other ownership interests, or (iii) the right to appoint the majority of the directors (or the equivalent thereof) in such Person;

(iii) "Effective Time" shall mean February 23, 2022.

(iv) "Family Member" means to any Person, the spouse, registered domestic partner, parent, sibling, descendants (including any adopted descendant) and trusts for the benefit of each of the foregoing of such Person who is a natural person;

(v) "Oran Shiloh" means (i) Oran Shilo Investments LP (a limited partnership organized under the laws of the State of Israel, registered number 55-025056-7), and (ii) Il Makiage Investments L.P. (a limited partnership organized under the laws of Israel, registered number 55-026949-2).

(vi) "Permitted Transferee" shall mean any of the following:

(I)    in the case of an institutional, private equity, hedge, venture capital or other private investment fund, or any subsidiary of such a person, any partner, limited partner, retired partner, member or retired member of such holder, any affiliated fund, any fund which is Controlled (as defined below) by or under common Control with one or more general partners of such holder, any fund that is managed and governed by the same management company as such holder, any fund that Controls such holder or any fund that is Controlled by, under common Control with, managed or advised by the same management company or registered investment advisor that controls, is under common control with, manages or advises the fund that Controls such holder;

(II)   in the case of a mutual fund, pension fund, other pooled investment vehicle or an institutional client, to another mutual fund, pension fund, other pooled investment vehicle or an institutional client in connection with a merger, fund reorganization or otherwise for regulatory or fund management purposes;

(III)  in the case of a partnership, its partners, provided each has received their entitlement in the Transferred Class B Shares on a pro-rata basis based on their partnership interests, *provided* that with respect to the Class B Shares, such partnership or its ultimate Controlling person, maintains the exclusive ability to vote or control and direct the vote of the Class B Shares;

(IV)   in the case of a natural person, an entity Controlled (directly or indirectly) by a natural person, or a trust created by a natural person,

(a)    such natural person;

(b)    a Family Member of such natural person, and, solely in the context of a transfer of assets in connection with a divorce, a former spouse of such natural person (*provided* that and as long as such transfer is not in excess of 50% of the shares held by such a Shareholder and subject to such former spouse signing an irrevocable proxy and power of attorney to such transferring Shareholder with respect to such transferred shares in form and substance reasonably satisfactory to the Board of Directors, which includes such transferring Shareholder maintaining the exclusive ability to vote the Class B Shares);

(c)  any custodian, trustee (including a trustee of a voting trust), executor or other fiduciary for the account of such Shareholder or natural person or any one or more Family Members of such natural person or any of such Shareholder's Permitted Transferees or any trust contemplated by clause (e);

(d)  a trust whose sole beneficiary(ies) is the Shareholder, such natural person and/or their Permitted Transferees;

(e)  if the Shareholder is a trust, any beneficiary(ies) of the trust; and

(f)  a company, corporation, partnership or limited liability company Controlled by such natural person and/or his Family Members, in each case, whether directly or indirectly through one or more Permitted Transferees thereof,

*provided* that with respect to Class B Shares, in the case of clauses (IV)(b) through (f), such natural person (or in the case of an entity or trust, the natural person Controlling or creating it) maintains the exclusive ability to vote or control and direct the vote of the Class B Shares.

For the avoidance of any doubt, as of the date of adoption of these Articles, Oran Holtzman is a Permitted Transferee and the ultimate Controlling shareholder of Oran Shilo.

(vii)  "Transfer" with respect to a Class B Share shall mean (i) any sale, assignment, transfer, conveyance, hypothecation, pledge or encumbrance (subject to sub-section (c) below) or other transfer or disposition of such share or any legal or beneficial interest in such share, whether or not for value and whether voluntary or involuntary or by operation of law or court order, including any such transaction or order that results in the designation of any other person to exercise the voting rights attached to the Class B Share, and (ii) the deposit of any Class B Share into a voting trust or entry into a voting agreement or arrangement with respect to any Class B Share or the granting of any proxy or power of attorney with respect thereto; *provided, however*, that the following shall not be considered a "Transfer": (a) the grant of a proxy to officers or directors of the Company at the request of the Board of Directors of the Company in connection with actions to be taken at any General Meeting; (b) entering into a voting agreement that provides for the grant of a voting proxy to the Chief Executive Officer of the Company; (c) the pledge of Class B Shares by a holder of Class B Shares that creates a mere security interest in such shares pursuant to a *bona fide* loan or indebtedness transaction so long as the holder of Class B Shares continues to exercise exclusive voting control over such pledged shares; *provided, however*, that a foreclosure on such Class B Shares or other similar action under or in connection with the pledge shall constitute a "Transfer"; (d) the fact that, at any time the spouse of any holder of Class B Shares possesses or obtains an interest in such holder's Class B Shares arising solely by reason of the application of the community property laws of any jurisdiction, so long as no other event or circumstance shall exist or have occurred that constitutes a "Transfer" of such Class B Shares; (e) the entering into a trading plan pursuant to Rule 10b5-1 under the U.S. Securities Exchange Act of 1934, as amended, with a broker or other nominee where the holder entering into the plan retains all voting control over the Class B Shares; *provided, however*, that a sale of such Class B Shares pursuant to such plan shall constitute a "Transfer" at the time of such sale; or (f) entering into a support, voting, tender or similar agreement, arrangement or understanding (with or without granting a proxy) in connection with a Change of Control Transaction; *provided, however*, that such Change of Control Transaction was approved by the Board of Directors.

7.  INCREASE OF AUTHORIZED SHARE CAPITAL.

(a)  The Company may, from time to time, by a Shareholders' resolution, whether or not all of the Shares then authorized have been issued, and whether or not all of the Shares theretofore issued have been called up for payment, increase its authorized share capital by increasing the number of Shares of any class it is authorized to issue. Any such increase shall be in such amount and shall be divided into such class of Shares, which Shares shall confer such rights and preferences, and shall be subject to such restrictions, as such resolution shall provide.

(b)  Except to the extent otherwise provided in such resolution, any new Shares included in the authorized share capital increase as aforesaid shall be subject to all of the provisions of these Articles that are applicable to shares of such class that are included in the existing share capital.

8.  SPECIAL OR CLASS RIGHTS; MODIFICATION OF RIGHTS.

(a)  The Company may, from time to time, by a Shareholders' resolution, provide for shares with such preferred or deferred rights or other special rights and/or such restrictions, whether in regard to dividends, voting, repayment of share capital or otherwise, as may be stipulated in such resolution.

(b)  If at any time the share capital of the Company is divided into different classes of shares, the rights attached to any class, unless otherwise provided by these Articles (including Article 6 hereof), may be modified or cancelled by the Company by a resolution of the General Meeting of the holders of all shares as one class, without any required separate resolution of any class of shares.

(c)  The provisions of these Articles relating to General Meetings shall apply, *mutatis mutandis*, to any separate general meeting of the holders of the Shares of a particular class, it being clarified that the requisite quorum at any such separate general meeting shall be two or more Shareholders present in person or by proxy and holding not less than thirty-three and one-third percent ($33^1/_3$%) of the issued Shares of such class, *provided, however*, that if such separate general meeting of the holders of the particular class was initiated by and convened pursuant to a resolution adopted by the Board of Directors (and not pursuant to the request or motion of any other person) and, at such time of the meeting, the Company is qualified to use the forms and rules of a "foreign private issuer" under the US securities laws, the requisite quorum at any such separate general meeting shall be two or more Shareholders (not in default in payment of any sum referred to in Article 14 hereof) present in person or by proxy and holding not less than twenty-five percent (25%) of the issued Shares of such class. For the purpose of determining the quorum present at such General Meeting, a proxy may be deemed to be two (2) or more Shareholders pursuant to the number of Shareholders represented by the proxy holder.

(d)  Unless otherwise provided by these Articles, an increase in the authorized share capital, the creation of a new class of shares, an increase in the authorized share capital of a class of shares, or the issuance of additional shares thereof out of the authorized and unissued share capital, shall not be deemed, for purposes of this Article 8, to modify or derogate or cancel the rights attached to previously issued shares of such class or of any other class.

9.  CONSOLIDATION, DIVISION, CANCELLATION AND REDUCTION OF SHARE CAPITAL.

(a)  The Company may, from time to time, by or pursuant to an authorization of a Shareholders' resolution, and subject to applicable law:

(i)  consolidate all or any part of its issued or unissued authorized share capital into shares of a per share nominal value which is larger, equal to or smaller than the per share nominal value of its existing Shares;

(ii)  divide or sub-divide its Shares (issued or unissued) or any of them, into shares of smaller or the same nominal value (subject, however, to the provisions of the Companies Law), and the resolution whereby any share is divided may determine that, as among the holders of the shares resulting from such subdivision, one or more of the shares may, in contrast to others, have any such preferred or deferred rights or rights of redemption or other special rights, or be subject to any such restrictions, as the Company may attach to unissued or new shares;

(iii)  cancel any authorized Shares which, at the date of the adoption of such resolution, have not been issued to any person nor has the Company made any commitment, including a conditional commitment, to issue such shares, and reduce the amount of its share capital by the amount of the shares so canceled; or

(iv)   reduce its share capital in any manner.

(b)   With respect to any consolidation of issued Shares and with respect to any other action which may result in fractional shares, the Board of Directors may settle any difficulty which may arise with regard thereto, as it deems fit, and, in connection with any such consolidation or other action which could result in fractional shares, may, without limiting its aforesaid power:

(i)   determine, as to the holder of shares so consolidated, which issued shares shall be consolidated into a share of a larger, equal or smaller nominal value per share;

(ii)   issue, in contemplation of or subsequent to such consolidation or other action, shares sufficient to preclude or remove fractional share holdings;

(iii)   redeem such shares or fractional shares sufficient to preclude or remove fractional share holdings;

(iv)   round up, round down or round to the nearest whole number, any fractional shares resulting from the consolidation or from any other action which may result in fractional shares; or

(v)   cause the transfer of fractional shares by certain Shareholders of the Company to other Shareholders thereof so as to most expediently preclude or remove any fractional shareholdings, and cause the transferees of such fractional shares to pay the transferors thereof the fair value thereof, and the Board of Directors is hereby authorized to act in connection with such transfer, as agent for the transferors and transferees of any such fractional shares, with full power of substitution, for the purposes of implementing the provisions of this sub-Article 9(b)(v).

10.   Issuance of share certificates, replacement of lost certificates.

(a)   To the extent that the Board of Directors determines that all shares shall be certificated or, if the Board of Directors does not so determine, to the extent that any Shareholder requests a share certificate or the Company's transfer agent so requires, share certificates shall be issued under the corporate seal of the Company or its written, typed or stamped name and shall bear the signature of one Director, the Company's Chief Executive Officer, or any person or persons authorized therefor by the Board of Directors. Signatures may be affixed in any mechanical or electronic form, as the Board of Directors may prescribe.

(b)   Subject to the provisions of Article 10(a), each Shareholder shall be entitled to one numbered certificate for all of the shares of any class registered in his or her name. Each certificate shall specify the serial numbers of the shares represented thereby and may also specify the amount paid up thereon. The Company (as determined by an officer of the Company to be designated by the Chief Executive Officer) shall not refuse a request by a Shareholder to obtain several certificates in place of one certificate, unless such request is, in the opinion of such officer, unreasonable. Where a Shareholder has sold or transferred a portion of such Shareholder's shares, such Shareholder shall be entitled to receive a certificate in respect of such Shareholder's remaining shares, provided that the previous certificate is delivered to the Company before the issuance of a new certificate.

(c)   A share certificate registered in the names of two or more persons shall be delivered to the person first named in the Register of Shareholders in respect of such co-ownership.

(d)   A share certificate which has been defaced, lost or destroyed, may be replaced, and the Company shall issue a new certificate to replace such defaced, lost or destroyed certificate upon payment of such fee, and upon the furnishing of such evidence of ownership and such indemnity, as the Board of Directors in its discretion deems fit.

11.  REGISTERED HOLDER.

Except as otherwise provided in these Articles or the Companies Law, the Company shall be entitled to treat the registered holder of each share as the absolute owner thereof, and accordingly, shall not, except as ordered by a court of competent jurisdiction, or as required by the Companies Law, be obligated to recognize any equitable or other claim to, or interest in, such share on the part of any other person.

12.  ISSUANCE AND REPURCHASE OF SHARES.

(a)   The unissued shares from time to time shall be under the control of the Board of Directors (and, to the extent permitted by law, any Committee thereof), which shall have the power to issue or otherwise dispose of shares and of securities convertible or exercisable into or other rights to acquire from the Company to such persons, on such terms and conditions (including, inter alia, price, with or without premium, discount or commission, and terms relating to calls set forth in Article 14(f) hereof), and at such times, as the Board of Directors (or the Committee, as the case may be) deems fit, and the power to give to any person the option to acquire from the Company any shares or securities convertible or exercisable into or other rights to acquire from the Company on such terms and conditions (including, inter alia, price, with or without premium, discount or commission), during such time as the Board of Directors (or the Committee, as the case may be) deems fit.

(b)   The Company may at any time and from time to time, subject to the Companies Law, repurchase or finance the purchase of any shares or other securities issued by the Company, in such manner and under such terms as the Board of Directors shall determine, whether from any one or more Shareholders. Such purchase shall be deemed as a distribution (as this term is defined in the Companies Law) but shall not be deemed as payment of dividends and as such, no Shareholder will have the right to require the Company to purchase his or her shares or offer to purchase shares from any other Shareholders.

13.  PAYMENT IN INSTALLMENT.

If pursuant to the terms of issuance of any share, all or any portion of the price thereof shall be payable in installments, every such installment shall be paid to the Company on the due date thereof by the then registered holder(s) of the share or the person(s) then entitled thereto.

14.  CALLS ON SHARES.

(a)   The Board of Directors may, from time to time, as it, in its discretion, deems fit, make calls for payment upon Shareholders in respect of any sum (including premium) which has not been paid up in respect of shares held by such Shareholders and which is not, pursuant to the terms of issuance of such shares or otherwise, payable at a fixed time, and each Shareholder shall pay the amount of every call so made upon him or her (and of each installment thereof if the same is payable in installments), to the person(s) and at the time(s) and place(s) designated by the Board of Directors, as any such times may be thereafter extended and/or such person(s) or place(s) changed. Unless otherwise stipulated in the resolution of the Board of Directors (and in the notice hereafter referred to), each payment in response to a call shall be deemed to constitute a pro rata payment on account of all the shares in respect of which such call was made.

(b)   Notice of any call for payment by a shareholder shall be given in writing to such shareholder not less than fourteen (14) days prior to the time of payment fixed in such notice, and shall specify the time and place of payment, and the person to whom such payment is to be made. Prior to the time for any such payment fixed in a notice of a call given to a shareholder, the Board of Directors may in its absolute discretion, by notice in writing to such shareholder, revoke such call in whole or in part, extend the time fixed for payment thereof, or designate a different place of payment or person to whom payment is to be made. In the event of a call payable in installments, only one notice thereof need be given.

(c)   If pursuant to the terms of issuance of a share or otherwise, an amount is made payable at a fixed time (whether on account of such nominal value of such share or by way of premium), such amount shall be payable at such time as if it were payable by virtue of a call made by the Board of Directors and for which notice was given in accordance with paragraphs (a) and (b) of this Article 14, and the provision of these Articles with regard to calls (and the non-payment thereof) shall be applicable to such amount or such installment (and the non-payment thereof).

(d)  Joint holders of a share shall be jointly and severally liable to pay all calls for payment in respect of such share and all interest payable thereon.

(e)  Any amount called for payment which is not paid when due shall bear interest from the date fixed for payment until actual payment thereof, at such rate (not exceeding the then prevailing debitory rate charged by leading commercial banks in Israel), and payable at such time(s) as the Board of Directors may prescribe.

(f)  Upon the issuance of shares, the Board of Directors may provide for differences among the holders of such shares as to the amounts and times for payment of calls for payment in respect of such shares.

15.  PREPAYMENT.

With the approval of the Board of Directors, any Shareholder may pay to the Company any amount not yet payable in respect of his or her shares, and the Board of Directors may approve the payment by the Company of interest on any such amount until the same would be payable if it had not been paid in advance, at such rate and time(s) as may be approved by the Board of Directors. The Board of Directors may at any time cause the Company to repay all or any part of the money so advanced, without premium or penalty. Nothing in this Article 15 shall derogate from the right of the Board of Directors to make any call for payment before or after receipt by the Company of any such advance.

16.  FORFEITURE AND SURRENDER.

(a)  If any Shareholder fails to pay an amount payable by virtue of a call, installment or interest thereon as provided for in accordance herewith, on or before the day fixed for payment of the same, the Board of Directors may at any time after the day fixed for such payment, so long as such amount (or any portion thereof) or interest thereon (or any portion thereof) remains unpaid, forfeit all or any of the shares in respect of which such payment was called for. All expenses incurred by the Company in attempting to collect any such amount or interest thereon, including, without limitation, attorneys' fees and costs of legal proceedings, shall be added to, and shall, for all purposes (including the accrual of interest thereon) constitute a part of, the amount payable to the Company in respect of such call.

(b)  Upon the adoption of a resolution as to the forfeiture of a Shareholder's share, the Board of Directors shall cause notice thereof to be given to such Shareholder, which notice shall state that, in the event of the failure to pay the entire amount so payable by a date specified in the notice (which date shall be not less than fourteen (14) days after the date such notice is given and which may be extended by the Board of Directors), such shares shall be ipso facto forfeited, provided, however, that, prior to such date, the Board of Directors may cancel such resolution of forfeiture, but no such cancellation shall stop the Board of Directors from adopting a further resolution of forfeiture in respect of the non-payment of the same amount.

(c)  Without derogating from Articles 52 and 56 hereof, whenever shares are forfeited as herein provided, all dividends, if any, theretofore declared in respect thereof and not actually paid shall be deemed to have been forfeited at the same time.

(d)  The Company, by resolution of the Board of Directors, may accept the voluntary surrender of any share.

(e)  Any share forfeited or surrendered as provided herein, shall become the property of the Company as a dormant share, and the same, subject to the provisions of these Articles, may be sold, re-issued or otherwise disposed of as the Board of Directors deems fit.

(f)   Any person whose shares have been forfeited or surrendered shall cease to be a shareholder in respect of the forfeited or surrendered shares, but shall, notwithstanding, be liable to pay, and shall forthwith pay, to the Company, all calls, interest and expenses owing upon or in respect of such shares at the time of forfeiture or surrender, together with interest thereon from the time of forfeiture or surrender until actual payment, at the rate prescribed in Article 14(e) above, and the Board of Directors, in its discretion, may, but shall not be obligated to, enforce or collect the payment of such amounts, or any part thereof, as it shall deem fit. In the event of such forfeiture or surrender, the Company, by resolution of the Board of Directors, may accelerate the date(s) of payment of any or all amounts then owing to the Company by the person in question (but not yet due) in respect of all shares owned by such Shareholder, solely or jointly with another.

(g)   The Board of Directors may at any time, before any share so forfeited or surrendered shall have been sold, re-issued or otherwise disposed of, nullify the forfeiture or surrender on such conditions as it deems fit, but no such nullification shall stop the Board of Directors from re-exercising its powers of forfeiture pursuant to this Article 16.

17.   Lien.

(a)   Except to the extent the same may be waived or subordinated in writing, the Company shall have a first and paramount lien upon all the shares registered in the name of each Shareholder (without regard to any equitable or other claim or interest in such shares on the part of any other person), and upon the proceeds of the sale thereof, for his or her debts, liabilities and engagements to the Company arising from any amount payable by such Shareholder in respect of any unpaid or partly paid share, whether or not such debt, liability or engagement has matured. Such lien shall extend to all dividends from time to time declared or paid in respect of such share. Unless otherwise provided, the registration by the Company of a transfer of shares shall be deemed to be a waiver on the part of the Company of the lien (if any) existing on such shares immediately prior to such transfer.

(b)   The Board of Directors may cause the Company to sell a share subject to such a lien when the debt, liability or engagement giving rise to such lien has matured, in such manner as the Board of Directors deems fit, but no such sale shall be made unless such debt, liability or engagement has not been satisfied within fourteen (14) days after written notice of the intention to sell shall have been served on such Shareholder, his or her executors or administrators.

(c)   The net proceeds of any such sale, after payment of the costs and expenses thereof or ancillary thereto, shall be applied in or toward satisfaction of the debts, liabilities or engagements of such Shareholder in respect of such share (whether or not the same have matured), and the remaining proceeds (if any) shall be paid to the shareholder, his or her executors, administrators or assigns.

18.   Sale after forfeiture or surrender or for enforcement of lien.

Upon any sale of a share after forfeiture or surrender or for enforcing a lien, the Board of Directors may appoint any person to execute an instrument of transfer of the share so sold and cause the purchaser's name to be entered in the Register of Shareholders in respect of such share. The purchaser shall be registered as the shareholder and shall not be bound to see to the regularity of the sale proceedings, or to the application of the proceeds of such sale, and after his or her name has been entered in the Register of Shareholders in respect of such share, the validity of the sale shall not be impeached by any person, and the remedy of any person aggrieved by the sale shall be in damages only and against the Company exclusively.

19.   Redeemable shares.

The Company may, subject to applicable law, issue redeemable shares or other securities and redeem the same upon terms and conditions to be set forth in a written agreement between the Company and the holder of such shares or in their terms of issuance.

**TRANSFER OF SHARES**

20.  **REGISTRATION OF TRANSFER**.

No transfer of shares shall be registered unless a proper writing or instrument of transfer (in any customary form or any other form satisfactory to the Board of Directors or an officer of the Company to be designated by the Chief Executive Officer) has been submitted to the Company (or its transfer agent), together with any share certificate(s) and such other evidence of title as the Board of Directors or an officer of the Company to be designated by the Chief Executive Officer may require. Notwithstanding anything to the contrary herein, shares registered in the name of The Depository Trust Company or its nominee shall be transferrable in accordance with the policies and procedures of The Depository Trust Company. Until the transferee has been registered in the Register of Shareholders in respect of the shares so transferred, the Company may continue to regard the transferor as the owner thereof. The Board of Directors, may, from time to time, prescribe a fee for the registration of a transfer, and may approve other methods of recognizing the transfer of shares in order to facilitate the trading of the Company's shares on the NASDAQ or on any other stock exchange on which the Company's shares are then listed for trading.

21.  **SUSPENSION OF REGISTRATION**.

The Board of Directors may, in its discretion to the extent it deems necessary, close the Register of Shareholders of registration of transfers of shares for a period determined by the Board of Directors, and no registrations of transfers of shares shall be made by the Company during any such period during which the Register of Shareholders is so closed.

**TRANSMISSION OF SHARES**

22.  **DECEDENTS' SHARES**.

Upon the death of a Shareholder, the Company shall recognize the custodian or administrator of the estate or executor of the will, and in the absence of such, the lawful heirs of the Shareholder, as the only holders of the right for the shares of the deceased Shareholder, after receipt of evidence to the entitlement thereto, as determined by the Board of Directors or an officer of the Company to be designated by the Chief Executive Officer.

23.  **RECEIVERS AND LIQUIDATORS**.

(a)   The Company may recognize any receiver, liquidator or similar official appointed to wind-up, dissolve or otherwise liquidate a corporate Shareholder, and a trustee, manager, receiver, liquidator or similar official appointed in bankruptcy or in connection with the reorganization of, or similar proceeding with respect to a Shareholder or its properties, as being entitled to the shares registered in the name of such Shareholder.

(b)   Such receiver, liquidator or similar official appointed to wind-up, dissolve or otherwise liquidate a corporate Shareholder and such trustee, manager, receiver, liquidator or similar official appointed in bankruptcy or in connection with the reorganization of, or similar proceedings with respect to a Shareholder or its properties, upon producing such evidence as the Board of Directors (or an officer of the Company to be designated by the Chief Executive Officer) may deem sufficient as to his or her authority to act in such capacity or under this Article, shall with the consent of the Board of Directors or an officer of the Company to be designated by the Chief Executive Officer (which the Board of Directors or such officer may grant or refuse in its absolute discretion), be registered as a Shareholder in respect of such shares, or may, subject to the regulations as to transfer herein contained, transfer such shares.

24. **GENERAL MEETINGS**.

(a)   An annual General Meeting ("Annual General Meeting") shall be held at such time and at such place, either within or outside of the State of Israel, as may be determined by the Board of Directors.

(b)   All General Meetings other than Annual General Meetings shall be called "Special General Meetings". The Board of Directors may, at its discretion, convene a Special General Meeting at such time and place, within or outside of the State of Israel, as may be determined by the Board of Directors.

(c)   If so determined by the Board of Directors, an Annual General Meeting or a Special General Meeting may be held through the use of any means of communication approved by the Board of Directors, provided all of the participating Shareholders can hear each other simultaneously. A resolution approved by use of means of communications as aforesaid, shall be deemed to be a resolution lawfully adopted at such general meeting and a Shareholder shall be deemed present in person at such general meeting if attending such meeting through the means of communication used at such meeting.

25. **RECORD DATE FOR GENERAL MEETING**.

Notwithstanding any provision of these Articles to the contrary, and to allow the Company to determine the Shareholders entitled to notice of or to vote at any General Meeting or any adjournment thereof, or entitled to receive payment of any dividend or other distribution or grant of any rights, or entitled to exercise any rights in respect of or to take or be the subject of any other action, the Board of Directors may fix a record date for the General Meeting, which shall not be more than the maximum period and not less than the minimum period permitted by law. Subject to applicable law, a determination of Shareholders of record entitled to notice of or to vote at a General Meeting shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

26. **SHAREHOLDER PROPOSAL REQUEST**.

(a)   Any Shareholder or Shareholders of the Company holding at least the required percentage under the Companies Law of the voting rights of the Company which entitles such Shareholder(s) to require the Company to include a matter on the agenda of a General Meeting (the "Proposing Shareholder(s)") may request, subject to the Companies Law, that the Board of Directors include a matter on the agenda of a General Meeting to be held in the future, provided that the Board of Directors determines that the matter is appropriate to be considered at a General Meeting (a "Proposal Request"). In order for the Board of Directors to consider a Proposal Request and whether to include the matter stated therein in the agenda of a General Meeting, notice of the Proposal Request must be timely delivered in accordance with applicable law, and the Proposal Request must comply with the requirements of these Articles (including this Article 26) and any applicable law and stock exchange rules and regulations. The Proposal Request must be in writing, signed by all of the Proposing Shareholder(s) making such request, delivered, either in person or by registered mail, postage prepaid, and received by the Secretary or the Chief Legal Officer of the Company (or, in the absence thereof, by the Chief Executive Officer of the Company). To be considered timely, a Proposal Request must be received within the time periods prescribed by applicable law. The announcement of an adjournment or postponement of a General Meeting shall not commence a new time period (or extend any time period) for the delivery of a Proposal Request as described above. In addition to any information required to be included in accordance with applicable law, a Proposal Request must include the following: (i) the name, address, telephone number, fax number and email address of the Proposing Shareholder (or each Proposing Shareholder, as the case may be) and, if an entity, the name(s) of the person(s) that controls or manages such entity; (ii) the number and class of shares of the Company held by the Proposing Shareholder(s), directly or indirectly (and, if any of such shares are held indirectly, an explanation of how they are held and by whom), which shall be in such number no less than as is required to qualify as a Proposing Shareholder, accompanied by evidence satisfactory to the Company of the record holding of such shares by the Proposing Shareholder(s) as of the date of the Proposal Request; (iii) the matter requested to be included on the agenda of a General Meeting, all information related to such matter, the reason that such matter is proposed to be brought before the General Meeting, the complete text of the resolution that the Proposing Shareholder proposes to be voted upon at the General Meeting, and a representation that the Proposing Shareholder(s) intend to appear in person or by proxy at the meeting; (iv) a description of all arrangements or understandings between the Proposing Shareholders and any other Person(s) (naming such Person or Persons) in connection with the matter that is requested to be included on the agenda and a declaration signed by all Proposing Shareholder(s) of whether any of them has a personal interest in the matter and, if so, a description in reasonable detail of such personal interest; (v) a description of all Derivative Transactions (as defined below) by each Proposing Shareholder(s) during the previous twelve (12) month period, including the date of the transactions and the class, series and number of securities involved in, and the material economic terms of, such Derivative Transactions; and (vi) a declaration that all of the information that is required under the Companies Law and any other applicable law and stock exchange rules and regulations to be provided to the Company in connection with such matter, if any, has been provided to the Company. The Board of Directors, may, in its discretion, to the extent it deems necessary, request that the Proposing Shareholder(s) provide additional information necessary so as to include a matter in the agenda of a General Meeting, as the Board of Directors may reasonably require.

A "Derivative Transaction" means any agreement, arrangement, interest or understanding entered into by, or on behalf or for the benefit of, any Proposing Shareholder or any of its affiliates or associates, whether of record or beneficial: (1) the value of which is derived in whole or in part from the value of any class or series of shares or other securities of the Company, (2) which otherwise provides any direct or indirect opportunity to gain or share in any gain derived from a change in the value of securities of the Company, (3) the effect or intent of which is to mitigate loss, manage risk or benefit of security value or price changes, or (4) which provides the right to vote or increase or decrease the voting power of, such Proposing Shareholder, or any of its affiliates or associates, with respect to any shares or other securities of the Company, which agreement, arrangement, interest or understanding may include, without limitation, any option, warrant, debt position, note, bond, convertible security, swap, stock appreciation right, short position, profit interest, hedge, right to dividends, voting agreement, performance-related fee or arrangement to borrow or lend shares (whether or not subject to payment, settlement, exercise or conversion in any such class or series), and any proportionate interest of such Proposing Shareholder in the securities of the Company held by any general or limited partnership, or any limited liability company, of which such Proposing Shareholder is, directly or indirectly, a general partner or managing member.

(b)   The information required pursuant to this Article shall be updated as of (i) the record date of the General Meeting, (ii) five business days before the General Meeting, and (iii) as of the General Meeting, and any adjournment or postponement thereof.

(c)   The provisions of Articles 26(a) and 26(b) shall apply, *mutatis mutandis*, to any matter to be included on the agenda of a Special General Meeting which is convened pursuant to a request of a Shareholder duly delivered to the Company in accordance with the Companies Law.

(d)   Notwithstanding anything to the contrary herein, this Article 26 may only be amended, replaced or suspended by a resolution adopted at a General Meeting by a majority of at least sixty percent (60%) of the total voting power of the Shareholders.

27.   NOTICE OF GENERAL MEETINGS; OMISSION TO GIVE NOTICE.

(a)   The Company is not required to give notice of a General Meeting, subject to any mandatory provision of the Companies Law.

(b)   The accidental omission to give notice of a General Meeting to any Shareholder, or the non-receipt of notice sent to such Shareholder, shall not invalidate the proceedings at such meeting or any resolution adopted thereat.

(c)  No Shareholder present, in person or by proxy, at any time during a General Meeting shall be entitled to seek the cancellation or invalidation of any proceedings or resolutions adopted at such General Meeting on account of any defect in the notice of such meeting relating to the time or the place thereof, or any item acted upon at such meeting.

(d)  In addition to any places at which the Company may make available for review by Shareholders the full text of the proposed resolutions to be adopted at a General Meeting, as required by the Companies Law, the Company may add additional places for Shareholders to review such proposed resolutions, including an internet site.

PROCEEDINGS AT GENERAL MEETINGS

28.  QUORUM.

(a)  No business shall be transacted at a General Meeting, or at any adjournment thereof, unless the quorum required under these Articles for such General Meeting or such adjourned meeting, as the case may be, is present when the meeting proceeds to business.

(b)  In the absence of contrary provisions in these Articles, the requisite quorum for any General Meeting shall be two or more Shareholders (not in default in payment of any sum referred to in Article 14 hereof), present in person or by proxy and holding shares conferring in the aggregate at least thirty-three and one third percent ($33^{1}/_{3}$%) of the voting power of the Company, provided, however, that with respect to any General Meeting, including Annual General Meeting, that was initiated by and convened pursuant to a resolution adopted by the Board of Directors (and not pursuant to the request of any other person), and, at such time of the General Meeting, the Company is qualified to use the forms and rules of a "foreign private issuer" under the U.S. securities laws, the requisite quorum shall be two or more Shareholders (not in default in payment of any sum referred to in Article 14 hereof) present in person or by proxy and holding shares conferring in the aggregate at least twenty-five percent (25%) of the voting power of the Company. For the purpose of determining the quorum present at a certain General Meeting, a proxy may be deemed to be two (2) or more Shareholders pursuant to the number of Shareholders represented by the proxy holder.

(c)  If within half an hour from the time appointed for the meeting a quorum is not present, then without any further notice the meeting shall be adjourned either (i) to the same day in the next week, at the same time and place, (ii) to such day and at such time and place as indicated in the notice of such meeting, or (iii) to such day and at such time and place as the Chairperson of the General Meeting shall determine (which may be earlier or later than the date pursuant to clause (i) above). No business shall be transacted at any adjourned meeting except business which might lawfully have been transacted at the meeting as originally called. At such adjourned meeting, if the original meeting was convened pursuant to a request under Section 63 of the Companies Law, one or more shareholders, present in person or by proxy, and holding the number of shares required for making such request, shall constitute a quorum, but in any other case any shareholder (not in default as aforesaid) present in person or by proxy, shall constitute a quorum.

29.  CHAIRPERSON OF GENERAL MEETING.

The Chairperson of the Board of Directors shall preside as Chairperson of every General Meeting of the Company. If at any meeting the Chairperson is not present within fifteen (15) minutes after the time fixed for holding the meeting or is unwilling or unable to act as Chairperson, any of the following may preside as Chairperson of the meeting (and in the following order): a Director designated by the Board of Directors, the Chief Executive Officer, the Chief Financial Officer, the Chief Legal Officer, the Secretary or any person designated by any of the foregoing. If at any such meeting none of the foregoing persons is present or all are unwilling or unable to act as Chairperson, the Shareholders present (in person or by proxy) shall choose a Shareholder or its proxy present at the meeting to be Chairperson. The office of Chairperson shall not, by itself, entitle the holder thereof to vote at any General Meeting nor shall it entitle such holder to a second or casting vote (without derogating, however, from the rights of such Chairperson to vote as a Shareholder or proxy of a Shareholder if, in fact, the Chairperson is also a Shareholder or such proxy).

30. **ADOPTION OF RESOLUTIONS AT GENERAL MEETINGS.**

(a)   Except as required by the Companies Law or these Articles, including, without limitation, Article 40 below and Article 6, a resolution of the Shareholders shall be adopted if approved by the holders of a simple majority of the voting power represented at the General Meeting in person or by proxy and voting thereon, as one class, and disregarding abstentions from the count of the voting power present and voting. Without limiting the generality of the foregoing, a resolution with respect to a matter or action for which the Companies Law prescribes a higher majority or pursuant to which a provision requiring a higher majority would have been deemed to have been incorporated into these Articles, but for which the Companies Law allows these Articles to provide otherwise, shall be adopted by a simple majority of the voting power represented at the General Meeting in person or by proxy and voting thereon, as one class, and disregarding abstentions from the count of the voting power present and voting.

(b)   Every question submitted to a General Meeting shall be decided by a show of hands, but the Chairperson of the General Meeting may determine that a resolution shall be decided by a written ballot. A written ballot may be implemented before the proposed resolution is voted upon or immediately after the declaration by the Chairperson of the results of the vote by a show of hands. If a vote by written ballot is taken after such declaration, the results of the vote by a show of hands shall be of no effect, and the proposed resolution shall be decided by such written ballot.

(c)   A defect in convening or conducting a General Meeting, including a defect resulting from the non-fulfillment of any provision or condition set forth in the Companies Law or these Articles, including with regard to the manner of convening or conducting the General Meeting, shall not disqualify any resolution passed at the General Meeting and shall not affect the discussions or decisions which took place thereat.

(d)   A declaration by the Chairperson of the General Meeting that a resolution has been carried unanimously, or carried by a particular majority, or rejected, and an entry to that effect in the minute book of the Company, shall be prima facie evidence of the fact without proof of the number or proportion of the votes recorded in favor of or against such resolution.

31. **POWER TO ADJOURN.**

A General Meeting, the consideration of any matter on its agenda, or the resolution on any matter on its agenda, may be postponed or adjourned, from time to time and from place to place: (i) by the Chairperson of a General Meeting at which a quorum is present (and he shall be required to do so if directed by the General Meeting, with the consent of the holders of a majority of the voting power represented in person or by proxy and voting on the question of adjournment), but no business shall be transacted at any such adjourned meeting except business which might lawfully have been transacted at the meeting as originally called, or a matter on its agenda with respect to which no resolution was adopted at the meeting originally called; or (ii) by the Board of Directors (whether prior to or at a General Meeting).

32. **VOTING POWER**.

Subject to the provisions of Article 33(a) and to any other provision of these Articles, including Article 6, conferring special rights as to voting, or restricting the right to vote, every Shareholder shall have one (1) vote for each Class A Share held by the Shareholder of record and ten (10) votes for each Class B Share held by the Shareholder of record, on every resolution, without regard to whether the vote thereon is conducted by a show of hands, by written ballot, or by any other means.

33. **VOTING RIGHTS.**

(a)  No Shareholder shall be entitled to vote at any General Meeting (or be counted as a part of the quorum thereat), unless all calls then payable by it, him or her in respect of it, his or her shares in the Company have been paid.

(b)  A company or other corporate body being a Shareholder of the Company may duly authorize any person to be its representative at any meeting of the Company or to execute or deliver a proxy on its behalf. Any person so authorized shall be entitled to exercise on behalf of such Shareholder all the power, which the Shareholder could have exercised if it were an individual. Upon the request of the Chairperson of the General Meeting, written evidence of such authorization (in form acceptable to the Chairperson) shall be delivered to him or her.

(c)  Any Shareholder entitled to vote may vote either in person or by proxy (who need not be Shareholder of the Company), or, if the Shareholder is a company or other corporate body, by representative authorized pursuant to Article (b) above.

(d)  If two or more persons are registered as joint holders of any share, the vote of the senior who tenders a vote, in person or by proxy, shall be accepted to the exclusion of the vote(s) of the other joint holder(s). For the purpose of this Article 33(d), seniority shall be determined by the order of registration of the joint holders in the Register of Shareholders.

(e)  If a Shareholder is a minor, under protection, bankrupt or legally incompetent, or in the case of a corporation, is in receivership or liquidation, it may, subject to all other provisions of these Articles and any documents or records required to be provided under these Articles, vote through his, her or its trustees, receiver, liquidator, natural guardian or another legal guardian, as the case may be, and the persons listed above may vote in person or by proxy.

PROXIES

34.  **INSTRUMENT OF APPOINTMENT**.

(a)  An instrument appointing a proxy shall be in writing and shall be substantially in the following form:

"I _____  of  _____
              *(Name of Shareholder)*                          *(Address of Shareholder)*

Being a shareholder of Oddity Tech Ltd. (the "Company") hereby appoints

_____  of  _____
              *(Name of Proxy)*                              *(Address of Proxy)*

as my proxy to vote for me and on my behalf in respect of all of my shares in the Company, at the General Meeting of the Company to be held on the ___ day of _____, _____ and at any adjournment(s) thereof.

Signed this ____ day of _____, _____.

(Signature of Appointor)

or in any usual or common form or in such other form as may be approved by the Board of Directors. Such proxy shall be duly signed by the appointor of such person's duly authorized attorney, or, if such appointor is company or other corporate body, in the manner in which it signs documents which binds it together with a certificate of an attorney with regard to the authority of the signatories.

(b)  Subject to the Companies Law, the original instrument appointing a proxy or a copy thereof certified by an attorney (and the power of attorney or other authority, if any, under which such instrument has been signed) shall be delivered to the Company (at its Office, at its principal place of business, or at the offices of its registrar or transfer agent, or at such place as notice of the meeting may specify) not less than forty eight (48) hours (or such shorter period as the notice shall specify) before the time fixed for such meeting. Notwithstanding the above, the Chairperson shall have the right to waive the time requirement provided above with respect to all instruments of proxies and to accept instruments of proxy until the beginning of a General Meeting. A document appointing a proxy shall be valid for every adjourned meeting of the General Meeting to which the document relates.

35.  **EFFECT OF DEATH OF APPOINTOR OF TRANSFER OF SHARES AND OR REVOCATION OF APPOINTMENT**.

(a)  A vote cast in accordance with an instrument appointing a proxy shall be valid notwithstanding the prior death or bankruptcy of the appointing Shareholder (or of his or her attorney-in-fact, if any, who signed such instrument), or the transfer of the share in respect of which the vote is cast, unless written notice of such matters shall have been received by the Company or by the Chairperson of such meeting prior to such vote being cast.

(b)  Subject to the Companies Law, an instrument appointing a proxy shall be deemed revoked (i) upon receipt by the Company or the Chairperson, subsequent to receipt by the Company of such instrument, of written notice signed by the person signing such instrument or by the Shareholder appointing such proxy canceling the appointment thereunder (or the authority pursuant to which such instrument was signed) or of an instrument appointing a different proxy (and such other documents, if any, required under Article 34(b) for such new appointment), provided such notice of cancellation or instrument appointing a different proxy were so received at the place and within the time for delivery of the instrument revoked thereby as referred to in Article 34(b) hereof, or (ii) if the appointing Shareholder is present in person at the meeting for which such instrument of proxy was delivered, upon receipt by the Chairperson of such meeting of written notice from such Shareholder of the revocation of such appointment, or if and when such Shareholder votes at such meeting. A vote cast in accordance with an instrument appointing a proxy shall be valid notwithstanding the revocation or purported cancellation of the appointment, or the presence in person or vote of the appointing Shareholder at a meeting for which it was rendered, unless such instrument of appointment was deemed revoked in accordance with the foregoing provisions of this Article 35(b) at or prior to the time such vote was cast.

BOARD OF DIRECTORS

36. POWERS OF THE BOARD OF DIRECTORS.

The Board of Directors may exercise all such powers and do all such acts and things as the Board of Directors is authorized by law or as the Company is authorized to exercise and do and are not hereby or by law required to be exercised or done by the General Meeting. The authority conferred on the Board of Directors by this Article 36 shall be subject to the provisions of the Companies Law, these Articles and any regulation or resolution consistent with these Articles adopted from time to time at a General Meeting.

37. EXERCISE OF POWERS OF THE BOARD OF DIRECTORS.

(a)  A meeting of the Board of Directors at which a quorum is present in accordance with Article 46 shall be competent to exercise all the authorities, powers and discretion vested in or exercisable by the Board of Directors.

(b)  A resolution proposed at any meeting of the Board of Directors shall be deemed adopted if approved by a majority of the Directors present, entitled to vote and voting thereon when such resolution is put to a vote.

(c)  The Board of Directors may adopt resolutions, without convening a meeting of the Board of Directors, in writing or in any other manner permitted by the Companies Law. Any resolutions passed by way of written consent in lieu of a meeting shall be filed with the applicable minutes book of the Company.

38. DELEGATION OF POWERS.

(a)  The Board of Directors may, subject to the provisions of the Companies Law, delegate any or all of its powers to committees (in these Articles referred to as a "Committee of the Board of Directors", or "Committee"), each consisting of one or more persons, and it may from time to time revoke such delegation or alter the composition of any such Committee. Any Committee so formed shall, in the exercise of the powers so delegated, conform to any regulations imposed on it by the Board of Directors, subject to applicable law. No regulation imposed by the Board of Directors on any Committee and no resolution of the Board of Directors shall invalidate any prior act done or pursuant to a resolution by the Committee which would have been valid if such regulation or resolution of the Board of Directors had not been adopted. The meetings and proceedings of any such Committee of the Board of Directors shall, mutatis mutandis, be governed by the provisions herein contained for regulating the meetings of the Board of Directors, to the extent not superseded by any regulations adopted by the Board of Directors.

(b)  The Board of Directors may from time to time appoint a Secretary to the Company, as well as Officers, agents, employees and independent contractors, as the Board of Directors deems fit, and may terminate the service of any such person. The Board of Directors may, subject to the provisions of the Companies Law, determine the powers and duties, as well as the salaries and compensation, of all such persons.

(c)  Subject to applicable law, the General Meeting may, in accordance with Section 50 of the Companies Law, take upon itself the authority and powers given to the Board or to any other organ of the Company, in each case, in respect of a specific matter or for a limited time which will not exceed the required time period in the circumstances.

39.  NUMBER OF DIRECTORS.

(a)  The Board of Directors shall consist of such number of Directors (not less than three (3) nor more than seven (7), including the External Directors, if any were elected) as may be fixed from time to time by resolution of the Board of Directors.

(b)  Notwithstanding anything to the contrary herein, this Article 39 may only be amended or replaced by a resolution adopted at a General Meeting by a majority of at least sixty percent (60%) of the total voting power of the Company's shareholders.

40.  ELECTION AND REMOVAL OF DIRECTORS.

(a)  The Directors, excluding the External Directors, if any were elected, shall be classified, with respect to the term for which they each severally hold office, into three classes, as nearly equal in number as practicable, hereby designated as Class I, Class II and Class III (each, a "Class"). The Board of Directors may assign members of the Board of Directors already in office to such classes at the time such classification becomes effective.

(i)   The term of office of the initial Class I directors shall expire at the Annual General Meeting to be held on the first Annual General Meeting following the adoption of these Articles and when their successors are elected and qualified,

(ii)   The term of office of the initial Class II directors shall expire at the first Annual General Meeting following the Annual General Meeting referred to in clause (i) above and when their successors are elected and qualified, and

(iii)   The term of office of the initial Class III directors shall expire at the first Annual General Meeting following the Annual General Meeting referred to in clause (ii) above and when their successors are elected and qualified,

(b)  At each Annual General Meeting, commencing with the Annual General Meeting referred to in Article 40(a)(i) above, each Nominee or Alternate Nominee (each as defined below) elected to replace the Directors of a Class whose term shall have expired at such Annual General Meeting shall be elected to hold office until the third Annual General Meeting next succeeding his or her election and until his or her respective successor shall have been elected and qualified. Notwithstanding anything to the contrary, each Director shall serve until his or her successor is elected and qualified or until such earlier time as such Director's office is vacated.

(c)  If the number of Directors, excluding External Directors, if any were elected, that comprises the Board of Directors is hereafter changed by the Board of Directors, any newly created directorships or decrease in directorships shall be so apportioned by the Board of Directors among the classes as to make all classes as nearly equal in number as is practicable, provided that no decrease in the number of Directors constituting the Board of Directors shall shorten the term of any incumbent Director.

(d)  Prior to every General Meeting of the Company at which Directors are to be elected, and subject to clauses (a) and (h) of this Article, the Board of Directors (or a Committee thereof) shall select, by a resolution adopted by a majority of the Board of Directors (or such Committee), a number of Persons to be proposed to the Shareholders for election as Directors at such General Meeting (the "Nominees").

(e)  Any Proposing Shareholder requesting to include on the agenda of a General Meeting a nomination of a Person to be proposed to the Shareholders for election as Director (such person, an "Alternate Nominee"), may so request provided that it complies with this Article 40(e), Article 26 and applicable law. Unless otherwise determined by the Board of Directors, a Proposal Request relating to an Alternate Nominee is deemed to be a matter that is appropriate to be considered only at an Annual General Meeting. In addition to any information required to be included in accordance with applicable law, such a Proposal Request shall include information required pursuant to Article 26, and shall also set forth: (i) the name, address, telephone number, fax number and email address of the Alternate Nominee and all citizenships and residencies of the Alternate Nominee; (ii) a description of all arrangements, relations or understandings during the past three (3) years, and any other material relationships, between the Proposing Shareholder(s), any of its affiliates, or, to the knowledge of the Proposing Shareholder, any other shareholder in the Company and each Alternate Nominee; (iii) a declaration signed by the Alternate Nominee that he or she consents to be named in the Company's notices and proxy materials and on the Company's proxy card relating to the General Meeting, if provided or published, and that he or she, if elected, consents to serve on the Board of Directors and to be named in the Company's disclosures and filings; (iv) a declaration signed by each Alternate Nominee as required under the Companies Law and any other applicable law and stock exchange rules and regulations for the appointment of such an Alternate Nominee and an undertaking that all of the information that is required under law and stock exchange rules and regulations to be provided to the Company in connection with such an appointment has been provided (including, information in respect of the Alternate Nominee as would be provided in response to the applicable disclosure requirements under Form 20-F (or Form 10-K, if applicable) or any other applicable form prescribed by the U.S. Securities and Exchange Commission (the "SEC")); (v) a declaration made by the Alternate Nominee of whether he or she meets the criteria for an independent director and, if applicable, External Director of the Company under the Companies Law and/or under any applicable law, regulation or stock exchange rules, and if not, then an explanation of why not; and (vi) any other information required at the time of submission of the Proposal Request by applicable law, regulations or stock exchange rules. In addition, the Proposing Shareholder(s) and each Alternate Nominee shall promptly provide any other information reasonably requested by the Company, including a duly completed director and officer questionnaire, in such form as may be provided by the Company, with respect to each Alternate Nominee. The Board of Directors may refuse to acknowledge the nomination of any person not made in compliance with the foregoing. The Company shall be entitled to publish any information provided by a Proposing Shareholder or Alternate Nominee pursuant to this Article 40(e) and Article 26, and the Proposing Shareholder and Alternate Nominee shall be responsible for the accuracy and completeness thereof.

(f)  The Nominees or Alternate Nominees shall be elected by a resolution adopted at the General Meeting at which they are subject for election. Notwithstanding Articles 26(a) and 26(c), in the event of a Contested Election, the method of calculation of the votes and the manner in which the resolutions will be presented to the General Meeting shall be determined by the Board of Directors in its sole and absolute discretion. In the event that the Board of Directors does not or is unable to make a determination on such matter, then the method described in clause (ii) below shall apply. The Board of Directors may consider, among other things, the following methods: (i) election of competing slates of Director nominees (determined in a manner approved by the Board of Directors) by a majority of the voting power represented at the General Meeting in person or by proxy and voting on such competing slates, (ii) election of individual Directors by a plurality of the voting power represented at the General Meeting in person or by proxy and voting on the election of Directors (which shall mean that the nominees receiving the largest number of "for" votes will be elected in such Contested Election), (iii) election of each nominee by a majority of the voting power represented at the General Meeting in person or by proxy and voting on the election of Directors, provided that if the number of such nominees exceeds the number of Directors to be elected, then as among such nominees the election shall be by plurality of the voting power as described above, and (iv) such other method of voting as the Board of Directors deems appropriate, including use of a "universal proxy card" listing all Nominees and Alternate Nominees by the Company. For the purposes of these Articles, election of Directors at a General Meeting shall be considered a "Contested Election" if the aggregate number of Nominees and Alternate Nominees at such meeting exceeds the total number of Directors to be elected at such meeting, with the determination thereof being made by the Secretary or the Chief Legal Officer of the Company (or, in the absence thereof, by the Chief Executive Officer of the Company) as of the close of the applicable notice of nomination period under Article 26 or under applicable law, based on whether one or more notice(s) of nomination were timely filed in accordance with Article 26, this Article 40 and applicable law; provided, however, that the determination that an election is a Contested Election shall not be determinative as to the validity of any such notice of nomination; and provided further, that, if, prior to the time of such meeting, one or more notices of nomination of an Alternate Nominee are withdrawn such that the number of candidates for election as Director no longer exceeds the number of Directors to be elected, the election shall not be considered a Contested Election. Shareholders shall not be entitled to cumulative voting in the election of Directors, except to the extent specifically set forth in this clause (f).

(g)  Notwithstanding anything to the contrary herein, this Article 40 and Article 43(e) may only be amended, replaced or suspended by a resolution adopted at a General Meeting by a majority of at least sixty percent (60%) of the total voting power of the Company's shareholders.

(h)  Notwithstanding anything to the contrary in these Articles, the election, qualification, removal or dismissal of External Directors, if so elected, shall be only in accordance with the applicable provisions set forth in the Companies Law.

41.  COMMENCEMENT OF DIRECTORSHIP.

Without derogating from Article 40, the term of office of a Director shall commence as of the date of his or her appointment or election, or on a later date if so specified in his or her appointment or election.

42.  CONTINUING DIRECTORS IN THE EVENT OF VACANCIES.

The Board of Directors (and, if so determined by the Board of Directors, the General Meeting) may at any time and from time to time appoint any person as a Director to fill a vacancy (whether such vacancy is due to a Director no longer serving or due to the number of Directors serving being less than the maximum number stated in Article 39 hereof). In the event of one or more such vacancies in the Board of Directors, the continuing Directors may continue to act in every matter, provided, however, that if the number of Directors serving is less than the minimum number provided for pursuant to Article 39 hereof, they may only act in an emergency or to fill the office of a Director which has become vacant up to a number equal to the minimum number provided for pursuant to Article 39 hereof, or in order to call a General Meeting of the Company for the purpose of electing Directors to fill any or all vacancies. The office of a Director that was appointed by the Board of Directors to fill any vacancy shall only be for the remaining period of time during which the Director whose service has ended was filled would have held office, or in case of a vacancy due to the number of Directors serving being less than the maximum number stated in Article 39 hereof the Board of Directors shall determine at the time of appointment the Class pursuant to Article 40 to which the additional Director shall be assigned. Notwithstanding anything to the contrary herein, this Article 42 may only be amended, replaced or suspended by a resolution adopted at a General Meeting by a majority of at least sixty percent (60%) of the total voting power of the Company's shareholders.

43.  VACATION OF OFFICE.

The office of a Director shall be vacated and he shall be dismissed or removed:

(a)  ipso facto, upon his or her death;

(b)  if he or she is prevented by applicable law from serving as a Director;

(c)  if the Board of Directors determines that due to his or her mental or physical state he or she is unable to serve as a Director;

(d)  if his or her directorship expires pursuant to these Articles and/or applicable law;

(e)   by a resolution adopted at a General Meeting by a majority of at least sixty percent (60%) of the total voting power of the Shareholders (with such removal becoming effective on the date fixed in such resolution). This sub-Article (e) may only be amended, replaced or suspended by a resolution adopted at a General Meeting by a majority of at least sixty percent (60%) of the total voting power of the Shareholders;

(f)   by his or her written resignation, such resignation becoming effective on the date fixed therein, or upon the delivery thereof to the Company, whichever is later; or

(g)   with respect to an External Director, if so elected, and notwithstanding anything to the contrary herein, only pursuant to applicable law.

44.   CONFLICT OF INTERESTS; APPROVAL OF RELATED PARTY TRANSACTIONS.

(a)    Subject to the provisions of applicable law and these Articles, no Director shall be disqualified by virtue of his or her office from holding any office or place of profit in the Company or in any company in which the Company shall be a shareholder or otherwise interested, or from contracting with the Company as vendor, purchaser or otherwise, nor shall any such contract, or any contract or arrangement entered into by or on behalf of the Company in which any Director shall be in any way interested, be avoided, nor, other than as required under the Companies Law, shall any Director be liable to account to the Company for any profit arising from any such office or place of profit or realized by any such contract or arrangement by reason only of such Director's holding that office or of the fiduciary relations thereby established, but the nature of his or her interest, as well as any material fact or document, must be disclosed by him or her at the meeting of the Board of Directors at which the contract or arrangement is first considered, if his or her interest then exists, or, in any other case, at no later than the first meeting of the Board of Directors after the acquisition of his or her interest.

(b)   Subject to the Companies Law and these Articles, a transaction between the Company and an Office Holder, and a transaction between the Company and another entity in which an Office Holder of the Company has a personal interest, in each case, which is not an Extraordinary Transaction (as defined by the Companies Law), shall require only approval by the Board of Directors, a Committee of the Board of Directors or the Chief Executive Officer of the Company. Such authorization, as well as the actual approval, may be for a particular transaction or more generally for specific type of transactions.

PROCEEDINGS OF THE BOARD OF DIRECTORS

45.   MEETINGS.

(a)   The Board of Directors may meet and adjourn its meetings and otherwise regulate such meetings and proceedings as the Board of Directors thinks fit.

(b)   A meeting of the Board of Directors shall be convened by the Secretary or the Chief Legal Officer of the Company upon instruction of the Chairperson or upon a request of at least two Directors which is submitted to the Chairperson or in any event that such meeting is required by the provisions of the Companies Law. In the event that the Chairperson does not instruct the Secretary or the Chief Legal Officer of the Company to convene a meeting upon a request of at least two (2) Directors within fourteen (14) days of such request, then such two Directors may convene a meeting of the Board of Directors. Any meeting of the Board of Directors shall be convened upon not less than two (2) days' notice, unless such notice is waived in writing by all of the Directors as to a particular meeting or by their attendance at such meeting or unless the matters to be discussed at such meeting are of such urgency and importance that notice is reasonably determined by the Chairperson as ought to be waived or shortened under the circumstances.

(c)   Notice of any such meeting may be given orally, by telephone, in writing or by mail, facsimile, email or such other means of communications as the Company may apply, from time to time.

(d)  Notwithstanding anything to the contrary herein, failure to deliver notice to a Director of any such meeting in the manner required hereby may be waived by such Director, and a meeting shall be deemed to have been duly convened notwithstanding such defective notice if such failure or defect is waived prior to action being taken at such meeting, by all Directors entitled to participate at such meeting to whom notice was not duly given as aforesaid.

Without derogating from the foregoing, no Director present at any time during a meeting of the Board of Directors shall be entitled to seek the cancellation or invalidation of any proceedings or resolutions adopted at such meeting on account of any defect in the notice of such meeting relating to the date, time or the place thereof or the convening of the meeting.

46.  **Quorum**.

Until otherwise unanimously decided by the Board of Directors, a quorum at a meeting of the Board of Directors shall be constituted by the presence in person or by any means of communication of a majority of the Directors then in office who are lawfully entitled to participate and vote in the meeting. No business shall be transacted at a meeting of the Board of Directors unless the requisite quorum is present (in person or by any means of communication provided that all participating Directors can hear each other simultaneously) when the meeting proceeds to business. If within thirty (30) minutes from the time appointed for a meeting of the Board of Directors a quorum is not present, the meeting shall stand adjourned at the same place and time forty-eight (48) hours thereafter unless the Chairperson has determined that there is such urgency and importance that a shorter period is required under the circumstances. If an adjourned meeting is convened in accordance with the foregoing and a quorum is not present within thirty (30) minutes of the announced time, the requisite quorum at such adjourned meeting shall be, any two (2) Directors, if the number of Directors then serving is up to five (5), and any three (3) Directors, if the number of Directors then serving is more than five (5), in each case who are lawfully entitled to participate in the meeting and who are present at such adjourned meeting. At an adjourned meeting of the Board of Directors the only matters to be considered shall be those matters which might have been lawfully considered at the meeting of the Board of Directors originally called if a requisite quorum had been present, and the only resolutions to be adopted are such types of resolutions which could have been adopted at the meeting of the Board of Directors originally called.

47.  **Chairperson of the board of directors**.

The Board of Directors shall, from time to time, elect one of the members of the Board to be the Chairperson of the Board of Directors, remove such Chairperson from office and appoint in his or her place. The Chairperson of the Board of Directors shall preside at every meeting of the Board of Directors, but if there is no such Chairperson, or if at any meeting he is not present within fifteen (15) minutes of the time fixed for the meeting or if he is unwilling to take the chair, the Directors present shall choose one of the Directors present at the meeting to be the Chairperson of such meeting.

48.  **Validity of acts despite defects**.

All acts done or transacted at any meeting of the Board of Directors, or of a Committee of the Board of Directors, or by any person(s) acting as Director(s), shall, notwithstanding that it may afterwards be discovered that there was some defect in the appointment of the participants in such meeting or any of them or any person(s) acting as aforesaid, or that they or any of them were disqualified, be as valid as if there were no such defect or disqualification.

**Chief executive officer**

49.  **Chief executive officer**.

The Board of Directors shall from time to time appoint one or more persons, whether or not Directors, as Chief Executive Officer of the Company who shall have the powers and authorities set forth in the Companies Law, and may confer upon such person(s), and from time to time modify or revoke, such titles and such duties and authorities of the Board of Directors as the Board of Directors may deem fit, subject to such limitations and restrictions as the Board of Directors may from time to time prescribe. Such appointment(s) may be either for a fixed term or without any limitation of time, and the Board of Directors may from time to time (subject to any additional approvals required under, and the provisions of, the Companies Law and of any contract between any such person and the Company) fix their salaries and compensation, remove or dismiss them from office and appoint another or others in his, her or their place or places.

**MINUTES**

50. **MINUTES.**

Any minutes of the General Meeting or the Board of Directors or any Committee thereof, if purporting to be signed by the Chairperson of the General Meeting, the Board of Directors or a Committee thereof, as the case may be, or by the Chairperson of the next succeeding General Meeting, meeting of the Board of Directors or meeting of a Committee, as the case may be, shall constitute prima facie evidence of the matters recorded therein.

**DIVIDENDS**

51. **DECLARATION OF DIVIDENDS**.

The Board of Directors may from time to time declare, and cause the Company to pay dividends as permitted by the Companies Law. The Board of Directors shall determine the time for payment of such dividends and the record date for determining the shareholders entitled thereto.

52. **AMOUNT PAYABLE BY WAY OF DIVIDENDS**.

Subject to the provisions of these Articles (including Article 6) and subject to the rights or conditions attached at that time to any share in the capital of the Company granting preferential, special or deferred rights or not granting any rights with respect to dividends, any dividend paid by the Company shall be allocated among the Shareholders (not in default in payment of any sum referred to in Article 14 hereof) entitled thereto on a *pari passu* basis in proportion to their respective holdings of the issued and outstanding shares of the Company in respect of which such dividends are being paid.

53. **INTEREST**.

No dividend shall carry interest as against the Company.

54. **PAYMENT IN SPECIE**.

If so declared by the Board of Directors, a dividend declared in accordance with Article 51 may, subject to Article 6, be paid, in whole or in part, by the distribution of specific assets of the Company or by distribution of paid up shares, debentures or other securities of the Company or of any other companies, or in any combination thereof, in each case, the fair value of which shall be determined by the Board of Directors in good faith.

55. **IMPLEMENTATION OF POWERS**.

The Board of Directors may settle, as it deems fit, any difficulty arising with regard to the distribution of dividends, bonus shares or otherwise, and in particular, to issue certificates for fractions of shares and sell such fractions of shares in order to pay their consideration to those entitled thereto, or to set the value for the distribution of certain assets and to determine that cash payments shall be paid to the Shareholders on the basis of such value, or that fractions whose value is less than NIS 0.01 shall not be taken into account. The Board of Directors may instruct to pay cash or convey these certain assets to a trustee in favor of those people who are entitled to a dividend, as the Board of Directors shall deem appropriate.

56. **DEDUCTIONS FROM DIVIDENDS**.

The Board of Directors may deduct or set off from any dividend or other moneys payable to any Shareholder in respect of a share any and all sums of money then payable by him or her to the Company on account of calls or otherwise in respect of shares of the Company and/or on account of any other matter of transaction whatsoever.

57. **RETENTION OF DIVIDENDS.**

(a)   The Board of Directors may retain any dividend or other moneys payable or property distributable in respect of a share on which the Company has a lien, and may apply the same in or toward satisfaction of the debts, liabilities, or engagements in respect of which the lien exists.

(b)   The Board of Directors may retain any dividend or other moneys payable or property distributable in respect of a share in respect of which any person is, under Articles 22 or 23, entitled to become a Shareholder, or which any person is, under said Articles, entitled to transfer, until such person shall become a Shareholder in respect of such share or shall transfer the same.

58. **UNCLAIMED DIVIDENDS**.

All unclaimed dividends or other moneys payable in respect of a share may be invested or otherwise made use of by the Board of Directors for the benefit of the Company until claimed. The payment of any unclaimed dividend or such other moneys into a separate account shall not constitute the Company a trustee in respect thereof, and any dividend unclaimed after a period of one (1) year (or such other period determined by the Board of Directors) from the date of declaration of such dividend, and any such other moneys unclaimed after a like period from the date the same were payable, shall be forfeited and shall revert to the Company, provided, however, that the Board of Directors may, at its discretion, cause the Company to pay any such dividend or such other moneys, or any part thereof, to a person who would have been entitled thereto had the same not reverted to the Company. The principal (and only the principal) of any unclaimed dividend of such other moneys shall be if claimed, paid to a person entitled thereto.

59. **MECHANICS OF PAYMENT**.

Any dividend or other moneys payable in cash in respect of a share, less the tax required to be withheld pursuant to applicable law, may, as determined by the Board of Directors in its sole discretion, be paid by check or warrant sent through the post to, or left at, the registered address of the person entitled thereto or by transfer to a bank account specified by such person (or, if two or more persons are registered as joint holders of such share or are entitled jointly thereto in consequence of the death or bankruptcy of the holder or otherwise, to any one of such Persons or his or her bank account or the person who the Company may then recognize as the owner thereof or entitled thereto under Article 22 or 23 hereof, as applicable, or such person's bank account), or to such person and at such other address as the person entitled thereto may by writing direct, or in any other manner the Board of Directors deems appropriate. Every such check or warrant or other method of payment shall be made payable to the order of the person to whom it is sent, or to such person as the person entitled thereto as aforesaid may direct, and payment of the check or warrant by the banker upon whom it is drawn shall be a good discharge to the Company. Every such check shall be sent at the risk of the Person entitled to the money represented thereby.

ACCOUNTS

60. **BOOKS OF ACCOUNT**.

The Company's books of account shall be kept at the Office of the Company, or at such other place or places as the Board of Directors may think fit, and they shall always be open to inspection by all Directors. No shareholder, not being a Director, shall have any right to inspect any account or book or other similar document of the Company, except as explicitly conferred by law or authorized by the Board of Directors. The Company shall make copies of its annual financial statements available for inspection by the Shareholders at the principal offices of the Company. The Company shall not be required to send copies of its annual financial statements to the Shareholders.

61. **AUDITORS**.

The appointment, authorities, rights and duties of the auditor(s) of the Company, shall be regulated by applicable law, provided, however, that in exercising its authority to fix the remuneration of the auditor(s), the Shareholders in General Meeting may act (and in the absence of any action in connection therewith shall be deemed to have so acted) to authorize the Board of Directors (with right of delegation to a Committee thereof or to management) to fix such remuneration subject to such criteria or standards, and if no such criteria or standards are so provided, such remuneration shall be fixed in an amount commensurate with the volume and nature of the services rendered by such auditor(s). The General Meeting may, if so recommended by the Board of Directors, appoint the auditors for a period that may extend until the third Annual General Meeting after the Annual General Meeting in which the auditors were appointed.

62. **FISCAL YEAR**.

The fiscal year of the Company shall be determined by the Board of Directors.

SUPPLEMENTARY REGISTERS

63. **SUPPLEMENTARY REGISTERS**.

Subject to and in accordance with the provisions of Sections 138 and 139 of the Companies Law, the Company may cause supplementary registers to be kept in any place outside Israel as the Board of Directors may think fit, and, subject to all applicable requirements of law, the Board of Directors may from time to time adopt such rules and procedures as it may think fit in connection with the keeping of such branch registers.

EXEMPTION, INDEMNITY AND INSURANCE

64. **INSURANCE**.

Subject to the provisions of the Companies Law with regard to such matters, the Company may enter into a contract for the insurance of the liability, in whole or in part, of any of its Office Holders imposed on such Office Holder due to an act performed by or an omission of the Office Holder in the Office Holder's capacity as an Office Holder of the Company arising from any matter permitted by law, including the following:

(a)   a breach of duty of care to the Company or to any other person;

(b)   a breach of his or her duty of loyalty to the Company, provided that the Office Holder acted in good faith and had reasonable grounds to assume that act that resulted in such breach would not prejudice the interests of the Company;

(c)   a financial liability imposed on such Office Holder in favor of any other person; and

(d)   any other event, occurrence, matters or circumstances under any law with respect to which the Company may, or will be able to, insure an Office Holder, and to the extent such law requires the inclusion of a provision permitting such insurance in these Articles, then such provision is deemed to be included and incorporated herein by reference (including, without limitation, in accordance with Section 56h(b)(1) of the Securities Law, if and to the extent applicable, and Section 50P of the Economic Competition Law).

65.   INDEMNITY.

(a)   Subject to the provisions of the Companies Law, the Company may retroactively indemnify an Office Holder of the Company to the maximum extent permitted under applicable law, including with respect to the following liabilities and expenses, provided that such liabilities or expenses were imposed on such Office Holder or incurred by such Office Holder due to an act performed by or an omission of the Office Holder in such Office Holder's capacity as an Office Holder of the Company:

(i)   a financial liability imposed on an Office Holder in favor of another person by any court judgment, including a judgment given as a result of a settlement or an arbitrator's award which has been confirmed by a court;

(ii)   reasonable litigation expenses, including legal fees, expended by the Office Holder as a result of an investigation or proceeding instituted against him or her by an authority authorized to conduct such investigation or proceeding, or in connection with a financial sanction, provided that (1) no indictment (as defined in the Companies Law) was filed against such Office Holder as a result of such investigation or proceeding; and (2) no financial liability in lieu of a criminal proceeding (as defined in the Companies Law) was imposed upon him or her as a result of such investigation or proceeding or if such financial liability was imposed, it was imposed with respect to an offense that does not require proof of criminal intent or in relation to a monetary sanction;

(iii)   reasonable litigation costs, including legal fees, expended by an Office Holder or which were imposed on an Office Holder by a court in proceedings filed against the Office Holder by the Company or in its name or by any other person or in a criminal charge in respect of which the Office Holder was acquitted or in a criminal charge in respect of which the Office Holder was convicted for an offence which did not require proof of criminal intent; and

(iv)   any other event, occurrence, matter or circumstance under any law with respect to which the Company may, or will be able to, indemnify an Office Holder, and to the extent such law requires the inclusion of a provision permitting such indemnity in these Articles, then such provision is deemed to be included and incorporated herein by reference (including, without limitation, in accordance with Section 56h(b)(1) of the Israeli Securities Law, if and to the extent applicable, and Section 50P(b)(2) of the RTP Law).

(b)   Subject to the provisions of the Companies Law, the Company may undertake to indemnify an Office Holder, in advance, with respect to those liabilities and expenses described in the following Articles:

(i)   Sub-Article 65(a)(ii) to 65(a)(iv); and

(ii)   Sub-Article 65(a)(i), provided that:

(1)   the undertaking to indemnify is limited to such events which the Directors shall deem to be foreseeable in light of the operations of the Company at the time that the undertaking to indemnify is made and for such amounts or criterion which the Directors may, at the time of the giving of such undertaking to indemnify, deem to be reasonable under the circumstances; and

(2)   the undertaking to indemnify shall set forth such events which the Directors shall deem to be foreseeable in light of the operations of the Company at the time that the undertaking to indemnify is made, and the amounts and/or criterion which the Directors may, at the time of the giving of such undertaking to indemnify, deem to be reasonable under the circumstances.

66. **EXEMPTION**.

Subject to the provisions of the Companies Law, the Company may, to the maximum extent permitted by law, exempt and release, in advance, any Office Holder from any liability for damages arising out of a breach of a duty of care.

67. **GENERAL**.

(a)   Any amendment to the Companies Law or any other applicable law adversely affecting the right of any Office Holder to be indemnified, insured or exempt pursuant to Articles 64 to 66 and any amendments to Articles 64 to 66 shall be prospective in effect, and shall not affect the Company's obligation or ability to indemnify, insure or exempt an Office Holder for any act or omission occurring prior to such amendment, unless otherwise provided by applicable law.

(b)   The provisions of Articles 64 to 66 shall apply to the maximum extent permitted by law (including, the Companies Law, the Securities Law and the Economic Competition Law); and (ii) are not intended, and shall not be interpreted so as to restrict the Company, in any manner, in respect of the procurement of insurance and/or in respect of indemnification (whether in advance or retroactively) and/or exemption, in favor of any person who is not an Office Holder, including, without limitation, any employee, agent, consultant or contractor of the Company who is not an Office Holder; and/or any Office Holder to the extent that such insurance and/or indemnification is not specifically prohibited under law.

**WINDING UP**

68. **WINDING UP**.

If the Company is wound up, then, subject to applicable law and to the rights of the holders of shares with special rights upon winding up, the assets of the Company available for distribution among the Shareholders shall be distributed to them in proportion to the number of issued and outstanding shares held by each Shareholder.

**NOTICES**

69. **NOTICES**.

(a)   Any written notice or other document may be served by the Company upon any Shareholder either personally, by facsimile, email or other electronic transmission, or by sending it by prepaid mail (airmail if sent internationally) addressed to such Shareholder at his or her address as described in the Register of Shareholders or such other address as the Shareholder may have designated in writing for the receipt of notices and other documents.

(b)   Any written notice or other document may be served by any Shareholder upon the Company by tendering the same in person to the Secretary or the Chief Legal Officer of the Company at the principal office of the Company, by facsimile transmission, or by sending it by prepaid registered mail (airmail if posted outside Israel) to the Company at its Office.

(c)   Any such notice or other document shall be deemed to have been served:

(i)   in the case of mailing, forty-eight (48) hours after it has been posted, or when actually received by the addressee if sooner than forty-eight hours after it has been posted, or

(ii)   in the case of overnight air courier, on the next business day following the day sent, with receipt confirmed by the courier, or when actually received by the addressee if sooner than three business days after it has been sent;

(iii)   in the case of personal delivery, when actually tendered in person, to such addressee;

(iv)   in the case of facsimile, email or other electronic transmission, on the first business day (during normal business hours in place of addressee) on which the sender receives automatic electronic confirmation by the addressee's facsimile machine that such notice was received by the addressee or delivery confirmation from the addressee's email or other communication server.

(d)   If a notice is, in fact, received by the addressee, it shall be deemed to have been duly served, when received, notwithstanding that it was defectively addressed or failed, in some other respect, to comply with the provisions of this Article 69.

(e)   All notices to be given to the Shareholders shall, with respect to any share to which persons are jointly entitled, be given to whichever of such persons is named first in the Register of Shareholders, and any notice so given shall be sufficient notice to the holders of such share.

(f)   Any Shareholder whose address is not described in the Register of Shareholders, and who shall not have designated in writing an address for the receipt of notices, shall not be entitled to receive any notice from the Company.

(g)   Notwithstanding anything to the contrary contained herein, notice by the Company of a General Meeting, containing the information required by applicable law and these Articles to be set forth therein, which is published, within the time otherwise required for giving notice of such meeting, in either or several of the following manners (as applicable) shall be deemed to be notice of such meeting duly given, for the purposes of these Articles, to any Shareholder whose address as registered in the Register of Shareholders (or as designated in writing for the receipt of notices and other documents) is located either inside or outside the State of Israel:

(i)   if the Company's shares are then listed for trading on a national securities exchange in the United States or quoted in an over-the-counter market in the United States, publication of notice of a General Meeting pursuant to a report or a schedule filed with, or furnished to, the SEC pursuant to the Securities Exchange Act of 1934, as amended; and/or

(ii)   on the Company's internet site.

(h)   The mailing or publication date and the record date and/or date of the meeting (as applicable) shall be counted among the days comprising any notice period under the Companies Law and the regulations thereunder.

AMENDMENT

70.   **AMENDMENT**.

Any amendment of these Articles (including pursuant to Article 6(i) and Section Article 26(d)) shall require, in addition to the approval of the General Meeting of shareholders in accordance with these Articles, also the approval of the Board of Directors with the affirmative vote of a majority of the then serving Directors.

71. **FORUM FOR ADJUDICATION OF DISPUTES**.

(a)   Unless the Company consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the exclusive forum for the resolution of any complaint asserting a cause or causes of action arising under the U.S. Securities Act of 1933, as amended, including all causes of action asserted against any defendant to such complaint. For the avoidance of doubt, this provision is intended to benefit and may be enforced by the Company, its officers and directors, the underwriters to any offering giving rise to such complaint, and any other professional or entity whose profession gives authority to a statement made by that person or entity and who has prepared or certified any part of the documents underlying the offering. The foregoing provisions of this Article 71 shall not apply to causes of action arising under the U.S. Securities Exchange Act of 1934, as amended, or any other claim for which the U.S. federal courts have exclusive jurisdiction.

(b)   Unless the Company consents in writing to the selection of an alternative forum, the competent courts in Tel Aviv, Israel shall be the exclusive forum for (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Company to the Company or the Company's shareholders, or (iii) any action asserting a claim arising pursuant to any provision of the Companies Law or the Securities Law or these Articles. Any person or entity purchasing or otherwise acquiring or holding any interest in shares of the Company shall be deemed to have notice of and consented to the provisions of this Article 71.

Any person or entity purchasing or otherwise acquiring or holding any interest in share capital of the Company shall be deemed to have notice of and consented to the provisions of this Article 71.

If any provision or provisions of this Article 71 shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever, (a) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article 71 (including, without limitation, each portion of any paragraph of this Article Tenth containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and (b) the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

\* \* \*

**Exhibit 4.1**



SPECIMEN

# ODDITY

## ODDITY Tech Ltd.

**CLASS A ORDINARY SHARES**

INCORPORATED UNDER THE LAWS OF THE STATE OF ISRAEL

CUSIP
SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

IS THE RECORD HOLDER OF

FULLY PAID AND NON-ASSESSABLE CLASS A ORDINARY SHARES, PAR VALUE NIS 0.001 PER SHARE, OF

ODDITY Tech Ltd.

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. WITNESS the facsimile signatures of its duly authorized officers.

Dated:

CHIEF EXECUTIVE OFFICER

GLOBAL CHIEF FINANCIAL OFFICER

COUNTERSIGNED AND REGISTERED:
AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC
(Brooklyn, NY)
TRANSFER AGENT AND REGISTRAR

By:

AUTHORIZED SIGNATURE

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common
TEN ENT — as tenants by the entireties
JT TEN — as joint tenants with right
    of survivorship and not as
    tenants in common

UNIF GIFT MIN ACT — .........................Custodian.................
                  (Cust)           (Minor)
       Under Uniform Gifts to Minors
       Act ..............................................
                        (State)

Additional abbreviations may also be used though not in the above list.

For Value Received, _____hereby sell, assign and transfer unto

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING POSTAL ZIP CODE, OF ASSIGNEE

Class A Ordinary Shares represented by this Certificate, and do hereby irrevocably constitute and appoint

_____ Attorney
to transfer the said shares on the books of the within named Corporation with full power of substitution in the premises.

Dated _____

X _____

X _____
**NOTICE:** THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED:

THE SIGNATURE(S) MUST BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATIONS AND CREDIT UNIONS WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM), PURSUANT TO S.E.C. RULE 17Ad-15.

**Exhibit 4.2**

*Execution Copy*

**REGISTRATION RIGHTS AGREEMENT**

---

TABLE OF CONTENTS

Page

| | | | |
|---|---|---|---|
| 1. | | Definitions | 1 |
| 2. | | Registration Rights | 3 |
| | 2.1 | Demand Registration | 3 |
| | 2.2 | Company Registration | 5 |
| | 2.3 | Underwriting Requirements | 5 |
| | 2.4 | Obligations of the Company | 7 |
| | 2.5 | Furnish Information | 8 |
| | 2.6 | Expenses of Registration | 8 |
| | 2.7 | Delay of Registration | 8 |
| | 2.8 | Indemnification | 9 |
| | 2.9 | Reports Under Exchange Act | 11 |
| | 2.10 | Limitations on Subsequent Registration Rights | 11 |
| | 2.11 | "Market Stand-off" Agreement | 12 |
| | 2.12 | Termination of Registration Subsequent Registration Rights | 12 |
| 3. | | Miscellaneous | 12 |
| | 3.1 | Successors and Assigns | 12 |
| | 3.2 | Governing Law | 13 |
| | 3.3 | Counterparts | 13 |
| | 3.4 | Titles and Subtitles | 13 |
| | 3.5 | Notices | 13 |
| | 3.6 | Amendments and Waivers | 13 |
| | 3.7 | Severability | 13 |
| | 3.8 | Entire Agreement | 14 |
| | 3.9 | Dispute Resolution | 14 |
| | 3.10 | Delays or Omissions | 15 |

i

**REGISTRATION RIGHTS AGREEMENT**

THIS REGISTRATION RIGHTS AGREEMENT (this "**Agreement**") is made as of this 2nd day of June, 2017 by and between Il Makiage Cosmetics (2013) Ltd., a company organized under the laws of Israel (the "**Company**"), and LCGP3 PRO MAKEUP, L.P., a Delaware limited partnership ("**L Catterton**"), Oran Shilo Investments LP, a limited partnership organized under the laws of the State of Israel ("**Oran Shilo**") and Il Makiage Investments L.P. a limited partnership organized under the laws of Israel ("**IM Investments**"). Each of L Catterton, Oran Shilo and IM Investments shall be referred as "**Investor**" and collectively the "**Investors**".

<u>**RECITALS**</u>

WHEREAS, the Company and the Investors are parties to that certain Share Purchase Agreement of even date herewith (the "**Purchase Agreement**"); and

WHEREAS, the Company and the Investors are parties to that certain Shareholders' Agreement of even date herewith (the "**Shareholders' Agreement**"); and

WHEREAS, in order to induce the Company to enter into the Purchase Agreement and to induce the L Catterton to invest funds in the Company pursuant to the Purchase Agreement, the Investors and the Company hereby agree that this Agreement shall govern the rights of the Investors to cause the Company to register Shares owned by the Investors and shall govern certain other matters as set forth in this Agreement;

NOW, THEREFORE, the parties hereby agree as follows:

1.    <u>Definitions</u>. For purposes of this Agreement:

1.1    "**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including without limitation any general partner, managing member, officer or director of such Person or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such Person.

1.2    "**Applicable Securities Law**" means any statute, law, regulation or rule of a country other than the United States that governs or addresses the sale or registration of securities in such jurisdiction, and the Israeli securities laws.

1.3    "**Damages**" means any loss, damage, claim or liability (joint or several) to which a party hereto may become subject under the Securities Act, the Exchange Act, or other federal or state law or other Applicable Securities Law, insofar as such loss, damage, claim or liability (or any action in respect thereof) arises out of or is based upon: (i) any untrue statement or alleged untrue statement of a material fact contained in any registration statement of the Company, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto; (ii) an omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading; or (iii) any violation or alleged violation by the indemnifying party (or any of its agents or Affiliates) of the Securities Act, the Exchange Act, any state securities law, or other Applicable Securities Law or any rule or regulation promulgated under the Securities Act, the Exchange Act, or any state securities law or other Applicable Securities Law.

1.4    "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

1.5    "**Excluded Registration**" means (i) a registration relating to the sale of securities to employees of the Company or a subsidiary pursuant to a stock option, stock purchase, or similar plan approved by the Board of Directors of the Company; (ii) a registration relating to an SEC Rule 145 transaction; (iii) a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of the Registrable Securities; or (iv) a registration in which the only Shares being registered is Shares issuable upon conversion of debt securities that are also being registered.

1.6    "**Form S-1**" means such form, or Form F-1 if applicable to a non- U.S. issuer, under the Securities Act or any similar form under other Applicable Securities Law as in effect on the date hereof or any successor registration form under the Securities Act subsequently adopted by the SEC.

1.7    "**Form S-3**" means such form, or Form F-3 if applicable to a non- U.S. issuer, under the Securities Act or any similar form under other Applicable Securities Law as in effect on the date hereof or any registration form under the Securities Act subsequently adopted by the SEC that permits incorporation of substantial information by reference to other documents filed by the Company with the SEC.

1.8    "**IPO**" means the Company's first underwritten public offering of its Shares under the Securities Act or other Applicable Securities Law.

1.9    "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

1.10    "**Registrable Securities**" means (i) the Shares owned by Oran Shilo immediately after the Closing of the Purchase Agreement; (ii) the Shares owned by IM Investments immediately after the Closing of the Purchase Agreement; (iii) the Shares purchased by the L Catterton pursuant to the Purchase Agreement; (iv) any shares of capital stock of the Company, or any Shares issued or issuable (directly or indirectly) upon conversion and/or exercise of any other securities of the Company, acquired by the Investors or their Permitted Transferees (as defined in the Shareholders' Agreement) after the date hereof by purchase, assignment or operation of law; and (v) any Shares issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, the Shares referenced in clauses (i) through (iv) above; excluding in all cases, however, any Registrable Securities sold by a Person in a transaction in which the applicable rights under this Agreement are not assigned pursuant to Subsection 3.1, and excluding for purposes of Section 2 any shares for which registration rights have terminated pursuant to Subsection 2.12(c)2.12 of this Agreement.

2

1.11    "**Registrable Securities then outstanding**" means the number of Shares determined by adding the number of Shares outstanding that are Registrable Securities and the number of Shares issuable (directly or indirectly) pursuant to then exercisable and/or convertible securities that are Registrable Securities.

1.12    "**SEC**" means the U.S. Securities and Exchange Commission or any other applicable governmental or quasi-governmental body or agency performing functions similar to the U.S. Securities and Exchange Commission.

1.13    "**SEC Rule 144**" means Rule 144 promulgated by the SEC under the Securities Act.

1.14    "**SEC Rule 145**" means Rule 145 promulgated by the SEC under the Securities Act.

1.15    "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

1.16    "**Selling Expenses**" means all underwriting discounts, selling commissions, and stock transfer taxes applicable to the sale of Registrable Securities, and fees and disbursements of counsel(s) for the Investors, except for the fees and disbursements of the Investors' Counsel(s) borne and paid by the Company as provided in Subsection 2.6.

1.17    "**Shares**" means the ordinary shares of the Company of par value NIS 0.1 each.

Other terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Shareholders' Agreement.

2.    Registration Rights. The Company covenants and agrees as follows:

2.1    Demand Registration.

(a)    Form S-1 Demand. If at any time after the earlier of (i) four (4) years after the date of this Agreement or (ii) one hundred eighty (180) days after the effective date of the registration statement for the IPO, the Company receives a request from any of the Investors that the Company file a Form S-1 registration statement (or similar registration statement or form under Applicable Securities Law) with respect to all or a lesser portion of the Registrable Securities then outstanding, then the Company shall as soon as practicable, and in any event within sixty (60) days after the date such request is given by the respective Investor, file a Form S-1 registration statement under the Securities Act (or similar registration statement or form under Applicable Securities Laws) covering all Registrable Securities that the Investor requested to be registered.

3

(b)    Form S-3 Demand. If at any time when it is eligible to use a Form S-3 registration statement (or similar registration statement or form under Applicable Securities Law), the Company receives a request from any of the Investors that the Company file a Form S-3 registration statement (or similar registration statement or form under Applicable Securities Law) with respect to outstanding Registrable Securities, then the Company shall as soon as practicable, and in any event within forty-five (45) days after the date such request is given by the respective Investor, file a Form S-3 registration statement under the Securities Act covering all Registrable Securities requested to be included in such registration.

(c)    Notwithstanding anything to the contrary, in the event that the IPO will not or is not expected to result in gross proceeds to the Company of at least US $75 million at a per Share price equal to 2.5 times the per Share price (as adjusted for any Recapitalization Event) paid by L Catterton for the L Catterton SPA Shares, then the Company shall be entitled to refuse to register any Registrable Securities pursuant to Subsection 2.1(a) above and none of the Investors shall have any claim whatsoever in connection with such refusal.

(d)    Furthermore and notwithstanding the foregoing obligations, if the Company furnishes to the requesting Investor a certificate signed by the Company's chief executive officer stating that in the good faith judgment of the Company's Board of Directors it would be materially detrimental to the Company and its stockholders for such registration statement to either become effective or remain effective for as long as such registration statement otherwise would be required to remain effective, because such action would (i) materially interfere with a significant acquisition, corporate reorganization, or other similar transaction involving the Company; (ii) require premature disclosure of material information that the Company has a bona fide business purpose for preserving as confidential; or (iii) render the Company unable to comply with requirements under the Securities Act, Exchange Act or other Applicable Securities Law, then the Company shall have the right to defer taking action with respect to such filing, and any time periods with respect to filing or effectiveness thereof shall be tolled correspondingly, for a period of not more than ninety (90) days after the request of the respective Investor is given; provided, however, that the Company may not invoke this right more than once in any twelve (12) month period and the period during which the Company defers taking action with respect to such filing shall not exceed one hundred twenty (120) days; and provided further that the Company shall not register any securities for its own account or that of any other stockholder during such ninety (90) day period other than an Excluded Registration.

4

(e)      The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to Subsection 2.1(a) (i) during the period that is sixty (60) days before the Company's good faith estimate of the date of filing of, and ending on a date that is one hundred eighty (180) days after the effective date of, a Company-initiated registration, provided that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective; (ii) after the Company has effected two (2) registrations pursuant to Subsection 2.1(a); or (iii) if an Investor proposes to dispose of shares of Registrable Securities that may be immediately registered on Form S-3 pursuant to a request made pursuant to Subsection 2.1(b). The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to Subsection 2.1(b) (i) during the period that is thirty (30) days before the Company's good faith estimate of the date of filing of, and ending on a date that is ninety (90) days after the effective date of, a Company-initiated registration, provided that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective; or (ii) if the Company has effected two (2) registrations pursuant to Subsection 2.1(b). A registration shall not be counted as "effected" for purposes of this Subsection 2.1(e) until such time as the applicable registration statement has been declared effective by the SEC.

2.2      Company Registration. If the Company proposes to register (including, for this purpose, a registration effected by the Company for stockholders other than the Investors) any of its Shares under the Securities Act or other Applicable Securities Law in connection with the public offering of such securities solely for cash (other than in an Excluded Registration), the Company shall, at such time, promptly give the Investors notice of such registration. Upon the request of an Investor given within twenty (20) days after such notice is given by the Company, the Company shall, subject to the provisions of Subsection 2.3, cause to be registered all of the Registrable Securities that each such Investor has requested to be included in such registration. The Company shall have the right to terminate or withdraw any registration initiated by it under this Subsection 2.2 before the effective date of such registration, whether or not an Investor has elected to include Registrable Securities in such registration. The expenses (other than Selling Expenses) of such withdrawn registration shall be borne by the Company in accordance with Subsection 2.6.

2.3      Underwriting Requirements.

(a)      If, pursuant to Subsection 2.1, an Investor intends to distribute the Registrable Securities covered by its request by means of an underwriting, it shall so advise the Company as a part of its request made pursuant to Subsection 2.1. The underwriter(s) will be selected jointly by the Company and such Investor(s). In such event, the right of such Investor(s) to include the such Investor's Registrable Securities in such registration shall be conditioned upon the Investor's participation in such underwriting and the inclusion of such Investor's Registrable Securities in the underwriting to the extent provided herein. The respective Investors shall (together with the Company as provided in Subsection 2.4(e)) enter into an underwriting agreement in customary form with the underwriter(s) selected for such underwriting. Notwithstanding any other provision of this Subsection 2.3, if the managing underwriter advises the respective Investors in writing that marketing factors require a limitation on the number of shares to be underwritten, then the number of Registrable Securities held by the respective Investors to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting, and then they shall be reduced on a pro-rata basis among all Investors that asked to participate in the registration (based on their pro-rata holdings in Registrable Securities at that time) provided that no Investor will be required to register more than the number of Registrable Securities that it asked to register.

5

(b)     In connection with any offering involving an underwriting of shares of the Company's capital stock pursuant to Subsection 2.2, the Company shall not be required to include any of the Investor's Registrable Securities in such underwriting unless the respective Investor accepts the terms of the underwriting as agreed upon between the Company and its underwriters, and then only in such quantity as the underwriters in their sole discretion determine will not jeopardize the success of the offering by the Company. If the total number of securities, including Registrable Securities, requested by stockholders to be included in such offering exceeds the number of securities to be sold (other than by the Company) that the underwriters in their reasonable discretion determine is compatible with the success of the offering, then the Company shall be required to include in the offering only that number of such securities, including Registrable Securities, which the underwriters and the Company in their sole discretion determine will not jeopardize the success of the offering. If the underwriters determined that less than all of the Registrable Securities requested to be registered can be included in such offering, then in no event shall (i) the number of Registrable Securities included in the offering be reduced unless all other securities (other than securities to be sold by the Company) are first entirely excluded from the offering, or (ii) the number of Registrable Securities included in the offering be reduced below twenty-five percent (25%) of the total number of securities included in such offering, unless such offering is the IPO, in which case the Investors may be excluded further if the underwriters make the determination described above and no other stockholder's securities are included in such offering. When more than one Investor asks to participate in the registration, the Registrable Securities will be excluded on a pro-rata basis in accordance with the provisions of Subsection 2.3(b) above.

(c)     For purposes of Subsection 2.1, a registration shall not be counted as "effected" if, as a result of an exercise of the underwriter's cutback provisions in Subsection 2.3(a), fewer than fifty percent (50%) of the total number of Registrable Securities that the Investors requested to be included in such registration statement are actually included. For the purpose of Subsection 2.1, any request for registration provided to the Company by an Investor will be sent to the other Investors, and each such other Investor will have thirty (30) days from the receipt of Company's notice, to notify the Company whether it wishes to register any of its Registrable Securities and the number of Registrable Securities it asks to register.

2.4    Obligations of the Company. Whenever required under this Section 2 to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a)    prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its commercially reasonable efforts to cause such registration statement to become effective and, upon the request of an Investor, keep such registration statement effective for a period of up to one hundred twenty (120) days or, if earlier, until the distribution contemplated in the registration statement has been completed; provided, however, that (i) such one hundred twenty (120) day period shall be extended for a period of time equal to the period the respective Investor refrains, at the request of an underwriter of Shares (or other securities) of the Company, from selling any securities included in such registration, and (ii) in the case of any registration of Registrable Securities on Form S-3 that are intended to be offered on a continuous or delayed basis, subject to compliance with applicable SEC rules, such one hundred twenty (120) day period shall be extended for up to sixty (60) days, if necessary, to keep the registration statement effective until all such Registrable Securities are sold;

(b)    prepare and file with the SEC such amendments and supplements to such registration statement, and the prospectus used in connection with such registration statement, as may be necessary to comply with the Securities Act or other Applicable Securities Law in order to enable the disposition of all securities covered by such registration statement;

(c)    furnish to the Investors a prospectus, including a preliminary prospectus, as required by the Securities Act or other Applicable Securities Law, and such other documents as the Investors may reasonably request in order to facilitate the disposition of the Registrable Securities;

(d)    use its commercially reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or blue-sky laws of such jurisdictions as shall be reasonably requested by the Investor; provided that the Company shall not be required to qualify to do business or to file a general consent to service of process in any such states or jurisdictions, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act or other Applicable Securities Law;

(e)    in the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the underwriter(s) of such offering;

(f)    use its commercially reasonable efforts to cause all such Registrable Securities covered by such registration statement to be listed on a national securities exchange or trading system and each securities exchange and trading system (if any) on which similar securities issued by the Company are then listed;

(g)    provide a transfer agent and registrar for all Registrable Securities registered pursuant to this Agreement and provide a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

7

(h)    make available for inspection by the Investors, any managing underwriter participating in any disposition pursuant to such registration statement, and any attorney or accountant or other agent retained by any such underwriter or selected by the Investors, all financial and other records, pertinent corporate documents, and properties of the Company, and cause the Company's officers, directors, employees, and independent accountants to supply all information reasonably requested by the Investors or any such underwriter, attorney, accountant, or agent, in each case, as necessary or advisable to verify the accuracy of the information in such registration statement and to conduct appropriate due diligence in connection therewith;

(i)    notify the Investors, promptly after the Company receives notice thereof, of the time when such registration statement has been declared effective or a supplement to any prospectus forming a part of such registration statement has been filed; and

(j)    after such registration statement becomes effective, notify each of the Investors of any request by the SEC that the Company amend or supplement such registration statement or prospectus.

In addition, the Company shall ensure that, at all times after any registration statement covering a public offering of securities of the Company under the Securities Act or other Applicable Securities Law shall have become effective, its insider trading policy shall provide that the Company's directors may implement a trading program under Rule 10b5-1 of the Exchange Act or other Applicable Securities Law.

2.5    Furnish Information. It shall be a condition precedent to the obligations of the Company to take any action pursuant to this Section 2 with respect to the Registrable Securities of the Investors that each of the Investors shall furnish to the Company such information regarding itself, the Registrable Securities held by it, and the intended method of disposition of such securities as is reasonably required to effect the registration of the Investor's Registrable Securities.

2.6    Expenses of Registration. All expenses (other than Selling Expenses) incurred in connection with registrations, filings, or qualifications pursuant to Section 2, including all registration, filing, and qualification fees; printers' and accounting fees; fees and disbursements of counsel for the Company; and the reasonable fees and disbursements of one counsel for each of the Investors ("**Investor Counsel**"), shall be borne and paid by the Company. All Selling Expenses relating to Registrable Securities registered pursuant to this Section 2 shall be borne and paid by the relevant Investor.

2.7    Delay of Registration. The Investors shall not have any right to obtain or seek an injunction restraining or otherwise delaying any registration pursuant to this Agreement as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 2.

8

2.8     Indemnification. If any Registrable Securities are included in a registration statement under this Section 2:

(a)     To the extent permitted by law, the Company will indemnify and hold harmless the each Investor, and the partners, members, managers, officers, directors, and stockholders of such Investor; legal counsel and accountants for such Investor; any underwriter (as defined in the Securities Act) for such Investor; and each Person, if any, who controls such Investor or underwriter within the meaning of the Securities Act or the Exchange Act, against any Damages actually incurred by them which are as a result of default or omission of the Company in breach of any Applicable Securities Law, and the Company will pay to such Investor, underwriter, controlling Person, or other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which Damages may result, as such expenses are incurred; provided, however, that the indemnity agreement contained in this Subsection 2.8(a) shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of the Company, which consent shall not be unreasonably withheld, nor shall the Company be liable for any Damages to the extent that they arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of the Investor, underwriter, controlling Person, or other aforementioned Person expressly for use in connection with such registration. For the avoidance of doubt, the Company shall not be liable for any Damages to an Investor that arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of such Investor for use in connection with a registration.

(b)     To the extent permitted by law, each Investor will indemnify and hold harmless the Company, and each of its directors, each of its officers who has signed the registration statement, each Person (if any), who controls the Company within the meaning of the Securities Act, legal counsel and accountants for the Company, any underwriter (as defined in the Securities Act), and any controlling Person of any such underwriter, against any Damages, in each case only to the extent that such Damages arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of such Investor expressly for use in connection with such registration; and such Investor will pay to the Company and each other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which Damages may result, as such expenses are incurred; provided, however, that the indemnity agreement contained in this Subsection 2.8(b) shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of such Investor, which consent shall not be unreasonably withheld; and provided further that in no event shall the aggregate amounts payable by such Investor by way of indemnity under Subsections 2.8(b) and 2.8(d) exceed the proceeds from the offering received by such Investor (net of any Selling Expenses paid by such Investor), except in the case of fraud or willful misconduct by the Investor.

9

(c)    Promptly after receipt by an indemnified party under this Subsection 2.8 of notice of the commencement of any action (including any governmental action) for which a party may be entitled to indemnification hereunder, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Subsection 2.8, give the indemnifying party notice of the commencement thereof. The indemnifying party shall have the right to participate in such action and, to the extent the indemnifying party so desires, participate jointly with any other indemnifying party to which notice has been given, and to assume the defense thereof with counsel mutually satisfactory to the parties; provided, however, that an indemnified party (together with all other indemnified parties that may be represented without conflict by one counsel) shall have the right to retain one separate counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such action. The failure to give notice to the indemnifying party within a reasonable time of the commencement of any such action shall relieve such indemnifying party of any liability to the indemnified party under this Subsection 2.8, to the extent that such failure materially prejudices the indemnifying party's ability to defend such action.

(d)    To provide for just and equitable contribution to joint liability under the Securities Act or any Applicable Securities Law in any case in which either: (i) any party otherwise entitled to indemnification hereunder makes a claim for indemnification pursuant to this Subsection 2.8 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case, notwithstanding the fact that this Subsection 2.8 provides for indemnification in such case, or (ii) contribution under the Securities Act or any Applicable Securities Law may be required on the part of any party hereto for which indemnification is provided under this Subsection 2.8, then, and in each such case, such parties will contribute to the aggregate losses, claims, damages, liabilities, or expenses to which they may be subject (after contribution from others) in such proportion as is appropriate to reflect the relative fault of each of the indemnifying party and the indemnified party in connection with the statements, omissions, or other actions that resulted in such loss, claim, damage, liability, or expense, as well as to reflect any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or allegedly untrue statement of a material fact, or the omission or alleged omission of a material fact, relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission; provided, however, that, in any such case (x) an Investor will not be required to contribute any amount in excess of the public offering price of all such Registrable Securities offered and sold by such Investor pursuant to such registration statement, and (y) no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation; and provided further that in no event shall an Investor's liability pursuant to this Subsection 2.8(d), when combined with the amounts paid or payable by such Investor pursuant to Subsection 2.8(b), exceed the proceeds from the offering received by such Investor (net of any Selling Expenses paid by such Investor), except in the case of willful misconduct or fraud by the Investor.

10

(e)    Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

(f)    Unless otherwise superseded by an underwriting agreement entered into in connection with the underwritten public offering, the obligations of the Company and the Investor under this Subsection 2.8 shall survive the completion of any offering of Registrable Securities in a registration under this Section 2, and otherwise shall survive the termination of this Agreement.

2.9    Reports Under Exchange Act. With a view to making available to the Investors the benefits of SEC Rule 144 and any other rule or regulation of the SEC or similar rules under an Applicable Securities Law that may at any time permit the Investors to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3 or other similar form under an Applicable Securities Law, the Company shall:

(a)    make and keep available adequate current public information, as those terms are understood and defined in SEC Rule 144 or Applicable Securities Law, at all times after the effective date of the registration statement filed by the Company for the IPO;

(b)    use commercially reasonable efforts to file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act, the Exchange Act (at any time after the Company has become subject to such reporting requirements) or Applicable Securities Law; and

(c)    furnish to the Investors, so long as any such Investor owns any Registrable Securities, forthwith upon request (i) to the extent accurate, a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144 (at any time after ninety (90) days after the effective date of the registration statement filed by the Company for the IPO), the Securities Act, the Exchange Act (at any time after the Company has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after the Company so qualifies), and any other Applicable Securities Law and (ii) such other information as may be reasonably requested in availing the Investors of any rule or regulation of the SEC that permits the selling of any such securities without registration (at any time after the Company has become subject to the reporting requirements under the Exchange Act) or pursuant to Form S-3 (at any time after the Company so qualifies to use such form) or other similar form under an Applicable Securities Law.

2.10    Limitations on Subsequent Registration Rights. From and after the date of this Agreement, the Company shall not, without the prior written consent of L Catterton, enter into any agreement with any holder or prospective holder of any securities of the Company that would allow such holder or prospective holder to include such securities in any registration unless, under the terms of such agreement, such holder or prospective holder may include such securities in any such registration on a pro rata basis with the Registrable Securities of the Investors that are included, and not on a priority basis (such pro-rata basis to be calculated based on the respective holdings in the Company of the shareholders who are entitled to the registration rights).

11

2.11    "Market Stand-off" Agreement.

(a)    Each of the Investors, if requested by the managing underwriter of a firmly underwritten IPO by the Company of its Shares, hereby agrees that, for a period of not more than one hundred eighty (180) days following the effective date of a registration statement for the Company's IPO, or not more than ninety (90) days for any other registration statement, it will not (i) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Shares, or any securities convertible into or exercisable or exchangeable for Shares, or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Shares, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Shares or such other securities, in cash or otherwise, as long as all officers, directors and five percent (5%) shareholders of the Company are bound by similar provisions. In connection with this Section 2.11, the Investor shall execute the form of lock-up agreement as may be requested by the managing underwriters, as long as all officers, directors and five percent (5%) or greater shareholders of the Company are bound by similar provisions.

(b)    The Company may impose stop-transfer instructions with respect to Shares or other securities subject to the foregoing restrictions until the end of the applicable lock-up period.

(c)    If any of the Investor receives written notice from the Company regarding the Company's plans to file a registration statement, then such Investor shall treat such notice confidentially and shall not disclose such information to any Person other than as necessary to exercise its rights under this Agreement.

2.12    Termination of Registration Subsequent Registration Rights. The right of the Investors to request registration or inclusion of Registrable Securities in any registration pursuant to Subsections 2.1 or 2.2 shall terminate upon the third (3rd) anniversary of the IPO.

3.    Miscellaneous.

3.1    Successors and Assigns. The rights under this Agreement may be assigned (but only with all related obligations) only together with the Shares pursuant to the relevant terms of the Shareholders' Agreement and the Company's Articles of Association. The terms and conditions of this Agreement inure to the benefit of and are binding upon the respective successors and permitted assignees of the Investors. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assignees any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

3.2     Governing Law. This Agreement shall be governed by the laws of The State of Israel.

3.3     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

3.4     Titles and Subtitles. The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement.

3.5     Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or (i) personal delivery to the party to be notified; (ii) when sent, if sent by electronic mail or facsimile during the recipient's normal business hours, and if not sent during normal business hours, then on the recipient's next business day; or (iii) one (1) business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next-day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their addresses as set forth on the signature page hereto, or to the principal office of the Company and to the attention of the Chief Executive Officer, in the case of the Company, Oran Shilo or IM Investments, or to such email address, facsimile number, or address as subsequently modified by written notice given in accordance with this Subsection 3.5. If notice is given to the Company, a copy (which shall not constitute a notice) shall also be sent to Herzog Fox & Neeman, Asia House, 4 Weizmann St., Tel Aviv 6423904 Israel, Attn: Ran Hai or Itay Lavi, ranh@hfn.co.il, lavii@hfn.co.il, and if notice is given to L Catterton, a copy (which shall not constitute a notice) shall also be given to Barack Ferrazzano Kirschbaum & Nagelberg LLP, 200 West Madison Street, Suite 3900, Chicago, Illinois 60606, Attn: Andrew R. Grossmann, Esq., andrew.grossmann@bfkn.com.

3.6     Amendments and Waivers. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with the written consent of the Company and the Investors;. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

3.7     Severability. In case any one or more of the provisions contained in this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and such invalid, illegal, or unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

13

3.8      Entire Agreement. This Agreement constitutes the full and entire understanding and agreement among the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

3.9      Dispute Resolution. Any unresolved controversy or claim arising out of or relating to this Agreement shall be submitted to arbitration at the request of, and upon written notice by, any disputing Party and shall be finally determined by arbitration pursuant to the rules of the London Court of International Arbitration ("**LCIA**") which rules are deemed to be incorporated by reference into this clause. The seat or legal place of arbitration shall be London, England, and the arbitration proceedings shall take place in London, England, before a panel of by one arbitrator mutually agreed upon by the Parties. If no agreement can be reached within fourteen (14) days after names of potential arbitrators have been proposed by the LCIA, the dispute shall be submitted to one arbitrator having reasonable experience in corporate finance transactions of the type provided for in this Agreement and shall be chosen by the LCIA in accordance with its rules. The decision of the arbitrator shall be binding and final on all the parties and not be subject to any appeal under any Law governing such procedures in respect of such arbitration proceedings. If any witness required for such proceedings is located in a jurisdiction outside of London (a "**Remote Location**"), the relevant Parties will meet with the arbitrator at the time of the proceeding to agree on an acceptable process of obtaining such witness's testimony, which may include taking testimony in such Remote Location via a live hearing, video or other recording, video conference or affidavit. The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled, provided however that: (i) the prevailing party's entitlement for reimbursement of attorney's fees, costs and disbursements shall be linked to the proportion of such party's success in the arbitration, such that such party's entitlement to reimbursement shall be equal to its reasonable attorney's fees, costs and disbursements multiplied by a fraction (expressed as a percentage), the numerator of which is equal to the actual monetary award determined pursuant to the arbitration, and the denominator of which is equal to the initiating party's monetary claim. For example, if L Catterton's claim is for a monetary damage of US$ 500,000 and the arbitration award is for US$ 100,000, then L Catterton's entitlement for reimbursement as aforementioned shall be 20% of its reasonable attorney's fees, costs and disbursements; and (ii) in any event any such reimbursement of attorney's fees, costs and disbursements shall be limited to a maximum amount of US$ 500,000. For the avoidance of doubt and notwithstanding the foregoing, this provision does not limit any party's right to seek enforcement of an arbitral award in any court having jurisdiction over the subject-matter and the parties.

14

3.10 <u>Delays or Omissions</u>. No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power, or remedy of such non-breaching or non-defaulting party, nor shall it be construed to be a waiver of or acquiescence to any such breach or default, or to any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. All remedies, whether under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

[Remainder of Page Intentionally Left Blank]

15

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

IL MAKIAGE COSMETICS, (2013) LTD.

By:      /s/ Oran Holtzman
Name:    Oran Holtzman
Title:    CEO

Address:    8 Haharash St., Tel Aviv, Israel
Fax:        +972-8-9298000
Email:      oran@ilmakiage.com

LCGP3 PRO MAKEUP, L.P.

By: CGP3 Managers, L.L.C., its general partner

Name:
Title:

Address:    599 West Putnam Avenue
            Greenwich, CT 06830
Fax:        +1-203-629-4903
Email:      michaelf@catterton.com

*Signature Page to Registration Rights Agreement*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

IL MAKIAGE COSMETICS (2013) LTD.

By: _____
Name: _____
Title: _____

Address: _____
_____
_____
Fax: _____
Email: _____

LCGP3 PRO MAKEUP, L.P.
By: CGP3 Managers, L.L.C.
Its: General Partner

By: _____ /s/ Michael Farello _____
Name: _____ Michael Farello _____
Title: _____ Authorized Person _____

Address:     599 West Putnam Avenue
             Greenwich, CT 06830
Fax:         203-629-4903
Email:       michaelf@catterton.com

*Signature Page to Registration Rights Agreement*

IL MAKIAGE INVESTMENTS L.P.

By: /s/ Oran holtzman
Name: Oran Holtzman
Title: CEO

 Address: 8 Haharash St., Tel Aviv, Israel
 Fax: +972-8-9298000
 Email: oran@ilmakiage.com

ORAN SHILO INVESTMENTS L.P.

By: /s/ Oran holtzman
Name: Oran Holtzman
Title: CEO

 Address: 8 Haharash St., Tel Aviv, Israel
 Fax: +972-8-9298000
 Email: oran@ilmakiage.com

*Signature Page to Registration Rights Agreement*

**INDEMNIFICATION AGREEMENT**

THIS INDEMNIFICATION AGREEMENT (the "**Agreement**"), dated as of _____, 20__, is entered into by and between ODDITY Tech Ltd., an Israeli company whose address is 8 Haharash St., Tel-Aviv-Jaffa, Israel (the "**Company**"), and the undersigned Director or Officer of the Company whose name appears on the signature page hereto officer (the "**Indemnitee**").

**WHEREAS**,    Indemnitee is an Office Holder ("*Nosse Misra*"), as such term is defined in the Companies Law, 5759-1999, as amended (the "**Office Holder**" and the "**Companies Law**" respectively), of the Company;

**WHEREAS**,    both the Company and Indemnitee recognize the increased risk of litigation and other claims being asserted against Office Holders of companies having their securities publicly traded;

**WHEREAS**,    the Amended and Restated Articles of Association of the Company (the "**Articles of Association**") authorize the Company to indemnify and advance expenses to its Office Holders and provide for insurance and exculpation to its Office Holders, in each case, to the fullest extent permitted by applicable law and subject to the limitations set out in the Company's compensation policy as shall be approved from time to time;

**WHEREAS**,    the Company has determined that it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify, and to advance expenses on behalf of, such persons, so that they will serve or continue to serve the Company free from undue concern that they will not be so indemnified;

**WHEREAS,**    the entry by this Company to this Agreement was approved by the competent organs of the Company; and

**WHEREAS**,    in recognition of Indemnitee's need for substantial protection against personal liability in order to assure Indemnitee's continued service to the Company in an effective manner and, in part, in order to provide Indemnitee with specific contractual assurance that the indemnification, insurance and exculpation afforded by the Articles of Association will be available to Indemnitee, the Company wishes to undertake in this Agreement for the indemnification of and the advancing of expenses to Indemnitee and as set forth in this Agreement and provide for insurance and exculpation of Indemnitee as set forth in this Agreement.

**NOW, THEREFORE**, the parties hereto agree as follows:

1.    **INDEMNIFICATION.**

1.1.  The Company hereby undertakes to indemnify Indemnitee to the fullest extent permitted by applicable law for any liability and expense specified in Sections 1.1.1 through 1.1.4 below, imposed on Indemnitee due to or in connection with an act performed by such Indemnitee, either prior to or after the date hereof, in Indemnitee's capacity as an Office Holder, including, without limitation, as a director, officer, employee, agent or fiduciary of the Company, any subsidiary thereof or any other corporation, collaboration, partnership, joint venture, trust or other enterprise, in which Indemnitee serves at any time at the request of the Company (the "**Corporate Capacity**"). The term "act performed in Indemnitee's capacity as an Office Holder" shall include, without limitation, any act, omission or failure to act and any other circumstances relating to or arising from Indemnitee's service in a Corporate Capacity. Notwithstanding the foregoing, in the event that the Office Holder is the beneficiary of an indemnification undertaking provided by a subsidiary of the Company or any other entity with respect to his or her Corporate Capacity with such subsidiary or entity, then the indemnification obligations of the Company hereunder with respect to such Corporate Capacity shall only apply to the extent that the indemnification by such subsidiary or other entity does not actually fully cover the indemnifiable liabilities and expenses relating thereto. The following shall be hereinafter referred to as "**Indemnifiable Events**":

1.1.1.   Financial liability imposed on Indemnitee in favor of any person pursuant to a judgment, including a judgment rendered in the context of a settlement or an arbitrator's award approved by a court. For purposes of Section 1 of this Agreement, the term "**person**" shall include, without limitation, a natural person, firm, partnership, joint venture, trust, company, corporation, limited liability entity, unincorporated organization, estate, government, municipality, or any political, governmental, regulatory or similar agency or body;

1.1.2.   Reasonable Expenses (as defined below) expended by Indemnitee as a result of an investigation or any proceeding instituted against the Indemnitee by an authority that is authorized to conduct such investigation or proceeding, and that was concluded without filing an indictment against the Indemnitee and without imposing on the Indemnitee a financial liability in lieu of a criminal proceeding, or that was concluded without filing an indictment against the Indemnitee but imposing a financial liability in lieu of a criminal proceeding in an offence that does not require proof of *mens rea*, or in connection with a financial sanction. In this section "conclusion of a proceeding without filing an indictment in a matter in which a criminal investigation has been instigated" and "financial liability in lieu of a criminal proceeding" shall have the meaning assigned to such terms under the Companies Law, and the term "financial sanction" shall mean such term as referred to in Section 260(a)(1a) of the Companies Law;

1.1.3.   Reasonable Expenses expended by or imposed on Indemnitee by a court, in a proceeding instituted against Indemnitee by the Company or on its behalf or by another person, or in a criminal charge from which Indemnitee was acquitted or in which Indemnitee convicted of an offence that does not require proof of *mens rea*; and

1.1.4.   Any other event, occurrence, matter or circumstances under any law with respect to which the Company may, or will be able to, indemnify an Office Holder (including, without limitation, in accordance with Section 56h(b)(1) of the Israeli Securities Law 5728-1968 (the "**Israeli Securities Law**"), if applicable, and Section 50P(b)(2) of the Israeli Economic Competition Law, 5758-1988 (the "**Economic Competition Law**")).

For the purpose of this Agreement, "**Expenses**" shall include, without limitation, legal fees and all other costs, expenses and obligations paid or incurred by Indemnitee in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness in or participate in any claim, action, suit, proceeding, alternative dispute resolution mechanism, hearing, inquiry or investigation relating to any matter for which indemnification hereunder may be provided. Expenses shall be considered paid or incurred by Indemnitee at such time as Indemnitee is required to pay or incur such cost or expenses, including upon receipt of an invoice or payment demand. The Company shall pay the Expenses in accordance with the provisions of Section 1.3.

1.2. Notwithstanding anything herein to the contrary, the Company's undertaking to indemnify the Indemnitee under Section 1.1.1 shall only be with respect to events described in **Exhibit A** hereto. The Board of Directors of the Company (the "**Board**") has determined that the categories of events listed in Exhibit A are foreseeable in light of the operations of the Company. The maximum amount of indemnification payable by the Company under Section 1.1.1 with respect to the specific events described in Exhibit A during any period of five years, shall be as set forth in Exhibit A hereto (the "**Limit Amount**"). If the Company undertook to indemnify multiple persons under agreements similar to this Agreement (the "**Indemnifiable Persons**") the Limit Amount for the five year period commencing on the closing of the first issuance and sale of the Company's ordinary shares to the public, pursuant to an effective registration statement under the United States Securities Act 1933, as amended, or the securities law of any other jurisdiction, and for every subsequent five year period, shall apply to all Indemnifiable Persons, in the aggregate, and if the Limit Amount is insufficient to cover all the indemnity amounts payable with respect to all Indemnifiable Persons during the relevant five year period, then such amount shall be allocated to such Indemnifiable Persons pro rata according to the percentage of their culpability, as finally determined by a court in the relevant claim, or, absent such determination or in the event such persons are parties to different claims, based on an equal pro rata allocation among such Indemnifiable Persons. The Limit Amount payable by the Company as described in Exhibit A is deemed by the Company to be reasonable in light of the circumstances. The indemnification provided under Section 1.1.1 herein shall not be subject to the limitations imposed by this Section 1.2 and Exhibit A if and to the extent such limits do not or are no longer required by the Companies Law.

1.3. If so requested by Indemnitee in writing, and subject to the Company's repayment and reimbursements rights set forth in Sections 3 and 5 below, the Company shall pay amounts to cover Indemnitee's Expenses with respect to which Indemnitee is entitled to be indemnified under Section 1.1 above, as and when incurred. The payments of such amounts shall be made by the Company directly to the Indemnitee's legal and other advisors, as soon as practicable, but in any event no later than fifteen (15) days after written demand by such Indemnitee therefor to the Company, and any such payment shall be deemed to constitute indemnification hereunder. As part of the aforementioned undertaking, the Company will make available to Indemnitee any security or guarantee that Indemnitee may be required to post in accordance with an interim decision given by a court, governmental or administrative body, or an arbitrator, including for the purpose of substituting liens imposed on Indemnitee's assets.

1.4. The Company's obligation to indemnify Indemnitee and advance Expenses in accordance with this Agreement shall be for such period (the "**Indemnification Period**") as Indemnitee shall be subject to any actual, possible or threatened claim, action, suit, demand or proceeding or any inquiry or investigation, whether civil, criminal or investigative, arising out of the Indemnitee's service in the Corporate Capacity as described in Section 1.1 above, whether or not Indemnitee is still serving in such position.

1.5. The Company undertakes that, subject to the mandatory limitations under applicable law, as long as it may be obligated to provide indemnification and advance Expenses under this Agreement, the Company will purchase and maintain in effect directors and officers liability insurance, which will include coverage for the benefit of the Indemnitee, providing coverage in amounts as reasonably determined by the Board; provided that, the Company shall have no obligation to obtain or maintain directors and officers insurance policy if the Company determines in good faith that such insurance is not reasonably available, the premium costs for such insurance are disproportionate to the amount of coverage provided, or the coverage provided by such insurance is so limited by exclusions that it provides an insufficient benefit. The Company hereby undertakes to notify the Indemnitee 30 days prior to the expiration or termination of the directors and officers liability insurance.

1.6. The Company undertakes to give prompt written notice of the commencement of any claim hereunder to the insurers in accordance with the procedures set forth in each of the policies. The Company shall thereafter diligently take actions reasonably necessary under the circumstances to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such action, suit, proceeding, inquiry or investigation in accordance with the terms of such policies. The above shall not derogate from Company's authority to freely negotiate or reach any compromise with the insurer which is reasonable at the Company's sole discretion provided that the Company shall act in good faith and in a diligent manner.

1.7. This agreement and the undertakings of the Company thereunder replace and come in lieu of any previous undertakings and agreements between the Company and the Office Holder relating to the indemnification of the Office Holder by the Company and such agreements and undertakings shall be terminated and shall have no force or effect starting from the date of this Agreement.

**2.   SPECIFIC LIMITATIONS ON INDEMNIFICATION.**

Notwithstanding anything to the contrary in this Agreement, the Company shall not indemnify or advance Expenses to Indemnitee with respect to (i) any act, event or circumstance with respect to which it is prohibited to do so under applicable law, or (ii) a counter claim made by the Company or in its name in connection with a claim against the Company filed by the Indemnitee.

**3.   REPAYMENT OF EXPENSES.**

3.1. In the event that the Company provides or is required to provide indemnification with respect to Expenses hereunder and at any time thereafter the Company determines, based on advice from its legal counsel, that the Indemnitee was not entitled to such payments, the amounts so indemnified by the Company will be promptly repaid by Indemnitee, unless the Indemnitee disputes the Company's determination, in which case the Indemnitee's obligation to repay to the Company shall be postponed until such dispute is resolved.

3.2. Indemnitee's obligation to repay to the Company for any Expenses or other sums paid hereunder shall be deemed as a loan given to Indemnitee by the Company subject to the minimum interest rate prescribed by Section 3(9) of the Income Tax Ordinance [New Version], 1961, or any other legislation replacing it, which is not considered a taxable benefit.

**4.   SUBROGATION.**

In the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all documents required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

**5.   REIMBURSEMENT.**

The Company shall not be liable under this Agreement to make any payment in connection with any Indemnifiable Event to the extent Indemnitee has otherwise actually received payment under any insurance policy or otherwise (without any obligation of Indemnitee to repay any such amount) of the amounts otherwise indemnifiable hereunder. Any amounts paid to Indemnitee under such insurance policy or otherwise after the Company has indemnified Indemnitee for such liability or Expense shall be repaid to the Company promptly upon receipt by Indemnitee, in accordance with the terms set forth in Section 3.2.

The Company hereby acknowledges that the Indemnitee has now or may have in the future certain rights to indemnification, advancement of expenses and/or insurance provided by third parties (the "**Third Party Indemnitor**"), and the Company hereby agrees (i) that the Company is the indemnitor of first resort (i.e., its obligations to the Indemnitee are primary and any obligation of any Third Party Indemnitor to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Indemnitee are secondary), (ii) it shall be required to advance the full amount of expenses incurred by the Indemnitee and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the fullest extent legally permitted and as required by the terms of this Agreement and/or the Articles of Association (or any other agreement between the Company and the Indemnitee), without regard to any rights the Indemnitee may have against the Third Party Indemnitors, and (iii) that it irrevocably waives, relinquishes and releases any Third Party Indemnitor from any and all claims against any Third Party Indemnitor for contribution, subrogation or any other recovery of any kind of respect of the subject matters of this Agreement. Without altering or expanding any of the Company's indemnification obligations hereunder, the Company further agrees that no advancement or payment by any Third Party Indemnitor on the Indemnitee's behalf with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and any Third Party Indemnitor shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of the Indemnitee against the Company. The Company and the Indemnitee agree that the Third Party Indemnitors are express third party beneficiaries of the terms of this Section 5.

6.  **EFFECTIVENESS.**

The Company represents and warrants that this Agreement is valid, binding and enforceable in accordance with its terms and was duly adopted and approved by the Company, and shall be in full force and effect immediately upon its execution.

7.  **NOTIFICATION AND DEFENSE OF CLAIM.**

Indemnitee shall notify the Company of the commencement of any action, suit or proceeding, and of the receipt of any notice or threat that any such legal proceeding has been or shall or may be initiated against Indemnitee (including any proceedings by or against the Company and any subsidiary thereof), promptly upon Indemnitee first becoming so aware; but the omission so to notify the Company will not relieve the Company from any liability which it may have to Indemnitee under this Agreement unless and to the extent that such failure to provide notice prejudices the Company's ability to defend such action. Notice to the Company shall be directed to the Chief Executive Officer or Chief Financial Officer of the Company at the address shown in the preamble to this Agreement (or such other address as the Company shall designate in writing to Indemnitee). With respect to any such action, suit or proceeding as to which Indemnitee notifies the Company of the commencement thereof and without derogating from Sections 1.1 and 2:

7.1. The Company will be entitled to participate therein at its own expense.

7.2. Except as otherwise provided below, the Company, alone or jointly with any other indemnifying party similarly notified, will be entitled to assume the defense thereof, with counsel selected by the Company. Indemnitee shall have the right to employ his or her own counsel in such action, suit or proceeding, but the fees and expenses of such counsel incurred after notice from the Company of its assumption of the defense thereof shall be at the expense of Indemnitee, unless: (i) the employment of counsel by Indemnitee has been authorized in writing by the Company; (ii) the Company, in good faith, reasonably concluded that there may be a conflict of interest between the Company and Indemnitee in the conduct of the defense of such action; or (iii) the Company has not in fact employed counsel to assume the defense of such action within reasonable time, in which cases the reasonable fees and expenses of Indemnitee's counsel shall be at the expense of the Company. The Company shall not be entitled to assume the defense of any action, suit or proceeding brought by or on behalf of the Company or as to which Indemnitee and the Company shall have reached the conclusion specified in (ii) above.

7.3. The Company shall not be liable to indemnify Indemnitee under this Agreement for any amounts or expenses paid in connection with a settlement of any action, claim or otherwise, effected without the Company's prior written consent.

7.4. The Company shall have the right to conduct the defense as it sees fit in its sole discretion (provided that the Company shall conduct the defense in good faith and in a diligent manner), including the right to settle or compromise any claim or to consent to the entry of any judgment against Indemnitee without the consent of the Indemnitee, provided that, the amount of such settlement, compromise or judgment does not exceed the Limit Amount (if applicable) and is fully indemnifiable pursuant to this Agreement (subject to Section 1.2 of this Agreement) and/or applicable law, and any such settlement, compromise or judgment does not impose any penalty or limitation on Indemnitee without the Indemnitee's prior written consent. The Indemnitee's consent shall not be required if the settlement includes a complete release of Indemnitee, does not contain any admission of wrong-doing by Indemnitee, and includes monetary sanctions only as provided above. In the case of criminal proceedings the Company and/or its legal counsel will not have the right to plead guilty or agree to a plea-bargain in the Indemnitee's name without the Indemnitee's prior written consent. Neither the Company nor Indemnitee will unreasonably withhold or delay their consent to any proposed settlement.

7.5. Indemnitee shall fully cooperate with the Company and shall give the Company all information and access to documents, files and to his or her advisors and representatives as shall be within Indemnitee's power, in every reasonable way as may be required by the Company with respect to any claim which is the subject matter of this Agreement and in the defense of other claims asserted against the Company (other than claims asserted by Indemnitee), provided that the Company shall cover all expenses, costs and fees incidental thereto such that the Indemnitee will not be required to pay or bear such expenses, costs and fees.

**8.  EXCULPATION.**

Subject to the provisions of the Companies Law, the Company hereby releases, in advance, the Office Holder from liability for any damage that arises from the breach of the Office Holder's duty of care (within the meaning of such terms under Sections 252 and 253 of the Companies Law), other than breach of the duty of care towards the Company in a distribution (as such term is defined in the Companies Law).

**9.  PARTIAL INDEMNIFICATION.**

If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of the expenses, judgments, fines or penalties actually or reasonably incurred by Indemnitee in connection with any proceedings, but not, however, for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion of such expenses, judgments, fines or penalties to which Indemnitee is entitled under any provision of this Agreement. Subject to the provisions of Section 5 above any amount received by Indemnitee (under any insurance policy or otherwise) shall not reduce the Limit Amount hereunder and shall not derogate from the Company's obligation to indemnify the Indemnitee in accordance with the provisions of this Agreement up to the Limit Amount, as set forth in Section 1.2.

**10.  BINDING EFFECT.**

This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns. In the event of a merger or consolidation of the Company or a transfer or disposition of all or substantially all of the business or assets of the Company, the Indemnitee shall be entitled to the same indemnification and insurance provisions as the most favorable indemnification and insurance provisions afforded to the then-serving Office Holders of the Company. In the event that in connection with such transaction the Company purchases a directors and officers' "tail" or "run-off" policy for the benefit of its then serving Office Holders, then such policy shall cover Indemnitee and such coverage shall be deemed to be in satisfaction of the insurance requirements under this Agreement. This Agreement shall continue in effect during the Indemnification Period regardless of whether Indemnitee continues to serve in a Corporate Capacity.

Any amendment to the Companies Law, the Israeli Securities Law, the Economic Competition Law or other applicable law adversely affecting the right of the Indemnitee to be indemnified, insured or released pursuant hereto shall be prospective in effect, and shall not affect the Company's obligation or ability to indemnify or insure the Indemnitee for any act or omission occurring prior to such amendment, unless otherwise provided by applicable law.

**11.  SEVERABILITY.**

The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**12.  NOTICE.**

All notices and other communications pursuant to this Agreement shall be in writing and shall be deemed provided if delivered personally, telecopied, sent by electronic facsimile, email, reputable overnight courier or mailed by registered or certified mail (return receipt requested), postage prepaid, to the parties at the addresses shown in the preamble to this Agreement, or to such other address as the party to whom notice is to be given may have furnished to the other party hereto in writing in accordance herewith. Any such notice or communication shall be deemed to have been delivered and received (i) in the case of personal delivery, on the date of such delivery, (ii) in the case of telecopier or an electronic facsimile or email, one business day after the date of transmission if confirmation of receipt is received, (iii) in the case of a reputable overnight courier, three business days after deposit with such reputable overnight courier service, and (iv) in the case of mailing, on the seventh business day following that on which the mail containing such communication is posted.

**13. GOVERNING LAW; JURISDICTION.**

This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Israel, without giving effect to the conflicts of law provisions of those laws. The Company and Indemnitee each hereby irrevocably consent to the exclusive jurisdiction and venue of the courts of Tel Aviv, Israel for all purposes in connection with any action or proceeding which arises out of or relates to this Agreement.

**14. ENTIRE AGREEMENT.**

This Agreement represents the entire agreement between the parties and supersedes any other agreements, contracts or understandings between the parties, whether written or oral, with respect to the subject matter of this Agreement.

**15. NO MODIFICATION AND NO WAIVER.**

No supplement, modification or amendment, termination or cancellation of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver. Any waiver shall be in writing. The Company hereby undertakes not to amend its Articles of Association in a manner which will adversely affect the provisions of this Agreement.

**16. ASSIGNMENTS; NO THIRD PARTY RIGHTS**

Neither party hereto may assign any of its rights or obligations hereunder except with the express prior written consent of the other party. Nothing herein shall be deemed to create or imply an obligation for the benefit of a third party, except as set forth in Section 5. Without limitation of the foregoing, nothing herein shall be deemed to create any right of any insurer that provides directors and officers' liability insurance, to claim, on behalf of Indemnitee, any rights hereunder.

**17. INTERPRETATION; DEFINITIONS.**

Unless the context shall otherwise require: words in the singular shall also include the plural, and vice versa; any pronoun shall include the corresponding masculine, feminine and neuter forms; the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; the words "herein", "hereof" and "hereunder" and words of similar import refer to this Agreement in its entirety and not to any part hereof; all references herein to Sections or clauses shall be deemed references to Sections or clauses of this Agreement; any references to any agreement or other instrument or law, statute or regulation are to it as amended, supplemented or restated, from time to time (and, in the case of any law, to any successor provisions or re-enactment or modification thereof being in force at the time); any reference to "law" shall include any supranational, national, federal, state, local, or foreign statute or law and all rules and regulations promulgated thereunder; any reference to a "day" or a number of "days" (without any explicit reference otherwise, such as to business days) shall be interpreted as a reference to a calendar day or number of calendar days; reference to month or year means according to the Gregorian calendar; reference to a "company", "corporate body" or "entity" shall include a, partnership, firm, company, corporation, limited liability company, association, joint venture, trust, unincorporated organization, estate, or a government municipality or any political, governmental, regulatory or similar agency or body, and reference to a "person" shall mean any of the foregoing or a natural person.

**18. COUNTERPARTS**

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and enforceable against the parties actually executing such counterpart, and all of which together shall constitute one and the same instrument; it being understood that parties need not sign the same counterpart. The exchange of an executed Agreement (in counterparts or otherwise) by facsimile or by electronic delivery in pdf format shall be sufficient to bind the parties to the terms and conditions of this Agreement, as an original.

*[SIGNATURE PAGE TO FOLLOW]*

**IN WITNESS WHEREOF**, the parties, each acting under due and proper authority, have executed this Indemnification Agreement as of the date first mentioned above, in one or more counterparts.

**ODDITY Tech Ltd.**

By: _____

Name and title: _____

**Indemnitee:**

Name: _____

Signature: _____

Address: _____

**EXHIBIT A***

**CATEGORY OF INDEMNIFIABLE EVENT**

1. Matters, events, occurrences or circumstances in connection or associated with employment relationships with employees or consultants or any employee union or similar or comparable organization.

2. Matters, events, occurrences or circumstances in connection or associated with business relations of any kind between the Company and its employees, independent contractors, customers, suppliers, partners, distributors, agents, resellers, representatives, licensors, licensees, service providers and other business associates.

3. Negotiations, execution, delivery and performance of agreements of any kind or nature and any decisions or deliberations relating to actions or omissions relating to the foregoing; any acts, omissions or circumstances that do or may constitute or are alleged to constitute anti-competitive acts, acts of commercial wrongdoing, or failure to meet any standard of conduct which is or may be applicable to such acts, omissions or circumstances.

4. Approval of and recommendation or information provided to shareholders with respect to any and all corporate actions, including the approval of the acts of the Company's management, their guidance and their supervision, matters relating to the approval of transactions with Office Holders (including, without limitation, all compensation related matters) or shareholders, including controlling persons and claims and allegations of failure to exercise business judgment, reasonable level of proficiency, expertise, care or any other applicable standard, with respect to the foregoing or otherwise with respect to the Company's business, strategy, operations and prospective outlook, and any discussions, deliberations, reviews or other preparatory or preliminary phases relating to any of the foregoing.

5. Violation, infringement, misappropriation, dilution and other misuse of copyrights, patents, designs, trade secrets, confidential information, proprietary information and any intellectual property rights, acts in connection with the registration, assertion or protection of rights to intellectual property and the defense of claims related to intellectual property, breach of confidentiality obligations, acts in regard of invasion of privacy or any violation of privacy or privacy related right or regulation, including with respect to databases or handling, collection or use of private information, acts in connection with slander and defamation, and claims in connection with publishing or providing any information, including any filings with any governmental authorities, whether or not required under any applicable laws.

6. Violations of or failure to comply with securities laws, and any regulations or other rules promulgated thereunder, of any jurisdiction, including without limitation, claims under the U.S. Securities Act of 1933 or the U.S. Exchange Act of 1934 or under the Israeli Securities Law, fraudulent disclosure claims, failure to comply with any securities authority or any stock exchange disclosure or other rules and any other claims relating to relationships with investors, debt holders, shareholders, optionholders, holders of any other equity or debt instrument of the Company, and otherwise with the investment community (including without limitation any such claims relating to a merger, acquisition, change in control transaction, issuance of securities, restructuring, spin out, spin off, divestiture, recapitalization or any other transaction relating to the corporate structure or organization of the Company); claims relating to or arising out of financing arrangements, any breach of financial covenants or other obligations towards investors, lenders or debt holders, class actions, violations of laws requiring the Company to obtain regulatory and governmental licenses, permits and authorizations in any jurisdiction, including in connection with disclosure, offering or other transaction related documents; actions taken in connection with the issuance, purchase, holding or disposition of any type of securities of Company, including, without limitation, the grant of options, warrants or other rights to purchase any of the same or any offering of the Company's securities (whether on behalf of the Company or on behalf of any holders of securities of the Company) to private investors, underwriters, resellers or to the public, and listing of such securities, or the offer by the Company to purchase securities from the public or from private investors or other holders, and any undertakings, representations, warranties and other obligations related to any of the foregoing or to the Company's status as a public company or as an issuer of securities.

7. Liabilities arising in connection with any products or services developed, distributed, rendered, sold, provided, licensed or marketed by the Company or any Affiliate thereof, and any actions or omissions in connection with the distribution, provision, sale, marketing, license or use of such products or services, including without limitation in connection with professional liability and product liability claims or regulatory or reputational matters.

8. The offering of securities by the Company (whether on behalf of itself or on behalf of any holder of securities and any other person) to the public and/or to offerees or the offer by the Company to purchase securities from the public and/or from private investors or other holders pursuant to a prospectus, offering documents, agreements, notices, reports, tenders and/or other processes.

9. Events, facts or circumstances in connection with change in ownership or in the structure of the Company, its reorganization, dissolution, winding up, any other arrangements concerning creditors rights, merger, change in control, issuances of securities, restructuring, spin out, spin off, divestiture, recapitalization or any other transaction relating to the corporate structure or organization of the Company, and the approval of failure to approve of any corporate actions and any matters relating to corporate governance, capital structure, articles of association or other charter or governance documents, appointment or dismissal of office holders or compensation thereof and appointment or dismissal of auditors, internal auditor or any other person performing any services for the Company.

10. Any claim or demand made in connection with any transaction not in the ordinary course of business of the Company, as well as the sale, lease, purchase or acquisition of, or the receipt or grant of any rights with respect to, any assets or business.

11. Any claim or demand made by any third party suffering any personal injury and/or bodily injury or damage to business or personal property or any other type of damage through any act or omission attributed to the Company, or its employees, agents or other persons acting or allegedly acting on its behalf, including, without limitation, failure to make proper safety arrangements for the Company or its employees and liabilities arising from any accidental or continuous damage or harm to the Company's employees, its contractors, its guests and visitors as a result of an accidental or continuous event, or employment conditions, permanent or temporary, in the Company's offices.

12. Any claim or demand made directly or indirectly in connection with complete or partial failure, by the Company or its directors, officers and employees, to pay, report, keep applicable records or otherwise, of any local or foreign federal, state, county, municipal or city taxes or other taxes or compulsory payments of any nature whatsoever, including, without limitation, income, sales, use, transfer, excise, value added, registration, severance, stamp, occupation, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll or employee withholding or other withholding, including any interest, penalty or addition thereto, whether disputed or not.

13. Any administrative, regulatory, judicial or civil actions orders, decrees, suits, demands, demand letters, directives, claims, liens, investigations, proceedings or notices of noncompliance or violation by any governmental entity or other person alleging potential responsibility or liability (including potential responsibility or liability for costs of enforcement investigation, cleanup, governmental response, removal or remediation, for natural resources damages, property damage, personal injuries or penalties or for contribution, indemnification, cost recovery, compensation or injunctive relief) arising out of, based on or related to (a) the presence of, release, spill, emission, leaning, dumping, pouring, deposit, disposal, discharge, leaching or migration into the environment (each a "**Release**") or threatened Release of, or exposure to, any hazardous, toxic, explosive or radioactive substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing material, polychlorinated biphenyls ("**PCBs**") or PCB-containing materials or equipment, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any environmental law, at any location, whether or not owned, operated, leased or managed by the Company or any of its subsidiaries, or (b) circumstances forming the basis of any violation of any environmental law or environmental permit, license, registration or other authorization required under applicable environmental law.

14. Any administrative, regulatory or judicial actions, orders, decrees, suits, demands, demand letters, directives, claims, liens, investigations, proceedings or notices of noncompliance or violation by any governmental or regulatory entity or authority or any other person alleging the failure to comply with any statute, law, ordinance, rule, regulation, order or decree of any governmental entity applicable to the Company or any of its businesses, assets or operations, or the terms and conditions of any operating certificate or licensing agreement.

15. Participation and/or non-participation at Company Board meetings, expression of opinion or view and/or voting and/or abstention from voting at Company Board meetings, including, in each case, any committee thereof, as well as expression of opinion publicly in connection with the service as an Office Holder.

16.  Review and approval of the Company's financial statements and any specific items or matters within, including any action, consent or approval related to or arising from the foregoing, including, without limitations, engagement of or execution of certificates for the benefit of third parties related to the financial statements.

17.  Violation of laws, rules or regulations requiring the Company to obtain regulatory and governmental licenses, permits and authorizations (including without limitation relating to export, import, encryption, antitrust or competition authorities) or laws related to any governmental grants in any jurisdiction.

18.  Resolutions and/or actions relating to investments in the Company and/or its subsidiaries and/or affiliated companies and/or investment in corporate or other entities and/or investments in other traded or non-traded securities and/or any other form of investment.

19.  Liabilities arising out of advertising, including misrepresentations regarding the Company's products or services and unlawful distribution of emails.

20.  Management of the Company's bank accounts, including money management, foreign currency deposits, securities, loans and credit facilities, credit cards, bank guarantees, letters of credit, consultation agreements concerning investments including with portfolio managers, hedging transactions, options, futures, and the like.

21.  All actions, consents and approvals, including any prior discussions, reviews and deliberations, relating to a distribution of dividends, in cash or otherwise, or to any other "distribution" as such term is defined under the Companies Law.

22.     Any administrative, regulatory, judicial, civil or criminal, actions orders, decrees, suits, demands, demand letters, directives, claims, liens, investigations, proceedings or notices of noncompliance, violation or breaches alleging potential responsibility, liability, loss or damage (including potential responsibility or liability for costs of enforcement, investigation, cleanup, governmental response, removal or remediation, property damage or penalties, or for contribution, indemnification, cost recovery, compensation or injunctive relief), whether alleged or claimed by customers, consumers, regulators, shareholders or others, arising out of, based on or related to: (a) cyber security, cyberattacks, data loss or breaches, unauthorized access to information, data, or databases (including but not limited to any personally identifiable information or private health information) and use or disclosure of information contained therein, not preventing or detecting the breach or failing to otherwise disclose or respond to the breach; (b) circumstances forming the basis of any violation of any law, permit, license, registration or other authorization required under applicable law governing data security, data protection, network security, information systems, privacy or any cyber environment (including, users, networks, devices, software, processes, information systems, databases, information in storage or transit, applications, services, and systems that can be connected directly or indirectly to networks); (c) failure to implement a reporting system or control, or failure to monitor or oversee the operation of such a system; (d) data destruction, extortion, theft, hacking, and denial of service attacks; losses or liabilities to others caused by errors and omissions, failure to safeguard data or defamation; or (e) security-audit, post-incident public relations and investigative expenses, criminal reward funds, data breach/privacy crisis management (including, management of an incident, investigation, remediation, data subject notification, call management, credit checking for data subjects, legal costs, court attendance and regulatory fines), extortion liability (including, losses due to a threat of extortion, professional fees related to dealing with the extortion), or network security liability (including, losses as a result of denial of access, costs related to data on third-parties and costs related to the theft of data on third-party systems).

The Limit Amount for all Indemnifiable Persons during each relevant period referred to in Section 1.2 of the Indemnification Agreement for all events described in this Exhibit A (in Sections 1-22 (inclusive) above), shall be the greater of:

(a) twenty-five percent (25%) of the Company's total shareholders' equity according to the Company's most recent financial statements as of the occurrence of the indemnifiable event;

(b) USD 25 million;

* Any reference in this Exhibit A to the Company shall include the Company and any entity in which the Indemnitee serves in a Corporate Capacity.

**IL Makiage Cosmetics (2013) Ltd. - 2020 Equity Incentive Plan**

1.     <u>Name</u>. This plan, as adopted by the Board of Directors of IL Makiage Cosmetics (2013) Ltd., (the "<u>Company</u>") on April 1, 2020, and as amended from time to time, shall be known as the "IL Makiage Cosmetics (2013) Ltd. 2020 Equity Incentive Plan" (the "<u>Plan</u>").

2.     <u>Purpose of the Plan</u>. The purposes of this Plan are to enable the Company to link the compensation and benefits of individuals and entities providing services to the Company and/or its Affiliates (including Directors) with the success of the Company and with long-term shareholder value and to attract such new individuals and entities to provide services to the Company and/or its Affiliates which the Company and/or its Affiliates shall decide their services are considered valuable.

3.     <u>Headings and Definitions</u>

3.1.    The section headings are intended solely for the reader's convenience and in no event shall they constitute a basis for the interpretation of the Plan.

3.2.     In this Plan, the following terms shall have the meanings set forth beside them:

| | |
|---|---|
| *"Affiliate"* | Corporate entities who are related to the Company by way of common ownership or control, as such term is defined in section 32(9) of the Ordinance, either directly or indirectly, either partially or entirely, including but not limited to any "employing company" and "employer" as defined in Section 102(a) of the Ordinance; |
| *"Applicable Law"* | The legal requirements applicable to the administration of equity incentive plans, any applicable laws, rules and regulations of any country or jurisdiction where Awards are granted under the Plan, as such laws, rules, regulations and requirements shall be in place from time to time including any Stock Exchange rules or regulations; |
| *"Approved Award"* | An Award granted under Section 102(b)(2) of the Ordinance, in accordance with the "capital gain tax route", and other rights granted or issued with respect to such Award; |
| *"Award"* | An Option or Share Award; |
| *"Award Agreement"* | A written agreement between the Company and a Participant or a notice provided by the Company setting forth the terms and conditions under which Awards are granted to a Participant; |
| *"Board"* | The Company's Board of Directors, or, subject to Applicable Law and the Company's incorporation documents, including the Articles of Association, any committee empowered by the Board for the purpose of implementation of this Plan (or any aspect thereof); |

*"Cause"*  Irrespective of any definition included in any other document held by a Participant and unless otherwise determined by the Board in the Participant's Award Agreement, the term Cause shall include any of the following-

(a)  A breach of any material provision of the employment or engagement agreement between the Company or an Affiliate and a Participant and any restrictive covenant provision the Participant is obligated to comply with, including but not limited to, a breach of any confidentiality duty of a Participant (including in regards to the confidentiality of this Plan and any grant made thereunder), inappropriate use of confidential information of the Company or an Affiliate or an event of breach of trust or breach of any non-competition obligation of a Participant;

(b)  Any act which constitutes a breach of a Participant's fiduciary duty towards the Company or an Affiliate, including without limitation disclosure of confidential information of the Company or an Affiliate and acceptance or solicitation to receive unauthorized or undisclosed benefits, irrespective of their nature, or funds or promises to receive either, from individuals, Consultants or corporate entities that the Company or an Affiliate does business with;

(c)  Any act of fraud by a Participant or embezzlement of funds of the Company or an Affiliate;

(d)  Any conduct or omission by, or state of affairs related to, the Participant reasonably determined by the Board to be materially detrimental to, or against the interests of, the Company or an Affiliate;

(e)  Any conviction of any felony involving moral turpitude or affecting the Company or an Affiliate;

(f)  Circumstances justifying the revocation and/or reduction of a Participant's entitlement to severance pay under Applicable Law, including where relevant, pursuant to Sections 16 or 17 of the Severance Pay Law, 1963; or

(g)  Any other reason which is defined as Cause in the Participant's personal employment contract;

For the avoidance of doubt it is clarified that the determination as to whether a Participant is being terminated for Cause shall be made in good faith by the Board and shall be final and binding on the Participant;

*"Company"*  IL Makiage Cosmetics (2013) Ltd., a company incorporated under the laws of the state of Israel, or any Successor Company resulting from the merger or consolidation of the Company in which the Company is not the surviving entity, or any company which assumes the Plan within any M&A Transaction or Structural Change;

*"Consultant"*    Shall mean any person or entity, except an Employee, engaged by the Company or an Affiliate, in order to render services to such company, including any individual engaged by an entity providing services to the Company or an Affiliate as aforementioned and any director of the Company or any Affiliate;

*"Controlling Shareholder"*    A controlling shareholder of the Company as defined in section 32(9) of the Ordinance, as amended from time to time;

*"Director"*    Shall mean anyone serving on the board of directors of the Company or any Affiliate;

*"Employee"*    Shall mean any person, who has signed an employment agreement and has commenced employment with the Company or any Affiliate, or anyone who is on the payroll of such company and specifically excluding anyone who may under Applicable Law be deemed an employee of the Company or an Affiliate if an employment agreement was not signed and he is not on the payroll of such company. Solely in respect of Approved Awards, this term shall include any officer or a Director of the Company or Israeli resident Affiliate all in accordance with Section 102;

*"Exercise Price"*    Shall mean the consideration required to be paid by a Participant in order to exercise an Option and to purchase one Share;

*"Expiration Date"*    With respect to an Option, and unless otherwise determined in the Option Agreement, the earlier of (i) the time such Option is fully exercised, or (ii) ten (10) years from the Grant Date of such Option, or (ii) the time on which such Option expires in accordance with Sections 11 and 14 below; with respect to a Share Award – (i) the time such Share Award is fully vested, or (ii) the time on which such Award expires in accordance with Sections 11 and 14 below;

*"Fair Market Value"*    Shall mean, as of any date, the value of an ordinary share of the Company determined as follows:

(i) If the ordinary shares are listed on any recognized Stock Exchange, the Fair Market Value shall be the closing sales price for such ordinary shares (or the closing bid, if no sales were reported), as quoted on such Stock Exchange for the last market trading day prior to the time of determination;

(ii) If the ordinary shares are regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value shall be the mean between the high bid and low asked prices for the ordinary shares on the last market trading day prior to the day of determination, or;

(iii) In the absence of any of the above, the Fair Market Value thereof shall be as determined in good faith by the Board of Directors of the Company.

For the avoidance of doubt, and where applicable, the above definition of Fair Market Value shall not apply for the purpose of determining the tax liability pursuant to Section 102(b)(3) of the Ordinance;

*"Grant Date"*    The date of the Board resolution approving the grant of the Awards, unless otherwise determined by the Board or required under Applicable Law, provided that with respect to Approved Awards, the Grant Date shall be only after the lapse of the required 30 day period from the filing of the Plan for approval with the ITA and if employment shall have not commenced the Grant Date shall be upon commencement of employment;

*"Holding Period"*    The holding period provided under Section 102 in respect of  the "capital gain tax route" or under a tax ruling by the Israeli Tax Authority;

*"Israeli Employee"*    An Employee of the Company or of an Israeli resident  Affiliate, who is an Israeli tax resident and who is not a Controlling Shareholder at the time of grant, or as a consequence of the grant, as stated in Section 102;

"M&A *Transaction"*    Any of the following (yet excluding any Structural Change or Spin-off Transaction):

(a)  A sale of all or substantially all the assets of the Company and its subsidiaries taken as a whole, or the sale or disposition (whether by merger or otherwise) of one or more subsidiaries of the Company if substantially all of the assets of the Company and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries;

(b) A merger (including a reverse triangular merger), consolidation, amalgamation or like transaction of the Company with or into another entity or a scheme of arrangement for the purpose of effecting such following which all or substantially all of the shareholders of the Company immediately prior to the merger are no longer shareholders of the Company either directly or indirectly; or

(c) A sale (including an exchange) of all or substantially all of the share capital of the Company to a third party unrelated to the then current shareholders of the Company, whether by a single transaction or a series of related transactions or within the scope of the same acquisition agreement; or

(d) Any other transaction or set of circumstances that is determined by the Board, in its discretion, to be a transaction having a similar or comparable effect.

Subject to specific confirmation of the Board the definition shall also include any purchase by a current shareholder of the Company (whether directly or indirectly) of all of the share capital of the Company not owned by such shareholder or its Affiliates immediately prior to the acquisition.

| | |
|---|---|
| *"Ordinance"* | The Israeli Income Tax Ordinance [New Version], 1961, as amended from time to time; |
| *"Option"* | An option to purchase one Share, granted to a Participant,subject to the provisions of this Plan and the applicable Option Agreement; |
| *"Option Agreement"* | A written agreement between the Company and a Participant or a notice provided by the Company setting forth the terms and conditions under which Options are granted to a Participant; |
| *"Participant"* | Shall mean anyone to which an Award was granted in accordance with section 5 of the Plan; |
| *"Plan"* | Shall mean this IL Makiage Cosmetics (2013) Ltd. 2020 Equity Incentive Plan, including any amendments thereto; |
| *"Restricted Share"* | A grant of a Share subject to restrictions, to a Participant, subject to the provisions of this Plan and the applicable Award Agreement; |
| *"Restricted Share Unit"* | A contingent right to be issued one Share upon the applicable Vesting Date, subject to the provisions of this Plan and the applicable Award Agreement; |
| *"Section 102"* | Section 102 of the Ordinance and the Israeli Income Tax Rules(Tax Relief in Issuance of Shares to Employees) 2003, as amended from time to time; |
| *"Share"* | An ordinary share of the Company, nominal value NIS 0.001,which is issued or issuable to a Participant upon grant, vesting or exercise of an Award; |
| *"Share Award"* | Any Restricted Share or Restricted Share Unit; |
| *"Spin-off Transaction"* | Any transaction in which assets of the Company are transferred or sold to a company or corporate entity in which the shareholders of the Company hold the same respective ownership stakes they are then holding in the Company [i.e. –transfer of assets to a 'sister company' of the Company]; |
| *"Stock Exchange"* | Any stock exchange, on which ordinary shares of the Company are listed, or such other market or a national market system, on which the Company's ordinary shares' prices are regularly quoted; |

*"Structural Change"*  Any re-domestication of the Company, share flip, creation of a holding company for the Company which will hold substantially all of the shares of the Company or any other transaction involving the Company in which the shares of the Company outstanding immediately prior to such transaction continue to represent, or are converted into or exchanged for shares that represent, immediately following such transaction, at least a majority, by voting power, of the share capital of the surviving, acquiring or resulting corporation;

*"Successor Company"*  Shall mean any entity with or into which the Company was merged or consolidated, or to which certain operations or certain assets of the Company were transferred, or which purchased substantially all the Company's assets or shares, including any parent of such entity;

*"Tax"*  Any applicable tax and other compulsory payments such as social security and health tax contributions (including interest and/or fines of any type and/or linkage differentials) required to be paid under any applicable law in relation to the Awards or the rights deriving there-from;

*"Termination"*  For an Employee, the termination of employment, for a Director the termination of directorship and for a Consultant, the expiration, or termination of such person's consulting or advisory relationship with the Company or an Affiliate, or the occurrence of any termination event as set forth in such person's Award Agreement;

For the purpose of this plan the following shall not be considered as Termination (i) for an Employee – paid vacation, sick leave, paid maternity leave, infant care leave, medical emergency leave, military reserve duty, or any other leave of absence authorized in writing by the Board; and (ii) for a Consultant- any temporary interruption in such person's availability to provide services to the Company and/or an Affiliate, which has been authorized in writing by Board;

Termination shall not include any transfer of a Participant between the Company and any Affiliate or between Affiliates, nor shall it include any change in a Participant's engagement status between an "Employee", "Director" and "Consultant" and vice versa (without derogating the different tax implications that may result from such change of status);

*"Termination Date"*  With regard to any Employee, the first date following the Grant Date on which there are no longer employment relations between such Employee and the Company or an Affiliate, for any reason whatsoever; however for the purpose of Termination for Cause, the Termination Date is the date on which a notice regarding such termination was sent by the Company or an Affiliate to the Employee;

|  | With regard to any Consultant, the earlier of (i) the date of termination of the agreement between the Consultant and the Company or an Affiliate; or (ii) the date on which a notice regarding such termination of agreement was sent by the Company or an Affiliate, or by the Consultant, to the other party; |
|---|---|
|  | With regards to a Director, the first date following the Grant Date on which the individual no longer serves as a member of the applicable board of directors; |
| *"Transfer"* | With respect of any Award or Share – the sale, assignment,transfer, pledge, mortgage or other disposition thereof or the grant of any right to a third party thereto; |
| *"Trustee"* | Any trustee appointed by the Company in accordance with Section 102 and approved by the Israeli Tax Authority; |
| *"Non-Approved 102 Award"* | An Award which is governed by Section 102(c) of the Ordinance; |
| *"Vesting Date"* | The date upon which the Award becomes vested, as determined in accordance with this Plan and set forth in the Award Agreement and for a Restricted Share the date upon which the underlying Shares are no longer subject to the Company's repurchase right; |

4.    Administration of the Plan

4.1.    The Board shall have the power to administer the Plan.

4.2.    Subject to the provisions of the Plan, Applicable Law and the Company's incorporation documents, the Board shall have the authority, at its discretion: (i) to grant Awards to Participants; (ii) to determine the terms and provisions of each Award granted (which need not be identical), including, but not limited to, the number of Awards to be granted to each Participant, provisions concerning the time and the extent to which the Awards may be vested and/or exercised (including the applicability of the Early Exercise Mechanism as detailed below, if at all), the underlying Shares sold and the nature and duration of restrictions as to the Transferability of Awards and/or Shares; (iii) to amend, modify or supplement (with the consent of the applicable Participant, if such amendments adversely affect the terms of his Awards) the terms of each outstanding Award, unless included otherwise under the terms of the Plan; (iv) to interpret the Plan; (v) to prescribe, amend, and rescind rules and regulations relating to the Plan, including the form of Award Agreements and rules governing the grant of Awards in jurisdictions in which the Company or any Affiliate operate; (vi) to authorize conversion or substitution under the Plan of any or all Awards or Shares and to cancel or suspend Awards, as necessary, provided that, if such action is not specifically allowed under the terms of this Plan, any material harm to the interests of the Participants shall be subject to consent from the Participants; (vii) to accelerate or defer (with the consent of the Participant) the right of a Participant to exercise in whole or in part, any previously granted Awards; (viii) to determine the effect of any increase or decrease of scope of engagement of a Participant on the vesting schedule of previously granted Awards; (ix) to authorize any person to execute on behalf of the Company any instrument required to effectuate the grant of an Award previously granted by the Board; and (x) to make all other determinations deemed necessary or advisable for the administration of the Plan.

4.3.    This Plan shall apply to grants of Awards made following the adoption of this Plan by the Board.

4.4.    All decisions, determinations, and interpretations of the Board shall be final and binding on all Participants unless otherwise determined by the Board.

5.    Eligibility. Awards may be granted to Employees, Directors or Consultants, provided that if services have not commenced, the grant will be made subject to commencement of actual services; An Approved Award and a Non-Approved 102 Award may only be granted to Israeli Employees.

6.    Shares Reserved for the Plan. The Company during the term of this Plan will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the vested portion of Awards granted under the Plan and any other share and Award plans which may be adopted by the Company in the future, subject to any adjustment made to the share capital of the Company by way of share split, reverse share split, distribution of share dividend or similar recapitalization events, at any time hereafter. The Shares may be authorized but unissued ordinary shares, or reacquired ordinary shares of the Company. If an Award should expire or become un-exercisable for any reason without having been exercised in full, or if any Share is repurchased by the Company prior to it becoming vested (due to the Early Exercise Mechanism), the Shares that were subject thereto shall, unless the Plan shall have been terminated, become available for future grant under the Plan. Shares issued under the Plan and later repurchased by the Company pursuant to any repurchase right which the Company may have, shall be available for future grant under the Plan, subject to Applicable Law.

7.    Options

7.1.    Grant

7.1.1.    The Board may grant Options from time to time at their sole discretion. The Options granted pursuant to the Plan, shall be evidenced by a written Option Agreement. Each Option Agreement shall state, among other matters, the number of Options granted, the Vesting Dates, the Exercise Price, the tax route and such other terms and conditions as the Board at its discretion may prescribe, provided that they are consistent with this Plan.

7.1.2.    Options which are Approved Awards, as determined in the Option Agreement, and any Shares issued in respect of such Approved Award shall be subject to the Trustee's trusteeship, as provided in Section 13 below. Any grant of an Approved Award shall be subject to compliance with the conditions of Section 102 and shall be considered for all purposes as granted only 30 days or more after the submission of the Plan for approval by the Israeli Tax Authority.

7.2.    Vesting.

7.2.1    The Board shall set vesting criteria in its discretion, which, depending on the extent to which the criteria are met, will determine the number of Options that will vest. The Board may set vesting criteria based upon continued engagement with or service to the Company or any Affiliate or based upon both continued engagement or service and the achievement of Company-wide, business unit, or individual goals, or any other condition as determined by the Board in its discretion. The vesting conditions and schedule shall be set in the applicable Option Agreement. No Option shall be exercised after the Expiration Date. The vesting provisions of individual Options may vary.

7.2.2   Unless determined otherwise by the Board, the vesting of the Options shall be postponed during any un-paid leave of absence. Upon return to service, the vesting shall continue and each of the remaining Vesting Dates shall be postponed by the number of days of such period of un-paid leave (i.e. shifting the entire remaining vesting schedule and extending it by the number of unpaid leave days). Despite the aforementioned, the following shall not postpone the vesting of the Options: paid vacation, paid sick leave, paid maternity leave, infant care leave, medical emergency leave, military reserve duty.

7.2.3   Subject to specific approval of the Board, and the despite the above, an Option Agreement may, but need not, include a provision whereby a Participant may elect at any time before the Participant's Termination Date to exercise all or part of the un-vested portion of the Options, subject to the terms specified in the Option Agreement ("**Early Exercise Mechanism**"). Any unvested Shares so purchased will be subject to a repurchase right in favor of the Company and to all other restrictions as described in the Company's form of Early Exercise Share Purchase Agreement unless the Board determines otherwise. The terms of any repurchase right will be specified in the applicable Option Agreement and Early Exercise Share Purchase Agreement.

7.2.4   The vesting of the Options shall continue upon any transfer of a Participant between the Company and any Affiliate or between Affiliates.

7.3.   An Option may be subject to such other terms and conditions, not inconsistent with the Plan, on the time or times when it may be exercised as the Board may deem appropriate.

7.4.   <u>Exercise of Options</u>

7.4.1. An Option shall be exercised by submission to the Company of a notice of exercise, in a form set by the Company, accompanied by payment as hereinafter described. The exercise of an Option shall occur upon receipt of a notice of exercise by the Company accompanied by payment in full of the Exercise Price payable for each of the Shares being purchased pursuant to such exercise, and as soon as practicable thereafter, and subject to the provisions of section 8.3 below, the Company will issue the Share(s) underlying such exercised Option, provided that the Shares so issued shall not be delivered to the Participant or any third party (other than the Trustee, if applicable) unless and until all applicable Tax was paid to the Trustee's (if applicable) and the Company's full satisfaction and subject to compliance with Applicable Law.

7.4.2. Except as otherwise provided in the Plan or in an Option Agreement, an Option may be exercised in full or in part, subject to the Expiration Date, provided it is not exercised for a fraction of a Share, as further detailed in section 10.3 below.

7.4.3. Notices of exercise of Options, which are submitted after the Expiration Date, or which relate to Options that have not yet vested (unless the Participant is entitled to exercise the Options through the Early Exercise Mechanism), or which do not contain all of the details required by the exercise form, shall not be accepted and shall have no force whatsoever.

7.4.4. The Participant shall sign any document required under any Applicable Law or by the Company or the Trustee for the purposes of issuance of the Shares.

7.4.5. As a condition to the exercise of an Option, the Company may require the person exercising such Option to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required.

7.5.   Consideration.

7.5.1. The Exercise Price of each Share subject to an Option shall be determined by the Board in its sole and absolute discretion in accordance with Applicable Law, subject to any guidelines as may be determined by the Board from time to time. Each Option Agreement will contain the Exercise Price determined for each Option covered thereby. The Exercise Price may or may not be equal to the Fair Market Value of the ordinary Shares of the Company, and any evaluation executed in relation to such shares shall not obligate the Company when determining the Exercise Price of any Option.

7.5.2. The Exercise Price shall be paid in cash or cheque at the time the Option is exercised, or by any other means as determined by the Board. Should the Company's ordinary shares be listed for trade on a Stock Exchange the Board may consider allowing a cashless exercise, or any other exercise method, subject to the provisions of Applicable Law. If, as of the date of exercise of an Option the Company is then permitting cashless exercises, the Participants will be able to engage in a "same-day sale" cashless brokered exercise program, involving one or more brokers, through such a program that complies with the Applicable Laws and that ensures prompt delivery to the Company of the amount required to pay the Exercise Price and any Tax.

7.5.3. The Exercise Price shall be denominated in the currency of the primary economic environment of, at the Board's discretion, either the Company or the Participant (that is the functional currency of the Company or the currency in which the Participant is paid).

8.   Restricted Share Units

8.1.   Grant

8.1.1.   The Board may grant Restricted Share Units from time to time at their sole discretion. The Restricted Share Units granted pursuant to the Plan, shall be evidenced by a written Award Agreement. Each Award Agreement shall state, among other matters, the number of Restricted Share Units granted, the Vesting Dates, the tax route and such other terms and conditions as the Board at its discretion may prescribe, provided that they are consistent with this Plan.

8.1.2.   Restricted Share Units which are Approved Awards, as determined in the Award Agreement, and any Shares issued in respect of such Approved Award shall be subject to the Trustee's trusteeship, as provided in Section 13 below. Any grant of an Approved Award shall be subject to compliance with the conditions of Section 102 and shall be considered for all purposes as granted only 30 days or more after the submission of the Plan for approval by the Israeli Tax Authority.

8.2.   Vesting.

8.2.1   The Board shall set vesting criteria in its discretion, which, depending on the extent to which the criteria are met, will determine the number of Restricted Share Units that will vest and the timing of the issuance of the Shares. The Board may set vesting criteria based upon continued engagement with or service to the Company or any Affiliate or based upon both continued engagement or service and the achievement of Company-wide, business unit, or individual goals, or any other condition as determined by the Board in its discretion including conditions relating to the occurrence of an IPO or M&A Transaction within a certain period of time. The vesting conditions and schedule shall be set in the applicable Award Agreement.

8.2.2   Unless determined otherwise by the Board, the vesting of the Restricted Share Units shall be postponed during any un-paid leave of absence. Upon return to service, the vesting shall continue and each of the remaining Vesting Dates shall be postponed by the number of days of such period of un-paid leave (i.e. shifting the entire remaining vesting schedule and extending it by the number of unpaid leave days). Despite the aforementioned, the following shall not postpone the vesting of the Restricted Share Units: paid vacation, paid sick leave, paid maternity leave, infant care leave, medical emergency leave, military reserve duty.

8.2.3   The vesting of the Restricted Share Units shall continue upon any transfer of a Participant between the Company and any Affiliate or between Affiliates. Nevertheless vesting conditions may change to comply with local tax implications provided that any change to vesting shall be subject to the written consent of the Participant.

8.3.   Settlement of Restricted Share Units. Following vesting of the Restricted Share Units, the Company shall issue Shares within reasonable time in the name of the Participant or the Trustee, subject to compliance with Applicable Law and payment of any tax liability associated with such issuance. The issuance of Shares upon vesting shall be subject to the payment of the nominal value of the Shares by the Participant.

8.4.   Voting Rights. The holders of Restricted Share Units shall have no voting rights until Shares are issued upon settlement of the Restricted Share Units.

8.5.   Creditors' Rights. A holder of Restricted Share Units shall have no rights other than those of a general creditor of the Company. Restricted Share Units represent an unfunded and unsecured obligation of the Company, subject to the terms and conditions of the applicable Award Agreement.

8.6.   Assignment or Transfer of Restricted Share Units. Except as otherwise provided in the applicable Award Agreement and then only to the extent permitted by applicable law, Restricted Share Units shall not be anticipated, assigned, attached garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily, involuntarily or by operation of law. Any act in violation of this Section shall be void. However, this Section shall not preclude a Participant from designating a beneficiary who will receive any outstanding vested Restricted Share Units in the event of the Participant's death, nor shall it preclude a transfer of vested Restricted Share Units by will or by the laws of descent and distribution.

8.7.   Dividend Equivalent Payments. The Board may permit Participants holding Restricted Share Units to receive payments on outstanding Restricted Share Units equivalent to amounts paid by way of dividend if and when dividends are paid to holders on Shares. At the sole discretion of the Board, such dividend equivalent may either be paid at the same time as dividend payments are made to shareholders or delayed until when Shares are issued pursuant to the Restricted Share Units and may be subject to the same vesting requirements as the Restricted Share Units. If the Board permits dividend equivalent payments to be made on Restricted Share Units, the terms and conditions for such payments will be set forth in the Award Agreement.

9.   Restricted Shares

9.1.   The Board will determine to whom an offer will be made to purchase Restricted Shares and the terms of such offer including the number of Shares, the purchase price to be paid by the Participant, the restrictions to which the Shares will be subject, and all other terms and conditions of the Restricted Stock Award, subject to the following terms and conditions. The Restricted Shares shall be subject to a written Award Agreement between the Company and the Participant, in such form as the Board shall from time to time approve. The Restricted Share Award will be accepted by the Participant's execution and delivery of the Award Agreement and full payment for the Shares to the Company within thirty (30) days from the date the Award Agreement is delivered to the person in electronic or written form. If such person does not execute and deliver the Award Agreement along with full payment for the Shares to the Company within such thirty (30) days, then the offer will terminate, unless otherwise determined by the Board. Any certificates representing the Restricted Shares shall bear such legends as shall be determined by the Board.

9.2.    Beginning on the Grant Date and subject to the execution of an Award Agreement and the payment of the applicable purchase price for the Shares, the Participant shall become a shareholder of the Company with respect to all Restricted Shares and shall have all of the rights of a shareholder, including the right to vote such Shares, and the right to receive distributions made with respect to such shares, including regular cash dividends (except as otherwise provided by the Board); provided, however, that in the absence of a Board action to the contrary, any Shares or any other property (other than regular cash distributions) distributed as a dividend or otherwise with respect to any Restricted Shares as to which the restrictions have not yet lapsed shall be subject to the same restrictions as the shares covered by such Restricted Shares, as further detailed in the applicable Award Agreement.

9.3.    The Participant shall not be permitted to transfer or sell Restricted Shares granted under the Plan prior to the lapse of the restrictions as detailed in the Award Agreement (the "**Restriction Period**").

9.4.    If and when the Restriction Period expires without a prior forfeiture of the Restricted Shares, certificates for Shares attributable to such Restricted Shares shall be delivered to the Participant (or, if certificates were previously issued, replacement certificates shall be delivered upon return of the previously issued certificates). All legends shall be removed from said certificates at the time of delivery to the Participant, except as otherwise required by applicable law, applicable agreements to which the Participant is bound or other limitations imposed by the Board. Notwithstanding the foregoing, actual certificates shall not be issued to the extent that book entry recordkeeping is used.

9.5.    Unless determined otherwise by the Board, the Restriction Period shall be postponed during any un-paid leave of absence. Upon return to service, the Restriction Period shall continue and be extended by the number of days of such period of un-paid leave. Despite the aforementioned, the following shall not postpone the Restriction Period: paid vacation, paid sick leave, paid maternity leave, infant care leave, medical emergency leave, and military reserve duty.

9.6.    Upon issuance of Restricted Shares, and as a condition to the issuance with no restrictions following the Restriction Period, the Participant shall consent to the terms of any agreement between the Company and its shareholders setting forth certain obligations of the Company's shareholders and certain restrictions and limitations on the transfer Shares in the Company including, without limitation, the terms of a "bring along" provision, by executing any document, including any joinder or adoption agreement, as shall be required by the Company.

10.    Terms and Conditions of the Awards. Awards granted under the Plan shall be evidenced by the related Award Agreement and shall be subject to the following terms and conditions and to such other terms and conditions included in the Award Agreement not inconsistent therewith, as the Board shall determine:

10.1.    Non Transferability of Awards. Unless otherwise determined by the Board, an Award shall not be Transferable by the Participant other than in accordance with section 11.2.1.2 below. Awards or rights arising therefrom shall not be subject to mortgage, attachment or other willful encumbrance, and no power of attorney shall be issued in respect thereof, whether such enter into force immediately or at a future date.

10.2. <u>One Time Benefit</u>. The Awards and underlying Shares are extraordinary, one-time benefits granted to the Participants, and are not and shall not be deemed a salary component for any purpose whatsoever, including in connection with calculating severance compensation under any Applicable Law.

10.3. <u>Fractions</u>. An Award may not be converted into a fraction of a Share. In lieu of issuing fractional Shares, on the vesting of a fraction of an Award, the Company shall convert any such fraction of an Award, which represents a right to receive 0.5 or more of a Share, to one Share and shall extinguish any such fraction of an Award, which represents a right to receive less than 0.5 of a Share without issuing any Shares.

10.4. <u>Term</u>. No full or partial exercise of an Award shall be carried out following the Expiration Date of such Award.

11. <u>Termination of Employment or Engagement.</u>

11.1. <u>Unvested Awards</u>. Unless otherwise determined by the Board, in the case of Termination, any Award or portion thereof that was not vested as of the Termination Date shall immediately expire on the Termination Date. Restricted Shares which have not yet completed the Restriction Period will be forfeited to the Company in accordance with section 9 above.

11.2. <u>Vested Options</u>

11.2.1. <u>Termination other than for Cause.</u>

11.2.1.1.    Unless otherwise determined by the Board, in the case of Termination other than for Cause, any Option or portion thereof that is vested as of the Termination Date may be exercised but only within such period (subject, however, to the provisions of section 14 below concerning early expiration or other treatment upon certain events) of time ending on the earlier of (i) ninety (90) days following the Termination Date, or (ii) the Expiration Date, but only to the extent to which such Option was exercisable at the time of the Termination Date. If, after the Termination Date, the Participant does not exercise his or her Option within the time specified above or in the Option Agreement, the Option shall expire.

11.2.1.2.    Unless otherwise determined by the Board, in the event of (i) Termination as a result of the Participant's death or resignation due to disability or (ii) the Participant dies within the period stated in section 11.2.1.1, then the Option may be exercised by the Participant's estate legal guardian, the Participant's estate, by a person who acquired the right to exercise the Option by bequest or inheritance or by a person designated to exercise the Option upon the Participant's death (the "**Assignees**"), but only within the period (subject, however, to the provisions of section 14 below concerning early expiration or other treatment upon certain events) ending on the earlier of (1) the date twelve (12) months following the date of death or the Termination Date due to disability (as the case may be) (or such longer or shorter period specified in the Option Agreement) or (2) the Expiration Date. If, after death or termination due to disability (as the case may be), the Option is not exercised within the time specified herein, the Option shall expire. The Transfer of Options to any Assignee shall be subject to the provision of a written notice to the Company and to the execution by the Assignee of any documents required by the Company. All of the terms of any Option, whether in this Plan, the Option Agreement and/or any other document in respect of such Option, shall be binding upon the Assignees.

11.2.1.3.    If the exercise of an Option following the Termination Date or death would be prohibited at any time solely because the issuance of Shares would violate requirements of any Applicable Law, then the Option shall expire: (i) in the event of a Termination - at the end of a period of ninety (90) days in the aggregate, or (ii) in the event of death - at the end of a period of twelve (12) months in the aggregate, during which the exercise of the Option would not be in violation of such requirements.

11.2.1.4.    During such periods following the Termination Date the Participant's entitlement to Options shall not continue to vest.

11.2.1.5.    The Board shall have the sole authority to extend the exercise periods detailed in sections 11.2.1.1 – 11.2.1.3 above at its sole discretion.

11.2.2. Termination for Cause. If a Participant's employment or engagement with the Company is terminated for Cause, any Option or portion thereof that has not been exercised as of the Termination Date shall immediately expire on the Termination Date.

11.3. No Participant shall be entitled to claim against the Company that he or she was prevented from continuing to exercise or vest Options as of the Termination Date. Such Participant shall not be entitled to any compensation in respect of the Options which would have vested in his favor had such Participant's employment or engagement with the Company or Affiliate not been terminated.

12. No Right to Employment, Service, Awards or Shares. The grant of an Award, the vesting of any Award or the issuance of a Share under the Plan shall impose no obligation on the Company or an Affiliate to continue the employment of any Employee or the engagement with any Consultant or the service of a Director and shall not lessen or affect the Company's or an Affiliate's right to terminate the employment or service relationship of such Participant at any time and/or for any or no reason with or without Cause, even if such Termination is immediately prior to the vesting of any Award. No Participant or other person shall have any claim to be granted any Awards or to the vesting of any Awards, whether expired immediately following grant or prior to vesting. There is no obligation for uniformity of treatment of Participants, or holders or beneficiaries of Awards and the terms and conditions of Awards and the Board's determinations and interpretations with respect thereto need not be the same with respect to each Participant (whether or not such Participants are similarly situated).

Nothing contained in the Plan shall prevent the Company from adopting, adjusting or continuing in effect compensation arrangements, which may, but need not, provide for the grant of Awards or Shares.

13. Trust

13.1.    Approved Awards and any Shares issued in connection with such Approved Awards shall be held by the Trustee for the benefit of the Participant, in accordance with the provisions of Section 102 in the "capital gain tax route". Any grant of an Award and any exercise of an Option or sale or transfer of a Share shall be notified to the Trustee.

13.2.    The validity of any order given to the Trustee by a Participant shall be subject to approval of such order by the Company. The Company does not undertake to approve orders given by any Participant to the Trustee within any period of time.

13.3.    Subject to the provisions of this Plan, the Approved Awards and any Shares issued in connection with such Approved Awards shall not be released from the control of the Trustee nor shall they be Transferred unless the Company and the Trustee are satisfied that the full amounts of Tax due by the applicable Participant have been paid or will be paid.

13.4.  Subject to the provisions of Section 102, a Participant shall not Transfer or release from the control of the Trustee any Approved Award or any Share issued in connection with such Approved Awards, until the lapse of the Holding Period. Notwithstanding the above, if any such release or Transfer occurs during the Holding Period, the sanctions under Section 102 shall apply to and shall be borne by such Participant.

13.5.  As long as the Approved Awards and any Shares issued in connection with such Approved Awards are held by the Trustee for the benefit of the Participant, all rights of the Participant over the Approved Awards and Shares cannot be Transferred other than by will or laws of descent and distribution.

13.6.  Without derogating from the aforementioned, the Board shall have the authority to determine the specific procedures and conditions of the trusteeship with the Trustee in a separate agreement between the Company and the Trustee, all subject to Section 102.

13.7.  Should the Approved Awards or any Shares issued in connection with such Approved Awards be transferred by power of a last will or under laws of decent, the provisions of Section 102 shall apply to the legal heirs or transferees by law of the deceased Participant.

13.8.  Approved Awards that do not comply with the requirements of Section 102 shall be considered Non-Approved 102 Awards or Awards subject to tax under Section 3(i) of the Ordinance.

14.  Adjustments to the Shares subject to the Plan

14.1.  Adjustment Due to Change in Capital. If the ordinary shares of the Company shall at any time be changed or exchanged by distribution of a share dividend (bonus shares), share split, combination or exchange of shares, recapitalization, or any other like event by or of the Company, and as often as the same shall occur, then the number and class of the Shares underlying the Awards subject to the Plan and the Exercise Price of the Options shall be appropriately and equitably adjusted so as to maintain through such an event the proportionate equity portion represented by the Awards and the total Exercise Price of the Options, provided, however, that no adjustment shall be made by reason of the distribution of subscription rights (rights offering) on outstanding ordinary shares or other issuance of shares by the Company. Fractions of shares shall be dealt with in accordance with the provisions of section 9.3 above. Except as expressly provided herein, no issuance by the Company of shares of any class, or securities convertible into shares of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or Exercise Price of Shares underlying an Award.

14.2.  Adjustment Due to a Structural Change. In the event of a Structural Change, the Shares underlying the Awards subject to the Plan shall be exchanged or converted into shares of the Company or Successor Company in accordance with the exchange effectuated in relation to the ordinary shares of the Company, and the Exercise Price and quantity of shares underlying the Awards shall be adjusted in accordance with the terms of the Structural Change. The adjustments required shall be determined in good faith solely by the Board and shall be subject to the receipt of any approval required, including any tax ruling, if necessary.

14.3.  Adjustment Due to a Spin-Off Transaction. In the event of a Spin-Off Transaction, the Board may determine that the holders of Awards shall be entitled to receive equity in the new company formed as a result of the Spin-Off Transaction, in accordance with equity granted to the ordinary shareholders of the Company within the Spin-Off Transaction, taking into account the terms of the Awards, including the vesting schedule and Exercise Price. The determination regarding the Participant's entitlement within the scope of a Spin-Off Transaction shall be in the sole and absolute discretion of the Board.

14.4. <u>M&A Transaction</u>.

14.4.1 Without derogating from the Board's general power under the Plan, in the event of any M&A Transaction, the Board shall be entitled (but not obliged), at its sole discretion and without the Participant's consent and action and without any prior notice requirement, to determine any of the following: (i) provide for an assumption or exchange of Awards and/or Shares for Awards and/or shares and/or other securities or rights of the Successor Company or parent or Affiliate thereof; and/or (ii) provide for an exchange of Awards or Shares for a monetary compensation (including for avoidance of doubt a cash-out of the Awards for the net value); and/or (iii) determine that all unvested Awards and un-exercised vested Options shall expire on the date of such M&A Transaction without payment; and/or (iv) determine that the exchange, assumption, conversion or purchase detailed above will be made subject to any payment or escrow arrangement, or any other arrangement determined within the scope of the M&A Transaction in relation to the ordinary shares of the Company and/or (v) provide for the acceleration of vesting of such Awards, as to all or part of the Shares, under such terms and conditions as the Board shall determine. The Board may determine, in its sole discretion, that upon completion of an M&A Transaction, the terms of any Award be otherwise amended, modified or terminated, as the Board shall deem in good faith to be appropriate. In the case of assumption and/or substitution of Awards, and unless otherwise determined by the Board, appropriate adjustments shall be made so as to reflect such action and all other terms and conditions of the Award Agreements shall remain substantially unchanged, including but not limited to the vesting schedule, all subject to the determination of the Board, which determination shall be at its sole discretion and final. The grant of any substitutes for the Awards and/or Shares to Participants further to an M&A Transaction, as provided in this section, shall be considered as full compliance with the terms of this Plan. The value of the exchanged Awards and/or Shares pursuant to this section 13.4 shall be determined in good faith solely by the Board, based among others on the Fair Market Value, and its decision shall be final and binding on all the Participants.

Unless determined otherwise by the Board of Directors, and without derogating from the aforementioned, any Awards not assumed or exchanged for Awards and/or shares and/or other securities or rights or not cashed-out, shall expire immediately prior to the consummation of the M&A Transaction. Neither the authorities and powers of the Board under this Section 14.4, nor the exercise or implementation thereof, shall (i) be restricted or limited in any way by any adverse consequences (tax or otherwise) that may result to any holder of an Award, and (ii) as, *inter alia*, being a feature of the Award upon its grant, be deemed to constitute a change or an amendment of the rights of such holder under this Plan, nor shall any such adverse consequences (as well as any adverse tax consequences that may result from any tax ruling or other approval or determination of any relevant tax authority) be deemed to constitute a change or an amendment of the rights of such holder under this Plan.

14.4.2 For the purposes of this section 14.4, the mechanism for determining the assumption or exchange as aforementioned shall be as may be agreed upon between the Board and the Successor Company.

14.4.3 Without derogating from the above, in the event of an M&A Transaction the Board shall be entitled, at its sole discretion, to require the Participants to exercise all vested Awards within a set time period and sell all of their Shares on the same terms and conditions as applicable to the other shareholders selling their Company's ordinary shares as part of the M&A Transaction. Each Participant acknowledges and agrees that the Board shall be entitled to authorize any one of its members to sign any agreement required to affect the sale of Shares including any share transfer deeds in customary form in respect of the Shares held by such Participant and that such share transfer deed shall bind the Participant.

14.4.4 Despite the aforementioned, if and when the method of treatment of Awards within the scope of an M&A Transaction determined according to the above will in the sole opinion of the Board prevent the M&A Transaction from occurring, or materially risk the M&A Transaction, the Board may determine different treatment for different Awards held by Participants such that not all Awards will be treated equally within the scope of the M&A Transaction.

14.4.5 In the event in which the exercise price of the Options is higher than the per-share value of the shares of the Company in such an M&A Transaction ("out-of-the-money Options"), the Board shall be entitled to cancel and terminate such Options effective upon consummation of the M&A Transaction without consideration.

14.4.6 In the event in which the Awards shall be cancelled upon the M&A Transaction, the Company shall provide notice to such Participants in such manner as notice is provided regarding the M&A Transaction to any other shareholders of the Company not represented in the Board. Such notice shall be sent to the last known address of the Participants according to the records of the Company. The Company shall not be under any obligation to ensure that such notice was actually received by the Participants.

14.4.7 It is clarified that this section 14.4 shall apply inter alia in the event of partial transactions which in the aggregate constitute an M&A Transaction in accordance with sub-section (c) of the definition of M&A Transaction, and in each such transaction the Board shall have the full power and authority under this Section 14.4.

14.5. Liquidation. In the event of the proposed dissolution or liquidation of the Company, all Awards will expire immediately prior to the consummation of such proposed action, unless otherwise provided by the Board.

14.6. The Participants shall execute any documents required by the Company or any Successor Company or parent of affiliate thereof in order to affect any of the actions determined within the scope of this section 14. The failure to execute any such document may cause the expiration and cancellation of any Award held by such Participant, as determined by the Board in its sole and absolute discretion.

14.7. Any adjustment according to this section shall be subject to the receipt of a tax ruling or approval from the tax authorities, if and as necessary.

15. Taxes and Withholding Tax

15.1. Approved Awards and Non-Approved 102 Awards shall be taxed in accordance with Section 102. For the avoidance of doubt it is clarified that any Award granted to a Consultant or a Controlling Shareholder or any Award granted to a Participant who is not an Israeli tax resident, shall not be subject to the provisions of Section 102 and shall be taxed in accordance with Applicable Law.

15.2. Any Tax imposed in respect of the Awards and/or Shares, including, but not limited to, in respect of the grant of Awards, and/or the vesting or exercise of Awards, and/or the Transfer, waiver, or expiration of Awards and/or Shares, and/or the sale of Shares, shall be borne solely by the Participants, and in the event of death by their heirs or transferees. The Company, the Affiliates, the Trustee (if applicable) or anyone on their behalf shall not be required to bear the aforementioned Taxes, directly or indirectly, nor shall they be required to gross up such Tax in the Participants' salaries or remuneration. The applicable Tax shall be deducted from the proceeds of sale of Shares or shall be paid to the Company, an Affiliate or the Trustee (if applicable) by the Participants. Without derogating from the aforementioned, the Company, an Affiliate and the Trustee (if applicable) shall be entitled to withhold Taxes according to the requirements of any Applicable Laws, rules, and regulations, and to deduct any Taxes from payments otherwise due to the Participant from the Company or an Affiliate (if applicable).

15.3.  The Company's or Trustee's (if applicable) obligation to deliver Shares upon grant, vesting or exercise of an Award or to sell or transfer Shares is subject to payment (or provision for payment satisfactory to the Board and the Trustee (if applicable)) by the Participant of all Taxes due by him under any Applicable Law.

15.4.  The Participants shall indemnify the Company and/or the applicable Affiliate and/or the Trustee (if applicable), immediately upon request, for any Tax (including interest and/or fines of any type and/or linkage differentials in respect of Tax and/or withheld Tax) for which the Participant is liable under any Applicable Law or under the Plan, and which was paid by the Company, the Affiliate or the Trustee (if applicable), or which the Company, the Affiliate or the Trustee (if applicable) are required to pay. The Company, the Affiliate and the Trustee (if applicable) may exercise such indemnification by deducting the amount subject to indemnification from the Participants' salaries or remunerations.

15.5.  In respect to Non-Approved 102 Awards, if there occurs a Termination of the Participant's service to or employment with the Company or an Affiliate, the Participant shall extend to the Company or the applicable Affiliate a security or guarantee for the payment of Tax due in respect of such Award as required under Section 102.

15.6.  For avoidance of doubt it is clarified that the tax treatment of any Award granted under this Plan is not guaranteed and although Awards may be granted under a certain tax route, they may become subject to a different tax route in the future.

15.7.  Any Award classified as a Capital Gain Award is meant to comply in full with the terms and conditions of Section 102 and the requirements of the ITA, therefore it is clarified that at all times the Plan is to be read such that it complies with the requirements of Section 102 and as a consequence, should any provision in the Plan disqualify the Plan and/or the Awards granted thereunder from beneficial tax treatment pursuant to the provisions of Section 102 of the Ordinance, such provision shall not apply to the Capital Gain Awards and underlying Shares unless the Israel Tax Authority provides approval of compliance with Section 102.

16.  Registration of the Shares on a Stock Exchange

16.1.  Should reorganization or certain other arrangements regarding the Company's share capital be necessary prior to the registration of the Company's ordinary shares or their respective depositary receipts on a Stock Exchange, such arrangements or reorganization may be also carried out in respect of the Participants and their Awards and/or Shares.

16.2.  The Participant acknowledges that in the event that the Company's ordinary shares or their respective depositary receipts shall be registered for trading in any Stock Exchange, or in the event of a private offering of shares, the Participant's rights to exercise their Options or sell the Shares may be subject to certain limitations (including a lock-up period), as will be requested by the Company or its underwriters, and the Participant unconditionally agrees and accepts any such limitations.

16.3.  The Company does not undertake to cause the ordinary shares or the Shares to be listed on a Stock Exchange, or that the registration of the ordinary shares or the Shares for trade, if at all, shall take place within a certain period of time.

17.  The Rights Attached to the Shares

17.1.  Equal Rights. The Shares constitute part of the ordinary shares of the Company, and they shall have equal rights for all intents and purposes as the rights attached to the ordinary shares of the Company, subject to the provisions of this Plan and any Award Agreement. The Shares, being part of the ordinary shares of the Company, shall not be protected against dilution in any manner whatsoever, unless otherwise determined by the Board. It is hereby clarified that the Shares shall not constitute a separate class of shares, but shall be an integral part of the Company's ordinary shares.

Any change of the Company's Articles of Association or any other incorporation document, which may change the rights attached to the Company's ordinary shares, shall also apply to the Shares, and the provisions hereof shall apply with the necessary modifications arising from any such change.

The grant of Awards and issuance of Shares under this Plan shall not restrict the Company in any way regarding future creation of additional and/or other classes of shares, including classes of shares, which may in any manner be preferred over the currently existing ordinary shares which are offered to Participants under this Plan. Subject to section 12.1 above, the grant of Awards and Shares under this Plan shall not entitle any Participant to receive any compensation in the event of any change of the Company's capital.

17.2.  Dividend Rights. No Participant shall have any rights to receive dividends in respect of the Shares underlying any outstanding Awards, until such Awards are converted into Shares and these Shares are issued to the Participant or the Trustee. Following the issuance of such Shares by the Company, such Shares will entitle the Participant to receive any dividend, to which other holders of ordinary shares in the Company are entitled.

17.3.  Transfer and Sale of Shares. Transfer of Shares shall be in accordance with the Company's incorporation documents.

17.4.  Bring Along. For the avoidance of doubt it is clarified that as part of the ordinary shares of the Company, Shares issued pursuant to Awards or in connection thereto shall be subject to any bring-along provision included in the incorporation documents of the Company or any shareholders agreement or similar agreement(s) by which some or all holders of ordinary shares of the Company are bound.

17.5.  Voting Rights. No Participant shall have any rights to vote in the Company's meetings in respect of underlying Shares, until such Shares are issued to the Participant or the Trustee. Following the issuance of such Shares by the Company, the Participant shall have the same voting rights as other holders of ordinary shares in the Company. Notwithstanding the aforesaid, and unless determined otherwise by the Board, as long as the Company's ordinary shares are not traded on a Stock Exchange, any Shares issued pursuant to an Award shall be voted by an irrevocable proxy, such proxy to be assigned to the person or persons designated by the Board. The Participants will be required, as a condition to the receipt of the Awards granted pursuant to this Plan and as a condition to the issuance of any Shares, to sign such a proxy. Unless otherwise determined by the Board, the proxy will be transferred upon any transfer of Shares unless such transfer occurs upon an M&A Transaction or upon or after an IPO of the Company.

17.6. <u>Information Rights.</u> Despite the Company's incorporation documents and the provisions of Applicable Law, no Participant shall have any right to receive financial information regarding the Company and any of its Affiliates, including financial reports, or any other reports which other shareholders of the Company are entitled to receive.

18. <u>Repurchase Right</u>:

The following shall be subject to the receipt of a tax ruling from the Israeli Tax Authority, if such ruling is required and if required shall be subject to the receipt of any approval required by applicable law and shall be in effect until the listing of the Company's ordinary shares on a Stock Exchange:

18.1. Repurchase in the case of Termination for Cause: In the event that the Participant's employment or engagement with or service to the Company or an Affiliate is terminated for Cause, or if following Termination it is found that the Participant committed an act constituting Cause, any Shares already issued to the Participant as a result of an Awards shall be forfeited and returned to the Company upon request of the latter for the original purchase price (the Exercise Price) of such Shares.

18.2. Repurchase in the case of working for a competitor: In the event that a Participant will commence working or providing services to a competitor of the Company or an Affiliate or to a subsidiary or affiliate of such competitor any Shares already issued to the Participant as a result of an Awards shall be forfeited and returned to the Company upon request of the latter for the original purchase price (the Exercise Price) of such Shares. For the purposes of this Section, a "competitor" shall mean any person or entity that operates, conducts, or manages a business in the field of the Company's business. This restriction is limited to a time period of 2 years after the termination of employment.

18.3. General repurchase: Following Termination, the Board shall be entitled, at its sole and absolute discretion, to instruct such Participant to sell his Shares to the Company for the then Fair Market Value of the Shares.

18.4. In the event that the Board has determined that a Participant's Shares shall be repurchased under any of the aforesaid sections 18.1-18.3, then the Participant shall be obliged to sell, any Shares that such Participant has received under the Plan, in accordance with the instructions issued by the Board. The determination of the Board in this regard shall be final.

18.5. If the Company is not permitted under Applicable Law to repurchase Shares under sections 18.1-18.3, the Company may assign such right under the Plan to the Company's existing shareholders (save, for avoidance of doubt, for other Participants who hold Shares resulting from the exercise of Awards granted under the Plan or any other employee benefit plan).

19. <u>Clawback Policy</u>. Any Award, amount, or benefit received under the Plan shall be subject to potential cancellation, recoupment, rescission, payback, or other similar action in accordance with any applicable Company clawback policy (the "**Policy**") or any applicable law, as may be in effect from time to time. A Participant's receipt of an Award shall be deemed to constitute the Participant's acknowledgment of and consent to the Company's application, implementation, and enforcement of (i) the Policy and any similar policy established by the Company that may apply to the Participant together with all other similarly situated Participants, whether adopted prior to or following the making of any Award and (ii) any provision of applicable law relating to cancellation, rescission, payback, or recoupment of compensation, as well as the Participant's express agreement that the Company may take such actions as are necessary to effectuate the Policy, any similar policy, and applicable law, without further consideration or action.

20. Breach of Restrictive Covenants. Except as otherwise provided by the Board, notwithstanding any provision of the Plan to the contrary, if the Participant breaches a confidentiality, non-competition, non-solicitation, non-disclosure, non-disparagement, or other similar restrictive covenant set forth in an Award Agreement or any other agreement between the Participant and the Company or any Affiliate, whether during or after the Participant's Termination, in addition to any other penalties or restrictions that may apply under any such agreement, state law, or otherwise, the Participant shall forfeit or pay to the Company:

20.1.  Any and all outstanding Awards granted to the Participant, including Awards that have become vested or exercisable;

20.2.  Any Shares held by the Participant in connection with the Plan that were acquired by the Participant after the Participant's Termination and within the twelve (12)-month period immediately preceding the Participant's Termination of Service (less any exercise price paid for such shares);

20.3.  The profit realized by the Participant from the exercise and sale of any Award or Share and within the twelve (12) month period immediately preceding the Participant's Termination; and

21.  Changes to the Plan. The Board shall be entitled, from time to time, to update and/or change the terms of this Plan, in whole or in part, at its sole discretion, provided that in the Board's opinion such a change shall not materially derogate from the rights attached to the Awards and/or Shares already granted under this Plan, unless mutually agreed otherwise between the Participant and the Company. The Board shall be entitled to terminate this Plan at any time, provided that such termination shall not materially affect the rights of Participants, to whom Awards have already been granted.

22. Effective Date and Duration of the Plan

22.1.  The Plan shall be effective as of the day it was adopted by the Board and shall terminate at the end of ten (10) years from such day of adoption.

22.2.  The Company shall obtain the approval of the Company's shareholders for the adoption of this Plan or for any amendment to this Plan, if shareholders' approval is necessary or desirable to comply with any Applicable Law, including without limitation the securities laws of jurisdictions applicable to Awards granted to Participants under this Plan, or if shareholders' approval is required by any authority or by any governmental agency or by any national securities exchange, including without limitation the US Securities and Exchange Commission.

22.3.  Termination of the Plan shall not affect the Board's ability to exercise the powers granted to it hereunder with respect to Awards granted under the Plan prior to the date of such termination.

23.  Successors and Assigns. The Plan and any Award granted thereafter shall be binding on all successors and assignees of the Company and a Participant, including, without limitation, the estate of such Participant and the executor, administrator or trustee of such estate, or any receiver or trustee in bankruptcy or representative of the Participant's creditors.

24. Miscellaneous

24.1.  Notices. Notices and requests regarding this Plan shall be sent in writing by registered mail or by courier to the addresses of the Company and the Participant or by facsimile transmission (provided that written confirmation of receipt is provided) with a copy by mail, as follows: if to the Company: at its principal offices; if to the Participant - to the Participant's address, as registered in the Company's registries. Such notices shall be deemed received at the addressee as follows: if sent by registered mail - within three (3) business days following their deposit for mailing at a post office located in the country of addressee, or seven (7) business days following their deposit for mailing at a post office located outside the country of addressee, and if hand-delivered or sent by facsimile or email - on the day of delivery (or refusal to receive).

24.2.  This Plan (together with the applicable Award Agreement(s) entered into with any Participant) constitutes the entire agreement and understanding between the Company and such Participant in connection with the grant of Awards to the Participant. Any representation and/or promise and/or undertaking made and/or given by the Company or by whosoever on its behalf, which has not been explicitly expressed herein or in an Award Agreement, shall have no force and effect.

25.  Governing Law. The Plan shall be governed by, construed and enforced in accordance with the laws of the State of Israel, without giving effect to principles of conflicts of law. The competent courts of Tel Aviv-Jaffa shall have exclusive jurisdiction to hear all disputes arising in connection with this Plan.

\* \* \* \* \*

**United States Sub-Plan to the**
**IL Makiage Cosmetics (2013) Ltd. 2020 Equity Incentive Plan**
**As approved by the Board of Directors on: April 1, 2020**
**As approved by the Shareholders on: April 1, 2020**

**1.    PURPOSE**

The Board of IL Makiage Cosmetics (2013) Ltd. (the "**Company**") established the IL Makiage Cosmetics (2013) Ltd. 2020 Equity Incentive Plan (the "**Plan**"). Through the Plan, the Company established a framework to aid the Company in attracting, retaining, motivating and rewarding employees and non-employee directors of, and consultants to, the Company or its subsidiaries or Affiliates, to provide for equitable and competitive compensation opportunities, to recognize individual contributions and reward achievement of Company goals, and promote the creation of long-term value for shareholders by closely aligning the interests of U.S. Participants with those of shareholders.

According to the authority granted to the Board of Directors of the Company under Section 4.2 of the Plan, the Board determined that it was necessary and desirable to establish a sub-plan of the Plan (the "***U.S. Sub-Plan***") for the purpose of granting Awards to Eligible Persons who are residents of the United States or who are or may become subject to U.S. tax (i.e., income tax, social security and/or withholding tax ("***U.S. Participants***")), including (i) stock options which qualify as Incentive Stock Options ("***ISOs***") within the meaning of Section 422 of the Code, (ii) stock options that are

Nonstatutory Stock Options ("***NSOs***"), and (iii) Share Awards, consisting of Restricted Shares or Restricted Share Units (which may be settled in Shares or cash, per the terms of applicable Award Agreement). It is the intent for all Awards to be exempt from or comply with Section 409A of the Code, and to comply with certain other provisions and exemptions under U.S. law. All Awards granted to U.S. Participants are subject to the terms and conditions of the Plan and this U.S. Sub-Plan; provided, that to the extent that the terms and conditions of the Plan differ from or conflict with, the terms or conditions of this U.S. Sub-Plan, the terms and conditions of this U.S. Sub-Plan shall prevail.

**2.    INTERPRETATION**

For the purposes of the U.S. Sub-Plan, the definitions set out in the Plan shall apply to the U.S. Sub-Plan as such definitions apply to the Plan and in addition the following terms shall have the following meanings (unless the context requires otherwise):

2.1     *"Code"* means the Internal Revenue Code of 1986, as amended. Reference to a specific section of the Code or regulation thereunder shall include any valid regulation promulgated under such section, and any comparable provision of any future legislation or regulation amending, supplementing or superseding such section or regulation, and regulations thereto.

2.2     *"Director"* means a member of the Board, manager or comparable governing body of the Company or any subsidiary or Affiliate.

2.3     "***Disability***" means, with respect to a U.S. Participant, the inability of such U.S. Participant to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months as provided in Sections 22(e)(3) and 409A(a)(2)(c)(i) of the Code, and will be determined by the Board on the basis of such medical evidence as the Board deems warranted under the circumstances.

2.4    *"Eligible Person"* has the meaning specified in Section 3.1.1.

2.5    "*Employee*" has the meaning specified in the Plan, except that for purposes of the U.S. Sub-Plan, an Employee shall also include any person whom the Company or an Affiliate classifies as an employee (including any officer who is an employee) for U.S. employment tax purposes regardless of whether such individual has signed an employment agreement with the Company or an Affiliate.

2.6    "*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended.

2.7    *"Incentive Stock Option"* or "*ISO*" means an Option intended to be (as set forth in the Option Agreement) and which qualifies as an incentive stock option within the meaning of Section 422(b) of the Code.

2.8    "*M&A Transaction*" For purposes of the U.S. Sub-Plan only, the term "substantially all," as used in the definition of M&A Transaction in the Plan, shall mean "more than 50%."

2.9    *"Nonstatutory Stock Option"* or "*NSO*" means an Option not intended to be (as set forth in the Option Agreement) or which does not qualify as an Incentive Stock Option.

2.10    "*Securities Act*" means the U.S. Securities Act of 1933, as amended.

2.11    *"Ten Percent Stockholder"* means a person who, at the time an Option is granted to such person, owns (or is deemed to own pursuant to Section 424(d) of the Code) shares possessing more than ten percent (10%) of the total combined voting power (as defined under applicable U.S. law) of all classes of shares of the Company within the meaning of Section 422(b)(6) of the Code.

**3.    TERMS**

3.1    **Eligibility and Certain Award Limitations**.

3.1.1    **Eligibility**.

3.1.1.1    **In General**. Awards may be granted under the U.S. Sub-Plan only to Eligible Persons. For purposes of the U.S. Sub-Plan, an "**Eligible Person**" means (i) an Employee, (ii) a non-employee executive officer or non-employee Director of the Company or an Affiliate, or (iii) a Consultant, subject to the limitations of Section 3.1.2 below.

3.1.1.2    **Incentive Stock Options**. Options intended to qualify as Incentive Stock Options may be granted only to an Employee of the Company or of a "parent corporation" or "subsidiary corporation" (as those terms are defined in Section 424 of the Code) with respect to the Company. Neither service as a Director nor payment of a director's fee by the Company shall be sufficient to constitute "employment" by the Company for purposes of the U.S. Sub-Plan.

3.1.1.3    **Nonstatutory Stock Options** (limitation of eligibility). Nonstatutory Stock Options may not be granted to Employees, Directors, or Consultants who are providing services to any "parent" of the Company, as such term is defined in Rule 405 of the Securities Act, unless the Company, in consultation with its legal counsel, has determined that such Options are exempt from, or alternatively comply with, the distribution requirements of Section 409A of the Code.

3.1.2  **Consultants.** A Consultant will not be eligible for the grant of an Option if, at the time of grant, either the offer or sale of the Company's securities to such Consultant is not exempt under Rule 701 of the Securities Act because of the nature of the services that the Consultant is providing to the Company, because the Consultant is not a natural person, or because of any other provision of Rule 701, unless the Company determines that such grant need not comply with the requirements of Rule 701 and will satisfy another exemption under the Securities Act as well as comply with the securities laws of all other relevant jurisdictions**.**

3.1.3  **Change in Time Commitment**. In the event a U.S. Participant's regular level of time commitment in the performance of his or her services for the Company and any Affiliates is reduced (for example, and without limitation, a U.S. Participant has a change in status from a full-time Employee to a part-time Employee) after the date of grant of any Award to the U.S. Participant, the Board has the right in its sole discretion to (x) make a corresponding reduction in the number of shares subject to any portion of such Award that is scheduled to vest or become payable after the date of such change in time commitment, and (y) in lieu of or in combination with such a reduction, extend the vesting or payment schedule applicable to such Award (as may be permitted by law at the time of such change in time commitment). In the event of any such reduction, the U.S. Participant will have no right with respect to any portion of the Award that is so reduced or extended.

3.1.4  **Requirement to Sign Shareholders' Agreements**. In connection with the grant, vesting and/or exercise of any Award under the Plan or U.S. Sub-Plan, the Board may require a Participant to execute and become a party to agreements entered with Shareholders of the Company (collectively referred to as "***Shareholders' Agreement***") as a condition of such grant, vesting and/or exercise. The Shareholders' Agreement may contain restrictions on the transferability of shares acquired under the Plan (such as a right of first refusal or a prohibition on transfer) and such shares may be subject to call rights and drag-along rights of the Company and certain of its investors. The Company shall also have any repurchase rights set forth in the Shareholders' Agreement or any Award Agreement.

3.2   **Incentive Stock Options.** The following provisions shall control any grants of Options that qualify as Incentive Stock Options:

3.2.1  **Grants of Incentive Stock Options**. Each Option that is intended to be an Incentive Stock Option must be designated by the Board at the date of grant, and in the Option Agreement, as an Incentive Stock Option, provided that any Option designated as an Incentive Stock Option will be a Nonstatutory Stock Option to the extent the Option fails to meet the requirements of Code Section 422. In the case of an Incentive Stock Option, the Board shall determine the acceptable methods of payment on the date of grant and it shall be included in the applicable Option Agreement.

3.2.2  **Additional Limits for Ten Percent Stockholders**. As provided by Section 422(c)(5) of the Code, a person who owns more than 10% of the total combined voting power of all classes of outstanding stock of the Company, its parent or any of its subsidiaries will not be eligible for the grant of an Incentive Stock Option *unless* (i) the Exercise Price is at least 110% of the Fair Market Value of a Share on the date of grant and (ii) such Incentive Stock Option by its terms is not exercisable after the expiration of five (5) years from the date of grant. The attribution rules of Section 424(d) of the Code will be applied in determining stock ownership.

3.2.3    **Maximum ISO Limit.** The maximum aggregate number of Shares that may be issued under the Plan pursuant to the exercise of Incentive Stock Options shall not exceed 93,651 Shares (the *"ISO Share Limit"*) (subject to adjustment as provided in Section 14 of the Plan).

3.2.4    **No Transfer**. As provided by Section 422(b)(5) of the Code, an Incentive Stock Option will not be transferable except by will or by the laws of descent and distribution, and will be exercisable during the lifetime of the U.S. Participant only by the U.S. Participant. If the Board elects to allow the transfer of an Option by a U.S. Participant that is designated as an Incentive Stock Option, such transferred Option will automatically become a Nonstatutory Stock Option.

3.2.5    **Fair Market Value Limitation.** To the extent that options designated as Incentive Stock Options (granted under all Shares plans of the Company, including the Plan) become exercisable by a U.S. Participant for the first time during any calendar year for Shares having a Fair Market Value greater than One Hundred Thousand Dollars ($100,000 USD), the portions of such options which exceed such amount shall be treated as Nonstatutory Stock Options. For purposes of this Section 3.2.5, Options designated as Incentive Stock Options shall be taken into account in the order in which they were granted, and the Fair Market Value of Shares shall be determined as of the time the option with respect to such Shares was granted. If an Option is treated as an Incentive Stock Option in part and as a Nonstatutory Stock Option in part by reason of the limitation set forth in this Section, the U.S. Participant may designate which portion of such Option the U.S. Participant is exercising. In the absence of such designation, the Optionee shall be deemed to have exercised the Incentive Stock Option portion of the Option first. Upon exercise of the Option, Shares issued pursuant to each such portion shall be separately identified.

3.2.6    **Leave of Absence**. If a U.S. Participant goes on a leave of absence, and the period of leave exceeds ninety (90) days, then any Incentive Stock Options held by the U.S. Participant shall cease to be treated as an Incentive Stock Option on the 180th day following the first day of such leave and shall thereafter be treated for U.S. tax purposes as a Nonstatutory Stock Option, *unless* reemployment upon expiration of such leave is guaranteed by statute or contract.

3.2.7    **Modification**. If an Incentive Stock Option is modified (within the meaning of Code Section 424(h)), such Option will thereupon cease to be treated as an Incentive Stock Option to the extent required by the Code.

3.3    **Post-Termination Exercise Period; Extensions; Lapse of ISO Status**.

3.3.1    Section 11 of the Plan shall govern the post-Termination exercise periods of Options granted to U.S. Participants pursuant to the U.S. Sub-Plan.

3.3.2    Despite any other provision included in the Plan, no extension of the post-Termination Option exercise period shall be made with respect to any Option held by a U.S. Participant that would constitute an extension of the Option pursuant to Code Section 409A and subject the U.S. Participant to penalties under Section 4999 of the Code.

3.4 **Exercise Price**. The Exercise Price per share for an Option shall be determined by the Board; provided that such Exercise Price shall be not less than the Fair Market Value of a Share on the effective date of grant of the Option unless expressly determined in writing by the Board on the Option's date of grant, and subject to compliance with Section 409A of the Code. Notwithstanding the foregoing, an Option (whether an Incentive Stock Option or a Nonstatutory Stock Option) may be granted with an Exercise Price lower than the minimum exercise price set forth above if such Option is granted pursuant to an assumption or substitution for another option in a manner qualifying under the provisions of Section 424(a) of the Code.

3.5 **Term of Awards**. The Board shall determine the term of each Award, provided that in no event shall any Option be exercisable after the expiration of ten (10) years after the effective date of grant of such Option. Subject to the foregoing, unless otherwise specified by the Board in the Option Agreement, any Option granted hereunder shall terminate ten (10) years after the effective date of grant of the Option, unless earlier terminated in accordance with its provisions.

3.6 **Termination of Employment or Service**. If, on the date of Termination, the U.S. Participant is not vested as to his or her entire Award, the Shares covered by the unvested portion of the Award shall revert to the Plan. If, after Termination, the entire vested portion of his or her Option shall not be exercised within the applicable time period, the Option shall terminate and the Shares covered by the unexercised vested portion of such Option shall also revert to the Plan.

3.7 **Limits on Transferability; Beneficiaries**.

   3.7.1 **In General**. No Award or other right or interest of a U.S. Participant under this U.S. Sub-Plan shall be pledged, hypothecated or otherwise encumbered or subject to any lien, obligation or liability of such U.S. Participant to any party (other than the Company or a subsidiary or Affiliate thereof), or assigned or transferred by such U.S. Participant otherwise than by will or the laws of descent and distribution, and such Awards or rights that may be exercisable shall be exercised during the lifetime of the U.S. Participant only by the U.S. Participant or his or her guardian or legal representative, except as permitted by the Board.

   3.7.2 **Domestic Relations Orders**. Subject to the approval of the Board or a duly authorized officer of the Company, an Award may be transferred pursuant to the terms of a domestic relations order, official marital settlement agreement or other divorce or separation instrument as permitted by Treasury Regulations Section 1.421-1(b)(2). If an Option is an Incentive Stock Option, such Option will be deemed to be a Nonstatutory Stock Option as a result of such transfer.

   3.7.3 **Beneficiary Designation**. Subject to the approval of the Board or a duly authorized officer of the Company, a U.S. Participant may, by delivering written notice to the Company, in a form approved by the Company (or the designated broker), designate a third party who, on the death of the U.S. Participant, will thereafter be entitled to exercise all rights and interests in the Award, held by the U.S. Participant at the time of death, including the right to exercise an Option, and to receive the Shares or other consideration resulting from the settlement or exercise of such Award. In the absence of such a designation, upon the death of the U.S. Participant, the executor or administrator of the U.S. Participant's estate will be entitled to exercise all rights and interests in the Award, held by the U.S. Participant at the time of death, including the right to exercise an Option, and to receive the Shares or other consideration resulting from the settlement or exercise of such Award. However, the Company may prohibit designation of a beneficiary at any time, including due to any conclusion by the Company that such designation would be inconsistent with the provisions of applicable laws.

4.  **ADMINISTRATION OF U.S. SUB-PLAN**

4.1  **Manner of Exercise of Board Authority**. The express grant of any specific power to the Board, and the taking of any action by the Board, shall not be construed as limiting any power or authority of the Board. To the fullest extent authorized under applicable law, the Board may delegate to officers or managers of the Company or any subsidiary or Affiliate, or committees thereof, the authority, subject to such terms as the Board shall determine, to perform such functions, including administrative functions, as the Board may determine.

4.2  **Share Limit for Awards Issued to California Residents.** For purposes of compliance with Section 25102(o) of the California Corporations Code, the aggregate number of Shares that may be issued pursuant to Awards granted to residents of the state of California will not exceed 93,651 shares.

4.3  **Compliance with Legal and Other Requirements**. The Company may, to the extent deemed necessary or advisable by the Board, postpone the issuance or delivery of Shares until completion of such registration or qualification of such Shares or other required action under any federal or state law, rule or regulation or listing or other required action with respect to any stock exchange or automated quotation system upon which the Shares or other securities of the Company are listed or quoted, as the Board may consider appropriate, and may require any U.S. Participant to make such representations, furnish such information and comply with or be subject to such other conditions as it may consider appropriate in connection with the issuance or delivery of in compliance with applicable laws, rules, and regulations or listing requirements.

4.4  **Disclaimer; Non-Uniform Treatment**. Notwithstanding any provision in the U.S. Sub-Plan or Plan to the contrary, the Company shall have no liability to any Participant or any other person if an Option designated as an Incentive Stock Option fails to qualify as such at any time or if an Award is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A of the Code and the terms of such Award do not satisfy the requirements of Section 409A of the Code. The Board's determination under the Plan and U.S. Sub-Plan need not be uniform and may be made by it selectively among persons who are eligible to receive, or actually receive, Awards. Without limiting the generality of the foregoing, the Board shall be entitled to make non-uniform and selective determinations, amendments and adjustments, and enter into non-uniform and selective Award Agreements.

4.5  **Unfunded Plan**. The Plan and the U.S. Sub-Plan shall be unfunded. Neither the Company nor the Board shall be required to establish any special or separate fund or to segregate any assets to assure the performance of its obligations under the Plan or U.S. Sub-Plan.

**5.    TAX PROVISIONS**

5.1    **Section 409A Compliance.** The Company intends that Awards granted pursuant to the Plan to U.S. Participants be exempt from or comply with Section 409A of the Code (including any amendments or replacements of such section), and the Plan shall be so construed. Notwithstanding other provisions of this U.S. Sub-Plan or any Award Agreements hereunder, unless otherwise determined by the Board in its sole and absolute discretion, no Award shall be granted, deferred, accelerated, extended, paid out or modified under this U.S. Sub-Plan in a manner that would result in the imposition of an additional tax under Section 409A of the Code upon a U.S. Participant. In the event that it is reasonably determined by the Board that, as a result of Section 409A of the Code, payments in respect of any Award under the Plan may not be made at the time contemplated by the terms of the Plan or the relevant Award Agreement, as the case may be, without causing the U.S. Participant holding such Award to be subject to taxation under Section 409A of the Code, including as a result of the fact that the U.S. Participant is a "specified employee" under Section 409A of the Code, the Company will attempt to make such payment on the first day that would not result in the U.S. Participant incurring any tax liability under Section 409A of the Code. The Company shall use commercially reasonable efforts to implement the provisions of this Section 5.1 in good faith; provided that neither the Company, the Board nor any of the Company's employees, directors or representatives shall have any liability to U.S. Participants with respect to this Section 5.1. Without limiting the foregoing, unless otherwise determined by the Board in its sole and absolute discretion, the terms of Section 4 and of the Plan as they relate to U.S. Participants shall be subject to the requirements and limitations of Section 409A of the Code. Notwithstanding any provision of the Plan to the contrary, in the event that following such effective date the Board determines that any Award may be subject to Section 409A of the Code and related Department of Treasury guidance (including such Department of Treasury guidance as may be issued after such effective date), the Board may adopt such amendments to the Plan and the applicable Award Agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Board determines are necessary or appropriate to (a) exempt the Award from Section 409A of the Code and/or preserve the intended tax treatment of the benefits provided with respect to the Award, or (b) comply with the requirements of Section 409A of the Code and related Department of Treasury guidance and thereby avoid the application of any penalty taxes under such Section. Notwithstanding any provision of the definition of M&A Transaction in the Plan to the contrary, in the event that any amount or benefit under the Plan or the U.S. Sub-Plan with respect to a U.S. Participant that constitutes deferred compensation under Section 409A of the Code and the settlement of or distribution of such amount or benefit is to be triggered by an M&A Transaction, then such settlement or distribution shall be subject to the event constituting the M&A Transaction also constituting a "change in control event" (as defined in Code Section 409A). The settlement of Restricted Share Units shall occur not later than 2½ months following the year in which they become vested, unless the terms of the Award Agreement specify a later settlement date in compliance with Section 409A of the Code.

5.2    **Share Withholding**. When, under applicable tax laws, a U.S. Participant incurs tax liability in connection with the exercise, vesting, or settlement of any Award that is subject to tax withholding and the U.S. Participant is obligated to pay the Company the amount required to be withheld, the Board may in its sole discretion allow the U.S. Participant to satisfy the tax withholding obligation by electing to have the Company withhold from the Shares to be issued up to the minimum number of Shares having a Fair Market Value on the date that the amount of tax to be withheld is to be determined that is not more than the amount to be withheld (except as otherwise specifically provided by the Committee, such Shares withheld may not be used to satisfy more than the maximum individual statutory tax rate for each applicable tax jurisdiction); or to arrange a mandatory "sell to cover" on U.S. Participant's behalf (without further authorization) but in no event will the Company withhold Shares or "sell to cover" if such withholding would result in adverse accounting consequences to the Company. Any elections to have Shares withheld or sold for this purpose will be made in accordance with the requirements established by the Board for such elections and be in writing in a form acceptable to the Board.

5.3    **No Obligation to Notify or Minimize Taxes**. The Company will have no duty or obligation to the U.S. Participant to advise such holder as to the time or manner of exercising an Option. Furthermore, the Company will have no duty or obligation to warn or otherwise advise such holder of a pending termination or expiration of an Award or a possible period in which an Option may not be exercised. The Company has no duty or obligation to minimize the tax consequences of an Award to the U.S. Participant.

**6.    LIMITATION ON RIGHTS CONFERRED UNDER U.S. SUB-PLAN**

Neither this U.S. Sub-Plan nor any action taken hereunder shall be construed as (i) giving any Eligible Person or U.S. Participant the right to continue as an Eligible Person or U.S. Participant or in the employee or service of the Company or a subsidiary or Affiliate, (ii) interfering in any way with the right of the Company or a subsidiary or Affiliate to terminate any Eligible Person's or U.S. Participant's employment or service at any time, (iii) giving an Eligible Person or U.S. Participant any claim to be granted any Award under the Plan or to be treated uniformly with other U.S. Participants and employees, or (iv) conferring on a U.S. Participant any of the rights of a shareholder of the Company unless and until the U.S. Participant is duly issued or transferred Shares in accordance with the terms of an Award, an Option is duly exercised, or a Restricted Share Unit is settled. Except as expressly provided in this U.S. Sub-Plan and an Award Agreement, neither this U.S. Sub-Plan nor any Award Agreement shall confer on any person other than the Company and the U.S. Participant any rights or remedies thereunder.

**7.    AUTHORIZATION OF SUB-PLAN**

7.1    **Effectiveness**. This U.S. Sub-Plan shall become effective upon its adoption by the Board (the "*Effective Date*"). It shall continue in effect for a term of ten (10) years from such date or from the date of its approval by the shareholders, whichever is earlier, unless sooner terminated under the terms of the Plan.

7.2    **Shareholder Approval**. The authority to grant ISOs pursuant to the Plan and this U.S. Sub-Plan to U.S. Participants shall be subject to approval by the shareholders of the Company within twelve (12) months before or after the date the Plan and this U.S. Sub-Plan are adopted. Any outstanding ISOs, and any Shares purchased pursuant to an ISO under this U.S. Sub-Plan before shareholder approval is obtained must be rescinded if shareholder approval is not obtained within twelve (12) months before or after the Plan and this U.S. Sub-Plan are adopted.

7.3    **Nonexclusivity of the Plan**. Neither the adoption of this U.S. Sub-Plan by the Board nor its submission to the Shareholders of the Company for approval shall be construed as creating any limitations on the power of the Board or a committee thereof to adopt such other incentive arrangements, apart from the Plan or this U.S. Sub-Plan, as it may deem desirable, and such other arrangements may be either applicable generally or only in specific cases.

**8.    GOVERNING LAW**

This U.S. Sub-Plan shall in all respects be governed by and be construed in accordance with the laws of Israel to the maximum extent permissible, without giving effect to the principals of conflicts of laws of any state or jurisdiction, and applicable provisions of federal law. For the purpose of taxation of U.S. Participant, the provisions of the Code shall also apply.

**ODDITY TECH LTD.**

**2023 INCENTIVE AWARD PLAN**

**SHARE OPTION GRANT NOTICE**

Capitalized terms not specifically defined in this Share Option Grant Notice (the "Grant Notice") have the meanings given to them in the 2023 Incentive Award Plan (as amended from time to time, the "Plan") of Oddity Tech Ltd. (the "Company"). The Company hereby grants to the participant listed below ("Participant") the share option described in this Grant Notice (the "Option"), subject to the terms and conditions of the Plan and the Share Option Agreement attached hereto as Exhibit A (the "Agreement"), and the special terms and provisions, if any, for the Participant's country of residence in the appendix attached hereto as Exhibit B (the "International Appendix"), each of which are incorporated into this Grant Notice by reference.

**Participant:**
**Grant Date:**
**Exercise Price per Share:**
**Shares Subject to the Option:**
**Final Expiration Date:**
**Vesting Commencement Date:**
**Vesting Schedule:**                                    [To be specified in individual agreements]
**Type of Option**                        ☐  Incentive Stock Option          ☐  Non-Qualified Option

By Participant's signature below or electronic acceptance or authentication in a form authorized by the Company, Participant agrees to be bound by the terms of this Grant Notice, the Plan, the Agreement and the International Appendix, as applicable. Participant has reviewed the Plan, this Grant Notice, the Agreement and the International Appendix, as applicable, in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Grant Notice and fully understands all provisions of the Plan, this Grant Notice, the Agreement and the International Appendix, as applicable. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or relating to the Option.

**ODDITY TECH LTD.**                                         **PARTICIPANT**

By:                                                          By:
Print Name:                                                  Print Name:
Title:

**EXHIBIT A**

**SHARE OPTION AGREEMENT**

**ARTICLE I.**
**GENERAL**

1.1     Incorporation of Terms of Plan. The Option is subject to the terms and conditions set forth in this Agreement, the International Appendix, as applicable, and the Plan, which is incorporated herein by reference. In the event of any inconsistency between the Plan and this Agreement, the terms of the Plan will control.

1.2     Defined Terms. Capitalized terms not specifically defined herein shall have the meanings specified in the Plan or the Grant Notice. For purposes of this Agreement,

(a)     "Cessation Date" shall mean the date of Participant's Termination of Service (regardless of the reason for such termination).

(b)     ["CIC Qualifying Termination" shall mean Participant's Termination of Service by any Participating Company without Cause upon or during the twelve-month period immediately following a Change in Control.][1]

(c)     "Participating Company" shall mean the Company or any of its parents or Subsidiaries.

**ARTICLE II.**
**GRANT OF OPTION**

Section 2.1     Grant of Option. In consideration of Participant's past and/or continued employment with or service to a Participating Company and for other good and valuable consideration, effective as of the grant date set forth in the Grant Notice (the "Grant Date"), the Company has granted to the Participant the Option to purchase any part or all of an aggregate number of Shares set forth in the Grant Notice, upon the terms and conditions set forth in the Grant Notice, the Plan and this Agreement, subject to adjustment as provided in Article VIII of the Plan.

Section 2.2     Exercise Price. The exercise price per Share of the Shares subject to the Option (the "Exercise Price") shall be as set forth in the Grant Notice.

Section 2.3     Consideration to the Company. In consideration of the grant of the Option by the Company, Participant agrees to render faithful and efficient services to any Participating Company.

**ARTICLE III.**
**PERIOD OF EXERCISABILITY**

Section 3.1     Commencement of Exercisability.

(a)     Subject to Participant's continued employment with or service to a Participating Company on each applicable vesting date and subject to Sections [3.1(b)], 3.2, 3.3, 5.9 and 5.14 hereof, the Option shall become vested and exercisable in such amounts and at such times as are set forth in the Grant Notice.

---

[1] **Note to Draft:** Include for participants receiving double trigger protection.

(b)        [Notwithstanding the Grant Notice or the provisions of Section 3.1(a) and (c), in the event of a CIC Qualifying Termination, the Option shall become vested and exercisable in full on the date of such CIC Qualifying Termination.][2]

(c)        Unless otherwise determined by the Administrator or as set forth in a written agreement between Participant and the Company, any portion of the Option that has not become vested and exercisable on or prior to the Cessation Date (including, without limitation, pursuant to any employment or similar agreement by and between Participant and the Company) shall be forfeited on the Cessation Date and shall not thereafter become vested or exercisable.

Section 3.2       Duration of Exercisability. The installments provided for in the vesting schedule set forth in the Grant Notice are cumulative. Each such installment that becomes vested and exercisable pursuant to the vesting schedule set forth in the Grant Notice shall remain vested and exercisable until it becomes unexercisable under Section 3.3 hereof. Once the Option becomes unexercisable, it shall be forfeited immediately.

Section 3.3       Expiration of Option. The Option may not be exercised to any extent by anyone after the first to occur of the following events:

(a)        The expiration date set forth in the Grant Notice; *provided* that such expiration date shall not be later than the tenth (10th) anniversary of the Grant Date;

(b)        Except as the Administrator may otherwise approve, the ninetieth (90th) day following the Cessation Date by reason of Participant's Termination of Service for any reason other than due to death, Disability or by a Participating Company for Cause;

(c)        Except as the Administrator may otherwise approve, immediately upon the Cessation Date by reason of Participant's Termination of Service by a Participating Company for Cause; and

(d)        The expiration of twelve (12) months from the Cessation Date by reason of Participant's Termination of Service due to death or Disability.

Section 3.4       Tax Withholding. Notwithstanding any other provision of this Agreement:

(a)        The Participating Companies have the authority to deduct or withhold, or require Participant to remit to the applicable Participating Company, an amount sufficient to satisfy any applicable federal, state, local and foreign taxes (including the employee portion of any FICA obligation) required by Applicable Law to be withheld with respect to any taxable event arising pursuant to this Agreement. The Participating Companies may withhold or Participant may make such payment in one or more of the forms specified below:

(i)        by cash or check made payable to the Participating Company with respect to which the withholding obligation arises;

---

[2] **Note to Draft:** Include for participants receiving double-trigger protection.

A-2

(ii)        by the deduction of such amount from other compensation payable to Participant;

(iii)        with respect to any withholding taxes arising in connection with the exercise of the Option, with the consent of the Administrator, by requesting that the Participating Companies withhold a net number of vested Shares otherwise issuable upon the exercise of the Option having a then current Fair Market Value not exceeding the amount necessary to satisfy the withholding obligation of the Participating Companies based on the maximum statutory withholding rates in Participant's applicable jurisdictions for federal, state, local and foreign income tax and payroll tax purposes that are applicable to such taxable income;

(iv)        with respect to any withholding taxes arising in connection with the exercise of the Option, with the consent of the Administrator, by tendering to the Company vested Shares held for such period of time as may be required by the Administrator in order to avoid adverse accounting consequences and having a then current Fair Market Value not exceeding the amount necessary to satisfy the withholding obligation of the Participating Companies based on the maximum statutory withholding rates in Participant's applicable jurisdictions for federal, state, local and foreign income tax and payroll tax purposes that are applicable to such taxable income;

(v)        with respect to any withholding taxes arising in connection with the exercise of the Option, through the delivery of a notice that Participant has placed a market sell order with a broker acceptable to the Company with respect to Shares then issuable to Participant pursuant to the Option, and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to the Participating Company with respect to which the withholding obligation arises in satisfaction of such withholding taxes; provided that payment of such proceeds is then made to the applicable Participating Company at such time as may be required by the Administrator, but in any event not later than the settlement of such sale; or

(vi)        in any combination of the foregoing.

(b)        With respect to any withholding taxes arising in connection with the Option, in the event Participant fails to provide timely payment of all sums required pursuant to Section 3.4(a), the Company shall have the right and option, but not the obligation, to treat such failure as an election by Participant to satisfy all or any portion of Participant's required payment obligation pursuant to Section 3.4(a)(ii) or Section 3.4(a)(iii) above, or any combination of the foregoing as the Company may determine to be appropriate. The Company shall not be obligated to deliver any certificate representing Shares issuable with respect to the exercise of the Option to, or to cause any such Shares to be held in book-entry form by, Participant or his or her legal representative unless and until Participant or his or her legal representative shall have paid or otherwise satisfied in full the amount of all federal, state, local and foreign taxes applicable with respect to the taxable income of Participant resulting from the exercise of the Option or any other taxable event related to the Option.

(c)        In the event any tax withholding obligation arising in connection with the Option will be satisfied under Section 3.4(a)(iii), then the Company may elect to instruct any brokerage firm determined acceptable to the Company for such purpose to sell on Participant's behalf a whole number of Shares from those Shares then issuable upon the exercise of the Option as the Company determines to be appropriate to generate cash proceeds sufficient to satisfy the tax withholding obligation and to remit the proceeds of such sale to the Participating Company with respect to which the withholding obligation arises. Participant's acceptance of this Option constitutes Participant's instruction and authorization to the Company and such brokerage firm to complete the transactions described in this Section 3.4(c), including the transactions described in the previous sentence, as applicable. The Company may refuse to issue any Shares to Participant until the foregoing tax withholding obligations are satisfied, provided that no payment shall be delayed under this Section 3.4(c) if such delay will result in a violation of Section 409A.

A-3

(d)        Participant is ultimately liable and responsible for all taxes owed in connection with the Option, regardless of any action any Participating Company takes with respect to any tax withholding obligations that arise in connection with the Option. No Participating Company makes any representation or undertaking regarding the treatment of any tax withholding in connection with the awarding, vesting or exercise of the Option or the subsequent sale of Shares. The Participating Companies do not commit and are under no obligation to structure the Option to reduce or eliminate Participant's tax liability.

**ARTICLE IV.**
**EXERCISE OF OPTION**

Section 4.1      Person Eligible to Exercise. During the lifetime of Participant, only Participant may exercise the Option or any portion thereof. After the death of Participant, any exercisable portion of the Option may, prior to the time when the Option becomes unexercisable under Section 3.3 hereof, be exercised by Participant's personal representative or by any Person empowered to do so under the deceased Participant's will or under the then Applicable Laws of descent and distribution.

Section 4.2      Partial Exercise. Subject to Section 5.2, any exercisable portion of the Option or the entire Option, if then wholly exercisable, may be exercised in whole or in part at any time prior to the time when the Option or portion thereof becomes unexercisable under Section 3.3 hereof.

Section 4.3      Manner of Exercise. The Option, or any exercisable portion thereof, may be exercised solely by delivery to the Secretary of the Company (or any third party administrator or other Person designated by the Company), during regular business hours, of all of the following prior to the time when the Option or such portion thereof becomes unexercisable under Section 3.3 hereof.

(a)        An exercise notice in a form specified by the Administrator, stating that the Option or portion thereof is thereby exercised, such notice complying with all applicable rules established by the Administrator;

(b)        The receipt by the Company of full payment for the Shares with respect to which the Option or portion thereof is exercised, in such form of consideration permitted under Section 4.4 that is acceptable to the Administrator;

(c)        The payment of any applicable withholding tax in accordance with Section 3.4;

(d)        Any other written representations or documents as may be required in the Administrator's sole discretion to effect compliance with Applicable Law; and

(e)        In the event the Option or portion thereof shall be exercised pursuant to Section 4.1 by any Person or Persons other than Participant, appropriate proof of the right of such Person or Persons to exercise the Option.

Notwithstanding any of the foregoing, the Administrator shall have the right to specify all conditions of the manner of exercise, which conditions may vary by country and which may be subject to change from time to time.

Section 4.4    Method of Payment. Payment of the Exercise Price shall be by any of the following, or a combination thereof, at the election of Participant:

(a)    Cash or check;

(b)    With the consent of the Administrator, surrender of vested Shares (including, without limitation, Shares otherwise issuable upon exercise of the Option) held for such period of time as may be required by the Administrator in order to avoid adverse accounting consequences and having a Fair Market Value on the date of delivery equal to the aggregate Exercise Price of the Option or exercised portion thereof;

(c)    Through the delivery of a notice that Participant has placed a market sell order with a broker acceptable to the Company with respect to Shares then issuable upon exercise of the Option, and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to the Company in satisfaction of the Exercise Price; *provided* that payment of such proceeds is then made to the Company at such time as may be required by the Administrator, but in any event not later than the settlement of such sale; or

(d)    Any other form of legal consideration acceptable to the Administrator.

Section 4.5    Conditions to Issuance of Shares. The Company shall not be required to issue or deliver any certificate or certificates for any Shares or to cause any Shares to be held in book-entry form prior to the fulfillment of all of the following conditions: (a) the admission of the Shares to listing on all stock exchanges on which such Shares are then listed, (b) the completion of any registration or other qualification of the Shares under any state or federal law or under rulings or regulations of the Securities and Exchange Commission or other governmental regulatory body, which the Administrator shall, in its absolute discretion, deem necessary or advisable, (c) the obtaining of any approval or other clearance from any state or federal governmental agency that the Administrator shall, in its absolute discretion, determine to be necessary or advisable, (d) the receipt by the Company of full payment for such Shares, which may be in one or more of the forms of consideration permitted under Section 4.4, and (e) the receipt of full payment of any applicable withholding tax in accordance with Section 3.4 by the Participating Company with respect to which the applicable withholding obligation arises.

Section 4.6    Rights as Shareholder. Neither Participant nor any Person claiming under or through Participant will have any of the rights or privileges of a shareholder of the Company in respect of any Shares purchasable upon the exercise of any part of the Option unless and until certificates representing such Shares (which may be in book-entry form) will have been issued and recorded on the records of the Company or its transfer agents or registrars and delivered to Participant (including through electronic delivery to a brokerage account). No adjustment will be made for a dividend or other right for which the record date is prior to the date of such issuance, recordation and delivery, except as provided in Article VIII of the Plan. Except as otherwise provided herein, after such issuance, recordation and delivery, Participant will have all the rights of a shareholder of the Company with respect to such Shares, including, without limitation, the right to receipt of dividends and distributions on such Shares.

Section 4.7    Restrictive Covenants; Forfeiture. The Participant hereby acknowledges and agrees that the restrictive covenants set forth on Annex I hereto together with any restrictive covenants or similar written agreements (the "Restrictive Covenant Agreements") between such Participant and the Company or any other Participating Company are incorporated herein by reference, and that such agreements, as applicable, remain in full force and effect. In the event the Participant materially breaches the Restrictive Covenant Agreements or any other written covenants between such Participant and any Participating Company, the Participant shall immediately forfeit any and all Options granted under this Agreement (whether or not vested), and Participant's rights in any such Options shall lapse and expire. For the avoidance of doubt, such forfeiture, lapse and expiration shall not limit the Participating Companies' ability to seek other remedies for such breach.

A-5

**ARTICLE V.**
**OTHER PROVISIONS**

Section 5.1    Administration. The Administrator shall have the power to interpret the Plan, the Grant Notice, this Agreement and the International Appendix, as applicable, and to adopt such rules for the administration, interpretation and application of the Plan, the Grant Notice, this Agreement and the International Appendix, as applicable, as are consistent therewith and to interpret, amend or revoke any such rules. All actions taken and all interpretations and determinations made by the Administrator will be final and binding upon Participant, the Company and all other interested Persons. To the extent allowable pursuant to Applicable Law, no member of the Committee or the Board will be personally liable for any action, determination or interpretation made with respect to the Plan, the Grant Notice, this Agreement or the International Appendix, as applicable.

Section 5.2    Whole Shares. The Option may only be exercised for whole Shares.

Section 5.3    Option Not Transferable. Subject to Section 4.1 hereof, the Option may not be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution, unless and until the Shares underlying the Option have been issued, and all restrictions applicable to such Shares have lapsed. Neither the Option nor any interest or right therein or part thereof shall be liable for the debts, contracts or engagements of Participant or his or her successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect, except to the extent that such disposition is permitted by the preceding sentence. Notwithstanding the foregoing, with the consent of the Administrator, if the Option is a Non-Qualified Option, it may be transferred to permitted transferees in accordance with the Plan pursuant to any conditions and procedures the Administrator may require.

Section 5.4    Adjustments. The Administrator may accelerate the vesting of all or a portion of the Option in such circumstances as it, in its sole discretion, may determine. Participant acknowledges that the Option is subject to adjustment, modification and termination in certain events as provided in this Agreement and the Plan, including Article VIII of the Plan.

Section 5.5    Notices. Any notice to be given under the terms of this Agreement to the Company shall be addressed to the Company in care of the Secretary of the Company at the Company's principal office, and any notice to be given to Participant shall be addressed to Participant at Participant's last email or physical address reflected on the Company's records. By a notice given pursuant to this Section 5.5, either party may hereafter designate a different address for notices to be given to that party. Any notice shall be deemed duly given when sent via email (to Participant only) or when sent by certified mail (return receipt requested) and deposited (with postage prepaid) in a post office or branch post office regularly maintained by the United States Postal Service.

Section 5.6    Titles. Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

A-6

Section 5.7      Governing Law. The laws of the State of Israel shall govern the interpretation, validity, administration, enforcement and performance of the terms of this Agreement regardless of the law that might be applied under principles of conflicts of laws.

Section 5.8      Conformity to Securities Laws. Participant acknowledges that the Plan, the Grant Notice, this Agreement and the International Appendix, as applicable, are intended to conform to the extent necessary with all Applicable Laws, including, without limitation, the provisions of the Securities Act and the Exchange Act, and any and all regulations and rules promulgated thereunder by the Securities and Exchange Commission and state securities laws and regulations. Notwithstanding anything herein to the contrary, the Plan shall be administered, and the Option is granted and may be exercised, only in such a manner as to conform to Applicable Law. To the extent permitted by Applicable Law, the Plan, the Grant Notice, this Agreement and the International Appendix, as applicable, shall be deemed amended to the extent necessary to conform to Applicable Law.

Section 5.9      Amendment, Suspension and Termination. To the extent permitted by the Plan, this Agreement may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Administrator or the Board, *provided* that, except as may otherwise be provided by the Plan, no amendment, modification, suspension or termination of this Agreement shall adversely affect the Option in any material respect without the prior written consent of Participant.

Section 5.10      Successors and Assigns. The Company may assign any of its rights under this Agreement to single or multiple assignees, and this Agreement shall inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth in Section 5.3 and the Plan, this Agreement shall be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

Section 5.11      Limitations Applicable to Section 16 Persons. Notwithstanding any other provision of the Plan or this Agreement, if Participant is subject to Section 16 of the Exchange Act, the Plan, the Option, the Grant Notice and this Agreement shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including any amendment to Rule 16b-3 of the Exchange Act) that are requirements for the application of such exemptive rule. To the extent permitted by Applicable Law, this Agreement shall be deemed amended to the extent necessary to conform to such applicable exemptive rule.

Section 5.12      Not a Contract of Employment. Nothing in this Agreement, the International Appendix, as applicable, or in the Plan shall confer upon Participant any right to continue to serve as an employee or other service provider of any Participating Company or shall interfere with or restrict in any way the rights of any Participating Company, which rights are hereby expressly reserved, to discharge or terminate the services of Participant at any time for any reason whatsoever, with or without cause, except to the extent (i) expressly provided otherwise in a written agreement between a Participating Company and Participant or (ii) where such provisions are not consistent with applicable foreign or local laws, in which case such applicable foreign or local laws shall control.

Section 5.13      Entire Agreement. The Plan, the Grant Notice and this Agreement (including any exhibit hereto) constitute the entire agreement of the parties and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof.

Section 5.14      Section 409A. This Option is not intended to constitute "nonqualified deferred compensation" within the meaning of Section 409A. However, notwithstanding any other provision of the Plan, the Grant Notice or this Agreement, if at any time the Administrator determines that this Option (or any portion thereof) may be subject to Section 409A, the Administrator shall have the right in its sole discretion (without any obligation to do so or to indemnify Participant or any other Person for failure to do so) to adopt such amendments to the Plan, the Grant Notice or this Agreement, or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, as the Administrator determines are necessary or appropriate for this Option either to be exempt from the application of Section 409A or to comply with the requirements of Section 409A.

A-7

Section 5.15    Agreement Severable. In the event that any provision of the Grant Notice, this Agreement (including, for the avoidance of doubt, the Restrictive Covenant Agreement) or the International Appendix, as applicable, is held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of the Grant Notice, this Agreement or the International Appendix, as applicable.

Section 5.16    Limitation on Participant's Rights. Participation in the Plan confers no rights or interests other than as herein provided. This Agreement creates only a contractual obligation on the part of the Company as to amounts payable and shall not be construed as creating a trust. Neither the Plan nor any underlying program, in and of itself, has any assets. Participant shall have only the right to receive Shares as a general unsecured creditor with respect to the Option, as and when exercised pursuant to the terms hereof.

Section 5.17    Counterparts. The Grant Notice may be executed in one or more counterparts, including by way of any electronic signature, subject to Applicable Law, each of which shall be deemed an original and all of which together shall constitute one instrument.

Section 5.18    Broker-Assisted Sales. In the event of any broker-assisted sale of Shares in connection with the payment of withholding taxes as provided in Section 3.4(c) or the payment of the Exercise Price as provided in Section 4.4(c): (a) any Shares to be sold through a broker-assisted sale will be sold on the day the tax withholding obligation or exercise of the Option, as applicable, occurs or arises, or as soon thereafter as practicable; (b) such Shares may be sold as part of a block trade with other participants in the Plan in which all participants receive an average price; (c) Participant will be responsible for all broker's fees and other costs of sale, and Participant agrees to indemnify and hold the Company harmless from any losses, costs, damages, or expenses relating to any such sale; (d) to the extent the proceeds of such sale exceed the applicable tax withholding obligation or Exercise Price, the Company agrees to pay such excess in cash to Participant as soon as reasonably practicable; (e) Participant acknowledges that the Company or its designee is under no obligation to arrange for such sale at any particular price, and that the proceeds of any such sale may not be sufficient to satisfy the applicable tax withholding obligation or Exercise Price; and (f) in the event the proceeds of such sale are insufficient to satisfy the applicable tax withholding obligation, Participant agrees to pay immediately upon demand to the Participating Company with respect to which the withholding obligation arises an amount in cash sufficient to satisfy any remaining portion of the applicable Participating Company's withholding obligation.

Section 5.19    Incentive Stock Options. Participant acknowledges that to the extent the aggregate Fair Market Value of Shares (determined as of the time the option with respect to the Shares is granted) with respect to which Incentive Stock Options, including this Option (if applicable), are exercisable for the first time by Participant during any calendar year exceeds $100,000 or if for any other reason such Incentive Stock Options do not qualify or cease to qualify for treatment as "incentive stock options" under Section 422 of the Code, such Incentive Stock Options shall be treated as Non-Qualified Options. Participant further acknowledges that the rule set forth in the preceding sentence shall be applied by taking the Option and other share options into account in the order in which they were granted, as determined under Section 422(d) of the Code and the Treasury Regulations thereunder. Participant also acknowledges that an Incentive Stock Option exercised more than three (3) months after Participant's Termination of Service, other than by reason of death or disability, will be taxed as a Non-Qualified Option.

A-8

Section 5.20    Notification of Disposition. If this Option is designated as an Incentive Stock Option, Participant shall give prompt written notice to the Company of any disposition or other transfer of any Shares acquired under this Agreement if such disposition or transfer is made (a) within two (2) years from the Grant Date or (b) within one (1) year after the transfer of such Shares to Participant. Such notice shall specify the date of such disposition or other transfer and the amount realized, in cash, other property, assumption of indebtedness or other consideration, by Participant in such disposition or other transfer.

Section 5.21    Clawback. The Option (including any proceeds, gains or other economic benefit actually or constructively received by the Participant upon any receipt or exercise of the Option or upon the receipt or resale of any Shares underlying the Option) will be subject to any Company clawback policy as in effect from time to time, including any clawback policy adopted to comply with Applicable Laws (including the Dodd-Frank Wall Street Reform and Consumer Protection Act and any rules or regulations promulgated thereunder).

Section 5.22    Special Provisions for Options Granted to Participants Outside the United States. If the Participant performs services for any Participating Company outside of the United States, this Agreement shall be subject to the special provisions, if any, for the Participant's country of residence, as set forth in the International Appendix. If the Participant relocates to one of the countries included in the International Appendix during the life of this Agreement, the special provisions for such country shall apply to the Participant, to the extent the Company determines that the application of such provisions is necessary or advisable in order to comply with applicable foreign and local law or facilitate the administration of the Plan. The Company reserves the right to impose other requirements on this Agreement, the Option and the Shares issued upon exercise of the Option, to the extent the Company determines it is necessary or advisable in order to comply with applicable foreign or local laws or facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

* * * * *

A-9

**EXHIBIT B**
**TO SHARE OPTION AWARD AGREEMENT**

**SPECIAL PROVISIONS FOR SHARE OPTIONS**

**GRANTED TO PARTICIPANTS OUTSIDE THE U.S.**

This Exhibit B includes additional terms applicable to Participants who reside or provide services to a Participating Company in the countries identified below. These terms and conditions are in addition to those set forth in the Agreement to which this Exhibit B is attached and the Plan and to the extent there are any inconsistencies between these terms and conditions and those set forth in the Agreement, these terms and conditions shall prevail. Any capitalized term used in this Exhibit B without definition shall have the meaning ascribed to such term in the Plan or the Agreement, as applicable.

This International Appendix also includes information relating to exchange control and other issues of which the Participant should be aware with respect to his or her participation in the Plan. The information is based on the exchange control, securities and other laws in effect in the respective countries as of June 2023. Such laws are often complex and change frequently. As a result, the Company strongly recommends that the Participant does not rely on the information herein as the only source of information relating to the consequences of participation in the Plan because the information may be out of date at the time the Option is exercised or Shares acquired under the Plan are sold.

In addition, the information is general in nature and may not apply to the particular situation of the Participant, and the Company is not in a position to assure the Participant of any particular result. Accordingly, the Participant is advised to seek appropriate professional advice as to how the relevant laws in his or her country may apply to his or her situation. Finally, if the Participant is a citizen or resident of a country other than the one in which he or she is currently working, the information contained herein may not be applicable to the Participant.

**ISRAEL**

The following provisions will apply if the Participant is an employee of an Israeli resident subsidiary of the Company on the Grant Date.

Israeli Sub-Plan: The Options and underlying Shares shall be subject to the provisions of the Plan and the Sub-Plan for Israeli Participants (the "*Israeli Sub-Plan*"). The terms used herein shall have the meaning ascribed to them in the Plan and the Israeli Sub-Plan.

A-10

**Designation**. The Options are intended to be subject to the trustee capital gain route of Section 102 of the Israeli Tax Ordinance [New Version] 1961 ("**Section 102**" and "**Capital Gains Route**"), subject to compliance with the requirements under Section 102 and any rules or regulations thereunder, including the execution of this Agreement and the required declarations. However, in the event the Options do not meet the requirements of Section 102, such Options and the underlying Shares shall not qualify for the favorable tax treatment under the Capital Gains Route. The Company makes no representations or guarantees that the Options will qualify for favorable tax treatment and will not be liable or responsible if favorable tax treatment is not available under Section 102.

**The Trustee**. The Options and the Shares issued upon exercise and/or any additional rights, including without limitation any right to receive any dividends or any Shares received as a result of an adjustment made under the Plan, that may be granted in connection with the Options (the "**Additional Rights**") shall be issued to or controlled by the Trustee for the Participant's benefit under the provisions of the Capital Gains Route for at least the period stated in Section 102 or any other period of time determined by the Israel Tax Authority ("**ITA**"). In accordance with the requirements of Section 102 and the Capital Gains Route, the Participant shall not sell nor transfer from the Trustee the Common Stock or Additional Rights until the end of the period required under Section 102 or any shorter period determined by the ITA (the "**Holding Period**"). Notwithstanding the above, if any such sale or transfer occurs before the end of the Holding Period, the sanctions under Section 102 shall apply and shall be borne by the Participant.

**Taxes**. Despite section 2.4 of the Agreement, Tax shall not generally be due upon exercise of the Options but upon sale or release of the Shares from the Trustee. Any and all taxes due in relation to the Options and Shares, shall be borne solely by the Participant and in the event of death, by the Participant's heirs. Each Participating Company and/or the Trustee shall withhold taxes according to the requirements under the applicable laws, the rules, and regulations, including withholding taxes at source. Furthermore, the Participant hereby agrees to indemnify the applicable Participating Company, and/or the Trustee and hold them harmless against and from any and all liability for any such tax or interest or penalty thereon, including without limitation, liabilities relating to the necessity to withhold, or to have withheld, any such tax from any payment made to the Participant. Each Participating Company and/or the Trustee, to the extent permitted by law, shall have the right to deduct from any payment otherwise due to the Participant, or from proceeds of the sale of any Shares, an amount equal to any Taxes required by law to be withheld with respect to such Shares. The Participant will pay to the applicable Participating Company or the Trustee any amount of taxes that the Participating Company or the Trustee may be required to withhold with respect to any Shares that cannot be satisfied by the means previously described. The Company may refuse to deliver any Shares if the Participant fails to comply with the Participant's obligations in connection with the taxes as described in this section. Any fees associated with any exercise, sale, transfer or any act in relation to the Options and the Shares, shall be borne by the Participant. The Trustee and/or the applicable Participating Company shall be entitled to withhold or deduct such fees from payments otherwise due to/from the Participating Company or the Trustee.

**Acknowledgements**. In addition to the acknowledgments included in the Agreement, by accepting the Option the Participant hereby understands, acknowledges, agrees as follows: (i) Participant is familiar with the provisions of Section 102 and the regulations and rules promulgated thereunder, including without limitations the provisions of the tax route applicable to the Participant's Options and agrees to comply with such provisions, as amended from time to time, provided that if such terms are not met, the specific tax route may not apply; (ii) the Participant accepts the provisions of the trust agreement signed between the Company and the Trustee, and agrees to be bound by its terms; (iii) the Participant acknowledge that selling the Shares or releasing the Shares from the control of the Trustee prior to the termination of the Holding Period constitutes a violation of the terms of Section 102 and agrees to bear the relevant sanctions; (iv) the Participant authorizes the Company to provide the electronic capitalization table system provider and the Trustee with any information required for the purpose of administering the Plan including executing their obligations according to Section 102, the trust deed and the trust agreement, including without limitation information about the Participant's Options, Shares, income tax rates, salary bank account, contact details and identification number and acknowledges that the information might be shared with an administrator who is located outside of Israel, where the level of protection of personal data is different than in Israel.

A-11

<u>**ANNEX I**</u>

**Restrictive Covenant Agreement**

A-12

**ODDITY TECH LTD.**

**2023 INCENTIVE AWARD PLAN**

**RESTRICTED SHARE UNIT GRANT NOTICE**

Capitalized terms not specifically defined in this Restricted Share Unit Grant Notice (the "Grant Notice") have the meanings given to them in the 2023 Incentive Award Plan (as amended from time to time, the "Plan") of Oddity Tech Ltd. (the "Company").

The Company hereby grants to the participant listed below ("Participant") the Restricted Share Units described in this Grant Notice (the "RSUs"), subject to the terms and conditions of the Plan and the Restricted Share Unit Agreement attached hereto as Exhibit A (the "Agreement"), and the special terms and provisions, if any, for the Participant's country of residence in the appendix attached hereto as Exhibit B (the "International Appendix"), each of which are incorporated into this Grant Notice by reference. [Each RSU is hereby granted in tandem with a corresponding dividend equivalent to the extent a portion of such RSU is vested, as further described in Article II of the Agreement (the "Dividend Equivalents").][1]

| | |
|---|---|
| **Participant:** | *[Insert Participant Name]* |
| **Grant Date:** | *[Insert Grant Date]* |
| **Number of RSUs:** | *[Insert Number of RSUs]* |
| **Vesting Commencement Date:** | *[Insert Vesting Commencement Date]* |
| **Vesting Schedule:** | *[To be specified in individual agreements]* |

[**Withholding Taxes – Sell to Cover:** Upon the issuance of the resulting Shares following the vesting of the restricted share units, the Company, on your behalf, will instruct the Agent (as defined in the Agreement) to (1) sell that number of Shares determined in accordance with Section 2.5 of the Agreement as may be necessary to satisfy all applicable withholding obligations with respect to any taxable event arising in connection with the RSUs, and (2) to allow the Agent (as defined in the Agreement) to remit the cash proceeds of such sale(s) to the Company. The Company shall then make a cash payment equal to the required tax withholding from the cash proceeds of such sale(s) directly to the appropriate taxing authorities (such actions, the "Sell to Cover Process").][2]

By accepting this Award electronically through the Plan service provider's online grant acceptance policy, Participant agrees to be bound by the terms and conditions of the Plan, the Agreement, the International Appendix, as applicable, and the Grant Notice. Participant has reviewed the Agreement, the International Appendix, as applicable, the Plan and the Grant Notice in their entirety, has had an opportunity to obtain the advice of counsel prior to executing the Grant Notice and fully understands all provisions of the Grant Notice, the Agreement, the International Appendix, as applicable, and the Plan. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan, the Grant Notice, the Agreement and the International Appendix, as applicable.

---

[1] **Note to Draft:** To include if dividend equivalents will be granted in tandem.

[2] **Note to Draft:** Insert for mandatory sell to cover.

**ODDITY TECH LTD.**                                    **PARTICIPANT**

By: _____                          By: _____

Print Name: _____                  Print Name: _____

Title: _____

Exhibit A

**TO RESTRICTED SHARE UNIT GRANT NOTICE**

**RESTRICTED SHARE UNIT AWARD AGREEMENT**

Pursuant to the Grant Notice to which this Agreement is attached, the Company has granted to Participant the number of RSUs set forth in the Grant Notice.

**ARTICLE I.**
**GENERAL**

Section 1.1    Defined Terms. Capitalized terms not specifically defined herein shall have the meanings specified in the Plan or the Grant Notice. For purposes of this Agreement,

(a)    "Cessation Date" shall mean the date of Participant's Termination of Service (regardless of the reason for such termination).

(e)    ["CIC Qualifying Termination" shall mean Participant's Termination of Service by any Participating Company without Cause upon or during the twelve-month period immediately following a Change in Control.][3]

(f)    "Participating Company" shall mean the Company or any of its parents or Subsidiaries.

Section 1.2    Incorporation of Terms of Plan. The RSUs and the Class A ordinary shares of the Company ("Shares") issued to Participant hereunder are subject to the terms and conditions set forth in this Agreement and the Plan (including, without limitation, Section 10.6 thereof), which is incorporated herein by reference. In the event of any inconsistency between the Plan and this Agreement, the terms of the Plan shall control.

**ARTICLE II.**
**AWARD OF RESTRICTED SHARE UNITS**

Section 2.1    Award of RSUs [and Dividend Equivalents]

(a)    In consideration of Participant's past and/or continued employment with or service to a Participating Company and for other good and valuable consideration, effective as of the grant date set forth in the Grant Notice (the "Grant Date"), the Company has granted to Participant the number of RSUs set forth in the Grant Notice, upon the terms and conditions set forth in the Grant Notice, the Plan and this Agreement, subject to adjustment as provided in Article VIII of the Plan. Each RSU represents the right to receive one Share at the times and subject to the conditions set forth herein. However, unless and until the RSUs have vested, Participant will have no right to the payment of any Shares subject thereto. Prior to the actual delivery of any Shares, the RSUs will represent an unsecured obligation of the Company, payable only from the general assets of the Company.

(b)    [The Company hereby grants to Participant an Award of Dividend Equivalents with respect to each RSU granted pursuant to the Grant Notice for all ordinary cash dividends that are paid to all or substantially all holders of the outstanding Shares between the Grant Date and the date when the applicable RSU is distributed or paid to Participant or is forfeited or expires. The Dividend Equivalents for each RSU shall be equal to the amount of cash that is paid as a dividend on one Share. All such Dividend Equivalents shall be credited to Participant and be deemed to be reinvested in additional RSUs as of the date of payment of any such dividend based on the Fair Market Value of a Share on such date. Each additional RSU that results from such deemed reinvestment of Dividend Equivalents granted hereunder shall be subject to the same vesting, distribution or payment, adjustment and other provisions that apply to the underlying RSU to which such additional RSU relates.][4]

---

[3] **Note to Draft:** Include for participants receiving double trigger protection.

Section 2.2    Vesting of RSUs [and Dividend Equivalents].

(a)    Subject to Participant's continued employment with or service to a Participating Company on each applicable vesting date and subject to the terms of this Agreement, the RSUs shall vest in such amounts and at such times as are set forth in the Grant Notice. [Each additional RSU that results from deemed reinvestments of Dividend Equivalents pursuant to Section 2.1(b) shall vest whenever the underlying RSU to which such additional RSU relates vests.]

(b)    In the event Participant incurs a Termination of Service, except as may be otherwise provided by the Administrator or as set forth in a written agreement between Participant and the Company, Participant shall immediately forfeit any and all RSUs [and Dividend Equivalents] granted under this Agreement that have not vested or do not vest on or prior to the date on which such Termination of Service occurs, and Participant's rights in any such RSUs [and Dividend Equivalents] that are not so vested shall lapse and expire.

(c)    [Notwithstanding the Grant Notice or the provisions of Section 2.2(a) and Section 2.2(b), in the event of a CIC Qualifying Termination, the RSUs shall become vested in full on the date of such CIC Qualifying Termination.][5]

Section 2.3

(a)    Distribution or Payment of RSUs. Participant's RSUs shall be distributed in Shares (either in book-entry form or otherwise) within 60 days following the vesting of the applicable RSU pursuant to Section 2.2. Notwithstanding the foregoing, the Company may delay a distribution or payment in settlement of RSUs if it reasonably determines that such payment or distribution will violate federal securities laws or any other Applicable Law, *provided* that such distribution or payment shall be made at the earliest date at which the Company reasonably determines that the making of such distribution or payment will not cause such violation, as required by Treasury Regulation Section 1.409A-2(b)(7)(ii), and *provided further* that no payment or distribution shall be delayed under this Section 2.3(a) if such delay will result in a violation of Section 409A.

(b)    All distributions shall be made by the Company in the form of whole Shares.

Section 2.4    Conditions to Issuance of Certificates. The Company shall not be required to issue or deliver any certificate or certificates for any Shares or to cause any Shares to be held in book-entry form prior to the fulfillment of all of the following conditions: (a) the admission of the Shares to listing on all stock exchanges on which such Shares are then listed, (b) the completion of any registration or other qualification of the Shares under any state or federal law or under rulings or regulations of the Securities and Exchange Commission or other governmental regulatory body, which the Administrator shall, in its absolute discretion, deem necessary or advisable, (c) the obtaining of any approval or other clearance from any state or federal governmental agency that the Administrator shall, in its absolute discretion, determine to be necessary or advisable, and (d) the receipt of full payment of any applicable withholding tax in accordance with Section 2.5 by the Participating Company with respect to which the applicable withholding obligation arises.

---

[4] **Note to Draft:** Insert for dividend equivalents.

[5] **Note to Draft:** Include for participants receiving double-trigger protection.

Section 2.5    Tax Withholding. Notwithstanding any other provision of this Agreement:

(a)    [As set forth in Section 9.5 of the Plan, the Company shall have the authority and the right to deduct or withhold, or to require the Participant to remit to the Company, an amount sufficient to satisfy all applicable federal, state and local taxes required by law to be withheld with respect to any taxable event arising in connection with the RSUs. Such applicable taxes shall be satisfied using the Sell to Cover Process pursuant to the Grant Notice. Notwithstanding any other provision of this Agreement, the Company shall not be obligated to deliver any new certificate representing Shares to the Participant or the Participant's legal representative or enter such Shares in book entry form unless and until the Participant or the Participant's legal representative shall have paid or otherwise satisfied in full the amount of all federal, state and local taxes applicable to the taxable income of the Participant resulting from the grant or vesting of the RSUs or the issuance of Shares. By accepting this award of RSUs, the Participant hereby acknowledges and agrees:

(i)    The Participant hereby appoints the Company's transfer agent (together with any other party the Company determines necessary to execute the Sell to Cover Process, the "Agent") as the Participant's agent and authorizes the Agent to (1) sell on the open market at the then prevailing market price(s), on the Participant's behalf, as soon as practicable on or after the Shares are issued upon the vesting of the RSUs, that number (rounded up to the next whole number) of the Shares so issued necessary to generate proceeds to cover (x) any tax withholding obligations incurred with respect to such vesting or issuance and (y) all applicable fees and commissions due to, or required to be collected by, the Agent with respect thereto and (2) apply any remaining funds to the Participant's federal tax withholding or remit such remaining funds to the Participant.

(ii)    The Participant hereby authorizes the Company and the Agent to cooperate and communicate with one another to determine the number of Shares that must be sold pursuant to subsection (i) above.

(iii)    The Participant understands that the Agent may effect sales as provided in subsection (i) above in one or more sales and that the average price for executions resulting from bunched orders will be assigned to the Participant's account, and the Participant has no control over the time of such sales. In addition, the Participant acknowledges that it may not be possible to sell Shares as provided by subsection (i) above due to (1) a legal or contractual restriction applicable to the Participant or the Agent, (2) a market disruption, or (3) rules governing order execution priority on the national exchange where the Shares may be traded. The Participant further agrees and acknowledges that in the event the sale of Shares would result in material adverse harm to the Company, as determined by the Company in its sole discretion, the Company may instruct the Agent not to sell Shares as provided by subsection (i) above. In the event of the Agent's inability to sell sufficient Shares, the Participant will continue to be responsible for the timely payment to the Company and/or its Affiliates of all federal, state, local and foreign taxes that are required by applicable laws and regulations to be withheld.

(iv)        The Participant acknowledges that regardless of any other term or condition of this Section 2.5(a), the Agent will not be liable to the Participant for (1) special, indirect, punitive, exemplary, or consequential damages, or incidental losses or damages of any kind, or (2) any failure to perform or for any delay in performance that results from a cause or circumstance that is beyond its reasonable control.

(v)        The Participant hereby agrees to execute and deliver to the Agent any other agreements or documents as the Agent reasonably deems necessary or appropriate to carry out the purposes and intent of this Section 2.5(a). The Agent is a third-party beneficiary of this Section 2.5(a).

(b)        The Company shall not be obligated to deliver any certificate representing Shares issuable with respect to the RSUs to, or to cause any such Shares to be held in book-entry form by, Participant or his or her legal representative unless and until Participant or his or her legal representative shall have paid or otherwise satisfied in full the amount of all federal, state, local and foreign taxes applicable with respect to the taxable income of Participant resulting from the vesting or settlement of the RSUs or any other taxable event related to the RSUs.

(c)        Participant is ultimately liable and responsible for all taxes owed in connection with the RSUs, regardless of any action the Company or any other Participating Company takes with respect to any tax withholding obligations that arise in connection with the RSUs. No Participating Company makes any representation or undertaking regarding the treatment of any tax withholding in connection with the awarding, vesting or settlement of the RSUs or the subsequent sale of Shares (including, without limitation, pursuant to the Sell to Cover Process). The Participating Companies do not commit and are under no obligation to structure the RSUs to reduce or eliminate Participant's tax, insider trading or other liability.][6]

(a)        [The Participating Companies have the authority to deduct or withhold, or require Participant to remit to the applicable Participating Company, an amount sufficient to satisfy any applicable federal, state, local and foreign taxes (including the employee portion of any FICA obligation) required by Applicable Law to be withheld with respect to any taxable event arising pursuant to this Agreement. The Participating Companies may withhold or Participant may make such payment in one or more of the forms specified below:

(i)        by cash or check made payable to the Participating Company with respect to which the withholding obligation arises;

(ii)        by the deduction of such amount from other compensation payable to Participant;

(iii)        with respect to any withholding taxes arising in connection with the vesting or settlement of the RSUs, with the consent of the Administrator, by requesting that the Company withhold a net number of vested Shares otherwise issuable pursuant to the RSUs having a then current Fair Market Value not exceeding the amount necessary to satisfy the withholding obligation of the Participating Companies based on the maximum statutory withholding rates in Participant's applicable jurisdictions for federal, state, local and foreign income tax and payroll tax purposes that are applicable to such taxable income;

---

[6] **Note to Draft:** To include for awards subject to mandatory sell to cover.

(iv)    with respect to any withholding taxes arising in connection with the vesting or settlement of the RSUs, with the consent of the Administrator, by tendering to the Company vested Shares having a then current Fair Market Value not exceeding the amount necessary to satisfy the withholding obligation of the Participating Companies based on the maximum statutory withholding rates in Participant's applicable jurisdictions for federal, state, local and foreign income tax and payroll tax purposes that are applicable to such taxable income;

(v)    with respect to any withholding taxes arising in connection with the vesting or settlement of the RSUs, through the delivery of a notice that Participant has placed a market sell order with a broker acceptable to the Company with respect to Shares then issuable to Participant pursuant to the RSUs, and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to the Participating Company with respect to which the withholding obligation arises in satisfaction of such withholding taxes; *provided* that payment of such proceeds is then made to the applicable Participating Company at such time as may be required by the Administrator, but in any event not later than the settlement of such sale; or

(vi)    in any combination of the foregoing.

(b)    With respect to any withholding taxes arising in connection with the RSUs, in the event Participant fails to provide timely payment of all sums required pursuant to Section 2.5(a), the Company shall have the right and option, but not the obligation, to treat such failure as an election by Participant to satisfy all or any portion of Participant's required payment obligation pursuant to Section 2.5(a)(ii) or Section 2.5(a)(iii) above, or any combination of the foregoing as the Company may determine to be appropriate. The Company shall not be obligated to deliver any certificate representing Shares issuable with respect to the RSUs to Participant or his or her legal representative unless and until Participant or his or her legal representative shall have paid or otherwise satisfied in full the amount of all federal, state, local and foreign taxes applicable with respect to the taxable income of Participant resulting from the vesting or settlement of the RSUs or any other taxable event related to the RSUs.

(c)    In the event any tax withholding obligation arising in connection with the RSUs will be satisfied under Section 2.5(a)(iii), then the Company may elect to instruct any brokerage firm determined acceptable to the Company for such purpose to sell on Participant's behalf a whole number of shares from those Shares then issuable to Participant pursuant to the RSUs as the Company determines to be appropriate to generate cash proceeds sufficient to satisfy the tax withholding obligation and to remit the proceeds of such sale to the Participating Company with respect to which the withholding obligation arises. Participant's acceptance of this Award constitutes Participant's instruction and authorization to the Company and such brokerage firm to complete the transactions described in this Section 2.5(c), including the transactions described in the previous sentence, as applicable. The Company may refuse to issue any Shares in settlement of the RSUs to Participant until the foregoing tax withholding obligations are satisfied, provided that no payment shall be delayed under this Section 2.5(c) if such delay will result in a violation of Section 409A of the Code.

(d)    Participant is ultimately liable and responsible for all taxes owed in connection with the RSUs, regardless of any action any Participating Company takes with respect to any tax withholding obligations that arise in connection with the RSUs. No Participating Company makes any representation or undertaking regarding the treatment of any tax withholding in connection with the awarding, vesting or payment of the RSUs or the subsequent sale of Shares. The Participating Companies do not commit and are under no obligation to structure the RSUs to reduce or eliminate Participant's tax, insider trading or other liability.][7]

Section 2.6    Rights as Shareholder. Neither Participant nor any Person claiming under or through Participant will have any of the rights or privileges of a shareholder of the Company in respect of any Shares deliverable hereunder unless and until certificates representing such Shares (which may be in book-entry form) will have been issued and recorded on the records of the Company or its transfer agents or registrars and delivered to Participant (including through electronic delivery to a brokerage account). Except as otherwise provided herein, after such issuance, recordation and delivery, Participant will have all the rights of a shareholder of the Company with respect to such Shares, including, without limitation, the right to receipt of dividends and distributions on such Shares.

Section 2.7    Restrictive Covenants; Forfeiture. The Participant hereby acknowledges and agrees that the restrictive covenants set forth on Appendix A hereto together with any restrictive covenants or similar written agreements (the "Restrictive Covenant Agreements") between such Participant and the Company or any other Participating Company are incorporated herein by reference, and that such agreements, as applicable, remain in full force and effect. In the event the Participant materially breaches any Restrictive Covenant Agreement or any other written covenants between such Participant and any Participating Company, the Participant shall immediately forfeit any and all RSUs [and Dividend Equivalents] granted under this Agreement (whether or not vested), and Participant's rights in any such RSUs [and Dividend Equivalents] shall lapse and expire. For the avoidance of doubt, such forfeiture, lapse and expiration shall not limit the Participating Companies' ability to seek other remedies for such breach.

**ARTICLE III.**
**OTHER PROVISIONS**

Section 3.1    Administration. The Administrator shall have the power to interpret the Plan, the Grant Notice and this Agreement and to adopt such rules for the administration, interpretation and application of the Plan, the Grant Notice and this Agreement as are consistent therewith and to interpret, amend or revoke any such rules. All actions taken and all interpretations and determinations made by the Administrator will be final and binding upon Participant, the Company and all other interested Persons. To the extent allowable pursuant to Applicable Law, no member of the Committee or the Board will be personally liable for any action, determination or interpretation made with respect to the Plan, the Grant Notice or this Agreement.

Section 3.2    RSUs Not Transferable. The RSUs may not be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution, unless and until the Shares underlying the RSUs have been issued, and all restrictions applicable to such Shares have lapsed. No RSUs or any interest or right therein or part thereof shall be liable for the debts, contracts or engagements of Participant or his or her successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect, except to the extent that such disposition is permitted by the preceding sentence. Notwithstanding the foregoing, with the consent of the Administrator, the RSUs may be transferred to permitted transferees in accordance with the Plan, pursuant to any such conditions and procedures the Administrator may require.

---

[7] **Note to Draft:** To include for awards if no mandatory sell to cover.

Section 3.3    Adjustments. The Administrator may accelerate the vesting of all or a portion of the RSUs in such circumstances as it, in its sole discretion, may determine. Participant acknowledges that the RSUs and the Shares subject to the RSUs are subject to adjustment, modification and termination in certain events as provided in this Agreement and the Plan, including Article VIII of the Plan.

Section 3.4    Notices. Any notice to be given under the terms of this Agreement to the Company shall be addressed to the Company in care of the Secretary of the Company at the Company's principal office, and any notice to be given to Participant shall be addressed to Participant at Participant's last email or physical address reflected on the Company's records. By a notice given pursuant to this Section 3.4, either party may hereafter designate a different address for notices to be given to that party. Any notice shall be deemed duly given when sent via email (to Participant only) or when sent by certified mail (return receipt requested) and deposited (with postage prepaid) in a post office or branch post office regularly maintained by the United States Postal Service.

Section 3.5    Titles. Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

Section 3.6    Governing Law. The laws of Israel shall govern the interpretation, validity, administration, enforcement and performance of the terms of this Agreement regardless of the law that might be applied under principles of conflicts of laws.

Section 3.7    Conformity to Securities Laws. Participant acknowledges that the Plan, the Grant Notice, this Agreement and the International Appendix, as applicable, are intended to conform to the extent necessary with all Applicable Laws, including, without limitation, the provisions of the Securities Act and the Exchange Act, and any and all regulations and rules promulgated thereunder by the Securities and Exchange Commission, and state securities laws and regulations. Notwithstanding anything herein to the contrary, the Plan shall be administered, and the RSUs are granted, only in such a manner as to conform to Applicable Law. To the extent permitted by Applicable Law, the Plan, the Grant Notice, this Agreement and the International Appendix, as applicable, shall be deemed amended to the extent necessary to conform to Applicable Law.

Section 3.8    Amendment, Suspension and Termination. To the extent permitted by the Plan, this Agreement may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Administrator or the Board, *provided* that, except as may otherwise be provided by the Plan, no amendment, modification, suspension or termination of this Agreement shall adversely affect the RSUs in any material respect without the prior written consent of Participant.

Section 3.9    Successors and Assigns. The Company may assign any of its rights under this Agreement to single or multiple assignees, and this Agreement shall inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth in Section 3.2 and the Plan, this Agreement shall be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

Section 3.10    Limitations Applicable to Section 16 Persons. Notwithstanding any other provision of the Plan or this Agreement, if Participant is subject to Section 16 of the Exchange Act, the Plan, the RSUs [(including RSUs that result from the deemed reinvestment of Dividend Equivalents), the Dividend Equivalents], the Grant Notice and this Agreement shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including any amendment to Rule 16b-3 of the Exchange Act) that are requirements for the application of such exemptive rule. To the extent permitted by Applicable Law, this Agreement shall be deemed amended to the extent necessary to conform to such applicable exemptive rule.

Section 3.11    Not a Contract of Employment. Nothing in this Agreement, the International Appendix, as applicable, or in the Plan shall confer upon Participant any right to continue to serve as an employee or other service provider of any Participating Company or shall interfere with or restrict in any way the rights of any Participating Company, which rights are hereby expressly reserved, to discharge or terminate the services of Participant at any time for any reason whatsoever, with or without cause, except to the extent (a) expressly provided otherwise in a written agreement between a Participating Company and Participant or (b) where such provisions are not consistent with applicable foreign or local laws, in which case such applicable foreign or local laws shall control.

Section 3.12    Entire Agreement. The Plan, the Grant Notice and this Agreement (including any exhibit hereto) constitute the entire agreement of the parties and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof.

Section 3.13    Section 409A. This Award is not intended to constitute "nonqualified deferred compensation" within the meaning of Section 409A and shall be interpreted consistent with such intent. However, notwithstanding any other provision of the Plan, the Grant Notice or this Agreement, if at any time the Administrator determines that this Award (or any portion thereof) may be subject to Section 409A, the Administrator shall have the right in its sole discretion (without any obligation to do so or to indemnify Participant or any other Person for failure to do so) to adopt such amendments to the Plan, the Grant Notice or this Agreement (or any exhibit thereto), or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, as the Administrator determines are necessary or appropriate for this Award either to be exempt from the application of Section 409A or to comply with the requirements of Section 409A.

Section 3.14    Agreement Severable. In the event that any provision of the Grant Notice, this Agreement (including, for the avoidance of doubt, the Restrictive Covenant Agreement) or the International Appendix, as applicable, is held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of the Grant Notice, this Agreement or the International Appendix, as applicable.

Section 3.15    Limitation on Participant's Rights. Participation in the Plan confers no rights or interests other than as herein provided. This Agreement creates only a contractual obligation on the part of the Company as to amounts payable and shall not be construed as creating a trust. Neither the Plan nor any underlying program, in and of itself, has any assets. Participant shall have only the rights of a general unsecured creditor of the Company with respect to amounts credited and benefits payable, if any, with respect to the RSUs [and Dividend Equivalents].

Section 3.16    Clawback. The RSUs (including any proceeds, gains or other economic benefit the Participant actually or constructively receives upon receipt or settlement of the RSUs or the receipt or resale of any Shares underlying the RSUs) will be subject to any Company clawback policy as in effect from time to time, including any clawback policy adopted to comply with Applicable Laws (including the Dodd-Frank Wall Street Reform and Consumer Protection Act and any rules or regulations promulgated thereunder).

Section 3.17    Counterparts. The Grant Notice may be executed in one or more counterparts, including by way of any electronic signature, subject to Applicable Law, each of which shall be deemed an original and all of which together shall constitute one instrument.

Section 3.18     Special Provisions for RSUs Granted to Participants Outside the United States. If the Participant performs services for any Participating Company outside of the United States, this Agreement shall be subject to the special provisions, if any, for the Participant's country of residence, as set forth in the International Appendix. If the Participant relocates to one of the countries included in the International Appendix during the life of this Agreement, the special provisions for such country shall apply to the Participant, to the extent the Company determines that the application of such provisions is necessary or advisable in order to comply with applicable foreign and local law or facilitate the administration of the Plan. The Company reserves the right to impose other requirements on this Agreement, the RSUs and the Shares issued upon settlement of the RSUs, to the extent the Company determines it is necessary or advisable in order to comply with applicable foreign or local laws or facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

\* \* \* \* \*

**EXHIBIT B**
**TO RESTRICTED SHARE UNIT AWARD AGREEMENT**

**SPECIAL PROVISIONS FOR RESTRICTED SHARE UNITS**

**GRANTED TO PARTICIPANTS OUTSIDE THE U.S.**

This Exhibit B includes additional terms applicable to Participants who reside or provide services to a Participating Company in the countries identified below. These terms and conditions are in addition to those set forth in the Agreement to which this Exhibit B is attached and the Plan and to the extent there are any inconsistencies between these terms and conditions and those set forth in the Agreement, these terms and conditions shall prevail. Any capitalized term used in this Exhibit B without definition shall have the meaning ascribed to such term in the Plan or the Agreement, as applicable.

This International Appendix also includes information relating to exchange control and other issues of which the Participant should be aware with respect to his or her participation in the Plan. The information is based on the exchange control, securities and other laws in effect in the respective countries as of June 2023. Such laws are often complex and change frequently. As a result, the Company strongly recommends that the Participant does not rely on the information herein as the only source of information relating to the consequences of participation in the Plan because the information may be out of date at the time the RSUs are settled or Shares acquired under the Plan are sold.

In addition, the information is general in nature and may not apply to the particular situation of the Participant, and the Company is not in a position to assure the Participant of any particular result. Accordingly, the Participant is advised to seek appropriate professional advice as to how the relevant laws in his or her country may apply to his or her situation. Finally, if the Participant is a citizen or resident of a country other than the one in which he or she is currently working, the information contained herein may not be applicable to the Participant.

**ISRAEL**

The following provisions will apply if the Participant is an employee of the Company or an Israeli resident subsidiary of the Company on the Grant Date.

**Terms and Conditions**

The RSUs and shares issued thereunder shall be subject to the provisions of the Plan and the Sub-Plan for Israeli Participants (the "**Israeli Sub-Plan**"). The terms used herein shall have the meaning ascribed to them in the Plan and the Israeli Sub-Plan. In the event of any inconsistencies between the Israeli Sub-Plan, the Agreement or the Plan, the Israeli Sub-Plan will govern the RSUs.

The Withholding Tax Election language included in the Notice shall not apply to the Participants.

**Designation**. The RSUs are intended to be subject to the trustee capital gain route of Section 102 of the Israeli Tax Ordinance [New Version] 1961 ("**Section 102**" and "**Capital Gains Route**"), subject to compliance with the requirements under Section 102 and any rules or regulations thereunder, including the execution of this Agreement and the required declarations. However, in the event the RSUs do not meet the requirements of Section 102, such RSUs and the underlying Shares shall not qualify for the favorable tax treatment under the Capital Gains Route. The Company makes no representations or guarantees that the RSUs will qualify for favorable tax treatment and will not be liable or responsible if favorable tax treatment is not available under Section 102.

**Trust Arrangement**. The RSUs and the Shares issued upon vesting and/or any additional rights, including without limitation any right to receive any dividends or any shares received as a result of an adjustment made under the Plan, that may be granted in connection with the RSUs (the "**Additional Rights**") shall be issued to or controlled by the Trustee for the Participant's benefit under the provisions of the Capital Gains Route for at least the period stated in Section 102 or any other period of time determined by the Israel Tax Authority ("**ITA**"). In accordance with the requirements of Section 102 and the Capital Gains Route, the Participant shall not sell nor transfer from the Trustee the Shares or Additional Rights until the end of the period required under Section 102 or any shorter period determined by the ITA (the "**Holding Period**"). Notwithstanding the above, if any such sale or transfer occurs before the end of the Holding Period, the sanctions under Section 102 shall apply and shall be borne by the Participant.

**Taxes**. Despite section 2.5 of the Agreement, Tax shall not generally be due upon vesting but upon sale or release of the Shares from the Trustee. Any and all taxes due in relation to the RSUs and Shares, shall be borne solely by the Participant and in the event of death, by the Participant's heirs. Each Participating Company and/or the Trustee shall withhold taxes according to the requirements under the applicable laws, the rules, and regulations, including withholding taxes at source. Furthermore, the Participant hereby agrees to indemnify the applicable Participating Company, and/or the Trustee and hold them harmless against and from any and all liability for any such tax or interest or penalty thereon, including without limitation, liabilities relating to the necessity to withhold, or to have withheld, any such tax from any payment made to the Participant. Each Participating Company and/or the Trustee, to the extent permitted by law, shall have the right to deduct from any payment otherwise due to the Participant, or from proceeds of the sale of any Shares, an amount equal to any Taxes required by law to be withheld with respect to such Shares. The Participant will pay to the applicable Participating Company or the Trustee any amount of taxes that the Participating Company or the Trustee may be required to withhold with respect to any Shares that cannot be satisfied by the means previously described. The Company may refuse to deliver any Shares if the Participant fails to comply with the Participant's obligations in connection with the taxes as described in this section. Any fees associated with any vesting, sale, transfer or any act in relation to the RSUs and the Shares, shall be borne by the Participant. The Trustee and/or the applicable Participating Company shall be entitled to withhold or deduct such fees from payments otherwise due to/from the Participating Company or the Trustee.

**Acknowledgements**. In addition to the acknowledgements included in the Agreement above, by accepting the RSUs the Participant hereby understands, acknowledges, agrees as follows: (i) Participant is familiar with the provisions of Section 102 and the regulations and rules promulgated thereunder, including without limitations the provisions of the tax route applicable to the Participant's RSUs and agrees to comply with such provisions, as amended from time to time, provided that if such terms are not met, the specific tax route may not apply; (ii) the Participant accepts the provisions of the trust agreement signed between the Company and the Trustee, and agrees to be bound by its terms; (iii) the Participant acknowledge that selling the Shares or releasing the Shares from the control of the Trustee prior to the termination of the Holding Period constitutes a violation of the terms of Section 102 and agrees to bear the relevant sanctions; (iv) the Participant authorizes the Company to provide the third party share plan administrator nominated by the Company and the Trustee with any information required for the purpose of administering the Plan including executing their obligations according to Section 102, the trust deed and the trust agreement, including without limitation information about the Participant's RSUs, Shares, income tax rates, salary bank account, contact details and identification number and acknowledges that the information might be shared with an administrator who is located outside of Israel, where the level of protection of personal data is different than in Israel.

*Notifications*

**Securities Law Information**. If required, the Company shall approach the Israel Securities Authority in order to obtain an exemption from the requirement to file a prospectus in relation to the Plan. If such exemption is obtained, copies of the Plan and the Form S-8 registration statement for the Plan filed with the U.S. Securities and Exchange Commission will be available by contacting your local HR contact.

**APPENDIX A**

**Restrictive Covenant Agreement**

**ODDITY TECH LTD.**
**NON-EMPLOYEE DIRECTOR COMPENSATION POLICY**

Non-employee members of the board of directors (the "***Board***") of Oddity Tech Ltd. (the "***Company***") shall be eligible to receive cash and equity compensation as set forth in this Non-Employee Director Compensation Policy (this "***Policy***"). The cash and equity compensation described in this Policy shall be paid or be made, as applicable, automatically and without further action of the Board, to each member of the Board who is not an employee of the Company or any parent or subsidiary of the Company (each, a "***Non-Employee Director***") who may be eligible to receive such cash or equity compensation, unless such Non-Employee Director declines the receipt of such cash or equity compensation by written notice to the Company. This Policy shall become effective after the effectiveness of the Company's initial public offering (the "***IPO***") and shall remain in effect until it is revised or rescinded by further action of the Board. This Policy may be amended, modified or terminated by the Board at any time in its sole discretion and if such IPO does not occur on or prior to January 1, 2024 this Policy shall be void *ab initio*. The terms and conditions of this Policy shall supersede any prior cash and/or equity compensation arrangements for service as a member of the Board between the Company and any of its Non-Employee Directors and between any subsidiary of the Company and any of its non-employee directors.

    1.    <u>Cash Compensation</u>.

        (a)    <u>Annual Retainers</u>. Each Non-Employee Director shall receive an annual retainer of $50,000 for service on the Board.

        (b)    <u>Additional Annual Retainers</u>. In addition, a Non-Employee Director shall receive the following annual retainers:

            (i)    <u>Audit Committee</u>. A Non-Employee Director serving as Chairperson of the Audit Committee shall receive an additional annual retainer of $20,000 for such service. A Non-Employee Director serving as a member of the Audit Committee (other than the Chairperson) shall receive an additional annual retainer of $10,000 for such service.

            (ii)    <u>Compensation Committee</u>. A Non-Employee Director serving as Chairperson of the Compensation Committee shall receive an additional annual retainer of $15,000 for such service. A Non-Employee Director serving as a member of the Compensation Committee (other than the Chairperson) shall receive an additional annual retainer of $7,500 for such service.

            (iii)    <u>Nominating and Corporate Governance Committee</u>. A Non-Employee Director serving as Chairperson of the Nominating and Corporate Governance Committee shall receive an additional annual retainer of $10,000 for such service. A Non-Employee Director serving as a member of the Nominating and Corporate Governance Committee (other than the Chairperson) shall receive an additional annual retainer of $5,000 for such service.

(c)      Payment of Retainers. The annual retainers described in Sections 1(a) and 1(b) shall be earned on a quarterly basis based on a calendar quarter and shall be paid by the Company in arrears not later than the fifteenth day following the end of each calendar quarter. In the event a Non-Employee Director does not serve as a Non-Employee Director, or in the applicable positions described in Section 1(b), for an entire calendar quarter, such Non-Employee Director shall receive a prorated portion of the retainer(s) otherwise payable to such Non-Employee Director for such calendar quarter pursuant to Sections 1(a) and 1(b), with such prorated portion determined by multiplying such otherwise payable retainer(s) by a fraction, the numerator of which is the number of days during which the Non-Employee Director serves as a Non-Employee Director or in the applicable positions described in Section 1(b) during the applicable calendar quarter and the denominator of which is the number of days in the applicable calendar quarter.

2.      Equity Compensation. Non-Employee Directors shall be granted the equity awards described below. The awards described below shall be granted under and shall be subject to the terms and provisions of the Company's 2023 Incentive Award Plan or any other applicable Company equity incentive plan then-maintained by the Company (such plan, as may be amended from time to time, the "**Equity Plan**") and shall be granted subject to the execution and delivery of award agreements, including attached exhibits, in substantially the forms previously approved by the Board. All applicable terms of the Equity Plan apply to this Policy as if fully set forth herein, and all equity grants hereunder are subject in all respects to the terms of the Equity Plan.

(a)      Annual Awards. Each Non-Employee Director who (i) serves on the Board as of the date of any annual meeting of the Company's stockholders (an "**Annual Meeting**") after the Pricing Date and (ii) will continue to serve as a Non-Employee Director immediately following such Annual Meeting shall be automatically granted, on the date of such Annual Meeting, an award of restricted stock units that has an aggregate fair value on the date of such Annual Meeting of $185,000 (as determined in accordance with ASC 718 and with the number of shares of common stock underlying such award subject to adjustment as provided in the Equity Plan). The awards described in this Section 2(a) shall be referred to as the "**Annual Awards**." For the avoidance of doubt, a Non-Employee Director elected for the first time to the Board at an Annual Meeting shall receive only an Annual Award in connection with such election, and shall not receive any Initial Award on the date of such Annual Meeting as well.

(b)      Initial Awards. Except as otherwise determined by the Board, each Non-Employee Director who is initially elected or appointed to the Board after the Pricing Date on any date other than the date of an Annual Meeting shall be automatically granted, on the date of such Non-Employee Director's initial election or appointment (such Non-Employee Director's "**Start Date**"), an award of restricted stock units that has an aggregate fair value on such Non-Employee Director's Start Date equal to the product of (i) $185,000 (as determined in accordance with ASC 718) and (ii) a fraction, the numerator of which is (x) 365 minus (y) the number of days in the period beginning on the date of the Annual Meeting immediately preceding such Non-Employee Director's Start Date (or, if no such Annual Meeting has occurred, the effective date of the Company's IPO) and ending on such Non-Employee Director's Start Date and the denominator of which is 365 (with the number of shares of common stock underlying each such award subject to adjustment as provided in the Equity Plan). The awards described in this Section 2(b) shall be referred to as "**Initial Awards**." For the avoidance of doubt, no Non-Employee Director shall be granted more than one Initial Award.

2

(c)      <u>Termination of Employment of Employee Directors</u>. Members of the Board who are employees of the Company or any parent or subsidiary of the Company who subsequently terminate their employment with the Company and any parent or subsidiary of the Company and remain on the Board will not receive an Initial Award pursuant to Section 2(b) above, but to the extent that they are otherwise eligible, will be eligible to receive, after termination from employment with the Company and any parent or subsidiary of the Company, Annual Awards as described in Section 2(a) above.

(d)      <u>Vesting of Awards Granted to Non-Employee Directors</u>. Each Annual Award and Initial Award shall vest and become exercisable on the earlier of (i) the day immediately preceding the date of the first Annual Meeting following the date of grant and (ii) the first anniversary of the date of grant, subject to the Non-Employee Director continuing in service on the Board through the applicable vesting date. No portion of an Annual Award or Initial Award that is unvested or unexercisable at the time of a Non-Employee Director's termination of service on the Board shall become vested and exercisable thereafter. All of a Non-Employee Director's Annual Awards and Initial Awards shall vest in full immediately prior to the occurrence of a Change in Control (as defined in the Equity Plan), to the extent outstanding at such time.

* * * * *

3

**Oddity Tech Ltd. Compensation Policy**

**A.  Overview and Objectives**

1.  **Introduction**

This document sets forth the Compensation Policy for Executive Officers and Directors (this "**Compensation Policy**" or "**Policy**") of Oddity Tech Ltd. ("**Oddity**" or the "**Company**"), in accordance with the requirements of the Companies Law, 5759-1999 (the "**Companies Law**").

Compensation is a key component of Oddity's overall human capital strategy to attract, retain, reward, and motivate highly skilled individuals that will enhance Oddity's value and otherwise assist Oddity to reach its business and financial long-term goals. Accordingly, the structure of this Policy is established to tie the compensation of each officer to Oddity's goals and performance.

For purposes of this Policy, "Executive Officers" shall mean "Office Holders" as such term is defined in Section 1 of the Companies Law, excluding, unless otherwise expressly indicated herein, non-employee members of the Oddity's Board (and such committees formed by the Board).

This Policy is subject to applicable law and is not intended to, and should not be interpreted as, limiting, or derogating from provisions of applicable law to the extent not permitted.

Approval of compensation for an Executive Officer in accordance with this Policy shall be by the Company's competent organs. It shall be clarified that a deviation of up to 10% from the compensation limits specified in this Compensation Policy will not be considered as an exception or a deviation from the Compensation Policy. Immaterial changes in the terms of office of Executive Officers subordinate to the CEO within the limits established in this Policy will require only the approval of the CEO, subject to such terms being compatible with this Policy. For the purpose of this section, an immaterial change will be considered a change whose effect on the total annual cost of the Executive Officer's compensation does not exceed 10% in the aggregate concerning the terms of office set forth in the Executive Officer's employment agreement. This Policy shall apply to compensation agreements and arrangements which will be approved after the date on which this Policy is adopted and shall serve as Oddity's Compensation Policy for five (5) years, commencing as of its adoption, unless amended earlier. For the avoidance of any doubt, the Policy or any limitations thereunder shall not apply to any compensation paid or granted to Executive Officers prior to or immediately upon the effectiveness of the Company's initial public offering (the "**IPO**").

The Compensation Committee and the Board of Directors of Oddity (the "**Compensation Committee**" and the "**Board**", respectively) shall review and reassess the adequacy of this Policy from time to time, as required by the Companies Law.

In determining the terms of the compensation pursuant to this Policy, the Compensation Committee will take into consideration information prepared and presented by the Company's management, Company's management's recommendations, as well as information that may be provided by third party advisors who may be engaged by the Company from time to time.

2. **Objectives**

Oddity's objectives and goals in setting this Policy are to attract, motivate and retain highly experienced leaders who will contribute to Oddity's success and enhance shareholder value, while demonstrating professionalism in a highly achievement-oriented culture that is based on merit and rewards excellent performance in the long term. To that end, this Policy is designed, among others:

2.1.    to closely align the interests of the Executive Officers with those of Oddity's shareholders in order to enhance shareholder value;

2.2.    to align a significant portion of the Executive Officers' compensation with Oddity's short and long-term goals and performance;

2.3.    to provide the Executive Officers with a structured compensation package, including competitive salaries, performance-motivating cash and equity incentive programs and benefits, and to be able to present to each Executive Officer an opportunity to advance in a growing organization;

2.4.    to identify specific Executive Officers whose compensation will more closely align with the long-term performance of our Company's stock given their specific role and existing shareholding in the Company;

2.5.    to strengthen the retention and the motivation of Executive Officers in the long-term;

2.6.    to provide appropriate awards in order to incentivize superior individual excellency and corporate performance; and

3. **Compensation Instruments**

Compensation instruments under this Policy may include the following:

3.1.    base salary;

3.2.    benefits;

3.3.    cash bonuses;

3.4.    equity based compensation;

3.5.    change of control terms; and

3.6.    retirement and termination terms.

4. **Overall Compensation—Ratio Between Fixed and Variable Compensation**

4.1.    This Policy aims to balance the mix of "Fixed Compensation" (comprised of base salary and benefits) and "Variable Compensation" (comprised of cash bonuses and equity-based compensation) in order to, among other things, appropriately incentivize Executive Officers to meet Oddity's short and long-term goals while taking into consideration the Company's need to manage a variety of business risks.

4.2.    The total annual target bonus and equity-based compensation per vesting annum (based on the fair market value at the time of grant calculated on a linear basis) of each Executive Officer shall not exceed 95% of such Executive Officer's total compensation package for such year. For the avoidance of doubt, the above limitation shall not apply in connection with any equity-based compensation to be issued or approved by Oddity's Board of Directors prior to or immediately upon effectiveness of our IPO to Executive Officers who are Principal Shareholders (as defined in the Companies Law) in the Company or their relatives ("**Pre-IPO Equity Compensation Package**").

5.    **Inter-Company Compensation Ratio**

5.1.    In the process of drafting and updating this Policy, Oddity's Board has examined the ratio between employer cost associated with the engagement of the Executive Officers, including directors, and the average and median employer cost associated with the engagement of Oddity's other employees (including contractor employees as defined in the Companies Law) (the "**Ratio**").

5.2.    The possible ramifications of the Ratio on the daily working environment in Oddity were examined and will continue to be examined by Oddity from time to time in order to ensure that levels of executive compensation, as compared to the overall workforce will not have a negative impact on work relations in Oddity.

B.    **Base Salary and Benefits**

6.    **Base Salary**

6.1.    A base salary provides fixed compensation to Executive Officers and allows Oddity to attract and retain competent executive talent and maintain a stable management team. The base salary varies among Executive Officers, and is individually determined according to the educational background, prior vocational experience, qualifications, company's role, business responsibilities and the past performance of each Executive Officer.

6.2.    Since a competitive base salary is essential to Oddity's ability to attract and retain highly skilled professionals, Oddity will seek to establish, to the extent practicable, a base salary that is competitive with base salaries paid to Executive Officers in a peer group of other companies operating in technology sectors which are similar in their characteristics to Oddity's,  while considering, among others, such companies' size and characteristics including (as applicable) their revenues, profitability rate, growth rates, market capitalization, number of employees and operating arena (in Israel and globally). To that end, Oddity shall to the extent practicable and required under the circumstances, utilize as a reference, comparative market data and practices.

6.3.    The Compensation Committee and the Board may periodically consider and approve base salary adjustments for Executive Officers. In addition, and subject to applicable law, the CEO of the Company may approve non-material changes to the base salary of Executive Officers who are subordinated to the CEO. The main considerations for approving salary adjustment are similar to those used in initially determining the base salary, but may also include change of role or responsibilities, recognition for professional achievements, regulatory or contractual requirements, budgetary constraints or market trends. When approving salary adjustments for the Executive Officers, the Compensation Committee and the Board will also consider the previous and existing compensation arrangements of the Executive Officer whose base salary is being considered for adjustment. Any limitation herein based on the annual base salary shall be calculated based on the monthly base salary applicable at the time of consideration of the respective grant or benefit

7. **Benefits**

7.1.    The following benefits may be granted to the Executive Officers in order, among other things, to comply with legal requirements:

7.1.1.    paid time off / vacation days in accordance with market practice (as relevant in the domicile of the applicable Executive Officer);

7.1.2.    sick days in accordance with domicile market practice;

7.1.3.    convalescence pay according to applicable law;

7.1.4.    monthly remuneration for a study fund, per domicile market practice, and as allowed by applicable law and with reference to Oddity's practice and the practice in peer group companies;

7.1.5.    Oddity shall contribute on behalf of the Executive Officer to an insurance policy or a pension fund, as allowed by applicable law and with reference to Oddity's policies and procedures and the practice in peer group companies (including contributions on bonus payments); and

7.1.6.    Oddity shall contribute on behalf of the Executive Officer towards work disability insurance, per domicile market practice, and as allowed by applicable law and with reference to Oddity's policies and procedures and to the practice in peer group companies.

7.2.    Executive Officers will receive domicile-applicable benefits, based on, and subject to, the principles of this Policy, as customary and as applicable in the relevant jurisdiction in which they are employed. Such customary benefits shall be determined based on the methods described in Section 6.2 of this Policy (with the necessary changes and adjustments).

7.3.    In events of relocation or repatriation of an Executive Officer to another geography, such Executive Officer may receive other similar, comparable or customary benefits as applicable in the relevant jurisdiction in which he or she is employed or additional payments to reflect adjustments in cost of living. Such benefits may include reimbursement for out-of-pocket one-time payments and other ongoing expenses, such as housing allowance, car allowance, and home leave visit, etc.

7.4.    Oddity may offer additional benefits to its Executive Officers, which will be comparable to customary market practices, such as, but not limited to: cellular and land line phone benefits, company car and travel benefits, reimbursement of business travel including a daily stipend when traveling and other business related expenses, insurances, other benefits (such as newspaper subscriptions, academic and professional studies), etc. Such additional benefits shall be determined in accordance with Oddity's policies and procedures, and shall be set on a domicile-basis.