**EXHIBIT 1**
**PART 6**

equity based award, except for acceleration provisions that are disclosed on Section 4.3(b) of the Company Disclosure Schedule;

(f)    issue, create, incur, assume or guarantee any Indebtedness;

(g)    fail to promptly pay and discharge current Liabilities except where disputed in good faith by appropriate proceedings;

(h)    directly or indirectly acquire any material properties or assets, sell, assign, license, transfer, convey, lease or otherwise dispose of any of the material properties or assets of the Company or encumber or subject to any Lien (other than Permitted Liens), or allow or suffer to be encumbered any of the material properties or assets of the Company, in each case, whether tangible or intangible, except in the Ordinary Course of Business;

(i)    invest in, make a loan, advance or capital contribution to, or otherwise acquire the securities of any other Person or introduce any material change with respect to the operation of the Company;

(j)    cancel or compromise any debt or claim or waive or release any material right of the Company except in the Ordinary Course of Business and which, in the aggregate, would not be material to the Company;

(k)    enter into commitments for capital expenditures in excess of $250,000 for all commitments in the aggregate;

(l)    enter into any labor or collective bargaining agreement, through negotiation or otherwise, or make any commitment or incur any liability to any labor organization, except when required by applicable Law or Order;

(m)    make a material change in its accounting reporting principles, methods, policies or practices;

(n)    make, change or revoke any material Tax election, settle or compromise any income or other material Tax claim, change (or make a request to any Taxing Authority to change) any material aspect of its method of accounting for Tax purposes, consent to any extension or waiver of the limitation period applicable to any claim or assessment relating to Taxes, file any amended income or other material Tax Return;

(o)    adopt a plan or agreement of complete or partial liquidation, dissolution, restructuring, merger, consolidation or other reorganization, other than the Mergers;

(p)    (i) enter into any Contract that if it was in force as of the Agreement Date would be a Material Contract or amendment to any Material Contract, or (ii) terminate, supplement, restate or amend, or waive any rights under, any Material Contract or material Permit; in each case, other than in the Ordinary Course of Business.

(q)    commence any Legal Proceeding;

74

(r)    release, assign, compromise, settle or agree to settle any Legal Proceeding material to the Company;

(s)    grant or enter into a license, sublicense or transfer to any Person any rights to any Owned Company Intellectual Property or Owned Company Technology other than in the Ordinary Course of Business;

(t)    fail to (i) pay any annuity or any filing, prosecution, maintenance or other fee or file any document, response to office action or other filing in connection with any Company Intellectual Property Registrations when due or (ii) diligently prosecute and maintain all Company Intellectual Property Registrations;

(u)    enter into any agreement for the creation or development by a third party (except for consultants or independent contractors engaged by the Company in the Ordinary Course of Business pursuant to a Contract containing an assignment (including a present assignment) of Intellectual Property Rights to the Company) of any material Intellectual Property Rights, products or services for the Company; or

(v)    agree, in writing or otherwise, to take any of the foregoing actions.

6.3    No Control of the Company's Business. Without derogating the provisions of Section 6.1 and Section 6.2, Parent acknowledges and agrees that nothing contained in this Agreement shall give Parent, directly or indirectly, the right to control or direct the Company's operations prior to the Closing and (ii) prior to the Closing, the Company shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' operations.

6.4    Exclusive Dealing.

(a)    The Company shall, and shall cause its Affiliates, directors, officers, employees, agents and other representatives to, immediately following the execution of this Agreement discontinue any discussions or negotiations with any Person (other than Parent Merger Sub I and Merger Sub II) relating to any Acquisition Transaction.

(b)    Until the earlier of the First Effective Time or the termination of this Agreement pursuant to Article IX, the Company will not, and will cause its Affiliates, directors, officers, employees, agents and other representatives not to, take any of the following actions with any Person other than Parent, Merger Sub I, and Merger Sub II: (i) solicit, initiate, authorize, recommend, propose, entertain or encourage any proposals or offers from, or conduct discussions with or engage in negotiations with any Person relating to an Acquisition Transaction, (ii) furnish or cause to be furnished to any Person, other than Parent, Merger Sub I, and Merger Sub II, information relating to, or otherwise cooperate with, facilitate or encourage any effort or attempt by any such Person with regard to, an Acquisition Transaction, or (iii) enter into any agreement with any Person providing for an Acquisition Transaction.

(c)    If the Company or any of its Affiliates, directors, officers, employees, agents or other representatives receives any inquiry or proposal relating to an Acquisition Transaction from any Person (other than Parent, Merger Sub I, and Merger Sub II) at any time

prior to the First Effective Time, then the Company shall immediately (and in no event later than one (1) Business Day after the Company becomes aware of such inquiry or proposal) (i) advise Parent orally and in writing of such inquiry or proposal (including the identity of the Person making such inquiry or submitting such proposal, and the terms thereof), (ii) provide to Parent a copy of such inquiry or proposal if in writing, and (iii) notify such Person in writing that the Company is subject to an exclusivity agreement with respect to the sale of the Company that prohibits it from considering the bid, expression of interest or information, provided that if restricted by confidentiality obligations existing as of the Agreement Date, the Company may omit the identity of the Person making such inquiry or proposal and the terms and copy of such inquiry or proposal.

6.5    Stockholder Approval; Notice of Stockholder Action; Consent.

(a)    On the date hereof, or immediately thereafter and in no event more than five Business Days following the date hereof, the Company shall obtain written consents executed by Stockholders representing, at least, (i) a majority of the holders of the issued and outstanding Company Capital Stock, voting together as a single class, (ii) a majority of the holders of the issued and outstanding Company Common Stock, and (iii) a majority of the holders of the issued and outstanding Company Preferred Stock, voting together as a single class (the "Company Requisite Vote"), each in the form attached hereto as Exhibit A (the "Written Stockholder Consent"). Promptly following receipt of the Company Requisite Vote, the Company shall cause its corporate Secretary to deliver a copy of the duly executed Written Stockholder Consent to Parent, together with a certificate executed on behalf of the Company by its corporate Secretary certifying that the Company Requisite Vote has been obtained. As promptly as practicable following the receipt of the Company Requisite Vote, the Company will send an information statement to those Stockholders who did not execute the Written Stockholder Consent, which information statement shall be subject to Parent's prior review and approval and shall contain, among other things, such disclosure materials required pursuant to applicable Law (including pursuant to Sections 228(e) and 262 of the DGCL), the COI and Company's By-laws, which shall be in a form reasonably acceptable to Parent.

(b)    As soon as reasonably practicable after the receipt of the Company Requisite Vote, the Company shall use commercially reasonable efforts to obtain executed Written Stockholder Consents from all Stockholders that have not previously executed the Written Stockholder Consent.

6.6    Payoff Letters and Invoices. If needed, the Company shall exercise commercially reasonable efforts to obtain and deliver to Parent no later than three (3) Business Day prior to the Closing Date, an accurate and complete copy of: (a) a payoff letter, dated no more than two (2) Business Days prior to the Closing Date, with respect to all Indebtedness, if any, of the Company owed to such lender and the amounts payable to the lender thereof to (i) satisfy such Indebtedness as of the Closing and (ii) terminate and release any Liens (which Liens might be terminated post-First Effective Time) related thereto (each, a "Payoff Letter"); and (b) an invoice from each advisor or other service provider to the Company with respect to all Transaction Expenses estimated to be due and payable to such advisor or other service provider, as the case may be, as of the Closing

Date and which will remain unpaid at the Closing (each, an "Invoice").

## ADDITIONAL COVENANTS AND AGREEMENTS

7.1  Access to Information. The Company agrees that, prior to the First Effective Time, Parent, Merger Sub I, and Merger Sub II shall be entitled, at Parent's expense, through its officers, employees and representatives (including its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Company and such examination of the books, records and financial condition of the Company as it reasonably requests, excluding with respect to any source code or similar technical information, any customers, suppliers or similar business partners, or to any employee or Contractor of the Company (access to such employees and Contractors to be made available loosely prior to Closing). Any such investigation and examination shall be conducted upon prior notice during regular business hours and under reasonable circumstances and in a manner that does not interfere with the normal business operations of the Company, and the Company shall use commercially reasonable efforts to cooperate therewith. In order that Parent, Merger Sub I and Merger Sub II may have full opportunity to make such physical, business, accounting and legal review, examination or investigation as it may reasonably request of the affairs of the Company, the Company shall cause its representatives to use commercially reasonable efforts to cooperate with such representatives in connection with such review and examination.  Notwithstanding the foregoing, the Company shall not be required to permit Parent, Merger Sub I and Merger Sub II any examination or inspection or other access, or to disclose to Parent, Merger Sub I or Merger Sub II any information, if the Company believes in good faith, based on a written advice of counsel, that such examination, inspection, access, or disclosure could violate (i) any applicable Law or (ii) any contractual obligation of the Company as of the date hereof (provided, that the Company shall, upon the reasonable request of Parent, use its commercially reasonable efforts to obtain the required consent of any third party to such access or disclosure), provided, however, that the Company shall use reasonable efforts to allow for the examination, inspection, access, or disclosure to the maximum extent, including the entry into common interest agreements.

7.2  Efforts; Regulatory Compliance.

(a)  Each of the parties to this Agreement shall use its commercially reasonable efforts to promptly (i) take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable to cause the conditions to the Closing to be satisfied as promptly as practicable (and by or before the Termination Date) and to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including preparing and filing promptly and fully all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents, and (ii) obtain all approvals, consents, registrations, permits, waiting period expirations or terminations, authorizations and other confirmations ("Consent") from any Governmental Authority or third party necessary, proper or advisable to consummate the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the parties shall cooperate with, and do all things reasonably requested to assist, one another in the prompt preparation and filing (which filings shall occur no later than ten (10) days after the Agreement

77

Date) of any filings required under the HSR Act or any foreign antitrust, merger control, or competition law. Parent shall be responsible for making, with the Company's reasonable assistance, any filing that may be required under any foreign antitrust, merger control, or competition law and shall consider in good faith any matters or comments raised by the Company. The Parties shall keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from the United States Federal Trade Commission, the United States Department of Justice and any other applicable Governmental Authority and shall comply promptly with any such inquiry or request and shall promptly provide any supplemental information requested in connection with the filings made hereunder pursuant to the HSR Act or such other applicable Law. Without limiting the generality of the foregoing, each party shall provide to the other (or the other's respective advisors) upon request copies of all correspondence between such party and any Governmental Authority relating to the transactions contemplated by this Agreement. The Parties may, as they deem advisable and necessary, designate any competitively sensitive materials provided to the other under this Section 7.2 as "outside counsel only." Such materials and the information contained therein shall be given only to outside counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient without the advance written consent of the party providing such materials. In addition, to the extent reasonably practicable, all discussions, telephone calls, and meetings with a Governmental Authority regarding the transactions contemplated by this Agreement shall include representatives of both Parties. Subject to applicable Law, the parties will consult and cooperate with each other in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, and proposals made or submitted to any Governmental Authority regarding the transactions contemplated by this Agreement by or on behalf of any party. Each party shall use its commercially reasonable efforts to obtain expiration or termination of the waiting period under the HSR Act. Notwithstanding the foregoing, or any other covenant herein contained, in connection with the expiration or termination of the waiting period under the HSR Act or receipt of any Consent from any Governmental Authority under the HSR Act or under any other applicable Law or in connection with the consummation of the Mergers, neither the Parent nor any of its Affiliates shall be required to divest, sell, license or hold separate material portions of their respective businesses, product lines, properties or assets, or otherwise take or commit to take any action that materially restricts its rights with respect to any of its businesses, product lines, properties or assets, or its ability to retain itself as an entity or to make any license, payment or commercial concession to any third party as a condition to obtaining any required consent of any third party.

      (b)     If any administrative or judicial Legal Proceeding is instituted (or threatened to be instituted) by a Governmental Authority challenging the consummation of the Mergers as violative of any applicable Law, each of the Parent and the Company shall, and shall cause their respective Affiliates to, cooperate with the other parties and use their commercially reasonable efforts to contest and resist any such Legal Proceeding, including any Legal Proceeding that seeks a temporary restraining order or preliminary injunction that would prohibit, prevent or restrict consummation of the Mergers; provided, however, nothing in this Section 7.2(b) or otherwise in this Agreement shall require the Company, Parent or their Affiliates, nor permit the Company, Parent or their Affiliates, to enter into or agree to enter into any understanding, undertaking, settlement, consent decree, stipulation or agreement that would limit in any manner such Person's or any of its Affiliates' ability to operate its business following the Closing in its absolute discretion, or require the sale, divestiture, holding separate (including by establishing a

78

trust or otherwise) or license of any of their assets, securities or businesses of such Person or any of its Affiliates.

7.3    Notification of Certain Matters. From the Agreement Date until the earlier termination of this Agreement in accordance with its terms and the First Effective Time, the Company shall give prompt notice to Parent, and Parent shall give prompt notice to the Company, of (a) any written notice or other communication received by such party from any Governmental Authority in connection with the Mergers or other transactions contemplated by this Agreement or from any Person alleging that the consent of such Person is or may be required in connection with the Mergers or the other transactions contemplated by this Agreement, (b) any actions, suits, claims, known investigations or other Legal Proceedings commenced or, to such party's Knowledge, threatened against, relating to or involving or otherwise affecting such party or its subsidiaries which relate to the Mergers or the other transactions contemplated by this Agreement, (c) the discovery of any fact or circumstance that, or the occurrence or non-occurrence of any event the occurrence or non-occurrence of which, has caused any representation or warranty made by such party contained in this Agreement to be untrue or inaccurate such that the condition set forth in Section 8.2(a) or Section 8.3(a) would not be satisfied at Closing, and (d) any failure of such party to comply with or satisfy any covenant or agreement to be complied with or satisfied by it hereunder such that the condition set forth in Section 8.2(b) or Section 8.3(b) would not be satisfied in all material respects at Closing.   For the avoidance of doubt, the delivery of any notice pursuant to this Section 7.3 shall not (i) cure any breach of, or non-compliance with, any other provision of this Agreement, (ii) limit the remedies available to the party receiving such notice (except that notice of any new event, condition, fact or circumstance that occurs after the Agreement Date shall exempt the Escrowed Holders from claims based on fraud or intentional misrepresentation related to such new events, conditions, facts or circumstances), (iii) constitute an acknowledgment or admission of breach of this Agreement, or (iv) will be deemed to amend or supplement the Company Disclosure Schedule.

7.4    Fees and Expenses. Except as otherwise set forth in this Agreement (including with respect to Transaction Expenses), all fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such fees or expenses, whether or not the transactions contemplated hereby are consummated.

7.5    Tax Matters.

(a)    Filing of Tax Returns; Payment of Taxes.

(i)    The Company shall timely file or cause to be timely filed all Tax Returns in respect of the Company that are required to be filed on or prior to the Closing Date (taking into account any period of extension) and shall pay or cause to be paid all Taxes of the Company due on or before the Closing Date. All such Tax Returns shall be prepared in a manner consistent with prior practice (unless otherwise required by applicable Laws).

(ii)    Following the Closing Date, Parent shall cause to be timely filed all Tax Returns with respect to Pre-Closing Tax Periods required to be filed by the Company after the Closing Date (taking into account any period of extension) and shall pay or cause to be paid all Taxes shown due on such Tax Returns (subject to the rights to payment from the Escrowed Holders

under Section 10.2(a)(vi)). All such Tax Returns shall be prepared in a manner consistent with prior practice (unless otherwise required by applicable Laws), and the terms of this Agreement.

(iii) Parent shall cause the Company to provide Representative with copies of such completed Tax Returns (or relevant portions of such Tax Returns with respect to a Straddle Period) that include a Pre-Closing Tax Period at least thirty (30) days prior to the due date for filing thereof, along with supporting workpapers. Representative and Parent shall attempt in good faith to resolve any disagreements regarding such Tax Returns prior to the due date for filing. In the event that Representative and Parent are unable to resolve any dispute with respect to such Tax Return at least ten (10) days prior to the due date for filing, then Section 7.5(e) shall apply, and any resolution reached pursuant thereto shall be binding on the parties.

(iv) Any deductions with respect to Transaction Expenses and other transaction costs incurred by or on behalf of the Company in connection with the transactions contemplated hereby that, in each case, arise from expenses or costs that are economically borne by the Escrowed Holders (including any expenses or costs paid before the Closing) that are reflected as deductions in determining the Net Aggregate Consideration shall, to the extent permitted by applicable Law, be allocated to and reported on Tax Returns for Pre-Closing Tax Periods. Any net operating losses, net capital losses and other Tax credits or similar Tax assets and attributes of the Company generated in a Pre-Closing Tax Period that are available as of the Closing Date, shall be utilized, to the extent permitted by applicable Law, to reduce the liabilities of the Company for Taxes (if any) in such Pre-Closing Tax Period.

(b) Straddle Period Tax Allocation. The Company will, if permitted by applicable Law, close the taxable period of the Company as of the close of business on the Closing Date. If applicable Law does not permit the Company to close its taxable year as of the close of business on the Closing Date, with respect to a Straddle Period, Taxes shall be allocated (i) to the Escrowed Holders for the period up to and including the close of business on the Closing Date and (ii) to Parent for the period subsequent to the Closing Date. The amount of Property Taxes for the Straddle Period allocated to a Pre-Closing Tax Period shall be determining by multiplying (A) the amount of such Taxes for the entire Straddle Period by (B) a fraction, the numerator of which is the number of calendar days in such Straddle Period in the Pre-Closing Tax Period and the denominator of which is the number of calendar days in the entire Straddle Period. For all other Taxes, the amount of Taxes relating to a Straddle Period shall be allocated based on a closing of the books method, provided that exemptions, allowances or deductions that are calculated on an annual basis shall be allocated between the period ending on the Closing Date and the period after the Closing Date in proportion to the number of days in each such period.

(c) Tax Audits. If notice of any Legal Proceeding with respect to Taxes of the Company shall be received by an Indemnitee for which the Escrowed Holders may reasonably be expected to be liable pursuant to Section 10.2 (a "Tax Claim"), Parent shall promptly notify Representative of such claim (provided, however, that the failure of the Indemnitee to give Representative notice as provided herein shall not relieve the Escrowed Holders of the obligations under this Section 7.5 or Section 10.2(a)(vi) except to the extent that the Escrowed Holders are actually prejudiced thereby). Representative shall have the right to control the conduct and the defense of such claim, including any settlement or compromise thereof, to the extent related to a Tax period that ends on or prior to the Closing Date; provided, however, that Representative shall

80

keep Parent reasonably informed of the progress of any such Tax Claim and shall not settle any such Tax Claim, without the consent of Parent, such consent not to be unreasonably withheld, conditioned or delayed. Parent shall control the conduct and defense of any other Tax Claim (including any Tax Claim that Representative does not elect to control hereunder), including any settlement or compromise thereof; provided, however, that Parent shall keep Representative reasonably informed of the progress of any such Tax Claim and shall not settle any such Tax Claim, to the extent such Tax Claim relates to a Pre-Closing Tax Period, without the consent of Representative, such consent not to be unreasonably withheld, conditioned or delayed; provided, further, that if the consent of Representative is so obtained, such settlement of that portion of any such claim shall alone be determinative of the amount of indemnification pursuant to Article X, and neither Representative nor any person who has a beneficial interest in the Escrow Fund shall have any power or authority to object under any provision of this Section 7.5 or Article X to the amount of any demand by Parent against the Escrow Fund with respect to such settlement.

(d)    Transfer Taxes. Parent shall be liable for and shall pay or cause to be paid all sales, use, stamp, documentary, filing, recording, transfer or similar fees or Taxes or governmental charges as levied by any Governmental Authority including any interest and penalties) in connection with the transactions contemplated by this Agreement.

(e)    Disputes. Any dispute as to any matter covered hereby which Parent and the Representative are unable to amicably resolve in good faith discussions within twenty (20) days after delivery of notice by either party of the applicable dispute, shall be resolved by an independent accounting firm mutually acceptable to the Representative and Parent (the "Expert"). The Expert shall be required to make a determination as soon as reasonably practicable and in any event within twenty (20) Business Days of his or her appointment. The Expert's determination shall be deemed final and binding on the parties. The fees and expenses of such Expert shall be borne equally by the Escrowed Holders, on the one hand, and Parent, on the other. If any dispute with respect to a Tax Return is not resolved prior to the due date of such Tax Return, then the party responsible for preparing such Tax Return shall use commercially reasonable efforts to extend the filing date of such Tax Return, and only upon the expiration of such extensions (if obtained), such Tax Return shall be filed in the manner which the party responsible for preparing such Tax Return deems correct.

(f)    Tax Actions. Without the prior written consent of Representative (which consent shall not be unreasonably withheld, delayed or conditioned), Parent shall not, and shall not cause its Affiliates or the Surviving Company to (i) make, change or revoke any election that has any retroactive effect on any Pre-Closing Tax Period, (ii) refile, revoke, amend or cause to be amended any Tax Return of the Company for Pre-Closing Tax Periods or Straddle Period,, (iii) extend or waive any statute of limitations or other period for the assessment of any Tax or deficiency related to a Tax Return of or with respect to the Company for any Pre-Closing Tax Period, or (iv) initiate or otherwise approach any Governmental Authority regarding any voluntary disclosure (or similar) agreement or procedure with respect to Taxes payable by or with respect to the Company related to any Pre-Closing Tax Period, unless, in each case, such action (A) is required by a determination (within the meaning of Section 1313(a)(1) of the Code or any comparable provision of state or local law) or (B) would not reasonably be expected to create or

increase an indemnity claim under this Agreement with respect to Taxes..

(g)    Tax Refunds. Any Tax refund (including any interest in respect thereof or credit received in lieu of a refund) including VAT refunds, if any, actually received or recognized by Parent, the Surviving Company, or any of their Affiliates after the Closing that relate to any Taxes paid by the Company in a Pre-Closing Tax Period (including the portion of any Straddle Period on or prior to the Closing Date), reflected as a deduction in the determination of Net Aggregate Consideration or borne by the Escrowed Holders under Section 10.2(a)(vi) shall be for the account of the Escrowed Holders, except to the extent such Tax refund (or credit) resulted from the carry back of a net operating loss or other Tax attribute or Tax credit that was generated after the Closing. Parent shall pay, or cause to be paid to the Paying Agent for further distribution to the Escrowed Holders any such refund or credit, in each case, net of any Tax or other reasonable costs incurred by Parent the Surviving Company, or any of their Affiliates resulting from the obtaining and receipt of such refund or credit, within ten (10) days after (x) the receipt of any such refund or (y) the recognition of such credit against a Tax, as applicable.

(h)    Access.   Parent, on the one hand, and Representative, on the other hand, agree to furnish or cause to be furnished to the other, upon reasonable request, as promptly as practicable, such information and assistance relating to Taxes, including access to books and records, in such party's possession as is reasonably necessary for the filing of all Tax Returns by Parent or the Company, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Without limiting the foregoing, Parent agrees to furnish or cause to be furnished to Representative, upon reasonable request, as promptly as practicable, such information and assistance that may reasonably be needed to determine whether Parent or any relevant Affiliate thereof is a passive foreign investment company within the meaning of Section 1297(a) of the Code, and such information and assistance that may reasonably be needed by Representative or any Person that receives Consideration Shares hereunder to prepare and file all Tax Returns, and make any relevant elections, in connection with the rules applicable to holding stock in a passive foreign investment company.

(i)    Intended Tax Treatment.

(i)    The Company and each Parent Party agree and acknowledge that the Mergers, taken together, are intended to (A) be a single integrated transaction, consistent with the principles set forth in Rev. Rul. 2001-46, 2001-2 C.B. 321, that qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, and (B) qualify for an exception to the general rule of Section 367(a)(1) of the Code, pursuant to the provisions of Treasury Regulations Section 1.367(a)-3(c)(1). The Company and each Parent Party agree to file all Tax Returns, and take all positions regarding Taxes in front of any Governmental Authority, in a manner consistent with the intended treatment described in the foregoing sentence (including, for the avoidance of doubt, by complying with the reporting requirements of Treasury Regulations Section 1.367(a)-3(c)(6), to the extent applicable), unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code (or similar provision of state, local, or non-U.S. Law).

(ii)    Neither the Company nor any Parent Party shall take or fail to take (and the Company and each Parent Party shall cause its respective Affiliates not to take or

82

knowingly fail to take) any action that could reasonably be expected to (A) prevent or impede the Mergers, taken together, from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code, or (B) cause the stockholders of the Company to recognize gain pursuant to Section 367(a)(1) of the Code. This Agreement is intended to be, and is hereby adopted by the Company and each Parent Party as, a "plan of reorganization" for purposes of Sections 354, 361, and 368 of the Code and the Treasury Regulations promulgated thereunder.

(j)  Coordination with Article X. In the event of a conflict between the provisions of Section 7.5(c) and the provisions of Section 10.2(e), the provisions of Section 7.5(c) shall control.

7.6  Employee Benefits.

(a)  Unless Parent directs the Company otherwise in writing no later than five (5) Business Days prior to the First Effective Time, no later than immediately prior to the First Effective Time, the Company will terminate any and all Company Plans intended to qualify as a qualified cash or deferred arrangement under Section 401(k) of the Code ("Company 401(k) Plans"). At the request of Parent, the Company will provide Parent with evidence that each such Company 401(k) Plan has been terminated effective no later than immediately prior to the First Effective Time pursuant to resolutions duly adopted by the board of directors of the Company or such other applicable governing body or committee thereof.

(b)  The provisions of this Section 7.6 are solely for the benefit of the parties to this Agreement, and no employee of the Company or Contractor (including any beneficiary or dependent thereof) shall be regarded for any purpose as a third party beneficiary of this Agreement, and no provision of this Section 7.6 shall create such rights in any such persons. Nothing herein shall guarantee employment or engagement for any period of time or preclude the ability of Parent, the Surviving Company to terminate the employment of any Company's employee or Contractor at any time and for any reason.

7.7  Resignation of Directors and Officers. The Company shall cause the directors and officers of the Company in office immediately prior to the First Effective Time to resign as directors and officers, as applicable, effective as of the First Effective Time.

7.8  Further Assurance. From and after the Closing, each of the Company Merger Sub I, Merger Sub II, and Parent shall execute and deliver such further instruments of conveyance, transfer and assignment and shall take such other reasonable and lawful actions as a Party may reasonably request of another party in order to effectuate the purposes of this Agreement and the other Transaction Documents to which they are parties and to carry out the terms hereof and thereof.

7.9  Directors' and Officers' Insurance; Indemnification Agreements.

(a)  From and after the First Effective Time and subject to applicable Law, the Company and any successor in interest thereof (including the Surviving Company) shall, and Parent shall cause the Company and the Surviving Company and any successor in interest thereof to, fulfill and honor in all respects all the obligations of the Company pursuant to (i) each indemnification agreement in effect between the Company and each person who is or was a

83

director or officer of the Company and listed in Section 7.9(a)(I) of the Company Disclosure Schedule pursuant to written agreements outstanding on the Agreement Date made available to the Parent and disclosed in Section 7.9(a)(II) of the Company Disclosure Schedule (each such director or officer, a "Covered Person" and, collectively, the "Covered Persons") in accordance with their terms; and (ii) any indemnification, exculpation and expense advancement provisions under the COI, in the case of each of (i) and (ii) solely with respect to claims arising from or related to facts or events that occurred at or before the First Effective Time including with respect to matters, acts or omissions occurring in connection with the approval of or entering into this Agreement or the consummation of the Merger. Without limiting the foregoing, from and after the First Effective Time, Parent shall, until seven years from the First Effective Time, cause the Fundamental Documents of the Surviving Company (or any successor thereof) (as amended from time to time) to contain provisions no less favorable to the Covered Persons with respect to exculpation and limitation of liabilities of directors and officers and indemnification (including provisions relating to expense advancement) than are set forth as of the date of this Agreement in the Fundamental Documents of the Company as currently in effect, which provisions shall not be amended, repealed or otherwise modified in a manner that would adversely affect the rights thereunder of the Covered Persons with respect to exculpation and limitation of liabilities and indemnification, all of the foregoing subject to applicable Law, it being the intent of the parties hereto that the current and former officers and directors of the Company prior to the Closing shall continue to be entitled to such exculpation and indemnification to the fullest extent permitted under applicable Law; provided, however, that all rights to indemnification in respect of any claims asserted or made within such seven (7) year period shall continue until the disposition of such claim.

(b)    Without derogating from the other provisions of this Section 6.1 and Section 6.2 above, prior to the Closing, the Company shall purchase, and Parent shall cause the Company (and its successors, if applicable) following the First Effective Time to maintain, for the benefit of the Covered Persons, policies of directors' and officers' and fiduciary liability "tail" or "run-off" insurance providing for such coverage in amount and scope no less than the Company's existing directors' and officers' liability insurance coverage for a period of no less than seven (7) years after the First Effective Time (the "D&O Tail Policy"). Any cost and expenses related to the acquisition of such insurance shall be considered part of the Transaction Expenses.

(c)    The Covered Persons and their heirs or successors to whom this Section 7.9 applies shall be intended third party beneficiaries of this Section 7.9.

(d)    Each of Parent and the Covered Person shall cooperate, and cause its, his or her respective Affiliates to cooperate, in the defense of any claim for indemnification by a Covered Person and shall provide access to properties and individuals as reasonably requested and furnish or cause to be furnished records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials or appeals, as may be reasonably requested in connection therewith.

7.10    280G Approval. If required to avoid the imposition of Taxes under Section 4999 of the Code or the loss of deduction under Section 280G of the Code with respect to any payment or benefit in connection with the transactions contemplated by this Agreement, the Company will (a) no later than three (3) Business Days prior to the Closing Date, obtain and deliver to Parent from each "disqualified individual" (as defined in Section 280G(c) of the Code) whom may receive any

84

payment or benefits that would constitute a "parachute payment" (within the meaning of Section 280G(b)(2)(A) of the Code) a waiver of such disqualified individual's rights to some or all of such payments or benefits (the "Waived 280G Benefits" and, each such waiver, a "280G Waiver") so that all remaining payments or benefits, if any, shall not be "excess parachute payments" (within the meaning of Section 280G of the Code) and (b) as soon as practicable following the delivery of the 280G Waivers to Parent but no later than prior to the Closing Date, with respect to each such disqualified individual who provides a duly executed 280G Waiver, submit to a stockholder vote for approval (along with adequate disclosure satisfying the requirements of Section 280G(b)(5)(B)(ii) of the Code and any regulations promulgated thereunder) the rights of any such "disqualified individual" to receive the Waived 280G Benefits. Prior to soliciting 280G Waivers from the "disqualified individuals", the Company shall provide drafts of such waivers and disclosure materials to Parent for its review and approval (which approval will not be unreasonably withheld, conditioned or delayed).   If any of the Waived 280G Benefits fail to be approved by the stockholders as contemplated above, such Waived 280G Benefits shall not be made or provided. Prior to the Closing, the Company shall deliver to Parent written confirmation (i) that a Company stockholder vote was solicited in conformance with Section 280G of the Code, and the requisite Company shareholder approval was obtained with respect to any payments and/or benefits that were subject to the Company shareholder vote (the "Section 280G Approval") or (ii) that the Section 280G Approval was not obtained and as a consequence, pursuant to the 280G Waivers, such "parachute payments" shall not be made or provided. The Company shall use commercially reasonable efforts to seek the 280G Approval in a manner which satisfies all applicable requirements of Section 280G(b)(5)(B) of the Code and the Department of Treasury regulations promulgated thereunder.

7.11    Retention RSUs. At or prior to the First Effective Time, Parent shall grant restricted stock units covering Oddity's Class A Ordinary Shares to certain employees and/or Contractors as shall be determined by Parent in consultation with the Company, based on a per share price, for each unit, of $430.31, with vesting in two equal portions on the third and fourth anniversaries of the Effective Date (the "Future RSUs"). The number of restricted stock units covering Oddity's Class A Ordinary Shares granted, pursuant to this Section 7.10, shall not exceed, in aggregate, the Retention Bonus Amount, to be calculated based on a per share price, for each unit, of $430.31. Any Future RSUs granted pursuant to this Section 7.10, shall be granted in accordance with Oddity's applicable equity plan, and shall be evidenced by an award agreement in Oddity's standard form made available to the Company.

7.12    Obligations by Oddity. Each Parent Party hereby covenants to cause Oddity to duly and timely perform and complete any and all obligations which by their nature are to be performed by Oddity, directly or indirectly, under this Agreement, any Transaction Documents or otherwise in order for all Parent Parties to fully perform and comply with all obligations, covenants and actions required to be performed by Oddity or any other Parent Party in connection with the consummation of the Transaction, including without limitation, the issuance by Oddity of any portion of the Consideration Shares, the New RSUs, or any other form of consideration payable under this Agreement (in cash or equity).

85

CONDITIONS TO CLOSING

8.1   <u>Conditions to Each Party's Obligation to Effect the Merger</u>. The respective obligations of each party hereto to effect the Merger shall be subject to the satisfaction (or waiver, if permissible under applicable Law) at or prior to the First Effective Time of the following conditions:

(a)   <u>Governmental Approval</u>. The waiting period (and any extensions thereof) applicable to the consummation of the Mergers and the transactions contemplated hereby under the HSR Act shall have expired or been terminated.

(b)   <u>No Injunctions or Restraints</u>. No Law or Order enacted, promulgated, issued, entered, amended or enforced by any Governmental Authority shall be in effect (whether temporary, preliminary or permanent) enjoining, restraining, preventing or prohibiting consummation of the Merger or making the consummation of the Mergers illegal.

8.2   <u>Conditions to Obligation of the Company</u>. The obligation of the Company to effect the Mergers is further subject to the satisfaction (or waiver thereof in writing by Company, if permissible under applicable Law) at or prior to the First Effective Time of the following conditions:

(a)   <u>Representations and Warranties</u>. Each of the representations and warranties of Parent, Merger Sub I, and Merger Sub II set forth in this Agreement shall be true, correct and complete as of the Agreement Date and, (i) in all material respects (other than any representations and warranties qualified by materiality), as of the Closing Date as if made on and as of the Closing Date (or, if given as of a specific date, at and as of such date) or (ii) in all respects (for representations and warranties qualified by materiality), as of the Closing Date as if made on and as of the Closing Date (or, if given as of a specific date, at and as of such date).

(b)   <u>Performance</u>. Parent, Merger Sub I and Merger Sub II shall have performed and complied, in all material respects, with each covenant and obligation required by this Agreement to be so performed or complied with by Parent, Merger Sub I and Merger Sub II at or prior to the Closing.

(c)   <u>Deliveries</u>. The deliveries referred to in <u>Section 0</u> shall have been made.

(d)   <u>Oddity Guarantee</u>.   Oddity shall have delivered to the Company an executed copy of the Limited Guarantee in the form attached as <u>Exhibit I</u> hereto.

(e)   <u>No Legal Proceedings</u>. There shall not be instituted or pending any Legal Proceeding initiated by any Governmental Authority challenging or seeking to make illegal or otherwise restraining or prohibiting the consummation of the Mergers.

(f)   <u>Certificate of Parent</u>. Parent shall have delivered to the Company a certificate executed by an officer of Parent and in the form attached hereto as <u>Exhibit J</u>, to the effect that the conditions specified in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u> have been satisfied (the

86

"Parent Closing Certificate").

8.3     Conditions to Obligations of Parent, Merger Sub I and Merger Sub II. The obligations of Parent, Merger Sub I and Merger Sub II to effect the Mergers are further subject to the satisfaction (or waiver thereof in writing by Parent, Merger Sub I and Merger Sub II, if permissible under applicable Law) at or prior to the First Effective Time of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties of the Company (i) set forth in the Fundamental Representations shall be true, correct and complete in all respects as of the Agreement Date and as of the Closing Date as if made on and as of the Closing Date (or, if given as of a specific date, at and as of such date), (ii) set forth in Article IV (other than the Fundamental Representations) shall be true, correct and complete in all material respects as of the Agreement Date and as of the Closing Date as if made on and as of the Closing Date (or, if given as of a specific date, at and as of such date).

(b)     Performance. The Company shall have performed and complied, in all material respects, with each covenant and obligation required by this Agreement to be so performed or complied with by the Company at or before the Closing.

(c)     No Material Adverse Effect. Since the Agreement Date, a Material Adverse Effect shall not be continuing at the Closing Date.

(d)     Certificate of the Company. The Company shall have delivered to Parent, Merger Sub I and Merger Sub II a certificate, duly signed by the Company's chief executive officer, in the form attached hereto as Exhibit K, to the effect that the conditions specified in Section 8.38.3, Section 8.3(b), Section 8.3(c), Section 8.3(g), Section 8.3(h) and Section 8.3(m), have been satisfied (the "Company Closing Certificate").

(e)     No Legal Proceedings. There shall not be instituted, pending or threatened a Legal Proceeding initiated by, or before, any Governmental Authority challenging or seeking to make illegal or otherwise directly restrain or prohibit the consummation of the Mergers and no Legal Proceeding shall be pending against Parent, Merger Sub I, Merger Sub II or the Company or any Equityholders: (i) which seeks to frustrate or prevent the consummation of either Merger on the terms, and conferring upon Parent and the Company all of their respective rights and benefits, contemplated by this Agreement, or (ii) which could limit in any manner or impose any limitations on the ownership or operation by Parent of all or any portion of businesses or assets of the Company, or require the sale, divestiture, or license of any of the Assets, Securities or businesses of any of the Parent or the Company.

(f)     Non-Competition Agreements. The Non-Competition Agreements between Parent and each of the Identified Persons shall be in full force and effect at the First Effective Time.

(g)     Continuing Employment and Engagement. All of the Key Employees and Key Contractors, to whom Parent has extended offer letters or engagement letters, as shall solely be determined by Parent, to become employees or contractors, as applicable, of Parent or any of its Affiliates (as shall solely be determined by the Parent) (the "Employing Member") (on at least the same terms of their current employment or engagement) shall have accepted Parent's offer of

87

employment or engagement to become an employee or contractor of the Employing Member immediately following the Closing and shall not have evidenced any intention to terminate employment or engagement with the applicable Employing Member following the Closing.

(h)    Waiver or Expiration of Appraisal Rights. Stockholders representing at least ninety percent (90%) of the outstanding shares of Company Capital Stock (calculated on an as-converted-to-Company-Common-Stock basis) issued and outstanding as of immediately prior to the First Effective Time shall have waived their appraisal rights (and Parent shall have received evidence reasonably satisfactory to it for such waivers), or such appraisal rights shall have otherwise expired (and such expiration is confirmed in writing by a letter duly signed by the Company's chief executive officer and delivered to the Parent).

(i)    Contracts and Consents. All (i) Contracts listed on Schedule 8.3(a)(i)(i) shall have been duly terminated, and (ii) consents listed on Schedule 8.3(a)(i)(ii), which are required in connection with (A) the execution and delivery of this Agreement or any other Transaction Document, the compliance by the Company with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby, or (B) the continuing validity and effectiveness immediately following the Closing of any Permit or Contract of the Company, shall have been duly received.

(j)    FIRPTA Certificate. Prior to the Closing, the Company shall have delivered to Parent a certificate (the "FIRPTA Certificate") pursuant to Treasury Regulations section 1.1445-2(c)(3), duly executed and acknowledged by an authorized officer of the Company, in the form of Exhibit L hereto, certifying that interests in the Company are not "U.S. real property interests," together with the notice required to be mailed to the IRS under Treasury Regulations section 1.897-2(h).

(k)    Company Plans. Unless otherwise directed by Parent under Section 7.6(a), Parent shall have received evidence reasonably satisfactory to it that each Company 401(k) Plan shall have been terminated.

(l)    280G Approval. The Company shall deliver to Parent evidence reasonably acceptable to Parent that a vote of the stockholders of the Company was solicited in accordance with the foregoing provisions of Section 7.9(d) and that either (i) the requisite number of votes of the stockholders of the Company was obtained with respect to any Waived 280G Benefits (the "280G Approval") or (ii) the 280G Approval was not obtained, and, as a consequence, any Waived 280G Benefits shall not be made or provided for in any manner.

(m)    Company Requisite Vote. The Company Requisite Vote shall have been received and evidence thereof shall have been delivered to Parent and shall be in full force and effect.

(n)    Minimum Cash Amount. As of the Closing Date, and after giving effect to the repayment of all Outstanding Indebtedness, the Company shall have at least 85% of the

88

Minimum Cash Amount at its bank accounts.

(o)    Deliveries. The deliveries set forth in Section 3.14(a) shall have been made.

(p)    Repayment of Outstanding Indebtedness and Termination of Credit Lines. At or prior the First Effective Time, all Outstanding Indebtedness shall have been repaid and all Credit Lines, if any, shall have been terminated.


## TERMINATION

9.1    Termination. At any time prior to the First Effective Time, whether before or after approval of the matters presented in connection with the Merger by the Stockholders, this Agreement may be terminated:

(a)    by either the Company or Parent, by written notice to the other party, if the First Effective Time shall not have occurred on or before May 31, 2023 ("Termination Date"); provided, however, that the right to terminate this Agreement under this Section 9.1(a) shall not be available to any party whose action or failure to act has been the principal cause of or resulted in the failure of the Mergers to occur on or before such date and such action or failure to act constitutes a material breach of this Agreement;

(b)    by mutual agreement in writing of Parent and the Company;

(c)    by Parent, by written notice to the Company, if (i) Parent is not in material breach of any of its obligations under this Agreement and the Company shall breach in any respect any representation, warranty, obligation or agreement hereunder which breach would give rise to a failure of a condition set forth in Section 8.3 or Section 8.3(b) and such breach shall not have been cured, or such breach is incapable of being cured, within twenty (20) days following receipt by the Company of written notice of such breach, or (ii) any permanent injunction or other Order of a court or other competent authority preventing the consummation of the Mergers shall have become final and nonappealable;

(d)    by the Company, by written notice to Parent, if (i) the Company is not in material breach of any of its obligations under this Agreement and the Parent shall breach in any respect any representation, warranty, obligation or agreement hereunder which breach would give rise to a failure of a condition set forth in Section 8.2(a) or Section 8.2(b) and such breach shall not have been cured, or such breach is incapable of being cured, within twenty (20) days following receipt by Parent of written notice of such breach, or (ii) any permanent injunction or other Order of a court or other competent authority preventing the consummation of the Mergers shall have become final and nonappealable;

(e)    by either Parent or the Company, if a Governmental Authority shall have issued any order, injunction or other decree or taken any other action, in each case, which has

become final and nonappealable and which restrains, enjoins or otherwise prohibits the Mergers;

(f)     by Parent if there shall have occurred a Material Adverse Effect; or

(g)     by Parent, if evidence of receipt of the Company Requisite Vote has not been provided to Parent within five days following the execution of this Agreement.

9.2     Procedure Upon Termination. In the event of termination and abandonment by Parent or the Company, or both, pursuant to Section 9.1 hereof (other than pursuant to Section 9.1(b)), written notice thereof shall forthwith be given to the other party or parties setting forth a reasonably detailed description of the basis on which such party is terminating this Agreement, and this Agreement shall terminate without further action by Parent or the Company.

9.3     Effect of Termination. In the event that this Agreement is validly terminated as provided in this this Article IX, this Agreement shall forthwith become void, each of the parties shall be relieved of their duties and obligations arising under this Agreement after the date of such termination, and such termination shall be without Liability to Parent, either Merger Sub, the Company, Representative, the Equityholders or their respective officers, directors, stockholders or affiliates; provided, however, that the obligations of the parties set forth in Section 7.4 (Fees and Expenses), this Article IX (Termination), Article XI (Miscellaneous) and the Mutual Non-Disclosure Agreement, by and between the Company and Oddity, dated as of January 10, 2023 (the "Confidentiality Agreement") shall survive any such termination and shall be enforceable hereunder; provided, further, however, that nothing in this Section 9.3 shall relieve Parent, either Merger Sub, the Company or Representative of any Liability for a breach of this Agreement prior to the effective date of termination or from any claims, causes of action or remedies arising from fraud or intentional breach of this Agreement.

## SURVIVAL; INDEMNIFICATION

10.1   General Survival. The representations and warranties of the Company contained in this Agreement and Company Closing Certificate shall survive the Mergers and continue until the date that is eighteen (18) months from the First Effective Time (such date, the "General Expiration Date"); provided, however, that (a) the representations and warranties contained in (i) Section 4.1 (Organization and Good Standing), Section 4.2 (Authorization of Agreement), Section 4.3(b) (Capitalization), and Section 4.22 (Brokers and Financial Advisors), shall survive until the expiration of the applicable statute of limitations with respect to the underlying subject matter of such representations and warranties (the representations and warranties set forth in this clause (i) being hereinafter referred to as "Fundamental Representations"), (b) Section 4.9 (Taxes) (the "Tax Representations") shall survive until the expiration of the applicable statute of limitations with respect to the underlying subject matter of such representations and warranties (including all periods of extension and revisiting whether automatic or permissive), (c) the representations and warranties contained in Section 4.12 (Intellectual Property) (the "IP Representations") shall survive the Merger and continue until the date that is thirty-six (36) months from the First Effective Time, (d) any claim for breach by the Company of its representations and warranties contained in this Agreement and Company Closing Certificate involving fraud or intentional misrepresentation

90

shall survive indefinitely, and (e) if a Claim Notice is duly and timely given under and in accordance with this Article X prior to the applicable expiration date with respect to any indemnifiable Loss resulting from, arising out of, relating to, imposed upon or incurred by any Indemnitee by reason of a breach of any representation or warranty, such claim shall be preserved until such claim is finally resolved or waived in accordance with the procedures set forth herein (each of the foregoing time periods, a "Survival Period"). The right of any Indemnitee to make a claim for Losses with respect to Section 10.2(a)(ii) through 10.2(a)(vi) of this Agreement shall survive the Merger in accordance with the Survival Period.

  10.2  Indemnification.

    (a) Indemnity. Subject to the limitations in this Section 10.2, from and after the First Effective Time and until the expiration of the applicable Survival Period as set forth in Section 10.1, if any, Parent, Merger Sub I, Merger Sub II, the First Surviving Corporation and the Surviving Company and their respective affiliates, officers, directors, stockholders, representatives and agents (collectively, the "Indemnitees") shall be indemnified and held harmless, by each Stockholder who does not perfect his, her or its appraisal rights pursuant to Section 262 of the DGCL, each Dissenting Stockholder who withdraws or otherwise terminates his, her or its appraisal rights pursuant to the DGCL, each Optionholder, on a several and not joint basis (collectively, "Escrowed Holders"), from and against and in respects of all Losses to the extent resulting from, arising out of, relating to, imposed upon or incurred by Parent, Merger Sub I, Merger Sub II, the First Surviving Corporation and the Surviving Company or any other Indemnitee by reason of:

    (i) any breach of, or inaccuracy in, a representation or warranty of the Company in this Agreement or the Company Closing Certificate;

    (ii) any breach or failure by the Company prior to Closing to perform any of the covenants, agreements or obligations of the Company contained in this Agreement;

    (iii) any payments in respect of Dissenting Shares, to the extent, in the aggregate, exceeding the amounts that otherwise would have been payable pursuant hereto upon the exchange of such Dissenting Shares;

    (iv) subject to the limitations of Section 3.15, any inaccuracy in the Allocation Schedule;

    (v) any claims by any current or former holder any Security Right of the Company (including any predecessors), including Company Capital Stock, Company Stock Options or Company SAFEs to the effect that such Person is entitled to any Security Right or any payment in connection with the Mergers other than as specifically set forth on the Allocation Schedule and that entitles any such Person to any portion of the Net Aggregate Consideration not in accordance with the Allocation Schedule; or

    (vi) disregarding any disclosure on the Company Disclosure Schedule but excluding any amount that is included in Transaction Expenses or the calculation of Closing Indebtedness), (A) without duplication, Taxes, including taxes payable, of or owed by the Company with respect to any Pre-Closing Tax Periods (with any Taxes with respect to any Straddle

91

Period determined as provided in Section 7.5(b)), (B) Taxes for which the Company (or any predecessor of the foregoing) is held liable under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law) by reason of such entity being included in any consolidated, affiliated, combined or unitary group at any time on or before the Closing Date, , or (C) any failure by the Escrowed Holders to timely pay any and all Taxes required to be borne by a certain Escrowed Holder pursuant to Section 7.5(d), in each case to the extent not taken into account as part of Transaction Expenses or Closing Indebtedness;

(b)    Escrow Fund. Subject to the limitations set forth in Section 10.2(c), if any Indemnitee seeks to assert a Claim Notice for indemnification pursuant to this Agreement (an "Indemnification Claim"), such Indemnitee shall be required to first submit such Claim Notice, and any dispute with respect to such indemnification claim shall be resolved, in accordance with the terms of Section 10.2(d) or Section 10.2(e) of this Agreement. Prior to any such Indemnitee seeking payment directly from any Escrowed Holder with respect to such Indemnification Claim to the extent there are funds available in the Escrow Fund, such Indemnitee shall first seek payment from the Escrow Fund based on, with respect to the portion of the Losses attributed to such Escrowed Holder, such Escrowed Holder's Indemnity Pro Rata Share of the funds in the Escrow Fund (payable from the Escrow Fund, based on the same pro rata ratio between cash and Consideration Shares applicable to such Escrowed Holder in accordance with the Allocation Schedule); provided, however, that if there are not sufficient funds in the Escrow Fund, subject to the limitations set forth in Section 10.2(c), such Indemnitee shall be permitted to seek indemnification directly from the Escrowed Holders, based on each Escrowed Holder's Indemnity Pro Rata Share, to the extent of any shortfall. Notwithstanding the aforesaid, the recourse of an Indemnitee with respect to claims resulting from fraud or intentional misrepresentation by (i) any Escrowed Holder, solely with respect to such Escrowed Holder who committed such fraud or intentional misrepresentation and (ii) the Company, solely with respect to an Escrowed Holder who had actual knowledge of such of Company's fraud or intentional misrepresentation, shall, in both cases, be, as shall be determined by Parent at its sole discretion, either from (X) the Escrow Fund or (Y) directly from the applicable Escrowed Holder.

For the avoidance of doubt, notwithstanding the partial payment of the Net Aggregate Consideration in Consideration Shares, the Net Aggregate Consideration for the purpose of this Article X shall be deemed equal to $69,200,259, as may be adjusted pursuant to the final Allocation Schedule, pursuant to the terms of the Agreement and each Consideration Share shall be valued for purposes of indemnification and this Article X as the value of such share at the Closing, i.e., $ 430.41 (the "Agreed Value").

(c)    Limitations.

(i)    Except for fraud or intentional misrepresentation and without derogating from any Indemnitees' entitlement to seek any equitable remedy, including a preliminary or permanent injunction or specific performance, the Escrowed Holders shall not be liable for any Losses with respect to the matters set forth in Section 10.2(a)(i) until the aggregate amount of all such Losses exceeds an amount in United States Dollars equal to 0. 5% of the Net Aggregate Consideration (as set forth on the Allocation Schedule); (the "Basket"); provided, however, that Losses attributable to breach of, or inaccuracy in, any Fundamental Representations shall not be subject to the Basket; provided, further, however, that if such aggregate amount

92

exceeds the applicable Basket, then the Indemnitees shall be entitled to indemnification for the entire amount of all such Losses within the Basket (and all such Losses shall remain subject to the limitations set forth in this Article X). For purposes of calculating Losses with respect to any breach or breaches by the Company of any of its representations and warranties contained in or made by or pursuant to this Agreement that are qualified by materiality or Material Adverse Effect (including for the purpose of determining whether the Basket has been satisfied) (but not for purposes of determining whether such a breach has occurred), all such qualifications shall be disregarded.

(ii) The total amount of Losses which the Escrowed Holders shall be obligated to pay to the Indemnitees under Section 10.2(a)(i) shall not exceed the Escrow Amount (the "Cap"); provided, however, notwithstanding the foregoing, the total amount of Losses which shall be recoverable by the Indemnitees from the Escrowed Holders (A) with respect to Fundamental Representations or in connection with fraud or intentional misrepresentation (except for any such fraud or intentional misrepresentation of the Company of which an Escrow Holder had actual knowledge and failed to disclose such knowledge prior to the First Effective Time, in which case no cap shall apply) shall not exceed the Net Aggregate Consideration (inclusive of the Escrow Fund, the Adjustment Escrow Fund, the Representative Expense Amount and any other amount deducted from the Net Aggregate Consideration payable pursuant to this Agreement) actually received by such Escrowed Holder (the "Fundamental Representations Cap") and the amount of Losses each Escrowed Holder shall be obligated to pay the Indemnitees with respect thereto shall not exceed its, his or her Indemnity Pro Rata Share of the Fundamental Representations Cap, and (B) with respect to IP Representations shall not exceed twenty five percent (25%) of the Net Aggregate Consideration (the "IP Representations Cap") and the amount of Losses each Escrowed Holder shall be obligated to pay the Indemnitees with respect thereto shall not exceed its, his or her Indemnity Pro Rata Share of the IP Representations Cap (provided that in the event that an Indemnitee is indemnified for any Losses from the Escrow Fund, the IP Representations Cap amount shall be reduced by the amount of such Losses); provided, further, however, that, notwithstanding the foregoing, the total amount of Losses which an Escrowed Holder shall be obligated to pay the Indemnitees in the event of fraud or intentional misrepresentation of which such Escrowed Holder had actual knowledge and failed to disclose such knowledge prior to the First Effective Time, shall not be subject to the Cap, the Fundamental Representations Cap or the IP Representations Cap. Subject to the other limitations in this Article X, the total amount of Losses which the Escrowed Holders shall be obligated to pay to the Indemnitees under this Agreement or otherwise in connection with the transactions contemplated by this Agreement or under Section 10.2(a)(ii) through Section 10.2(a)(vi) shall not exceed the Net Aggregate Consideration (inclusive of the Escrow Fund, the Adjustment Escrow Fund, the Representative Expense Amount and any other amount deducted from the Net Aggregate Consideration payable pursuant to this Agreement) actually received by such Escrowed Holder and the amount of Losses each Escrowed Holder shall be obligated to pay the Indemnitees with respect thereto shall not exceed the portion of the Net Aggregate Consideration (inclusive of the Escrow Fund, the Adjustment Escrow Fund, the Representative Expense Amount and any other amount deducted from the Net Aggregate Consideration payable pursuant to this Agreement) actually received by such Escrowed Holder and attributed to such Escrowed Holder.

(iii) An Indemnitee's right to indemnification under this Article X based on the breach of any representation or warranty or the failure of any representation or warranty to

93

be true and correct as of the Agreement Date and in all material respects as of the Closing Date (or, if given as of a specific date, at and as of such date), or the failure to perform any covenant shall not be diminished or otherwise affected in any way as a result of the existence of such Indemnitee's knowledge of such breach, untruth or nonperformance as of the Agreement Date and the Closing Date (or, if given as of a specific date, at and as of such date), regardless of whether such knowledge exists as a result of the Indemnitee's investigation or as a result of disclosure by the Company (or any other Person), unless (except otherwise provided in this Agreement or in the Company Disclosure Schedule) such disclosure was set forth in this Agreement or in the Company Disclosure Schedule and subject to other terms related to such disclosure as set out herein.

(iv)    When determining the amount of Losses payable hereunder, any amount of Losses shall be reduced by any amount actually received by any Indemnitees (net of any increase in premium, deductibles and other costs and expenses incurred by such Indemnitee as a result of seeking recovery for such Losses) under applicable insurance policies, indemnification provisions or otherwise in respect of such Losses, and any Tax benefits realized by any Indemnitees in respect of such Losses, as if such insurance proceeds, indemnification or other amounts or Tax benefits had been received or realized prior to the collection of any Losses under this Agreement and any excess Losses previously collected after such recalculation shall be repaid to the Escrow Fund, or after the release of the Escrow Fund, such amount shall be paid to the Paying Agent for distribution to the Escrowed Holders, based on their respective Indemnity Pro Rata Share. The Indemnitees shall not be required to file or bring a lawsuit, arbitration or other action or Legal Proceeding with respect to any insurance policy or third party, provided however that nothing in this Agreement shall derogate from Indemnitees' obligation to use commercially reasonable efforts to mitigate any Losses. For the avoidance of doubt, notwithstanding anything to the contrary in this Agreement, the Indemnitees shall be entitled to seek indemnification under this Article X concurrently with seeking recovery from any third party insurance policies or other third party. Furthermore, Losses will be calculated (A) net of any third party indemnification or contribution payments actually received by any Indemnitee (including, without limitation, insurance payments discussed above) and (B) without regard to any punitive damages (unless actually awarded to a third party).

(v)    No Indemnitee shall be indemnified more than once for the same Loss suffered, regardless if such Loss may be attributed to more than one indemnity, breach of several paragraphs of the representations, warranties or the breach of or default in connection with several covenants or obligations herein, and regardless whether or not such breaches of covenants or misrepresentations are made with fraud.

(vi)    Notwithstanding any other provision of this Agreement, the Escrowed Holders shall not have any liability or indemnification obligation under Section 10.2 (a)(vi) for (A) any Taxes of the Company resulting from any election made under Section 338 of the Code with respect to the Mergers, or (B) any Taxes of the Company resulting from any action taken outside the ordinary course of business by the Company after the Closing on the Closing Date.

(vii)    The representations and warranties of the Company contained in this Agreement and in Company Disclosure Schedule constitute the sole and exclusive representations and warranties made by or on behalf of the Company in connection with the transactions

94

contemplated by this Agreement, and Parent understands, acknowledges and agrees that all other representations and warranties made by or on behalf of the Company of any kind or nature, express or implied, are specifically disclaimed by the Company. In addition, no Escrowed Holder shall have any liability with respect to the representations, warranties, covenants and agreements made by any other Party other than the Company.

(d)     Indemnification Procedure.

(i)     Subject to the provisions of Section 7.5(c) which shall govern with respect to Tax Claims, if at any time prior to the expiration of applicable Survival Period, Indemnitee becomes aware of facts or circumstances that Indemnitee believes, in good faith, gives rise to indemnification claim hereunder, then Parent shall promptly notify in writing the Representative of such claim by delivering a written notice (a "Claim Notice"), with a copy to the Escrow Agent (if and to the extent seeking recourse against the Escrow Fund). The Claim Notice shall (A) state that the Indemnitee has paid, sustained, suffered or incurred (or, if it is reasonably anticipates, that it will have to pay, sustain, suffer or incur) Losses, the amount of such Losses (which, in the case of Losses not yet actually paid, suffered, incurred or sustained, shall be a good faith estimate of the amount thereof, followed by an additional Claim Notice when such Losses are incurred and paid), (B) specify in reasonable detail the individual items of Losses included in the amount so stated, (C) identify the nature of the misrepresentation, breach of warranty, covenant or specific indemnity to which such Loss is allegedly attributable and the material facts (including any supporting documentation, if applicable) giving rise to the Losses and (D) a description, in reasonable detail, of the facts, circumstances or events giving rise to such alleged indemnifiable Losses, including (1) the basis for such anticipated liability and the nature of the breach to which such Losses relate, (2) the identity of any third party claimant (if any), and (3) copies of any formal demand or complaint from any third party claimant (if any) and together with any other supporting documentation or evidence. Parent and the Indemnitees shall afford the Representative and its designated representatives and advisors such additional information, documents and material as are reasonably requested by the Representative in order to allow the Representative to properly consider, evaluate, respond and discuss with the Parent and the Indemnitee the claim for indemnification, and the Representative shall be entitled to discuss, receive information and consult with any Escrowed Holder on such matter.

(ii)     On or prior to the date that is thirty (30) days from the date that a Claim Notice is deemed duly received by the Representative, the Representative may deliver to Parent a written response (the "Response Notice") in which the Representative either: (A) agrees to the Losses claimed in the Claim Notice as owed to the Indemnitees; (B) agrees that a portion, but not all, of the Losses claimed in the Claim Notice (such portion, the "Agreed Amount") are owed to the Indemnitees; or (C) indicates that no Losses claimed in the Claim Notice are owed to the Indemnitees.   Any Losses claimed that are not agreed to be owed to the Indemnitees pursuant to the Response Notice shall be referred to as a "Contested Amount."

(iii)     If the Representative delivers to the Parent a Response Notice agreeing to the entirety of the Losses claimed in the Claim Notice or to an Agreed Amount, then (A) to the extent there are funds available in the Escrow Fund, the Representative shall promptly (and no later than three (3) Business Days) instruct the Escrow Agent to distribute such Agreed Amount to the Indemnitee (based on the same pro rata ratio between cash and Consideration Shares

95

applicable to each Escrowed Holder in accordance with the Allocation Schedule) and (B) to the extent there are no funds available in the Escrow Fund, subject to the limitations in 10.2(c), within twenty (20) Business Days following the delivery of such Response Notice to Parent, each Escrowed Holder shall pay to the Indemnitees, in each case subject to the limitations set forth herein, such Indemnity Pro Rata Share of the Losses so agreed (*less* any amounts recovered from the Escrow Fund with respect thereto, if any), whether by cash or Consideration Shares, at such Escrowed Holder's discretion. The delivery of any Consideration Shares under this Agreement for purposes of satisfying the indemnification obligation of Indemnitee shall be at the Agreed Value.

(iv)    If the Representative delivers to Parent a Response Notice indicating that there is a Contested Amount, the Representative and Parent shall attempt in good faith to resolve the dispute related to the Contested Amount within the thirty (30) days following the delivery of such Response Notice.  If Parent and the Representative resolve such dispute, such resolution shall be binding and a settlement agreement stipulating the amount owed to the Indemnitees (the "Stipulated Amount") shall be signed by the Indemnitees and the Representative, and (A) to the extent there are funds available in the Escrow Fund, the Representative shall promptly (and no later than three (3) Business Days) instruct the Escrow Agent thereof and the Escrow Agent shall deliver such Agreed Amount to the Indemnitees (based on the same pro rata ratio between cash and Consideration Shares applicable to each Escrowed Holder in accordance with the Allocation Schedule) as instructed and (B) to the extent there are no funds available in the Escrow Fund, subject to the limitations in 10.2(c), within twenty (20) Business Days following execution of the settlement agreement, each Escrowed Holder shall pay to the Indemnitees, in each case subject to the limitations set forth herein, such Indemnity Pro Rata Share of the Losses so agreed (*less* any amounts recovered from the Escrow Fund with respect thereto, if any), whether by cash or Consideration Shares, at such Escrowed Holder's discretion.

(v)    If the Representative and Parent are unable to resolve the dispute related to the Contested Amount within thirty (30) days following the delivery of such Response Notice, either of Parent or Representative may bring suit in the courts of the State of Delaware and Federal Courts of the United States of America, in each case, located within the State of Delaware to resolve the matter in accordance with Section 11.2. Judgment upon any award rendered by the competent court may be entered in any court having jurisdiction.

(vi)    Any amount under the Escrow Fund at the end of the Escrow Period shall be retained by the Escrow Agent in escrow in order to satisfy any unresolved claims specified in any Claim Notice that has been properly delivered by an Indemnitee prior to the expiration of the applicable Survival Period until finally resolved (the "Retained Escrow Amount"). Any remaining amount under the Escrow Fund (which amount includes the Accrued Interest) *less* the Retained Escrow Amount shall be released by the Escrow Agent to the Paying Agent to be further distributed to such Escrowed Holders based on their Indemnity Pro Rata Share of such remaining amount, three (3) Business Days following the end of the Escrow Period.

(e)    Third Party Claims.

(i)    If an Indemnitee becomes aware of a third party claim (including a claim, demand, audit, investigation or an inquiry by any Governmental Authority) that Parent believes, in good faith, may result in an indemnification claim pursuant hereto (each, a "Third

96

Party Claim"), Parent shall promptly, deliver to Representative a Claim Notice of such claim in writing and in reasonable detail, accompanied by the documents relating to the claim, and Parent shall conduct the defense of such claim on behalf of the Indemnitees. The Representative shall be entitled, at its sole option and expense, to participate in, but not to determine or control, any defense of the Third Party Claim or settlement negotiations with respect to the Third Party Claim. The costs of participating in such defense or settlement incurred by Representative shall be borne or paid by the Escrowed Holders. Parent shall and shall cause the Indemnitees to (A) reasonably cooperate with the Representative and its counsel in defending or settling the Third Party Claim, (B) give the Representative and its counsels the opportunity to comment and advise on strategy with respect to the defense or settlement of the Third Party Claim and be involved in the various proceedings undertaken for the purpose of defending or settling the Third Party Claim, and (C) provide the Representative and its counsel with copies of all pleadings, notices and material communications with respect to the Third Party Claim in a timely manner, to the extent that receipt of such documents does not breach any material privilege relating to any Indemnitees (being specified that in such case, the joint defense doctrine, communality of interest or any equivalent shall benefit to the Representative and its counsel, and the Indemnitees and the Representative shall execute the required agreements in such respect). The failure to notify the Representative of a Third Party Claim as set forth in this Section 10.2(e) shall relieve the Escrowed Parties from liability in connection therewith to the extent that such failure materially and adversely effects the ability of the Escrowed Parties to defend their interests in such action or that the Escrowed Holders or otherwise materially prejudiced thereby.

(ii)    No settlement of any such Third Party Claim with any third party claimant shall be determinative of the existence of or amount of Losses or the Indemnitees' entitlement to indemnity relating to such matter, except with the consent of the Representative, which consent shall not be unreasonably withheld, conditioned or delayed. However, if the consent of Representative is obtained to the settlement of a Third Party Claim, such settlement of that portion of any such claim shall alone be determinative of the amount of the claim against the Escrow Fund, and neither Representative nor any Person who has a beneficial interest in funds in the Escrow Fund shall have any power or authority to object under any provision of this Article X to the amount of any demand by Parent against the funds in the Escrow Fund with respect to such settlement; provided, that nothing in such consent shall be deemed as an agreement to waive or amend any limitation on such indemnification and any indemnity with respect thereto shall be subject to the limitations contained in this Agreement unless otherwise specified in such consent.

(iii)    In the event the Indemnitees elect not to defend a Third Party Claim, the Representative may defend such claim at the Escrowed Holders' sole cost and expense. In such event, neither the Escrowed Holders nor the Representative shall have any right to settle, adjust or compromise any Third Party Claim without the express written consent of the Indemnitees against whom the third party claim has been asserted, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that such consent shall not be required if the sole remedy in the settlement or compromise is monetary remedies to be borne by the Escrowed Holders or any Person other than the Indemnitees, and the Indemnitees against whom the Third Party Claim has been asserted are provided with full and complete release from such claims.

(iv)    With respect to any Third Party Claim subject to indemnification hereunder, the Indemnitees and the Representative: (A) shall each keep the other informed in all

97

material respects of the status of such Third Party Claim and any related Proceedings at all stages, and (B) assist as the other may reasonably require and cooperate in good faith with each other in order to ensure the proper and adequate defense or settlement of any Third Party Claim. For the avoidance of doubt, Third Party Claims which are Tax Claims shall not be governed by this Section 10.2(e), but shall rather be governed by Section 7.5(c).

(f)    Exclusive Remedy. Parent, Merger Sub I, Merger Sub II, and Indemnitees agree that Indemnitees' sole and exclusive remedy after the First Effective Time with respect to any and all Losses relating to this Agreement and the transactions contemplated by this Agreement, and any and all Losses with respect to any representations, warranties, covenants, special indemnification claims, and agreements in this Agreement and the Company Closing Certificate, shall be pursuant to the indemnification provisions set forth in this Article X; provided, however, that the foregoing clause of this sentence shall not be deemed a waiver by any party of any right to bring a claim against any other party to a Transaction Document, specific performance or injunctive relief, or any right or remedy against an Escrowed Holder arising by reason of any fraud or intentional misrepresentation of such Escrowed Holder or fraud or intentional misrepresentation of the Company of which such Escrowed Holder had knowledge, with respect to this Agreement or the Company Closing Certificate. Subject to the other limitations contained herein, the obligations of the Escrowed Holders under this Article X shall not be reduced, offset, eliminated or subject to contribution by reason of any action or inaction by the Company prior to the First Effective Time that contributed to any inaccuracy or breach giving rise to such obligation, it being understood that the Escrowed Holders, not the Company or the Surviving Company, shall have the sole obligation for the indemnification obligations under this Article X, subject to Section 7.9.

(g)    Without derogating from and subject to Section 7.9, no Escrowed Holder shall initiate any Legal Proceeding for indemnification or contribution from the Company, or any employee, officer, director or agent thereof, in their capacity as such, with respect to any indemnity claims arising under or in connection with this Article X, to the extent that any Person is entitled to indemnification hereunder for such claim, and each Equityholder hereby waives any such right of indemnification or contribution from the Company that it has or may have in the future.

(h)    Tax Treatment of Payments.    The parties hereto shall treat any payments made pursuant to this Article X as adjustments to the Aggregate Merger Consideration for Tax purposes unless applicable Tax Law causes such payment not to be so treated.

10.3    Representative. For purposes of this Agreement, the Escrowed Holders, by virtue of the approval of the Mergers and this Agreement and without any further action on the part of any such Escrowed Holder or the Company, shall be deemed to have consented to the appointment of the Representative, as the exclusive agent and attorney-in-fact under this Agreement, the Paying Agent Agreement, and the Escrow Agreement for and on behalf of each such Escrowed Holder and the taking by Representative of any and all actions and the making of any decisions required or permitted to be taken by the Representative under and subject to the terms, conditions and limitations, of this Agreement, the Paying Agent Agreement, and the Escrow Agreement, including the exercise of the power to (a) prepare, execute and deliver this Agreement and the Transaction Documents to which it is a party, any document, certificate or other instrument required to be delivered by or on behalf of the Escrowed Holders and any amendments hereto and thereto, (b) authorize delivery to Parent and the Surviving Company of the Escrow Fund or any

98

portion thereof, in satisfaction of Indemnification Claims, (c) agree to, negotiate, enter into settlements and compromises of and comply with orders of courts and awards of arbitrators with respect to such Indemnification Claims and to pursue remedies and Legal Proceedings in connection with any alleged breach of this Agreement, (d) resolve any Indemnification Claims, (e) make and settle determinations and calculations with respect to distributions and allocations of the Net Aggregate Consideration and any portion thereof, including, the Escrow Fund and the Representative Expense Amount, (f) to give and receive notices and communications hereunder, and (g) take all actions necessary in the judgment of Representative for the accomplishment of the foregoing (including engaging counsel, accountants or other advisors in connection with the foregoing matters) and all of the other terms, conditions and limitations of this Agreement, the Paying Agent Agreement, and the Escrow Agreement or that are specifically mandated by the terms of this Agreement. Notwithstanding the foregoing, the Representative shall have no obligation to act on behalf of the Escrowed Holders, except as expressly provided herein, in the Escrow Agreement and the Paying Agent Agreement, and for purposes of clarity, there are no obligations of the Representative in any ancillary agreement, schedule, exhibit or the Company Disclosure Schedule. The powers, immunities and rights to indemnification granted to the Representative Group hereunder: (i) are coupled with an interest and shall be irrevocable and survive the death, incompetence, bankruptcy or liquidation of any Escrowed Holder and shall be binding on any successor thereto, and (ii) shall survive the delivery of an assignment by any Escrowed Holder of the whole or any fraction of his, her or its interest in the Escrow Fund. The Escrowed Holders and their successors will be bound by all actions taken by Representative in connection with this Agreement, the Escrow Agreement, and the Paying Agent Agreement as if expressly confirmed and ratified in writing by the Escrowed Holders, all defenses which may be available to any Escrowed Holder to contest, negate or disaffirm the action of the Representative taken in good faith under this Agreement, the Escrow Agreement, or the Paying Agent Agreement are waived, and Parent and the Surviving Company shall be entitled to rely on any action or decision of Representative.. Neither the Representative nor its members, managers, directors, officers, contractors, agents and employees (collectively, the "Representative Group"), will incur liability with respect to any action taken or suffered by it in reliance upon any notice, direction, instruction, consent, statement or other document believed by it to be genuine and to have been signed by the proper person (and shall have no responsibility to determine the authenticity thereof), nor for any other action or inaction in connection with the acceptance or administration of the Representative's responsibilities hereunder, under the Escrow Agreement or the Paying Agent Agreement, except its own willful misconduct, bad faith or gross negligence. In all questions arising under this Agreement, the Escrow Agreement or the Paying Agent Agreement, Representative may: (i) rely on the advice of counsel, and Representative will not be liable to the Escrowed Holders for anything done, omitted or suffered in good faith by Representative based on such advice, (ii) rely upon the Allocation Schedule, (iii) rely upon any signature believed by it to be genuine, and (iv) reasonably assume that a signatory has proper authorization to sign on behalf of the applicable Escrowed Holder or other party. The Escrowed Holders shall, severally and not jointly, based on their Indemnity Pro Rata Share, indemnify, defend and hold harmless the Representative Group and its successors and assigns from and against any and all suits, actions, causes of action, losses, liabilities, damages, claims, penalties, fines, forfeitures, fees, costs, judgments, amounts paid in settlement and expenses (including reasonable attorneys' fees and court costs and fees and expenses of counsel and experts and in connection with seeking recovery from insurers, and all expenses of document location, duplication and shipment) (collectively,

99

"Representative Losses") actually incurred in connection with any actions taken or omitted to be taken by the Representative pursuant to the terms of this Agreement, the Paying Agent Agreement, or the Escrow Agreement, in each case as such Representative Loss is incurred; provided that in the event it is finally adjudicated that a Representative Loss or any portion thereof was primarily caused by the willful misconduct, bad faith or gross negligence of the Representative, the Representative will reimburse the Escrowed Holders the amount of such indemnified Representative Loss attributable to such willful misconduct, bad faith or gross negligence. Any Representative Losses actually suffered or incurred may be recovered by the Representative only in the following order: (i) first, from the Representative Expense Amount, (ii) second, from the amounts in the Escrow Fund otherwise distributable to the Escrowed Holders pursuant to the terms hereof and the Escrow Agreement, if any, at the time such amount can be released to the Escrowed Holder pursuant to the terms hereof and the Escrow Agreement in accordance with written instructions delivered by the Representative to the Escrow Agent; and (iii) last, directly by the Escrowed Holders, in which case indemnification for Representative's losses actually suffered or incurred shall be limited to each Escrowed Holder's Indemnity Pro Rata Share thereof. In no event will the Representative be required to advance or risk its own funds on behalf of the Escrowed Holders or otherwise in the exercise or performance of any of its powers, rights, duties or privileges or pursuant to this Agreement, the Escrow Agreement, or the transactions contemplated hereby or thereby, and the Representative will not be required to take any action involving any expense unless the payment of such expense is made or provided for in a manner satisfactory to it. The Representative may resign at any time and the majority of the Escrowed Holders can appoint a new Representative by written consent by sending notice and a copy of the duly executed written consent appointing such new Representative to Representative, Parent and the Escrow Agent. Such appointment will be effective upon the later of the date indicated in the consent or the date such consent is received by Parent, Merger Sub I, Merger Sub II (or, if after the First Effective Time, the Surviving Company) and the Escrow Agent.

## MISCELLANEOUS

11.1 Specific Performance. The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that there may not be any adequate remedy at law for any violation by any party of any of the covenants or agreements contained in this Agreement. It is accordingly agreed that the parties hereto shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Chancery Court of the State of Delaware or any federal court sitting in the State of Delaware, without bond or other security being required, this being in addition to any other remedy to which they are entitled at Law or in equity.

11.2 Governing Law; Submission to Jurisdiction.

(a)    This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware, applicable to contracts executed in and to be performed entirely within that State without giving effect to any principles with respect to conflicts of laws that could

100

result in the application of the laws of any other state.

(b)     Any actions and proceedings under this Agreement shall be heard and determined in the Chancery Court of the State of Delaware or any federal court sitting in the State of Delaware, and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts (and, in the case of appeals, appropriate appellate courts therefrom) in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. The parties hereto agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law. Each party hereto hereby consents to process being served in any such action or proceeding by the mailing of a copy thereof to the address set forth in Section 11.7 and agrees that such service upon receipt shall constitute good and sufficient service of process or notice thereof. Nothing in this Section 11.2 shall affect or eliminate any right to serve process in any other manner permitted by Law.

11.3   Entire Agreement. This Agreement, the Company Disclosure Schedule and the other Transaction Documents (including the schedules and exhibits hereto and thereto and the Confidentiality Agreement) represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, superseding, without limitation, that certain non-binding Term Sheet by and between Oddity and the Company, dated February 2, 2023.

11.4   Amendment. Except as is otherwise required by applicable Law, prior to the First Effective Time may be amended by the parties hereto at any time by execution of an instrument in writing signed by Parent, Merger Sub I, Merger Sub II and the Company. Except as is otherwise required by applicable Law, after the First Effective Time may be amended by the parties hereto at any time by execution of an instrument in writing signed by Parent, Merger Sub I, Merger Sub II and the Representative.

11.5   Extension; Waiver. At any time prior to the First Effective Time, Parent, Merger Sub I and Merger Sub II, on the one hand, and the Company, on the other, may, to the extent legally allowed, (a) extend the time for the performance of any of the obligations of the other party hereto, (b) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto or (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if, and to the extent, set forth, in an instrument in writing signed on behalf of such party. No action, except an actual waiver, taken pursuant to this Agreement or any other Transaction Document, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

11.6   No Third Party Beneficiaries. This Agreement, the Company Disclosure Schedule

101

and the other Transaction Documents (including the schedules and exhibits hereto and thereto) are not intended to, and shall not, confer upon any other Person any rights or remedies hereunder, except for Section 7.9 which is for the benefit of the Covered Persons, and Article X, which is for the benefit of the Indemnitees covered thereby.

11.7  Notices. All notices, requests and other communications to any party hereunder shall be in writing and shall be deemed given (a) when delivered or sent if delivered in person or sent by facsimile or email transmission (provided electronic confirmation of facsimile or email transmission is obtained) or, if delivered on a non-Business Day, then on the first Business Day following delivery or facsimile or email transmission (with electronic confirmation of transmission), (b) on the third (3rd) Business Day after dispatch by registered certified mail, or (c) on the next Business Day if transmitted by national overnight courier, in each case as follows (provided, however, that any notice of change of address shall only be valid upon receipt):

**If to the Company, to:**

Revela, Inc.

_____

_____
Attention:          _____
Facsimile:          _____
Email:              _____

With a copy to (which shall not constitute notice):

Presidio Legal, P.C.
340 S. Lemon Ave., Suite 9501
Walnut, CA 91789
USA
Attention: Sean Mahsoul
E-mail:  sean@presidio.legal

and with a copy to (which shall not constitute notice):

Meitar, Law Offices
16 Abba Hillel Rd.
Ramat Gan 5250608
Israel
Attention: Yael Nardi
Email: ynardi@meitar.com

102

**If to Parent, Merger Sub I, Merger Sub II or the Surviving Company, to:**

Oddity Tech Ltd.

8 Haharash St, Tel Aviv, Israel

Attention: Oran Holtzman; Jonathan Truppman
Email: oran@oddity.com
JonathanT@oddity.com

With a copy to (which shall not constitute notice):

Herzog Fox & Neeman

4 Yitzhak Sadeh Street,
Tel Aviv 6777504, Israel

Attention: Itay Lavi, Adv.
Fax:   +972-3-696-6464
Email: lavii@herzoglaw.co.il


**If to the Representative, to:**

_____
_____
_____


With a copy to (which shall not constitute notice):

Presidio Legal, P.C.
340 S. Lemon Ave., Suite 9501
Walnut, CA 91789
USA
Attention: Sean Mahsoul    _____
E-mail:  sean@presidio.legal _____

and with a copy to (which shall not constitute notice):

103

Meitar, Law Offices
16 Abba Hillel Rd.
Ramat Gan 5250608
Israel
Attention: Yael Nardi
Email: ynardi@meitar.com

11.8  Severability. If any term or other provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, provisions and conditions of this Agreement shall nevertheless remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic and legal substance of the transactions contemplated by this Agreement is not affected in any manner adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the fullest extent permitted by applicable Law in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the extent possible.

11.9  Assignment; Binding Effect. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned, in whole or in part, by operation of Law or otherwise, by any of the parties hereto without the prior written consent of each other party hereto, except that (i) each of Parent, Merger Sub I and Merger Sub II may assign, in its sole discretion, any of or all its rights, interests and obligations under this Agreement to one (1) or more of its Affiliates, but no such assignment shall relieve Parent, Merger Sub I or Merger Sub II, as applicable, of any of its obligations hereunder, and (ii) the rights of the Escrowed Holders as of the First Effective Time to receive any portion of the Escrow Fund and/or Representative Expense Amount, if and to the extent released, shall be assignable by the Escrowed Holders from time to time, in whole or in part, whether by assignment, operation of law or otherwise. Parent shall cause the Indemnitees to act in accordance with this Agreement, as if an original party hereto. Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and permitted assigns. Any purported assignment not permitted under this Section 11.9 shall be null and void.

11.10 Counterparts. This Agreement may be executed in multiple counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one (1) and the same agreement. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement.

11.11 No Right of Setoff. Except as explicitly set forth herein, the Parent shall not be entitled to set-off against any payment obligations owing by it to the Company or any of the Equityholders under this Agreement, any Transaction Document, any related agreement, or any other certificate, agreement, document or other instrument to be executed and delivered by the Parent in connection with the transactions contemplated hereby, or against any claims that the Parent may have against any of the Equityholders under such agreements.

11.12 Conflict Waiver. Notwithstanding that the Company has been represented by

104

Meitar, Law Firm and Presidio Legal, P.C. (the "Firms") in the preparation, negotiation and execution of this Agreement and the transactions contemplated herein ("Transaction"), the Company agrees that after the Closing Date the Firms may represent the Representative, the Escrowed Holders and/or their Affiliates in matters related to this Agreement and ancillary agreements hereto, the Transaction Agreements and any documents related thereto, including without limitation in respect of any indemnification claims. The Company hereby acknowledges, on behalf of itself and its Affiliates that it has had an opportunity to ask for and has obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation, and it hereby waives any conflict arising out of such future representation. Neither the Company nor the Indemnitees may waive attorney-client privilege with respect to the Transaction without Stockholders' Representative written consent.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Meitar, Law Firm and Presidio Legal, P.C. (the "Firms") in the preparation, negotiation and execution of this Agreement and the transactions contemplated herein ("Transaction"), the Company agrees that after the Closing Date the Firms may represent the Representative, the Escrowed Holders and/or their Affiliates in matters related to this Agreement and ancillary agreements hereto, the Transaction Agreements and any documents related thereto, including without limitation in respect of any indemnification claims. The Company hereby acknowledges, on behalf of itself and its Affiliates that it has had an opportunity to ask for and has obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation, and it hereby waives any conflict arising out of such future representation. Neither the Company nor the Indemnitees may waive attorney-client privilege with respect to the Transaction without Stockholders' Representative written consent.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement and Plan of Mergers to be duly executed and delivered as of the date first above written.

IM PRO MAKEUP NY L.P.,

By: /s/ Oran Holtzman
Name: Oran Holtzman
Title: Director in the GP

IM PRO MAKEUP NY MERGER SUB, INC.,

By: /s/ Oran Holtzman
Name: Oran Holtzman
Title: Director

ODDITY LABS, LLC,

By: /s/ Oran Holtzman
Name: Oran Holtzman
Title: Director

IN WITNESS WHEREOF, the parties hereto have caused this Agreement and Plan of Mergers to be duly executed and delivered as of the date first above written.

REVELA, INC.

By: /s/ Evan Zhao
Name: Evan Zhao
Title: Chief Executive Officer

EVAN ZHAO, solely in his capacity as Representative

/s/ Evan Zhao
EVAN ZHAO, representative

**Exhibit 21.1**

**Subsidiaries of ODDITY Tech LTD.**

| Name | State or Other Jurisdiction of Incorporation or Organization |
| --- | --- |
| Il MAKIAGE BEAUTY I.L LTD | Israel |
| IL MAKIAGE GB LTD | United Kingdom |
| I.M. GLOBAL RETAIL LIMITED PARTNERSHIP | Israel |
| IM INDUSTRIES INC. | New Jersey |
| IM PROFESSIONAL MAKEUP INC. | New York |
| IM RETAIL MANAGEMENT LTD | Israel |
| MISS BEAUTY LTD | Israel |
| NEOWIZE INC | Delaware |
| NEOWIZE LTD | Israel |
| ODDITY Labs LLC | Delaware |
| ODDITY Tech US Inc. | New York |
| SPOILEDCHILD INC. | Delaware |
| VOYAGE81 LTD | Israel |

Exhibit 23.1

**Consent of Independent Registered Public Accounting Firm**

We consent to the reference to our firm under the caption "Experts" and to the use of our report dated May 1, 2023, in the Registration Statement (Form F-1) and related Prospectus of Oddity Tech Ltd. dated June 23, 2023.

|  | /s/ KOST, FORER, GABBAY & KASIERER |
|---|---|
| Tel Aviv, Israel | KOST, FORER, GABBAY & KASIERER |
| June 23, 2023 | A Member of EY Global |

Exhibit 99.1

CONSENT TO BE NAMED AS DIRECTOR

In connection with the Registration Statement on Form F-1 (including any and all amendments, including post-effective amendments, or supplements thereto, or the Registration Statement, of Oddity Tech, Ltd, or the Company, the undersigned hereby consents to being named and described in the Registration Statement filed with the U.S. Securities and Exchange Commission as a person to become a director of the Company, with such appointment to become effective as of immediately prior to, and contingent upon, the closing of the offering described in the Registration Statement, and to the filing or attachment of this Consent with such Registration Statement.

IN WITNESS WHEREOF, the undersigned has executed this Consent as of the 23rd day of June, 2023.

/s/ Ohad Chereshniya

Ohad Chereshniya

**Exhibit 107**

CALCULATION OF FILING FEE TABLES

FORM F-1
(Form Type)

ODDITY TECH LTD.
(Exact Name of Registrant as Specified in the Articles of Association)

Table 1: Newly Registered and Carry Forward Securities

| | Security Type | Security Class Title | Fee Calculation or Carry Forward Rule | Maximum Aggregate Offering Price[(1)(2)] | Fee Rate | Amount of Registration Fee | Carry Forward Form Type | Carry Forward File Number | Carry Forward Initial Effective Date | Filing Fee Previously Paid in Connection with Unsold Securities to be Carried Forward |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Newly Registered Securities | | | | | | |
| Fees to be Paid | Equity | Common Stock, par value $0.0001 per share | 457(o) | $100,000,000 | $110.20 per $1,000,000 | $11,020 | | | | |
| Fees Previously Paid | | | | | | | | | | |
| | | | | Carry Forward Securities | | | | | | |
| Carry Forward Securities | | | | | | | | | | |
| | | | Total Offering Amounts | | | $100,000,000 | | | | |
| | | | Total Fees Previously Paid | | | $0 | | | | |
| | | | Total Fee Offsets | | | $0 | | | | |
| | | | Net Fee Due | | | $11,020 | | | | |

(1) Includes offering price of additional shares that the underwriters have the option to purchase.
(2) Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(o) under the Securities Act of 1933, as amended