**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN HOARE Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>             v.<br><br>ODDITY TECH LTD., ORAN HOLTZMAN, LINDSAY DRUCKER MANN, SHIRAN HOLTZMAN-EREL, MICHAEL FARELLO, LILACH PAYORSKI, OHAD CHERESHNIYA, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, ALLEN & COMPANY, BOFA SECURITIES INC., BARCLAYS CAPITAL INC., TRUIST SECURITIES, INC., JMP SECURITIES LLC, KEYBANC CAPITAL MARKETS INC., EVERCORE GROUP, LLC, and J.P MORGAN SECURITIES LLC.,<br><br>                              Defendants. | **Case No. 1:24-CV-06571-MMG**<br><br><br>**CLASS ACTION**<br><br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiff Alex Gordon and Plaintiff Brian Hoare (collectively "Plaintiffs"), individually

and on behalf of all others similarly situated, by their undersigned attorneys, for Plaintiffs' complaint

against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and their

own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation

conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the

Defendants' public documents, conference calls and announcements made by Defendants, United

States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases

published by and regarding ODDITY Tech Ltd. ("Oddity"), analysts' reports and advisories about

Oddity, information obtained from interviews of former Oddity employees, and other information

readily obtainable on the Internet.  Plaintiffs believe that substantial, additional evidentiary support

1

will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Oddity securities between July 19, 2023 and May 20, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Oddity and certain of its management, directors, and the underwriters of its initial public offering held on July 19, 2023 ("IPO").

2.     Oddity describes itself as "a consumer tech platform that is built to transform the global beauty and wellness market" and "a pure-play digitally branded platform" that Defendants set out to build "from Day 1". Oddity purports to be serve customers worldwide through its artificial intelligence- ("AI") driven online platform, using data science, machine learning, and computer vision capabilities to identify consumer needs, as well as develop solutions in the form of beauty and wellness products.

3.     This presentation of Oddity as a technology company is false. Oddity, and its largest brand, Il Makiage, is a legacy retail cosmetics business that has been in business since 1972. Notably, Oddity operates a chain of 43 retail stores in Israel as well as six beauty schools. As recently as 2017, Defendant Oran Holtzman ("Holtzman") was planning on opening 40 retail stores in the United States as well as developing an online presence.

4.     As a cosmetics retailer, Il Makiage and Oddity face the same issues faced by other retailers: the cost of leasing and maintaining physical stores, the cost of managing a retail sales force, potential legal exposure from lawsuits from employees as well as customers, and the cost of

marketing campaigns both using new media such as online social media and tried-and-true methods such as subscriptions.

5. Not content to be seen as a routine cosmetics retailer, and in an effort to enrich its co-founders and controllers, Holtzman and his sister, Defendant Shiran Holtzman-Erel ("Holtzman-Erel"), Oddity was re-branded with multiple identities designed to cash in on the latest investment trends. In 2019, Oddity was presented as solutions "as-a-Service". In 2021, Oddity was described as a Data Science business. In 2022, Oddity offered a crypto-currency. Finally, Oddity was re-branded as an AI technology company in 2023 and sought to conduct an initial public offering ("IPO").

6. Leading up to and following its IPO, Defendants widely portrayed Oddity as a disruptor in the cosmetics industry. In particular, Defendants differentiated Oddity from traditional brick-and-mortar retailers by asserting that it used, *inter alia*, proprietary AI technologies to target consumer needs and that it was "a data and consumer tech platform" that was "unconstrained by physical store footprints". With investors and analysts increasingly attentive to the potential benefits and competitive advantages of AI-powered technologies, Oddity's purportedly differentiated approach to the cosmetics industry garnered praise and attention. There was no mention of Oddity and Il Makiage's longstanding and substantial retail operations in Israel.

7. On or around July 19, 2023, Oddity conducted its initial public offering ("IPO"), issuing over 12 million of its Class A ordinary shares to the public at the offering price of $35.00 per share. Oddity itself, however, received less than 15 per cent of the proceeds, just $57.26 million. Over 85 per cent, or $337.83 million went to other selling shareholders, primarily Holtzman and its largest shareholder, the *L* Catterton fund.

8. On or around March 15, 2024, Oddity conducted a secondary public offering ("Secondary Offering"), registering up to 4,900,000 shares of Class A ordinary shares owned by a

3

selling shareholder, LCGP3 Pro Makeup, L.P., a fund managed by *L* Catterton, to the public at the offering price of $43.50 per share. Oddity was not to receive any proceeds from the sales of these shares.

9. Throughout the Class Period, Defendants made materially false and misleading statements regarding Oddity's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Oddity overstated its AI technology and capabilities, and/or the extent to which this technology drove its sales; (ii) Oddity's repeat purchase rates and revenues were, at least in part, derived from traditional marketing as well as unsustainable and deceptive sales and advertising practices; (iii) Oddity downplayed the true scope and severity of ongoing civil litigation against it and/or its subsidiaries; and (iv) as a result, Oddity's public statements were materially false and misleading at all relevant times.

10. On May 21, 2024, NINGI Research ("Ningi") published a report (the "Ningi Report") regarding Oddity, alleging that it "completely misled investors about every critical aspect of its business[.]" In particular, the Ningi Report alleged, *inter alia*, that Ningi "talked to former employees who told [Ningi] that [Oddity's] AI is nothing but a questionnaire"; that Oddity's lauded "repeat purchase rates" are attributable to "customers unknowingly enter[ing] into non-cancelable plans" that allow Oddity "to recognize repeat purchases in the following quarters even though the customers don't want the product"; and that Ningi had "found hundreds of undisclosed lawsuits filed against ODDITY and its subsidiaries in the US and Israel, frequently alleging unpaid bills and violations of consumer protection laws," including multiple class action lawsuits filed within the past several years.

11. On this news, Oddity's Class A ordinary share price fell $3.02 per share, or 7.37%, to close at $37.97 per share on May 21, 2024. Oddity's Class A ordinary share price continued to

decline by an additional $1.30 per share, or 3.42%, over the following two consecutive trading sessions, closing at $36.67 per share on May 23, 2024.

12.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Oddity's securities, Plaintiffs and other class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 11(a) and 15(a) of the Securities Act (15 U.S.C. §§ 77k(a) and 77o(a)), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.    Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b). Pursuant to its IPO, Oddity issued over 12 million of its Class A ordinary shares to the public. Oddity's Class A ordinary shares trade in the U.S. on the Nasdaq Global Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in Oddity's securities located in the U.S., some of whom reside in this District.

16.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

17.     Lead Plaintiff Alex Gordon, as set forth in his Certification previously filed in this action, acquired Oddity securities during the Class Period and suffered damages as result of Defendants' misconduct set forth herein.

18.     Plaintiff Brian Hoare, as set forth in his Certification previously filed in this action, acquired Oddity securities during the Class Period and suffered damages as result of Defendants' misconduct set forth herein.

19.     Defendant Oddity is organized under the laws of the State of Israel ("Israel"), with principal executive offices located at 8 Haharash Street, Tel Aviv-Jaffa, 6761304, Israel.  Oddity's Class A ordinary shares trade on the NASDAQ under the ticker symbol "ODD."

20.     Defendant Holtzman has served as Oddity's CEO and a Director at all relevant times.  Defendant Holtzman is also a Co-Founder of Oddity.

21.     Defendant Lindsay Drucker Mann ("Mann") has served as Oddity's CFO at all relevant times.

22.     Defendant Shiran Holtzman-Erel has served as Oddity's Chief Product Officer and a Director at all relevant times.  Defendant Holtzman-Erel is also a Co-Founder of Oddity and Defendant Holtzman's sister.

23.     Defendant Michael Farello ("Farello") has served as a Director of Oddity at all relevant times.

24.     Defendant Lilach Payorski ("Payorski") has served as a Director of Oddity at all relevant times.

25.     Defendant Ohad Chereshniya ("Chereshniya") has served as a Director of Oddity since July 2023.

26.     Defendants Holtzman, Mann, Holtzman-Erel, Farello, Payorski, and Chereshniya

6

are collectively referred to herein as the "Individual Defendants."

27.     The Individual Defendants possessed the power and authority to control the contents of Oddity's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Oddity's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Oddity, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

28.     Oddity and the Individual Defendants are collectively referred to herein as "Defendants."

29.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") is a New York limited liability company with principal executive offices located at 200 West Street, New York, New York. Defendant Goldman Sachs entered into an underwriting agreement with Oddity and the selling shareholders in connection with the IPO. Goldman Sachs also acted as a joint lead book-running manager and as a co-representative of the underwriters.

30.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a Delaware limited liability company with principal executive offices located at 1585 Broadway, New York, New York. Defendant Morgan Stanley entered into an underwriting agreement with Oddity and the selling shareholders in connection with the IPO. Morgan Stanley also acted as a joint lead book-running manager and as a co-representative of the underwriters.

31.     Defendant Allen & Company is a New York limited liability company with principal executive offices located at 711 Fifth Avenue, 8th Floor, New York, New York. Allen & Company entered into an underwriting agreement with Oddity and the selling shareholders in connection with the IPO. Allen & Company also acted as a joint lead book-running manager and as a co-representative

7

of the underwriters.

32.    Defendant BofA Securities Inc. ("BofA") is a Delaware corporation with principal executive offices located at One Bryant Park, New York, New York. BofA entered into an underwriting agreement with Oddity and the selling shareholders in connection with the IPO. BofA also acted as a joint book-running manager.

33.    Defendant Barclays Capital Inc. ("Barclays") is a Connecticut corporation with principal executive offices located at 745 7th Avenue, New York, New York. Barclays entered into an underwriting agreement with Oddity and the selling shareholders in connection with the IPO. Barclays also acted as a joint book-running manager.

34.    Defendant Truist Securities, Inc. ("Truist") is a Tennessee corporation with principal executive offices located at 3333 Peachtree Road, N.E., Atlanta Financial Center, South Tower, 9th Floor. Atlanta, Georgia. Truist entered into an underwriting agreement with Oddity and the selling shareholders in connection with the IPO. Truist also acted as a joint book-running manager.

35.    Defendant JMP Securities LLC ("JMP"), also known as Citizens JMP Securities, LLC, a Delaware limited liability company, has its principal executive offices located at 101 California Street, Suite 1700, San Francisco, California. JMP entered into an underwriting agreement with Oddity and the selling shareholders in connection with the IPO. JMP also acted as a joint book-running manager.

36.    Defendant KeyBanc Capital Markets Inc. ("KeyBanc") is an Ohio corporation with principal executive offices located at 127 Public Square, Cleveland, Ohio. KeyBanc entered into an underwriting agreement with Oddity and the selling shareholders in connection with the IPO. KeyBanc also acted as a joint book-running manager.

37.    Defendant Evercore Group L.L.C. ("Evercore") is a Delaware limited liability company with principal executive offices located at 55 East 52nd Street, New York, New York. Evercore entered into an underwriting agreement with Oddity and the selling shareholder in connection with the Form F-1 registration statement (File No. 333-277850) filed with the SEC on March 12, 2024, the Form F-1 MEF registration statement filed with the SEC on March 14, 2024, and the related prospectus filed with the SEC on March 15, 2024.

8

38.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is a Delaware limited liability company with principal executive offices located at 383 Madison Avenue New York, New York. J.P. Morgan entered into an underwriting agreement with Oddity and the selling shareholders in connection with the Form F-1 registration statement (File No. 333-277850) filed with the SEC on March 12, 2024, the Form F-1 MEF registration statement filed with the SEC on March 14, 2024, and the related prospectus filed with the SEC on March 15, 2024.

39.    "IPO Underwriter Defendants" refers to Defendants Goldman Sachs, Morgan Stanley, Allen & Company, BofA, Barclays, Truist, JMP, and KeyBanc.

40.    "Secondary Offering Underwriter Defendants" refers to Defendants Goldman Sachs, J.P. Morgan, Morgan Stanley, Allen & Company, Evercore, Barclays, Truist, JMP, and KeyBanc.

## SUBSTANTIVE ALLEGATIONS

### Background

41.    Founded in 2013, Oddity describes itself as "a consumer tech platform that is built to transform the global beauty and wellness market." Oddity further represents that it is "built to be the most impactful platform of our lifetime."

42.    Oddity sells beauty, hair, and skin products under the "Il Makiage" and "SpoiledChild" brands by noting that their work is "set on making the future."

43.    Il Makiage is a legacy cosmetics retail chain founded in the United States in 1972. In 1996, Il Makiage began franchising stores in Israel.

44.    By 2013, Il Makiage's fortunes had faded, and it was in bankruptcy proceedings prior to being purchased by Oran Holtzman.

45.    Holtzman rebuilt Il Makiage, and managed to make its Israel stores and beauty schools profitable.

46.    Below is a picture of Holtzman - posing in one of his Il Makiage stores  in Israel - published   in   a   company   profile   on   Xnet,   at   https://xnet.ynet.co.il/articles/0,7340,L-

9

5297776,00.html, accessed February 18, 2025.



47.     Today, Oddity, through Il Makiage, owns and operates 43 retail stores in Israel, and 7 beauty schools.

48.     Confidential Witness 2 ("CW2") was interviewed on February 3, 2025. CW2 was a medium level manager at Il Makiage in Israel until one and a half years ago, and was in charge of product development. CW2 worked at the head Il Makiage offices in Tel Aviv and reported to the General Manager in Israel.

49.     According to CW2, each store usually had more than seven employees. Seven employees at 43 locations equals 301 employees that Oddity has not disclosed to investors.

50.     In addition to the labor costs of the undisclosed retail stores, there are maintenance and renovation costs, and just as the stores were undisclosed to investors, so were the attendant costs of running a legacy brick-and-mortar cosmetics operation.

51.     Below is a photograph of the Il Makiage store at 50 Dizengoff St. Tel Aviv, Israel, taken on February 4, 2025.



52.    Below is a photograph of the Il Makiage store at 6 Ha-Gdud ha-Ivri St. Ashdod,

Israel, taken on February 5, 2025.



53.    Below are photographs of Il Makiage's newest beauty school, opened in June 2024

in Ashdod Sea Mall. The photographs were taken February 5, 2025.





54.      Il Makiage was Holtzman's first experience leading a company after graduating from business school and working for the accounting firm Ernst and Young. Defendant Holtzman chose Il Makiage because it was failing and therefore offered a vehicle for significant recovery and with potential for growth.

55.     In June 2017, the investment firm *L* Catterton invested $34 million in Il Makiage in anticipation of Oddity's expansion to the United States.

56.     In a statement announcing its investment in Oddity, issued June 8, 2017*, L* Catterton wrote "[i]n addition to its boutiques, the company [Il Makiage] operates a network of makeup artist academies."

### *Performance Marketing, Not Technology, Drives Oddity Sales*

57.     Despite its attempts to brand itself as a technology company beginning in 2018, interviews with former Oddity employees reveal that Oddity is actually a performance marketing company with a legacy retail business in Israel, which depends on the marketable illusion of technology to drive investor interest.

58.     Confidential Witness 3 ("CW3"), is a former head of products specializing in e-commerce strategy at Il Makiage.

59.     CW3 said that Il Makiage's advertising "is what we call excellent performance marketing … but it is not a technology company. There is no vision behind the corporation and no significant technology."

60.     CW3 also said: "I will say it clear and sharp: their success is not because of technology. Perhaps they developed new things. Before we used the term A.I. they had nothing to do with this (artificial intelligence). They do excellent performance marketing, but it is absolutely not what they are trying to paint themselves as."

61.     According to CW3, Oddity's strategy depends on its ability to effectively leverage advertising spend - a strategy used by all corporations that advertise significantly. This has "absolutely nothing" to do with technology. "There's no technology in ODDITY."

62.     As supported by the statements of CW3, Oddity does not depend on technology to generate sales, but a far more prosaic sales tactic - advertising.

63. This was further corroborated by another former Oddity employee, Confidential Witness 1 ("CW1"). CW1 was a senior executive who worked at Il Makiage's head offices in Tel Aviv until 2023 and had a broad view of all Il Makiage's stores, services, and programs in Israel. When CW1 was asked whether Il Makiage used artificial intelligence to generate sales in Israel, she responded: "no, we didn't use A.I., we used traditional methods doing our best to reach positive results." One of the traditional techniques cited by CW1 to generate sales was product giveaways and coupons.

64. Many of the technologies touted by Oddity in the build-up to the IPO have still not seen release or were never as advanced as Oddity claimed.

65. Oddity purchased Voyage81 in 2021, and the announcement of the acquisition promised that Voyage81's hyperspectral imaging systems, when "combined with Il Makiage's current AI algorithms, will leverage users' personal smartphone cameras to provide unparalleled online matching capabilities to users of Il Makiage and its upcoming homegrown digital beauty and wellness brands."

66. The applications promised by this technology have not materialized.

67. The PowerMatch/SpoiledBrain technology was not, as advertised, based on a proprietary algorithm or machine learning models, but a simple quiz.

68. Holtzman-Erel, Oddity's Chief Product Officer and Co-Founder, told a journalist in a February 23, 2020 interview that the SpoiledBrain was comprised of "simple questions with four possible answers," and did not mention AI.

### *Court Cases Against Oddity*

69. In addition to failing to disclose its retail presence in Israel, Oddity has never informed investors of the large number of court cases in which it is entangled in both Israel – owing largely to its retail presence – and to a lesser extent in the United States.

70.     In Israel, Il Makiage is entangled in at least 218 lawsuits, including having been sued in several class action lawsuits in 2014, 2015, 2016, 2017 (twice), 2021, and 2022. The value in dispute of the class actions exceeded more than $10 million. Similar to bad reviews from US customers about Oddity's billing practices for overcharging for "try before you buy" purchases, an Israel class action lawsuit from 2015 alleged that, over the course of two years, the company overcharged a customer for purchases at Il Makiage stores. Allegedly, the scheme consisted of the cash registers rounding up each product's price by a few cents and charged the higher amount, without the customer noticing.

71.     In 2014, a woman filed a class action lawsuit against Il Makiage for unsolicited ads she allegedly received via text.  In addition to the class action complaints, there are dozens of individual complaints related to spam texts or spam mail. The damages sued for range from a couple of thousand to several million shekels. In the complaints, the plaintiffs stated that they told Il Makiage that they didn't want to receive any advertisements or promotions from the company. However, this did not stop the spamming.

72.     In a 2017 class action lawsuit, an Il Makiage beauty school student sued after she canceled the year-long course in advance after moving abroad but was charged anyway.

73.     In a 2018 labor dispute, Il Makiage was sued for firing a beauty school's principal because of an alleged lack of performance a month after she underwent fertility treatment. Ultimately, Il Makiage was ordered to pay the plaintiff on various claims, including compensation for violations of Israel's Women's Labor Law. Strikingly, the company claimed to have paid the former employee her severance pay, but the court called the company out: "Defendant [Il Makiage] didn't present even a shred of evidence that the check was sent to the plaintiff and when it was sent. The judgment was given about four years after the date on which the severance pay was supposed to be paid, and until the date it was signed, the defendant [Il Makiage] didn't bother to

15

pay the plaintiff what she was duly entitled to."

74.    In 2020, a long-term supplier sued Il Makiage for unpaid bookcases that the company produced in 2018. Ultimately, Il Makiage was ordered to pay for the products, including interest and court fees.

75.    A former employee who was a manager at two different stores sued Il Makiage for compensation, redemption, and damages after allegedly being fired when she revealed she was pregnant. Another woman successfully sued Il Makiage for damages. Another woman sued Il Makiage successfully for not hiring her after the company found out that she was pregnant.

76.    In 2021, a Tel Aviv mall sued Il Makiage for allegedly unpaid rent for one of its locations. Oddity's CEO, Holtzman, was also named a defendant in the complaint because he personally guaranteed the lease agreement in 2019. Another property manager had already sued the company and Holtzman in 2015 for unpaid rent.

77.    In the United States, there are several lawsuits and judgments against Oddity subsidiaries that were never disclosed to investors.

78.    There are three Americans with Disability Act ("ADA") Class Action lawsuits filed against Oddity Tech subsidiaries in the United States, seeking damages and an order requiring the subsidiaries like to make websites ADA-compliant.

79.    Oddity has an outstanding federal tax lien filed against it by the Internal Revenue Service ("IRS") in 2019.

80.    There are 4 Washington state tax warrants for unpaid taxes by Oddity Tech subsidiaries, totaling $243,679.09.

81.    There are eight judgments against Oddity or its subsidiaries for unpaid taxes owed to the New York Department of Labor, totaling $40,499.64.

82.    There are ten judgments for unpaid taxes owing to the New York Department of

16

Taxation and Finance, totaling $21,650.67.

83.    There are at least four legal actions in New York Supreme Court against Oddity Tech subsidiaries alleging a breach of contract and claiming damages totaling $266,542.51.

84.    In the United States, the legal claims against Oddity Tech subsidiaries undisclosed to investors total $572,371.91.

### *Oddity's Deceptive and Unsustainable Marketing Practices*

85.    Rather than technology, Oddity depends on unsustainable and deceptive sales practices – luring customers into subscriptions – to generate sales.

86.    Consumers are lured in by an ad promising "free" or "risk free" trial of a cosmetic product available for a shipping and handling fee and must enter their payment information to pay for shipping. Once a customer enters their payment information, the trap is sprung. After payment information is entered, and without clearly notifying the consumer, Oddity places a hold on the customer's account for the full price of the product. Worse, the product trials are set by default on an "auto-replenish" schedule causing Oddity to attempt to charge the customer's card for the full price of the product multiple times over after ordering a trial product. Several customers complained of Oddity continuing to attempt to charge their card until they canceled. In many cases, even when customers successfully ended their trial, Oddity continued to attempt to charge their bank accounts.

87.    Understandably, Oddity's practices upset many customers and have led to many Better Business Bureau complaints, as well outraged customers communicating their displeasure online on social media, Facebook groups, Reddit, and Youtube.

88.    Details were provided by CW1. When asked about how Il Makiage handled returns, CW1 pointed to the fact that because cosmetics are for personal use, a product that has been sampled cannot be readily returned and resold. Referring specifically to this problem, CW1 pointed

to the huge losses caused by cosmetics returns. "The loss from returning is huge."

89.     Perhaps as a response to the waste of shipping returned and unusable product back for returns, when customers call Oddity to communicate that they do not wish to purchase the product, Oddity does not require that they send the product back, in effect "gifting" the product.

90.     In 2018, the Federal Trade Commission filed a complaint against Apex Capital Group for a try-before-you-buy program identical to the program for SpoiledChild and Il Makiage, where customers received an advertisement that they only needed to pay shipping, but the true nature of the transaction was not disclosed or difficult to find, and customers were charged the full price of the product, and they were enrolled in an auto-subscription they did not realize they had selected.

91.     Customer complaints on Better Business Bureau, Reddit, and Facebook frequently mention having been enrolled in an automatic subscription by Il Makiage and SpoiledChild after having entered payment information to pay for shipping as part of the try-before-you-buy program.

92.     In a Facebook group called 'Il Makiage is a Fraud' with more than 2,600 members, users posted dozens of stories about unwarranted charges and other issues. One member described a situation that appears to be happening regularly, "*I called Makiage and since I didn't place the order and am not in their system, they refuse to refund. I had no idea who the company was until my card was charged.*" In the end, Il Makiage allegedly refuses to issue a refund because the company doesn't have any records of the cardholder being a customer. Other group members say that they had to get a new card to stop the unjustified charges. As of February 2025, individuals still complain that their accounts are charged even though they never ordered anything from Il Makiage. Another BBB complaint alleged six "*unauthorized fraudulent charges.*" On Reddit, users echoed the same issues of unauthorized charges, with one user reporting in April 2024 that they were called by their bank's fraud department because of repeated attempts by Il Makiage to charge them. Another Reddit user couldn't order from Il Makiage because the bank labeled the transaction as "suspicious activity."

93.     There were at least 1,402 complaints published on the BBB website regarding

Oddity's Il Makiage business within the last three years.  Some of these complaints, published on the BBB website as recently as July and June 2024, related to the same or similar deceptive sales and advertising practices alleged in the Ningi Report, a sample of which are provided below:



**Initial Complaint**
07/02/2024

**Complaint Type:** Sales and Advertising Issues
**Status:** Resolved ❓

I purchased a number of products from Il Makiage makeup company in March. I also returned the items that same month as they were not as good (in my opinion) as some less expensive products and for the money, I felt I could find a better product elsewhere. I then canceled auto shipments and was told by the company in an email that auto replenishments had been canceled. This morning, I was once again charged for a product that I not only did not want , but had been told I would not be charged for again. This is essentially the company stealing money from my bank account and is unacceptable!



**Initial Complaint**
06/28/2024

**Complaint Type:** Sales and Advertising Issues
**Status:** Answered ❓

This company is a scam. They say they have a try before you buy on their makeup, yet they charge you the full price before the makeup even arrives. Then when you try to contact them, there is no response. People need to be aware how disreputable this company is.



**Initial Complaint**
06/28/2024

**Complaint Type:** Service or Repair Issues
**Status:** Answered ❓

06/27/24 PayPal sent me a notification that Il Makage charged $137.03 and I never authorized nor did I have a subscription for my PayPal to be charged automatically. I filed a dispute with PayPal and they claim that the charge is legitimate, which it isnt. I did cancel with PayPal any



**Initial Complaint**
06/26/2024

**Complaint Type:** Product Issues
**Status:** Answered ❓



I originally attempted a trial period with the company and had to pay a $4.00 shipping fee. Next thing I know I was charged approximately $65.95. I immediately contacted the company and they said that it was just some kind of glitch and it will return the money less the $4 back to my account. Well that never happened. I told them then that I no longer want their procduct if they will just take what they want from my account. That was back sometime in late 2021. Here we are 2024 and they have consistently tried to take $65.95 from my account every 3-4 month since then. I called my bank and the company had created a wallet with my account. OMG! I disputed the charges and had my bank remove the wallet and put an alert not to allow this company to charge my account. Well that only lasted about 6 months and it started all over again. Called my bank again and disputed the charges and remove the wallet again and changed my card number. I have boxes of make-up stockpiling as I do not use makeup often. Please help me and I am absolutely positive 100's of other women get this monkey off their back and out of their accounts. The sad part is the makeup is actually really good. But I refuse to have any company or anyone other than myself just jacking money out of my account. I have made every attempt from the first $4 to contact them and make them stop. For a long time I was forwarding from the email they sent me begging them to stop it but never got a reply to realize that their emails are non repy emails. I went on the site at one point desparately trying to find a way out and it appeared that I did so I followed all the prompts just to be led to a dead end that had no resultion, it just stopped and didn't go any further. It is a farse and it is an insult to women everywhere. Please help me stop them from doing this to me and anyone else.

19

***Oddity Rebrands Itself as a Technology Company***

94.     In anticipation of entering the American market, and following *L* Catterton's investment, it was important for Holtzman and Oddity to market itself not as a legacy cosmetics company, but as a technology-wielding disruptor. To accomplish this, Oddity has attempted to market itself as whatever is hot at the time. In 2019, Oddity marketed itself as a provider of "as-a-Service" solutions in 2019, data science in 2021, a crypto-coin in 2022, and artificial intelligence in 2023.

95.     In a statement by *L* Catterton announcing a private secondary offering issued January 10, 2022, references to the Il Makiage brick-and-mortar stores and schools vanished: "Il Makiage has converted millions of consumers from shopping for beauty products in stores to making purchases online and disrupted the industry in the process."

96.     As it relates to the Il Makiage brand, Oddity began describing it as "[d]efining and building the future of beauty through proprietary technology that connects people with superior products fit for them." Oddity's website notes that the Il Makiage brand is "shifting millions of customers offline to online, and [is] the fastest growing beauty brand in the US."

97.     As it relates to the SpoiledChild brand, Oddity represents that it is "[e]mpowering a new generation of consumers to redefine the rules of aging, unlocking wellness online." Oddity's website notes that the SpoiledChild brand is "[p]owered by SpoiledBrain, a proprietary machine learning algorithm matching users to their perfect products based on their unique individual profile.

98.     Oddity purports to serve customers worldwide through its AI-driven online platform, powered by its so-called "PowerMatch" and "SpoiledBrain" technologies, which purportedly use data science, machine learning, and computer vision capabilities to identify consumer needs, as well as develop solutions in the form of beauty and wellness products.

99.     The last publicly disclosed figure regarding Il Makiage's revenue from its Israel operations was in 2016, when Defendant Holtzman told an Israeli publication that Il Makiage generated revenues equivalent to $24.3 million in shekels. Even though Il Makiage's retail business in Israel has since grown in size following *L* Catterton's initial statement announcing its investment in Oddity, there were no statements or disclosures to the investing public

acknowledging Oddity's brick-and-mortar presence in Israel until the after release of the NINGI report on May 21, 2024.

100.    Instead, Oddity has described itself as a technology-wielding disruptor in an industry dominated by legacy retail businesses. To investors, Oddity has consistently represented that it has no need for a brick-and-mortar presence, and that it operates exclusively as an online direct-to-consumer business.

### *The Initial Public Offering*

101.    On June 23, 2023, Oddity filed a registration statement on Form F-1 with the SEC in connection with its initial public offering, registering 12,105,261 Class A ordinary shares which, after several amendments, was declared effective by the SEC on July 18, 2023 (The "2023 Form F-1"). Each of the Individual Defendants excepting Chereshniya signed or authorized the signing of the 2023 Form F-1.

102.    On July 18, 2023, Oddity filed a Form F-1 MEF registration statement which registered an additional 1,815,789 Class A ordinary shares (the "2023 MEF"). The 2023 MEF incorporated by reference the 2023 Form F-1. Each of the Individual Defendants excepting Chereshniya signed or authorized the signing of the 2023 Form MEF. Collectively, the 2023 Form F-1 and the 2023 MEF are referred to as the "2023 Registration Statement").

103.    On or around July 19, 2023, Oddity conducted its initial public offering, in which over 12 million of its Class A ordinary shares were sold to the public at the offering price of $35.00 per share for approximate proceeds, after applicable underwriting discounts and commissions, and before expenses, of $57.26 million to Oddity and $337.83 million to certain selling shareholders, including Holtzman, Mann, and Payorski and *L* Catterton.

104.    On July 20, 2023, Oddity filed a prospectus (the "2023 Prospectus")) on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the 2023 Registration Statement.

*The Secondary Offering*

105.    On March 12, 2024, Oddity filed a Form F-1 registration statement (File No. 333-277850) to register 4,000,000 Class A ordinary shares of, LCGP3 Pro Makeup, L.P., a fund managed by *L* Catterton, at a price of $43.50 per share ("2024 Form F-1"). Each of the Individual Defendants, individually or through their authorized attorney-in-fact, signed the 2024 Form F-1.

106.    From the close of trading on March 12, 2024 to the opening of trading on March 13, 2024, Oddity's stock price declined from $46.12 to $43.14. Late on March 12, 2024, *Seeking Alpha* published a news article attributing a 5.7% decline in Oddity's stock during after-hours trading on March 12, 2024, to the news that LCGP3 Pro Makeup, L.P. was seeking to register and sell up to 4 million of its Oddity shares through the 2024 Form F-1.

107.    At 4:45 p.m. on March 14, 2024, the SEC declared the 2024 Form F-1 effective.

108.    After market close on March 14, 2024, Oddity filed a Form F-1 MEF Registration Statement ("2024 MEF"). The 2024 MEF increased the aggregate number of Oddity Class A ordinary shares offered by LCGP3 Pro Makeup, L.P. by 900,000 Class A ordinary shares, of which 117,391 may be sold pursuant to the Secondary Offering Underwriters Defendants' option to purchase additional Oddity Class A ordinary shares. The 2024 MEF incorporated by reference all of the contents of and exhibits to the 2024 Form F-1. Each of the Individual Defendants, individually or through their authorized attorney-in-fact, signed the 2024 MEF.

109.    The 2024 MEF was effective upon its filing with the SEC. Collectively, the 2024 Form F-1 and the 2024 MEF are referred to as the "2024 Registration Statement".

110.    After market close on March 15, 2024, Oddity filed a prospectus (the "2024 Prospectus") on Form 424B4 with the SEC in connection with the Secondary Offering, which incorporated and formed part of the 2024 Registration Statement.

111.    The 2024 Prospectus stated that LCGP3 Pro Makeup, L.P., a fund managed by *L*

Catterton, was selling up to 4.9 million shares in the Secondary Offering under a firm commitment agreement with the Secondary Offering Underwriters.

112.    As LCGP3 Pro Makeup, L.P. and the Secondary Offering Underwriters started selling newly-registered Oddity shares on the market on March 15, 2024, Oddity's trading volume increased and its stock price began to further decline to close at $36.37 on April 4, 2024. This decline occurred on higher than normal volume, with an average of approximately 980,000 shares for that period as compared to Oddity's normal average volume of approximately 560,000 shares per day between March 24, 2023 to March 1, 2024. The sale of LCGP3 Pro Makeup, L.P.'s shares signaled to the market that *L* Catterton, a long-time investor, had concerns about Oddity's business as it continued to reduce its position post-IPO.

113.    In its 2023 Registration Statement and 2024 Registration Statement, Oddity describes itself as "a consumer tech platform that is built to transform the global beauty and wellness market" and "a pure-play digitally branded platform" that Defendants set out to build "from Day 1". Oddity purports to serve customers worldwide through its artificial intelligence-("AI") driven online platform, using data science, machine learning, and computer vision capabilities to identify consumer needs, as well as develop solutions in the form of beauty and wellness products. As set forth in greater detail below, the 2023 Registration Statement and 2024 Registration Statement are filled with references to Oddity's core focus on technology. Completely absent is any reference to Oddity's longstanding retail consumer business.

114.    Oddity's marketing itself as a disruptor in the cosmetics industry and assertions that it used, *inter alia*, proprietary AI technologies to target consumer needs was successful. With investors and analysts increasingly attentive to the potential benefits and competitive advantages of AI-powered technologies, Oddity's purportedly differentiated approach to the cosmetics industry garnered praise and attention.

115.    In April 2024, Evercore ISI initiated research coverage of Oddity by praising its "differentiated Online-only strategy powered by AI-optimized product personalization."

116.    Institutional investors have also been taken in by Oddity's story: global money manager Baillie Gifford told its clients in November 2023 that they specifically invested in Oddity because of its online-only model. "There have been no real online players. You've seen some of the existing players move to some online sales, but actually, doing this with an online-only model is a completely different business" (referring to Oddity's purportedly online-only model).

117.    Holtzman ended an interview in December 2023 with the words, "nothing against stores or retail, but we don't need it yet."

118.    Baptista Research, in a research coverage note published August 19, 2024, praised Oddity for its purportedly online-only model: "[t]he digital first approach positions the company well within the competitive online beauty and wellness market, asserting dominance particularly in direct-to-consumer channels."

119.    Truist Securities, in a favorable coverage note published May 8, 2024, noted: "[t]oday's Beauty and Wellness market is a $600B TAM, dominated by multi-brand brick-and-mortar retailers. Despite its size and prevalence, the industry has been slow to transform, although there is a clear ongoing migration of this industry online . . . . [i]n contrast, Oddity is a pure play, DTC model that aims to disrupt this massive industry through technology and proprietary data leverage at scale."

120.    William O'Neil and Co., Inc., in a Buy Recommendation note published December 6, 2024, noted Oddity's two major brands, Il Makiage and SpoiledChild, "primarily operate as online, direct-to consumer beauty businesses, allowing customers to purchase products through their websites."

121.    In a quarterly research note published May 8, 2024, Morgan Stanley quoted

Oddity's response to reports of a cosmetics industry slowdown as follows: "ODD further commented that it perceives any industry slowdown as more of a retail store shift to the online channel, where ODD has 100% of its exposure[.]"

### *The Release of the NINGI Report*

122. On May 21, 2024, during pre-market hours, Ningi published a report regarding Oddity, alleging that it "completely misled investors about every critical aspect of its business[.]

123. In particular, the Ningi Report alleged, *inter alia*, that Ningi "talked to former employees who told [Ningi] that [Oddity's] AI is nothing but a questionnaire"; that Oddity's lauded "repeat purchase rates" are attributable to "customers unknowingly enter[ing] into non-cancelable plans" that allow Oddity "to recognize repeat purchases in the following quarters even though the customers don't want the product"; and that Ningi had "found hundreds of undisclosed lawsuits filed against ODDITY and its subsidiaries in the US and Israel, frequently alleging unpaid bills and violations of consumer protection laws," including multiple class action lawsuits filed within the past several years.

124. Following publication of the Ningi Report, Oddity's Class A ordinary share price fell $3.02 per share, or 7.37%, to close at $37.97 per share on May 21, 2024. Indeed, notwithstanding Oddity's purported rebuttal on May 21, 2024, its Class A ordinary share price continued to decline by an additional $1.30 per share, or 3.42%, over the following two consecutive trading sessions, closing at $36.67 per share on May 23, 2024.

125. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Oddity securities, Plaintiffs and other class members have suffered significant losses and damages.

### **THE SECURITIES ACT CLAIMS**

126. The 2023 Registration Statement registered 13,921,050 Oddity Class A ordinary shares for sale. These shares were sold in the IPO at $35 per share and began trading on July 19,

2023. Oddity received proceeds of $57.2 million, net of underwriting discounts, commissions, and estimated offering costs.

127.    The 2024 Registration Statement registered an additional 4,900,000 Oddity Class A ordinary shares for sale.  These shares were sold by LCGP3 Pro Makeup, L.P. through the Secondary Offering Underwriters and began trading on March 15, 2024. Oddity received no proceeds from the Secondary Offering.

128.    Oddity's 2023 Registration Statement and 2024 Registration Statement contained untrue statements of material fact and omitted to state other material facts required to be stated in order to make statements therein not misleading. The omissions and misrepresentations within the Registration Statements related to: (*i*) Oddity's overstating its AI technology and capabilities, and/or the extent to which this technology drove Oddity sales; (*ii*) the omission of any information regarding Oddity's physical retail operations in Israel; *(iii)* Oddity's attribution of repeat purchase rates, purportedly loyal customer base, and overall sales and competitive advantage to its AI-powered and online business model; and (*iv*) Oddity's downplaying of the true scope and severity of Oddity's and its subsidiaries' legal risks and lawsuits.

**The 2023 Registration Statement**

129.    Oddity's 2023 Registration Statement mentions "AI" 40 times. Specifically, the Registration Statement describes the abilities of Oddity's technology capabilities in the following manner:

> ***Our Proprietary Tech Products Change the Way Consumers Shop for Beauty Online***
>
> We are a technology company at our core and have created a purpose-built platform for the beauty and wellness industry to scale our digitally native brand portfolio. Our platform delivers the future of beauty and wellness to consumers by addressing the complex demands they face when buying online. Our core technology products should and will serve multiple brands:
>
> \*     \*     \*
>
> ***PowerMatch / SpoiledBrain.*** Our proprietary algorithms and machine learning models match customers with accurate complexion and beauty products. Using artificial intelligence, or AI, PowerMatch and SpoiledBrain help users identify the

26

correct products, formulations, and shades, reducing the risk of incorrect selection and eliminating the need to physically try on products in-store. We use many real-time predictions drawn from our pool of user data and are constantly improving our models to increase accuracy and conversion.

***Computer Vision.*** Patented software technology allows existing smartphone cameras to provide hyperspectral information, which until now could only be obtained using expensive, dedicated, and complex hyperspectral cameras that cost $20,000 or more. Our hyperspectral vision technology can detect 31 wavelengths that are invisible to the human eye. By applying unique, physics-based AI technology to recover and interpret this hyperspectral information, we can analyze skin and hair features, detect facial blood flows, monitor heart-rate, and create melanin and hemoglobin maps. We believe this imaging technology will allow us to rapidly expand our product capabilities with a lower amount of data needed for our machine learning models, such as more personalized products and brands in categories that traditionally require in-person diagnostics.

*    *    *

***A Holistic End-to-End User Journey Enabled by Technology***. ODDITY is powered by our vision and commitment to revolutionize the beauty and wellness industry through technology innovations and outside thinking. We have built a holistic, end-to-end customer journey, with each of our user touchpoints seeking to enhance and optimize the overall experience. Our integrated model aims to eliminate significant friction, bringing discovery, product matching, tutorial, purchase, and repeat engagement under a single platform. We do so by making technology core to our business model and through proprietary innovations, such as Kenzza, our collection of machine learning models that drive the user journey including PowerMatch / SpoiledBrain, and computer vision / hyperspectral technologies

*    *    *

***Technology First.*** Our business model is centered on our in-house technology capabilities, with leading expertise in data science, machine learning, and computer vision. We operate a cutting-edge R&D and technology center in Tel Aviv that is fully integrated with our business operations in New York City. Our tech team is the largest team within our company today and comprises over 40% of our headcount. Our investments in and focus on recruiting top technology talent is a key component of our strategy. We expect our technology roadmap will define the future of beauty.

130. In violation of Section 11 of the Securities Act, the statements above misrepresented Oddity's technological capabilities and presented Oddity as a technology company rather than a cosmetics retail company.

131. Because Oddity's 2023 Registration Statement describes it as a technology company,

27

causing investors to perceive and value it as a technology company, the actual capabilities of and extent to which its technology could be used to drive sales was material to investors and, for that reason, should have been disclosed in the Registration Statement.

132.    The 2023 Registration Statement mentions Oddity's online business model over 96 times and includes misrepresentations that Oddity's sales are driven primarily by AI and technology. Such statements include:

> We are a consumer tech platform that is built to transform the global beauty and wellness market.
>
> …
>
> ODDITY, powered by our first brand IL MAKIAGE, has been the fastest growing global beauty direct-to-consumer platform from 2020 through 2022, according to Women's Wear Daily. Our first brand, IL MAKIAGE, was also the fastest growing digital, direct-to-consumer beauty brand in the United States through 2021, which is the latest available data from Digital Commerce 360. Our second brand, SpoiledChild, launched in 2022 with the goal of disrupting the wellness category online, and is scaling even faster than IL MAKIAGE.
>
> Our success is based on our outsider approach. We are a technology company seeking to reinvent every aspect of a massive industry. Our tech team is the largest team within our company today and comprises over 40% of our headcount. We invest heavily in data science, machine learning, and computer vision, and we have an evergreen commitment to exploring and investing in emerging technologies. Our technology innovations, when combined with our world-class physical product range and compelling brands built to win online, aim to eliminate significant friction for customers and support a seamless end-to-end user experience.
>
> …
>
> Since our first digital brand launch in 2018, we have disrupted the way millions of consumers shop for beauty products by bringing them online and transforming the shopping experience. We bring visitors to our website, turn them into users by asking questions and learning about them, and then leverage the data we have across the platform to convert them into paying customers. We have built a platform of over 40 million users that we have direct access to and have generated over 1 billion unique data points on our users' beauty preferences through our digital model. As of March 31, 2023, we had over 4 million active customers, or customers that made at least one purchase with us within the last 12 months.

*    *    *

28

***The Growth Opportunity Ahead***.    With our rapidly growing user base, we are unlocking distribution for wellness and beauty online. The strength of our playbook is demonstrated by the rapid and consistent success we have seen with our brands in multiple markets, and the even stronger performance we have seen from SpoiledChild since its launch. We see significant potential to grow our existing brands and to disrupt additional product categories across the global beauty and wellness market. However, our ability to grow depends on a variety of factors, many of which are beyond our control. See the section titled "Risk Factors" for more information.

*    *    *

***Beauty and Wellness Represents a Massive Market Ripe for Digital Disruption.***    Today's beauty and wellness market is dominated by multi-brand brick-and-mortar retailers. Despite its size and prevalence in our daily lives, the industry has been slow to transform. According to Euromonitor, in 2022, online sales accounted for only 21% of sales in the broader beauty and personal care industry globally. We believe that this underdevelopment of online as compared to other retail categories, such as apparel, is driven by little incentive for established offline players to change their models, consumer knowledge gaps, outsourced digital distribution, over reliance on third-party retailers, lack of online innovation, and limited data-driven insights across the industry.

*    *    *

We believe the winner in the beauty and wellness industry will be the company that recognizes that technology, data and online capabilities are at the core of the business, and can leverage these strengths to innovate and address rapidly changing consumer preferences. We believe the combination of our almost entirely online and direct-to-consumer business model, deep technology expertise, and exceptional product offerings positions us best to address the modern-day beauty and wellness consumer. However, our sale of beauty and wellness products has inherent risks, including, but not limited to, fluctuations in the demand for our technology and products, our reliance on user data, and supply chain disruptions, shipping disruptions and capacity constraints, and increases in shipping costs. See the section titled "Risk Factors" for more information.

**The Power of Digital**

The potential reach of a successful online model is significant — unconstrained by physical store footprints or local marketing limitations. Our technology-powered model has the ability to reach a broad and diverse audience in beauty and wellness.

We are a gateway for online adoption, with almost half of our customers making their first online beauty purchase with us, based on internal estimates. We expect our market share position to strengthen as beauty and wellness purchases increasingly shift online.

*    *    *

29

We operate an elite technology organization, and technology is at the center of everything we do. An ethos of innovation, creation, agility, and disruption permeates our entire company. Our dedicated workforce includes in-house engineers, data scientists, computer vision experts, and product teams that comprise over 40% of our global headcount. Our tech team is completely integrated with the business teams, working hand-in-hand across areas like growth, customer experience, marketing, and product development to drive the business.

To execute our extensive roadmap, we deploy new versions of our platform and funnels every week. The multiple deployments improve and add features that the customer wants and needs.

Our operating method is a hallmark of the most advanced technology companies and allows us to keep a strong pace of innovation and execution as we scale. The tech team is organized in squads devoted to key domains, each organized as small standalone startups with dedicated project managers, software developers, and quality assurance. This allows all teams to push domains in parallel and avoid bottlenecks. We work in weekly sprints that include planning, coding, deploying, testing, analyzing performance, and optimizing.

\*      \*      \*

Based on the success and online demand we have experienced in the past three years, we believe that beauty will be 50% online in the near term. We are uniquely positioned for the future of beauty and are years ahead in terms of technology and online capabilities. We believe our business is completely different from those of the legacy beauty companies.

With over 40 million unique users as of March 31, 2023, we are unlocking distribution for wellness and beauty online using data and in-house technology. Our strategy is to grow separate and standalone digitally native brands to disrupt new categories.

\*      \*      \*

***Data-Centric and Online Business Model.*** Our data drives revenue, product development, marketing, distribution, operations, and new brand development. It creates a significant competitive advantage in acquiring users digitally, driving our high engagement and improving repeat purchase rates. Since the launch of our first brand, IL MAKIAGE, we have been continuously refining our machine learning models. Our extensive data moat allows us to build machine learning models with zero-example learning capabilities to drive efficiencies and speed to market for new product launches. In turn, our AI capabilities deliver a hyper personalized beauty experience to the customer to drive customer loyalty and repeat purchase rates.

133.    The 2023 Registration Statement also includes a Founder's Letter from Holtzman

30

which contains further misrepresentations regarding Oddity's technology and operations. The Founder's Letter included the following statements:

> From Day 1 we set out to build a digital platform designed to learn from our users. We deployed algorithms and machine learning models leveraging user data seeking to deliver a precise product match and seamless shopping experience.
>
> …
>
> But technology was never the goal — it is the means to build a better future and a strong company. The results are extraordinary. We have achieved a level of scale, growth, and profitability that we believe has never been done before by a pure-play digitally branded platform. We are a gateway for consumers to online adoption, with almost half of our customers shopping beauty online for the first time with us. We have proven the ability to launch brands developed organically, a testament to the significant potential of our data-powered platform.

134. The statements set forth above are misleading because they state that Oddity's sales and growth were primarily the result of its use of AI and proprietary technology. In fact, as set forth above, Oddity's sales are the result of conventional marketing, advertising, and subscription sales.

135. The 2023 Registration Statement also does not disclose that Oddity uses social media marketing and promotion practices to generate sales for Il Makiage and SpoiledChild that are both deceptive and unsustainable.

136. Because these marketing and sales practices create reputational risk, and upset consumers, which could lead to regulatory investigations and are therefore material to investors, they should have been disclosed to investors in the 2023 Registration Statement.

137. Also, because Oddity's practice of gifting product to consumers who have tried products and do not wish to purchase products is a costly marketing strategy, and therefore material to investors, this practice should have been disclosed to investors in the 2023 Registration Statement.

138. However, Oddity did not disclose the risks of the try-before-you-buy program's design to investors; nor did Oddity disclose that it gifted products to customers who did not wish to keep their trial products. By failing to disclose the risk of a costly and unpopular marketing strategy, Oddity violated Section 11 of the Securities Act.

139. Further, in violation of Section 11 of the Securities Act, the statements above did not

disclose that Oddity owned and was operating brick-and-mortar retail and services businesses at the time the 2023 Registration Statement was signed.

140.    Oddity's 2023 Registration Statement makes clear that Oddity is an online, direct-to-consumer business. Thus, the fact that it owns and operates a brick-and-mortar retail and service business was material to investors and, for that reason, should have been disclosed in the 2023 Registration Statement.

141.    However, the 2023 Registration Statement did not disclose this material fact to investors.

142.    The 2023 Registration Statement also failed to include material facts revealing the true scope and severity of Oddity's and/or subsidiaries' legal issues and related lawsuits. Instead, the 2023 Registration Statement contains a boilerplate warning regarding legal risks as follows:

> We are currently involved in, and may in the future be involved in, legal proceedings, claims, and government investigations in the ordinary course of business. These may include proceedings, claims and investigations relating to, among other things, regulatory matters, data privacy and cybersecurity, commercial matters, intellectual property, competition, tax, employment, pricing, discrimination and consumer rights.
>
> The results of any current or future legal proceedings, claims or government investigations are inherently unpredictable and subject to significant judgment to determine the likelihood and amount of loss related to such matters. While it is not possible to predict the outcomes with certainty, based on our current knowledge, we believe that the final outcomes of any pending matters will not, either individually or in the aggregate, have a material adverse effect on our business, financial condition and results of operations. Regardless of the final outcome, however, litigation can have an adverse impact on us due to defense and litigation costs, diversion of management resources, reputational harm and other factors.

143.    Indeed, in discussing "[d]isputes and other legal or regulatory proceedings [that] could adversely affect our financial results," the 2023 Registration Statement states, in relevant part:

> From time to time, we have been and may in the future become involved in litigation, other disputes, or regulatory proceedings in connection with or incidental to our business, including litigation related to intellectual property, regulatory matters, contract, advertising, and other claims. In general, claims made by us or against us in litigation, disputes, or other proceedings can be expensive and time consuming to bring or defend against and could result in settlements, injunctions, or damages that could significantly affect our business. It is not possible to predict the final resolution of the litigation, disputes, or proceedings to which we currently are or may in the

future become party to. Regardless of the final resolution, such proceedings may have an adverse effect on our reputation, financial condition, and business, including by utilizing our resources and potentially diverting the attention of our management from the operation of our business.

144.    Plainly, the foregoing risk warning was a generic, catch-all provision that was not tailored to Oddity's actual known risks regarding the true scope and severity of its and/or its subsidiaries' legal issues and related lawsuits, much less the existence of hundreds of lawsuits filed against Oddity and/or its subsidiaries, including multiple class action lawsuits filed within the past several years.

**The 2024 Registration Statement**

145.    The 2024 Registration Statement mentions "AI" over 40 times.  Specifically, the 2024 Registration Statement describes the abilities of Oddity's technological capabilities in the following manner:

**Our Proprietary Tech Products Change the Way Consumers Shop for Beauty Online**

We are a technology company at our core and have created a purpose-built platform for the beauty and wellness industry to scale our digitally native brand portfolio. Our platform delivers the future of beauty and wellness to consumers by addressing the complex demands they face when buying online. Our core technology products should and will serve multiple brands:

*PowerMatch / SpoiledBrain*

Our proprietary algorithms and machine learning models match customers with accurate complexion and beauty products. Using artificial intelligence, PowerMatch and SpoiledBrain help users identify the correct products, formulations, and shades, reducing the risk of incorrect selection and eliminating the need to physically try on products in-store. We use many real-time predictions drawn from our pool of user data and are constantly improving our models to increase accuracy and conversion.

*Computer Vision*

Patented software technology allows existing smartphone cameras to provide hyperspectral information, which until now could only be obtained using expensive, dedicated, and complex hyperspectral cameras that cost $20,000 or more. Our hyperspectral vision technology can detect 31 wavelengths that are invisible to the human eye. By applying unique, physics-based AI technology to recover and interpret this hyperspectral information, we can analyze skin and hair features, detect facial blood flows, monitor heart-rate, and create melanin and hemoglobin

33

maps.

We believe this hyperspectral imaging technology will allow us to rapidly expand our product capabilities with a lower amount of data needed for our machine learning models, such as more personalized products and brands in categories that traditionally require in-person diagnostics.

\*    \*    \*

### *A Holistic End-to-End User Journey Enabled by Technology*

ODDITY is powered by our vision and commitment to revolutionize the beauty and wellness industry through technology innovations and outside thinking. We have built a holistic, end-to-end customer journey, with each of our user touchpoints seeking to enhance and optimize the overall experience. Our integrated model aims to eliminate significant friction, bringing discovery, product matching, tutorial, purchase, and repeat engagement under a single platform. We do so by making technology core to our business model and through proprietary innovations, including:

- **Kenzza.** We believe Kenzza, our video-on-demand beauty platform, is the world's largest library of bespoke beauty media content. Users find education and inspiration from our in-house content, custom made for us by some of the world's most influential beauty creators.

- **PowerMatch / SpoiledBrain.** Dozens of machine learning models deliver product recommendations with precision, saving our users time and effort, and driving conversion.

- **Computer Vision / Hyperspectral.** Patented software for hyperspectral recovery allows us to replace an expert's eyes by giving every mobile phone camera the capabilities of a $20,000 hyperspectral instrument.

\*    \*    \*

### *Technology First*

Our business model is centered on our in-house technology capabilities, with leading expertise in data science, machine learning, and computer vision. We operate a cutting-edge R&D and technology center in Tel Aviv that is fully integrated with our business operations in New York City. Our tech team is the largest team within our company today and comprises over 40% of our headcount as of December 31, 2023. Our investments in and focus on recruiting top technology talent is a key component of our strategy. We expect our technology roadmap will define the future of beauty.

146.    In violation of Section 11 of the Securities Act, the statements above misrepresented

Oddity's technological capabilities and presented Oddity as a technology company rather than a

cosmetics retail company.

147.    Because Oddity's 2024 Registration Statement describes it as a technology company, causing investors to perceive and value it as a technology company, the actual capabilities of and extent to which its technology could be used to drive sales was material to investors and, for that reason, should have been disclosed in the 2024 Registration Statements.

148.    The 2024 Registration Statement mentions Oddity's online business model 86 times and include misrepresentations that Oddity's sales are driven primarily by AI and technology. Such statements include:

> We are a consumer tech platform that is built to transform the global beauty and wellness market.
>
> …
>
> ODDITY's success is based on our outsider approach. We are a technology company seeking to reinvent every aspect of a massive industry. Our tech team is the largest team within our company today and comprises over 40% of our headcount as of December 31, 2023. We invest heavily in data science, machine learning, and computer vision, and we have an evergreen commitment to exploring and investing in emerging technologies. Our technology innovations, when combined with our world-class physical product range and compelling brands built to win online, aim to eliminate significant friction for customers and support a seamless end-to-end user experience.
>
> …
>
> Since our first digital brand launch in 2018, we have disrupted the way millions of consumers shop for beauty products by bringing them online and transforming the shopping experience. We bring visitors to our website, turn visitors into users by asking questions and learning about them, and then leverage the data we have across the platform to convert them into paying customers. We have built a platform of approximately 50 million users that we have direct access to and have generated over 2 billion unique data points on our users' beauty preferences through our digital model. As of December 31, 2023, we had approximately 5 million active customers, or customers that made at least one purchase with us within the last 12 months.
>
> *      *      *
>
> ***The Growth Opportunity Ahead***
>
> With our rapidly growing user base, we are unlocking distribution for wellness and beauty online. We aim to launch a new, standalone digitally native brand on a

regular cadence to disrupt new categories. Each brand will have different teams and leadership, but we plan to have all brands served by our centralized technology and data science teams.

\*       \*       \*

**Beauty and Wellness Represents a Massive Market Ripe for Digital Disruption**

Today's beauty and wellness market is dominated by multi-brand brick-and-mortar retailers. Despite its size and prevalence in our daily lives, the industry has been slow to transform.

We believe that this underdevelopment of online as compared to other retail categories, such as apparel, is a function of the following:

- Established Offline Players.   Legacy players continue to perform well by leveraging offline channels as the main gateway to the consumer. Therefore, these companies have little incentive to adopt change in their businesses.

- Lack of Disruptors.   In the beauty and wellness category, technological disruptors are required to develop physical products in addition to industry-defining technology. This requirement makes it less compelling to technology teams and increases the barrier to entry.

- Consumer Knowledge Gap.   Beauty and wellness products are complex and require a high degree of personalization across attributes like shade matching and formulation. Without technology to help with selection, and with high price points that increase the cost of getting it wrong, consumers are compelled to shop in physical stores to get the right product.

- Outsourced Digital Distribution.  The majority of the market is wholesale brands that sell to powerful and consolidating retail partners. The reliance of wholesalers on these distribution partners has made it difficult for beauty and wellness companies to invest in their brand.com capabilities, or risk disintermediating retail partners. Retailers are asserting increasing power in this sphere through retail media and other initiatives.

- Scale and Profitability Trade-off.   Various independent beauty brands have emerged in recent years, but it has been difficult for these new entrants to achieve sustainable scale or profitability without the help of third-party retailers. This reliance can reduce the efficiency of marketing spend, while increasing risks of boom-bust revenue cycles based on an overreliance on retailer merchandising decisions.

- Limited Data.  Brands that outsource digital distribution to third parties usually have limited access to the consumer data that can be used to drive further online adoption. We believe legacy companies either place little emphasis on, or have

36

no direct method to efficiently collect, consumer data. The lack of a direct data connection between companies and consumers impedes product innovation and personalization.

*      *      *

We believe the winner in the beauty and wellness industry will be the company that recognizes that technology, data and online capabilities are at the core of the business, and can leverage these strengths to innovate and address rapidly changing consumer preferences. We believe the combination of our almost entirely online and direct-to-consumer business model, deep technology expertise, and exceptional product offerings positions us best to address the modern-day beauty and wellness consumer.

**The Power of Digital**

The potential reach of a successful online model is significant — unconstrained by physical store footprints or local marketing limitations. Our technology-powered model has the ability to reach a broad and diverse audience in beauty and wellness.

We are a gateway for online adoption, with almost half of our customers making their first online beauty purchase with us based on internal estimates. We expect our market share position to strengthen as beauty and wellness purchases increasingly shift online.

*      *      *

We operate an elite technology organization, and technology is at the center of everything we do. An ethos of innovation, creation, agility, and disruption permeates our entire company. Our dedicated workforce includes in-house engineers, data scientists, computer vision experts, and product teams that comprise over 40% of our global headcount. Our tech team is integrated with the business teams, working hand-in-hand across areas like growth, customer experience, marketing, and product development to drive the business.

To execute our extensive roadmap, we deploy new versions of our platform and funnels every week. The multiple deployments improve and add features that the customer wants and needs.

Our operating method allows us to keep a strong pace of innovation and execution as we scale. The tech team is organized in squads devoted to key domains, each organized as small standalone startup with dedicated project managers, software developers, and quality assurance teams. This allows all teams to push domains in parallel and avoid bottlenecks. We work in weekly sprints that include planning, coding, deploying, testing, analyzing performance, and optimizing

…

37

IL MAKIAGE is a prestige, digital beauty brand powered by ODDITY's consumer tech platform, which leverages data science, machine learning and computer vision capabilities to deliver high-quality online experiences for consumers.

*       *       *

Based on the success and online demand we have experienced thus far, we believe that beauty will be 50% online in the near term. We are uniquely positioned for the future of beauty and are years ahead in terms of technology and online capabilities. We believe our business is completely different from those of the legacy beauty companies.

With approximately 50 million unique users as of December 31, 2023, we are unlocking distribution for wellness and beauty online using data and in-house technology. Our strategy is to grow separate and standalone digitally native brands to disrupt new categories.

*       *       *

**Data-Centric and Online Business Model.**   Our data drives revenue, product development, marketing, distribution, operations, and new brand development. It creates a significant competitive advantage in acquiring users digitally, driving our high engagement and improving repeat purchase rates. Since the launch of our first brand, IL MAKIAGE, we have been continuously refining our machine learning models. Our extensive data moat allows us to build machine learning models with zero-example learning capabilities to drive efficiencies and speed to market for new product launches. In turn, our AI capabilities deliver a hyper personalized beauty experience to the customer to drive customer loyalty and repeat purchase rates.

*       *       *

149.    The statements set forth above are misleading because they state that Oddity's sales and growth were primarily the result of its use of AI and proprietary technology. In fact, as set forth above, Oddity's sales are the result of conventional marketing, advertising, and subscription sales.

150.    The 2024 Registration Statement also does not disclose that Oddity uses deceptive and unsustainable social media marketing and promotion practices to generate sales for Il Makiage and SpoiledChild.

151.    Because these marketing and sales practices create reputational risk, and upset consumers, which could lead to regulatory investigations and are therefore material to investors,

38

they should have been disclosed to investors in the 2024 Registration Statement.

152.    Also, because Oddity's practice of gifting product to consumers who have tried products and do not wish to purchase products is a costly marketing strategy, and therefore material to investors, this practice should have been disclosed to investors in the 2024 Registration Statement.

153.    However, Oddity did not disclose the risks of the try-before-you-buy program's design to investors; nor did Oddity disclose that it gifted products to customers who did not wish to keep their trial products. By failing to disclose the risk of a costly and unpopular marketing strategy, Oddity violated the Securities Act.

154.    Further, in violation of the Securities Act, the statements above did not disclose that Oddity owned and was operating brick-and-mortar retail and services businesses at the time the 2024 Registration Statement was signed.

155.    Oddity's 2024 Registration Statement makes clear that Oddity is an online, direct-to-consumer business. Thus, the fact that it owns and operates a brick-and-mortar retail and service business was material to investors and, for that reason, should have been disclosed in the 2024 Registration Statement.

156.    However, the 2024 Registration Statement did not disclose this material fact to investors.

157.    The 2024 Registration Statement also failed to include material facts revealing the true scope and severity of Oddity's and/or subsidiaries' legal issues and related lawsuits. Instead, the 2024 Registration Statement contains a boilerplate warning regarding legal risks as follows:

> From time to time, we may become involved in actions, claims, suits, and other legal proceedings arising in the ordinary course of business, including assertions by third parties relating to intellectual property infringement, breaches of contract or warranties, employment-related matters, regulatory matters, data privacy and cybersecurity, commercial matters, competition, tax, pricing, discrimination and consumer protection.

39

The results of any current or future legal proceedings, claims or government investigations are inherently unpredictable and subject to significant judgment to determine the likelihood and amount of loss related to such matters. While it is not possible to predict the outcomes with certainty, based on our current knowledge, we believe that the final outcomes of any pending matters will not, either individually or in the aggregate, have a material adverse effect on our business, financial condition and results of operations. Regardless of the final outcome, however, litigation can have an adverse impact on us due to defense and litigation costs, diversion of management resources, reputational harm and other factors.

158.    Indeed, in discussing "[d]isputes and other legal or regulatory proceedings [that] could adversely affect our financial results[,]" The 2024 Registration Statement states, in relevant part:

From time to time, we have been and may in the future become involved in litigation, other disputes, or regulatory proceedings in connection with or incidental to our business, including litigation related to intellectual property, regulatory matters, contract, advertising, and other claims. In general, claims made by us or against us in litigation, disputes, or other proceedings can be expensive and time consuming to bring or defend against and could result in settlements, injunctions, or damages that could significantly affect our business. It is not possible to predict the final resolution of the litigation, disputes, or proceedings to which we currently are or may in the future become party to. Regardless of the final resolution, such proceedings may have an adverse effect on our reputation, financial condition, and business, including by utilizing our resources and potentially diverting the attention of our management from the operation of our business.

159.    Plainly, the foregoing risk warning was a generic, catch-all provision that was not tailored to Oddity's actual known risks regarding the true scope and severity of its and/or its subsidiaries' legal issues and related lawsuits, much less the existence of hundreds of lawsuits filed against Oddity and/or its subsidiaries, including multiple class action lawsuits filed within the past several years.

## COUNT I

### (Liability pursuant to Section 11 of the Securities Act against All Defendants)

160.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

161.    This Cause of Action is brought pursuant to Section 11 of the Securities Act against all Defendants.

162.    The 2023 Registration Statement and 2024 Registration Statement (collectively the "Registration Statements") contained untrue statements of material facts and/or omitted to state other facts necessary in order to make the statements made not misleading or otherwise required to be stated therein.

163.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased or otherwise acquired Oddity ordinary shares pursuant and traceable to the 2023 Registration Statement and sold Oddity ordinary shares prior to July 19, 2024 at a price less than $35.00 ("IPO Class").

164.    Plaintiffs also bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased or otherwise acquired Oddity ordinary shares pursuant and traceable to the 2024 Registration Statement (the "Secondary Offering Class", collectively with the IPO Class, the "Securities Act Classes").

165.    Defendant Oddity is the registrant and issuer of the stock sold in the initial public offering and the Secondary Offering. As issuer of the stock, Oddity is strictly liable to Plaintiffs and the Securities Act Classes for the actionable statements and omissions in the Registration Statements.

166.    The Individual Defendants were directors of Oddity and signed the Registration Statements and, therefore, are strictly liable jointly and severally to Plaintiffs and the Securities Act Classes for the actionable statements in the Registration Statements.

167.    The Underwriter Defendants and the Secondary Offering Underwriter Defendants acted as underwriters regarding the offerings of Oddity common shares and, therefore, are strictly liable jointly and severally to Plaintiffs and the Securities Act Classes for the actionable statements in the Registration Statements.

168.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

169.    Plaintiffs acquired Oddity ordinary shares issued pursuant to, or traceable to the

Registration Statements.

170.    Purchasers of Oddity ordinary shares issued pursuant to, or traceable to the 2023 Registration Statement who sold shares prior to July 19, 2024 at a price below $35.00 are entitled to recover damages from Defendants pursuant to Section 11 of the Securities Act.

171.    Plaintiff Hoare acquired Oddity ordinary shares issued pursuant to, or traceable to the 2024 Registration Statement.

172.    Purchasers of Oddity ordinary shares issued pursuant to, or traceable to the 2024 Registration Statement are entitled to recover damages from Defendants pursuant to Section 11 of the Securities Act.

173.    The members of the Securities Act Classes are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Oddity securities were actively traded on the NASDAQ.  While the exact number of members in the Securities Act Classes is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Securities Act Classes.  Record owners and other members of the Securities Act Classes may be identified from records maintained by Oddity or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

174.    Plaintiffs' claims are typical of the claims of the members of the Securities Act Classes as all members of the Securities Act Classes are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

175.    Plaintiffs will fairly and adequately protect the interests of the members of the Securities Act Classes and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Securities Act Classes.

176.    Common questions of law and fact exist as to all members of the Securities Act Classes and predominate over any questions solely affecting individual members of the Securities Act Classes.  Among the questions of law and fact common to the Class are:

        a.    whether the federal securities laws were violated by Defendants' acts as

alleged herein;

b. whether statements made in the Registration Statements misrepresented or omitted material facts about the business, operations and management of Oddity; and

c. whether the members of the Securities Act Classes have sustained damages and, if so, what is the proper measure of damages.

177.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Securities Act Classes may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Classes to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT II

### (Liability pursuant to Section 15 of the Securities Act Against the Individual Defendants)

178.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

179.    This Cause of Action is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

180.    The Individual Defendants were controlling persons of Oddity by virtue of their positions as directors or senior officers of Oddity.

181.    Each of the Individual Defendants was privy to confidential proprietary information concerning Oddity and its business and operations.

182.    Due to their positions of control and authority, the Individual Defendants were able to, and did, control the contents of the Registration Statements that contained untrue statements and/or omissions of material fact.

183.    Oddity's conduct, as alleged herein, constitutes a violation of the Securities Act.

184.    The Individual Defendants are liable to Plaintiffs and the other members of the

Securities Act Classes, jointly and severally with and to the same extent as Oddity, pursuant to Section 15 of the Securities Act.

## THE EXCHANGE ACT CLAIMS

185.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

186.    The Class Period begins on July 19, 2023, when Oddity's Class A ordinary shares began publicly trading on the NASDAQ pursuant to the materially false or misleading statements and omissions in the 2023 Registration Statement.

187.    As set forth above, Oddity's 2023 Registration Statement contained untrue statements of material fact and omitted to state other material facts required to be stated in order to make statements therein not misleading. The omissions and misrepresentations within the 2023 Registration Statement related to: (*i*) Oddity's overstating its AI technology and capabilities, and/or the extent to which this technology drove Oddity sales; (*ii*) the omission of any information regarding Oddity's physical retail operations in Israel; *(iii)* Oddity's attribution of repeat purchase rates, purportedly loyal customer base, and overall sales and competitive advantage to its AI-powered and online business model; and (*iv*) Oddity's downplaying of the true scope and severity of Oddity's and its subsidiaries' legal risks and lawsuits.

188.    Defendants continued to make material misrepresentations and omitted to state other material facts required to be stated in order to make statements not misleading throughout the Class Period.

189.    On August 9, 2023, Oddity issued a press release announcing its second quarter 2023 results (the "2Q23 Earnings Release"). The 2Q23 Earnings Release quoted Defendant Holtzman, who stated, in relevant part:

44

We believe our year-to-date financial performance, with net revenue growth of 69% year-over-year, $50 million of net income, and $70 million of Adjusted EBITDA, reflects the power of our business model as we work to transform the global beauty and wellness market through technology and entrepreneurial DNA . . . . We are unlocking online for this massive, global TAM [total addressable market] by leveraging data science, artificial intelligence, and computer vision to deliver superior products and experiences to our over 40 million users.

190.    On November 7, 2023, Oddity issued a press release announcing its third quarter 2023 results (the "3Q23 Earnings Release").  The 3Q23 Earnings Release quoted Defendant Holtzman, who stated, in relevant part:

We continue to deliver excellent growth and profitability for IL MAKIAGE and SpoiledChild, while building powerful engines to scale our business and expand our lead in 2024 and beyond.   Our large investments in technology and data capabilities over the past five years are enabling us to continue to grow fast without damaging our high margins and strong profitability.

191.    On March 5, 2024, Oddity issued a press release announcing its fourth quarter and full year 2023 results (the "4Q/FY23 Earnings Release").  The 4Q/FY23 Earnings Release quoted Defendant Holtzman, who stated, in relevant part, that "[o]ur large investments in technology and product over the past 5 years are yielding significant returns and allow the rare combination of scale, growth, and profitability."

192.    The statements from the 2Q23 Earnings Release, 3Q23 Earnings Release, and 4Q/FY23 Earnings Release are materially misleading because they state that Oddity's sales and growth were primarily the result of its use of AI and proprietary technology. In fact, as set forth above, Oddity's sales are the result of conventional marketing, advertising, and subscription sales. Accordingly, these statements overstated Oddity's AI technology and capabilities, and/or the extent to which this technology drove its sales.

193.    On March 6, 2024, Oddity filed an annual report on Form 20-F with the SEC, reporting its financial and operating results for the quarter and year ended December 31, 2023 (the "2023 20-F").  The 2023 20-F contained similar misrepresentations, touting Oddity's purported

proprietary AI technology and capabilities, while attributing its "repeat purchase rates,"

purportedly loyal customer base, and overall sales and competitive advantages to its AI-powered

and online business model.

194.    Specifically, the 2023 20-F stated:

We are a consumer tech platform that is built to transform the global beauty and
wellness market.

…

ODDITY's success is based on our outsider approach. We are a technology company
seeking to reinvent every aspect of a massive industry. Our tech team is the largest
team within our company today and comprises over 40% of our headcount as of
December 31, 2023. We invest heavily in data science, machine learning, and
computer vision, and we have an evergreen commitment to exploring and investing
in emerging technologies. Our technology innovations, when combined with our
world-class physical product range and compelling brands built to win online, aim to
eliminate significant friction for customers and support a seamless end-to-end user
experience.

…

Since our first digital brand launch in 2018, we have disrupted the way millions of
consumers shop for beauty products by bringing them online and transforming the
shopping experience. We bring visitors to our website, turn them into users by asking
questions and learning about them, and then leverage the data we have across the
platform to convert them into paying customers. We have built a platform of
approximately 50 million users that we have direct access to and have generated over
2billion unique data points on our users' beauty preferences through our digital
model.

\*        \*        \*

***The Growth Opportunity Ahead***

With our rapidly growing user base, we are unlocking distribution for wellness and
beauty online. We aim to launch a new, standalone digitally native brand on a regular
cadence to disrupt new categories. Each brand will have different teams and
leadership, but we plan to have all brands served by our centralized technology and
data science teams.

The strength of our playbook is demonstrated by the rapid and consistent success we
have seen with the IL MAKIAGE brand in multiple markets, and the even stronger
performance we have seen from SpoiledChild since its launch. We see significant
potential to grow our existing brands and to disrupt additional product categories

46

across the global beauty and wellness market. Our organization is set up to scale in multiple vectors: through continued growth of the IL MAKIAGE brand, through future homegrown brand launches like SpoiledChild via our New Ventures incubator, and through selective partnerships and M&A.

…

***Beauty and Wellness Represents a Massive Market Ripe for Digital Disruption***

Today's beauty and wellness market is dominated by multi-brand brick-and-mortar retailers. Despite its size and prevalence in our daily lives, the industry has been slow to transform.

We believe that this underdevelopment of online as compared to other retail categories, such as apparel, is a function of the following:

●**Established Offline Players.** Legacy players continue to perform well by leveraging offline channels as the main gateway to the consumer. Therefore, these companies have little incentive to adopt change in their businesses.

●**Lack of Disruptors.** In the beauty and wellness category, technological disruptors are required to develop physical products in addition to industry-defining technology. This requirement makes it less compelling to technology teams and increases the barrier to entry.

●**Consumer Knowledge Gap.** Beauty and wellness products are complex and require a high degree of personalization across attributes like shade matching and formulation. Without technology to help with selection, and with high price points that increase the cost of getting it wrong, consumers are compelled to shop in physical stores to get the right product.

●**Outsourced Digital Distribution.** The majority of the market is wholesale brands that sell to powerful and consolidating retail partners. The reliance of wholesalers on these distribution partners has made it difficult for beauty and wellness companies to invest in their brand.com capabilities, or risk disintermediating retail partners. Retailers are asserting increasing power in this sphere through retail media and other initiatives.

●**Scale and Profitability Trade-off.** Various independent beauty brands have emerged in recent years, but it has been difficult for these new entrants to achieve sustainable scale or profitability without the help of third-party retailers. This reliance can reduce the efficiency of marketing spend, while increasing risks of boom-bust revenue cycles based on an overreliance on retailer merchandising decisions.

●**Limited Data.** Brands that outsource digital distribution to third parties usually have limited access to the consumer data that can be used to drive further online adoption. We believe legacy companies either place little emphasis on, or have

no direct method to efficiently collect, consumer data. The lack of a direct data connection between companies and consumers impedes product innovation and personalization.

…

We believe the winner in the beauty and wellness industry will be the company that recognizes that technology, data and online capabilities are at the core of the business, and can leverage these strengths to innovate and address rapidly changing consumer preferences. We believe the combination of our almost entirely online and direct-to-consumer business model, deep technology expertise, and exceptional product offerings positions us best to address the modern-day beauty and wellness consumer.

**The Power of Digital**

The potential reach of a successful online model is significant — unconstrained by physical store footprints or local marketing limitations. Our technology-powered model has the ability to reach a broad and diverse audience in beauty and wellness.

We are a gateway for online adoption, with almost half of our customers making their first online beauty purchase with us, based on internal estimates. We expect our market share position to strengthen as beauty and wellness purchases increasingly shift online.

…

This technology-powered, data-centric model shares similarities with other "land and expand" models in the technology industry, which are designed to support faster growth at higher incremental returns than analog ones. Once a user is onboarded, we are able to market additional products and services at lower incremental costs, supporting favorable incremental returns on our capital.

…

We operate an elite technology organization, and technology is at the center of everything we do. An ethos of innovation, creation, agility, and disruption permeates our entire company. Our dedicated workforce includes in-house engineers, data scientists, computer vision experts, and product teams that comprise over 40% of our global headcount. Our tech team is completely integrated with the business teams, working hand-in-hand across areas like growth, customer experience, marketing, and product development to drive the business.

To execute our extensive roadmap, we deploy new versions of our platform and funnels every week. The multiple deployments improve and add features that the customer wants and needs.

Our operating method allows us to keep a strong pace of innovation and execution as we scale. The tech team is organized in squads devoted to key domains, each

organized as small standalone startups with dedicated project managers, software developers, and quality assurance. This allows all teams to push domains in parallel and avoid bottlenecks. We work in weekly sprints that include planning, coding, deploying, testing, analyzing performance, and optimizing.

*      *      *

**Our Proprietary Tech Products Change the Way Consumers Shop for Beauty Online**

We are a technology company at our core and have created a purpose-built platform for the beauty and wellness industry to scale our digitally native brand portfolio. Our platform delivers the future of beauty and wellness to consumers by addressing the complex demands they face when buying online. Our core technology products should and will serve multiple brands:

*PowerMatch / SpoiledBrain*

Our proprietary algorithms and machine learning models match customers with accurate complexion and beauty products. Using artificial intelligence, or AI, PowerMatch and SpoiledBrain help users identify the correct products, formulations, and shades, reducing the risk of incorrect selection and eliminating the need to physically try on products in-store. We use many real-time predictions drawn from our pool of user data and are constantly improving our models to increase accuracy and conversion.

*Computer Vision*

Patented software technology allows existing smartphone cameras to provide hyperspectral information, which until now could only be obtained using expensive, dedicated, and complex hyperspectral cameras that cost $20,000 or more. Our hyperspectral vision technology can detect 31 wavelengths that are invisible to the human eye. By applying unique, physics-based AI technology to recover and interpret this hyperspectral information, we can analyze skin and hair features, detect facial blood flows, monitor heart-rate, and create melanin and hemoglobin maps. We believe this imaging technology will allow us to rapidly expand our product capabilities with a lower amount of data needed for our machine learning models, such as more personalized products and brands in categories that traditionally require in-person diagnostics.

*      *      *

**Our Competitive Strengths**

We have created something new: an industry-redefining, digitally native beauty and wellness company built around an extensible consumer tech platform. Our competitive strengths include:

49

…

***Data-Centric and Online Business Model.*** Our data drives revenue, product development, marketing, distribution, operations, and new brand development. It creates a significant competitive advantage in acquiring users digitally, driving our high engagement and improving repeat purchase rates. Since the launch of our first brand, IL MAKIAGE, we have been continuously refining our machine learning models. Our extensive data moat allows us to build machine learning models with zero-example learning capabilities to drive efficiencies and speed to market for new product launches. In turn, our AI capabilities deliver a hyper personalized beauty experience to the customer to drive customer loyalty and repeat purchase rates.

195. The statements set forth above are misleading because they state that Oddity's sales and growth were primarily the result of its use of AI and proprietary technology. In fact, as set forth above, Oddity's sales are the result of conventional marketing, advertising, and subscription sales.

196. The 2023 20-F also does not disclose that Oddity uses social media marketing and promotion practices to generate sales for Il Makiage and SpoiledChild that are both deceptive and unsustainable.

197. Because these marketing and sales practices create reputational risk, and upset consumers, which could lead to regulatory investigations – similar programs to Oddity's try-before-you-buy program have been investigated by the FTC – and are therefore material to investors, they should have been disclosed to investors in the 2023 20-F.

198. Also, because Oddity's practice of gifting product to consumers who have tried products and do not wish to purchase products is a costly marketing strategy, and therefore material to investors, this practice should have been disclosed to investors in the 2023 20-F.

199. However, Oddity did not disclose the risks of the try-before-you-buy program's design to investors; nor did Oddity disclose that it gifted products to customers who did not wish to keep their trial products.

200. Further, the statements above did not disclose that Oddity owned and was operating brick-and-mortar retail and services businesses as of December 31, 2023.

201. Oddity's 2023 20-F presents that Oddity is an online, direct-to-consumer business. Thus, the fact that it owns and operates a brick-and-mortar retail and service business was material

50

to investors and, for that reason, should have been disclosed in the 2023 20-F.

202.    The 2023 20-F also continued to downplay the true scope and severity of Oddity's and/or its subsidiaries' legal issues and related lawsuits.  For example, in a section entitled "Legal Proceedings," the 2023 20-F merely stated:

> From time to time, we may become involved in actions, claims, suits, and other legal proceedings arising in the ordinary course of business, including assertions by third parties relating to intellectual property infringement, breaches of contract or warranties, employment-related matters, regulatory matters, data privacy and cybersecurity, commercial matters, competition, tax, pricing, discrimination and consumer protection.
>
> The results of any current or future legal proceedings, claims or government investigations are inherently unpredictable and subject to significant judgment to determine the likelihood and amount of loss related to such matters. While it is not possible to predict the outcomes with certainty, based on our current knowledge, we believe that the final outcomes of any pending matters will not, either individually or in the aggregate, have a material adverse effect on our business, financial condition and results of operations. Regardless of the final outcome, however, litigation can have an adverse impact on us due to defense and litigation costs, diversion of management resources, reputational harm and other factors.

203.    Indeed, the 2023 20-F contained the same boilerplate risk warning purporting to warn of "[d]isputes and other legal or regulatory proceedings [that] *could* adversely affect our financial results," which likewise served as a generic, catch-all provision that was not tailored to Oddity's actual known risks regarding the true scope and severity of its and/or its subsidiaries' legal issues and related lawsuits, much less the existence of hundreds of lawsuits filed against Oddity and/or its subsidiaries, including multiple class action lawsuits filed within the past several years.

204.    Appended as exhibits to the 2023 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Holtzman and Mann certified that the 2023 20- F "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the

51

financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report[.]"

205.    As set forth above, Oddity's 2024 Registration Statement (effective March 14, 2024) contained untrue statements of material fact and omitted to state other material facts required to be stated in order to make statements therein not misleading. The omissions and misrepresentations within the 2024 Registration Statement related to: (*i*) Oddity's overstating its AI technology and capabilities, and/or the extent to which this technology drove Oddity sales; (*ii*) the omission of any information regarding Oddity's physical retail operations in Israel; *(iii)* Oddity's attribution of repeat purchase rates, purportedly loyal customer base, and overall sales and competitive advantage to its AI-powered and online business model; and (*iv*) Oddity's downplaying of the true scope and severity of Oddity's and its subsidiaries' legal risks and lawsuits

206.    On May 7, 2024, Oddity issued a press release announcing its first quarter 2024 results (the "1Q24 Earnings Release").  The 1Q24 Earnings Release quoted Defendant Holtzman, who stated, in relevant part, that "[o]ur platform enables our brands to sustain high and profitable growth at large scale across categories, with strong repeat rates and customer satisfaction[.]"

207.    The statements from the 1Q24 Earnings Release are materially misleading because they state that Oddity's sales and growth were primarily the result of its use of AI and proprietary technology. In fact, as set forth above, Oddity's sales are the result of conventional marketing, advertising, and subscription sales. Accordingly, these statements overstated Oddity's AI technology and capabilities, and/or the extent to which this technology drove its sales.

<u>**SCIENTER ALLEGATIONS**</u>

208.    During the Class Period, Defendants Oddity and Holtzman had both the motive and opportunity to commit fraud.  Indeed, by overstating Oddity's purported proprietary AI technologies to target consumer needs, Oddity and its insiders stood to profit handsomely from

Oddity's IPO and the recent hype surrounding AI in the securities markets. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Oddity's securities during the Class Period.

209.    Holtzman and *L* Catterton were to materially benefit from the Offering by selling over 50% of the Oddity Class A share holdings during the Class Period and benefiting from the materially false and/or misleading statements.

210.    Oddity's filings with the SEC during the Class Period substantiate that both Defendant Holtzman (who, as the beneficial owner of Oran Shilo Investments LP which he controls, has voting control and investment power over Oddity's shares) and *L* Catterton (the beneficial owner of LCGP3 Pro Makeup, L.P.) sold a material portion of their ownership stake in Oddity's initial public offering.

211.    *L* Catterton is a private equity company that was created by the partnership of Catterton with LVMH Moët Hennessy - Louis Vuitton and Groupe Arnault. *L* Catterton represents that its philosophy is "focused exclusively on building iconic and enduring consumer brands." As such, *L* Catterton investments are typically long-term.

212.    *L* Catterton was an initial investor in Oddity. In June 2017, *L* Catterton invested $29 million into Oddity stating it would "be used to support and accelerate the expansion of IL MAKIAGE in the United States." This investment by *L* Catterton in Oddity was led by its Managing Partner, Defendant Michael Fallero. Since this investment, Defendant Fallero has served as a director on Oddity's board of directors.

213.    In the IPO, 13,921,050 shares were sold to the public. The primary benefactor of the IPO was not Oddity, but instead the "selling shareholders" who sold collectively 12,166,665

Class A shares. In the IPO, Defendant Holtzman registered and sold 7,097,696 shares and *L* Catterton registered and sold 5,068,969 shares. Only 1,754,385 Class A shares were sold by Oddity for net proceeds of $53 million. Notably, as of December 31, 2023, Oddity had not used any of the proceeds it received in the IPO.

214.     In the IPO, Holtzman sold 50.88% of the Oddity Class A shares that he owned immediately before the IPO for gross proceeds of over $248.4 million. These sales reduced his ownership stake in Oddity Class A shares from 32.4% to 15.1%.

215.     In the IPO, *L* Catterton sold 27.84% of its holdings immediately before the IPO for gross proceeds of over $177.4 million. This sale reduced *L* Catterton's ownership stake in Oddity Class A shares from 42.3% to 29%.

216.     Thereafter on or about March 15, 2024, Oddity registered an additional 4,900,000 Class A shares beneficially-owned by *L* Catterton. This secondary offering was solely for the benefit of *L* Catterton as Oddity did not sell any shares in the offering and did not receive any proceeds from this offering.

217.     As a result of selling 4,782,609 shares in the secondary offering, *L* Catterton received gross proceeds of $208 million.  This sale further reduced *L* Catterton's ownership stake in Oddity Class A shares from 29% to 18.4% following the secondary offering. As a result of its sales in the IPO and the secondary offering, *L* Catterton sold 54.1% of the Oddity Class A shares that it owned immediately before the IPO for gross proceeds over $385.4 million.

218.     Both Holtzman and *L* Catterton were motivated to sell their shares by the misstatements in the 2023 Registration Statement and, in the case of *L* Catterton, to benefit from the additional misstatements made thereafter in the 2024 Registration Statement and during the Class Period. Holtzman's and *L* Catterton's sales and change in ownership is summarized in the following chart:

| ODDITY CLASS A SHARES | | | | | |
|---|---|---|---|---|---|
| Beneficial Owner | Shares Beneficially Owned Before Initial Public Offering (Percentage Ownership) | Shares Beneficially Owned After Initial Public Offering and and Percentage Ownership | Shares Beneficially Owned After Secondary Offering | Total Shares Sold | Gross Proceeds |
| Holtzman | 13,950,146 (32.4%) | 6,852,450 (15.1%) | 6,852,450 (15.1%) | 7,097,696 | $248,419,360 |
| L Catterton | 18,209,326 (42.3%) | 13,140,357 (29%) | 8,357,748 (18.4%) | 9,851,578 | $385,457,407 |

219.    Collectively, these facts further support a strong and cogent inference of Holtzman's scienter.

220.    Further, the misrepresentations regarding Oddity's use of AI technology to generate and grow sales concerned the core operations of its business. Oddity repeatedly described technology as the "core" of its operations. As CEO, Holtzman had access to relevant operational and business information and knew that conventional marketing, advertising, and subscriptions drove the growth in Oddity's sales and, therefore, that Oddity's statements were misleading.

221.    Holtzman also knew of Il Makiage's retail operations in Israel. In 2018 he was photographed inside one of Il Makiage's retail stores. Holtzman thus intentionally omitted information regarding these retail operations from Oddity's public statements set forth herein.

222.    By virtue of his position as CEO, Holtzman's knowledge is imputed to Oddity.

## RELIANCE

223.    At all material times, Plaintiffs and other purchasers of Oddity ordinary shares are presumed to have relied on the misleading statements and omissions by Oddity and Holtzman in

that, among other things:

      a.      Oddity and Holtzman made public misrepresentations or failed to disclose material facts during the Class Period;

      b.      the omissions and misrepresentations were material;

      c.      Oddity's stock traded in an efficient market;

      d.      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Oddity's stock; and

      e.      Plaintiffs and other investors purchased Oddity securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

224.    At all relevant times, the markets for Oddity securities were efficient for the following reasons, among others:

      a. Oddity filed periodic public reports with the SEC;

      b. Oddity regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

      c. Oddity was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

      d. Oddity securities was actively traded in an efficient market, namely NASDAQ, under the ticker symbol "ODD".

225.    As a result of the foregoing, the market for Oddity securities promptly digested current information regarding Oddity from publicly available sources and reflected such information in the price of Oddity securities.  Under these circumstances, all purchasers of Oddity securities during the Class Period suffered similar injury through their purchase of Oddity securities at artificially inflated prices and the presumption of reliance applies.

## LOSS CAUSATION AND ECONOMIC LOSS

226.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Oddity's securities, and operated as a fraud or deceit on acquirers of Oddity's securities. As detailed above, when the truth about the scheme to defraud, and accurate details of Oddity's business were revealed, the value of Oddity securities declined as the prior artificial inflation no longer propped up its securities prices. The decline in Oddity's securities price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by the Plaintiffs and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Oddity-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate Oddity's securities price and the subsequent significant decline in the value of Oddity's share price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

227.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiffs and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Oddity's operations, as alleged herein. Throughout the Class

Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Oddity securities to be artificially inflated. Plaintiffs and other Class members purchased Oddity's securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

228.     On May 21, 2024, Ningi published the Ningi Report regarding Oddity, stating that it "completely misled investors about every critical aspect of its business[.]"  In particular, the Ningi Report alleged, *inter alia*, that Ningi "talked to former employees who told [Ningi] that [Oddity's] AI is nothing but a questionnaire"; that Oddity's lauded "repeat purchase rates" are attributable to "customers unknowingly enter[ing] into non-cancelable plans" that allow Oddity "to recognize repeat purchases in the following quarters even though the customers don't want the product"; and that Ningi had "found hundreds of undisclosed lawsuits filed against ODDITY and its subsidiaries in the US and Israel, frequently alleging unpaid bills and violations of consumer protection laws," including multiple class action lawsuits filed within the past several years.

229.     On this news, Oddity's Class A ordinary share price fell $3.02 per share, or 7.37%, to close at $37.97 per share on May 21, 2024.  Oddity's Class A ordinary share price continued to decline by an additional $1.30 per share, or 3.42%, over the following two consecutive trading sessions, closing at $36.67 per share on May 23, 2024.

230.     The new information disclosed by the Ningi Report was material, negative information. Oddity's securities prices decreased as investors and the market considered the Ningi Report as well as Oddity's responses. The information disclosed in the Ningi Report caused the price of Oddity stock to decrease significantly.

<u>**COUNT III**</u>

<u>**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Oddity and Holtzman)**</u>

231.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully

set forth herein.

232.    This Count is asserted against Defendants Oddity and Holtzman and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

233.    During the Class Period, Oddity and Holtzman engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Oddity securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Oddity securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Oddity and Holtzman, and each of them, took the actions set forth herein.

234.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of Oddity and Holtzman participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Oddity securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Oddity's finances and business prospects.

59

235.    By virtue of his positions at Oddity, Holtzman had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Holtzman acted with reckless disregard for the truth in that he failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Holtzman. Said acts and omissions of Holtzman were committed willfully or with reckless disregard for the truth. In addition, Holtzman knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

236.    Information showing that Holtzman acted knowingly or with reckless disregard for the truth is peculiarly within Holtzman and Oddity's knowledge and control. As the CEO of Oddity, Holtzman had knowledge of the details of Oddity's internal affairs. As CEO, Holtzman's knowledge and/or recklessness is imputed to Oddity.

237.    During the Class Period, Oddity securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Oddity securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Oddity securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Oddity securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

238.    By reason of the conduct alleged herein, Oddity and Holtzman knowingly or

60

recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

239.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of Oddity's securities during the Class Period, upon the disclosure that Oddity had been disseminating misrepresented financial statements to the investing public.

240.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Oddity securities during the Class Period (the "Exchange Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of Oddity, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

241.    The members of the Exchange Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Oddity securities were actively traded on the NASDAQ. While the exact number of Exchange Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Exchanged Class. Record owners and other members of the Exchange Class may be identified from records maintained by Oddity or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

242.    Plaintiff's claims are typical of the claims of the members of the Exchange Class as all members of the Exchange Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

61

243.     As of December 21, 2023, there were 45,319,675 Class A Ordinary Shares of Oddity common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable. While the exact number of Exchange Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands if not millions of members in the proposed Exchange Class.

244.     Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Exchange Class.

245.     Common questions of law and fact exist as to all members of the Exchange Class and predominate over any questions solely affecting individual members of the Exchange Class. Among the questions of law and fact common to the Exchange Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Oddity;

c. whether the Individual Defendants caused Oddity to issue false and misleading financial statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of Oddity securities during the Class Period were artificially

inflated because of the Defendants' conduct complained of herein; and

f. whether the members of the Exchange Class have sustained damages and, if so, what is the proper measure of damages.

246. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Exchange Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Exchange Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

247. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

g. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

h. the omissions and misrepresentations were material;

i. Oddity securities are traded in an efficient market;

j. Oddity's shares were liquid and traded with moderate to heavy volume during the Class Period;

k. Oddity's stock traded on the NASDAQ and was covered by multiple analysts;

l. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Oddity's securities; and

m. Plaintiffs and members of the Class purchased, acquired and/or sold Oddity securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

63

Based upon the foregoing, Plaintiffs and the members of the Exchange Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT IV

**(Liability pursuant to Section 20(a) of the Exchange Act Against the Individual Defendants)**

248.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

249.    During the Class Period, the Individual Defendants participated in the operation and management of Oddity, and conducted and participated, directly and indirectly, in the conduct of Oddity's business affairs.  Because of their senior positions, they knew the adverse non-public information about Oddity's misstatement of income and expenses and false financial statements.

250.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Oddity's financial condition and results of operations, and to correct promptly any public statements issued by Oddity which had become materially false or misleading.

251.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Oddity disseminated in the marketplace during the Class Period concerning Oddity's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Oddity to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Oddity within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Oddity securities.

252.    Each of the Individual Defendants, therefore, acted as a controlling person of Oddity.  By reason of their senior management positions and/or being directors of Oddity, each of

64

them had the power to direct the actions of, and exercised the same to cause, Oddity to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Oddity and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

253.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations of Section 10(b) of the Exchange Act committed by Oddity.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the representatives of the Exchange Class and the Securities Act Classes;

B.    Requiring Defendants to pay damages sustained by Plaintiffs, the Exchange Class, and the Securities Act Classes by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Exchange Class and the Securities Act Classes prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: May 12, 2025                    Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Nicholas Porritt*
Nicholas I. Porritt
Adam M. Apton
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 202-3827
nporritt@zlk.com
aapton@zlk.com

Alexander A. Krot III
1101 Vermont Avenue, NW
Suite 800
Washington, DC 20005
Tel: (202) 524-4290
Fax: (212) 202-3827
akrot@zlk.com
(*pro hac vice to be submitted*)

*Attorneys for Lead Plaintiff Alex Gordon*

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
600 Third Avenue, 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Plaintiff Brian Hoare*