**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN HOARE Individually and on Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>    vs.<br><br>ODDITY TECH LTD., ORAN HOLTZMAN, LINDSAY DRUCKER MANN, SHIRAN HOLTZMAN-EREL, MICHAEL FARELLO, LILACH PAYORSKI, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, ALLEN & COMPANY, BOFA SECURITIES INC., BARCLAYS CAPITAL INC., TRUIST SECURITIES, INC., JMP SECURITIES LLC, KEYBANC CAPITAL MARKETS INC., EVERCORE GROUP, LLC, and J.P MORGAN SECURITIES LLC.,<br><br>                        Defendants. | Case No. 1:24-CV-06571-MMG<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' JOINT MOTION TO DISMISS**
**SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...................................................................................................... iii

PRELIMINARY STATEMENT..................................................................................................1

BACKGROUND .........................................................................................................................5

      A.     Oddity Acquired Il Makiage, a Legacy Retail Chain............................................5

      B.     Oddity's IPO. ........................................................................................................6

      C.     Oddity's SPO. .......................................................................................................8

      D.     NINGI Attacks Oddity. ........................................................................................8

LEGAL STANDARDS...............................................................................................................10

ARGUMENT ..............................................................................................................................11

I.     PLAINTIFFS FAIL TO PLEAD A SECTION 11 CLAIM.................................................11

      A.     Plaintiffs Fail To Allege a Material Misrepresentation in the Registration Statements. ..........................................................................................................11

           i.     No Misstatement About Oddity's Israeli Stores.......................................12

           ii.     No Misstatements About Technology or Marketing .................................14

                  (1)     Technology................................................................................14

                  (2)     Marketing and Advertising ........................................................16

           iii.     No Misstatement Regarding Lawsuits.......................................................17

      B.     Plaintiffs Fail To Plead Scienter...........................................................................18

      C.     Plaintiffs Lack Standing and Suffered No Cognizable Loss Resulting from the IPO. ......................................................................................................................18

      D.     Plaintiffs Cannot Trace Any Post-SPO Purchases to Either the IPO or SPO. .......20

      E.     Plaintiffs' Claims Are Time-Barred. ....................................................................23

           i.     Plaintiffs Were on Notice of Their Claims on the Dates of the Offerings. 24

           ii.     Plaintiffs' Claims Against the IPO Underwriters Are Time-Barred..........24

        iii.     Plaintiffs' Section 11 SPO Claims Are Time-Barred as To All Defendants. ....................................................................................................25

II.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 15 OF THE SECURITIES ACT. ..............................................................................................26

III.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5. .........................................................................26

      A.     Plaintiffs Fail To Allege Misleading Statements or Omissions. ...........................27

           i.     No Misstatements in Oddity's Registration Statement. ............................27

           ii.     No Misstatements in Oddity's Earnings Releases and Form 20-F.............27

                (1)     No Misstatements Regarding AI. ....................................................27

                (2)     No Misstatements About Oddity's Israeli Stores. ..........................28

                (3)     No Misstatements Regarding Oddity's Legal Proceedings. ..........29

      B.     Plaintiffs Fail to Allege a Strong Inference of Scienter. .......................................29

           i.     Plaintiffs Fail to Plead Motive and Opportunity. .....................................29

           ii.     Plaintiffs Fail to Plead Conscious Misbehavior or Recklessness. .............30

      C.     Plaintiffs Fail to Allege Loss Causation................................................................31

      D.     Plaintiffs Fail to Plausibly Allege Scheme Liability. ............................................33

IV.     PLAINTIFFS FAIL TO PLEAD A SECTION 20(a) CLAIM. ........................................33

CONCLUSION..............................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akerman v. Oryx Commc'ns., Inc.*,
810 F.2d 336 (2d Cir. 1987)..................................................................................................20

*Alta Partners v. Forge Global Holdings*,
2024 WL 1116682 (S.D.N.Y. 2024)......................................................................................23

*Amorosa v. Ernst & Young LLP*,
682 F. Supp. 2d 351 (S.D.N.Y. 2010)..............................................................................19, 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................................................10, 21

*ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).................................................................................10, 26, 29, 34

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..............................................................................................................13

*Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*,
2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .........................................................................19

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) ...........................................................................................11

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
543 F. App'x 72 (2d Cir. 2013) ...........................................................................................32

*Chan v. New Oriental Educ. & Tech. Grp. Inc.*,
2019 WL 2865452 (D.N.J. July 3, 2019)...............................................................................12

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020)...................................................................................30

*Colliton v. Cravath, Swaine & Moore LLP*,
2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008)..............................................................23

*Coronel v. Quanta Capital Holdings Ltd.*,
2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) .........................................................................18

*Cortina v. Anavex Life Scis. Corp.*,
2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) .......................................................................31

*Cupat v. Palantir Techs.*,
2025 WL 1141534 (D. Colo. 2025)................................................................................22

*Defeo v. IonQ, Inc.*,
2025 WL 1035292 (4th Cir. Apr. 8, 2025) ...................................................................32

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)........................................................................................30

*Enter. Mortg. Acceptance Co., LLC, Sec. Litig. v. Enter. Mortg. Acceptance Co.*,
391 F.3d 401 (2d Cir. 2004).........................................................................................25

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
95 F. Supp. 2d 169 (S.D.N.Y. 2000)............................................................................18

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019)..........................................................................17

*Helo v. Sema4 Holdings Corp.*,
2024 WL 3593677 (D. Conn. July 31, 2024) ..............................................................18

*Ho v. Duoyuan Global Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012)....................................................................20, 22

*IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of
Scotland Grp., PLC*,
783 F.3d 383 (2d Cir. 2015).........................................................................................13

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)..........................................................................34

*In re AOL Time Warner Sec. & ERISA Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004)....................................................................19, 20

*In re Ariad Pharms. Sec. Litig.*,
842 F.3d 744 (1st Cir. 2016).........................................................................................21

*In re Bristol–Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)..........................................................................30

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ...............................................................................22, 23

*In re Deutsche Telekom AG Sec. Litig.*,
2002 WL 244597 (S.D.N.Y. Feb. 20, 2002)................................................................34

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ....................................................................14, 33

*In re HEXO Corp. Sec. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021)......................................................................................10

*In re IPO Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)......................................................................................19

*In re IPO Sec. Litig.*,
   383 F. Supp. 2d 566 (S.D.N.Y. 2005)........................................................................................9

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ....................................................................................28

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
   650 F.3d 167 (2d Cir. 2011)...................................................................................................26

*In re Livent, Inc. Sec. Litig.*,
   78 F. Supp. 2d 194 (S.D.N.Y. 1999).......................................................................................34

*In re Marsh & McLennan Cos. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006).....................................................................................11

*In re Marsh & McLennan Cos. Sec. Litig.*,
   536 F. Supp. 2d 313 (S.D.N.Y. 2007).....................................................................................18

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003)................................................................................13, 20

*In re N. Telecom Ltd. Sec. Litig.*,
   116 F. Supp. 2d 446 (S.D.N.Y. 2000).....................................................................................15

*In re Omnicom Grp. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)...................................................................................................31

*In re Qudian Inc. Sec. Litig.*,
   2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019)........................................................................14

*In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*,
   774 F. Supp. 2d 584 (S.D.N.Y. 2011).....................................................................................19

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 431 (S.D.N.Y. 2003)................................................................................24, 25

*In re XP Inc. Sec. Litig.*,
   524 F. Supp. 3d 23 (E.D.N.Y. 2021) ......................................................................................18

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob.*, Ltd., 620 F.3d 137 (2d Cir. 2010) ...............................15

v

*Lau v. Opera Ltd.*,
    527 F. Supp. 3d 537 (S.D.N.Y. 2021)..................................................................................5,6

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)................................................................................................31

*Lipow v. Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015)..................................................................................31

*Liu v. Intercept Pharms., Inc.*,
    2020 U.S. Dist. LEXIS 53252 (S.D.N.Y. Mar. 26, 2020) .........................................................34

*Livingston v. Cablevision Sys. Corp.*,
    966 F. Supp. 2d 208 (E.D.N.Y. 2013) .................................................................................14

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)...................................................................12, 16, 32

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*,
    526 U.S. 344 (1999)...............................................................................................................1

*Park Yield LLC v. Brown*,
    2019 WL 6684127 (S.D.N.Y. Dec. 6, 2019) ...........................................................................12

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..................................................................................... passim

*SEC v. First Jersey Sec.*,
    101 F.3d 1450 (2d Cir. 1996)...............................................................................................34

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011)...................................................................................33

*SEC v. Rio Tinto*
    *plc*, 41 F.4th 47 (2d Cir. 2022)............................................................................................33

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)................................................................................................23

*Stoll v. Ardizzone*,
    2007 WL 2982250 (S.D.N.Y. Oct. 9, 2007) ..........................................................................25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)......................................................................................................5, 29

*Tyler v. Liz Claiborne, Inc.*,
    814 F. Supp. 2d 323 (S.D.N.Y. 2011)..................................................................................31

*Villare v. Abiomed, Inc.*,
  2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)..........................................................................30

*Winter v. Stronghold Digital Mining, Inc.*,
  686 F. Supp. 3d 295 (S.D.N.Y. 2023)....................................................................................15

*Youngers v. Virtus Inv. Partners Inc.*,
  195 F. Supp. 3d 499 (S.D.N.Y. 2016)....................................................................................26

*Zheng v. Pingtan Marine Enter.*,
  379 F. Supp. 3d 164 (E.D.N.Y. 2019) ...................................................................................35

**Statutes & Rules**

15 U.S.C. § 77m............................................................................................................23, 24, 25

15 U.S.C. § 77k(a) .................................................................................................................11, 14

15 U.S.C. § 77k(e) ........................................................................................................................19

15 U.S.C. § 78u-4(b)(1)(B)...........................................................................................................10

15 U.S.C. § 78u-4(b)(2)(A)...........................................................................................................29

PSLRA ...............................................................................................................................10, 29, 31

F.R.C.P. 15(c) ...............................................................................................................................24

F.R.C.P. 8(a) .................................................................................................................................11

F.R.C.P. 9(b) ...................................................................................................................10, 11, 18

F.R.C.P. 12(b)(6) ..........................................................................................................................10

Defendants ODDITY Tech Ltd. ("Oddity"); Lindsay Drucker Mann and Michael Farello ("Individual Defendants"); Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Allen & Company LLC, BofA Securities, Inc. ("BofA"), Barclays Capital Inc., Truist Securities, Inc., JMP Securities LLC, KeyBanc Capital Markets Inc. (the "IPO Underwriters"); and Evercore Group, L.L.C. and J.P. Morgan Securities LLC (together with the IPO Underwriters, but excluding BofA, the "SPO Underwriters")[1] submit this memorandum of law in support of their joint motion to dismiss the Second Amended Complaint ("Complaint" or "SAC").

## PRELIMINARY STATEMENT

Plaintiffs parrot a self-interested short-seller, NINGI, in an attempt to manufacture a claim under the securities laws.  Echoing baseless claims from a NINGI-issued report (the "Report"), Plaintiffs allege that Oddity concealed its long-standing operation of Israeli retail stores and misrepresented its use of technology.  But Oddity's retail stores were always in plain view, and the Complaint is devoid of facts showing that any of Oddity's statements touting its technology were false.  Moreover, the Complaint should also be dismissed because (i) Plaintiffs have not adequately pleaded scienter, (ii) Oddity stock traded above the initial public offering ("IPO") price at all times following the Report and, moreover, that Report—the sole alleged corrective disclosure—was admittedly based on public information, (iii) Plaintiffs do not plead that any purchases of Oddity stock following Oddity's secondary public offering ("SPO") can be traced to the SPO, as required by law, (iv) Plaintiffs' IPO claims are time-barred as to the IPO Underwriters and the SPO claims are time-barred as to all Defendants, and (v) Plaintiffs have not adequately alleged control person liability.

---

[1] Plaintiffs have not served Oran Holtzman, Shiran Holtzman-Erel, Lilach Payorski or Ohad Chereshniya, so they are not parties. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).

\*     \*     \*

***Plaintiffs Plead No Actionable Misstatement or Omission***

Plaintiffs fail to allege that Oddity's disclosures were false or misleading.  Plaintiffs implausibly claim that Oddity concealed, in public filings, its continued operation of Israeli retail stores.  But those stores were never a secret—they are the namesake of Oddity's flagship brand, Il Makiage, were open for all to see and were listed on Oddity's Israeli website in Hebrew. Oddity appropriately noted in its Registration Statements that its business was "almost entirely online"—reflecting the minor role of that legacy physical retail business in Oddity's operations and financials.

Plaintiffs contend that Oddity misstated other aspects of its operations, such as its use of AI and technology.  Oddity's statements about technology are inactionable puffery.  And the conclusory allegations from unidentified former employees are unavailing, because none was a member of Oddity's "tech team", and none has any basis to dispute Oddity's disclosures. Finally, Plaintiffs' allegations that Oddity's "Registration Statement also does not disclose that Oddity uses social media marketing" (SAC ¶ 135) and that it faces certain lawsuits  are belied by Oddity's explicit disclosures.  (Ex. 1 at 126, 132-33; *Infra* Parts I.A and III.A.)

***Plaintiffs Fail to Plead Scienter***

Plaintiffs do not allege the requisite strong inference of scienter—*i.e.*, an intent to defraud.  This requirement applies to each of Plaintiffs' claims—even the Securities Act claims— because they all sound in fraud.  Yet Plaintiffs do not attempt to allege scienter for their Securities Act claims.  (*Infra* Part I.B.)  And Plaintiffs' Exchange Act allegations rest on the unremarkable premise that Oddity and its CEO sold shares in the IPO.  That is insufficient to establish scienter.  (*Infra* Part III.B.)

***Plaintiffs' Claims Independently Fail For Lack of Standing and Loss Causation***

The Complaint fails because Plaintiffs suffered no losses from the IPO and cannot show they purchased shares that can be traced to the SPO.

Plaintiffs' Securities Act claims concerning the IPO fail because neither Plaintiff sold Oddity stock for less than the IPO price *after the NINGI Report*. Indeed, the Report allegedly caused the stock price to drop to $36—above the $35 IPO price—and the stock price remained above $35 through the end of the Section 11 class period (July 19, 2024). Plaintiffs thus lack standing to bring Section 11 claims based on the IPO. (*Infra* Part I.C.)

In the SAC Plaintiffs have added allegations related to Oddity's SPO—conducted on March 14, 2024, nine months after the IPO—predicated on alleged misstatements in an accompanying 2024 Registration Statement. Plaintiffs added these allegations in an attempt to establish standing because the SPO offered shares at $43.50—higher than Oddity's stock prices following the Report.

But Plaintiffs' SPO allegations also fail. Shares sold in the SPO traded alongside and indistinguishably from shares issued in the IPO. Plaintiffs therefore cannot and do not plead any facts that plausibly trace any stock Plaintiffs purchased to the SPO and the 2024 Registration Statement the SAC challenges. Nor do they plead any facts plausibly ruling out the possibility that such shares were registered and sold in the IPO—in which case Plaintiffs suffered no damages, for the reasons stated above. This traceability issue dooms Plaintiffs' claims rooted in the SPO. (*Infra* Part I.D.)

Further, to suffer *any* loss, Plaintiffs must identify the publication of some *new*, material information, which could plausibly have caused a stock decline. But the only "new" information Plaintiffs identify was the issuance of the Report, which by its own admission reveals no "new"

3

facts. Although NINGI made the sensational claim that it was revealing previously undisclosed information, its Report *concedes* that the statements in the Report were "obtained from public sources" and moreover were *not* "statement[s] of fact". (Ex. 3 at 1.) NINGI disclosed that it "will realize significant gains in the event that the prices of [Oddity's] securities decline"; that the Report reflects its own personal "opinions"; that its "opinions may prove to be substantially inaccurate"; and that it makes "no representation, express or implied, as to [their] accuracy". (*Id.* at 1, 3.) Courts repeatedly have instructed that allegations of short-sellers must be disregarded or severely discounted given the short-seller's interest in depressing the stock price. That is especially apt as Oddity promptly denied NINGI's allegations, neither NINGI nor Plaintiffs disputed Oddity's response to the Report and, within three weeks of publication, Oddity's stock price had more than fully rebounded. (*Infra* Part III.C.)

Moreover, Plaintiffs were on notice of their alleged claims against Defendants as of the dates of the Offerings (July 19, 2023 and March 12, 2024) because all the facts related to Plaintiffs' claims were publicly available. Consequently, Plaintiffs' claims against the IPO Underwriters are time-barred because they were brought over a year after the IPO. Plaintiffs' Section 11 claims regarding the SPO are time-barred as to all Defendants because Plaintiffs added SPO allegations over a year from the SPO date. (*Infra* Part I.E.)

***Plaintiffs' Control Person Claims Fail***

Finally, Plaintiffs' control person claims fail because Plaintiffs cannot plead an underlying violation and do not adequately plead that Individual Defendants engaged in the requisite control. (*Infra* Parts II and IV.)

4

<u>**BACKGROUND**</u>[2]

**A.      Oddity Acquired Il Makiage, a Legacy Retail Chain.**

The Il Makiage brand began in 1996 in Israel as a "cosmetics retail chain".  (SAC ¶ 43.)  "By 2013, Il Makiage's fortunes had faded", and it entered bankruptcy.  (SAC ¶ 44.)  Oran Holtzman purchased the business out of bankruptcy, believing it offered a "potential for growth".  (SAC ¶ 54.)  Mr. Holtzman rebuilt it, and "managed to make its Israel stores and beauty schools profitable".  (SAC ¶ 45.)

Oddity's operation of Il Makiage stores in Israel has never been secret.  The investment firm L Catterton publicly announced, in connection with its investment in Oddity in 2017, that "[i]n addition to its boutiques, the company [Il Makiage] operates a network of makeup artist academies".  (SAC ¶ 56.)  L Catterton's investments are mentioned throughout the 2023 Registration Statement.  (Ex. 1 at 164-65.)  Plaintiffs also reproduce a photograph of Mr. Holtzman in an Israeli store—taken from a 2018 Oddity profile—and photographs of branded brick-and-mortar stores in Israel taken this year.  (SAC ¶¶ 46-53; Ex. 7.)  Il Makiage's Israel website has a "stores" tab and even displays its stores on a map.  (Ex. 6.)[3]  Indeed, prior to the SPO, Oddity acknowledged its physical retail presence, acknowledging that some competitors "*have larger physical retail footprints*."  (Ex. 2 at 11; Ex. 8 at 25.)  It was public knowledge that Il Makiage's brick-and-mortar business in Israel remains active.

---

[2] For purposes of this Motion, Oddity accepts the pleaded facts, as it must at this stage. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  However, Oddity disputes many facts and will prove their falsity should the case proceed (which it ought not).

[3] The Complaint refers to the number of retail stores in Israel.  (SAC ¶ 47.)  Plaintiffs' Complaint refers to the NINGI Report and appears to rely on the NINGI Report for this information, which in turn sources it from the Il Makiage website, Google Maps and "news reports".  (Ex. 3 at 6.)  The Court may take judicial notice of such information.  *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 550 (S.D.N.Y. 2021).

As Oddity's online business expanded, the Israeli brick-and-mortar business became—and remains—an immaterial part of Oddity's business.  The lion's share of Oddity's revenue—approximately 75%—is generated through the U.S.  (Ex. 1 at 87.)[4]  Oddity's ex-U.S. operations (from Israel, Canada, the UK, Europe and Australia), *in aggregate*, account for the remainder.  (*Id*.)  Shortly after NINGI's Report, Oddity explained that the Israel stores accounted for less than 5% of its net revenue and EBITDA.[5]  (Ex. 4 at 1.)  Neither NINGI nor Plaintiffs dispute this.

## B.    Oddity's IPO.

On July 19, 2023—the start of the putative class period—Oddity conducted its IPO at a $35.00/share offering price.  (SAC ¶¶ 7, 103.)  In its 2023 Registration Statement issued in connection with the IPO, Oddity explained that it is a "consumer tech platform that is built to transform the global beauty and wellness market" and has been working to "transform[] the shopping experience" to "bring visitors to our website, turn them into users by asking questions and learning about them, and then leverage the data we have across the platform to convert them into paying customers".  (SAC ¶ 194.)  Oddity "invest[s] heavily in data science, machine learning, and computer vision".  (*Id.*)  While Oddity's "competitive strengths" are its data-centric online platform, Oddity also disclosed that it was not wholly digital, describing its operations as "almost entirely online".  (*Id.*)  Oddity likewise reported lease agreements, noting that some were for stores.  (Ex. 1 at F-21.)

---

[4] The Court may consider documents referenced in the Complaint, including the Form F-1 Registration Statement.  *Lau*, 527 F. Supp. 3d at 550.

[5] The Court may take judicial notice of information that was in Plaintiffs' possession when they filed the Complaint.  *Lau*, 527 F. Supp. 3d at 550.  Indeed, Plaintiffs' Original Complaint ("OC") referred to Oddity's response, and never asserted that this statement was false or misleading.  (OC ¶ 58.)

Oddity also detailed various aspects of its business:

**Technology.**  The Registration Statements disclosed that when a consumer visits an Oddity-brand website, it begins by "asking questions" about the consumer.  (*Id.* at 1.)  These answers, along with Oddity's "1 billion unique data points on [] users' beauty preferences", are "used across multiple vectors, including product recommendations, remarketing and retargeting, new product and brand development, and machine learning".  (*Id.* at 4, 110.)

In 2023, Oddity acquired Revela for its molecular discovery technology and established "ODDITY LABS", an R&D arm focused on using biotech along with a machine-learning tool developed by Revela in product development.  (*Id.* at 7.)

**Marketing and Sales Strategy.**  The Registration Statements disclosed that Oddity's "success is impacted not only by [its] ability to use data to convert users to customers, but also by [its] ability to retain [] customers and drive repeat purchases."  (*Id.* at 86.)  In addition to "driv[ing] high levels of [] engagement" with its consumer-facing online brands, Oddity "invest[s] strategically in performance marketing, such as paid search and product listing advertisements" and "paid social media advertisements".  (*Id.*)  Oddity warned that "if consumers perceive us as being irresponsible or untruthful in our marketing" or if there are "[n]egative posts or comments about us", that "could damage our brand and reputation".  (*Id.* at 45.)  Prior to the SPO, Oddity reiterated that its success depends in part on marketing and its financial condition may suffer if its "public image or reputation were to be tarnished by negative publicity", or if it is "unable to cost-effectively use social media platforms as marketing tools". (Ex.2 at 6, 7; Ex. 8 at 20, 21.)

**Legal Proceedings.**  The Registration Statements disclosed that Oddity is susceptible to litigation and is "*currently involved in*, and may in the future be involved in, legal proceedings,

claims, and government investigations". (SAC ¶ 142 (emphasis added).) Oddity further explained its belief "that the final outcomes of any pending matters will not, either individually or in the aggregate, have a material adverse effect on [its] business, financial condition and results of operations." (*Id.*) The proceedings referred to were—with some exceptions—small claims related to "spam texts or spam mail". (SAC ¶ 71; Ex. 4 at 1.) Oddity disclosed that it is subject to laws for "automatically renewing subscription services", which could result in "substantial legal fees and costs and reputational harm". (Ex. 1 at 45.)

### C. Oddity's SPO.

On March 12, 2024, Oddity filed an additional Registration Statement (the 2024 Registration Statement) to register 4,000,000 shares held indirectly by a private investor, L Catterton. (SAC ¶ 105.) The 2024 Registration Statement enabled L Catterton to market those shares and became effective after the market closed on March 14, 2024. (SAC ¶¶ 106, 107.) The underwriters of the SPO began selling the newly registered shares to the public on March 15, 2024, at an offering price of $43.50. (SAC ¶¶ 105,112.) While Plaintiffs allege that the 2024 Registration Statement contained misstatements that are "substantially identical" to those in the 2023 Registration Statement, they acknowledge that the signatories to the 2024 Registration Statement were different, the underwriters of the SPO were different, and the offering prices were different. (Dkt. 64 at 1; SAC ¶¶ 101-03, 105-08.) Yet Oddity shares issued pursuant to the 2024 Registration Statement always traded alongside shares issued pursuant to the 2023 Registration Statement.

### D. NINGI Attacks Oddity.

On May 21, 2024, NINGI Research—a short-seller seeking to profit on the *decline* of Oddity's stock—published a report claiming that Oddity "misled investors about every critical

8

aspect of its business". (Ex. 3 at 3.) The Report reveals that NINGI is "short [on] ODDITY" and "will realize significant gains in the event that the prices of [Oddity's] securities decline". (*Id*. at 1, 3.) NINGI disclaimed any "representation, express or implied, as to the accuracy" "of "any . . . information" in the Report and emphasized that the "report is . . . an opinion, not a statement of fact". (*Id.*) NINGI disclosed that its information was "obtained from public sources" and interviews conducted with unnamed former employees. (*Id.* at 1, 3.)

The gravamen is that it is NINGI's *opinion* that Oddity "conceal[ed] a large brick-and-mortar business and sales generated by dishonest tactics." (*Id.* at 3.) The Report also claims that "ODDITY's product-matching technology is akin to 'a normal questionnaire'"; "ODDITY's digital growth is its non-cancelable subscriptions"; the "Better Business Bureau (BBB) and social media are flooded with complaints"; and Oddity failed to disclose lawsuits "alleging unpaid bills and violations of consumer protection laws". (*Id.* at 4-5.) The Report qualifies these allegations, conceding that they are based on NINGI's "*opinion* [that] the claim that ODDITY is using AI is just a lie", and that it is just its "*opinion* [that] ODDITY is not a cutting-edge tech company". (*Id*. at 9, 26 (emphases added).)

After publication of the Report, Oddity's share price fell (to $36.67 on May 23), but remained over the $35 offering price. (SAC ¶ 124.) That drop was short-lived—within three weeks of the Report and Oddity's response (Ex. 4), the price rebounded to higher than pre-Report levels, trading at $44.31 by June 7. (Ex. 5.)[6]

---

[6] The Court "may take judicial notice of well-publicized stock prices". *In re IPO Sec. Litig.*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005).

9

## LEGAL STANDARDS

To withstand a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court accepts well-pleaded facts, mere "labels and conclusions" or "[t]hreadbare recitals of the elements of a cause of action" are disregarded. *Id*.

Plaintiffs' Exchange Act claims are governed by the heightened pleading standards of the PSLRA. Plaintiffs must specify "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading". 15 U.S.C. § 78u-4(b)(1)(B). Plaintiffs also must satisfy the "exacting pleading requirements" of Rule 9(b), requiring that "the circumstances constituting fraud . . . shall be stated with particularity". *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

Because Plaintiffs' Securities Act claims are based on the same allegations as their Exchange Act claims, they "sound in fraud" and are also subject to Rule 9(b). *Rombach v. Chang*, 355 F.3d 164, 171-72 (2d Cir. 2004); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 299 n.17 (S.D.N.Y. 2021). Indeed, the allegations supporting Plaintiffs' Securities Act claims are deployed verbatim to support their Exchange Act securities fraud claims.[7] (SAC ¶ 185.) "Allowing plaintiffs to allege fraud [for the majority of the Complaint] and then withdraw those claims for [a subset of their claims] in order to state a Section 11 claim eviscerates Rule 9(b)'s mandate to 'safeguard a defendant's reputation from improvident charges of wrongdoing.'" *In re*

---

[7] Plaintiffs' Section 11 claim "incorporate[s] by reference and reallege[s] each and every allegation contained above". (SAC ¶ 160.) That includes further insinuations of fraud, *e.g.* comments from a Facebook group called "Il Makiage is a Fraud", a Reddit comment that they were "called by their bank's fraud department", and a complaint alleging "unauthorized fraudulent charges". (SAC ¶ 92.)

10

*Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 492 (S.D.N.Y. 2006).  Regardless of the pleading standard, however, dismissal is appropriate.

**ARGUMENT**

**I.      PLAINTIFFS FAIL TO PLEAD A SECTION 11 CLAIM.**

**A.      Plaintiffs Fail To Allege a Material Misrepresentation in the Registration Statements.**

Under Section 11 of the Securities Act, a plaintiff must allege that a registration statement either (1) contained an untrue statement of material fact, (2) omitted to state a material fact required to be stated therein, or (3) omitted to state a material fact necessary to make the statements therein not misleading.  15 U.S.C. § 77k(a).  Plaintiffs fail to do so.  This Motion focuses on the alleged misstatements in the 2023 Registration Statement, but because Plaintiffs allege that the 2023 and 2024 Registration Statements contain "substantially identical" misstatements (Dkt. 64 at 1), all arguments apply equally to the 2024 Registration Statement.

*First*, Plaintiffs fail to identify the specific alleged misstatements, and instead quote paragraphs (or pages) from the 2023 Registration Statement.  "[L]eaving the District Court to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false" falls "far short" of Rule 9(b)'s requirements.  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012); *Rombach*, 355 F.3d at 171.[8]

*Second*, Plaintiffs' allegations are parroted from the Report issued by NINGI, a short-seller with "an obvious motive to exaggerate the infirmities of the securities in which they

---

[8] Plaintiffs' failure to identify specific alleged misstatements also violates Rule 8(a)'s mandate that they plead "a short and plain statement showing that the pleader is entitled to relief".  Defendants are entitled to know which statements Plaintiffs contend are false or misleading.

speculate". *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020). NINGI's allegations must be approached with "caution and care". *Id*. Moreover, "the *complaint* must rise or fall on allegations about defendant['s] conduct and not on wide-eyed citation to the gratuitous commentary of outsiders." *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, 2019 WL 2865452, at *7 (D.N.J. July 3, 2019).

The bulk of Plaintiffs' allegations are based on blind reliance on the Report, in which NINGI disclaims that it "makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information" contained therein. (Ex. 3 at 1.) Plaintiffs' reliance on NINGI's biased "*opinion*" synthesized from information "obtained from public sources" and unnamed "former employees" of unspecified position (Ex. 3 at 1, 3) is insufficient. *Long Miao*, 442 F. Supp. 3d at 804.

*Third*, Plaintiffs fail to plead facts to show the 2023 or 2024 Registration Statements contained a material misrepresentation or omission.

### i.    No Misstatement About Oddity's Israeli Stores

Plaintiffs allege that the Registration Statements misled investors into believing that Oddity does not operate *any* retail stores. (SAC ¶¶ 50, 95, 99-100, 139-40.) Yet as Plaintiffs acknowledge, Oddity's purchase of the Israel Il Makiage stores out of bankruptcy was publicly known. (SAC ¶¶ 43-47, 56.) In fact, the Registration Statements disclosed its lease agreements for stores (*see* Ex. 1 at F-21) and that its operations were "*almost* entirely online". (Ex. 1 at 114 (emphasis added).) All of that was true. Investors were informed that Oddity was largely—but not entirely—digital, and that a small portion was retail stores.

Moreover, these stores were never concealed—they were available for all to see. *Park Yield LLC v. Brown*, 2019 WL 6684127 at *8 (S.D.N.Y. Dec. 6, 2019) (defendants had no duty

12

to disclose information that plaintiff "could have easily learned about . . . through, for example, a quick internet search"). The Report even explains that "a quick search on Google Maps brings up dozens of retail stores". (Ex. 3 at 6.) Each location is listed on Il Makiage Israel's website itself. (Ex. 6.) The Complaint further reproduces an image of Mr. Holtzman in front of a store, published in a 2018 Company profile on Ynet. (SAC ¶ 46; Ex. 7.) All of these sources were available at the time of Oddity's IPO, and "Section 11 . . . do[es] not require the disclosure of publicly available information." *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003).

Further, Plaintiffs do not (and cannot) identify any duty to disclose the number of Israeli stores or employees. Nor do Plaintiffs allege how such information would be material to investors, as it must be to render an omission actionable. *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988). To the contrary, "a misstatement related to less than 5% of a financial statement carries the preliminary assumption of immateriality". *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015). Plaintiffs do not allege that any omission relating to the Israeli stores affects more than 5% of its financials. Indeed, Plaintiffs never challenged as false or misleading Oddity's disclosure (in response to NINGI) that Israeli stores accounted for *less than 5%* of its net revenue and EBITDA, despite referencing Oddity's response in their OC. (Ex. 4 at 1; OC ¶ 58.)

Finally, while Plaintiffs allege that the (unquantified) "costs" of maintaining retail locations would be relevant to investors (SAC ¶ 50), they do not allege that those costs were omitted from Oddity's financials. Plaintiffs concede that these stores are "profitable"— generating revenues *exceeding* their costs. (SAC ¶ 45.) And Plaintiffs ignore that the cost of leases (including store leases) were disclosed. (Ex. 1 at F-21.) Plaintiffs do not (and cannot)

13

advance any cogent theory that any alleged omission of a small, publicly known and profitable part of Oddity's business would have been material. *In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *6 (S.D.N.Y. Sept. 27, 2019).

### ii.     No Misstatements About Technology or Marketing

#### (1)     Technology

Plaintiffs broadly contend that Oddity "overstate[s] its AI technology".  (SAC ¶ 128.) Yet Plaintiffs do not—and have no basis to—challenge Oddity's detailed explanations of its technology, including its "tech team" comprising "40% of [its] headcount" or the "1 billion unique data points" that it uses for real-time product recommendations.  (Ex. 1 at 85, 115.)

*First*, many of the challenged statements are inactionable puffery, which "do[es] not give rise to securities violations." *Rombach*, 355 F.3d at 174.  For example, Oddity's statement that it is "seeking to reinvent every aspect of a massive industry," and statements about its "significant potential to grow [its] existing brands and to disrupt additional product categories" (SAC ¶ 132), are the types of expressions that courts repeatedly have held are "too general to cause reliance by a reasonable investor".  *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013); *Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 220 (E.D.N.Y. 2013) ("[Defendant's] statement that [company] 'can continue to provide superior products, superior customer service, and compete aggressively, and continue to grow' is quintessential inactionable puffery.")

*Second,* Plaintiffs complain that they "have still not seen release" of Oddity's applications of its "hyperspectral imaging systems".  (SAC ¶¶ 64-66.)  Plaintiffs quote a purported statement not contained in the Registration Statements, which discusses how Oddity "will leverage" the technology.  (SAC ¶ 65.)  Plaintiffs provide no source, and Section 11 claims are limited to misstatements in a registration statement.  15 U.S.C. § 77k(a).  More importantly,

14

the fact that Plaintiffs have *yet* to see release of certain technology in a consumer-facing application does not mean a prior forward-looking statement was false.  In the 2023 Registration Statement, Oddity disclosed that it acquired Voyage81, which developed hyperspectral imaging technology; and that Oddity "believe[s] this imaging technology" will allow it to expand its "product capabilities".  (Ex. 1 at 118.)  Oddity did not make any representation as to *when* such technology would be released, or the manner in which it would be used, and thus Plaintiffs cannot demonstrate that the statement was false or misleading merely by alleging that consumers have not yet seen release.  *See Winter v. Stronghold Digital Mining, Inc.*, 686 F. Supp. 3d 295, 307 (S.D.N.Y. 2023) (considering the "'truth of a statement made in the registration statement' as 'judged by the facts as they existed when the registration statement became effective'").

Moreover, these statements are classic "forward-looking statement[s] accompanied by sufficient cautionary language", which are "not actionable".  *Iowa Pub. Emps.' Ret. Sys. v. MF Glob.*, Ltd., 620 F.3d 137, 141 (2d Cir. 2010).  The 2023 Registration Statement disclosed that Oddity may "fail[] to successfully complete the integration of any acquired business or to achieve the long-term plan for such business".  (Ex. 1 at 71.)  Plaintiffs allege no facts suggesting Oddity's statement about the future promise of this technology was not a genuinely-held belief of its future applications.  *See In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 467 (S.D.N.Y. 2000).

*Third,* Plaintiffs repeat allegations from the Report that the "PowerMatch/SpoiledBrain technology was not, as advertised, based on a proprietary algorithm".  (SAC ¶ 67.)  Plaintiffs' only support for this allegation is a 2020 interview—three years *prior* to the 2023 Registration Statement—in which Oddity's Chief Product Officer described SpoiledBrain's product-matching algorithm as "simple questions with four possible answers" and supposedly "did not mention

15

AI". (SAC ¶ 68.)  The fact that Ms. Holtzman did not mention AI *in a 2020* interview says nothing about the PowerMatch/Spoiled Brain technology *in 2023*.  Moreover, there was nothing concealed about SpoiledBrain's user questions, which were disclosed.  (Ex. 1 at 110.)  Indeed, in its 2023 Registration Statement, Oddity disclosed that it asks questions of its online visitors, and uses the answers to "buil[d] a platform of over 40 million users" with "over 1 billion unique data points".  (*Id.*.)  Furthermore, the allegations centering on the user interface (the "simple questions") have no bearing on Oddity's statements about AI-use, which refer to back-end systems used to process the data.

*Fourth*, Plaintiffs attempt to utilize confidential witnesses ("CWs") to bolster their claims that Oddity "is not a technology company".  (*See* SAC ¶¶ 57-63.)  None is alleged to have been on Oddity's technology team— its "largest" team "compris[ing] over 40% of [its] headcount".  (Ex. 1 at 2.)  The generalized statements attributed to the CWs should be discredited as "descriptions [that] do not suggest that they had been in position[s] to know the facts attributed to them."  *Long Miao*, 442 F. Supp. 3d at 799.

### (2)    Marketing and Advertising

Plaintiffs allege that Oddity understated the extent it relies on conventional marketing and advertising and failed to "disclose that Oddity uses social media marketing and promotion practices to generate sales". (SAC ¶¶ 135, 196.)

Plaintiffs ignore the explicit disclosures of Oddity's marketing strategies.  Oddity disclosed that it "invest[s] strategically in performance marketing, such as paid search and product listing advertisements" and "paid social media advertisements".  (Ex. 1 at 86.)  Oddity acknowledged that its "business depends on [its] ability to maintain a strong base of engaged customers and content creators, including through the use of social media" and "a variety of

marketing channels". (*Id.* at 10, 126.) Oddity's use of social media is mentioned *25 times* and marketing is mentioned *98 times* in the 2023 Registration Statement.

Plaintiffs also wrongly assert that "Oddity did not disclose the risks of the try-before-you-buy program's design". (SAC ¶ 138.) The 2023 Registration Statement disclosed that through the "'Try Before You Buy' program", customers "pay[] only for the products they keep after the trial period", and Oddity does "not resell returned goods". (Ex. 1 at 32.) Oddity warned investors: "Product returns could harm our business." (*Id.*) Having disclosed precisely the risks Plaintiffs complain of, there is no actionable statement regarding Oddity's sales and marketing practices. *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 838 (S.D.N.Y. 2019).

### iii. No Misstatement Regarding Lawsuits

Plaintiffs claim that Oddity "failed to include material facts revealing the true scope and severity of Oddity's and/or subsidiaries' legal issues and related lawsuits". (SAC ¶ 142.) Plaintiffs restate—almost verbatim—the Report's references to small claims lawsuits in Israel and vaguely referenced class action suits. (*Compare* SAC ¶¶ 69-84 *with* Ex. 3 at 35-39.)

But Oddity's 2023 Registration Statement *did* disclose that Oddity is "currently involved in, and may in the future be involved in, legal proceedings" and that it "believe[s] that the final outcomes of any pending matters will not, either individually or in the aggregate, have a material adverse effect on our business". (Ex. 1 at 132-33.) It also disclosed that it accrues loss contingencies on its balance sheet for litigation "when a loss is probable". (*Id.* at F-20.) Plaintiffs do not plausibly allege that any of the legal proceedings had a material effect on Oddity's business—and Oddity is not required to disclose immaterial legal proceedings. *In re*

17

*Marsh & McLennan Cos. Sec. Litig.*, 536 F. Supp. 2d 313, 322 (S.D.N.Y. 2007); *In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 36 (E.D.N.Y. 2021).

### B.    Plaintiffs Fail To Plead Scienter.

Because "Rule 9(b) requires that all averments of fraud be stated with particularity . . . that long has meant the plaintiff must allege with particularity the circumstances constituting the fraud and *scienter*." *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 174 (S.D.N.Y. 2000). Accordingly, where a Section 11 claim sounds in fraud, a plaintiff must "convey through factual allegations that the defendants made materially false statements, and that they did so with *scienter*". *Coronel v. Quanta Capital Holdings Ltd.*, 2009 WL 174656, at *15–16 (S.D.N.Y. Jan. 26, 2009).

Plaintiffs make no scienter allegations for their Section 11 claims. Even assuming Plaintiffs' scienter allegations in support of their Section 10(b) claim applied to their Section 11 claim, those would fail for the reasons discussed *infra* Section III.B. And the Complaint contains no scienter allegations whatsoever against the Individual Defendants or Underwriter Defendants. "In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *Helo v. Sema4 Holdings Corp.*, 2024 WL 3593677, at *10 (D. Conn. July 31, 2024).

### C.    Plaintiffs Lack Standing and Suffered No Cognizable Loss Resulting from the IPO.

Plaintiffs' purchases of shares registered under the 2023 Registration Statement could not have caused them any cognizable losses because no Plaintiffs sold shares below the price publicly offered in the IPO ($35.00). They thus have no cognizable losses resulting from the IPO, and their claims concerning the purchase of any shares registered under the 2023 Registration Statement should be dismissed for lack of standing.

18

Section 11 claims should be dismissed where "the absence of loss causation is apparent on the face of the complaint". *Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010); *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011). Moreover, when Plaintiffs fail to allege cognizable losses, their claims must be dismissed for lack of jurisdiction. *In re AOL Time Warner Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 245-46 (S.D.N.Y. 2004).

"[B]ased on the plain language of Section 11 and its legislative history, a plaintiff who sells a security above its offering price has no cognizable damages under Section 11". *In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 351 (S.D.N.Y. 2003); 15 U.S.C. § 77k(e). Plaintiffs concede this principle. (SAC ¶ 170.) But Plaintiffs allege that the Report revealed the truth about Oddity, causing the stock price to close after its publication at $37.97 on May 21 (and $36.67 on May 23)—*above the IPO Price.* (SAC ¶ 124.) Indeed, following the Report, Oddity's stock price remained above $35.00 through July 19. (Ex. 5.)

It is thus unsurprising that neither Plaintiff sold Oddity stock below $35.00 following the Report; consequently, neither suffered cognizable injury from the IPO. (Dkt. 15-2, 17-1.) Lead Plaintiff Gordon did not sell Oddity stock at any time, and suffered no loss. 15 U.S.C. § 77k(e).[9] Plaintiff Hoare alleges sales of Oddity stock at $34.53 and $34.52, but those were completed on May 3, 2024—*before* the Report (Dkt. 15-2). Losses resulting from sales made before the alleged truth was "revealed" could not have been caused by a Section 11 violation as a matter of law. *Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 371-72 (S.D.N.Y. 2010); *In*

---

[9] The IPO price was not greater than the value of any Oddity stock held as of the date of the Complaint, an alternative measure of damages. 15 U.S.C. § 77k(e). Oddity traded above $40.00 on July 19, 2024. (Ex. 5.)

*re Merrill Lynch & Co.*, 272 F. Supp. 2d at 253–55; *Akerman v. Oryx Commc'ns., Inc.*, 810 F.2d 336, 342 (2d Cir. 1987).  Because neither Plaintiff suffered any cognizable injury, they lack standing to bring a Section 11 claim and their claims should be dismissed for lack of jurisdiction. *See In re AOL*, 381 F. Supp. 2d at 245-46.

Moreover, as an independent basis for dismissal, the face of the Complaint shows that the Report did not cause Plaintiffs' alleged losses, for the reasons discussed *infra* Part I.C.

### D.      Plaintiffs Cannot Trace Any Post-SPO Purchases to Either the IPO or SPO.

Plaintiffs' claims relating to the SPO should also be dismissed for a different, but equally straightforward deficiency: Plaintiffs' failure to plead a trace between any post-SPO share purchases to the SPO.

A Securities Act plaintiff must "plead and prove that he purchased shares traceable to the allegedly defective registration statement".  *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023).  That is because, in Section 11, Congress only authorized lawsuits by plaintiffs who have purchased a "security registered under the particular registration statement alleged to contain a falsehood or misleading omission".  *Id*. at 767-68.  Plaintiffs are required to trace their purchases to the allegedly defective registration statement through a "direct chain of title from the original offering to the ultimate owner".  *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 561 (S.D.N.Y. 2012).  When a company has conducted an IPO and has issued only one registration statement, traceability may be a non-issue, as all of the publicly available shares were necessarily issued pursuant to that single registration statement.  *Slack*, 598 U.S. at 763.  However, when shares are issued in multiple offerings and traded alongside and indistinguishable from one another—as is the case here following the SPO—traceability can present a fatal issue.

20

Important consequences flow from the tracing requirement, and courts cannot properly resolve Securities Act claims in the absence of such tracing. *Id.* at 768. For example, Section 11 imposes liability only on the individuals involved in preparing a particular registration statement and caps underwriters' liability at the "total price" of the shares actually underwritten by them. *Id.* If a plaintiff cannot identify the particular registration statement that resulted in the issuance of the shares she purchased, then courts would be unable to apply these statutory limitations. Indeed, Plaintiffs here allege that different sets of defendants were responsible for the 2023 and 2024 Registration Statements, and allege that IPO and SPO purchasers are entitled to different amounts of damages, resulting from the different prices offered in the IPO and SPO. (SAC ¶¶ 170, 172.) As shown above in Part I.C, investors who purchased shares issued in the IPO have no cognizable losses at all because Oddity's stock price remained above the IPO price following the alleged corrective disclosure.

Plaintiffs utterly fail to plead facts tracing (or showing any ability to trace) any of their shares purchased after the SPO to the 2024 Registration Statement, requiring dismissal of their claims concerning their post-SPO purchases. Plaintiffs merely offer the legal conclusions that "Plaintiff Hoare acquired Oddity ordinary shares issued pursuant to, or traceable to the 2024 Registration Statement" (SAC ¶ 171), and "Plaintiffs acquired Oddity ordinary shares issued pursuant to, or traceable to the Registration Statements" (SAC ¶ 169). This Court should disregard such "threadbare recitals of the elements of a cause of action" and "mere conclusory statements". *Iqbal*, 556 U.S. at 678. Such conclusions are "not entitled to the assumption of truth" and should be rejected as they are not "supported by factual allegations". *Id.* at 679. This applies fully to Plaintiffs' general allegations. *In re Ariad Pharms. Sec. Litig.*, 842 F.3d 744, 755-56 (1st Cir. 2016) ("almost by definition, a general allegation that a plaintiff's shares are

21

traceable to the offering in question is nothing more than a 'formulaic recitation' of that element"); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) ("When a company has issued shares in multiple offerings under more than one registration statement, however, a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering."); *Cupat v. Palantir Techs.*, 2025 WL 1141534, at *15 (D. Colo. 2025) ("bare allegations to the effect that Plaintiffs purchased securities traceable to or pursuant to the allegedly defective registration statement are insufficient . . . they are the exact sort that binding Supreme Court precedent directs courts not to consider"); *Duoyuan*, 887 F. Supp. 2d at 561.

Application of that rule is particularly important here because Plaintiffs have made inconsistent allegations about the traceability of their securities. In connection with his application for Lead Plaintiff status, Plaintiff Gordon certified that his sole purchase of Oddity securities occurred on July 26, 2023—*before* the SPO; his shares could not possibly be traced to the SPO. (Dkt. 17-1.) That fact, which is incorporated into the SAC (¶ 17), is inconsistent with his conclusory statement that "Plaintiffs" can trace their shares to both "Registration Statements" (SAC ¶ 169). Plaintiff Hoare has also waffled on this issue. In the First Amended Complaint, he alleged that his shares were "traceable to the Registration Statement", referring to the 2023 Registration Statement, and omitted any reference to the 2024 Registration Statement. (Dkt. 36 ¶ 138.) After Defendants showed that the IPO could not have caused any cognizable losses, Plaintiff attempted to reverse course and allege that he purchased shares that are "traceable to the 2024 Registration Statement". (SAC ¶ 171.) The Court should reject such gamesmanship. Plaintiffs are allowed to plead new facts in an amended complaint; they should not be allowed to

22

rely on new conclusory statements that are contradicted by facts they alleged before. *Colliton v. Cravath*, 2008 WL 4386764, at \*6 (S.D.N.Y. 2008).

While "[s]ome district courts have held that this [general] allegation" of traceability suffices, *In re Century*, 729 F.3d at 1107, those decisions often involve the simple scenario of a single IPO and are plainly distinguishable. Under such circumstances "[n]o further factual enhancement is needed because by definition *all* of the company's shares will be directly traceable to the offering in question". *Id.*

In any event, cases permitting "general allegations" cannot be reconciled with *Iqbal* and *Twombly* and the requirement that Plaintiffs allege "factual content" showing traceability. *In re Century*, 729 F.3d at 1107 (rejecting district court precedent because "*Iqbal* and *Twombly* moved us away from a system of pure notice pleading" and require "factual content").[10]

Because Plaintiffs cannot trace their post-SPO purchases to either Registration Statement they challenge, their claims regarding post-SPO purchases should be dismissed.

### E.    Plaintiffs' Claims Are Time-Barred.

Plaintiffs' claims against the IPO Underwriters, and the added SPO claims against all Defendants, are time barred. The statute of limitations for Section 11 claims is one year "after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. "Discovery" amounts to actual or constructive notice of the claim. *Amorosa*, 409 Fed. Appx. at 416.

---

[10] In holding that "general allegations" of traceability suffice, *Alta Partners v. Forge Glob. Holdings*, 2024 WL 1116682 (S.D.N.Y. 2024), cites a 2011 case that in turn cites back to a pronouncement originating in an out-of-circuit case that predates *Iqbal* by 17 years. *Shapiro v. UJB Fin.*, 964 F.2d 272 (3d Cir. 1992). None of the cases along the chain of cites reckons with *Iqbal*, and the principle stated in these cases has not been good law for years.

####        i.        Plaintiffs Were on Notice of Their Claims on the Dates of the Offerings.

Plaintiffs were on notice of their alleged claims against Defendants on the dates of the Offerings (July 19, 2023 and March 12, 2024) because all the underlying facts were publicly available.  Plaintiffs nevertheless allege that they were not on notice until publication of the NINGI Report.  (SAC ¶ 99.)  However, the NINGI Report did not provide any *new* information to investors: Oddity's store leases were already disclosed, as was the fact that its business is not entirely online—the retail business in Israel was publicly available to anyone examining Oddity's business (for example, through the Israel website).  Oddity's legal proceedings were also disclosed.  Because these underlying facts were available at the time of the Offerings, Plaintiffs were on constructive notice of their claims prior to the Report.

####        ii.        Plaintiffs' Claims Against the IPO Underwriters Are Time-Barred.

Plaintiffs' claims against the IPO Underwriters are time-barred because they were brought over a year after the IPO, the date Plaintiffs were put on notice.  15 U.S.C. § 77m. Plaintiffs added the IPO Underwriters to their Amended Complaint on February 18, 2025—over a year from the IPO date (July 19, 2023).  Accordingly, Plaintiffs can save their claims as timely *only* if they relate back to the date of the OC (July 19, 2024); the claims against the IPO Underwriters do not.

An amended pleading naming a new defendant *only* relates back to the date of a prior pleading when (1) both complaints arise out of the same transaction (2) the additional defendant was omitted from the original pleading by mistake, and (3) the additional defendant is not prejudiced.  (Fed. R. Civ. P. 15(c); *In re WorldCom Sec. Litig.*, 294 F. Supp. 2d 431, 448 (S.D.N.Y. 2003).)  Where a plaintiff knows the identities of additional defendants and does not name them, this is a choice—not a mistake.  *WorldCom*, 294 F. Supp. 2d at 449.  The Court

24

"assumes" that a plaintiff knows the identities of underwriters when they are named in offering documents addressed in the initial complaint. *Id.*; *Enter. Mortg. Acceptance Sec. Litig. v. Enter. Mortg. Acceptance*, 391 F.3d 401, 405 n.2 (2d Cir. 2004).

Here, Plaintiffs excluded the IPO Underwriters from the OC despite knowing their identities, which were on the front page of the IPO Prospectus. (Ex. 9.) Plaintiffs have not demonstrated that the omission was a mistake. The claims against the IPO Underwriters should not relate back to the OC.

### iii.    Plaintiffs' Section 11 SPO Claims Are Time-Barred as To All Defendants.

Plaintiffs' Section 11 SPO claims as to all defendants are time-barred. Plaintiffs added the SPO allegations and the new SPO Underwriters in their SAC on May 20, 2025, over a year from the SPO date (March 12, 2024) and outside the one-year statute of limitations for Section 11 claims. 15 U.S.C. § 77m.

These claims do not relate back to the dates of the Original or Amended Complaints because the SPO claims do not arise out of the same transaction as the IPO claims. "The preparation and filing of a new document with the SEC"—including a registration statement— "is a new and separate transaction" for purposes of relation back. *Stoll v. Ardizzone*, 2007 WL 2982250, at *3 (S.D.N.Y. 2007). This is true even when the alleged misstatements are the same in both registration statements. *Id.*

The SAC adds an entirely new transaction—the 2024 Registration Statement and SPO. Plaintiffs' Section 11 SPO claims cannot relate back and are time barred.

25

## II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 15 OF THE SECURITIES ACT.[11]

To state a claim under Section 15 of the Securities Act, a plaintiff must allege (i) a "primary violation" of Section 11 and (ii) control by the defendant over the primary violator. *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011).

*First*, because Plaintiffs have failed adequately to allege a primary violation of Section 11 of the Securities Act, for the reasons described above (Part I, *supra*), Plaintiffs' Section 15 claims also fail. *Rombach*, 355 F.3d at 177-78.

*Second*, Plaintiffs also have not alleged the requisite control. Plaintiffs baldly allege that "[t]he Individual Defendants were controlling persons of Oddity by virtue of their positions as directors or senior officers". (SAC ¶ 180.) That conclusory allegation is insufficient. *Youngers v. Virtus Inv. Partners*, 195 F. Supp. 3d 499, 524-25 (S.D.N.Y. 2016). There are no allegations showing that either Ms. Drucker Mann or Mr. Farello exercised managerial control.

## III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5.[12]

To state a Section 10(b) Exchange Act claim, a plaintiff must allege that each defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury [called 'loss causation']". *ATSI*, 493 F.3d at 105. Plaintiffs' Section 10(b) claim should be dismissed because Plaintiffs have not adequately

---

[11] The Section 15 claims are brought against all "Individual Defendants"—for purposes of this motion, Ms. Drucker Mann and Mr. Farello. (SAC ¶ 179.)

[12] The Section 10(b) claim is brought against Oddity and Mr. Holtzman. (SAC ¶ 232.) As Mr. Holtzman has not been served, the motion to dismiss the Section 10(b) claim is brought by Oddity.

alleged any misstatements, pled with particularity facts giving rise to scienter, or adequately alleged that their losses were caused by any actionable misstatement or omission.

### A. Plaintiffs Fail To Allege Misleading Statements or Omissions.

### i. No Misstatements in Oddity's Registration Statement.

In asserting their Exchange Act claims, "Plaintiffs incorporate by reference and reallege each and every allegation contained above", *i.e.*, their claims as to the 2023 and 2024 Registration Statements.  (*see* SAC ¶ 185.)  Because the Registration Statements do not contain any false or misleading statements for the reasons described above, Plaintiffs' 10(b) claims similarly fail as to those statements.  (*See* Part I.A, *supra.*)

### ii. No Misstatements in Oddity's Earnings Releases and Form 20-F.

The alleged misstatements in the Form 20-F and earnings releases are nearly identical to those in the 2023 Registration Statement (SAC ¶¶ 189-96), and thus Plaintiffs' 10(b) claims fail for the same reasons.  (*See* Part I.A, *supra*.)

### (1) No Misstatements Regarding AI.

Plaintiffs claim that Oddity's earnings releases and Form 20-F, like its 2023 Registration Statement, "overstated Oddity's AI technology and capabilities, and/or the extent to which this technology drove its sales".  (SAC ¶ 192.)  Plaintiffs challenge statements from Oddity's earnings releases in which Mr. Holtzman characterized Oddity's earnings and performance as positive.  (SAC ¶¶ 189-91.)  Plaintiffs do *not* allege that Oddity had not achieved those earnings, but instead distort the statements to imply that "Oddity's sales and growth were primarily the result of its use of AI".  (SAC ¶ 192.)  Not so.  Instead, each statement describes Oddity's efforts to "***transform*** the global beauty and wellness market through technology", to leverage technology to "***build***[] powerful engines" and "***grow*** fast", and Oddity's "large investments" in technology.  (SAC ¶¶ 189-90.)  Nothing about those statements attributes sales primarily to AI.

27

Moreover, these statements are plainly forward-looking and inactionable as corporate puffery. *Rombach*, 355 F.3d at 174.

Plaintiffs' similar criticism regarding Oddity's Form 20-F also fails.  The 20-F never asserts that sales are "primarily" driven by AI or other technology, and Oddity never disclaims the use of "marketing, advertising and subscription sales".  (SAC ¶ 195.)  To the contrary, as with the 2023 Registration Statement, the 20-F explains that Oddity "acquire[s] new users through a variety of marketing channels including social media, search engine optimization and brand-oriented marketing campaigns".  (Ex. 2 at 72-74.)  The 20-F also discloses Oddity's promotional practices.  (*Id.* at 17.)

### (2)    No Misstatements About Oddity's Israeli Stores.

Plaintiffs aver that Oddity failed to disclose its brick-and-mortar operations in Israel. Plaintiffs again provide no explanation, let alone with the requisite particularity, how this alleged omission renders any cited statement materially misleading.  (*See* Part I.A, *supra.*)  The challenged statements never claim that Oddity's business is entirely digital—the Form 20-F explains that Oddity is "almost entirely online", making clear Oddity retains certain non-digital operations.  (Ex. 2 at 61.)  Where, as here, "allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for failing to disclose this information."  *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003).  Moreover, there is no allegation why information relating to a very small, profitable part of Oddity's business would be material.  (*See* Part I.A, *supra*.)  (*See* Part I.A.i, *supra*.)

28

**(3)**      **No Misstatements Regarding Oddity's Legal Proceedings.**

Plaintiffs' challenge to Oddity's legal disclosures in its Form 20-F fails for the same reasons as those in the 2023 Registration Statement: Oddity affirmatively disclosed its involvement in ongoing litigation and accompanying risks (Ex. 2 at 124), and its practice of accruing for loss contingencies when a loss is probable and can be reasonably estimated (*Id*. at F-25). Plaintiffs do not allege any obligation to disclose specific lawsuits.

**B.**      **Plaintiffs Fail to Allege a Strong Inference of Scienter.**

Plaintiffs' 10(b) claim should also be dismissed for the independent reason that Plaintiffs fail to plead facts giving rise to a strong inference of scienter. Under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference" of scienter as to each defendant, 15 U.S.C. § 78u-4(b)(2)(A).[13] "[A] court must consider plausible, nonculpable explanations for the defendant's conduct" and a complaint survives "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. This heightened scienter requirement of intent "to deceive, manipulate, or defraud" is met only with particularized facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Neither is adequately alleged.

**i.**      **Plaintiffs Fail to Plead Motive and Opportunity.**

Plaintiffs contend that Oddity and Mr. Holtzman had motive because they sold shares through Oddity's IPO. (SAC ¶ 218.) But such generic motives—which are common to any

---

[13] The Complaint alleges that Mr. Holtzman's scienter should be imputed to Oddity. Although Mr. Holtzman has not been served, this Motion addresses these allegations solely for the purposes of evaluating Oddity's scienter.

parent company or officer—are insufficient.  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir. 2009).  Indeed, the sale of shares to the public is *the very purpose of an IPO*.  Plaintiffs' theory that IPO sales—on their own—support a "strong inference" of scienter has been routinely rejected by courts in this district.  *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 420 (S.D.N.Y. 2020) ("[T]he fact that the Individual Defendants sold only in public offerings cuts against an inference of scienter, because it suggests a motive that is 'generally possessed by most corporate directors and officers.'").  Moreover, "[w]hile 'unusual' executive stock trading under some circumstances may give rise to an inference of fraudulent intent, executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent." *In re Bristol–Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

### ii.    Plaintiffs Fail to Plead Conscious Misbehavior or Recklessness.

With no plausible motive alleged, Plaintiffs must allege "a defendant's conscious misbehavior or recklessness" and those allegations' strength "'must be correspondingly greater'".  *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *22 (S.D.N.Y. Sept. 21, 2021).  Plaintiffs must allege conduct that is at least "highly unreasonable", and an "extreme departure from the standards of ordinary care".  *Id.*  None of Plaintiffs' allegations come close.

Plaintiffs' contention that Mr. Holtzman somehow "intentionally omitted information regarding these retail operations" because he was "photographed inside one" is illogical.  (SAC ¶ 221.)  That Mr. Holtzman posed for a Company profile in front of a store demonstrates that he had no intent to conceal their existence—and in fact tried to publicize it—thus negating any inference of scienter.  And Plaintiffs' allegation that Mr. Holtzman "had access to" information about "conventional marketing, advertising and subscriptions", (SAC ¶ 220), is too vague and

30

conclusory because it is indisputable that Oddity's public filings disclosed all of these—and Plaintiffs plead no facts showing Mr. Holtzman "had access to" information suggesting those disclosures were somehow insufficient. *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015).

Finally, Plaintiffs' attempt to invoke the core operations doctrine fails. (SAC ¶ 220.) "[T]hat an allegedly fraudulent statement concerned 'core operations,' standing alone, is insufficient to support strong circumstantial evidence of scienter." *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011). And "there is considerable doubt whether the core operations doctrine survived enactment of the PSLRA, and many courts have held that it is no longer valid." *Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016).

Because no alleged facts give rise to a strong inference of scienter (or even to a weak one), Plaintiffs' Section 10(b) claims should be dismissed.

## C.    Plaintiffs Fail to Allege Loss Causation.

Plaintiffs' Section 10(b) claim separately fails because they do not adequately allege that their losses were caused by any actionable misstatement or omission. Loss causation requires Plaintiffs in a Section 10(b) claim to plead a "corrective disclosure", *i.e.* announcement or series of announcements that "reveal to the market the falsity" of a prior statement. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005). Critically, a corrective disclosure must show more than a "negative characterization of already-public information". *In re Omnicom Grp. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010). But, although the Report—the only alleged corrective disclosure—uses hyperbole about "previously undisclosed" matters, NINGI concedes that the information therein was "obtained from public sources" and "is expressed as an opinion, not a

31

statement of fact". (Ex. 3 at 1-5.) The allegations attributed to unnamed former employees similarly added no new information to the market. Indeed, none of the underlying facts discussed in the Report is "new"—the fact that Oddity had leases for stores was disclosed, as was the fact that its business was not entirely online; the retail business in Israel was never concealed and was publicly touted to anyone who cared to examine Oddity's business in that country (for example, through the Israel website); and Oddity's involvement in legal proceedings was disclosed. With respect to Oddity's AI capabilities, NINGI concedes that it is just its "*opinion* [that] the claim that ODDITY is using AI is just a lie" and that it is just its "*opinion* [that] ODDITY is not a cutting-edge tech company". (*Id.* at 9, 26 (emphases added).) "Reports express[ing] negative opinions . . . based on information that was already publicly available . . . are not 'corrective' for the purpose of pleading loss causation." *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013).[14]

The fact that a stock price drop followed a short-seller's report does not make the allegations any more plausible because depressing a company's stock price (however briefly) is the short-seller's *raison d'etre*. *Long Miao*, 442 F. Supp. 3d at 800. NINGI had a vested interest in mischaracterizing publicly available information about Oddity because it would "realize significant gains in the event that the prices of [Oddity's] securities decline". (Ex. 3 at 1.)

Oddity's stock price recovery further confirms the lack of any plausible link between Plaintiffs' alleged losses, and the so-called *new* information—which in reality was neither *new* nor unknown— repackaged and misrepresented by NINGI. Although a temporary stock price

---

[14] NINGI's "interviews" with unnamed employees also are inadequate. *Long Miao*, 442 F. Supp. 3d at 801 ("[T]he case law reflects a particular need for close scrutiny where a short-seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources, without corroboration."); *Defeo v. IonQ, Inc.*, 2025 WL 1035292, at *6 (4th Cir. Apr. 8, 2025).

32

drop followed the Report, after Oddity addressed NINGI's misleading claims (Ex. 4), the stock price rose within weeks to pre-Report levels.  (Ex. 5.)  Clearly, Oddity did not shut down its retail stores, develop new technology or defeat all pending litigation in those few weeks.  The only plausible inference is that the market temporarily reacted to NINGI's mischaracterization, but promptly reverted to valuing Oddity based on its fundamentals, not a short-seller's hyperbole.  (Ex. 5.)  That is why "loss causation is not adequately pled simply by allegations of a drop in stock price following an announcement of bad news if the news did not disclose the fraud".  *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 384.

### D.    Plaintiffs Fail to Plausibly Allege Scheme Liability.

Plaintiffs also assert that Oddity "engaged in a plan, scheme, conspiracy and course of conduct . . . to defraud".  (SAC ¶ 233.)  "[C]ourts have routinely rejected [] attempt[s] to bypass the elements necessary to impose 'misstatement' liability . . . by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'"  *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011).  In other words, "misstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections" of Rule 10b-5; rather, there must be "something extra that makes a violation a scheme".  *SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) (citation omitted). Plaintiffs' "scheme" allegations are identical to Plaintiffs' deficiently alleged misstatements and do not identify "something extra".

### IV.  PLAINTIFFS FAIL TO PLEAD A SECTION 20(a) CLAIM.[15]

To state a claim under Section 20(a), a plaintiff "must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant

---

[15] The Section 20(a) claims are brought against the "Individual Defendants"—for purposes of this motion, Ms. Drucker Mann and Mr. Farello.  (SAC ¶ 249.)

was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108.  Plaintiffs' 20(a) claims fail for several reasons.

*First*, as explained above, Plaintiffs fail to show a primary violation.  (Part III, *supra*; *Liu v. Intercept Pharms., Inc.*, 2020 U.S. Dist. LEXIS 53252, at \*52 (S.D.N.Y. Mar. 26, 2020).) *Second*, Plaintiffs fail to allege that the Individual Defendants are control persons.  Control over a primary violator "may be established by showing that [the Individual Defendants] possessed 'the power to direct or cause the direction of the management and policies of [Oddity], whether through the ownership of voting securities, by contract, or otherwise.'"  *SEC v. First Jersey Sec.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996).  Plaintiffs provide no such allegation.  Plaintiffs allege control based on "their positions of control and authority as senior officers".  *Id.*  But "[o]fficer or director status alone does *not* constitute control for the purposes of § 20(a) liability"—actual control is "essential to control person liability."  *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999).  Plaintiffs fail to plead that the Individual Defendants possessed the power to control.

*Third*, Plaintiffs' 20(a) claim fails because Plaintiffs do not plead facts to show that the Individual Defendants were "in some meaningful sense, [c]ulpable participant[s] in the controlled [entity's] fraud".  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005)*.*  Where a complaint contains no detailed allegations regarding the state of mind of the "control person", a Section 20(a) claim should be dismissed.  *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at \*6-7 (S.D.N.Y. Feb. 20, 2002).  The Complaint does not provide any such allegations.  Instead, Plaintiffs merely allege that Ms. Drucker Mann "has served as

34

Oddity's CFO" and that Mr. Farello "has served as a Director of Oddity".  (SAC ¶¶ 21, 23.)  That

is woefully insufficient.[16]

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

---

[16] Plaintiffs allege that Ms. Drucker Mann "signed certifications pursuant to the Sarbanes-Oxley Act", but that too is insufficient.  (SAC ¶ 204.)  "[C]ourts in this circuit regularly hold that the signing of a SOX certification, without more, is insufficient to plead scienter." *Zheng v. Pingtan Marine Enter.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019).

Dated:   June 26, 2025

Respectfully Submitted,

*/s/ Yonatan Even*
Yonatan Even
Lauren M. Rosenberg
**CRAVATH, SWAINE & MOORE LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
yeven@cravath.com
lrosenberg@cravath.com

*Attorneys for Defendants Oddity Tech Ltd., Lindsay Drucker Mann and Michael Farello*

*/s/ Susan L. Saltzstein*
Susan L. Saltzstein
Robert A. Fumerton
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
susan.saltzstein@skadden.com
robert.fumerton@skadden.com

*Attorneys for Underwriter Defendants*

## CERTIFICATE OF WORD COUNT COMPLIANCE

Pursuant to local Civil Rule 7.1(c), I certify under penalty of perjury that the foregoing

Joint Memorandum of Law in Support of Defendants' Joint Motion to Dismiss contains 10,473

words, excluding items exempted by local Civil Rule 7.1(c).  In making this certification I have

relied upon the word count of Microsoft Word, the word-processing system used to prepare the

memorandum.


Dated:   June 26, 2025

Respectfully Submitted,

*/s/ Yonatan Even*
Yonatan Even
Lauren M. Rosenberg
**CRAVATH, SWAINE & MOORE LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
yeven@cravath.com
lrosenberg@cravath.com

*Attorneys for Defendant Oddity Tech Ltd.*
*Lindsay Drucker Mann and Michael*
*Farello*


*/s/ Susan L. Saltzstein*
Susan L. Saltzstein
Robert A. Fumerton
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
susan.saltzstein@skadden.com
robert.fumerton@skadden.com

*Attorneys for Underwriter Defendants*

37