# EXHIBIT 1
# PART 4

**[Signature Page of Share Purchase Agreement]**

**IN WITNESS WHEREOF**, this Share Purchase Agreement has been duly executed on the date herein above set forth.

IL MAKIAGE COSMETICS (2013) LTD.

By:     /s/ ORAN HOLTZMAN
        Name: ORAN HOLTZMAN
        Title: CFO

**[Signature Page of Share Purchase Agreement]**

**IN WITNESS WHEREOF**, this Share Purchase Agreement has been duly executed on the date herein above set forth.

VOYAGE81 LTD.

By:   /s/ Niv Price
     Name: Niv Price
     Title: CEO

**[Signature Page of Share Purchase Agreement]**

**IN WITNESS WHEREOF**, this Share Purchase Agreement has been duly executed on the date herein above set forth.

|  |  |
|---|---|
| | /s/ Niv Price |
| **IANGELS INGENUITY FUND L.P** | **NIV PRICE** |
| Name :    Shelly Hod Moyal | |
| Title:     Director | |
| | /s/ Boaz Arad |
| **IANGELS TECHNOLOGIES LP** | **BOAZ ARAD** |
| Name :    Shelly Hod Moyal | |
| Title:     Director | |
| /s/ Michael Granoff | /s/ Alon Hirsch |
| **MANIV MOBILITY II, L.P.** | **ALON HIRSCH** |
| Name :    Michael Granoff | |
| Title:     Managing Partner | |
| /s/ Michael Granoff | /s/ Rafi Gidron |
| **MANIV MOBILITY II A, L.P.** | **RAFI GIDRON** |
| Name :    Michael Granoff | |
| Title:     Managing Partner | |

**TRUE VENTURES VI, L.P.,** for itself
and as nominee for True Ventures VI-A, L.P.

By: True Venture Partners VI, LLC

Its: General Partner

Name:     James G. Stewart
Title:      COO

/s/ Omer Shachar
**NEXT GEAR VENTURE PARTNERS L.P.**

Name:     Omer Shachar
Title:      Partner

**[Signature Page of Share Purchase Agreement]**

**IN WITNESS WHEREOF,** this Share Purchase Agreement has been duly executed on the date herein above set forth.

/s/ Shelly Hod Moyal

**IANGELS INGENUITY FUND L.P**

Name :   Shelly Hod Moyal
Title:     Director

**NIV PRICE**

/s/ Shelly Hod Moyal

**IANGELS TECHNOLOGIES LP**

Name :   Shelly Hod Moyal
Title:     Director

**BOAZ ARAD**

**MANIV MOBILITY II, L.P.**

Name :   Michael Granoff
Title:     Managing Partner

**ALON HIRSCH**

**MANIV MOBILITY II A, L.P.**

Name :   Michael Granoff
Title:     Managing Partner

**RAFI GIDRON**

**TRUE VENTURES VI, L.P.,** for itself
and as nominee for True Ventures VI-A, L.P.

By: True Venture Partners VI, LLC

Its: General Partner

Name:    James G. Stewart
Title:      COO

**NEXT GEAR VENTURE PARTNERS L.P.**

Name:    Omer Shachar
Title:

[Signature Page of Share Purchase Agreement]

**IN WITNESS WHEREOF,** this Share Purchase Agreement has been duly executed on the date herein above set forth.

| | |
|---|---|
| **IANGELS INGENUITY FUND L.P** | **NIV PRICE** |
| Name : Shelly Hod Moyal<br>Title: Director | |
| **IANGELS TECHNOLOGIES LP** | **BOAZ ARAD** |
| Name : Shelly Hod Moyal<br>Title: Director | |
| **MANIV MOBILITY II, L.P.** | **ALON HIRSCH** |
| Name : Michael Granoff<br>Title: Managing Partner | |
| **MANIV MOBILITY II A, L.P.** | **RAFI GIDRON** |
| Name : Michael Granoff<br>Title: Managing Partner | |

/s/ James G. Stewart

**TRUE VENTURES VI, L.P.,** for itself
and as nominee for True Ventures VI-A, L.P.

By: True Venture Partners VI, LLC

Its: General Partner

Name: James G. Stewart
Title: COO

**NEXT GEAR VENTURE PARTNERS L.P.**

Name: Omer Shachar
Title:

**IN WITNESS WHEREOF**, this Share Purchase Agreement has been duly executed on the date herein above set forth.

Shareholder Representative

Nate Jaret
solely in its capacity as the Shareholder Representative

By:    /s/ Nate Jaret

# AGREEMENT AND PLAN OF MERGERS

dated as of April 4, 2023

## BY AND AMONG

IM PRO MAKEUP NY L.P.,

IM PRO MAKEUP NY MERGER SUB, INC.,

ODDITY LABS, LLC,

**Revela Inc.**

and

**Evan Zhao**
**AS THE REPRESENTATIVE**

**TABLE OF CONTENTS_**

| | | Page |
|---|---|---|
| DEFINITIONS; INTERPRETATION | | 6 |
| 1.1 | Certain Definitions | 6 |
| 1.2 | Cross Reference Table | 19 |
| 1.3 | Interpretive Matters | 20 |
| THE MERGERS | | 22 |
| 2.1 | The Mergers | 22 |
| 2.2 | Closing | 22 |
| 2.3 | Effective Times | 22 |
| 2.4 | Effects of the Mergers | 22 |
| 2.5 | Certificate of Incorporation; Bylaws | 23 |
| 2.6 | Directors and Officers | 23 |
| CONVERSION OF SHARES; EXCHANGE | | 23 |
| 3.1 | Conversion; Allocation of Merger Consideration | 23 |
| 3.2 | Company Stock Options and Company SAFEs | 24 |
| 3.3 | Company SAFEs | 25 |
| 3.4 | Allocation Schedule and Certain Other Schedules | 25 |
| 3.5 | Paying Agent; Cash Payments | 27 |
| 3.6 | Issuance of Consideration Shares. | 28 |
| 3.7 | Lost, Stolen or Destroyed Certificates | 28 |
| 3.8 | No Further Ownership Rights in Company Capital Stock | 28 |
| 3.9 | Withholding | 29 |
| 3.10 | Stock Transfer Books | 29 |
| 3.11 | Taking of Necessary Action; Further Action | 29 |
| 3.12 | Representative Expense Amount | 29 |
| 3.13 | Appraisal Rights | 30 |
| 3.14 | Deliveries at Closing | 31 |
| 3.15 | Post-Closing Adjustment. | 33 |
| REPRESENTATIONS AND WARRANTIES OF THE COMPANY | | 35 |
| 4.1 | Organization and Good Standing | 36 |
| 4.2 | Authorization of Agreement | 36 |
| 4.3 | Conflicts; Consents of Third Parties | 37 |

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| 4.4 | Capitalization | 38 |
| 4.5 | Corporate Records | 39 |
| 4.6 | Financial Statements | 40 |
| 4.7 | No Undisclosed Liabilities | 41 |
| 4.8 | Absence of Certain Changes | 41 |
| 4.9 | Taxes | 41 |
| 4.10 | Real Property | 44 |
| 4.11 | Tangible Personal Property | 45 |
| 4.12 | Intellectual Property | 45 |
| 4.13 | Material Contracts | 54 |
| 4.14 | Employee Benefit Plans | 57 |
| 4.15 | Labor | 59 |
| 4.16 | Litigation | 62 |
| 4.17 | Compliance with Laws; Permits | 62 |
| 4.18 | Environmental Matters | 63 |
| 4.19 | Insurance | 63 |
| 4.20 | Related Party Transactions | 64 |
| 4.21 | Bank Accounts | 64 |
| 4.22 | Brokers and Financial Advisors | 64 |
| 4.23 | Anti-Corruption Laws; Certain Business Practices | 64 |
| 4.24 | Export Compliance | 65 |
| 4.25 | Social Media | 66 |
| 4.26 | Solvency | 66 |
| 4.27 | Privacy | 66 |
| | REPRESENTATIONS AND WARRANTIES OF PARENT, MERGER SUB I, AND MERGER SUB II | 68 |
| 5.1 | Corporate Existence and Power | 68 |
| 5.2 | Corporate Authorization | 68 |
| 5.3 | Consideration Shares. | 69 |
| 5.4 | Litigation | 69 |

**TABLE OF CONTENTS**
(continued)

|  |  |  | Page |
|---|---|---|---|
| 5.7 | Conflicts; Consents of Third Parties | | 70 |
| | COVENANTS OF THE COMPANY | | 72 |
| 6.1 | Conduct of the Business Pending Closing | | 72 |
| 6.2 | Restrictions on the Conduct of the Business Pending Closing | | 73 |
| 6.3 | No Control of the Company's Business | | 75 |
| 6.4 | Exclusive Dealing | | 75 |
| 6.5 | Stockholder Approval; Notice of Stockholder Action; Consent | | 76 |
| | ADDITIONAL COVENANTS AND AGREEMENTS | | 77 |
| 7.1 | Access to Information | | 77 |
| 7.2 | Efforts; Regulatory Compliance | | 77 |
| 7.3 | Notification of Certain Matters | | 79 |
| 7.4 | Fees and Expenses | | 79 |
| 7.5 | Tax Matters | | 79 |
| 7.6 | Employee Benefits | | 83 |
| 7.7 | Resignation of Directors and Officers | | 83 |
| 7.8 | Further Assurance | | 83 |
| 7.9 | Directors' and Officers' Insurance; Indemnification Agreements | | 83 |
| 7.10 | 280G Approval | | 84 |
| | CONDITIONS TO CLOSING | | 86 |
| 8.1 | Conditions to Each Party's Obligation to Effect the Merger | | 86 |
| 8.2 | Conditions to Obligation of the Company | | 86 |
| 8.3 | Conditions to Obligations of Parent, Merger Sub I and Merger Sub II | | 87 |
| | TERMINATION | | 89 |
| 9.1 | Termination | | 89 |
| 9.2 | Procedure Upon Termination | | 90 |
| 9.3 | Effect of Termination | | 90 |
| | SURVIVAL; INDEMNIFICATION | | 90 |
| 10.1 | General Survival | | 90 |
| 10.2 | Indemnification | | 91 |
| 10.3 | Representative | | 98 |

**TABLE OF CONTENTS**
(continued)

|  |  | Page |
|---|---|---|
| | MISCELLANEOUS | 100 |
| 11.1 | Specific Performance | 100 |
| 11.2 | Governing Law; Submission to Jurisdiction | 100 |
| 11.3 | Entire Agreement | 101 |
| 11.4 | Amendment | 101 |
| 11.5 | Extension; Waiver | 101 |
| 11.6 | No Third Party Beneficiaries | 101 |
| 11.7 | Notices | 102 |
| 11.8 | Severability | 104 |
| 11.9 | Assignment; Binding Effect | 104 |
| 11.10 | Counterparts | 104 |

**Miscellaneous Schedules**

| | |
|---|---|
| Schedule 1.1(a) | Identified Persons |
| Schedule 1.1(b) | Key Employees and Key Contractors |
| Schedule 3.14(a)(iv) | Assignment Deeds |
| Schedule 5.3 | Terms of Restricted Ordinary Shares |
| Schedule 5.10 | Financial Statements of Parents |
| Schedule 8.3(a)(i)(i) | Terminated Contracts |
| Schedule 8.3(a)(i)(ii) | Required Consents |

**Exhibits**

| | |
|---|---|
| Exhibit A | Form of Written Stockholder Consent |
| Exhibit B | Form of Non-Competition Agreement |
| Exhibit C | Form of Offer Letter |
| Exhibit D-1 | Form of First Certificate of Merger |
| Exhibit D-2 | Form of Second Certificate of Merger |
| Exhibit E | Form of Resignation Letter |
| Exhibit F | Form of Written SAFEholder Consent |
| Exhibit G | Form of Consideration Shares Proxy |
| Exhibit H | Form of Accredited Investor Declaration |
| Exhibit I | Form of Parent Guarantee |
| Exhibit J | Form of Parent Certificate |
| Exhibit K | Form of Company Certificate |
| Exhibit L | Form of FIRPTA Certificate |

## AGREEMENT AND PLAN OF MERGERS

THIS AGREEMENT AND PLAN OF MERGERS (this "Agreement") is made and entered into as of April 4, 2023 (the "Agreement Date") by and among, IM PRO MAKEUP NY L.P., a limited partnership incorporated under the laws of the state of New York ("Parent"), IM PRO MAKEUP NY Merger Sub, Inc., a Delaware corporation and wholly-owned subsidiary of Parent ("Merger Sub I"), ODDITY LABS, LLC, a Delaware limited liability company and wholly-owned subsidiary of Parent ("Merger Sub II" and, together with Merger Sub I, "Merger Subs"), Revela, Inc., a Delaware corporation (the "Company") and Evan Zhao, solely in his capacity as representative of the Equityholders ("Representative").

### RECITALS

WHEREAS, the parties intend that Merger Sub I be merged with and into the Company, with the Company surviving the merger (the "First Surviving Corporation"), on the terms and subject to the conditions set forth in this Agreement (the "First Merger"), immediately followed by the First Surviving Corporation merging with and into Merger Sub II, with Merger Sub II surviving the merger (the "Surviving Company"), on the terms and subject to the conditions set forth in this Agreement (the "Second Merger" and, together with the First Merger, the "Mergers");

WHEREAS, the board of directors of the Company has (a) determined that the Mergers are in the best interests of the Company and the holders of Company Capital Stock ("Stockholders"), and declared it advisable, to enter into this Agreement, (b) approved the execution, delivery and performance by the Company of this Agreement and the consummation of the transactions contemplated hereby, including the Mergers and (c) resolved to recommend adoption of this Agreement and approval of the Mergers by the Stockholders;

WHEREAS, the boards of directors of Parent and Merger Subs have approved and declared advisable the execution, delivery and performance by Parent and Merger Subs of this Agreement and the consummation of the transactions contemplated hereby, including the Mergers, and Parent, as the sole stockholder of Merger Subs, has approved and adopted the execution, delivery and performance by Merger Subs of this Agreement and the consummation of the transactions contemplated hereby, including the Mergers;

WHEREAS, pursuant to the First Merger, at the First Effective Time, the Company Capital Stock shall be converted into the right to receive cash and Securities of Oddity Tech Ltd. ("Oddity"), the indirect holder of all equity interests in Parent, holding all such interests through disregarded entities for United States federal income Tax purposes, or through entities that will be treated as entities that are disregarded as separate from Oddity, effective prior to the Closing for United States federal income Tax purposes, in the amounts and on the terms and subject to the conditions set forth herein;

WHEREAS, as a condition and inducement to Parent and Merger Subs entering into this Agreement, each of the Identified Persons, concurrently with the execution and delivery of this Agreement, is entering into (i) a non-competition agreement in the form attached hereto as Exhibit B (each, a "Non-Competition Agreement") and (ii) offer letter with Parent or its Affiliates,

5

as applicable, in the form attached hereto as <u>Exhibit C</u>, in each case dated as of the Agreement Date, each of which shall become effective at, and conditional upon the occurrence of, the First Effective Time;

WHEREAS, for U.S. federal income Tax purposes, it is intended that (i) the Mergers, stepped together, shall (A) be a single integrated transaction, consistent with the principles set forth in Rev. Rul. 2001-46, 2001-2 C.B. 321, that qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, and (B) for an exception to the general rule of Section 367(a)(1) of the Code, and (ii) this Agreement be, and is hereby adopted as, a "plan of reorganization" for purposes of Sections 354, 361 and 368 of the Code and the Treasury Regulations thereunder; and

NOW, THEREFORE, in consideration of the premises, covenants and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## DEFINITIONS; INTERPRETATION

1.1    <u>Certain Definitions</u>. The following terms shall have the following meanings:

"<u>Acquisition Transaction</u>" means, other than the transactions contemplated by this Agreement: (a) any acquisition or purchase of Company Capital Stock by any person or "group" (as defined under Section 13(d) of the Exchange Act and the rules and regulations thereunder) representing more than a ten percent (10%) voting interest in any class or series of Company Capital Stock, or any tender offer or exchange offer that if consummated would result in any person or "group" (as defined under Section 13(d) of the Exchange Act and the rules and regulations thereunder) beneficially owning Company Capital Stock representing ten percent (10%) or more of the voting interest in any class or series of Company Capital Stock, or any merger, consolidation, business combination or similar transaction involving the Company pursuant to which the stockholders of the Company immediately preceding such transaction hold less than ninety percent (90%) of the equity interests in any class or series of capital stock of the surviving or resulting entity of such transaction; (b) any direct or indirect sale, license, acquisition or disposition of all or a material portion of the assets of any of the Company other than the sale of inventory or obsolete assets or non-exclusive licenses in the Ordinary Course of Business; or (c) any initial public offering of capital stock or other securities of the Company pursuant to a registration statement filed under the Securities Act or any similar offering or filing in any foreign jurisdiction.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Aggregate Merger Consideration</u>" means (i) an amount equal to $32,236,901.42,

6

as may be adjusted pursuant to the Allocation Schedule prior to Closing; *plus* (ii) the positive difference between the Closing Cash and the Minimum Cash Amount, if any (the aggregate amount of (i) and (ii) may be referred hereto as the "Net Cash Aggregate Merger Consideration"); and *plus* (iii) the Consideration Shares, which for the purpose of this Agreement are deemed to be purchased based on a per share price of $430.31.

"Antitrust Laws" means the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, the Federal Trade Commission Act, as amended, and all other applicable Laws issued by any Governmental Authority that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"Assets" means, with respect to any Person, all businesses, properties, assets, machinery, equipment, furniture, fixtures, licenses, permits, franchises, goodwill, Technology, Intellectual Property Rights and rights of such Person, of every nature, kind and description, tangible and intangible, owned or leased, wherever located (whether in the United States or otherwise) and whether or not carried or reflected on the books or records of such Person, used, held for use or useful in connection with the operation of the businesses of such Person.

"Assignment Deeds" means those certain deeds to be attached hereto as Schedule 3.14(a)(iv) required to the assignment of the Company Assets to the Surviving Company.

"Business" means the business of the Company as was conducted prior to the First Effective Time.

"Business Day" means a day except a Saturday, a Sunday or other day on which the banks in the State of Israel or the State of New York are authorized or required by Law to be closed.

"Cash" means the cash and cash equivalents of the Company. For the avoidance of doubt, Cash shall not include any short-term and long-term investments or restricted cash.

"Capitalization Representations" means the representations and warranties contained in Section 4.3(b) (Capitalization).

"Certificate" means a certificate or certificates, if any, which immediately prior to the First Effective Time represented outstanding shares of Company Capital Stock.

"Change of Control Payments" means, without duplication with the Transaction Expenses items already counted, the aggregate amount of all change of control, bonus, termination, severance or other similar payments, whether accrued or incurred prior to or at the First Effective Time, that are payable by the Company, to any Person as a direct result of or in connection with the Mergers or any of the other transactions contemplated by this Agreement pursuant to Contracts in effect as of the First Effective Time, including (a) to the extent attributed to the acceleration or early vesting of any right or benefit or lapse of any restriction as a result of or in connection with the Mergers (but specifically excluding any such acceleration or related benefits, such as severance, triggered solely by events incurred following, and not related to, the consummation of the Mergers, such as an involuntary termination following the First Effective Time), (b) any payment, cost, expense or Liability, of the Company arising out of, in connection with or pursuant to Section

7

280G of the Code resulting from the transactions hereunder and (c) any applicable value added Tax, employer-paid portion of any employment and payroll Taxes related thereto actually paid or payable (including any employment or payroll Taxes attributable to the cash-out of Company Stock Options pursuant to this Agreement, but excluding employer-related payroll Taxes related to any post-First Effective Time exercise of options or any such Taxes due in respect of any compensatory payments offered by Parent); in each case, excluding, for the avoidance of doubt, any severance payments to be made to any employees or Contractors who were either not extended offers by Parent or its Affiliates.

"Closing Cash" means the Cash as of the close of business on the First Effective Time.    For the avoidance of doubt, Closing Cash shall be calculated after payment of Outstanding Indebtedness and shall include the Minimum Cash Amount.

"Closing Indebtedness" means the amount of Indebtedness of the Company, on a consolidated basis, as of the First Effective Time based on the same methodologies and accounting practices and principles applied on a consistent basis by the Company prior to Closing.    For the avoidance of doubt, Closing Indebtedness shall not include Outstanding Indebtedness or other Indebtedness that is paid off by the Company prior to Closing.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Capital Stock" means the shares of the Company Common Stock and Company Preferred Stock (including those shares of Company Common Stock and Preferred Stock that will be issued upon conversion of the Company SAFEs).

"Company Common Stock" means the shares of the Company's common stock, par value $0.00001 per share.

"Company Intellectual Property Registrations" means all applications, issuances and registrations with any Registration Office or Internet domain name registrar for Intellectual Property Rights (a) owned or purported to be owned by, or (b) for which an application is filed in the name of, in each case, the Company.

"Company Preferred Stock" means, collectively, the shares of the Series Seed-1 Preferred Stock, Series Seed-2 Preferred Stock, and the Series Seed-3 Preferred Stock.

"Company Products" means all products and services that are currently offered, distributed, or under development by the Company.

"Company Technology" means any and all Technology that is, or was in the past three (3) years prior to the date hereof, owned, purported to be owned, or used by the Company.

"Company Stock Option Plan" means the Company's 2021 Equity Incentive Plan, and any appendix thereto, as amended.

"Confidential Information" means all non-public information pertaining to the Company and/or its Business and/or the Company Products, Company Technology or Company Intellectual Property, including without limitation all Trade Secrets, any and all information

8

constituting or relating to product development, price, customer and supplier lists, pricing and marketing plans, policies and strategies, details of client and consultant contracts, operations methods, product development techniques, business acquisition plans or new personnel acquisition plans and all other confidential or proprietary information with respect to a party and their customers and vendors; provided, however, that "Confidential Information" shall not include (a) issued Patents and published Patent applications or (b) information that is or becomes generally available to the public or general industry knowledge through no action or inaction by the Company or Parent.

"Consideration Shares" means 45,601 Class A Ordinary A Shares of Oddity, par value NIS 0.001 each (the "Ordinary Consideration Shares") and 40,285 Restricted Class A Ordinary Shares of Oddity (the "Restricted Consideration Shares"), terms (including vesting terms, if applicable) of which are set forth on Schedule 5.3. Number of the aggregate Consideration Shares at Closing may be adjusted based on the Allocation Schedule to be provided at Closing.

"Contract" means any legally binding contract, agreement, indenture, note, purchase order, sales order, bond, loan or credit agreement, instrument, lease, commitment, mortgage, deed of trust, license or other arrangement, understanding or obligation, whether written or oral and all amendments, restatements, supplements or other modifications thereto or waivers thereunder.

"Copyleft License" means any license that requires, as a condition of use, modification and/or distribution of Software or other Technology subject to such license, that such Software or other Technology subject to such license, or other Software or other Technology incorporated with, derived from, used, or distributed with such Software or other Technology subject to such license (a) in the case of Software, be made available or distributed in a form other than binary (e.g., source code form), (b) be licensed for the purpose of allowing the making of derivative works, (c) be licensed under terms that allow the Company Products or portions thereof or interfaces therefor to be reverse engineered, reverse assembled or disassembled (other than to the extent permitted by Law), or (d) be redistributable at no license fee. Copyleft Licenses include, without limitation, all versions of the GNU General Public License, the GNU Lesser General Public License, the Affero General Public License, the Mozilla Public License, the Common Development and Distribution License, the Eclipse Public License and all Creative Commons "sharealike" licenses.

"Copyrights" means copyrights and all other rights, throughout the world, with respect to Works of Authorship and all registrations thereof and applications therefor (including moral and economic rights, however denominated).

"Credit Lines" means any credit facility extended to the Company (but excluding credit cards held by employees of the Company), if any.

"Critical Employees" means Key Employees and Key Contractors of the Company.

"Databases" means databases and other compilations and collections of data or information.

"Environmental Law" means any applicable federal, state or local Laws relating to

9

the protection of the environment, or that classify, regulate, call for the remediation of, require reporting with respect to, or list or define air, water, groundwater, solid waste, hazardous or toxic substances, materials, wastes, pollutants or contaminants, or which regulate the manufacture, handling, transport, use, treatment, storage or disposal of Hazardous Materials or materials containing Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means an escrow agent to be mutually appointed by Parent and Company prior to Closing.

"Escrow Amount" means an amount equal to the lesser of (a) $10,500,000 or (b) fifteen percent (15%) of the Aggregate Merger Consideration, which amount may be, at the sole discretion of each Equityholder, deposited by the Equityholders or on behalf of the Equityholders either in cash ("Cash Escrow Amount") or in Consideration Shares ("Equity Escrow Amount"), as set forth in the Allocation Schedule.

"Escrow Period" means the date that is eighteen (18) months from the First Effective Time.

"Escrowed Shares" means the Consideration Shares included in the Escrow Amount.

"Equityholder" means holder of (a) shares of Company Capital Stock or (b) Company Stock Options.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Facilities" means all buildings and improvements on any real property leased or owned by the Company either currently or in the past, to the extent that the Company has or had control over such buildings and improvements.

"fraud" means common law fraud (as opposed to any fraud claim based on constructive knowledge, negligent or reckless misrepresentation) under Delaware law, in connection with a representation or warranty contained in this Agreement or in any certificate delivered pursuant to this Agreement or in any of the other Transaction Documents.

"Fundamental Documents" means the documents, as amended and in effect as of any applicable date, by which any Person (other than an individual) establishes its legal existence and which govern its internal affairs. For example, the "Fundamental Documents" of a corporation would be its articles of association or certificate of incorporation and bylaws, the "Fundamental Documents" of a limited liability company would be its certificate of formation or organization and operating agreement and the "Fundamental Documents" of a limited partnership would be its limited partnership certificate and its limited partnership agreement.

"GAAP" means generally accepted accounting principles in the United States as in effect on the applicable date.

"Governmental Authority" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether federal, state, local or foreign, or any agency, instrumentality or authority thereof, or any court or arbitral body, exercising executive, legislative, judicial, regulatory or administrative functions.

"Grants" means, grants, funding, incentives or subsidies, or applications therefor.

"Hazardous Material" means any substance, material or waste that is regulated, classified, or otherwise characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "pollutant," "contaminant," "radioactive," or words of similar meaning or effect, including petroleum and its by-products, asbestos, polychlorinated biphenyls, radon, mold, urea formaldehyde insulation.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder.

"Identified Persons" means certain employees and certain Contractors of the Company as set forth on Schedule 1.1(a).

"Indebtedness" means, with respect to the Company and without duplication, the unpaid principal, accreted value, accrued and unpaid interest, prepayment and redemption premiums or penalties (including breakage costs, penalties and fees, if any, unpaid fees or expenses and other monetary obligations in respect of (a) all indebtedness for borrowed money or for the deferred or unpaid purchase price of property or services, (b) any other indebtedness which is evidenced by a note, bond, debenture or similar instrument or commercial paper (including a purchase money obligation), (c) all deferred obligations to reimburse any bank or other Person in respect of amounts paid or advanced under a letter of credit, surety bond, bank guarantee, performance bond or other instrument, (d) all Indebtedness of others guaranteed, directly or indirectly, by the Company or as to which the Company has an obligation (contingent or otherwise) that is substantially the economic equivalent of a guarantee, (e) all obligations under capital leases, (f) all Indebtedness of others secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on any property or assets of the Company (whether or not such obligation is assumed by the Company), (g) the aggregate net Liability pursuant to any derivative instruments, including any interest rate or currency swaps, caps, collars, options, futures or purchase or repurchase obligations, or other similar derivative instruments, (h) amounts related to R&D Tax Credit Advance, and (i) amounts related to unpaid marketing expenses. Notwithstanding the foregoing, "Indebtedness" shall not include Transaction Expenses or Change of Control Payments.

"Indemnity Pro Rata Share" means with respect to each Escrowed Holder the quotient obtained by dividing: (a) the aggregate portion of the Net Aggregate Consideration payable to such Escrowed Holder under this Agreement with respect to shares of Company Capital Stock and Company Stock Options held by such Escrowed Holder as of the First Effective Time, by (b) the Net Aggregate Consideration payable to all of the Escrowed Holders with respect to all shares of Company Capital Stock and Company Stock Options held by such Escrowed Holders as of the First Effective Time (in each case giving no effect to any withholdings pursuant to Section 3.9 and any indemnification obligation pursuant to Article X).

11

"Intellectual Property Rights" means any and all of the following rights (anywhere in the world, whether statutory, common law or otherwise): (a) Patents, (b) Copyrights, (c) design rights and registrations thereof and applications therefor, (d) integrated circuit layouts and mask works including registrations thereof and application therefor, (e) rights with respect to Trademarks, (f) rights with respect to domain names, (g) rights with respect to Trade Secrets or Confidential Information, including rights to limit the use or disclosure thereof by any Person, (h) rights with respect to Databases, (i) publicity and privacy rights, including all rights with respect to use of a Person's name, signature, likeness, image, photograph, voice, identity, personality, and biographical and personal information and materials, (j) any other intellectual property or proprietary rights equivalent or similar to any of the foregoing now known or hereafter recognized in any jurisdiction, (k) all rights to derivatives, improvements, modifications, enhancements, revisions and releases to any of the foregoing, and (l) all benefits, privileges, claims, causes of action and remedies arising out of or related to any of the foregoing, including the exclusive rights to apply for and maintain all registrations, renewals and extensions, to sue for past, present and future infringement, misappropriation, unauthorized uses or disclosures, or other violations, and to settle and retain proceeds from any such action, and all contractual and other entitlements to royalties and other payments for the use or practice thereof.

"intentional misrepresentation" shall mean a misrepresentation of a representation or warranty contained in this Agreement that is made by a Person with the actual knowledge at the time of making such representation or warranty that such representation or warranty is inaccurate with the intent to deceive.

"IRS" means the United States Internal Revenue Service.

"IT Systems" means all computer systems, servers, network equipment and other computer hardware and information technology systems and services owned, leased or licensed by the Company or otherwise used in the operation of the Business.

"Key Contractors" means the contractors of the Company set forth in Schedule 1.1(b).

"Key Employees" means the employees of the Company set forth in Schedule 1.1(b).

"Knowledge" means, (a) with respect to the Company, the actual knowledge of each of Evan Zhao, Avinash Boppana, and David Zhang, and any facts that such persons would have reasonably be expected to have discovered or become aware after reasonable inquiry in the course of reasonably performing such person's duties, and (b) with respect to any other Person, the actual knowledge of the specified Person.

"Law" means any applicable federal, state, foreign, local, municipal or other law, statute, constitution, principle of common law, resolution, ordinance, edict, decree, statute, code, ordinance, rule, regulation, ruling or other legal requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority, including all Environmental Laws and Anti-Corruption Laws.

"Legal Proceeding" means any suit, claim, action, litigation, arbitration, proceeding

12

(including any civil, criminal, administrative, investigative or appellate proceeding), hearing, audit, investigation or examination commenced, brought, conducted or heard by or before, or otherwise involving, any court, tribunal, other Governmental Authority, any arbitrator or arbitration panel.

"Liability" means any Indebtedness, debt, loss, damage, liability or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, due or to become due, whether in contract, tort, strict liability or otherwise and whether required to be reflected in financial statements under GAAP or not), and including all costs and expenses relating thereto.

"Licensed Company Intellectual Property" means any Intellectual Property Rights licensed to the Company by any Person (or subject to a covenant not to sue granted to or in favor of the Company by any Person) that has been used, is used or is held for use by the Company.

"Licensed Company Technology" means any Technology licensed to the Company by any Person (or subject to a covenant not to sue granted in favor of the Company by any Person) that has been used, is used or is held for use by the Company.

"Lien" means, with respect to any property or asset, any lien, pledge, mortgage, deed of trust, security interest, hypothecation, charge or other adverse claim of any kind in respect of such property or asset, other than Liens arising under the COI or Bylaws, that do not impede the transferability of such Company Capital Stock in connection with the consummation of the transactions contemplated hereby.

"Losses" means any and all deficiencies, judgments, losses, settlements, damages, interest, fines, penalties, Taxes, costs, expenses (including reasonable and documented legal, accounting and other costs and expenses of professionals) and other liabilities and expenses incurred or actually paid in connection with investigating, defending, or satisfying any and all demands, claims, actions, causes of action, suits, proceedings, assessments, judgments or appeals, and in seeking indemnification therefor, in each case, whether or not arising out of a Third Party Claim; provided, however, that "Losses" shall not include punitive or exemplary damages except actually awarded to a third party.

"Material Adverse Effect" means any change, effect, event, occurrence or development that (a) has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, assets, properties, operations or financial condition of the Company or (b) prevents or delays beyond the Termination Date the Company from consummating the transactions contemplated by this Agreement; provided, however, that no change, effect, event, occurrence or development (by itself or when aggregated with any other changes, effects, events, occurrences or developments) resulting from, arising out or relating to, any of the following shall be deemed to constitute a Material Adverse Effect or otherwise be taken into account when determining whether a "Material Adverse Effect" has occurred or may, would or could occur: (i) any circumstance, change, or effect resulting from or arising out of the announcement, existence or pendency of the transactions contemplated by this Agreement including the identity of the Parent and the impact thereof on relationships, contractual or otherwise, with customers, suppliers, distributors or partners; (ii) changes in GAAP or other

13

applicable accounting standards, requirements or principles or Law after the Agreement Date or the interpretation of the foregoing; (iii) failure to meet any estimates, internal projections or forecasts; (iv) any action taken by the Company that is required to be taken by this Agreement or the failure to take action by the Company that is expressly prohibited under this Agreement; (v) any breach by Parent, Merger Sub I, or Merger Sub II of this Agreement, (vi) general economic or political conditions or changes in such conditions, (vii) changes affecting the industries in which the Company participates; and (viii) any act of God, any act of terrorism, war or other hostilities, any regional, national or international calamity, natural disasters, or any other similar event, provided that in each case of (vi), (vii) and (viii), such matters do not have a material disproportionate effect on the Company (relative to the other participants in the industries in which the Company operates).

"Minimum Cash Amount" means an amount equal to $10,000,000 of Cash.

"Net Aggregate Consideration" means the Aggregate Merger Consideration *less* (a) Closing Indebtedness, *less* (b) all Transaction Expenses, and *less* (c) the amount, if any, by which the Minimum Cash Amount exceeds the Closing Cash. Notwithstanding anything to the contrary in this Agreement, any deductions to be made to the Aggregate Merger Consideration pursuant to clauses (a), (b), and (c) of this definition of Net Aggregate Consideration shall at all times be made without duplication and in no event shall there be any double counting of any such item.

"Open Source License" means any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Definition (as promulgated by the Free Software Foundation), or any substantially similar license, including any license approved by the Open Source Initiative or any Creative Commons License. For the avoidance of doubt, Open Source Licenses include all Copyleft Licenses.

"Open Source Materials" means any Software or Technology subject to an Open Source License.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or other similar requirement or agreement enacted, adopted, promulgated or applied by any Governmental Authority.

"Ordinary Course of Business" means the ordinary course of operations of the business of the Company through the Agreement Date consistent with past practice.

"Owned Company Intellectual Property" means any and all Intellectual Property Rights owned or purported to be owned by the Company.

"Owned Company Technology" means any Company Technology owned or purported to be owned by the Company.

"Patents" means any domestic, international, regional or foreign patents, utility models, and applications, invention disclosures and drafts of patent applications (and any patents or utility models that issue as a result of such applications) and any reissues, divisions, divisionals, continuations, continuation-in-parts, provisional applications, renewals, extensions, substitutions, reexaminations, or invention registrations related to such patents, utility models and applications.

14

"Payment Card Industry Data Security Standard" means those standards set forth in https://www.pcisecuritystandards.org/security_standards/.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Authority .

"Permitted Liens" means (a) statutory liens for current Taxes that are not yet due and payable or Taxes that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established as would be required by GAAP, (b) suppliers', contractors', workers' and similar Liens arising or incurred in the ordinary course of business with respect to amounts not yet due and payable, (c) statutory liens to secure obligations to landlords, lessors, or renters under leases or rental agreements, and (d) liens disclosed on the Balance Sheet.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

"Personal Information" means, in addition to any definition provided by the Company for any similar term (e.g., "personally identifiable information" or "PII") in any privacy policy or other public-facing statement, all information that is defined as such under applicable Privacy Law including information which states is associated with an identified or identifiable individual person or an individual person's device (or, in the case of compliance with the CCPA (hereinafter defined) and where applicable, a household), which may include, but not be limited to, (a) information that identifies, could be used to identify or is otherwise identifiable with an individual, including name, physical address, telephone number, email address, financial account number or government-issued identifier (including Social Security number and driver's license number), medical, health or insurance information, including protected health information ("PHI") and electronic protected health information ("ePHI") as these terms are defined under HIPAA, gender, date of birth, educational or employment information, religious or political views or affiliations, marital or other status, and any other data used or intended to be used to identify, contact or precisely locate an individual (e.g., geolocation data), (b) information that is created, maintained, or accessed by an individual (e.g., videos, audio or individual contact information), (c) any data regarding an individual's activities online or on a mobile device or other application (e.g., searches conducted, web pages or content visited or viewed) and (d) Internet Protocol addresses, unique device identifiers or other persistent identifiers. Personal Information may relate to any individual, including a current, prospective or former customer or employee of any Person. Personal Information includes information in any form, including paper, electronic and other forms.

"Post-Closing Tax Period" means any Tax period beginning after the Closing Date and the portion of any Straddle Tax Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date, and the portion of any Straddle Period ending on and including the Closing Date.

"Price Per Share" means with respect to each share of Company, an amount equal to (a) the Net Aggregate Consideration, *divided by* (b) the Total Share Number.

"Privacy Law" means all applicable Laws currently in effect, governing the receipt,

15

collection, compilation, use, storage, registration of databases, processing, sharing, sale, safeguarding, security, disclosure or transfer of Personal Information, including but not limited to the California Consumer Privacy Act 2018 ("CCPA"), the California Privacy Rights Act of 2020 ("CPRA"), Privacy and Electronic Communications Directive 2002/58/EC concerning the processing of personal data and the protection of privacy in the electronic communications sector (Directive on privacy and electronic communications), the Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data and any amendments and local implementations thereto, and including all Laws governing practices associated with advertising, marketing and promoting online, the sending of solicited or unsolicited electronic mail messages, text messages, calls, faxes or any commercial or promotional communications of other kinds using Personal Information, including without limitation, the Communications Decency Act, the Telephone Consumer Protection Act, the CAN-SPAM Act, and all Laws governing breach notification.

"Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Registration Office" means, collectively, the United States Patent and Trademark Office, the United States Copyright Office, the World Intellectual Property Office and all equivalent foreign patent, trademark, copyright offices or other Governmental Authority.

"Representative Expense Amount" means US$100,000.

"Retention Bonus Amount" means US$6,000,000.

"SEC" means the United States Securities and Exchange Commission, together with its staff.

"Securities" means, with respect to any Person, such Person's "securities" as defined in Section 2(1) of the Securities Act and shall include such Person's capital stock, membership interests, partnership interests or other equity interests or any options, warrants or other securities or rights that are directly or indirectly convertible into, or exercisable or exchangeable for, such Person's capital stock, membership interests, partnership interests or other equity interests.

"Security Right" means any option, warrant, subscription right, preemptive right, other right, proxy, put, call, demand, plan, commitment, agreement, understanding or arrangement of any kind relating to any equity security of the Company, whether issued or unissued, or any other security convertible into or exchangeable for any such security. "Security Right" includes any right relating to issuance, sale, assignment, transfer, purchase, redemption, conversion, exchange, registration or voting, and includes rights conferred by any Law, the Company's Fundamental Documents or by Contract relating to any equity security of the Company.

"Series Seed-1 Preferred Stock" means shares of Series Seed-1 preferred stock of the Company, par value $0.00001 per share.

"Series Seed-2 Preferred Stock" means shares of Series Seed-2 preferred stock of

16

the Company, par value $0.00001 per share.

"Series Seed-3 Preferred Stock" means shares of Series Seed-3 preferred stock of the Company, par value $0.00001 per share.

"Social Media Accounts" means any and all accounts, profiles, pages, feeds, registrations and other presences on or in connection with any (a) social media or social networking website or online service, (b) blog or microblog, (c) mobile application, (d) photo, video or other content-sharing website, (e) virtual game world or virtual social world, (f) rating and review website, (g) wiki or similar collaborative content website or (h) message board, bulletin board, or similar forum.

"Software" means all (a) computer programs and other software and code, including firmware and microcode, and including software implementations of algorithms, models, and methodologies, whether in source code, object code or other form, including libraries, frameworks, software development kits, application programming interfaces, subroutines and other components thereof; (b) computerized Databases and other computerized compilations and collections of data or information, including all data and information included in such Databases, compilations or collections; (c) screens, user interfaces, command structures, report formats, templates, menus, buttons and icons related to any of the foregoing; (d) descriptions, flow-charts, architectures, development tools, and other materials used to design, plan, organize and develop any of the foregoing; and (e) documentation, including development, diagnostic, support, user and training documentation related to any of the foregoing.

"Straddle Period" means any Tax period beginning before or on and ending after the Closing Date.

"Tax" (and with correlative meaning, "Taxes") means (a) all U.S. federal, state, local or non-U.S. taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, escheat, unclaimed property, employment, social security, Medicare, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges in the nature of tax, (b) all interest, indexation differentials, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (a), (c) any transferee or successor liability in respect of any items described in clauses (a) or (b) payable by reason of contract, assumption, transferee liability, successor liability, operation of Law, or as a result of any express or implied obligation to assume Taxes or to indemnify any other Person, and (d) any liability for the payment of any amounts of the type described in clause (a) or (b) payable as a result of being a member of an affiliated, consolidated, combined, unitary or aggregate group for any Taxable period, including under Treasury Regulations Section 1.1502-6(a) (or any predecessor or successor thereof of any analogous or similar provision under Law) or otherwise.

"Taxing Authority" means the IRS and any other Governmental Authority responsible for the administration of any Tax.

"Tax Return" means any return, report, declaration, or statement filed or required

17

to be filed with respect to any Tax (including any attachments and schedules thereto, and any amendment thereof) including any information return, claim for refund, amended return, declaration of estimated Tax, withholding tax return, amended withholding tax return and including, where permitted or required, combined, consolidated, affiliated or unitary returns for any group of entities that includes the Company.

"Technology" means any and all (a) technology, formulae, algorithms, procedures, processes, methods, techniques, know-how, creations, inventions, discoveries, and improvements (whether patentable or unpatentable), (b) technical, engineering, manufacturing, product, marketing, servicing, financial, supplier, personnel, and other information and materials, (c) specifications, designs, models, devices, prototypes, schematics, and development tools, (d) Software, content, and other Works of Authorship, (e) Databases, (f) Trademarks, (g) domain names, and (h) Trade Secrets.

"Total Share Number" means the sum of (a) the total number of shares of Company Common Stock issued and outstanding immediately prior to the First Effective Time (including shares of Company Common Stock that would be issued on account of shares of Company Preferred Stock that are deemed to convert into Company Common Stock in connection with the Mergers), *plus* (b) the total number of shares of Company Common Stock that are issuable upon the exercise of all outstanding Company Stock Options, *plus* (c) the total number of shares of Company Common Stock that are issuable upon the exercise of all outstanding instruments convertible into Company Common or Preferred Stock (including the Company SAFEs) which are not covered in any of the above sub-sections.

"Trademarks" means unregistered and registered trademarks and service marks, trademark and service mark applications, trade dress and logos, brand names, trade names, d/b/a names, business names, corporate names, product names, slogans and other source or business identifiers and any renewals and extensions of any of the foregoing.

"Trade Secrets" means confidential and proprietary information, whether oral or written, including designs, concepts, compilations of information, methods, techniques, procedures, processes, know-how, whether or not patentable, of any nature in any form, including all writings, memoranda, copies, reports, papers, surveys, analyses, drawings, letters, computer printouts, computer programs, computer applications, specifications, business methods, business processes, business techniques, business plans, data (including customer data), graphs, charts, sound recordings and/or pictorial reproductions, that (a) derive independent economic value, actual or potential, from not being generally known to the public or to other Persons who can obtain economic value from its disclosure or use and (b) are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

"Transaction Documents" means this Agreement and each document, certificate and instrument executed in connection herewith.

"Transaction Expenses" means, without duplication, any and all (whether or not disclosed) (a) unpaid costs, fees and expenses of outside professionals incurred by the Company in connection with the negotiation, execution and consummation of the transactions contemplated hereby, including all legal fees, Tax, consulting, accounting, management, dataroom provider,

18

finder or other similar fees and investment banking fees and expenses and the Representative's engagement fee, to the extent unpaid prior to Closing (but not the Representative Expense Amount), (b) unpaid fees, costs premiums and other expenses relating to the D&O Tail Policy, (c) Change of Control Payments (excluding the acceleration of any unvested Common Stock Options and restricted shares of Common Stock and the conversion of any Company SAFEs) and (d) any applicable unpaid Taxes due in connection with any item described in clauses (a) and (b). Transaction Expenses shall exclude Indebtedness.

"Treasury Regulations" means the United States Treasury Regulations promulgated under the Code.

"WARN" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar foreign, state or local Laws.

"Works of Authorship" means Software, register-transfer level and gate-level descriptions, netlists, documentation, scripts, verification components, test suites, websites, content, images, graphics, text, literary works, photographs, artwork, artistic works, audiovisual works, dramatic works, sound recordings, musical works, graphs, drawings, reports, analyses, designs, compilations, writings, and other works of authorship and copyrightable subject matter.

1.2     Cross Reference Table. The following terms defined elsewhere in this Agreement in the Sections set forth below shall have the respective meaning therein defined:

| Term | | Definition | |
| --- | --- | --- | --- |
| 280G Approval | 90 | Closing Date | 23 |
| 280G Waiver | 87 | COI | 32 |
| Accrued Interest | 34 | Company | 6 |
| Adjustment Dispute Notice | 35 | Company 401(k) Plans | 85 |
| Affidavit of Loss | 30 | Company Closing Certificate | 89 |
| Agreed Adjustments | 35 | Company Disclosure Schedule | 37 |
| Agreed Amount | 97 | Company Plans | 59 |
| Agreement | 6 | Company Properties | 46 |
| Agreement Date | 6 | Company Property | 46 |
| Allocation Schedule | 28 | Company Requisite Vote | 78 |
| Anti-Corruption Laws | 66 | Company Software | 52 |
| Balance Sheet | 42 | Company Stock Option | 26 |
| Balance Sheet Date | 42 | Company Warrants | 27 |
| Basket | 94 | Consent | 79 |
| BIS | 66 | Contested Amount | 97 |
| Cap | 95 | Contractors | 62 |
| Certificate of Merger | 23 | Covered Person | 86 |
| Claim Notice | 97 | Covered Persons | 86 |
| Closing | 23 | D&O Tail Policy | 86 |
| Closing Balance Sheet | 34 | Datasite | 23 |

19

Designated Accounting Firm .................... 36
Determination Letter ................................ 59
DGCL ...................................................... 23
DLLCA .................................................... 23
Dissenting Shares .................................... 32
Dissenting Stockholders .......................... 32
Effective Time ......................................... 23
Employing Member ................................. 89
ERISA Affiliate ....................................... 59
Escrow Agreement ................................... 34
Escrow Fund ............................................ 34
Escrowed Holders .................................... 93
Excess Consideration .............................. 36
Expert Calculations ................................. 36
Financial Statements ............................... 42
First Certificate of Merger ...................... 24
First Effective Time ................................ 24
Fundamental and Tax Representations Cap
................................................................ 95
Fundamental Representations ................... 92
Future RSUs ............................................ 87
General Expiration Date .......................... 92
Grant Date ............................................... 40
Hazardous Materials Activities ............... 65
Inbound Intellectual Property Contracts ... 52
Indemnification Claim ............................. 94
Indemnitees ............................................. 93
Industry Organizations ............................ 55
Institutions .............................................. 54
Intellectual Property Contracts ............... 52
Invention Assignment Agreements .......... 50
Invoice .................................................... 79
IP Representations ................................... 92
IP Representations Cap ............................ 95
Letter of Transmittal ............................... 29
Material Contracts ................................... 56
Merger ...................................................... 6
Merger Sub ............................................... 6
Merger Sub Common Stock ..................... 24
Merger Sub I Common Stock ................... 25
Non-Competition Agreement ..................... 7

OFAC ....................................................... 66
Optionholder ........................................... 26
Outbound Intellectual Property Contracts  51
Parent ....................................................... 6
Parent Closing Certificate ....................... 89
Parent Closing Statement ........................ 34
Parent Party ............................................ 70
Paying Agent ........................................... 28
Paying Agent Agreement ......................... 28
Payoff Letter ........................................... 78
Personal Property Leases ......................... 47
Real Property Lease ................................. 46
Real Property Leases ............................... 46
Representative ........................................... 6
Representative Group ............................. 101
Representative Losses ............................ 101
Response Notice ...................................... 97
Restricted Parties .................................... 67
Retained Escrow Amount ........................ 98
Review Period ......................................... 35
Safeholder ............................................... 27
Second Certificate of Merger .................. 24
Section 280G Approval ........................... 87
Securities Act .......................................... 40
Shortfall Consideration ........................... 37
Signing Estimated Allocation Schedule .... 27
Social Media Account Names .................. 67
Stipulated Amount ................................... 98
Stockholders ............................................. 6
Substantial Suppliers ............................... 58
Survival Period ........................................ 93
Tax Claim ................................................ 82
Tax Holidays ........................................... 44
Tax Representations ................................. 92
Termination Date ..................................... 91
Third Party Claim .................................... 98
Trade Control Laws ................................. 67
Vested Optionholder ................................ 26
Waived 280G Benefits ............................. 87
Written Stockholder Consent ................... 78

1.3    Interpretive Matters. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(b)    Dollars. Any reference in this Agreement to $ or "dollars" means United States dollars.

(c)    Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(d)    Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(e)    Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(f)    Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(g)    Negotiation and Drafting. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

(h)    Updates. Except as otherwise set forth herein, any Law defined or referred to herein or in any agreement or instrument that is referred to herein means such Law as in effect on the applicable date.

(i)    Foreign. The term "foreign" when used with respect to applicable Law or a Governmental Authority shall refer to all jurisdictions other than the United States.

(j)    Made Available. The term "made available" means a document was uploaded to the "Revela – Strategic Transaction" datasite at "box.com" (the "Datasite") and made available for review by Parent and its counsels on or prior to the Agreement Date.

21

THE MERGERS

2.1     The Mergers. At the Closing, upon the terms and subject to the conditions set forth in this Agreement and the applicable provisions of the General Corporation Law of the State of Delaware (the "DGCL") and the Limited Liability Company Act of the State of Delaware (the "DLLCA"), (a) Merger Sub I shall be merged with and into the Company in the First Merger, whereupon the separate corporate existence of Merger Sub I shall cease and the Company shall continue as the First Surviving Corporation and as a wholly-owned subsidiary of Parent, and (b) immediately following the First Merger, and as part of the same plan, the First Surviving Corporation shall be merged with and into Merger Sub II in the Second Merger, whereupon the separate corporate existence of the First Surviving Corporation shall cease and Merger Sub II shall continue as the Surviving Company and as a wholly-owned subsidiary of Parent.

2.2     Closing. Unless this Agreement is earlier terminated pursuant to Article IX, the closing of the Mergers (the "Closing") shall take place on a date to be specified by the parties, which shall be no later than the third (3rd) Business Day after the satisfaction or waiver of each of the conditions set forth in Article VIII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time) or at such other time as the parties hereto agree (the "Closing Date"). The Closing shall take place remotely (through electronic exchange).

2.3     Effective Times. At the Closing, the parties hereto shall file (i) a Certificate of Merger in substantially the form attached hereto as Exhibit D-1 (the "First Certificate of Merger") with the Secretary of State of the State of Delaware, in accordance with the relevant provisions of the DGCL, and make all other filings or recordings required by the DGCL in connection with the First Merger, and (ii) immediately following the filing of the First Certificate of Merger, the parties hereto shall file a Certificate of Merger in substantially the form attached hereto as Exhibit D-2 (the "Second Certificate of Merger", together with the First Certificate of Merger, the "Certificates of Merger") with the Secretary of State of the State of Delaware, in accordance with the relevant provisions of the DGCL and DLLCA, and make all other filings or recordings required by the DGCL and DLLCA in connection with the Second Merger. The First Merger shall become effective at the time that the First Certificate of Merger is filed and accepted by the Secretary of State of the State of Delaware or at such later time as is agreed to by Parent and the Company and specified in the First Certificate of Merger (the "First Effective Time"), and the Second Merger shall become effective at such time that the Second Certificate of Merger is filed and accepted by the Secretary of State or at such later time as is agreed by Parent and the Company and is specified in the Second Certificate of Merger, but in any event following the First Effective Time and as soon as practicable following the First Effective Time.

2.4     Effects of the Mergers. At the First Effective Time, the effect of the First Merger shall be as provided in this Agreement, the First Certificate of Merger and the applicable provisions of the DGCL. Without limiting the generality of the foregoing, and subject thereto, at the First Effective Time, all the property, rights, privileges, powers and franchises of the Company and Merger Sub I shall vest in the First Surviving Corporation, and all debts, Liabilities and duties of the Company and Merger Sub I shall become the debts, Liabilities and duties of the First Surviving

22

Corporation, and the First Surviving Corporation shall be a wholly-owned subsidiary of Parent. At the Second Effective Time, the effect of the Second Merger shall be as provided in this Agreement, the Second Certificate of Merger and the applicable provisions of the DGCL and DLLCA. Without limiting the generality of the foregoing, and subject thereto, at the Second Effective Time, all the property, rights, privileges, powers and franchises of the First Surviving Corporation and Merger Sub II shall vest in the Surviving Company, and all debts, Liabilities and duties of the First Surviving Corporation and Merger Sub II shall become the debts, Liabilities and duties owing of the Surviving Company, and the Surviving Company shall be a wholly-owned subsidiary of Parent.

2.5   Certificate of Incorporation; Bylaws.   At the First Effective Time, the Certificate of Incorporation of Merger Sub I, as in effect immediately prior to the First Effective Time, shall be the Certificate of Incorporation of the First Surviving Corporation until thereafter amended as provided by the DGCL and such certificate of incorporation. At the First Effective Time, the bylaws of Merger Sub I, as in effect immediately prior to the First Effective Time, shall be the bylaws of the First Surviving Corporation until thereafter amended as provided by the DGCL, the certificate of incorporation and such bylaws, except that all references to Merger Sub I therein shall be changed to references to the First Surviving Corporation.

2.6   Directors and Officers.   From and after the First Effective Time, the directors of Merger Sub I immediately prior to the First Effective Time shall be the directors of the First Surviving Corporation, and the officers of Merger Sub I immediately prior to the First Effective Time shall be the officers of the First Surviving Corporation (in replacement of such officers of the Company), in each case, until their respective successors are duly elected or appointed and qualified or their earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of the First Surviving Corporation.

CONVERSION OF SHARES; EXCHANGE

3.1   Conversion; Allocation of Merger Consideration.

(a)   At the First Effective Time, and on the terms and subject to the conditions of this Agreement, by virtue of the First Merger and without any action on the part of the holders of Company Capital Stock or any shares of capital stock of Merger Sub I:

(i)   each share of common stock, par value $0.1 per share, of Merger Sub I ("Merger Sub I Common Stock") issued and outstanding immediately prior to the First Effective Time shall, by virtue of the First Merger and without any action on the part of Parent, Merger Sub or the Company, be converted into one (1) validly issued, fully paid and nonassessable share of common stock of the First Surviving Corporation;

(ii)   each share of Company Capital Stock held by the Company in its treasury or by Parent, either Merger Sub or any other Subsidiary of Parent, shall be cancelled and extinguished without any conversion thereof, and no cash or other consideration shall be delivered or deliverable in exchange therefor;

23

(iii)    except for shares to be cancelled and extinguished in accordance with Section 3.1(ii) and the Dissenting Shares, each holder of shares of the Company (whether Common Stock, Series Seed-1 Preferred Stock, Series Seed-2 Preferred Stock or Series Seed-3 Preferred Stock) issued and outstanding immediately prior to the First Effective Time shall, by virtue of the First Merger and without any action on the part of Parent, either Merger Sub, the Company or any Stockholder, be entitled to receive for all the shares held by such stockholder, and such shares shall be converted into the right to receive (A) at the First Effective Time, a portion of the Net Aggregate Consideration, in cash and in Consideration Shares as set forth in the Allocation Schedule opposite such stockholder's name, less the portion of the Escrow Fund, and the Representative Expense Amount attributable to such stockholder as set forth in the Allocation Table opposite such holder's name (based upon the Indemnity Pro Rata Share of such holder), without interest, plus (B) any cash disbursements required to be made from the Escrow Fund and the Representative Expense Amount to the holder (based on such stockholder's Indemnity Pro Rata Share of the released amount); provided, however, that any amounts payable pursuant to the foregoing clause (B) shall be payable at the times provided for in, and subject to the conditions and contingencies of, this Agreement and the Escrow Agreement; and

(iv)    If at any time during the period between the Agreement Date and the First Effective Time, any change in the outstanding Company Capital Stock shall occur by reason of any reclassification, recapitalization, stock split or combination, split-up, exchange or readjustment of shares or any stock dividend thereon with a record date during such period, or any similar transaction or event, all references in this Agreement to specified numbers of shares of Company Capital Stock of any class or series affected thereby, and all calculations provided for that are based upon numbers of shares of Company Capital Stock of any class or series affected thereby, shall be equitably adjusted to the extent necessary to provide the parties the same economic effect as contemplated by this Agreement prior to such reclassification, recapitalization, stock split or combination, split-up, exchange or readjustment of shares or any stock dividend thereon, or any similar transaction or event.

(b)    At the Second Effective Time, by virtue of the Second Merger and without any action on the part of and on the terms and subject to the conditions of this Agreement, by virtue of the Second Merger and without any action on the part of the holders of capital stock in the First Surviving Corporation or any limited liability company interests in Merger Sub II, (i) each limited liability company interest of Merger Sub II issued and outstanding immediately prior to the Second Effective Time shall remain outstanding as a limited liability company interest of the Surviving Company and shall not be affected by the Second Merger and (ii) each share of stock of the First Surviving Corporation issued and outstanding immediately prior to the Second Effective Time shall be cancelled and shall cease to exist, and no consideration shall be paid with respect thereto, such that, immediately following the Second Merger, the Surviving Company shall be a direct wholly owned subsidiary of Parent.

3.2    Company Stock Options and Company SAFEs.

(a)    Prior to the First Effective Time, the Company shall take all actions necessary to provide that each option to purchase shares of Company Common Stock (each, a "Company Stock Option") that is unexpired and unexercised immediately prior to the First Effective Time (with the unvested Company Stock Options being accelerated and becoming vested)

24

shall be cancelled as of and subject to the First Effective Time and each holder thereof (each, an "Optionholder") shall cease to have any rights with respect thereto, except the right to receive the consideration payable in respect thereof, as set forth in this Section 3.2(a). At the First Effective Time, on the terms and subject to the conditions of this Agreement, each Optionholder shall, by virtue of the First Merger and without any further action on the part of Parent, either Merger Sub, the Company or such Optionholder, be entitled to receive, (i) at the First Effective Time, a portion of the Net Aggregate Consideration, in cash and in Consideration Shares as set forth in the Allocation Schedule opposite such Optionholder's name (which reflects the deduction of the number of shares of Common Stock eligible to be purchased by such Optionholder that are equal in value to the exercise price applicable to such Optionholder's Company Stock Options), less the portion of the Escrow Fund and the Representative Expense Amount attributable to such holder as set forth in the Allocation Table opposite such Optionholder's name (based upon the Indemnity Pro Rata Share of such holder), without interest, plus (ii) any cash disbursements required to be made from the Escrow Fund, the Representative Expense Amount to the Optionholder (based on such Optionholder's Indemnity Pro Rata Share of the released amount); provided, however, that any amounts payable pursuant to the foregoing clause (ii) shall be payable at the times provided for in, and subject to the conditions and contingencies of, this Agreement and the Escrow Agreement.  For the avoidance of doubt, if the exercise price payable in respect of a share of Company Common Stock under a Company Stock Option equals or exceeds the Price Per Share, such Company Stock Option shall be cancelled for no consideration at the First Effective Time and the Optionholder shall have no further rights with respect thereto.

(b)     Prior to the First Effective Time, the Company shall take all actions necessary to provide that each Company Stock Option that provides for an exercise price per share that equals or exceeds the Price Per Share, shall, by virtue of the First Merger and without any action by Parent, either Merger Sub, the Company or the holder of such award be cancelled for no consideration at the First Effective Time and the holders of such awards shall have no further rights with respect thereto.

(c)     Without limiting the foregoing, the Company shall take all actions necessary to ensure that the Company will not at the First Effective Time be bound by any options, stock appreciation rights, restricted stock units, warrants, SAFEs or other rights or agreements which would entitle any Person, other than Parent and its Subsidiaries, to own any capital stock of the First Surviving Corporation or to receive any payment in respect thereof except as contemplated under this Agreement. The adjustments provided for in this Section 3.2 shall be and are intended to be effected in a manner that is consistent with Section 409A and Section 424(a) of the Code, to the extent applicable.

3.3     Company SAFEs.  Immediately prior to the First Effective Time, all outstanding SAFEs which provides for issuance of shares of Company Capital Stock (the "Company SAFEs") shall be converted into Company Shares in accordance with their terms, and each holder of such SAFE (each, a "Safeholder") shall be deemed as a Stockholder for the purpose of this Agreement and shall cease to have any rights with respect to such SAFE.

3.4     Allocation Schedule and Certain Other Schedules.

25

(a)    Concurrently with the execution of this Agreement by the parties, the Company shall deliver to Parent a spreadsheet setting forth the parties' best estimates of (i) a hypothetical calculation of the Net Aggregate Consideration and (ii) a hypothetical allocation of the Net Aggregate Consideration (both of the Net Cash Aggregated Merger Consideration and the Consideration Shares, including the type thereof, e.g., whether restricted or not) among the Stockholders, the Optionholders, and the Safeholders (the "Signing Estimated Allocation Schedule"). The Signing Estimated Allocation Schedule is an estimate only, and the placeholders used for Net Aggregate Consideration (including the calculations used for Closing Cash, Transaction Expenses, and Closing Indebtedness) and amounts to be paid or issued, as the case may be, to the Stockholders, the Optionholders, and the Safeholders, will be subject to adjustments as shall appear in the Allocation Schedule.

(b)    At least three (3) Business Days prior to the Closing Date, the Company shall deliver to Parent a correct and complete schedule certified by the Chief Executive Officer of the Company, accurately and completely setting forth, as of the date of such delivery (i) (A) the calculation of the Price Per Share, (B) the Company's good faith estimate of the amount of Net Aggregate Consideration, Closing Cash, Closing Indebtedness and all outstanding Transaction Expenses, in each case calculated as of the First Effective Time, (C) allocation of the Net Aggregate Consideration, including the type thereof, e.g., whether restricted or not) among the Stockholders, the Optionholders and the Safeholders as of the First Effective Time, and (D) each Stockholder's, Optionholder's, and Safeholder's Indemnity Pro Rata Share and portion of each of the Escrow Fund and the Representative Expense Amount, (ii) a correct and complete list of record holders of the issued and outstanding shares of Company Capital Stock as of the First Effective Time (including type and number of shares held by each such holder) with the then current address, email addresses and telephone number (each if available) of each holder, (iii) a correct and complete list of record holders of the outstanding Company Stock Options as of the Effective Time (including number of options held by each such holder) with the then current address, email addresses and telephone number (each if available) of each holder, (iv) a correct and complete list of record holders of the outstanding Company SAFEs as of the First Effective Time (including type and number of shares such SAFEs are covering and held by each such Safeholder) with the then current address, email addresses and telephone number (each if available) of each holder, (v) any other documentation reasonably requested by Parent in support of the calculations by the Company of the Net Aggregate Consideration and any item pursuant to which such Net Aggregate Consideration was calculated and (vi) any other information required for payment of the Transaction Expenses identified in the Allocation Schedule (collectively, the "Allocation Schedule"). The Allocation Schedule shall be prepared in accordance with the liquidation preference under the COI, or as otherwise agreed to by the Stockholders in accordance with the terms and conditions under the COI.   The Company may continue to update the Allocation Schedule up to one (1) Business Day prior to the Closing, and the certificate of the Chief Executive Officer of the Company referenced in this Section 3.4(b) shall be applicable to the final Allocation Schedule as of no more than one (1) Business Day prior to the Closing.   Parent shall be entitled to rely entirely upon the Allocation Schedule in connection with making the payments and respective issuances. For the avoidance of doubt, the portion of the Net Cash Aggregate Merger Consideration of (X) each Stockholder (who are not employees or Contractors of the Company as at the First Effective Time) shall be fifty percent (50%) of such Stockholder's pro-rated portion of the Net Aggregate Consideration (and the remaining portion of the Net Aggregate Consideration shall be Ordinary Consideration Shares), other than as specifically set forth in the Allocation

26

Schedule, and (Y) each Stockholder and each Optionholder (in each case, who are Key Employees or Key Contractors of the Company as at the First Effective Time) shall be twenty-five percent (25%) of such Stockholder's or Optionholder's pro-rated portion of the Net Aggregate Consideration (and the remaining portion of the Net Aggregate Consideration shall be Restricted Consideration Shares), other than as specifically set forth on the Allocation Schedule.

3.5    Paying Agent; Cash Payments.

(a)    At or prior to the Closing, Parent and Representative shall enter into a paying agent agreement with a mutually appointed paying agent (the "Paying Agent") in a form agreed to between Parent, Company and the Paying Agent (the "Paying Agent Agreement"), pursuant to which the Paying Agent shall be appointed to act as paying agent for the Parent for the purpose of distributing (i) the Net Cash Aggregate Merger Consideration, (ii) the Representative Expense Amount to the Representative and (iii) the Cash Escrow Amount to the Escrow Agent.

(b)    Subject to the terms and conditions of this Agreement, as soon as reasonably practicable after the First Effective Time, but in no event later than two (2) Business Days thereafter (unless otherwise stated):

(i)    Parent shall deposit with the Paying Agent an amount equal to (A) the Cash Escrow amount pursuant to the provisions of Section 3.14(b), by means of wire transfer of immediately available funds, to be distributed by the Paying Agent to the Escrow Agent, and (B) the Representative Expense Amount pursuant to the provisions of Section 3.12, by means of wire transfer of immediately available funds, to be distributed by the Paying Agent to the Representative;

(ii)    Parent will deposit with the Paying Agent for distribution by the Paying Agent to the Optionholders (to accounts designated by the Optionholders in Letters of Transmittal) in cash in an amount equal to the Net Cash Aggregate Merger Consideration payable in respect of the Company Stock Options pursuant to Section 3.2(a), as further set forth on the Allocation Schedule, by means of wire transfer of immediately available funds, to be distributed by the Paying Agent to the Optionholders;

(iii)    Parent shall deposit with the Paying Agent for distribution by the Paying Agent to the Stockholders (to accounts designated by the Stockholders in Letters of Transmittal) cash in an amount equal to the Net Cash Aggregate Merger Consideration payable in respect of Company Capital Stock pursuant to Section 3.1(a)(iii), as further set forth on the Allocation Schedule, by means of wire transfer of immediately available funds, to be distributed by the Paying Agent only upon receipt of a duly executed and completed Letter of Transmittal from the applicable Stockholder; provided, however, that the Paying Agent shall not make any such disbursement to any Stockholder unless all Certificates previously held by such Stockholder or other documentation submitted in compliance with Section 3.6 shall have been delivered to the Paying Agent;

(c)    Unless submitted to the Paying Agent at or prior to Closing, as soon as practicable after the Closing Date, but no later than three (3) Business Days after the Closing, the Paying Agent will mail or otherwise cause to be delivered to each Stockholder and Optionholder,

27

a letter of transmittal (which will include appropriate information regarding IRS Form W-8/W-9 (or other appropriate United States Tax form)), in the form attached as an exhibit to the Paying Agent Agreement (the "Letter of Transmittal"). Following the Effective Time and delivery to the Parent or to the Paying Agent of a duly completed and executed Letter of Transmittal, and, in the case of Stockholders, together with surrender of a Certificate (or Certificates) or an Affidavit of Loss with respect thereto, each Stockholder and Optionholder, as applicable, shall be entitled to receive in exchange therefor the portion of the Net Cash Aggregate Merger Consideration to which such Stockholder and   Optionholder, as applicable, is entitled pursuant to this Article III (subject to Section 3.9 and Section 3.14(b) and the Certificate(s) so surrendered shall be cancelled. Following the First Effective Time, until so surrendered or cancelled, each outstanding Certificate that, prior to the First Effective Time, represented shares of Company Capital Stock or the right to acquire shares of Company Capital Stock will be deemed from and after the First Effective Time, for all purposes, to evidence only the right to receive a portion of the Net Cash Aggregate Merger Consideration as provided in Section 3.1, Section 3.2 or Section 3.2(b), as applicable.

(d)    Any payments made by Parent or on its behalf to the Paying Agent pursuant to this Agreement and the Paying Agent Agreement, as applicable, shall be treated for all purposes as full satisfaction of Parent's payment obligations of such amounts under this Agreement and shall be deemed as if made to the applicable Equityholders.

(e)    The Company shall provide to Parent any information or other documentation that is reasonably required by the Paying Agent pursuant to the Paying Agent Agreement relating to cost basis reporting under Section 6045 of the Code and the Treasury Regulations promulgated thereunder, such as the acquisition date and acquisition price of any Company Capital Stock held by a Person that are "covered securities" within the meaning of Section 6045(g)(3) of the Code.

3.6    Issuance of Consideration Shares. At the First Effective Time, subject to the terms and conditions of this Agreement, Parent shall cause the Consideration Shares along with all related share certificates in the name of the Escrowed Holders to be issued to, and held by the Paying Agent for further transfer to the Equityholders, pursuant to the allocation set forth in the Allocation Schedule (which for the avoidance of any doubt shall include the type of Consideration Shares, e.g., whether restricted or not), all other than the Escrowed Shares that will be issued along with all related share certificates in the name of the Escrowed Holders the Effective Date, to the Escrow Agent.

3.7    Lost, Stolen or Destroyed Certificates.  If any Certificates shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed, Parent or Paying Agent will deliver in exchange for such lost, stolen or destroyed Certificate, the portion of the Net Aggregate Consideration and any other amounts or other consideration payable or issued under this Article III with respect to the Company Capital Stock formerly represented thereby; provided, however, that Parent may, in its sole discretion, require the Person who is the owner of such lost, stolen or destroyed Certificate to provide an affidavit of loss in the form attached to the Letter of Transmittal (the "Affidavit of Loss").

3.8    No Further Ownership Rights in Company Capital Stock. As of the First Effective

28

Time, all Certificates representing Company Capital Stock issued and outstanding immediately prior to the First Effective Time shall no longer be outstanding and shall automatically be cancelled and retired and shall cease to exist, and each Stockholder shall cease to have any rights with respect to such Stockholder's Certificates or shares of Company Capital Stock represented thereby, except for the right to receive its respective portion of the Net Aggregate Consideration and any other amounts or other consideration payable or issuable under this Article III upon surrender of such Certificate in accordance with Section 3.5 (other than Certificates representing Company Capital Stock to be cancelled in accordance with Section 3.1(a)(ii) and Dissenting Shares).

3.9    Withholding. Each of Parent, each Merger Sub, the Paying Agent, the Escrow Agent, the First Surviving Corporation, and the Surviving Company shall be entitled to deduct and withhold from any amounts payable or otherwise deliverable (in kind or otherwise) to any Equityholder or other Person pursuant to this Agreement such amounts as Parent, a Merger Sub, the Paying Agent, the Escrow Agent, the First Surviving Corporation, or the Surviving Company, as the case may be, are required to deduct or withhold therefrom under the Code, or any Tax law, with respect to the making of such payment; provided, that written notice of any intention to withhold (other than withholding required in connection with any (i) payment of compensatory amounts, (ii) failure by the Company to deliver the FIRPTA Certificate as required under this Agreement, or (iii) failure by an Equityholder to provide an applicable IRS Form W-8/W-9 (or other appropriate United States Tax form) as required by the Letter of Transmittal) shall be provided to the Representative at least ten (10) Business Days prior to any such withholding and Parent, either Merger Sub, the Paying Agent, the Escrow Agent, the First Surviving Corporation, or the Surviving Company as applicable, shall use commercially reasonable efforts to reduce or eliminate any such withholding. To the extent that such amounts are so withheld and timely paid over to the appropriate Taxing Authority, (a) such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person to whom or to which such amounts would otherwise have been paid in respect of whom such deduction and withholding was made, (b) such withheld amounts shall be remitted by such payor to the applicable Governmental Authority, and (c) such payor shall promptly provide to the Equityholder from which such amounts were withheld written confirmation of the amount so withheld. For the avoidance of doubt, no Israeli Taxes will be deductible or withheld from any portion of any amounts payable or otherwise deliverable (in kind or otherwise) to any Equityholder or other Person pursuant to this Agreement.

3.10    Stock Transfer Books. The stock transfer books of the Company shall be closed immediately upon the First Effective Time, and there shall be no further registration of transfers of shares of Company Capital Stock thereafter on the records of the Company.

3.11    Taking of Necessary Action; Further Action. If at or any time after the First Effective Time or the Second Effective Time, as applicable, any further action is necessary or desirable to carry out the purposes of this Agreement and to vest Parent with control over, and to vest, perfect, or confirm of record or otherwise in, the First Surviving Corporation or the Surviving Company any and all right, title and possession to, all assets, property, rights, privileges, powers and franchises of the Company, the officers and directors of the First Surviving Corporation, the Surviving Company, Parent, and Representative shall, in the name of their respective corporations or otherwise, be fully authorized to take all such lawful and necessary action.

3.12    Representative Expense Amount. A portion of the Net Cash Aggregate Merger

29

Consideration otherwise payable to the Escrowed Holders equal to the Representative Expense Amount, shall not be paid at the First Effective Time to the Escrowed Holders, but shall instead be deposited with the Representative to be held in a segregated non-interest bearing account and used by the Representative for the direct payment of, or reimbursement of the Representative for, third party expenses incurred by the Representative in performing its duties pursuant to this Agreement. The portion of the Net Cash Aggregate Merger Consideration to be contributed on behalf of each Escrowed Holder hereunder to the Representative Expense Amount shall be based on the Indemnity Pro Rata Share of such Escrowed Holder. The Representative Expense Amount is solely for the use by the Representative to pay any costs, fees and other Representative Losses related to the performance by the Representative of its duties and obligations hereunder, and the Representative will not use the Representative Expense Amount for its operating expenses or any other corporate purposes. The Representative is not providing any investment supervision, recommendations or advice and shall have no responsibility or liability for any loss of principal of the Representative Expense Amount other than as a result of its gross negligence or willful misconduct. The Representative is not acting as a withholding agent or in any similar capacity in connection with the Representative Expense Amount and has no tax reporting or income distribution obligations on behalf of Parent with respect to the Representative Expense Amount. The Escrowed Holders will not receive any interest on the Representative Expense Amount and assign to the Representative any such interest. The Representative may contribute funds to the Representative Expense Amount from any consideration otherwise distributable to the Escrowed Holders. In the event that Representative has not used the entire Representative Expense Amount at such time as the termination of the Escrow Period (or such later time upon which outstanding claims for indemnification hereunder are deemed resolved), any remaining amount shall be distributed by the Representative to the Paying Agent for further distribution by the Paying Agent to the Escrowed Holders pro rata to their respective Indemnity Pro Rata Share. The Representative Expense Amount, or any portion thereof, will be distributed to the Escrowed Holders in accordance with the terms of the Paying Agent Agreement and such distribution shall be based on the Indemnity Pro Rata Share. If the Representative Expense Amount shall be insufficient to reimburse the Representative's expenses in accordance with this Agreement, the Representative shall be entitled to seek additional amounts (i) from the funds in the Escrow Fund that would be finally distributable to the Escrowed Holders under Article X; provided, however, that any additional payment from the Escrow Fund shall not impact any of the obligations of each Escrowed Holder pursuant to Article X and (ii) directly from the Escrowed Holders. No Payor nor any Indemnitee shall have any right, title or interest to the Representative Expense Amount and shall not make any claims against the Representative Expense Amount under this Agreement or otherwise.

3.13 <u>Appraisal Rights</u>. Notwithstanding any provision of this Agreement to the contrary, any issued and outstanding shares of Company Capital Stock held by Persons who have exercised and perfected appraisal rights for such shares of Company Capital Stock in accordance with Section 262 of the DGCL ("<u>Dissenting Shares</u>") and as of the First Effective Time have neither effectively withdrawn nor lost any right to such appraisal, shall not be converted into or represent a right to receive any portion of the consideration payable under this Article III attributable to such Dissenting Shares. Such Stockholders (the "<u>Dissenting Stockholders</u>") shall be entitled to receive payment of the appraised value of such shares of Company Capital Stock held by them in accordance with Section 262 of the DGCL, unless and until such Dissenting Stockholders fail to perfect, effectively withdraw or otherwise lose their appraisal rights under the DGCL. Notwithstanding the foregoing, if any Dissenting Stockholder shall effectively withdraw or lose

30

(through failure to perfect or otherwise) the right to appraisal, then as of the First Effective Time or the occurrence of such event, whichever occurs later, such Dissenting Shares shall automatically be converted into and represent only the right to receive the applicable portion of the Net Aggregate Consideration with respect to such shares, without interest, upon surrender of the Certificate or Certificates representing such Dissenting Shares, subject to Section 3.9, Section 3.14(b), and Article X. The Company shall provide Parent (a) prompt notice of any written demands for appraisal or payment of the fair value of any shares of Company Capital Stock, the withdrawal of such demands and any other related instruments served pursuant to the DGCL and received by the Company, and (b) the opportunity to participate in all negotiations and proceedings with respect to demands for appraisal under the DGCL. The payout and delivery of consideration under this Agreement to the holders of Company Capital Stock, Vested Options and Company SAFEs (other than to holders of Dissenting Shares who shall be treated as provided herein and under the DGCL) shall not be affected by the exercise or potential exercise of appraisal rights under the DGCL. The Company shall not settle any demands for appraisal under the DGCL without the prior written consent of Parent which shall not be unreasonably withheld, conditioned or delayed.

3.14   Deliveries at Closing.

(a)   Deliveries by the Company. On or prior to the Closing Date, the Company shall deliver, or cause to be delivered, to Parent the following:

(i)   a certificate dated as of the Closing Date, duly executed by the Secretary of the Company, given by him or her on behalf of the Company, certifying as to (A) an attached copy of the Company's bylaws as in effect as of the Agreement Date and stating that such bylaws have not been amended, modified, revoked or rescinded since the Agreement Date, (B) an attached copy of the Company's Amended and Restated Certificate of Incorporation as in effect as of the Agreement Date (the "COI") and stating that such certificate has not been amended, modified, revoked or rescinded, (C) an attached copy of the resolutions of the board of directors of the Company authorizing and approving the execution, delivery and performance of, and the consummation of the transactions contemplated by, this Agreement, and stating that such resolutions have not been amended, modified, revoked or rescinded, and (D) an attached copy of the Written Stockholder Consent, and stating that such resolutions have not been amended, modified, revoked or rescinded;

(ii)   a certificate of the Secretary of State of the State of Delaware as to the good standing of the Company as of a date not more than five (5) Business Days prior to the Closing Date;

(iii)   the Escrow Agreement and Paying Agent Agreement, duly executed by the Representative;

(iv)   the Assignment Deeds, duly executed by the Company;

(v)   Execution of the Written Stockholder Consent (as defined below) by all Stockholders;

(vi)   the Allocation Schedule, certified as to accuracy and completeness on behalf of the Company by its Chief Executive Officer;

31

(vii)    the FIRPTA Certificate (as defined below);

(viii)   the Company Closing Certificate;

(ix)    the resignations of the directors and officers of the Company as of the First Effective Time, in the form attached hereto as Exhibit E;

(x)    Execution of consent and waiver of any unconverted Safeholders in the form attached hereto as Exhibit F;

(xi)    Proxy by all Stockholders, Optionholders, and Safeholders, in the form attached hereto as Exhibit G, in respect of all Consideration Shares issued to such Stockholders, Optionholders, and Safeholders; and

(xii)   a validly executed declaration by each Stockholder, Optionholder, and Safeholder, in the form attached hereto as Exhibit H of his/her/its confirmation that he, she, it is an Accredited Investor as defined in the Securities Act.

Deliveries by Parent. On or prior to the Closing Date, Parent shall deliver or cause to be delivered to the Company or the applicable third party, the following:

(xiii)   the following Transaction Documents duly executed, as appliable, by the respective parties thereto, other than the Company and Representative:

(A)    Escrow Agreement;

(B)    Paying Agent Agreement; and

(C)    A certificate of Share Register of Oddity, duly certified by one of Oddity's office holders, reflecting the issuance of the Consideration Shares; and

(D)    Documentation, reasonably satisfactory to the Company in consultation with tax advisors chosen by the Company in its sole discretion, that Oddity is 'in control' of Parent for purposes of Section 368(a)(2)(D) of the Code, together with a certification from one of Oddity's office holders certifying that such documentation is true, correct, and complete, and there are no amendments or modifications thereof, or any intent to amend or modify such documentation.[1]

(xiv)   Parent shall make the payments and equity issuances contemplated by this Article III.

(b)    Escrow. At the Closing, Parent, Representative and Escrow Agent shall enter into an Escrow Agreement, in a form to be agreed to prior to Closing (the "Escrow

---

[1] For the avoidance of doubt these should be the duly completed and signed 8832 for the Israeli corp' (and proof of filing and IRS receipt thereof, such as mailing receipt and return receipt indicating IRS' receipt) and the signed sale/merger documents for US corp. Note to Parent: Understood that there will be supporting documentation.   The language contemplates a deliverable in the nature of a secretary's certificate (i.e., officer certification).

32

Agreement"), pursuant to which Parent shall deposit, or shall cause to be deposited, with the Escrow Agent, the Escrow Amount (together with interest and income earned on the Cash Escrow Amount, if any (the "Accrued Interest"), the "Escrow Fund") to be held and distributed by the Escrow Agent in accordance with the terms of this Agreement and the Escrow Agreement. The Escrow Amount will be deducted from the portion of the Net Aggregate Consideration attributed to the Escrowed Holders based on their respective Indemnity Pro Rata Share in accordance with the Allocation Schedule (which shall reflect the allocation between the Cash Escrow Amount and Escrowed Shares for each Equityholder, pursuant to such Equityholder's choice). The Escrow Amount shall be available to satisfy any amounts due from the Escrowed Holders for any Indemnification Claims pursuant to Article X and the Escrow Amount and Accrued Interest shall be held and released in accordance with the Escrow Agreement and the provisions of Section 3.9 and Section 10.2. With respect to the Escrowed Shares- all cash or other additional securities, rights or other property accrued or issued on account of such Escrowed Shares as of their date of issuance shall be issued to the Paying Agent for further distribution to the Escrowed Holder.

3.15  Post-Closing Adjustment.

(a)    As promptly as practicable, but in no event later than 10 calendar days following the Closing Date, Company shall prepare and deliver to the Parent, a certificate, certified as true and correct as of such date by an authorized representative of Company, to include an unaudited balance sheet of the Company as of 12:01 a.m. (PT) on the Closing Date (the "Closing Balance Sheet"), together with a statement (the "Company Closing Statement") setting forth in reasonable detail Company's good faith calculation of each of (i) Closing Cash, (ii) Closing Indebtedness, (iii) Transaction Expenses, and (iv) the Net Aggregate Consideration and attaching all relevant backup materials and schedules; together with a reasonably detailed computation, and reasonable supporting materials, in each case, using the same methodologies and accounting practices and principles applied on a consistent basis by the Company prior to Closing.

(b)    From and after the delivery of the Closing Balance Sheet and the Company Closing Statement, Company shall provide the Parent and any accountants or advisors retained by Parent with reasonable access during normal business hours to the books and records and personnel of the Surviving Company, including relevant work papers and back-up materials and such other information and materials as reasonably requested by Parent, solely for the purposes of: (A) enabling the Parent and its accountants and advisors to calculate and to review Company's calculations as reflected Closing Balance Sheet and Company Closing Statement; and (B) identifying any dispute related to the calculations set forth in the Company Closing Statement.

(c)    If the Parent disputes the calculation of Closing Cash, Closing Indebtedness, Transaction Expenses, or the Net Aggregate Consideration set forth in the Company Closing Statement, then Parent shall deliver a written notice (an "Adjustment Dispute Notice") to Company, Representative and the Escrow Agent during the thirty (30) day period commencing upon receipt by Parent of the Closing Balance Sheet and the Company Closing Statement (the "Review Period"). The Adjustment Dispute Notice shall set forth, in reasonable detail, the basis for the dispute of such calculation and attaching all relevant backup materials and schedules.

(d)    If Parent does not deliver an Adjustment Dispute Notice prior to the expiration of the Review Period, Company's calculations of each of Closing Cash, Closing

33