# EXHIBIT 1
# PART 5

Indebtedness, Transaction Expenses and the Net Aggregate Consideration shall be deemed final and binding on Parent, the Representative and the Equityholders for all purposes of this Agreement.

(e)    If Parent delivers an Adjustment Dispute Notice prior to the expiration of the Review Period with respect to Company's calculation of Closing Cash, Closing Indebtedness, Transaction Expenses or the Net Aggregate Consideration, then (i) with respect to those items which do not appear in the Adjustment Dispute Notice or not under a dispute, such items shall be deemed final and binding on Parent, the Representative and the Equityholders for all purposes of this Agreement, (ii) with respect to those items in dispute under the Adjustment Dispute Notice, the Representative and Parent shall negotiate in good faith, meet, confer and exchange any additional relevant information reasonably requested by the other party regarding the computation of such disputed items for a period of thirty (30) calendar days after the end of the Review Period, and use reasonable efforts to resolve by written agreement (the "Agreed Adjustments") any differences as to such disputed items.   In the event Parent and the Representative so resolve any such differences, Company's calculations set forth in the Company Closing Statement, as adjusted by the Agreed Adjustments, shall be final and binding for purposes of this Agreement.   If the Representative and Parent are unable to reach agreement on any disputed item within such thirty (30) calendar day period, then either the Representative or Parent may submit the objections as related to the items under dispute to KPMG, and if such firm declines such appointment, to another United States nationally recognized independent accounting firm mutually agreed upon by Parent and the Representative (such firm, or any successor thereto, being referred to herein as the "Designated Accounting Firm") after such 30th day.   In resolving any disputed item, the Designated Accounting Firm (x) shall determine the Closing Cash, Closing Indebtedness, Transaction Expenses and/or the Net Aggregate Consideration in accordance with the respective definitions thereof and shall use the same methodologies and accounting practices and principles applied on a consistent basis by the Company prior to Closing, (y) shall limit its review to matters still in dispute as specifically set forth in the Adjustment Dispute Notice (and only to the extent such matters are still in dispute) and (z) shall act as an expert and not as an arbitrator.   The Designated Accounting Firm shall be directed by Parent and the Representative to resolve the unresolved objections as promptly as reasonably practicable, and, in any event, within forty-five (45) calendar days of such referral, and, upon reaching such determination, to deliver a copy of its calculations (the "Expert Calculations") to the Representative, Parent and the Escrow Agent.   In connection with the resolution of any such dispute by the Designated Accounting Firm, each of Parent, the Representative and their respective advisors and accountants shall have a reasonable opportunity to meet with the Designated Accounting Firm to provide their respective views as to any disputed issues with respect to the calculation of Closing Cash, Closing Indebtedness, Transaction Expenses or the Net Aggregate Consideration.   The determination of Closing Cash, Closing Indebtedness, Transaction Expenses or the Net Aggregate Consideration (as applicable) made by the Designated Accounting Firm shall be final and binding on Parent, the Representative and the Equityholders for all purposes of this Agreement, absent manifest error, and judgment may be entered on such determination of the Designated Accounting Firm in any court having jurisdiction over the party against which such determination is to be enforced and either party may seek specific enforcement or take other necessary legal action to enforce any decision under this Section.   In calculating Closing Cash, Closing Indebtedness, Transaction Expenses and the Net Aggregate Consideration (as applicable), the Designated Accounting Firm shall be limited to addressing only the particular disputes referred to in the Adjustment Dispute Notice.   The Expert Calculations (A) shall reflect in detail the differences, if any, between the disputed items reflected

34

therein and the disputed items set forth in the Company Closing Statement and the Adjustment Dispute Notice, and (B) with respect to any specific discrepancy or disagreement, shall be no greater than the higher amount calculated by Parent or the Representative, as the case may be, and no lower than the lower amount calculated by Parent or the Representative, as the case may be. The fees and expenses of the Designated Accounting Firm shall be paid by Parent and the Representative (on behalf of the Equityholders from the Representative Expense Amount) in inverse proportion as they may prevail (based on the disputed items as resolved by the Designated Accounting Firm as compared to the disputed items proposed by Parent and the Representative, respectively), as determined by the Designated Accounting Firm.

(f)     If the Net Aggregate Consideration, as finally determined in accordance with this Section 3.15, is less than the Net Aggregate Consideration as set forth in the Allocation Schedule (the amount, if any, by which the Net Aggregate Consideration as set forth in the Allocation Schedule is greater than the Net Aggregate Consideration, as finally determined in accordance with this Section 3.15, the "Excess Consideration"), then Parent shall be obligated to seek to recover any and all Excess Consideration from the Escrow Fund.   If there is any Excess Consideration, then Parent and the Representative shall promptly direct the Escrow Agent to disburse to the Surviving Company cash and/or Consideration Shares from the Escrow Fund, in an amount equal to such Excess Consideration based on the Indemnity Pro Rata Share for each Equityholder in accordance with such Equityholder's consideration contribution to the Escrow Fund (*i.e.*, pro rata ratio between cash and Consideration Shares) in accordance with the Allocation Schedule.   If the Net Aggregate Consideration, as finally determined in accordance with this Section 3.15, is greater than the Net Aggregate Consideration as set forth in the Allocation Schedule (the amount by which the Net Aggregate Consideration as set forth in the Allocation Schedule is less than the Net Aggregate Consideration, as finally determined in accordance with this Section 3.15, the "Shortfall Consideration"), then Parent shall promptly deposit an amount in cash and such number of Consideration Shares equal, in proportions similar to those set forth in the Allocation Table, which together is equal to such Shortfall Consideration with the Paying Agent for disbursement to the Escrowed Holders based on their Indemnity Pro Rata Share (in accordance with the written instructions provided by the Representative to the Paying Agent). If the Net Aggregate Consideration, as finally determined in accordance with this Section 3.15, equals the Net Aggregate Consideration as set forth in the Allocation Schedule, then no disbursement shall be made to any party.

(g)     For clarity, the process set forth in this Section 3.15 shall be the exclusive remedy of Parent and the Representative for disputes related to the calculation of Net Aggregate Consideration and the Company Closing Statement; provided, however, that nothing in Section 3.15 shall relieve Parent, Merger Sub I, Merger Sub II, the Company or Representative of any Liability from any claims, causes of action or remedies arising from fraud.

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as disclosed in a document of even date herewith and delivered by the Company to Parent and Merger Subs concurrently with the execution and delivery of this Agreement and referring by numbered section (and, where applicable, by lettered subsection) of

35

the representations and warranties in this Agreement (unless the relevance of that disclosure or reference to other representations and warranties is readily apparent on the face of such disclosure) (the "Company Disclosure Schedule"), and regardless of whether any Section of this Article IV makes reference to the Company Disclosure Schedule, the Company represents and warrants to Parent and Merger Subs, as of the Agreement Date and as of the Closing Date (or, if given as of a specific date, at and as of such date), for the benefit of the Indemnitees.

4.1    Organization and Good Standing. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted. The Company is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not have a Material Adverse Effect. Section 4.1 of the Company Disclosure Schedule accurately sets forth: (a) the names of the members of the board of directors (or similar body) of the Company; (b) the names of the members of each committee of the board of directors (or similar body) of the Company; and (c) the names and titles of the officers of the Company.

4.2    Authorization of Agreement.

(a)    The Company has all requisite corporate power and authority to execute and deliver this Agreement and, subject to obtaining the Written Stockholder Consent, each other Transaction Document to which it is, or at the Closing will be, a party, and, subject to obtaining the Written Stockholder Consent, to perform its obligations under this Agreement and each such other Transaction Document, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each other Transaction Document to which it is, or at the Closing will be, a party, and the consummation of the transactions contemplated hereby and therebyhave been or will be duly and validly authorized by the board of directors and stockholders of the Company, and no other corporate proceedings on the part of the Company are necessary to authorize the execution, delivery or performance by the Company of this Agreement and each such other Transaction Document, or to consummate the transactions contemplated hereby and thereby. This Agreement has been, and, when executed at Closing, each other Transaction Document to which it is a party will be, duly and validly executed and delivered by the Company and, assuming the due authorization, execution and delivery by the other parties hereto and thereto, this Agreement constitutes, and each other Transaction Document when so executed and delivered will constitute, the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b)    The board of directors of the Company has unanimously (i) determined this Agreement and the transactions contemplated hereby, including the Mergers, to be advisable and fair to, and in the best interests of, the Stockholders and that the consideration to be paid to the Equityholders for each share of Company Capital Stock andCompany Stock Options, held by them

in the Mergers is fair to and in the best interests of such Equityholders, (ii) approved and adopted this Agreement and the transactions contemplated hereby (iii) resolved to recommend that the Stockholders adopt this Agreement and approve the Mergers and the other transactions contemplated by this Agreement, which resolutions have not been subsequently rescinded, modified or withdrawn in any way.

(c)     The Company Requisite Vote (as defined below) is the only vote of the holders of any class or series of capital stock of the Company necessary to approve this Agreement and thereby approve the principal terms of the Mergers and the consummation of the transactions contemplated hereby.

4.3    Conflicts; Consents of Third Parties.

(a)     Except as set forth on Section 4.3(a) of the Company Disclosure Schedule, neither the execution and delivery by the Company of this Agreement or any of the other Transaction Documents, nor the consummation of the transactions contemplated hereby or thereby, nor compliance by the Company with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or give rise to any obligation of the Company to make any payment under, or to the increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Liens (other than Permitted Liens) upon any of the properties or assets of the Company under, any provision of (i) the Company's Fundamental Documents, (ii) any Material Contract or Permit to which the Company is a party,(iii) any Order applicable to the Company or any of the properties or assets of any of the Company or (iv) assuming compliance with the matters referred to in Section 4.3(b), any applicable Law, except with respect to clause (ii)-(iv) where a default, violation or failure to comply with such Material Contract, Order or applicable Law (as applicable) would not be material to the Company or impede its ability to consummate the transactions contemplated by this Agreement and would not reasonably expected to result in a material Liability to the Company.

(b)     Except for (i) any filings that may be required in connection with the transactions described herein under the HSR Act and any foreign antitrust, merger control, or competition law, and the receipt of any clearances, authorizations, approvals, or waiting period expirations or terminations as may be required in connection with the transactions described herein under the HSR Act and any foreign antitrust, merger control, or competition law (ii) the filing of the First Certificate of Merger as required by the DGCL and the Second Certificate of Merger as required by the DGCL and DLLCA and as set forth on Section 4.3(b) of the Company Disclosure Schedule and (iii) any consents, notices to, waivers, approvals and authorizations to third parties set forth on Section 4.3(a) of the Company Disclosure Schedule, no consent, notices to, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Authority, (or any other Person (other than the parties to this Agreement) is required on the part of the Company in connection with (i) the execution and delivery of this Agreement or any other Transaction Document, the compliance by the Company with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby or (ii) continuing validity and effectiveness immediately following the Closing of any Permit or Material Contract of the Company, other than as a result of any change of control provisions in any contracts

37

to which Parent, Merger Sub I, or Merger Sub II or any of their respective Affiliates is a party, or judgments, permits, orders or any applicable Law binding on Parent, Merger Sub I, or Merger Sub II or any of their respective Affiliates.

4.4    Capitalization.

(a)    As of the Agreement Date, the authorized capital stock of the Company consists of 25,300,000 shares of Company Common Stock par value $0.00001 per share, and 8,190,549 shares of Company Preferred Stock par value $0.00001 per share, of which 2,401,996 have been designated Series Seed-1 Preferred Stock, 3,165,031 have been designated Series Seed-2 Preferred Stock and 2,623,522 have been designated Series Seed-3 Preferred Stock. The rights and privileges of the Company Capital Stock are set forth in the COI. As of the Agreement Date, the number of shares of Company Common Stock and Company Preferred Stock outstanding is set forth in Section 4.3(b)(a)-1 of the Company Disclosure Schedule. Except as set forth on Section 4.3(b)(a) of the Company Disclosure Schedule, no shares of Company Capital Stock are held by the Company as treasury stock. As of the Agreement Date, (i) the number of shares of Company Common Stock that are reserved for issuance under the Company Stock Option Plan, (ii) the number of shares of Company Common Stock reserved for issuance outside of the Company Stock Option Plan, (iii) the number of shares of Company Common Stock subject to outstanding Company Stock Options granted under the Company Stock Option Plan, (iv) the number of shares of Company Common Stock subject to outstanding Company Stock Options granted outside the Company Stock Option Plan, and (v) the number of shares of Company Common Stock available for grant under the Company Stock Option Plan, in each case is set forth in Section 4.3(b)(a)-2 of the Company Disclosure Schedule. All issued and outstanding shares of Company Capital Stock are duly authorized, validly issued, fully paid and nonassessable and such shares have not been issued in violation of any preemptive rights pursuant to applicable Law or in the Company's Certificate of Incorporation. All issued and outstanding shares of Company Capital Stock have been issued pursuant to valid exemptions from registration under the Securities Act of 1933, as amended (the "Securities Act"), and all other applicable securities laws. A true and complete list of record holders of the issued and outstanding Company Capital Stock as of the Agreement Date is set forth on Section 4.3(b)(a) of the Company Disclosure Schedule.

(b)    Section 4.3(b)(b) of the Company Disclosure Schedule sets forth a true, correct and complete list of all outstanding Company Stock Options, Company SAFEs and other rights to purchase or receive shares of Company Capital Stock granted under the Company Stock Option Plan, any sub-plans thereto or otherwise, and, for each such Company Stock Option and other right, (i) the number and type of shares of Company Capital Stock subject thereto, (ii) the terms of vesting (including the extent to which it will become accelerated as a result of the Mergers) and vested status, (iii) the grant and expiration dates, (iv) the exercise price, if applicable, (v) the name of the holder thereof and (vi) the status of the Company Stock Option as an "incentive stock option" as defined in Section 422 of the Code, a non-qualified stock option or otherwise.

(c)    Except as set forth on Section 4.3(b)(c) of the Company Disclosure Schedule, there is no existing option, restricted stock unit, stock appreciation right, performance stock, "phantom" stock, warrant, call, right or Contract of any character to which the Company is a party requiring, and there are no securities of the Company outstanding which upon conversion or exchange would require, the Company to issue, sell or transfer of any additional shares of

Company Capital Stock or other equity securities of the Company or other securities convertible into, exchangeable or evidencing the right to subscribe for or purchase shares of Company Capital Stock or other equity securities of the Company. The Company is not a party to any voting trust, stockholders agreement, investors' rights agreement, voting trust, right of first refusal and co-sale agreement, management rights agreement or other similar Contract with respect to the voting, redemption, registration, sale, transfer or other disposition of Company Capital Stock or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase Company Capital Stock or other Securities of the Company. There are no outstanding obligations of the Company to repurchase, redeem or otherwise acquire any shares of Company Capital Stock or other equity securities of the Company or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase shares of Company Capital Stock or other equity securities of the Company. There are no outstanding bonds, debentures, notes or other obligations, the holders of which have the right to vote with the holders of Company Capital Stock on any matter.

(d)     With respect to the Company Stock Options issued pursuant to the Company Stock Option Plan, (i) each grant of an option was duly authorized no later than the grant date of such option (the "Grant Date") by all necessary corporate action and, except as set forth in Section 4.4(d) of the Company Disclosure Schedule, was executed and delivered by each party thereto within a reasonable time following the Grant Date, (ii) all options granted to U.S. taxpayers have an exercise price equal to no less than the fair market value of the underlying shares of Company Common Stock on the Grant Date, as determined in accordance with Section 409A of the Code, (iii) each such grant was made in accordance with the terms of the Company Stock Option Plan and all applicable Laws, including valid exemptions from registration under the Securities Act and all other applicable securities laws, (iv) the Company Stock Option Plan is the only plan or program the Company maintains under which outstanding options to acquire Company Common Stock, restricted stock, stock appreciation rights or other compensatory equity-based awards have been or may be granted, (v) the Company has made available to Parent true, correct and complete copies of each duly executed option agreement, (vi) other than with respect to number of shares of Common Stock underlying, exercise price, vesting commencement date, vesting schedule and tax track, no award agreement differs in any material respect from such form agreements, (vii) there is no agreement, arrangement or understanding (written or oral) to amend, modify or supplement such Company Stock Options in any case from the form provided to Parent and (viii) each such grant was properly accounted for in all material respects in accordance with GAAP in the financial statements (including the related notes) of the Company.

(e)     Except as set forth in Section 4.3(b)(e) of the Company Disclosure Schedule, there are no offer letters, other employment Contracts or other arrangements that contemplate a grant of options to purchase Company Capital Stock or other equity awards with respect to Company Capital Stock, or arrangements with Persons who have otherwise been promised options or any other rights to purchase Company Capital Stock or other equity awards with respect to Company Capital Stock, which options or other equity awards have not been granted as of the Agreement Date.

4.5    Corporate Records.

(a)     The Company has made available to Parent true, correct and complete

39

copies of the Company's Fundamental Documents in existence as of the date of this Agreement. All such Fundamental Documents are in full force and effect and the Company is not in violation of any provisions therein.

(b)    The minute books and corporate resolutions of the Company previously made available to Parent, Merger Sub I, and Merger Sub II contain true, correct and complete records of all meetings (if available) and corporate resolutions and in each case accurately reflect in all material respects all corporate action of the Stockholders and board of directors (including committees thereof) of the Company which took place prior to the Agreement Date. The stock certificate books and stock ledger of the Company previously made available to Parent are true, correct and complete.

4.6    Financial Statements.

(a)    Section 4.6(a) of the Company Disclosure Schedule contains true, correct and complete copies of (i) the unaudited balance sheet of the Company as of December 31, 2021, and the related unaudited statements of operations and cash flows of the Company for the year then ended, (ii) the unaudited balance sheet of the Company as of December 31, 2022, and the related unaudited statements of operations and cash flows of the Company for the year then ended and (iii) the unaudited balance sheet of the Company as of February, 2023 and the related reviewed statements of operations and cash flows of the Company for the two month period then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "Financial Statements"). Except as set forth on Section 4.6(a) of the Company Disclosure Schedule, each of the Financial Statements has been prepared materially in accordance with GAAP, as applied in the Balance Sheet, consistently applied by the Company throughout the periods presented and presents fairly, in all material respects, the financial position, results of operations and cash flow of the Company as of the dates and for the periods indicated therein; provided, however, that, in the case of the unaudited Financial Statements, such Financial Statements may not contain footnotes required by GAAP and are subject to normal recurring and year-end adjustments that are not, individually or in the aggregate, material to the Company. For the purposes hereof, the reviewed balance sheet of the Company as at February 28, 2023 is referred to as the "Balance Sheet" and February 28, 2023 is referred to as the "Balance Sheet Date".

(b)    The Company has not identified or been made aware of (i) any fraud, whether or not material, that involves the Company's management or any other current or former employee, consultant, or director of the Company who has a role in the preparation of financial statements or the internal accounting controls utilized by the Company, or (ii) as of the Agreement Date, any claim or allegation regarding any of the foregoing.

(c)    The Company (i) makes and keeps accurate books and records that fairly reflect, in all material respects, the transactions and dispositions of assets of the Company; and (ii) maintains internal accounting controls that provide reasonable assurance that (A) transactions are recorded as necessary to permit preparation of their respective financial statements in conformity with GAAP; (B) receipts and expenditures are made only in accordance with general or specific authorizations of management and directors of the Company; (C) access to its assets is permitted only in accordance with general or specific authorizations of management and directors of the Company; and (D) the reported accounting for its assets and liabilities is compared with existing

40

assets and liabilities at reasonable intervals.

(d)    All accounts receivable of the Company have arisen from bona fide transactions in the Ordinary Course of Business consistent with past practices and are valid, genuine.

4.7    No Undisclosed Liabilities. Other than as set forth in Section 4.7 of the Company Disclosure Schedule, the Company has no Liabilities required by GAAP to be reflected in a consolidated balance sheet of the Company or disclosed in the notes thereto other than (a) those reflected in, reserved against or otherwise described in the Balance Sheet or the notes thereto, (b) accounts payable or accrued salaries incurred in the Ordinary Course of Business since the Balance Sheet Date and similar in character and amount to the liabilities and obligations set forth on the Financial Statements, (c) the Transaction Expenses (as shall be set forth in the Allocation Schedule) or (d) non-monetary liabilities arising under Contracts to which the Company is a party or otherwise bound and which were made available to Parent by the Company. For clarity, (x) the mere existence of a yet-to-be-resolved claim, complaint or notice from a third party involving Company arising after the Agreement Date shall not constitute a breach of this Section 4.7 on the theory that such claim or the matters underlying such claim constituted Liability or obligation of Company as of the Agreement Date and (y) this Section 4.7 shall not be deemed to address the subject matter of any other representation or warranty in this Article IV that is qualified by Company's Knowledge so as to have the effect of the Company making a representation or warranty regarding such subject matter without a Knowledge qualifier.

4.8    Absence of Certain Changes. Except as expressly contemplated by this Agreement or as set forth on Section 4.8 of the Company Disclosure Schedule, since the Balance Sheet Date (i) as of the Agreement Date, there has not been any event, occurrence, development or state of facts that has had, individually or in the aggregate, a Material Adverse Effect and (ii) as of the Agreement Date, the business of the Company has been conducted in the ordinary course consistent with past practices.

4.9    Taxes.

(a)    (i) The Company has filed all income, franchise and other material Tax Returns required to be filed by it and such Tax Returns have been duly and timely filed with the appropriate Taxing Authority in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, complete and correct in all material respects, and (ii) all Taxes shown on such Tax Returns and all other amounts of Taxes (whether or not required to be shown on any Tax Return) due and payable by the Company have been fully and timely paid. With respect to any Taxes where payment is not yet due or owing, the Company has established in accordance with GAAP an adequate accrual for all such Taxes through the end of the last period for which the Company ordinarily records items on its respective books and records. The Company has not incurred any liability for Taxes since the Balance Sheet Date other than in the ordinary course of business consistent with past practice.

(b)    The Company has complied in material all respects with all applicable Laws relating to the payment and withholding of Taxes from payments made or deemed made to any

41

Person (including withholding of Taxes pursuant to Sections 1441, 1442, 1445, 1446, 1471, 1472 and 3406 of the Code or similar provisions under any foreign law), and has duly and timely withheld and paid over to the appropriate Taxing Authority all material amounts required to be so withheld and paid under all applicable Laws. The Company is in material compliance with, and its records contain all material information and documents necessary to comply with, all applicable information reporting and withholding requirements under all applicable Tax Laws.

(c)     Other than any Tax Returns that have not yet been required to be filed (taking into account any extensions), the Company has made available to Parent complete copies of (i) all income, franchise and all other material Tax Returns of the Company relating to the taxable periods with respect to which the applicable statute of limitation has not already expired (ii) any audit report issued relating to any material Taxes due from or with respect to the Company (iii) any closing or settlement agreements entered into by the Company with any Taxing Authority that are currently in effect, and (iv) all Tax rulings and similar Tax decisions from any Taxing Authority, in each case under subsection (ii) to (iv), for all taxable periods since inception.

(d)     Company has not received any written notice of any claim by a Taxing Authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by, or required to file any Tax Return in, that jurisdiction.

(e)     To the Knowledge of the Company, there are no audits or investigations by any Taxing Authority in progress, nor has the Company received any written notice from any Taxing Authority that it intends to conduct such an audit or investigation.

(f)     The Company or any other Person on its behalf has not (i) agreed to or is required to make any adjustments pursuant to Section 481(a) of the Code or any similar provision of Law nor has any Taxing Authority proposed any such adjustment, nor is there any application pending with any Taxing Authority requesting permission for any changes in accounting methods that relate to the Company, (ii) executed or entered into a closing agreement prior to the Closing Date pursuant to Section 7121 of the Code or any similar provision of Law with respect to the Company that is currently in effect, (iii) requested any extension of time within which to file any Tax Return, which Tax Return has since not been filed, other than extensions of time to file obtained in the ordinary course of business, (iv) granted any extension for the assessment or collection of Taxes that is currently in effect, which Taxes have not since been paid, or (v) granted to any Person any power of attorney that is currently in force with respect to any Tax matter, other than authorizations to contact Tax Return preparers that were included in Tax Returns filed by the Company.

(g)     The Company is not a party to any Tax sharing, allocation, indemnity or similar Contract (other than customary Tax indemnification provisions in commercial Contracts the principal purpose of which is unrelated to Taxes).

(h)     The Company is not nor has it ever been a member of any consolidated, combined, affiliated or unitary group of corporations for any Tax purposes or any similar group for federal, local or foreign Tax purposes (other than any group the common parent of which is the Company). The Company has no liability for Taxes of any Person under Treasury Regulations Section 1.1502-6 (or any comparable provision of state, local or foreign Law), as a transferee or

42

successor, by Contract or otherwise (other than under customary Tax indemnification provisions in commercial Contracts the principal purpose of which is unrelated to Taxes).

(i)    The Company has not engaged in any "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b)(1), (b)(2), or any other transaction requiring disclosure under an analogous provision of state, local or foreign Tax Law.

(j)    There are no Liens for Taxes on the Company's assets other than statutory liens for current Taxes that are not yet due or payable or liens for Taxes that are being contested in good faith by appropriate proceedings that are disclosed on the Company Disclosure Schedule.

(k)    Section 4.9(k) of the Company Disclosure Schedule sets forth all Tax exemptions, Tax holidays or other Tax reduction or incentives agreements or arrangements entered into by the Company and any Governmental Authority (and excluding, for the avoidance of doubt, any such exemptions, holidays or other arrangements that are generally applicable to all relevant taxpayers) (the "Tax Holidays"). The Company has made available to Parent all documentation relating to such Tax Holidays.

(l)    The prices and terms for the provision of any property or services by or to the Company to or from a Person related to the Company (as applicable) are at arm's length for purposes of relevant transfer pricing Laws, including Treasury Regulations promulgated under Section 482 of the Code and all related documentation if required by such Laws has been timely prepared or obtained and, if necessary, retained. The Company properly and timely documented its transfer pricing methodology, to the extent required by Section 482 and the Treasury Regulations promulgated thereunder.

(m)    To the Company's Knowledge, the Company has never engaged in a trade or business, had a "permanent establishment" (within the meaning of an applicable Tax treaty) or otherwise been subject to Tax in any country other than its country of formation.

(n)    The Company is (and has always been) treated as corporation for U.S. federal income Tax purposes and has not made an election pursuant to Treasury Regulation Section 301.7701-3. The Company has never elected (nor has any Person elected on its behalf) to be treated as an S corporation within the meaning of Sections 1361 and 1362 of the Code.

(o)    The Company has not constituted a "distributing corporation" or a "controlled corporation'' (within the meaning of Section 355(a)(1)(A) of the Code) (i) in a distribution of shares qualifying for tax-free treatment under Section 355 of the Code in the two years prior to the Agreement Date or (ii) in a distribution that could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in conjunction with this acquisition.

(p)    The Company will not be required to include in a taxable period ending after the Closing Date an amount of taxable income attributable to income that accrued in a taxable period prior to the Closing Date but was not recognized for Tax purposes in such prior taxable period (or to exclude from taxable income in a taxable period ending after the Closing Date any deduction recognition of which was accelerated from such taxable period to a taxable period prior to the Closing Date) as a result of any prepaid amount received prior to the Closing, the installment

43

method of accounting or open transaction disposition made prior to the Closing, the completed contract method of accounting, the long-term contract method of accounting, the cash method of accounting, any change in, or use of an improper, method of accounting for Pre-Closing Tax Periods, any deferred intercompany gain or any excess loss account described in Treasury Regulations under Code Section 1502, Section 481 of the Code or any election pursuant to Section 108(i) of the Code, made with respect to any taxable period ending on or prior to the Closing, or comparable provisions of state, local or non-U.S. Tax law.

(q)     To the Company's Knowledge, all Stockholders holding Company Common Stock that are nontransferable and subject to a substantial risk of forfeiture within the meaning of Section 83 of the Code with respect to which an election under Section 83(b) of the Code has been made timely and validly. All elections made under Section 83(b) of the Code by any Stockholder with respect to any Company Common Stock that are in the Company's possession have been made available to Parent.

(r)     The Company is not, nor has it been required to report, under Section 999 of the Code, operations in a country subject to an international boycott.

(s)     The Company has not taken or agreed to take any action or knows of any fact, agreement, plan or other circumstances that is reasonably likely (i) to prevent the Mergers, taken together, from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code, or (ii) cause the stockholders of the Company to recognize gain pursuant to Section 367(a)(1) of the Code. The Company operates at least one significant historic business line, or owns at least a significant portion of its historic business assets, in each case within the meaning of Treasury Regulations Section 1.368-1(d).

(t)     Notwithstanding anything to the contrary that may be contained in this Agreement, the representations and warranties made in this Agreement with respect to Taxes refer only to the past activities of the Company, and are not intended to serve as representations and warranties regarding, or a guarantee of, nor can they be relied upon with respect to, Taxes attributable to any Post-Closing Tax Period or any Tax position taken after the Closing Date, and no representations and warranties are provided with respect to any Tax attributes of the Company. The representations and warranties contained in this Section 4.9 and in Section 4.14 (to the extent related to Tax matters) are the sole and exclusive representations and warranties provided by the Company with respect to Tax matters.

(u)     The Company has properly classified its independent contractors and/or employees for Tax purposes and complied with the applicable employment withholding tax liabilities.

4.10   Real Property.

(a)     Section 4.10(a) of the Company Disclosure Schedule sets forth a complete list of all real property and interests in real property leased by the Company as lessee or sublessor (individually, a "Real Property Lease" and collectively, the "Real Property Leases" and such leased properties being referred to herein individually as a "Company Property" and collectively

44

as the "Company Properties"). The Company does not own, and has never in the past owned, any real property. The Company Properties constitute all interests in real property currently used or currently held for use in connection with the Business. The Company has a valid and enforceable leasehold interest, free and clear of any Liens (other than Permitted Liens) (subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity)), under each of the Real Property Leases, and no party, except for the Company, has a right to occupy any of the premises subject to a Real Property Lease.

(b)        The Company has not received any written notice from any insurance company that has issued to the Company a policy with respect to any Company Property requiring performance of any structural or other repairs or alterations to such Company Property. To the Knowledge of the Company, there are no structural, electrical, mechanical or other defects in any improvements located on any of the Company Properties.

(c)        The Company does not own or hold, or is obligated under or a party to, any option, right of first refusal or other contractual right to purchase, acquire, sell, assign or dispose of any real estate or any portion thereof or interest therein.

(d)        There is no real property which is leased, subleased or owned by Stockholders and which is used by the Company.

(e)        The Company has made available to Parent a true, correct and complete copy of each Real Property Lease.

4.11  Tangible Personal Property.

(a)        The Company has good and marketable title to, or, in the case of leased properties and assets, valid leasehold interests in, all of the material items of tangible personal property it purports to own or lease, free and clear of any and all Liens other than Permitted Liens. All such items of tangible personal property which, individually or in the aggregate, are material to the operation of the Business (if any) are in good condition and in a state of good maintenance and repair (ordinary wear and tear excepted) and are reasonably suitable for the purposes used.

(b)        Except as set forth on Section 4.11(b) of the Company Disclosure Schedule, the Company is not a party to a lease of personal property ("Personal Property Leases") relating to personal property used in the Business or to which the Company is a party or by which the properties or assets of the Company is bound. All of the items of personal property under the Personal Property Leases are in good condition and repair (ordinary wear and tear excepted) and are reasonably suitable for the purposes used, and such property is in all material respects in the condition required of such property by the terms of the lease applicable thereto during the term of the lease.

4.12  Intellectual Property.

(a)        Section 4.12(a)(i) of the Company Disclosure Schedule sets forth a true,

45

correct and complete list of all Company Intellectual Property Registrations (including the name of applicant/registrant and record owner(s) thereof) and: (i) for each Patent included in the Company Intellectual Property Registrations, the application serial number and date filed, the jurisdiction, the title, the patent number and date issued if issued, and the present status thereof, (ii) for each Trademark included in the Company Intellectual Property Registrations, the application serial number and date filed, the jurisdiction, the registration number, and registration date if registered, and the class of goods or services covered, the nature of the goods or services, and the present status thereof, (iii) for each domain name included in the Company Intellectual Property Registrations, the domain, the registration date, any renewal date, the name of the registrar, (iv) for each Copyright included in the Company Intellectual Property Registrations, the title, the jurisdiction, the application number and filing date, and if registered the number and date of such registration, and (v) for each registered design included in the Company Intellectual Property Registrations, the application serial number and filing date, the title, the jurisdiction, the registration number and registration date if registered, and present status thereof. Section 4.11(a)(ii) of the Company Disclosure Schedule sets forth a list of all material unregistered Trademarks used by the Company.

(b) To the Company's knowledge, each of the Company Intellectual Property Registrations (excluding applications) is valid and enforceable. Each of the Company Intellectual Property Registrations is subsisting, all necessary registration, maintenance and renewal fees due as of the Closing Date in connection with Company Intellectual Property Registrations have been made, and all necessary documents, recordations and certificates in connection with Company Intellectual Property Registrations have been filed with the relevant Registration Office for the purposes of prosecuting, perfecting and maintaining such Company Intellectual Property Registrations. Section 4.12(b) of the Company Disclosure Schedule sets forth a true, correct and complete list of all actions that must be taken within one hundred and twenty (120) days after the Closing Date for the purposes of obtaining, maintaining, renewing, or preserving any Company Intellectual Property Registrations, including the payment of any registration, maintenance or renewal fees or the filing of documents, applications or certificates or any responses to office actions. To the Company's Knowledge, there are no materials, information, facts or circumstances that would render any of the Company Intellectual Property Registrations invalid or unenforceable or that would materially affect any pending applications for any Company Intellectual Property Registrations, except in the ordinary course of prosecution such as office actions and search reports. All applications for Company Intellectual Property Registrations have been prosecuted in compliance with all material aspects of applicable rules, policies and procedures of the relevant jurisdiction and Registration Office for prosecution of applications for issuance or registration of Intellectual Property Rights in all material respects. The original, first and joint inventors (as applicable) of the subject matter claimed in each of the Company's Patents are properly named as inventors of such Company's Patents. The applicable Laws governing marking of products covered by the inventions in each of the issued Company's Patents have been complied with in all material respects, and no such notice has been used in a manner that is deceptive, intentionally misleading or unauthorized under such applicable Laws. To the Company's Knowledge, There has been no conduct by or on behalf of the Company that would reasonably be expected to render any issued Company Patents or any claim thereof invalid or unenforceable. To the Company's Knowledge, as of the Agreement Date, except as listed in Section 4.12(b)(i) of the Company Disclosure Schedule and except in the ordinary course of prosecution (such as office actions and search reports), there are no Legal Proceedings, including any inventorship challenge, opposition,

46

interference, derivation, reexamination, *ex parte* reexamination, *inter partes* review, *inter partes* reexamination, post grant review, reissue, invalidity, nullity or cancellation proceedings, pending for or involving or related to any of the Company Intellectual Property Registrations before any Registration Office, court, tribunal or other Governmental Authority, and, to the Knowledge of the Company as of the Agreement Date, no such Legal Proceedings are threatened or contemplated by any Governmental Authority or any other Person, nor does Company have Knowledge as of the Agreement Date of any circumstance or information that could give rise to any of the foregoing actions or proceedings. Except as listed in Section 4.12(b)(ii) of the Company Disclosure Schedule, no issuance or registration obtained and no application filed by the Company has been cancelled, abandoned, allowed to lapse or not renewed, except where the Company has in its reasonable business judgment decided to cancel, abandon, allow to lapse or not renew such issuance, registration or application.

(c)     To the Company's Knowledge, no Owned Company Intellectual Property, Owned Company Technology or Company Products are subject to any Legal Proceeding or Order against the Company, including any Legal Proceeding or Order restricting any use, transfer or licensing of such Owned Company Intellectual Property, Owned Company Technology or Company Products by the Company or that affects or challenges the validity, right to use or enforceability of such Owned Company Intellectual Property, Owned Company Technology or use of Company Products. To the Company's Knowledge as of the date hereof, no Licensed Company Intellectual Property or Licensed Company Technology included in any Company Product or otherwise used or held for use by the Company, and deemed as material component therein is subject to any Legal Proceeding or Order restricting any use, transfer or licensing of such Licensed Company Intellectual Property or Licensed Company Technology by the Company.

(d)     The Company is the sole and exclusive owner of, and has good, exclusive and marketable title to, all Owned Company Intellectual Property and Owned Company Technology free and clear of any Liens (except Permitted Liens), and all Owned Company Intellectual Property and Owned Company Technology are not subject to any payments except as set forth in Section 4.12(d) of the Company Disclosure Schedule (other than salaries payable to employees and independent contractors). All Owned Company Intellectual Property and Owned Company Technology are fully transferable, alienable and licensable by the Company and can be amended and modified by the Company, in each case without restriction (except Permitted Liens and any licenses and contractual restrictions contained in agreements entered into by the Company in the ordinary course of business or otherwise disclosed in Section 4.12(l)(i) of the Company Disclosure Schedule) and without payment of any kind to any Person.

(e)     The Company has valid and enforceable license or other right to use, practice and exploit all Licensed Company Intellectual Property and Licensed Company Technology in the manner in which the foregoing Intellectual Property Rights or Technology are or have been used, practiced and exploited. To the Company's Knowledge, the Company does not use, practice or exploit any Intellectual Property Rights and Technology in connection with its Business other than the Owned Company Intellectual Property, the Licensed Company Intellectual Property, the Owned Company Technology and the Licensed Company Technology.

(f)     To the Company's Knowledge, no Person other than the Company has any ownership interest in or exclusive rights to any Owned Company Intellectual Property or Owned

47

Company Technology or any improvements made by or for the Company to any Company Products or any Owned Company Intellectual Property or Owned Company Technology.

(g)    The Company has not (i) transferred ownership of, or granted any exclusive license or exclusive right under or with respect to, or authorized the retention of any exclusive right with respect to or joint ownership of, any Owned Company Intellectual Property or Owned Company Technology, (ii) permitted the Company's rights in any Owned Company Intellectual Property or Owned Company Technology to lapse or enter the public domain (except (a) with respect to Confidential Information that the Company no longer desires to keep confidential and identified in Section 4.12(g) of the Company Disclosure Schedule, or (b) where the Company has in its reasonable business judgment decided to enable it to lapse or enter the public domain), or (iii) granted to any Person any right to bring any claim or cause of action arising out of or related to infringement, misappropriation or violation of any Owned Company Intellectual Property or Owned Company Technology. No current or former manager, director, shareholder, founder, officer, employee, contractor, distributor, reseller or consultant of the Company owns or retains (and after giving effect to the transactions contemplated herein no such Person will own or retain) any right, title or interest in or to any of the Owned Company Intellectual Property or Owned Company Technology (other than, with respect to employees, contractors and consultants, the right to use such Owned Company Intellectual Property or Owned Company Technology within the scope of such Person's employment by or engagement with the Company).

(h)    Each current and former employee, contractor and consultant of the Company who was or is involved in or has contributed or is contributing to the creation or development of any Company Products, Owned Company Intellectual Property or Owned Company Technology for or on behalf of the Company has executed and delivered to the Company a written agreement, effective and enforceable in the jurisdiction in which such employee, contractor and consultant developed such Company Products, Owned Company Intellectual Property or Owned Company Technology, that (i) appropriately protects the confidentiality of all Confidential Information of the Company to which such employee, contractor or consultant has access, (ii) irrevocably assigns (to the fullest extent permitted by applicable Law) to the Company all right, title and interest in and to all Intellectual Property Rights or Technology created or developed by such Person during and in the scope of such Person's employment by or engagement with the Company (and, in the case of founders of the Company, any Intellectual Property Rights or Technology materially relevant and necessary to the Business created prior to the founder's employment or engagement with the Company), and (iii) if applicable, includes a waiver of or license to any and all moral rights and other non-assignable rights (to the extent possible under applicable Law and to the extent such rights were not assigned to the Company) such Person may possess in such Owned Company Intellectual Property Right or Owned Company Technology (collectively, the "Invention Assignment Agreements"). The Company has made available to the Parent true, correct and complete copies of all Invention Assignment Agreements. To the Company's Knowledge, no current or former employees, contractors or consultants of the Company who were or are involved in or has contributed or is contributing to the creation or development of any Owned Company Intellectual Property, Owned Company Technology or Company Products are in violation of their respective Invention Assignment Agreements. To the Company's Knowledge, no current or former employee, contractor or consultant of the Company owns or has claimed to have any rights in any Company Product, Owned Company Intellectual Property or Owned Company Technology. To the extent any Intellectual Property Right or

48

Technology covered by an Invention Assignment Agreement relates to Company Intellectual Property Registrations, and to the extent provided for by, and in accordance with, applicable Laws, the Company has recorded such Invention Assignment Agreements or other documents sufficient to evidence the assignment of such Intellectual Property Right or Technology to the Company, as applicable and appropriate, with the relevant Registration Office or Governmental Authority such that such Company Intellectual Property Registrations are in the name of the Company with no break in the chain of title. No current or former employee, contractor or consultant of the Company has ever expressly excluded any Intellectual Property Right or Technology from any Invention Assignment Agreement executed by such Person within the scope of such Person's employment by or engagement with the Company.

(i)     The Company has paid, in full, all mandatory payments to employees, contractors and consultants in relation to all Owned Company Intellectual Property and Owned Company Technology created and developed by such employees, contractors and consultants. Neither this Agreement nor any transaction contemplated herein is reasonably expected to result in any further amounts being payable to any current or former employees, contractors or consultants of the Company in relation to any Owned Company Intellectual Property and Owned Company Technology that would not have otherwise been payable in the absence of any transaction contemplated herein. The Company is not required to make any royalty payment, license payments or other payments, whether recurring or otherwise, to any Person, for the use of any Owned Company Intellectual Property or Owned Company Technology.

(j)     To the Company's Knowledge, there is no Order or other governmental prohibition or restriction, other than such which apply in general to the Company's industry, on the use, practice or exploitation of any Company Products, Owned Company Intellectual Property, Owned Company Technology or, to the Knowledge of the Company, Licensed Company Intellectual Property or Licensed Company Technology in any jurisdiction in which the Company currently conducts or has conducted Business or on the export or import of any of the Owned Company Intellectual Property or Owned Company Technology or Company Products from or to any jurisdiction which the Company currently conducts or has conducted Business.

(k)     To the Company's Knowledge, neither the current operation of the Business of the Company (including, as applicable, the design, development, manufacture, having manufactured, use, import, export, sale, offering for sale, provision, reproduction, display, performance, modification, licensing, disclosure, support, maintenance, commercialization or other exploitation of any Company Products or Company Software) nor the use, practice or exploitation of any Owned Company Intellectual Property or Owned Company Technology by or for the Company: (i) infringes or violates, has infringed or violated or; (ii) constitutes or results from misappropriation or misuse of, has constituted or resulted from misappropriation or misuse of any Intellectual Property Right or Technology of any Person; (iii) otherwise violates, or has violated any other rights of any Person (including any right to privacy); or (iv) constitutes, or has constituted unfair competition or trade practices. The Company has not received written notice from any Person of any claim (A) alleging any infringement, misappropriation, misuse, violation or unfair competition or trade practices with respect to any Intellectual Property Right or Technology, (B) that the Company must license from any Person or refrain from using any Intellectual Property Right or Technology or (C) challenging the validity, enforceability, effectiveness or ownership by the Company of any of the Owned Company Intellectual Property

49

or Owned Company Technology and to Company's Knowledge, no such claim is threatened by any Person and no reasonable and valid basis exists for any such claim. As of the Agreement Date, the Company has not received any written opinion of counsel regarding any allegation of infringement relating to the operation of the Business or to any Company Products, Owned Company Intellectual Property or Owned Company Technology.

(l)    Section 4.12(l)(i) of the Company Disclosure Schedule sets forth an accurate and complete list of all of the Contracts to which the Company is a party with respect to Owned Company Intellectual Property or Owned Company Technology licensed by the Company to any Person or pursuant to which the Company grants to any Person any immunity, authorization, consent, release, covenant not to sue or other right with respect to any Owned Company Intellectual Property or Owned Company Technology but excluding any Contract with a Person who was granted with a license or right to use Owned Company Intellectual Property or Owned Company Technology in order to perform services for the Company ("Outbound Intellectual Property Contracts"), except that non-disclosure agreements entered into in the ordinary course of business that constitute Outbound Intellectual Property Contracts need not be listed in Section 4.12(l)(i) unless the agreement includes commercial terms or Intellectual Property Rights licenses. As of the Agreement Date, the Company is not aware of any past or current material breach by any Person of the Outbound Intellectual Property Contracts. Section 4.12(l)(ii) of the Company Disclosure Schedule sets forth an accurate and complete list of all Contracts pursuant to which any Person has licensed any Intellectual Property Right or Technology to the Company or granted to the Company any immunity, authorization, consent, release, covenant not to sue or other right with respect to any Intellectual Property Right or Technology ("Inbound Intellectual Property Contracts", and, together with the Outbound Intellectual Property Contracts, the "Intellectual Property Contracts"), except that the following Inbound Intellectual Property Contracts need not be listed in Section 4.12(l)(ii) of the Company Disclosure Schedule: (a) Open Source Licenses, (b) nondisclosure agreements entered in the ordinary course of business (unless the agreement includes commercial terms or Intellectual Property Rights licenses), (c) Invention Assignment Agreements, (d) nonexclusive licenses for generally commercially available software, including off the shelf and shrink-wrapped software, and (e) licenses requiring payments of up to US$25,000 per license per annum. As of the Agreement Date, the Company has been, and is, in compliance, in all material respects, with the terms and conditions of all Inbound Intellectual Property Contracts. The Company has not been subjected to an audit of any kind in connection with any Inbound Intellectual Property Contracts or received any notice of any intent to conduct any such audit. The Company has made available to Parent true, correct and complete copies of all Intellectual Property Contracts.

(m)    Immediately following the Closing, the Company will be permitted to exercise all of the Company's rights under all Intellectual Property Contracts to the same extent the Company would have been able to had the transactions contemplated in this Agreement not occurred and without being required to pay any additional amounts or consideration other than fees, royalties or payments that the Company would otherwise have been required to pay had such transactions not occurred; in each case, except to the extent resulting from circumstances related to the Parent and/or its Affiliates.

(n)    Neither this Agreement nor any of the transactions contemplated herein will result in any of the following under or pursuant to any Contracts to which the Company is a party:

50

(i) any Person being granted rights or access to, or the placement in or release from escrow of, any Software source code or other Intellectual Property Rights or Technology, (ii) the Company, Parent or any of its Affiliates granting to any Person any ownership interest in, or any license, covenant not to sue, release or right under or with respect to, any Intellectual Property Rights or Technology or (iii) Parent or any of its Intellectual Property Rights or Technology being bound by, or subject to, any restriction on the operation or scope of their respective business as currently conducted; in each case, except to the extent resulting from circumstances related to the Parent and/or its Affiliates.

(o)    Section 4.12(o) of the Company Disclosure Schedule sets forth a true, correct and complete list of all (i) code owned by or developed by or for the Company that is incorporated or embedded in or bundled with any Company Products ("Company Software"), (ii) code not owned by the Company that is incorporated or embedded in or bundled with Company Products.

(p)    Section 4.12(p) of the Company Disclosure Schedule sets forth a true, correct and complete list of all Open Source Materials incorporated or embedded in, linked to or distributed with, any Company Software or Company Products, and (i) identifies the Open Source License (including version) applicable thereto, (ii) identifies, where available, a URL at which such Open Source Materials are available and at which such Open Source License is identified, (iii) states whether (and, if so, how) such Open Source Materials were modified by or for the Company, (iv) states whether such Open Source Materials were distributed by or for the Company, and (v) describes how such Open Source Materials are integrated with or interact with the Company Products or any portion thereof.

(q)    All use, modification and distribution of Company Software, Company Products and Open Source Materials by or for the Company or any of its Affiliates is in compliance in all material respects with all Open Source Licenses applicable thereto, including all copyright notice and attribution requirements.

(r)    The Company has not incorporated or embedded any Open Source Materials into, or combined, linked in any way, or distributed any Open Source Materials with, any Company Software or Company Products, or used or modified any Open Source Materials, in each case in a manner that requires or purports to require (or will require or purport to require following the Closing, when used in the same manner) any Company Software, Company Product, Owned Company Intellectual Property or Owned Company Technology, or any product or Software of Parent or any of Parent's Affiliates, or any portion thereof, to be distributed or made available under any Open Source License or that requires or purports to require the Company, Parent or any of Parent's Affiliates to grant any Patent license or other Patent rights.

(s)    Except as set forth in Section 4.13(s) of the Company Disclosure Schedule, neither the Company nor any of its employees, nor, to the Company's Knowledge, any of its contractors or consultants in the context of their employment or engagement with the Company (i) is or was a contributor, committer or submitter with respect to any open source projects or (ii) has licensed or made available any Company Software under any Open Source License. Section 4.12(s) of the Company Disclosure Schedule sets forth a true, correct and complete list of each open source project to which the Company or any of its employees, contractors or consultants in the context of

51

their employment or engagement with the Company has made contributions, commitments or submissions and, for each project (A) the name of the employee, contractor or consultant that made such contribution, commitment or submission in connection with such project, (B) the Open Source License pursuant to which such contribution, commitment or submission was made and (C) whether a corporate contribution license agreement was executed on behalf of the Company in connection with such project.

(t)    The Intellectual Property Rights and Technology owned by or validly licensed (pursuant to an enforceable written Inbound Intellectual Property Contract) to the Company constitute all Intellectual Property Rights and Technology necessary and sufficient for the Company to currently conduct its Business. None of the Transactions will alter, impair or otherwise adversely affect any rights of the Company in any Owned Company Intellectual Property or Owned Company Technology.

(u)    The Company has not: (i) disclosed, delivered or licensed, or permitted the disclosure, delivery or license of, any Company Software in source code form to any Person, whether through or from the Company, any escrow agent or any other Person, except to service providers engaged in development or hosting or storage activities for the Company in the Ordinary Course of Business pursuant to written agreements containing appropriate confidentiality obligations, (ii) granted any Person any rights, contingent or otherwise, to access or receive Company Software in source code form, except to service providers engaged in development or hosting or storage activities for the Company in the Ordinary Course of Business pursuant to written agreements containing appropriate confidentiality obligations, and (iii) entered into any escrow arrangement (or any Contract that contemplates any escrow arrangement) with respect to any Company Software. No event has occurred, and to the Company's knowledge, no circumstance or condition exists, that (with or without notice or lapse of time) will, or reasonably could be expected to, result in the delivery, license or disclosure of any such source code to any Person who is not, as of the Agreement Date, an employee, contractor or consultant of the Company who has executed an Invention Assignment Agreement or a service provider engaged in development or hosting or storage activities for the Company in the Ordinary Course of Business pursuant to a written agreement containing appropriate confidentiality obligations.

(v)    Except as set forth in Section 4.12(v) of the Company Disclosure Schedule, no (i) funding, personnel or facilities of any Governmental Authority, university, college, hospital or other academic or educational institution or research center (collectively, "Institutions") or (ii) funding from any Person (other than funds received in consideration for the Company shares) were used by the Company in the development of any Owned Company Intellectual Property, Owned Company Technology or Company Product. No Institutions have any rights in or with respect to any Owned Company Intellectual Property, Owned Company Technology or Company Product (to the extent owned or purported to be owned by the Company). To the Knowledge of the Company, as of the Agreement Date, no current or former employee, non-employee director or officer, consultant or independent contractor of the Company, who was or is involved in, or who contributed or contributes to, the creation or development of any Owned Company Intellectual Property, Owned Company Technology or Company Product, has performed services for, attended or was employed by or was under a scholarship from any Institution during a period of time during which such employee, non-employee director or officer, consultant or independent contractor was also performing services for the Company.

(w)    The Company has not entered into, applied for, requested, accepted, been notified in writing that it has been approved for, elected to participate in or received or become subject to or bound by any requirement or obligation relating to any Grants from any Governmental Authority, including any bi-national or multi-national (including European Union) grant programs for the financing of research and development or other similar funds. No Governmental Authority is entitled to receive any royalties or other payments from the Company, including, without limitation, with respect to any Owned Company Intellectual Property, Owned Company Technology or Company Products.

(x)    To the Knowledge of the Company as of the Agreement Date, no Person has infringed, misappropriated, misused or violated, or is infringing, misappropriating, misusing or violating, any Owned Company Intellectual Property, Owned Company Technology or Company Products. The Company has not made any claim against any Person alleging any infringement, misappropriation, misuse or violation of any Owned Company Intellectual Property, Owned Company Technology or Company Products, and has not invited any Person to take a license, authorization, covenant not to sue or the like with respect to any Owned Company Intellectual Property, Owned Company Technology or Company Products (except in the ordinary course of business development).

(y)    The Company has taken reasonable steps to protect and maintain the confidentiality of, and the rights of the Company in, the Company's Confidential Information and Trade Secrets. Without limiting the foregoing, The Company has required each current and former employee, contractor and consultant of the Company who has access to Company's Confidential Information to execute a written agreement that provides reasonable protection for such Confidential Information and Trade Secrets and all such current and former employees, contractors and consultants of the Company with access to such Confidential Information or Trade Secrets have executed such an agreement. All disclosures by the Company of any such Confidential Information or Trade Secrets have been made pursuant to a written agreement that provides reasonable protection for such Confidential Information and Trade Secrets. The Company has taken steps to protect the Trade Secrets or Confidential Information of any Person provided to the Company in accordance with its obligations of confidentiality with respect to such Trade Secrets or Confidential Information.

(z)    The Company has not received any written notice or request from any Person for indemnification with respect to any claim of infringement, misappropriation, misuse or violation of any Intellectual Property Rights or Technology.

(aa)    The IT Systems are adequate and sufficient (including with respect to working condition and capacity) for the operations of the Company as currently conducted. The Company has taken reasonable measures to preserve and maintain the performance, security and integrity of the IT Systems (and all Software, information or data stored thereon). Within the two (2) years prior to the Agreement Date, (i) there has been no failure with respect to any IT Systems that has had a material effect on the operations of the Company and (ii) to the Company's Knowledge, there has been no unauthorized access to or use of any IT Systems (or any Software, information or data stored thereon).

(bb)    Section 4.12(bb) of the Company Disclosure Schedule sets forth an accurate

53

and complete list of all of the Contracts to which the Company is a party with respect to any Intellectual Property Rights or Technology developed, created, authored or reduced to practice by the Company on behalf of or for the benefit of any third party.

(cc)    No (i) Company Product, (ii) Owned Company Technology or Owned Company Intellectual Property, or (iii) Works of Authorship authored, published or distributed by the Company includes, is based on, is derived from or required the license to use any Intellectual Property Rights or Technology which was developed by the Company for the benefit of or on behalf of any third party as listed in Section 4.12(cc) of the Company Disclosure Schedule.

(dd)    Section 4.12(dd) of the Company Disclosure Schedule contains a list of all standards-setting organizations, university or industry bodies and consortia and other multi-party special interest groups and activities in which the Company is currently participating or has previously participated ("Industry Organizations"). The Company is not subject to any membership agreements, bylaws, practices or policies of any Industry Organization (including with respect to licensing or non-assertion or any obligation or requirement that would impair or limit the Company's control of or ability to use or enforce any Intellectual Property Rights or Technology).    The Company has not made any commitments, promises, submissions, suggestions, statements or declarations to any Industry Organization, including any of the foregoing that would obligate the Company to grant licenses or agree to non-assert obligations to any Person or otherwise impair or limit the Company's control of or ability to use or enforce any Owned Company Intellectual Property or Owned Company Technology. No Company Patent has been identified by the Company, or, to the Knowledge of the Company, by any other Person, as essential to any standard promulgated by any Industry Organization. The Company does not implement any standard or specifications in any Company Products that would require the grant of any Intellectual Property Rights or Technology license to any Person.

(ee)    Except in the ordinary course of prosecution, no Registration Office has refused or rejected any Trademark application filed by or on behalf of the Company, and the Company is not aware of any other Person's prior rights in or to any such Trademark.

4.13    Material Contracts.

(a)    Section 4.13(a) of the Company Disclosure Schedule sets forth a complete and accurate list or description of all of the following Contracts to which the Company is a party or by which it is bound (collectively, together with the Contracts listed in Section 4.13(b) of the Company Disclosure Schedule (collectively, the "Material Contracts"):

(i)    Contracts with any current officer, director or Affiliate of the Company (excluding employment or equity related arrangements and indemnification agreements which have been made available to the Parent);

(ii)    agreements with stockholders of the Company and any other investors' rights agreement, voting agreements or registration rights agreements;

(iii)    Contracts required to be disclosed on Section 4.12(l) of the Company Disclosure Schedule;

54

(iv) Contracts that include any grant by the Company to any Person of any express license, right or covenant not to sue with respect to any Patents;

(v) Personal Property Leases and Real Property Leases;

(vi) (A) any pledge, security agreement, deed of trust or other Contracts that impose a Lien (other than Permitted Liens) on any of the Company's Assets, other than the obligation to sell specific Company Products identified in Contracts with customers in the Ordinary Course of Business and licenses in the Ordinary Course of Business under Inbound Intellectual Property Contracts set forth on Section 4.12(l)(ii) of the Company Disclosure Schedule and any other Permitted Liens; or (B) loan or credit agreement, indenture, debenture, note or other Contracts that create, incur or guarantee any Indebtedness, or (C) Contracts under which the Company assumes, or otherwise becomes liable for, the obligations of any other Person;

(vii) Contracts under which has made advances or loans to any other Person, except for advances of business expenses of up to $10,000 in the Ordinary Course of Business;

(viii) Contracts with any manufacturer for the Company Products (intended for mass production);

(ix) Contracts (or a group of related Contracts) that individually involved total payments by the Company in fiscal year of 2022 and in the first three months of 2023 in excess of $50,000; and Contracts (or a group of related Contracts) that based on the Company's good faith estimate are reasonably expected to involve payments by the Company in fiscal year 2023 in excess of $150,000;

(x) Contracts under which the Company is required to deliver or develop Company Products or to provide support and maintenance services for more than six (6) months from the Agreement Date;

(xi) Contracts that are not terminable by the Company on notice of ninety (90) days or less without penalty or other monetary liability;

(xii) Contracts relating to any single or series of related capital expenditures by the Company pursuant to which the Company has future financial obligations in excess of $100,000.

(xiii) Contracts for (i) the sale of any of the business, properties or assets of the Company other than in the Ordinary Course of Business, (ii) the grant to any Person of any preferential rights to purchase any of its properties or assets or (iii) the acquisition by the Company of any operating business, properties or assets, whether by merger, purchase or sale of stock or assets or otherwise (other than Contracts for the purchase of inventory or supplies entered into in the Ordinary Course of Business);

(xiv) distributor, sales representative, marketing or advertising Contracts;

(xv) Contracts that grant to any Person any (i) exclusive license, supply,

55

distribution or other exclusive rights, (ii) "most favored nation" rights, (iii) rights of first refusal, rights of first negotiation or similar rights or (iv) exclusive rights to purchase any of the Company Products or services;

(xvi)    Contracts for joint ventures or similar arrangements;

(xvii)    Contracts that by their terms explicitly purport to (A) limit, curtail or restrict the ability of the Company or any of its future subsidiaries or Affiliates to compete in any geographical area, market or line of business, (B) restrict the Persons to whom the Company or any of its future subsidiaries or Affiliates, may sell products or deliver services, (C) restrict the Persons the Company or any of its future subsidiaries or Affiliates may hire or (D) otherwise restrict the Company or any of its future subsidiaries or Affiliates from engaging in any aspect of the Company's Business;

(xviii)    Contracts required to be disclosed on Section 4.14(a)(iii) of the Company Disclosure Schedule, including Contracts for the employment of any individual on a full-time or part-time basis (other than Contracts providing for at-will employment), or Contracts with any individual consultant (other than temporary service provider arrangements) under which the Company has any current or future monetary liability and which are not terminable by the Company on notice of ninety (90) days or less without penalty or other monetary liability and Contracts providing for severance, retention, change in control or other similar payments;

(xix)    Contracts that involve an option to purchase, a right of first refusal or other similar potential right to acquire any material Assets or property interest or any Securities of any Person;

(xx)    Contracts that (A) have any Governmental Authority as a party; or (B) are with a party who is a subcontractor to any Governmental Authority in connection with such Contract;

(xxi)    Contracts that relate to the settlement of any Legal Proceeding;

(xxii)    Contracts establishing powers of attorney or agency agreements on behalf of any of the Company;

(xxiii)    Contracts that contain unlimited indemnification obligations to their customers or manufacturers by the Company, other than agreements entered into in the Ordinary Course of Business; and

(xxiv)    other than as set forth elsewhere on Section 4.13 of the Company Disclosure Schedule, all other Contracts that are material to the Business or operations of the Company and commitments or agreements to enter into any of the foregoing.

(b)    Section 4.13(b) of the Company Disclosure Schedule sets forth all Contracts to which the Company is a party or bound with its eight largest suppliers or business affiliates ("Substantial Suppliers") based on the amount paid or payable to such supplier or business affiliate by the Company. During 2022, no Substantial Supplier has: (i) stopped, or indicated in writing, an intention to stop, doing business with the Company; (ii) reduced, or indicated in writing, an

56

intention to reduce, substantially its business with the Company; or (iii) renegotiated or indicated in writing, that it has an intention to renegotiate the pricing terms or any other material terms of any Contract with such Substantial Supplier.

(c)     Each of the Material Contracts is in full force and effect and is the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). The Company has complied, in all material respects, with all of its performance requirements and obligations under the terms of all Material Contracts and the Company is not in material default or breach under the terms of any Material Contract , nor, to the Knowledge of the Company, does any condition exist that, with notice or lapse of time or both, would constitute a material default or breach thereunder by the Company. To the Knowledge of the Company, no other party to any Material Contract is in default or breach thereunder in any material respect, nor to the Knowledge of the Company, does any condition exist that with notice or lapse of time or both would constitute a material default or breach by any such other party thereunder. The Company has not received any written notice of termination or cancellation under any Material Contract or received any written notice of breach or default in any material respect under any Material Contract. The Company has made available to Parent true, correct and complete copies of all written Material Contracts (or a written description of the material terms of any Material Contract that is not written).

4.14    Employee Benefit Plans.

(a)     Section 4.14(a) of the Company Disclosure Schedule sets forth a correct and complete list of (i) all material "employee benefit plans" (as defined in Section 3(3) of ERISA), and (ii) all other material employee benefit plans, policies, agreements or arrangements (collectively, the "Company Plans").

(b)     Correct, complete and accurate copies of the following material documents with respect to each of the Company Plans have been delivered or made available to Parent by the Company to the extent applicable: (i) any Company Plans and all sub-plans and trust documents, insurance contracts or other funding arrangements, and amendments related thereto, (ii) the most recent audited financial statements and Forms 5500 and all schedules thereto, (iii) the most recent actuarial report, if any, (iv) the most recent IRS determination or opinion or advisory or notification letter (a "Determination Letter"), (v) the most recent summary plan descriptions required under ERISA with respect to each Company Plan, (vi) all material communications with participants and all material written correspondence to or from any Governmental Authority relating to any Company Plans, and (vii) all written summaries of all unwritten Company Plans.

(c)     The Company Plans have been established, administered, funded and maintained, in all material respects, in accordance with their terms and with all applicable provisions of ERISA, the Code and other applicable Laws. Each Company Plan providing for deferred compensation that constitutes a "nonqualified deferred compensation plan" (as defined in Section 409A(d)(1) of the Code and the regulations promulgated thereunder) has been established, administered and maintained in compliance in all material respects with the requirements of

57

Section 409A of the Code and the regulations promulgated thereunder. All contributions and premium payments required to have been made under any of the Company Plans or by applicable Law (without regard to any waivers granted under Section 412 of the Code), have been timely made, except as would not reasonably be expected to result in material liability to the Company.

(d)     Each Company Plan that is intended to be tax qualified under Section 401(a) of the Code is so qualified and has received, is covered by or has applied for a favorable Determination Letter from the IRS, and any trusts intended to be exempt from federal income taxation under the Code are so exempt. To the Knowledge of the Company, there are no facts or circumstances that would reasonably be expected to cause the loss of such qualification or exemption, or the imposition of any material liability, penalty or Tax under ERISA or the Code.

(e)     Neither the Company, nor any other entity which, together with the Company, would be treated, or in the last six (6) years has been treated, as a single employer under Section 4001 of ERISA or Section 414 of the Code (an "ERISA Affiliate") contributes to or has in the past six (6) years sponsored, maintained, contributed to or had any Liability in respect of (i) any defined benefit plan (as defined in Section 3(35) of ERISA), (ii) any plan subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA, (iii) a "multiemployer plan," as defined in Section 3(37) of ERISA, or (iv) a "multiple employer plan" within the meaning of Section 413(c) of the Code. None of the Company Plans provide for, and the Company has not incurred any current or projected Liability in respect of, post-employment life or health insurance benefits or coverage for any current or former employee, Contractor or director or any beneficiary thereof, except as may be required under Part 6 of the Subtitle B of Title I of ERISA, or similar state Laws any at the sole expense of such individual.

(f)     There are no pending Legal Proceedings arising from or relating to the Company Plans (other than routine benefit claims) that would, individually or in the aggregate, reasonably be expected to result in material liability to the Company, and, to the Knowledge of the Company, no facts exist that would reasonably be expected to form the basis for any such Legal Proceeding. No event has occurred and no condition exists that would, directly or by reason of the Company's affiliation with any of its ERISA Affiliates, subject the Company to any material Tax, fine, Lien (other than Permitted Liens), penalty or other liability imposed by ERISA, the Code or other applicable Law. With respect to each Company Plan, no investigation, audit, action or other Legal Proceeding by the Department of Labor, IRS or any other Governmental Authority that would, individually or in the aggregate, reasonably be expected to result in material liability to the Company is in progress, pending or, to the Knowledge of the Company, threatened.

(g)     Except as set forth on Section 4.14(g) of the Company Disclosure Schedule, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby (either alone or in combination with any other event) will under Law or Contract (i) result in any material payment becoming due to any current or former employee, Contractor or director of the Company, including any severance pay, retirement benefit or any other compensation or benefit according to any Law or Contract (ii) materially increase the compensation or benefits payable, including equity benefits, under any Company Plan, (iii) result in the acceleration of the time of payment, funding or vesting of any such compensation or benefits, including equity benefits, under any such Company Plan, (iv) require any material contributions or payments to fund any obligations under any Company Plan, (v) create any material limitation

58

or restriction on the right of the Company to merge, amend or terminate any Company Plan, or (vi) give rise to the payment of any amount that would not be deductible by Parent or the Surviving Company or their respective Affiliates by reason of Section 280G of the Code or would be subject to withholding under Section 4999 of the Code. There is no Contract by which the Company is bound to compensate any Person for excise taxes paid pursuant to Section 4999 or 409A of the Code.

(h)     No Company Plan is subject to the laws of any jurisdiction outside the United States.

4.15  Labor.

(a)     Section 4.15(a)(A) of the Company Disclosure Schedule sets forth a true, correct and complete list of all employees of the Company and includes, each employee's name and title, work location, date of hire or engagement, status, actual scope of employment (e.g., full or part-time or temporary), overtime classification (e.g., entitled or not entitled), prior notice entitlement, salary and any other material compensation and benefits, payable, maintained or contributed to or with respect to which any potential liability is borne by the Company (whether now or in the future) to each of the listed employees and including but not limited to the following entitlements: bonus (including type of bonus, calculation method and amounts received in 2022), deferred compensation, commissions (including calculation method and amounts received in 2022), overtime payment, severance obligations, obligation to provide compensation or benefits upon termination of employment or service other than as required by the law, vacation entitlement and accrued vacation, travel entitlement (e.g. travel pay, car, leased car arrangement and car maintenance payments) sick leave entitlement and accrual, shares and any other incentive payments, last compensation increase to date including the amount thereof, and whether the employee is on leave (and if so, the date on which such leave commenced and the date of expected return to work). Other than their salaries, the employees of the Company are not entitled to any material payment or benefit that may be reclassified as part of their determining salary for any purpose, including for calculating any social contributions. Except as set forth in Section 4.15(a)(B) of the Company Disclosure Schedule, the employment of each of the employees of the Company is terminable by the Company, at will, and upon termination of the employment of any such employee, no severance or other payments will become due, except as may be required under Part 6 of the Subtitle B of Title I of ERISA, or similar state Laws any at the sole expense of such individual. No employee of the Company is entitled (whether by virtue of any Law, Contract or otherwise) to any material benefits, entitlement or compensation that is not listed in Section 4.15(a)(A) of the Company Disclosure Schedule. The Company has not made any material promises or commitments to any of its employees, with respect to any future changes or additions to their compensation or benefits, as listed in Section 4.15(a)(A) of the Company Disclosure Schedule. Other than as listed in Section 4.15(a)(A) of the Company Disclosure Schedule (i) there are no other employees employed by the Company, and (ii) all current and former employees and Contractors of the Company have signed an employment agreement or engagement agreement (as the case may be) substantially in the form delivered or made available to Parent which in each case include undertakings concerning intellectual property and confidentiality. Details of any Person who has accepted an offer of employment made by the Company but whose employment has not yet started and any employee who was provided with or who received a notice of termination of his or her employment in the last twelve (12) months prior to the signing date of this Agreement

59

are contained in Section 4.15(a)(C) of the Company Disclosure Schedule. No Critical Employee of the Company has been dismissed in the last twelve (12) months prior to the signing date of this Agreement or has informed the Company (whether orally or in writing) of any plan to terminate employment with or services for the Company, and, to the Company's Knowledge, no such Person or Persons has any plans to terminate employment with or services the Company.

(b)    The Company is not and has never been a party to any collective bargaining agreement, or other Contract or arrangement with a labor union, works council, trade union or other organization or body involving any of its employees or employee representatives, or is otherwise required (under any Law, under any Contract or otherwise) to provide benefits or working conditions under any of the foregoing. The Company is not and has never been a member of any employers' association or organization. The Company has not paid, been required to pay nor has been requested to pay any payment to any employers' association or organization. There are no and have never been any labor organizations representing, and to the Knowledge of the Company there are no labor organizations purporting to represent or seeking to represent, any employees of the Company, and there are no representation proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of the Company, threatened to be brought or filed, with any labor relations tribunal. The Company has no Knowledge of any union organizing activities or proceedings of any labor union to organize any employees of the Company. The Company is not engaged, nor has ever been engaged, in any unfair labor practice of any nature. The Company has never had any strike, slowdown, work stoppage, lockout, job action or threat thereof, or question concerning representation, by or with respect to any of the employees of the Company.

(c)    The Company has not received written notice, and to the Company's Knowledge any verbal notice, of complaints, charges or claims against the Company and, to the Knowledge of the Company, no such complaints, charges or claims are threatened in writing, and to the Company's Knowledge any verbal threatened, by or before any Governmental Authority or based on, arising out of, in connection with or otherwise relating to the employment or termination of employment or failure to employ by the Company, of any individual. The Company is, and has been, in material compliance in all respects with all Laws relating to employees, employment and labor issues, including but not limited to: all such Laws relating to wages, hours, overtime and overtime payment, working during rest days, social benefits contributions, severance pay, termination of employment, engaging employees through services providers in accordance with the WARN Act, collective bargaining, discrimination, civil rights, safety and health, immigration, privacy issues, fringe benefits, employment practices, workers' compensation and the collection and payment of withholding or social security taxes and any similar tax. There has been no "mass layoff" or "plant closing" (as defined by WARN) with respect to the Company within the six (6) months prior to the date of this Agreement. The Company has properly classified all of its service providers as employed or self-employed, employees or independent contractors and as exempt or non-exempt for all purposes.

(d)    Section 4.15(d)(A) of the Company Disclosure Schedule sets forth a true and complete list of all present independent contractors and consultants ("Contractors") to the Company, and includes each Contractor's name, date of commencement, types of services provided, and rate of all regular compensation and benefits, bonus or any other compensation payable. Except as set forth in Section 4.15(d)(B) of the Company Disclosure Schedule, all

60

Contractors can be terminated on notice of thirty days or less to the Contractor. To the Company's Knowledge, all present and former Contractors are and were rightly classified as independent contractors and would not reasonably be expected to be reclassified by any Governmental Authority as employees of the Company, for any purpose whatsoever or to be entitled to any rights of an employee. All current Company Contractors have received all the rights to which they are and were entitled according to their applicable Contract with the Company. The Company is not engaged with any personnel through manpower agencies. The Company has not used the services of any temporary employees or "leased employees" (within the meaning of Section 414(n) of the Code).

(e)     Except as set forth in Section 4.15(e) of the Company Disclosure Schedule, the termination of all former employees and Contractors was in compliance with all material applicable Laws and Contracts and there are no outstanding obligations or Liabilities of the Company to such former employees and Contractors.The Company has made available to Parent: (i) accurate and complete copies of all such standard agreement forms; (ii) accurate and complete copies of all employee manuals and handbooks, all Company's policies and guidelines with regard to engagement terms and procedures and other material documents relating to the engagement of the employees and Contractors of the Company; (iii) a written summary of all unwritten policies, practices and customs in the Company; (iv) accurate and complete copies of all the employment agreements with the Critical Employees.

(f)     The Company is not liable for any payment to any trust or other fund or to any Governmental Authority, with respect to unemployment compensation benefits, social security or other benefits or obligations for employees (other than routine payments to be made in the Ordinary Course of Business, consistent with past practice). There are no pending claims against the Company under any workers' compensation plan or policy or for short or long term disability.

(g)     To the Knowledge of the Company, no current employee or Contractor of the Company: (i) has received an offer to join a business that may be competitive with the Business; (ii) is in violation of any term of any employment Contract, invention assignment agreement, patent disclosure agreement, non-competition agreement, non-solicitation agreement, or any restrictive covenant to a former employer relating to the right of any such employee to be employed by the Company because of the nature of the Business or to the use of trade secrets or proprietary information of others; or (iii) is providing any business or commercial services to any third party outside of his or her engagement with the Company that creates a conflict with such engagement with the Company.

(h)     Without derogating from any of the above representations, except as set forth in Section 4.15(h) of the Company Disclosure Schedule, the Company's liability towards its employees regarding severance pay, accrued vacation and contributions to all Company Plans are fully funded or if not required by any source to be funded are accrued on the Company's financial statements as of the date of such financial statements. All amounts that the Company is legally or contractually required to either (A) deduct from their employees' salaries and any other compensation or benefit or to transfer to such employees' Company Plans or (B) withhold from employees' salaries and any other compensation or benefit and to pay to any Governmental Authority as required by any applicable Law, have been duly deducted, transferred, withheld and

paid, in accordance with applicable Law, or if not required to be so withheld, have been accrued, and the Company has no outstanding obligation to make any such deduction, transfer, withholding or payment (other than routine payments, deductions or withholdings to be timely made in the Ordinary Course of Business and consistent with past practice).

(i)    Section 4.15(i)(A) of the Company Disclosure Schedule sets forth a true, correct and complete list of all employees and Contractors of the Company who are working in the United States and, to the Knowledge of the Company, are not United States citizens or permanent residents all of which hold proper work authorizations. Other than as detailed in Section 4.15(i)(B) of the Company Disclosure Schedule the Company does not engage any employee or Contractor, whose employment or engagement, to the Knowledge of the Company, requires special visas, licenses or permits.

(j)    To the Knowledge of the Company: (i) no allegations of sexual harassment have been made against any officer, director employee, or Contractor of the Company its Affiliates, and (ii) the Company and any of its Affiliates have not entered into any settlement agreement related to allegations of sexual harassment or sexual misconduct by an officer, director, employee or Contractor.

4.16    Litigation. Except as set forth on Section 4.16 of the Company Disclosure Schedule, there is (a) no pending or, to the Knowledge of the Company, threatened, Legal Proceeding against the Company or any of its properties or assets, (b) no pending or, to the Knowledge of the Company, threatened, audit, examination or, to the Knowledge of the Company, investigation by any Governmental Authority against the Company or any of its properties or assets, (c) no pending or, to the Knowledge of the Company, threatened Legal Proceeding that challenges the validity, or seeks to prevent, materially impair or materially delay consummation of the Mergers or any of the transactions contemplated hereby, (d) no pending or threatened in writing Legal Proceeding by the Company against any third party, (e) no settlement or similar agreement that imposes any material ongoing obligation or restriction on the Company, (f) no Order imposed or, to the Knowledge of the Company, threatened to be imposed upon the Company or any of its properties or assets, except for any Order which generally applies to all companies or similar companies in the industry, and (g) to the Knowledge of the Company, no Legal Proceeding threatened or pending against any of the directors, officers or employees of the Company in their capacity as such. Except as set forth on Section 4.16 of the Company Disclosure Schedule, the Company has not settled or compromised any Legal Proceeding or claim, whether filed or threatened, which settlement or compromise is or was material to the Company (other than a separation and release agreement entered into with a departing employee or consultant). Notwithstanding the foregoing, for all purposes of this Agreement, the Company does not make any representation or warranty (pursuant to this Section 4.16 or elsewhere in the Agreement) as to whether the Mergers will be the subject of any actual or threatened Legal Proceeding after the Agreement Date or will be challenged under any U.S. or foreign Antitrust Laws, unless at the Agreement Date it has a reasonable reason to believe that such Legal Proceeding will be brought after the Agreement Date.

4.17    Compliance with Laws; Permits.

(a)    The Company is and has been in compliance (i) with its Fundamental Documents, as in effect from time to time and (ii) in all material respects with all Laws and Orders

62

applicable to the Company and any of its business, properties or assets, and, to the Knowledge of the Company, no condition or state of facts exists that is reasonably likely to give rise to a material violation of, or a material liability or default under, any applicable Law or Order. The Company has not received any written notice to the effect that a Governmental Authority claimed or alleged that the Company was not in compliance in all material respects with all Laws or Orders applicable to the Company and any of its business, properties, or assets, except as would not reasonably be expected to be material to the Company.

(b)    Section 4.17(b) of the Company Disclosure Schedule contains a list of all material Permits which are required for the operation of the Business. The Company has all material Permits which are required for the operation of the Business. Company is not in default or violation, and, to the Company's Knowledge, no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation, in any material respect, of any term, condition or provision of any material Permit to which it is are a party, to which its business is subject or by which its properties or assets are bound. Company has not received any written notification from any Governmental Authority or any other Person asserting that (A) the Company is not in compliance with any Law, Permit or Order applicable to the Company or its Assets or Business; or (B) the Company may have an obligation to undertake, or to bear all or any portion of the cost of, any curative action of any nature.

4.18    Environmental Matters. The Company has not released any amount of any Hazardous Material. To the Knowledge of the Company, no Hazardous Materials are present in, on or under any property, including the land and the improvements, ground water and surface water thereof, that the Company has at any time owned, operated, occupied or leased. The Company has not transported, stored, used, manufactured, disposed of, released or exposed its employees or other Persons to Hazardous Materials in violation of any applicable Law or in a manner that would result in liability to the Company, nor has the Company disposed of, transported, sold, or manufactured any product containing a Hazardous Material (any or all of the foregoing being collectively referred to herein as "Hazardous Materials Activities") in violation of any rule, regulation, treaty or statute promulgated by any Governmental Authority to prohibit, regulate or control Hazardous Materials or any Hazardous Materials Activity. The Company has at all times complied with, and its uses and activities in the Facilities have at all times complied, in all material respects, with all Environmental Laws. Company has not received any written notice of any noncompliance of the Facilities or of its past or present operations with Environmental Laws. No notices, administrative actions or suits are pending or threatened in writing against the Company relating to Hazardous Materials or alleging a material violation of any Environmental Laws. Company has all material Permits and licenses required to be issued in connection with Environmental Laws and it is in compliance in all material respects with the terms and conditions of such Permits and licenses.

4.19    Insurance. Set forth on Section 4.19 of the Company Disclosure Schedule is a true, correct and complete list of all insurance policies held by the Company setting forth, in respect of each such policy, the policy name, carrier, term, type and amount of coverage. The Company has made available to Parent true, correct and complete copies of all such insurance policies. Such insurance policies (a) have been issued by insurers which, to the Knowledge of the Company, are reputable and financially sound, (b) are in full force and effect and (c) are for such amounts as are sufficient for all requirements of Law and all Contracts to which the Company is a party or by

63

which it is bound. No notice of cancellation or termination has been received by the Company with respect to any of such insurance policies and the Company has not received written notice of any retroactive material upward adjustment in premiums under any such insurance policies. To the Knowledge of the Company, no event has occurred, and the Company has not failed to give any notice or information, or given any inaccurate or erroneous notice or information, which limits or impairs the rights of the Company under, or would permit the termination or modification of, any such insurance policies. There is no claim by the Company outstanding under any such insurance policies, nor to the Knowledge of the Company, are there any circumstances likely to give rise to a claim.

4.20  Related Party Transactions. Except as set forth on Section 4.20 of the Company Disclosure Schedule, to the Knowledge of the Company, none of the respective directors, officers, or Stockholders of the Company (a) to the Company's Knowledge, owns any direct or indirect interest of any kind in, or controls or is a director, officer, employee or partner of, or consultant to, or lender to or borrower from or has the right to participate in the profits of, any Person which is (i) a competitor, supplier, customer, landlord, tenant, creditor or debtor of the Company, (ii) engaged in a business related to the Business, or (iii) a participant in any transaction to which the Company is a party or (b) is a party to any Contract with the Company, in each case, except in the Ordinary Course of Business.  For clarity, no disclosure will be required pursuant to this Section 4.20 with respect to any portfolio company of any venture capital, private equity or angel investor in Company.

4.21  Bank Accounts. Section 4.21 of the Company Disclosure Schedule contains a complete and correct list of each bank account or safe deposit box of the Company, the names and address of all banks in which the Company holds accounts or safe deposit boxes, and the names of all persons authorized to draw thereon or to have access thereto. No person holds a power of attorney to act on behalf of the Company.

4.22  Brokers and Financial Advisors. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Company in connection with the transactions contemplated by this Agreement or any other Transaction Document and no Person is entitled to any fee or commission or like payment in respect thereof.

4.23  Anti-Corruption Laws; Certain Business Practices. The Company has not nor has any director, officer, employee, or, to the Company's Knowledge, agent or other Person acting on behalf of the Company (a) violated the Foreign Corrupt Practices Act of 1977, as amended, the rules and regulations thereunder, applicable laws passed pursuant to the OECD Convention on Combating Bribery of Foreign Public Officials in International Transactions, dated 21 November 1977, or other similar (local or foreign) and applicable Laws that prohibit bribery, or corruption or any similar Law ("Anti-Corruption Laws"), (b) used any corporate or other funds for unlawful contributions, payments, gifts, or entertainment, or made any unlawful expenditures relating to political activity to foreign or domestic government officials, employees or others in violation of Anti-Corruption Laws, (c) accepted or received any unlawful contributions, payments, gifts or expenditures in violation, or which could be considered to be in violation, of any Anti-Corruption Laws or (d) made, offered or authorized any unlawful bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment. Neither the Company nor any director, officer, employee or, to the Company's Knowledge, agent of the Company has used any corporate funds

64

to maintain any off-the-books funds or engage in any off-the-books transactions nor has any of the before-stated parties falsified any documents of the Company. The Company has not conducted any internal or government-initiated investigation, or made a voluntary, directed, or involuntary disclosure to any Governmental Authority with respect to any alleged act or omission arising under or relating to any violation of any Anti-Corruption Laws.

4.24   Export Compliance.

(a)    The Company has not, nor, to the Company's Knowledge, has any director, officer, agent, employee or other Person acting on behalf of the Company violated or failed to comply in any material respect with any applicable Law related to the export or reexport of goods (including hardware, Software and technology), services and Know-how, including the Laws of (a) the Foreign Assets Control regulations administered by the Office of Foreign Assets Control in the United States Department of the Treasury ("OFAC"), the Export Administration Regulations administered by the United States Department of Commerce Bureau of Industry and Security ("BIS"), and the International Traffic in Arms Regulations administered by the U.S. Department of State's Directorate of Defense Trade Controls, (b) any other cognizant United States Governmental Authority; or (c) any other national government whose jurisdiction pertains to the Company and the Business (collectively, "Trade Control Laws"). None of the Company Products or the Company Technology (i) has any encryption means, or devices, or any other encrypted application or other technology whose development, commercialization or export is restricted under applicable Law or (ii) require the Company to obtain a license from an authorized body pursuant to applicable Law regulating the development, commercialization or export of technology. None of the Company Products are listed on the Commerce Control List of the Export Administration Regulations or subject to the International Traffic in Arms Regulations. The Company has not received any written notice of or been charged with the violation of, or to the Company's Knowledge has been under investigation for violation of Trade Control Laws.

(b)    The Company has not, during the past five years, engaged in any transactions, or otherwise dealt directly or indirectly, with (i) any Person organized under the laws of or ordinarily resident in a country or territory that is the subject of comprehensive sanctions (which currently comprise Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk, and Luhansk regions of Ukraine ("Restricted Countries"), or (ii) any Person designated on any Restricted Party list maintained by the U.S. government, including the Specially Designated Nationals and Blocked Persons List and the Foreign Sanctions Evader List administered by OFAC or the Denied Persons or Entity List administered by BIS, or any Person owned or controlled by, or acting on behalf of, a Person on any of the aforementioned U.S. government lists outlining individuals and entities deemed as, or connected with, terrorist organizations or "unlawful associations" (collectively, the "Restricted Parties").

(c)    The Company has made available to Parent copies of all written correspondence with any Governmental Authority relating to the export control classification of its products, enforcement matters, or any other inquiries, requests or communications with any Governmental Authority. The Company is not a Restricted Party and is not owned or controlled by, or acting on behalf of, a Restricted Party. To the Company's Knowledge, no Person affiliated with the Company, including its Employees, is a Restricted Party or owned or controlled by, or acting on behalf of a Restricted Party.

4.25  Social Media.  Section 4.25 of the Company Disclosure Schedule sets forth a true, correct and complete list of all Social Media Accounts that the Company uses, operates or maintains, including in connection with marketing or promoting any Company Products.  Section 4.25 of the Company Disclosure Schedule also lists, for each such Social Media Account, any account name(s), user name(s), nickname(s), display name(s), handle(s), and other identifiers registered or used by or for the Company with respect to such Social Media Account (collectively, "Social Media Account Names"). All use of the Social Media Accounts complies in all material respects with (i) all material terms and conditions, terms of use, terms of service and other Contracts applicable to such Social Media Accounts and (ii) applicable Law.

4.26  Solvency.  There has been no request by the Company or, to the Company's Knowledge, by any other person with respect to the Company for, nor, to the Company's Knowledge, has there been issued or commenced against or with respect to it any bankruptcy, receivership, freeze of proceedings, liquidation (whether voluntary or not), winding-up, arrangement with creditors, scheme of arrangement or other similar insolvency events, orders or proceedings, in each case, whether temporary or permanent.

4.27  Privacy.

(a)  The Company has (i) materially complied with all applicable Privacy Laws governing the receipt, collection, use, storage, registration of databases, processing, sharing, security disposal, disclosure, safeguarding, security or transfer (including cross-border) of Personal Information that is collected, processed or shared by or otherwise subject to the control of the Company, and materially complied with the Company's privacy policy and similar disclosures published on the Company's websites or otherwise communicated to third parties, (ii) implemented and maintained commercially reasonable technical and organizational measures designed to provide safeguards that will assist the Company to materially comply with such applicable Privacy Laws, including that the Company shall not acquire, fail to secure, share or use such Personal Information in a manner materially inconsistent with (A) such applicable Privacy Laws, (B) any notice to or consent from data subjects with regard to the use of their Personal Information, (C) any publicly available policy duly adopted by the Company, (D) any contractual commitment made by the Company that is applicable to such Personal Information, (E) any privacy policy or privacy statement from time to time published or otherwise made available by the Company to the Persons to whom the Personal Information relates, or (F) the Payment Card Industry Data Security Standard, with respect to any payment card data collected or handled by the Company, if any, or by third parties on the Company's behalf or having authorized access to the Company's records.

(b)  With respect to all Personal Information collected by Company, the Company has taken commercially reasonable steps required and necessary under the applicable Privacy Laws and its contractual obligations to protect such Personal Information against loss and against unauthorized access, use, modification, disclosure or other misuse, including implementing and monitoring compliance with reasonable measures with respect to technical and physical security of such Personal Information. The Company has industry standard safeguards (but not less than reasonable safeguards) in place to protect Personal Information in its possession or control from unauthorized access, including by its employees, independent contractors and consultants. To the Knowledge of the Company, there has been no loss or data breach incidents,

66

including any unauthorized access to or other misuse of any Personal Information maintained or processed by the Company or on behalf of the Company, and, to the knowledge of the Company, no third party misused any Personal Information collected by the Company.

(c)    The transfer of Personal Information in connection with the Transactions will not violate any applicable Privacy Laws or the Company's privacy policies as they currently exist or as they existed at any time during which any of the Personal Information was collected or obtained.  The Company is not subject to any contractual requirements or other legal obligations that, following the Closing, would materially prohibit the Company from receiving or using Personal Information in the manner in which the Company received and used such Personal Information prior to the Closing.

(d)    In connection with each third-party servicing, outsourcing or similar arrangement involving Personal Information acquired from or with respect to the Company, the Company has employed commercially reasonable efforts to contractually obligate any service provider to (i) comply with the applicable Privacy Laws with respect to Personal Information, (ii) take reasonable steps to protect and secure Personal Information from unauthorized disclosure, (iii) restrict use of Personal Information to those authorized or required under the servicing, outsourcing or similar arrangement, and (iv) certify the return or adequate disposal of Personal Information.

(e)    Except for disclosures of information required by applicable Privacy Law, authorized by the provider of Personal Information or pursuant to the Company's privacy policy and similar disclosures published on the Company's websites or otherwise communicated to providers of Personal Information, the Company has not sold, rented or otherwise made available, and does not sell, rent or otherwise make available, to third parties any Personal Information.

(f)    The Company has not received any written notice of any claims, investigations, or alleged violations of applicable Privacy Laws with respect to Personal Information possessed by or otherwise subject to the control of the Company, and, to the Knowledge of the Company, there are no facts or circumstances which are reasonably likely to form the basis for any such violation.

(g)    All employees of the Company with access to Personal Information are subject to a contractual or legal confidentiality obligation with respect to Personal Information and have received training in accordance with applicable Privacy Law and industry standards with respect to the processing and safeguarding of Personal Information.

(h)    The Company employs commercially reasonable efforts to make disclosures to, and obtain any necessary consents from, users, consumers, customers, employees, contractors, and other applicable Persons required by applicable Privacy Law and has filed any required registrations with the applicable data protection authority. A list of such required registrations is set forth in Section 4.27(h) of the Company Disclosure Schedule. Without limiting the generality of the foregoing, the Company, when required by applicable Privacy Law, has provided appropriate notice to, and, where required, received affirmative express consent from, all natural persons prior to the collection and processing of Personal Information by the Company.

4.28 <u>Full Disclosure</u>. This Agreement does not, and the Company Closing Certificate will not, (i) contain any representation, warranty or information that is false or misleading with respect to any material fact, or (ii) to the Company's Knowledge, omit to state any material fact necessary in order to make the representations, warranties and information contained herein and therein in the light of the circumstances under which such representations, warranties and information were or will be made or provided not false or misleading.

## REPRESENTATIONS AND WARRANTIES OF PARENT, MERGER SUB I, AND MERGER SUB II

Parent and each Merger Sub, jointly and severally, hereby represent and warrant to the Company, as of the Agreement Date and as of the Closing Date (or, if given as of a specific date, at and as of such date), as follows:

5.1 <u>Corporate Existence and Power</u>. Each of Parent, Merger Sub I and Merger Sub II (each, a "<u>Parent Party</u>") is a corporation (or, with respect to Parent, a limited partnership and with respect to Merger Sub II, a limited liability company) duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation. Since the date of its incorporation, Merger Sub I has not engaged in any activities other than in connection with or as contemplated by this Agreement. Merger Sub I was formed solely for the purpose of engaging in the transactions contemplated by this Agreement. All of the outstanding capital stock of Merger Sub I is, and at the First Effective Time, will be owned directly by Parent. Except for obligations or liabilities incurred in connection with its incorporation and as contemplated by this Agreement, Merger Sub I has not, and prior to the First Effective Time will not have, incurred, directly or indirectly through any subsidiary or Affiliate, any obligations or liabilities or engaged in any business activities of any type or kind whatsoever or entered into any agreements or arrangements with any person. Since the date of its formation, Merger Sub II has not engaged in any activities other than in connection with or as contemplated by this Agreement. Merger Sub II was formed solely for the purpose of engaging in the transactions contemplated by this Agreement. All of the outstanding equity interests of Merger Sub II are, and at the Second Effective Time, will be owned directly by Parent. Except for obligations or liabilities incurred in connection with its incorporation and as contemplated by this Agreement, Merger Sub II has not, and prior to the Second Effective Time will not have, incurred, directly or indirectly through any subsidiary or Affiliate, any obligations or liabilities or engaged in any business activities of any type or kind whatsoever or entered into any agreements or arrangements with any person. All of the outstanding stock of Parent at the First Effective Time and Second Effective Time will be, owned indirectly by Oddity. Each of Oddity, Parent, Merger Sub I, and Merger Sub II is in good standing in each jurisdiction and would have not a Material Adverse Effect on the ability of Oddity, Parent, Merger Sub I, or Merger Sub II to consummate the transactions contemplated by this Agreement.

5.2 <u>Corporate Authorization</u>. Each Parent Party has the absolute and unrestricted right, power and authority to enter into and to perform its obligations under this Agreement and each Transaction Document, and to consummate the transactions contemplated hereby and thereby; and the execution, delivery and performance by each Parent Party of this Agreement and each Transaction Document, have been duly authorized by all necessary action on the part of such

68

Parent Party and Oddity and no further action is required on the part of Oddity, Parent, Merger Sub I, or Merger Sub II to authorize this Agreement and each Transaction Document to which it is each a party to, and the transactions contemplated hereby and thereby. This Agreement and the actions to be performed hereunder constitutes the legal, valid and binding obligation of each Parent Party, enforceable against such Parent Party in accordance with its terms, subject to (a) laws of general application relating to bankruptcy, insolvency and the relief of debtors, and (b) rules of law governing specific performance, injunctive relief and other equitable remedies. Parent has the absolute and unrestricted right, power and authority to cause Oddity to perform all of its obligations under this Agreement, including without limitation, to timely and duly issue all Consideration Shares, Future RSUs and any other portion of the consideration hereunder (in cash or equity), either directly or indirectly, as set forth in this Agreement.

5.3    Consideration Shares. All Consideration Shares issued hereunder will be, when issued in accordance with the terms thereof: (A) duly authorized, validly issued, fully paid and non-assessable, and free from a Security Interest (other than as contemplated in Oddity's Fundamental Documents and as may be generally applicable under law, and with respect to the Restricted Class A Ordinary Shares only, which will be subject to the restrictions set forth in Schedule 5.3), and (B) issued in compliance with applicable securities laws and not subject to any preemptive rights created by statute, the articles of association of Parent, or any Contract to which Oddity, is a party or by which it is bound, nor subject to any restrictions on transfer created by Oddity (other than restrictions under this Agreement, Oddity's Fundamental Documents, and as may be generally applicable under applicable securities laws) and will have the rights, preferences, privileges, and restrictions set forth in the articles of association of Oddity, and will be duly registered in the name of the Equityholders in the Oddity's shareholders register.

5.4    Litigation. As of the Agreement Date, there is no there is no litigation, action, suit, proceeding, or arbitration pending or, to the knowledge of Parent, threatened against Oddity, Parent, Merger Sub I, or Merger Sub II, or to which Oddity, Parent, Merger Sub I, or Merger Sub II is otherwise a party, that in any manner challenges or would otherwise reasonably be expected to prevent, enjoin, alter or materially delay the Mergers or the other transactions contemplated by this Agreement.

5.5    No Prior Merger Sub Operations. Each of Merger Sub I and Merger Sub II was formed solely for the purpose of effecting the Mergers, has no assets or liabilities and has not engaged in any business activities or conducted any operations other than in connection with the transactions contemplated hereby.

5.6    Capitalization

(a)    The authorized share capital of Oddity as of immediately prior to First Effective Time is NIS 14,000 divided into (i) 10,000,000 Class A Ordinary Shares of nominal value NIS 0.001, each (ii) 2,000,000 Class B Ordinary Shares of nominal value NIS 0.001 each, and (iii) 2,000,000 Redeemable A Shares of nominal value NIS 0.001 each; All of the issued and outstanding shares of Oddity are duly authorized and validly issued, fully paid and nonassessable, and were issued in compliance with all applicable Laws and all requirements set forth in applicable Contracts. There is no liability for dividends declared or accrued and unpaid by Oddity.

69

(b)     As of the date hereof, other than as reflected in the Capitalization Table of Oddity made available to the Company prior to the date of this Agreement, at the date of this Agreement there are no other outstanding issued shares, securities or other instruments (including, but not limited to, any options, convertible notes, and warrants) of Oddity convertible into or exchangeable for shares or other securities of Oddity.

(c)     No shareholder of Oddity, other than LCGP3 Pro Makeup, L.P., entities controlled by Mr. Oran Holtzman and shareholders who received their securities pursuant to Oddity's incentive plan, is subject to(i)   any voting trusts, proxies, or other agreements or understandings with respect to the voting of the Oddity's issued and outstanding or unissued share capital; or, to Parent's knowledge (ii) any agreements in respect of registration, sale or transfer (including agreements relating to rights of first refusal, co-sale rights, or "drag-along" rights) of any of the Oddity's issued and outstanding unissued share capital, except as set forth in the articles of association of Oddity.

(d)     Oddity will have at or prior to the First Effective Time, sufficient reserved shares in its authorized but unissued share capital to allow the issuance and grant, as applicable, of the Consideration Shares.

(e)     To Parent's Knowledge, Oddity has not obtained, received or made aware of any valuation of Oddity's shares which is inconsistent with the Agreed Value.

5.7     Conflicts; Consents of Third Parties.

(a)     Neither the execution and delivery by Parent, Merger Sub I, and Merger Sub II of this Agreement and of the other Transaction Documents, nor the consummation of the transactions contemplated hereby or thereby, by Parent, Merger Sub I, and Merger Sub, nor the compliance by Oddity, Parent, Merger Sub I, and Merger Sub II with any of the provisions hereof or thereof will (i) conflict with, or result in the breach of, any provision of the certificate of incorporation or bylaws of Oddity, Parent, Merger Sub I, or Merger Sub II, (ii) conflict with, violate, result in the breach of, or constitute a default under any material Contract to which Oddity, Parent, Merger Sub I or Merger Sub II is a party or by which Oddity, Parent, Merger Sub I or Merger Sub II or their respective properties or assets are bound, (iii) violate any Order by which Oddity, Parent, Merger Sub I or Merger Sub II is bound or (iv) conflict with or result in the violation of any applicable Law.

(b)     The execution, delivery (where applicable) and performance by Oddity, Parent, Merger Sub I and Merger Sub II of this Agreement and the consummation by each Parent Party and Oddity of the transactions contemplated hereby require no action by or in respect of, or filing with, any Governmental Authority, other than (i) the filing of the Certificates of Merger with respect to the Mergers with the Delaware Secretary of State, (ii) compliance with any applicable requirements of the Securities Act, the Exchange Act and any other U.S. state or federal securities laws or the laws of any national securities exchange, and (iii) any actions or filings the absence of which would not be reasonably expected to materially impair the ability of any Parent Party   to consummate the transactions contemplated by this Agreement.

(c)     Parent represents that none of Parent or its respective directors, officers,

70

employees, or affiliates is (a) a Restricted Party; (b) organized under the laws of or ordinarily resident in a Restricted Country; or (c) 50% or more owned or controlled, directly or indirectly, by Restricted Parties or the government of a Restricted Country.

5.8 <u>Sufficiency of Funds</u>. Parent has sufficient Cash on hand or other sources of immediately available funds to enable it to make payment of the Net Cash Aggregate Merger Consideration and consummate the transactions contemplated by this Agreement.

5.9 <u>Reorganization; Tax Matters</u>.

(a) For U.S. federal income Tax purposes, (i) each of Oddity, Parent, and Merger Sub I is, and through the First Effective Time and Second Effective Time will be, classified as a C corporation (as defined in Section 1361(a)(2) of the Code), and (ii) Merger Sub II is, and through the First Effective Time and Second Effective Time will be, classified as a disregarded entity, and (iii) effective prior to the Closing and through the First Effective Time and Second Effective Time, Oddity will be "in control" of Parent for purposes of Section 368(a)(2)(D) of the Code. Neither Oddity, Parent, Merger Sub I, Merger Sub II, nor any of their Affiliates, have taken or agreed to take any action or knows of any fact, agreement, plan or other circumstance that is reasonably likely (A) to prevent the Mergers, taken together, from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code, or (B) cause the stockholders of the Company to recognize gain pursuant to Section 367(a)(1) of the Code. It is the present intention of Oddity and Parent through the Surviving Company, to continue at least one significant historic business line of the Company, or to use at least a significant portion of the Company's historic business assets in a business, in each case within the meaning of Treasury Regulations Section 1.368-1(d).

(b) For the entire thirty-six month period immediately preceding the Mergers, either Parent or a qualified subsidiary (as defined in Treasury Regulations Section 1.367(a)-3(c)(5)(vii)) or a qualified partnership (as defined in Treasury Regulations Section 1.367(a)-3(c)(5)(viii)) has been engaged in an active trade or business outside the United States, for purposes of Treasury Regulations Section 1.367(a)-3(c)(3). None of Oddity, Parent, Merger Sub I nor Merger Sub II (nor any of their Affiliates) has a plan or intention to substantially dispose of or discontinue (or to allow any qualified subsidiary or qualified partnership to substantially dispose of or discontinue) the active trade or business referred to in the preceding sentence. The fair market value of the total outstanding equity of Parent (not taking into account assets acquired outside the ordinary course of business, unless Parent is permitted to take such assets into account by Treasury Regulations Section 1.367(a)-3(c)(3)(iii)) is at least equal to the fair market value of the total outstanding equity of the Company.[2]

(c) Neither Parent nor any Affiliate was a passive foreign investment company within the meaning of Section 1297(a) of the Code for its taxable year that immediately precedes

---

[2] Could you explain why do we need outbound transfer language in a deal where a US corporation is acquiring another US corporation via a two steps merger structure? Response: Revela US shareholders are treated as exchanging stock in a US corp for stock in a non-US corp in the transaction, and thus are subject to the rules governing outbound transfers of US corp stock in a tax-free transaction. See Treasury Regulations Section 1.367(a)-3(d).

71

the Closing Date, and neither Parent nor any Affiliate expects that it will be a passive foreign investment company for its taxable year that includes the Closing Date.

5.10 Parent Financial Condition. Schedule 5.10 contains true, correct and complete copies of the consolidated and audited financial statements of Oddity as of December 31, 2021, and the consolidated and unaudited balance sheets of Oddity as of June 30, 2022, and September 30, 2022, which has been prepared in accordance with GAAP, consistently applied by the Company throughout the periods presented and presents fairly, in all material respects, the financial position, results of operations and cash flow of the Parent as an operational company as of the dates and for the periods indicated therein.

COVENANTS OF THE COMPANY

6.1    Conduct of the Business Pending Closing. Except as required by applicable Laws, as expressly required by this Agreement or any other Transaction Document or with the prior written consent of Parent, during the period from the Agreement Date until the earlier of the First Effective Time and the termination of this Agreement in accordance with its terms, the Company shall, except to the extent that Parent shall otherwise consent in writing (such consent not to be unreasonably withheld or conditioned) or except as contemplated by this Agreement (provided that Parent shall promptly respond (and in no event later than three Business Days from the date of a request) to any request for a consent under this Section 6.1 or Section 6.2.):

(a)    conduct its business only in the Ordinary Course of Business;

(b)    use commercially reasonable efforts, consistent with past practices, to (i) preserve its present business operations and organization intact, (ii) keep available the services of its present employees and (iii) preserve its present relationship with Persons having material business dealings with the Company (including customers and suppliers);

(c)    use commercially reasonable efforts consistent with past practices to maintain (i) all of its material assets and properties in their current condition, ordinary wear and tear, casualty and condemnation excepted, and (ii) its existing insurance policies in such amounts and of such kinds comparable to that in effect on the Agreement Date;

(d)    maintain the books, accounts and records in the Ordinary Course of Business;

(e)    maintain its current cash management practices and its policies, practices and procedures with respect to collection of accounts receivable, establishment of reserves for uncollectible accounts, accrual of accounts receivable, inventory control, prepayment of expenses, payment of accounts payable, accrual of other expenses, deferral of revenue, and acceptance of customer deposits in the Ordinary Course of Business; and

72

(f)    not take any action inconsistent with the provisions of this Agreement or any of the other Transaction Documents to which it is a party.

6.2    <u>Restrictions on the Conduct of the Business Pending Closing</u>. Except (i) as required by applicable Laws, (ii) as expressly required by this Agreement or any other Transaction Document or (iii) with the prior written consent of Parent (such consent not to be unreasonably withheld or conditioned), during the period from the Agreement Date until the earlier of the First Effective Time and the termination of this Agreement in accordance with its terms, the Company shall not:

(a)    declare, set aside, make or pay any dividend or other distribution in respect of Company Capital Stock or repurchase, redeem or otherwise acquire any outstanding shares of Company Capital Stock or other securities of, or other ownership interests in, the Company (except for repurchases of Company Capital Stock pursuant to Company repurchase rights arising upon termination of service of any employee, director or consultant of the Company);

(b)    transfer, issue, deliver or sell or authorize or propose the issuance, delivery or sale of, any shares of Company Capital Stock or stock units or securities convertible into, or subscriptions, rights, warrants or options to acquire, or other agreements or commitments of any character obligating it to issue any such shares or other convertible securities, other than the issuance of shares of Company Common Stock or other shares pursuant to the exercise of stock options or other rights exercisable or convertible into Company Capital Stock (including the Company SAFEs) outstanding as of the Agreement Date and disclosed on <u>Section 4.3(b)</u> of the Company Disclosure Schedule or the conversion of shares of Company Preferred Stock outstanding as of the Agreement Date and disclosed on <u>Section 4.3(b)</u> of the Company Disclosure Schedule;

(c)    effect any recapitalization, reclassification, stock split or like change in the capitalization of the Company;

(d)    amend the Fundamental Documents, except as needed to issue shares pursuant to the terms of the Company SAFEs;

(e)    (i) except for promises made and documented in the Ordinary Course of Business prior to the date of this Agreement, increase the compensation or fringe benefits of any present or former director, officer, employee or Contractor of the Company (except for payment of accrued or earned but unpaid bonuses), (ii) grant any new right to change in control, bonus, severance, termination or similar pay to any present or former director, officer, employee or Contractor of the Company except as required under applicable Law, Order or Company Plan set forth on <u>Section 4.14(a)</u> of the Company Disclosure Schedule, (iii) loan or advance any money or other property to any present or former director, officer, employee or Contractor of the Company, (iv) establish, adopt, enter into, amend or terminate any Company Plan or any plan, agreement, program, policy, trust, fund or other arrangement that would be a Company Plan if it were in existence as of the Agreement Date, except as required under applicable Law or Order, (v) grant any equity or equity-based awards, or (vi) hire, promote or change the classification or status in respect of any employee or individual in a level of directors and higher or whose annual salary is more than $150,000, or (vii) grant accelerate or change the vesting of, or terminate, any equity or

73