## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BRIAN HOARE Individually and on Behalf of All Others Similarly Situated,<br><br><br>Plaintiff,<br><br><br>v.<br><br><br>ODDITY TECH LTD., ORAN HOLTZMAN, LINDSAY DRUCKER MANN, SHIRAN HOLTZMAN-EREL, MICHAEL FARELLO, LILACH PAYORSKI, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, ALLEN & COMPANY, BOFA SECURITIES INC., BARCLAYS CAPITAL INC., TRUIST SECURITIES, INC., JMP SECURITIES LLC, and KEYBANC CAPITAL MARKETS INC.,<br><br><br>Defendants. | **Case No. 1:24-CV-06571-MMG**<br><br>**CLASS ACTION**<br><br><br>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... 7

I.  STATEMENT OF FACTS........................................................................................... 9

    A.  Early History ....................................................................................................... 9

    B.  The Initial Public Offering and Oddity's Attempt to Brand Itself a Tech Company 9

    C.  Secondary Public Offering.................................................................................. 10

    D.  The Truth Emerges.............................................................................................11

    E.  Plaintiffs' Investigation...................................................................................... 12

II.  ARGUMENT.............................................................................................................. 13

I.  The Complaint Adequately Alleges Material Misrepresentations and Omissions Under
    Section 11 of the Securities Act. ............................................................................... 13

    A. The Misrepresentations and Omissions Alleged Meet the Required Pleading
       Standards under Section 11........................................................................... 14

    B. The Complaint Sufficiently Alleges Oddity's Registration Statements Contain
       Materially Misleading Omissions and Misrepresentations Related to Undisclosed
       Oddity's Israeli Retail and Services Operations. ........................................... 15

    C. Oddity's Registration Statements Contained Materially Misleading Representations
       and Omissions Regarding Technology, Marketing, and Lawsuits. ............................. 16

       1.  The Registration Statements' representations about Oddity's technology and its
          effect on sales are materially misleading and actionable. .................................. 16

       2.  Oddity did not effectively disclose its Israeli retail operations through lease
          disclosures, or by the inclusion of the word "almost" in the Registration
          Statements............................................................................................ 19

       3.  The Registration Statements' omission to disclose the risks of their
          performance marketing practices is materially misleading and actionable...... 20

       4.  The Registration Statements' omission to disclose the risk of the lawsuits it was
          facing was materially misleading and actionable................................................ 21

       5.  Information about Oddity's Israeli operations was not publicly available. ....... 21

       6.  The SAC sufficiently alleges that Oddity's omission of its Israeli retail and
          services operations is material to investors. ......................................................... 22

    D. There is No Requirement Under Section 11 of the Securities Act for Plaintiffs to
       Plead or Prove Scienter.................................................................................. 24

E. Plaintiff Hoare has Standing to Assert a Claim Pursuant to Section 11 of the Securities Act. ........................................................................................................ 25

F. Plaintiffs Have Adequately Pleaded That Their Odddity Shares are Traceable to the 2023 and 2024 Registration Statements. ........................................................... 28

G. Plaintiffs' Claims Are Timely. ................................................................. 30

II. Plaintiffs State a Claim under Section 10(b) of the Exchange Act and Rule 10b-5. ..... 31

A. Plaintiffs Adequately Allege Misleading Statements and Omissions ..................... 31

1. Misstatements in Oddity's earnings releases and Form 20-F ........................... 31

i. Misstatements regarding AI ................................................................ 31

ii. Misstatements about Oddity's Israeli Retail and Services Operations.......... 32

B. The SAC Pleads a Strong Inference of Scienter. ................................................ 34

1. Defendant Holtzman's Scienter is Corroborated by Confidential Witnesses.... 36

2. Defendants' Statements Concerned Oddity's Primary Source of Revenue and Core Operation, Further Supporting Scienter ....................................... 37

3. Defendants Were Motivated to Mislead Investors. ................................... 38

C. Plaintiffs Adequately Allege Loss Causation. ................................................. 39

III. Plaintiffs State a Claim for Control Person Liability. ..................................... 39

III. CONCLUSION ............................................................................................. 40

## TABLE OF AUTHORITIES

**Cases**

*Akerman v. Oryx Commc'ns, Inc.*,
  810 F.2d 336 (2d Cir. 1987)............................................................................................. 20, 21

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) ................................................................................................... 7

*Amorosa v. Ernst & Young LLP*,
  682 F. Supp. 2d 351 (S.D.N.Y. 2010) ................................................................................ 22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................................ 23

*Barnes v. Osofsky*,
  373 F.2d 269 (2d Cir. 1967) .............................................................................................. 23

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................................ 23

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
  No. 07 CIV. 10528, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010) ................................... 22

*City of Pontiac Gen. Emples. Retirement Sys. v Lockheed Martin Corp.*,
  875 F. Supp 2d 359  (S.D.N.Y. 2012). ................................................................................ 28

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011)............................................................................................... 24

*Coronel v. Quanta Capital Holdings Ltd.*,
  No. 07 CIV. 1405 (RPP), 2009 WL 174656, at *12 (S.D.N.Y. Jan. 26, 2009) ........................ 19

*Cupat v. Palantir Techs.*,
  No. 1:22-CV-02805-GPG-SBP, 2025 WL 1141534, at *1 (D. Colo. Apr. 4, 2025) ................. 23

*DeMaria v. Andersen*,
  318 F.3d 170 (2d Cir. 2003) .............................................................................................. 20

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) .............................................................................................. 17

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000) .............................................................................................. 33

*Garnett v. RLX Tech. In*c., 632 F. Supp. 3d 574 (S.D.N.Y. 2022) *aff'd sub nom. Tseng v. De Vries*,
  No. 22-2787-CV, 2023 WL 8073087 (2d Cir. Nov. 21, 2023)................................................. 15

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
  95 F. Supp. 2d 169 (S.D.N.Y. 2000) .................................................................................. 19

*I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir.1991) ............................................................................................. 8, 10

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp.*,
  783 F.3d 383 (2d Cir. 2015) ............................................................................................ 17, 18

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) ................................................................................. 31, 32

*In re Ariad Pharms Sec. Litig.*,
  842 F.3d 744 (1st Cir. 2019) ....................................................................................................... 23

*In re Authentidate Holding Corp.*,
  No. 05 Civ. 5323 (LTS), 2006 WL 2034644, at *7 (S.D.N.Y. July 14, 2006) .......................... 22

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) ........................................................................................ 24

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) .................................................................................................... 23

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
  2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ............................................................................ 32

*In re Fuwei Films Sec. Litig.*,
  634 F. Supp. 2d 419 (S.D.N.Y. 2009) .................................................................................... 16, 21

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  643 F. Supp. 2d 562 (S.D.N.Y. 2009) ........................................................................................ 21

*In re IMAX Sec. Litig.*,
  587 F. Supp. 2d 471 (S.D.N.Y. 2008) ........................................................................................ 31

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) .................................................................................... 16, 22

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013) ........................................................................................ 15

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ............................................................................................. 8, 18, 21

*In re Pareteum Sec. Litig.*,
  No. 19 CIV. 9767 (AKH), 2021 WL 3540779, at *1 (S.D.N.Y. Aug. 11, 2021) ........................ 7

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015) .................................................................................... 22, 23

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir.) *cert. denied sub nom.*, Scholastic Corp. v. Truncellito, 534 U.S. 1071
  (2001) ............................................................................................................................................. 9

*In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*,
  774 F. Supp. 2d 584 (S.D.N.Y. 2011) ........................................................................................ 22

*In re Winstar Commc'ns*,
  No. 01 CV 11522, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) .................................... 33

*Karimi v. Deutsche Bank AG*
  607 F. Supp.3d 381 (S.D.N.Y. 2022) ......................................................................................... 12

*Lapin v. Goldman Sachs Grp., Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006) ........................................................................................ 28

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ........................................................................................... 7
*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020) ............................................................................. 7
*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells  Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) ...................................................................................... 7, 34
*Newman v. Warnaco Grp., Inc.*,
  335 F.3d 187 (2d Cir. 2003) ......................................................................................... 25
*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ......................................................................................... 33
*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019) ............................................................................ 32
*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ...................................................................................................... 19
*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  347 F. App'x 617 (2d Cir. 2009) .................................................................................... 8
*Rombach v. Chang*
  355 F.3d 164 (2d Cir. 2004) ........................................................................................... 8
*Set Capital LLC v. Credit Suisse Group AG*,
  996 F3d 64 (2d Cir. 2021) ............................................................................................ 28
*Setzer v. Omega Healthcare Invs., Inc.*,
  968 F.3d 204 (2d Cir. 2020) ......................................................................................... 17
*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992) ......................................................................................... 23
*Slack Technologies., LLC v. Pirani*,
  598 U.S. 759 (2023) ...................................................................................................... 23
*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406, 425 (2d Cir. 2008) ................................................................................... 7
*Stevelman v. Alias Rsch. Inc.*,
  174 F.3d 79 (2d Cir. 1999) ........................................................................................... 33

**Statutes**

15 U.S.C. § 77k(a) ............................................................................................................... 7
15 U.S.C. § 77k(e) ............................................................................................................. 20
15 U.S.C. § 78a.................................................................................................................... 19

**Rules**

Fed. R. Civ. P. 8.................................................................................................................... 8
Fed. R. Civ. P. 9(b) ...................................................................................................... 8, 9, 19

## PRELIMINARY STATEMENT

At the core of this action is Defendants' effort to present a conventional cosmetics business, Oddity Tech Ltd., that operates a chain of retail stores and is reliant on conventional marketing methods, as a pure-play, cutting-edge technology company leveraging state-of-the-art artificial technology to drive sales growth.  Oddity had long searched for a public identity to generate the market enthusiasm, and insider profits that its owners desired. From 2019 to 2023, it repeatedly pivoted its brand identity to align with the latest investment trend—from "solutions-as-a-service" in 2019, "data science" in 2021, "crypto-currency" in 2022, and finally "AI-driven technology" in 2023. Behind this carefully crafted façade, Oddity's longstanding and substantial Israeli retail presence—comprising 43 retail stores and seven beauty schools—belied its purportedly "almost entirely online" business model. Furthermore, its marketing and sales methods were entirely conventional, utilizing "Try Before You Buy" and subscription membership models. Defendants consciously concealed the magnitude of this substantial conventional sales operation, fully aware of its material significance to investors. Oddity's initial offering was a success and its insiders made millions of dollars from stock sales.

Investors began to be wary of Oddity after insiders first registered for sale, and then sold, substantial amounts of their stake in Oddity shortly after its IPO. This sale would make no sense if Oddity truly was on the cutting-edge of AI technology about to disrupt a massive, multi-billion dollar industry. Then, on May 21, 2024, NINGI Research published a detailed report exposing the truth about Oddity's business. Based on extensive research, including substantial Hebrew-language materials, as well as interviews with former Oddity employees, NINGI described Oddity's retail operations, its beauty schools, and its marketing methods which were old-school as well as aggressive, so much so that Oddity had been sued hundreds of times by upset customers.

These facts, documented in the NINGI Report, were the basis for NINGI's opinion that Oddity's stock was over-valued. Following the publication of the NINGI Report, Oddity's stock price plunged and investors lost millions of dollars.

Defendants' attack the NINGI Report as a "short-seller report" based on mere opinion. They also claim it contains no new information. Both arguments fall short. It is apparent from the NINGI Report that it contains detailed factual information that had not previously been readily available to investors. There is no other reason why Oddity's stock price declined so significantly immediately after its publication. In any event, Plaintiffs' allegations do not rise or fall on the NINGI Report; plaintiffs supported their allegations with findings from their own investigation.

Oddity misrepresented its business to investors in the Registration Statements for its two public offerings and in subsequent SEC filings and press releases. This was not mere oversight or incidental omission; they reflect a systematic attempt to mislead investors about Oddity's fundamental business structure, scale, and operational realities. Investors were thus deprived of material facts critical for making informed decisions. Oddity repeatedly presented itself falsely as a purely technology-driven, online-only enterprise. Oddity concealed material facts about its substantial Israeli retail presence, significant operational expenses, reliance on conventional marketing methods, and multiple undisclosed lawsuits, causing investors to purchase shares at artificially inflated prices based on incomplete and misleading information. Under Section 11 of the Securities Act of 1933, 15 U.S.C. §77k, and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and SEC Rule 10b-5, 17 C.F.R. 240.10b-5, Plaintiffs and the Class are entitled to damages. Defendants' motion to dismiss should be denied.

## I.  STATEMENT OF FACTS

### A.  Early History

Il Makiage was a cosmetics retail chain founded in 1972, which began franchising stores in Israel in 1996. ¶ 43. Defendant Oran Holtzman, fresh out of business school, used Oddity to purchase Il Makiage out of bankruptcy in 2013, and for roughly five years, was content to operate it as a legacy retail cosmetics brand with a beauty school services component. ¶¶ 44, 54. Holtzman harbored larger ambitions for Oddity, eventually seeking a significant rebranding of the company (¶¶3, 44, 54, 55). In June 2017, the investment firm *L* Catterton invested $34 million into Il Makiage to support Oddity's expansion into the United States retail cosmetics market, intending to open 40 stores. ¶¶3, 212. Importantly, this investment coincided with an effort to rewrite the brand's history, wherein references to Oddity's substantial retail presence in Israel disappeared from public-facing English-language documents prior to a planned IPO (¶¶55-56). Going forward, Oddity began attempting to brand itself with whatever technology term was trending at the time: in 2019, Oddity contended it was a solutions "as-a-Service" provider; in 2021, Oddity was described as a Data Science business; in 2022, Oddity purported to offer a cryptocurrency, and beginning in 2023, Oddity described itself as an artificial intelligence ("AI") technology company. ¶5.

### B.  The Initial Public Offering and Oddity's Attempt to Brand Itself a Tech Company

Oddity's Initial Public Offering (IPO) took place on July 19, 2023. In its Registration Statements for 2023 and 2024, Oddity repeatedly emphasized its identity as a technology-focused company, consistently downplaying any role of physical retail or conventional sales methods in its business model. Defendants stressed that Oddity's platform was "unconstrained by physical store footprints," highlighting its purported AI-driven technology and online-exclusive direct-to-consumer sales approach (¶¶113-132, 145-148). In its 2023 and 2024 Registration Statements,

Oddity described itself as "a consumer tech platform that is built to transform the global beauty and wellness market" and "a pure-play digitally branded platform" that Defendants set out to build "from Day 1". ¶113. In public disclosures and investor communications, Oddity insisted that its business did not rely significantly on brick-and-mortar retail, asserting that its online business model provided a competitive advantage and broader reach (¶¶117, 119, 121-132). Oddity's representations specifically emphasized its use of proprietary AI technologies, including PowerMatch and SpoiledBrain, claiming these systems significantly drove sales and consumer engagement (¶¶129-132). Oddity's IPO was a success and over 12 million shares were sold to the public at $35 per share, generating $57.26 million for Oddity and $337.83 million for its insiders, including Holtzman and *L* Catterton. ¶103.

### C. Secondary Public Offering

Despite having just realized a massive profit from their sales of Oddity shares in its IPO, insiders quickly arranged a for a secondary offering to sell another 4.9 million shares at a below-market price of $43.50. ¶105. This surprised investors as it was contrary to the Oddity's image as a high-growth AI technology company. ¶106. Oddity's stock price began to decline as a result. Nevertheless, Oddity continued with its secondary public offering on March 15, 2024, through a Form F-1 Registration Statement. This filing continued to stress the company's technology brand, once again omitting any reference to its significant retail presence in Israel. Crucially, Oddity asserted its business model's online-only nature, technology-driven sales, and AI capabilities. After registering the 4.9 million additional shares, they were sold into the market, driving Oddity's stock price down further. ¶112.

Investors and analysts were taken in by Oddity's efforts to brand itself a disruptor using advanced technologies to target consumers online, and its purportedly unique approach to cosmetics attracted attention and praise from analysts and investors. ¶114. In April 2024, Evercore

ISI published a research note praising Oddity's "differentiated Online-only strategy powered by AI-optimized product personalization." ¶115. Global money manager Baillie Gifford told its clients in November 2023 that they invested in Oddity because of its "online-only" model. ¶116. In a favorable coverage note published May 8, 2024, Truist Securities noted: "Oddity is a pure play, DTC [direct-to-consumer] model that aims to disrupt this massive industry through technology and proprietary data leverage at scale." ¶119. In a quarterly research note published May 8, 2024, Morgan Stanley described Oddity as having "100% of its exposure" in the "online channel".

### D. The Truth Emerges

On May 21, 2024, the NINGI Research report publicly revealed Oddity's deliberate concealment of its extensive Israeli retail operations. Contrary to Oddity's repeated representations of an online-only model, the report showed that Oddity was not a technology company. Instead, itoperated 43 physical stores in Israel and seven beauty schools, employing hundreds of undisclosed employees (¶¶10, 49, 57-61). Moreover, former employees confirmed that Oddity's technology-driven claims were significantly overstated. Rather than advanced AI systems, Oddity primarily relied on traditional marketing methods and customer engagement practices such as quizzes, giveaways, and aggressive advertising spend (¶¶58-68).

This disclosure sharply contradicted the defendants' representations in the IPO and secondary offering documents. Oddity's Class A ordinary shares dropped significantly, losing 7.37% immediately following the publication of the report and continuing to decline over subsequent trading days (¶¶124, 228-230). At this point in time, the corrective disclosure revealed to investors that Oddity operated a chain of 43 retail cosmetics stores and six beauty schools. ¶2.

### E. Plaintiffs' Investigation

After his appointment, Lead Plaintiff undertook to conduct an independent investigation of NINGI Report's allegations. In so doing, Plaintiffs' investigator interviewed several confidential witnesses who formerly worked at Oddity, as well as visited several of Oddity's brick-and-mortar stores and beauty schools to confirm their existence, and obtained corporate filings implicating Oddity of court cases involving Oddity in Israel, as well as investigating the cases implicating Oddity in the United States.

Plaintiffs interviewed three former employees in investigating Oddity. Confidential Witness ("CW")1 was a senior executive at Il Makiage's head offices in Tel Aviv until 2023 and had a broad view of all Il Makiage's stores, services, and programs in Israel. ¶63. CW1 confirmed that Il Makiage did not use technology to generate sales in Israel, but conventional marketing techniques like product giveaways and coupons. *Id.* CW2 was interviewed on February 3, 2025. CW2 was a midlevel manager in Israel until midway through 2023, and was involved in product development, working at the Il Makiage offices in Tel Aviv and reporting the General Manager in Israel. ¶48. According to CW2, generally, each retail store had more than seven employees, which, in accounting for each retail location, is at least 301 additional employees that Oddity never disclosed to investors. ¶49. CW3 is a former head of products, specializing in e-commerce strategy at Il Makiage. CW3 stated that Il Makiage is not a technology company but advertises itself as such in a feat of "excellent performance marketing … but it is not a technology company. There is no vision behind the corporation and no significant technology." ¶59. CW3 further corroborates that Oddity "had nothing to do" with AI technology before the term entered popular usage and therefore gained value as a marketing term. ¶60. Finally, CW3 made clear that Oddity's e-

commerce strategy depends not on technology, but its ability to effectively leverage advertising dollars. ¶61.[1]

## II.    ARGUMENT

On Rule 12(b)(6) motions to dismiss, courts "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in Plaintiffs' favor."[2] *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 169 (2d Cir. 2015). Dismissal is only appropriate where Plaintiffs "can prove no set of facts consistent with the complaint that would entitle them to relief." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021).[3]

### I.    The Complaint Adequately Alleges Material Misrepresentations and Omissions Under Section 11 of the Securities Act.

To assert a claim under Section 11, a complaint must allege that (1) the plaintiff purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. *In re Pareteum Sec. Litig.,* No. 19 CIV. 9767 (AKH), 2021 WL 3540779, at *1 (S.D.N.Y. Aug. 11, 2021*))* (citing *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011) (quoting 15 U.S.C. § 77k(a)). Significantly, Section 11 and Section

---

[1] Defendants' citation of *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) to attack the SAC is therefore misplaced. Def. Mem. at 12. *Long Miao* involves a complaint that "does not allege any independent corroborative facts, any independent investigation by counsel, or any contact by plaintiff's counsel with the interviewees[,]" and its allegations were "all reliant on [short-seller report publisher]'s attributions to unnamed persons, unlike in this case, where the SAC alleged corroborative facts and was based on an extensive independent investigation conducted by counsel. 442 F. Supp. 3d at 801; SAC at 1.

[2] Defendants purport to request the Court take judicial notice of the documents it filed with its motion. While the Court may take judicial notice of the existence of the documents, it should not accept them for the truth of their contents. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

[3] Emphasis is added and internal citations and quotation marks are omitted, unless otherwise noted.

12(a) provide for strict liability. *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004). For this reason, "plaintiffs bringing claims under section[] 11 . . . need not allege scienter, reliance, or loss causation." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

The test for whether a statement is materially misleading under Section 11 is "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991) (internal brackets omitted).

Here, Oddity's representations and omissions taken together and in context, would clearly have misled a reasonable investor as to its status as a technology company, the existence of an undisclosed brick-and-mortar retail and services operation in Israel, the use of conventional marketing techniques, rather than technology to drive sales, the risky and unsustainable performance marketing program's design, and the existence of undisclosed lawsuits and legal matters involving Oddity.

### A. The Misrepresentations and Omissions Alleged Meet the Required Pleading Standards under Section 11.

Defendants argue that Plaintiffs' Section 11 claims should be governed by the fraud pleading standard contained in Fed. R. Civ. P. 9(b). Plaintiffs' Section 11 claims, however, are not based in fraud but allege strict liability, in the case of Oddity, and negligence claims, against the remaining Defendants. As such, they are governed by Fed. R. Civ. P. 8's notice pleading standards, subject only to the "short and plain statement" requirements imposed by the rule. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 620-21 (2d Cir. 2009) (summary order); Fed. R. Civ. P. 8.

Even if Fed. R. Civ. P. 9(b)'s standards were applied to the Section 11 claims in the SAC, the allegations sufficiently identify the statements asserted to be fraudulent, and the reasons why,

along with who made them, and when and where they were made, satisfying Rule 9(b)'s specificity requirement. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir. 2001)

**B. The Complaint Sufficiently Alleges Oddity's Registration Statements Contain Materially Misleading Omissions and Misrepresentations Related to Undisclosed Oddity's Israeli Retail and Services Operations.**

The 2023 Registration Statement references Oddity's online business model over 96 times. ¶132. The 2024 Registration Statement contains 86 such references. ¶148. Of note, the 2023 Registration Statement indicates that Oddity is a "consumer tech platform that is built to transform the global beauty and wellness market" and "a pure-play digitally branded platform" that Defendants set out to build "from Day 1". ¶113. The 2023 Registration Statement further contains several references to Oddity's freedom from costs borne by legacy brick-and-mortar retailers: "[t]he potential reach of a successful online model is significant — unconstrained by physical store footprints or local marketing limitations. Our technology-powered model has the ability to reach a broad and diverse audience in beauty and wellness." ¶132. The 2023 Registration Statement trumpets the competitive advantages Oddity enjoys as online seller in a market "dominated by multi-brand brick-and-mortar retailers." ¶132. Additionally, the 2023 Registration Statement further singles out Il Makiage as "a prestige, digital beauty brand powered by ODDITY's consumer tech platform, which leverages data science, machine learning and computer vision capabilities to deliver high-quality online experiences for consumers." *Id*. "We are uniquely positioned for the future of beauty and are years ahead in terms of technology and online capabilities. We believe our business is completely different from those of the legacy beauty companies." *Id*. "We believe the combination of our almost entirely online and direct-to consumer business model, deep technology expertise, and exceptional product offerings positions us best to address the modern-day beauty and wellness consumer." *Id*.

A Founder's Letter incorporated with the Registration Statement and signed by Defendant Holtzman made the following representations:

> From Day 1 we set out to build a digital platform designed to learn from our users. We deployed algorithms and machine learning models leveraging user data seeking to deliver a precise product match and seamless shopping experience.
>
> …
>
> We have achieved a level of scale, growth, and profitability that we believe has never been done before by a **pure-play digitally branded platform**. We are a gateway for consumers to online adoption, with almost half of our customers shopping beauty online for the first time with us.

¶ 133.

Oddity's registration statements refer to its online-only business model so frequently that a reasonable investor would, upon reading its Registration Statements, have no idea that it operated a legacy retail and services business in Israel and utilized conventional marketing methods.

### C. Oddity's Registration Statements Contained Materially Misleading Representations and Omissions Regarding Technology, Marketing, and Lawsuits.

#### 1. The Registration Statements' representations about Oddity's technology and its effect on sales are materially misleading and actionable.

Contrary to the Defendants' contentions, Oddity's Registration Statements contain specific, verifiable claims about the extent to which technology is a driver of its sales, and these claims, when "taken together and in context, would have misled a reasonable investor []" as to the extent to which Oddity's technology drove its sales. *Oppenheimer*, 936 F.2d at 761.

Oddity's Registration Statements mention "AI" over 40 times. ¶¶129; 145. Specifically, the Registration Statements refer to applications of technology designed to excite investors, like "proprietary algorithms and machine learning models" and "AI", which the Registration Statements promise will "help identify correct products, formulations, and shades, reducing the

risk of incorrect selection and eliminating the need to physically try on products in-store." ¶¶129; 145. The Registration Statements also make specific, verifiable claims about the nature of Oddity as a technology business, referring to the employee count in Oddity's "tech team" comprising "over 40% of our headcount." *Id*.

The above statements in the Registration Statements regarding Oddity's use of technology in driving sales, and Oddity's status as a technology company, are false and misleading because as reported by a former head of products and specialist in e-commerce at Oddity, Oddity's sales success is not driven by technology, but by "performance marketing." ¶¶57-62. "There is no vision behind the corporation, and no significant technology." ¶59. Another former employee who worked at a senior executive in Oddity subsidiary Il Makiage's head offices in Tel Aviv until 2023 and was aware of all of Il Makiage's operations in Israel confirmed that Oddity did not use AI to generate sales, but traditional advertising methods like coupons and product giveaways. ¶63.

Similarly, Oddity's failure to disclose its Israeli operations means that statements regarding, for example, the size of its "tech team" as comprising "over 40% of [Oddity's] headcount[]" (¶129; 146) are materially false and misleading, as the SAC alleges that there are at least 301 undisclosed Oddity employees working in Oddity's undisclosed Israeli retail operations. ¶49; ECF No. 78-1 at 127. Oddity's reference to its use of technology, and its self-branding as a "technology company at [its] core" (¶145) is materially false and misleading to a reasonable investor, who would read the Registration Statements and not be aware of Oddity's Israeli retail and services operations, and would not be aware that much of Oddity's language regarding technology is an attempt to self-brand as a technology company, while in reality it is a legacy cosmetics retailer with an online presence.

Contrary to Defendants' contention, the cherry-picked statements about Oddity's technology were not puffery. Def. Mem. at 13. The thrust of these statements is not just an intent to disrupt an industry, but that Oddity is presently utilizing AI, proprietary algorithms, machine learning models, and hyperspectral imaging systems to drive sales, and that Oddity's workforce embodies its status as a technology company – not a company with a substantial legacy retail and services presence in Israel. It thus presented a misleading picture of Oddity's business model and its workforce. *See Karimi v. Deutsche Bank AG*, 607 F. Supp.3d 381, 392-94 (S.D.N.Y. 2022) (statements must be considered in context).

Further, Defendants' attempts to defend against technology misrepresentations as "forward-looking statements" are unavailing because, at the time the statements were made, they were not "forward-looking", but present statements of fact with present or past tense verbs that are unconditioned by statements of estimation or uncertainty. For example: "Our business model **is centered** on our in-house technology capabilities", "We **operate** a cutting-edge R&D and technology center in Tel Aviv that **is fully integrated** with our business operations in New York City". SAC ¶¶129; 145; 148.

Statements from CW3 confirm that Oddity's repeated reference to buzzy new technologies was materially false and misleading at the time those references were made: "[Oddity] is not a technology company. There is no vision behind the corporation and no significant technology." ¶59. CW3 also indicated that Oddity's repeated use of terms like "A.I." is not actual pursuit of technology, but "performance marketing[.]" ¶60. CW1 confirmed that Il Makiage used no technology to generate sales in Israel – just "traditional methods." ¶63. This is further confirmed by Oddity's repeated attempts to rebrand itself with the popular technology terms of the time: "provider of "as-a-Service" solutions in 2019, data science in 2021, a crypto-coin in 2022, and

artificial intelligence in 2023." ¶94. Finally, the "cautionary language" cited by Defendants (Def. Mem. at 15) is far too vague to be meaningful and appears to be targeted to risks of obtaining technology assets, rather than the risks associated with any particular strategy for the application of technology.

> **2.      Oddity did not effectively disclose its Israeli retail operations through lease disclosures, or by the inclusion of the word "almost" in the Registration Statements.**

Defendants contend that the inclusion of a single word "almost" in Oddity's 2023 Registration Statement, in describing its business model as "almost entirely online[4] and direct-to consumer", and the disclosure of some leases in consolidated financial statements buried over 200 pages in a note appended to Oddity's 2023 Form F-1 render Oddity's Israeli retail operations fully disclosed to investors. Def. Mem. at 12, Ex. 1 at F-21 ECF No. 78-2 at 32. Not so. Having read the statements in the Registration Statement regarding Oddity's business model, a reasonable investor would not read the word "almost" and gain awareness of Oddity's 43 physical stores in Israel, seven beauty schools, and approximately 301 employees.[5]

Further, the lease "disclosures" indicate only that, for the year ended December 31, 2022, Oddity had operating expenses in the amount of $5,133,000, operating lease ROU assets in the amount of $13,278,000, and total present value of lease liabilities in the amount of $11,966,000 for "various non-cancelable operating lease agreements for certain office spaces, stores and motor vehicles." Ex. 1 at F-21 ECF No. 78-2 at 32. While Oddity contends that it disclosed that some of

---

[5] The voluminous exhibits submitted by Defendants in support of their Motion to Dismiss (numbering some 1,828 pages) mention "retail store" only once – in Amended and Restated Articles of Association appended to the 2023 Form F-1.

the disclosed leases were for stores, this elides the fact that the size and scope of the Israeli operations was not disclosed by this statement, which lumps all leases into one statement.

Defendants also contend that a purportedly publicly available list of stores is available on a website operated by Oddity but concedes that such an inquiry would require accessing the Il Makiage Israel website, which is entirely in Hebrew. Def. Mem. at 12-13. Defendants further point to a picture of Defendant Holtzman in an Il Makiage store in Israel as further evidence of the public availability of information regarding Oddity's Israeli retail operations, but this image of Defendant Holtzman was published in a company profile on Ynet, an Israeli news publication published entirely in Hebrew. ECF No. 78-7, Ex. 7. None of the "publicly available information" regarding Oddity's Israeli presence was published in English language public sources.

3. **The Registration Statements' omission to disclose the risks of their performance marketing practices is materially misleading and actionable.**

CW3 stated that Oddity's success in sales is driven primarily by conventional advertising. (SAC ¶61). In response, Defendants point to a generic disclosure in the Registration Statements: "We invest strategically in performance marketing," The portion of this "disclosure" quoted by Defendants leaves out the second part of the statement – which emphasizes Oddity's "tech platform" as driving sales, which would lead a reasonable investor to believe that Oddity's sales and "engagement" are driven at least as much by Oddity's technology as by its consumer marketing practices. Further, the SAC does not only allege that Oddity failed to disclose that it uses performance marketing practices, but that it "does not disclose that Oddity uses social media marketing and promotion practices to generate sales for Il Makiage and SpoiledChild **that are both deceptive and unsustainable**." ¶¶ 135; 196. Nowhere in Oddity's purportedly "explicit disclosures" could an investor find mention of the risks of Oddity's practices which the SAC alleges "create reputational risk, and upset consumers, which could lead to regulatory

investigations – similar programs to Oddity's try-before-you-buy program have been investigated

by the FTC – and are therefore material to investors, they should have been disclosed[.]" ¶¶ 136;

197.

### 4. The Registration Statements' omission to disclose the risk of the lawsuits it was facing was materially misleading and actionable.

As alleged in the SAC, Oddity failed to disclose that it was named in hundreds of lawsuits

filed by customers resulting from its traditional marketing and sales methods.  SAC ¶¶ 69-84.

Defendants attempt to defend against Plaintiffs' allegations by resort to vague and general

disclosures about the possible effects of litigation that Defendants "may in the future be involved

in[ ] . . . relating to, among other things, regulatory matters, data privacy and cybersecurity,

commercial matters, intellectual property, competition, tax, employment, pricing, discrimination

and consumer rights[]" presents exactly the type of "[v]ague disclosure[] of general risks" that do

not protect Defendants under Second Circuit law. *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F.

Supp. 2d 277, 304 (S.D.N.Y. 2013). Further, the purported disclosure of legal risks does in no way

"directly address exactly the risk that plaintiffs claim was not disclosed" *In re MF Glob. Holdings*,

982 F. Supp. 2d at 304, namely that Oddity was involved in hundreds of lawsuits, and in particular,

exposed to lawsuits and potential regulatory legal proceedings given its risky marketing strategies

which upset consumers and the existence of hundreds of undisclosed employees in Israel. ¶¶4; 70

### 5. Information about Oddity's Israeli operations was not publicly available.

When information alleged to be publicly available is hidden behind a language barrier or

contained in news reports that are too sporadic to clarify or contextualize alleged misstatements

on their own, such information does not render misrepresentations immaterial. *Garnett v. RLX*

*Tech. In*c., 632 F. Supp. 3d 574, 609 (S.D.N.Y. 2022) *aff'd sub nom. Tseng v. De Vries*, No. 22-

2787-CV, 2023 WL 8073087 (2d Cir. Nov. 21, 2023). *In re Merrill Lynch & Co., Inc. Rsch. Reps.*

*Sec. Litig.*, 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003) is inapposite because, in that case, the plaintiff alleged conflicts of interest between brokerage firms, investment firms and research analysts, the factual basis for which she obtained from SEC filings and other public sources. *Merrill Lynch & Co*, 272 F. Supp. 2d at 250. Additionally, the plaintiff conceded in her complaint that she became aware of the alleged conflicts of interest through public sources, which extensively documented the complained-of conflicts of interest in established and widely available English-language news publications. *Id*., at 251-52. In contrast, the only way investors could have gained knowledge about Oddity's Israeli operations would have been through the ability to read and comprehend Hebrew, and presence of mind to search for Hebrew language news sources before 2018.

Rather, the Court should look to *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 438-39 (S.D.N.Y. 2009) in which this Court rejected defendants' argument on a motion to dismiss that publication of information in three Chinese-language newspaper articles excused defendants' failure to disclose information in SEC filings, holding that there are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document, on the basis that the information is public knowledge and otherwise available to them when it is published overseas and in a foreign language.

This case is factually similar to *In re Fuwei*, because the cited "publicly available" sources are all in Hebrew, like the allegedly public information in *In re Fuwei.* Accordingly, the Court should reject Defendants' attempt to disclaim responsibility for inadequate disclosures to investors on the basis of publication in a language that most investors likely do not understand.

### 6. The SAC sufficiently alleges that Oddity's omission of its Israeli retail and services operations is material to investors.

As a mixed question of law and fact, materiality is "rarely resolved at the motion to dismiss stage." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 213 n. 12 (2d Cir. 2020). Regardless, Oddity's omission of its Israeli retail and services operations are material to investors as it completely undermines Oddity's image as a pure-play, AI technology company. An omission is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp.*, 783 F.3d 383, 389-90 (2d Cir. 2015) (citing *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co*., 553 F.3d 187 (2d Cir. 2009). *ECA*, 553 F.3d at 197 (alterations and internal quotation marks omitted). "In other words . . . there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (internal quotation marks omitted). On a motion to dismiss, a complaint may not be properly dismissed unless the misstatements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (internal quotation marks omitted).

The SAC clearly lays out the reasons for the materiality of Oddity's undisclosed stores: "In addition to the labor costs of the undisclosed retail stores, there are maintenance and renovation costs, and just as the stores were undisclosed to investors, so were the attendant costs of running a legacy brick-and-mortar cosmetics operation." ¶50. It is substantially likely that a reasonable investor would consider the revelation of Oddity's undisclosed legacy retail and services operations as "having significantly altered the 'total mix'" of available information. When the attendant costs of operating a substantial legacy retail and services business are considered, it is extremely unlikely that a reasonable investor would consider this information "so obviously

unimportant" as to foreclose disagreement over its importance, especially for a company that has gone to such great lengths to brand itself as a technology company, free of such costs. The decline of Oddity's stock price after the publication of the NINGI Report supports the inference that it contained material, new information that affected Oddity's stock price. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (movement in stock price rendered are relevant for materiality assessment).

Defendants point to the "preliminary assumption of immateriality" granted to misrepresentations related to less than 5% of a financial statement. *IBEW*, 783 F.3d at 390 (2d Cir. 2015). The Second Circuit continue to state that "This 'rule of thumb,' however, is not conclusive" and proceeds to list a number of qualitative factors that should also be considered. *IBEW*, 783 F.3d at 390-91. Here, when the standard for dismissal and qualitative factors are considered, Oddity's purportedly quantitatively immaterial statements must be treated as material. The qualitative importance of a purported pure-play, AI technology company actually operating a substantial chain of retail stores, with all the employee cost as well as litigation that entails, is a qualitative factor that indicates materiality. A reasonable investor looking for a tech company would not consider 43 stores and seven beauty schools and approximately 301 employees "so obviously unimportant" that "reasonable minds could not differ on the question of their importance." ¶¶10, 49, 57-61.

### D. There is No Requirement Under Section 11 of the Securities Act for Plaintiffs to Plead or Prove Scienter.

Defendants argue that because Plaintiffs "make no scienter allegations for their Section 11 claims", they should be dismissed. Def. Mem. at 18. Scienter, however, is not an element of a claim pursuant to Section 11 of the Securities Act and, therefore, there is no requirement for a plaintiff to allege it. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)("unlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. § 78a et seq., plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation."); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 179 (2015)(plaintiff pursuant to Section 11 "need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud.")

Defendants argue that the application of Rule 9(b) to the Securities Act claim introduces a requirement to plead scienter. Def. Mem. at 18. Even putting to one side whether Rule 9(b) properly applies to Plaintiffs' Section 11 claims here, a procedural rule cannot introduce a substantive element to a statutory claim that the statute expressly excludes. To the extent that the District Court in *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 CIV. 1405 (RPP), 2009 WL 174656, at *12 (S.D.N.Y. Jan. 26, 2009) imposed a scienter requirement on plaintiff pursuant to Section 11 of the Securities Act, it was mistaken and contrary to binding Supreme Court and Second Circuit authority. Notably, District Court in *Coronel* dismissed the Section 11 claims for failure to plead "any material untruths or omissions" in the relevant offering documents rather than any failure to meet a non-existent scienter requirement. See *id.*, at *23; see also id., at *12 ("A plaintiff may establish Section 11 and 12(a)(2) claims by alleging only negligence.") Defendants' other authority involves claims under the Securities Exchange Act of 1934, which do have a scienter element, rather than claims under the Securities Act. *See Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 170 (S.D.N.Y. 2000).

### E. Plaintiff Hoare has Standing to Assert a Claim Pursuant to Section 11 of the Securities Act.

Plaintiffs alleging a claim under Section 11 of the Securities Act have no requirement to plead loss causation, which is not an element of a Section 11 claim. *In re Morgan Stanley*, 592 F.3d at 359. Nevertheless, Defendants seek to introduce one by disguising a requirement to plead

loss causation as a "standing" argument. Def. Mem. at 18-20. To establish standing under Section 11, a plaintiff need only allege that it acquired a security traceable to the allegedly misleading registration statement and suffered a cognizable loss pursuant to the statutory measure of damages contained in Section 11(e), 15 U.S.C. § 77k(e). *See DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003)("aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11 of the 1933 Act.").

Here, there is no question that both Plaintiffs purchased Oddity shares that were traceable to the 2023 Registration Statement as Gordon purchased shares on July 26, 2023 and Hoare purchased shares on March 7, 2024, before the Secondary Offering. Hoare also sold shares below the IPO price of $35.00, thus having cognizable losses under the statutory damages measure. Hoare also purchased Oddity shares on March 15, 2024, the day of the Secondary Offering, which are alleged to be traceable to the 2024 Registration Statement,[6] and sold below the Secondary Offering price of $43.50 or held to the date of the filing of the Initial Complaint, when Oddity's stock was trading at $40.12 per share. Thus, Hoare has alleged standing to allege Section 11 claims based on the 2024 Registration Statement as well.

There is a so-called "negative causation" defense under Section 11(e). Importantly, Defendants bear the burden of proving this defense which is typically addressed at summary judgment or at trial because of the intensive fact inquiry that is required as well as expert analysis. *See Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987)(noting "heavy burden" on defendants at summary judgment to prove negative causation which "reflects Congress' desire to allocate the risk of uncertainty to the defendants in these cases."). "Generally speaking, defendants bear the burden of demonstrating the applicability of each of these defenses, which are therefore

---

[6] Defendants' arguments regarding tracing are addressed in Part II.I.F, below.

unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)" *In re Morgan Stanley*, 592 F.3d at 360, at n.7; *see also In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009)("the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion"); *In re Fuwei*, 634 F. Supp. 2d at 444 (negative causation defense "more properly considered on a motion for summary judgment.") Notably, in *Akerman*, plaintiffs were allowed to take discovery on trading by insiders and other market participants as well as submit expert analysis to connect to misrepresentations in the registration statement stock price declines that occurred before their public disclosure. 810 F.2d at 342-43. Only on summary judgment could the District Court undertake the factual analysis necessary to determine if defendants had established their negative causation defense.

Similarly, Plaintiffs here have alleged stock price declines from March 12, 2024, when the Secondary Offering was announced, to April 4, 2024 which were the result of concerns indicated about Oddity's business that were fully revealed by the publication of the NINGI Report on May 21, 2024. Plaintiffs plausibly allege that these declines caused losses attributable to the misrepresentations and omissions contained in the 2023 and 2024 Registration Statements that are recoverable from Defendants under Section 11. SAC ¶¶ 106, 112, 124. Plaintiffs are entitled to discovery to obtain evidence to prove this allegation. *See In re Fuwei*, 634 F. Supp. 2d at 444 (motion to dismiss denied where plaintiff adequately alleged various pre-disclosure declines were related to alleged misrepresentations and omissions in the Registration Statement). The sufficiency of this evidence may be challenged by Defendants at summary judgment but is premature at the pleading stage.

This case is, therefore, distinguishable from the cases cited by Defendants where plaintiffs could identify no connection with stock price declines occurring before the final public disclosure

of misrepresentations in the registration statement. *See In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 596 (S.D.N.Y. 2011)(mutual fund prices based on NAV and unaffected by misrepresentations of fund investment policies in prospectus); *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, No. 07 CIV. 10528, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010)(complaint and public filings positively established decline was not caused by false statements in prospectus); *Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 371 (S.D.N.Y. 2010)(no connection between allegedly misleading audit opinion and stock price declines which failed to mention any audit issue); *In re Merrill Lynch*, 272 F. Supp. 2d at 254–55 (plaintiff concession of no pre-public disclosure of misrepresentation precluded recovery of pre-disclosure price declines).

### F.   Plaintiffs Have Adequately Pleaded That Their Odddity Shares are Traceable to the 2023 and 2024 Registration Statements.

Plaintiffs allege that they purchased Oddity shares that were issued "pursuant to, or traceable to" the 2023 and 2024 Registration Statements. See SAC ¶¶ 169 and 171. Such allegations, together with the timing of the allegedly misleading registration statements and the plaintiff share purchases, have been consistently held sufficient to plead tracing in this District. "At the pleading stage, a plaintiff's general allegations that securities were purchased pursuant or traceable to a false registration statement sufficiently state a claim." *In re Pareteum*, No. 19 CIV. 9767 (AKH), 2021 WL 3540779, at *19 (S.D.N.Y. Aug. 11, 2021)(gathering cases); *see also In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 384 (S.D.N.Y. 2015)(pleading standard satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement); *In re Authentidate Holding Corp.*, No. 05 Civ. 5323 (LTS), 2006 WL 2034644, at *7 (S.D.N.Y. July 14, 2006) (holding that Section 11 plaintiffs "are not required to explain how their shares can be traced" at pleading stage). This is a "lenient pleading standard" that "reflects the

reality that '[b]efore discovery takes place ... it is impossible for plaintiffs to know whether their shares were newly issued or were purchased in the secondary market.'" *In re Pareteum*, 2021 WL 3540779, at *19 (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 286 (3d Cir. 1992)).

It is therefore incorrect, as argued by Defendants, that the application of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544(2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), require more detailed allegations regarding tracing. Def. Mem. at 23. Courts have consistently upheld complaints based on the general allegation of traceability even while applying the *Twombly* and *Iqbal* pleading standards. *See*, *e.g. In re Petrobras*, 116 F. Supp. 3d at 377 (applying *Twombly* and *Iqbal*). Similarly, it is also incorrect to label these cases as involving a "simple scenario of a single IPO". *Petrobras*, for example, concerned multiple offerings over three years. *Id*. at 376; *see also In re Pareteum*, 2021 WL 3540779, at *9 (claims arising from merger and from secondary offering). Finally, the Supreme Court's recent decision in *Slack Technologies., LLC v. Pirani* provides no reason to revisit this well-established pleading rule, as *Slack* simply endorsed the longstanding tracing requirement established by the Second Circuit in 1967. 598 U.S. 759, 768 (2023)(endorsing rule from *Barnes v. Osofsky*, 373 F.2d 269, 272 (2d Cir. 1967)).

Defendants urge this Court to ignore the well-established precedent in this District and instead adopt a different pleading standard proposed by out-of-circuit authority. *See* Def. Mem. at 21-22 (citing *In re Ariad Pharms Sec. Litig.*, 842 F.3d 744, 755-6 (1st Cir. 2019); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013); *Cupat v. Palantir Techs.*, No. 1:22-CV-02805-GPG-SBP, 2025 WL 1141534, at *1 (D. Colo. Apr. 4, 2025)). The Court should reject this attempt. As Judge Hellerstein noted when rejecting a similar argument: "These authorities are

not binding on this Court, and in any event, I and others in this district reject such a burdensome pleading standard." *In re Pareteum*, 2021 WL 3540779, at *20, n.6 (gathering cases).[7]

### G.  Plaintiffs' Claims Are Timely.

Defendants assert, without authority, that Plaintiffs were on notice of their claims under Section 11 as soon as the 2023 and 2024 Registration Statements were published on July 19, 2023 and March 15, 2024 respectively, because "all the underlying facts were publicly available." Def. Mem. at 23-24. As set forth above, information indicating that the Registration Statement had misrepresented Oddity's business was introduced into the market beginning with the insider sales via the Secondary Offering and then fully described by the detailed NINGI Report. The NINGI Report contained significant information that was not widely available to investors, including information from corporate searched in Israel which require translation from Hebrew as well as information from Oddity employees.

For a Section 11 claim, "the limitations clock starts when the plaintiff discovers, or should have discovered … the facts constituting the 'untrue statement or the omission'". *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012). "The question is whether a plaintiff could have pled ′33 Act claims with sufficient particularity to survive a 12(b)(6) motion to dismiss more than one year prior to the filing of the operative complaint." *Id*. (applying *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)). This is a fact-intensive inquiry that is generally ill-suited for resolution on a motion to dismiss. *Id*. ("a motion to dismiss will only be granted where 'uncontroverted evidence irrefutably demonstrates [that the] plaintiff discovered or should have discovered" facts sufficient

---

[7] To the extent the Court requires Plaintiffs to plead additional facts demonstrating a "chain of title" to specific Registration Statements, Plaintiffs will seek leave to conduct limited discovery to obtain the necessary data from markets and regulators. *See Rose v. Butterfly Network, Inc.*, No. 22-CV-00854 (MEF)(JBC), 2025 WL 501427, at *6 (D.N.J. Feb. 13, 2025).

to adequately plead a claim.'")(quoting *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 193 (2d Cir. 2003)).

There is no incontrovertible evidence that Plaintiffs could have pled a claim under Section 11 sufficient to survive a motion to dismiss based on either the 2023 or the 2024 Registration Statements before the NINGI Report was published on May 21, 2024. Even though investors had started to suffer losses as a result of stock price declines caused by insider sales in the Secondary Offering, specific misrepresentations and omissions in the 2023 and 2024 Registration Statements could not have been alleged with particularity before the detailed, new, and non-public information contained in the NINGI Report. As Plaintiffs alleged Section 11 claims arising from the 2023 and 2024 Registration Statements by May 20, 2025, i.e., within one year, none of their claims is time-barred.

## II.    Plaintiffs State a Claim under Section 10(b) of the Exchange Act and Rule 10b-5.

### H.  Plaintiffs Adequately Allege Misleading Statements and Omissions

In addition to the materially misleading statements and omissions contained in the Registration Statements and outlined in Part II.I *supra*, Defendants made false and misleading statements in earnings releases and the Form 20-F filed with the SEC.

#### 1.    Misstatements in Oddity's earnings releases and Form 20-F
##### i.    Misstatements regarding AI

Defendants attempt to reframe the alleged misstatements regarding AI as being directed towards Oddity's efforts to disrupt the cosmetics industry. This fails for several reasons – first, the Defendants leave out the central allegation contained in the cited paragraph – that Oddity attributes its success to technology, rather than conventional marketing methods. The SAC does not need to distort the statements to imply that 'Oddity's sales and growth were primarily the result of its use of AI'", the statements speak for themselves. Oddity stated that it was "leveraging data science,

artificial intelligence, and computer vision to deliver superior products and experiences to our over 40 million users." SAC ¶ 189. In reading this statement, a reasonable investor would interpret Oddity's statement to attribute its positive earnings and results as resulting from AI and technology. *Id*. The use of the present tense in this statement reveals that Oddity is attributing its current success, to technology, and not the vague idea of future success. A reasonable investor would not read these statements as attributing Oddity's success to anything but technology. Similar statements are contained in Oddity's Second, Third, and Fourth Quarter 2023 Earnings Releases, SAC ¶¶189-92.

While the Defendants contend that "[n]othing about those statements attributes sales primarily to AI[,]" when the statements are considered in context, it is clear that Oddity is attributing its success in selling cosmetics to its technology. These statements are not "plainly forward-looking and inactionable as corporate puffery" (Def. Mem. at 28) for the same reasons the statements contained in the Registration Statement are not forward-looking or puffery– the statements plainly contain language in the present-tense and contain specific language. *See* Part II.II.C.1 *supra*

With respect to the statements contained in the 20-F, Oddity's attempt to defend by arguing that the 20-F never disclaimed that it used marketing or advertising fails for the reasons given above – that Oddity utilizes traditional methods without disclosing to investors that it does not use technology to generate sales, but conventional methods.

        **ii.**      **Misstatements about Oddity's Israeli Retail and Services Operations**

The Earnings Reports and 20-F's omission to disclose that Oddity's brick-and-mortar retail and services business in Israel makes Oddity's statements about Oddity's business strategy contained in the in the 20-F and Earnings Reports materially misleading because it does not tell

the whole story to investors, who would believe from those statements that Oddity is an online business, not a legacy retailer that expanded into online sales. Merely including the word "almost" in a 20-F is not enough – given the volume of statements made about online operations – to inform reasonable investor about Oddity's brick-and-mortar businesses. *See* Part II.I.B.3 *supra*. For the reasons above, information about Oddity's brick-and-mortar operations were not publicly available, and also for the reasons above, information about Oddity's brick-and-mortar operations were material. *Meyer*, 761 F.3d at 250.

Specifically, the 2023 Form 20-F states:

> **We are a technology company seeking to reinvent every aspect of a massive industry**. Our tech team is the largest team within our company today and comprises over 40% of our headcount as of December 31, 2023. We invest heavily in data science, machine learning, and computer vision, and we have an evergreen commitment to exploring and investing in emerging technologies. Our **technology innovations, when combined with our world-class physical product range and compelling brands built to win online**, aim to eliminate significant friction for customers and support a seamless end-to-end user experience.
> …

¶194.

Importantly, the Form 20-F omits completely any mention of Oddity's legacy retail and services presence in Israel as well as its reliance on conventional marketing. It is misleading to make so many statements to investors presenting Oddity as a technology company without disclosing that it is also a legacy cosmetics retailer and services provider. Oddity could have disclosed that the company was transitioning to an online-only technology platform, but still had assets in Israel and a plan to get rid of them. It did not – because everyone knew that the value of Oddity was have plummeted if it revealed it was not a built-for-purpose technology company but an online cosmetics store grafted onto a rump legacy cosmetics retailer and services provider. These statements are misleading because they imply that Oddity is *not* an "Established Offline Player[,]" or a "multi-brand brick-and-mortar retailer[,]" but a digital disruptor.

### B.  The SAC Pleads a Strong Inference of Scienter.

Scienter is adequately plead upon showing either: 1) motive and opportunity to commit the fraud; or 2) strong circumstantial evidence of conscious misbehavior or recklessness. *Set Capital LLC v. Credit Suisse Group AG*, 996 F3d 64, 78 (2d Cir. 2021). Circumstances evidencing the latter may include that defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). Courts must consider scienter "'holistically,' considering 'all of the facts alleged, taken collectively,' rather than 'any individual allegation, scrutinized in isolation.'" *Set Capital*, 996 F.3d at 78. Plaintiffs' inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre," but rather "cogent and at least as compelling as any opposing inference[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emples. Retirement Sys. v Lockheed Martin Corp.*, 875 F Supp 2d 359, 372 (S.D.N.Y. 2012).

The SAC's allegations holistically support a strong inference that Defendant Holtzman was aware of, or recklessly disregarded, that Oddity that Oddity did not use technology, be it "AI" or other buzzy technology to generate sales, but conventional advertising and marketing; had 43 retail cosmetics stores and seven beauty schools in Israel, employing 301 people; that certain of Oddity's performance marketing practices created reputational risk and risk of regulatory enforcement, and that Oddity was subject to legal proceedings in both Israel and United States, in departure from what investors had been led to expect, and contradicting Defendants' public statements.

Defendants' post-Class Period admissions of knowledge in the response to the NINGI Report, issued after the Class Period (ECF No. 78-9) strongly support their scienter. *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) (Second Circuit "explicitly recognize[s] that plaintiffs may rely on post-class period [statements] … to confirm what a

defendant should have known during the class period."). Defendants admitted that they knew about the "43 retail stores and 6 beauty schools" comprising the "brick and mortar business in Israel"; the "hundreds of lawsuits" mentioned by the NINGI Report; – later substantiated by Plaintiffs' investigation; the deliberate attempt to brand Oddity's conventional retailer business with an online component as a technology business driving Oddity's profits; and negative customer sentiment regarding the design of Oddity's Try Before You Buy program. While the response was ostensibly intended to refute the NINGI report's allegations, Defendants' attempt to refute the NINGI Report revealed that Defendants had knowledge of the falsity of the statements and omissions alleged to be materially false and misleading by the SAC. *See* ¶¶208-222.

Not only did Defendants admit their knowledge of Oddity's brick-and-mortar retail and services operations in Israel, lawsuits facing Oddity, and the deliberate attempt to cast Oddity's conventional sales and advertising-driven sales as caused by technology, but Defendants had contemporaneous awareness of facts contradicting their public statements regarding Oddity's online-business model and omission of Oddity's Israeli retail and services operations. In 2018, Holtzman was photographed inside an Il Makiage retail store in Israel for an article in the Hebrew language publication Ynet. ¶46. In addition, Holtzman's specific role and history at Oddity raise a strong inference that he had actual knowledge of, facts contradicting Oddity's statements regarding its Israeli legacy business, its marketing itself as a technology company despite being a performance marketing company, and the lawsuits facing it, or access to information contradicting such statements and omissions. Defendant Holtzman purchased Oddity out of bankruptcy, and ran it as a conventional cosmetics retailer and service provider in Israel since 2013. ¶¶ 44-45. Defendant Holtzman's involvement with Il Makiage from the outset, and his status as the face of the brand in interviews raises a strong inference of scienter.

Oddity's Registration Statements are filled with references both to Oddity's purportedly online business model and nature as a technology company. Specifically, the Registration Statements mention "AI" over 40 times. ¶¶129; 145. The 2023 Registration Statement references Oddity's online business model over 96 times. ¶132. The 2024 Registration Statement contains 86 such references.  ¶148. The Individual Defendants all signed the Registration Statements. ¶ 166. Given the volume of references to Oddity's online business model and technology purportedly driving Oddity's economic performance and differentiating it from other brick-and-mortar cosmetics retailers, it is difficult to believe that the absence of any attempt to inform investors of Oddity's reliance on more conventional sales techniques and the existence of 43 brick-and-mortar stores and 7 beauty schools in Israel is a mere oversight. Such emphasis on a fact that, without disclosure of more facts, is misleading to investors supports a strong inference of scienter.

### 1.    Defendant Holtzman's Scienter is Corroborated by Confidential Witnesses

CW3, a former head of products specializing in e-commerce strategy at Oddity, stated that "Oddity is what we call excellent performance marketing … but it is not a technology company. There is no vision behind the corporation and no significant technology." ¶59. "I will say it clear and sharp: their success is not because of technology." ¶60. CW3 further indicated that Oddity's strategy depends on its ability to effectively leverage advertising spend - a strategy used by all corporations that advertise significantly, which has "absolutely nothing" to do with technology. ¶ 61. "There's no technology in ODDITY." *Id*. These statements raise a strong inference that if a high-level executive was aware of Oddity's lack of technology, then Defendant Holtzman possessed a similar knowledge and awareness. CW1 corroborated CW3's allegations as to Oddity's employment of "traditional methods" rather than technology to generate sales.¶63. CW1 was a senior executive who worked at Il Makiage's head offices in Tel Aviv until 2023 and had a broad

view of all Il Makiage's stores, services, and programs in Israel. ¶63. CW1 indicated that AI was not used to generate sales in Israel. Given CW1's high level, work at Il Makiage's head offices, and overview of all Il Makiage's operations in Israel, CW1's statements raise a strong inference of scienter as to Defendant Holtzman's and Oddity's knowledge of the use of conventional methods, rather than technology to generate sales.

### 2. Defendants' Statements Concerned Oddity's Primary Source of Revenue and Core Operation, Further Supporting Scienter

Oddity's online sales and technology's prominence as the growth driver and thereby core operation of Oddity during the Class Period, which analysts and investors closely followed, further supports a strong inference of the Individual Defendants' scienter. Indeed, the Registration Statements explicitly label technology as "core to [Oddity's] business model" (¶129); the Registration Statement further proclaims "[w]e are a technology company at our core[.] *Id*.

Given the stated significance of technology and online sales to Oddity's performance, the Individual Defendants as Company officers "undoubtedly appreciated that" online sales and technology were core operations "importan[t] to the financial well-being and market perception of the Company[.]" *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 481 (S.D.N.Y. 2008)Consequently, Oddity's statements regarding these topics "represented … the most important metrics of [Oddity's] growth[,]" – ("With our rapidly growing user base, we are unlocking distribution for wellness and beauty online[]") ¶132; ("We have built a platform of over 40 million users that we have direct access to and have generated over 1 billion unique data points[.]) *Id*.

This contributes to an inference that Defendants' Class Period misstatements were made with scienter. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 459, n.20 (S.D.N.Y. 2005) (individual defendants "should have been aware" of information underlying their company's "fastest growing division"). The Court should thus "infer that [the C]ompany and its senior

executives [had] knowledge of … events affecting a significant source of revenue." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019)

Further, the Individual Defendants had a "duty to familiarize themselves with the facts relevant to the core operations of [Oddity]" to sign Oddity's SEC filings (¶¶166, 204). *In re MF Global*, 982 F. Supp. 2d at 319 (finding duty where officer-defendants who "demonstrated awareness" of pertinent financial accounting standards); *see also Alstom,* 406 F. Supp. 2d at 498. Some SEC filings contained alleged misstatements (¶¶129, 145), further demonstrating Defendants' scienter.

Far from there being "considerable doubt about whether the core operations doctrine survived enactment of the PSLRA, Defendants' cases concede the "core operations" doctrine is viable and that "[t]he majority of courts in the Second Circuit" agree. *See In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (finding scienter, in part, due to misstatements concerning "core operation"). Moreover, Defendants' cherry-picked *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323 (S.D.N.Y. 2011) is inapposite: there, "*none* of plaintiffs' other allegations support[ed] an inference of scienter," which was why the court found "the core operations doctrine [could] not bolster it." *Id.* at 343 (16% of company's business was not core).

### 3.    Defendants Were Motivated to Mislead Investors.

Defendant Holtzman as well as his longstanding business partner in Oddity, *L* Catterton, made millions of dollars as a result of Oddity's two offerings during the Class Period. *L* Catterton alone made over hundreds of millions of dollars  in profit on its $34 million investment in Oddity. SAC ¶¶55, 103, 106, 218. Holtzman sold 50% of his holdings for nearly $250 million in proceeds. *Id*. ¶ 218.  Such "concrete and personal benefit" from the profit from "extensive insider sales" can

support an inference of scienter. *Novak*, 216 F.3d at 307-08.; *see also Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85–86 (2d Cir. 1999) (sale of 40% of holdings indicative of scienter).

### C.  Plaintiffs Adequately Allege Loss Causation.

Defendants argue that, because the NINGI Report does not reveal any new information, and is expressed as an opinion, it did not reveal any new truth to the market and therefore is not a corrective disclosure. Def. Mem. at 32. Not so. In the Second Circuit, whether alleged misrepresentations adversely affect share price during the Class Period is a disputed factual issue for which resolution at the motion to dismiss stage is inappropriate. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (holding that where reasonable inferences must be drawn in favor of a non-moving party, trial court erred in granting of motion to dismiss on defendant's theory that lack of movement in stock price rendered alleged misrepresentations immaterial).

Additionally, the information Defendants contend is public is not actually public because it was hidden behind a language barrier and Oddity's public filings did not meaningfully disclose to investors the facts. *See* Part II.I.C.2, *supra*. The fact that the NINGI Report is based on a short-seller's opinion does not preclude it from revealing fraud. *In re Winstar Commc'ns,* No. 01 CV 11522, 2006 WL 473885, at \*14 (S.D.N.Y. Feb. 27, 2006) ("[a] defendant should not be rewarded by denying defrauded investors recovery simply because the information revealing the alleged fraud was a third party's opinion. . . [a]llegations that the market reacted negatively to an opinion or speculation which in fact exposes the falsity of defendants' representations can be sufficient to plead loss causation.").

### III.    Plaintiffs State a Claim for Control Person Liability.

Defendants move to dismiss Plaintiffs' claims under Section 15 of the Securities Act and Section 20(a) of the Securities Exchange Act primarily on the grounds that Plaintiffs fail to allege

a valid claim for primary liability. As set forth above, this is incorrect. As the alleged control persons also occupied management positions at Oddity and signed key SEC filings containing misrepresentations and omissions, they are sufficiently alleged to be "culpable participants" to be liable as control persons.

### III.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the motion be denied in its entirety. Alternatively, and in accordance with the Second Circuit's decision in *Loreley*, 797 F.3d at 190, Plaintiffs respectfully request leave to amend their complaint to cure any pleading defects.

Dated: July 28, 2025                                    Respectfully submitted,

                                                **LEVI & KORSINSKY, LLP**

                                                */s/ Nicholas Porritt*

                                                Nicholas I. Porritt
                                                33 Whitehall St, 27th Floor
                                                New York, NY 10004
                                                Tel: (212) 363-7500
                                                Fax: (212) 363-7171
                                                nporritt@zlk.com

                                                *Counsel for Lead Plaintiff Alex Gordon*

                                                **POMERANTZ LLP**
                                                Jeremy A. Lieberman
                                                J. Alexander Hood II
                                                James M. LoPiano
                                                600 Third Avenue, 20th Floor
                                                New York, NY 10016
                                                Tel: (212) 661-1100
                                                Fax: (917) 463-1044
                                                jalieberman@pomlaw.com
                                                ahood@pomlaw.com
                                                jlopiano@pomlaw.com

*Counsel for Plaintiff Brian Hoare*

**CERTIFICATE OF COMPLIANCE WITH WORD-COUNT**

I hereby certify that the foregoing document has been prepared using the Microsoft Word word-processing program and the word count function contained in Word calculates that the total words in this document, including footnotes but excluding the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, is 10,499 words and, therefore, it does not exceed the Court's limit of 10,500 words for memoranda of law as extended by the Court's order dated May 29, 2025 (ECF No. 65).

*/s/ Nicholas Porritt*
Nicholas I. Porritt